**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| H-Food Holdings, LLC, *et al.*,[1] | Case No. 24-90586 (ARP) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF ROBERT M. CARUSO,**
**CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT**
**OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Robert M. Caruso, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.      I am a Managing Director with Alvarez & Marsal North America, LLC (together with certain affiliates, "A&M") a restructuring advisory firm with numerous offices throughout the country.  A&M has been retained by each of the above captioned debtors and debtors in possession (collectively, the "Debtors", each individually, a "Debtor", and together with certain non-debtor affiliates, the "Company").  In connection with that retention, I have been appointed the chief restructuring officer (the "CRO") of the Company.  Prior to becoming the Debtors' CRO, I led the A&M team who served as one of the Debtors' principal financial advisors since September 2023.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783).  The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

2.      On November 22, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") in the United States Bankruptcy Court for the Southern District of Texas (this "Court") for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").   To facilitate the Debtors' transition into chapter 11, the Debtors have requested certain "first day" relief in various applications and motions filed with the Court (collectively, the "First Day Motions").  The First Day Motions, as applicable, seek relief intended to avoid immediate and irreparable harm to the Debtors' estates and to preserve their value, by, among other things, the use of cash collateral, and paying certain tax, prepetition, and administrative obligations to facilitate the Debtors' restructuring efforts.  The First Day Motions also seek certain procedural relief that will facilitate the Debtors' orderly transition into chapter 11.

3.      As a result of my service with the Company, review of relevant documents, and discussions with other members of the Company's management team and the professionals, I am familiar with the Company, and in particular the Debtors' day-to-day operations, business affairs, and books and records.  I am authorized to submit this declaration (the "Declaration") in support of the Petitions and the First Day Motions to assist the Court and other parties in interest in understanding the Company's corporate history, business operations, prepetition corporate and capital structure, and the circumstances leading to the commencement of these chapter 11 cases.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Company's management team and the Company's advisors, my review of relevant documents and information concerning the Company's financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the statements set forth in this Declaration on that basis.

## PRELIMINARY STATEMENT[2]

5.      Founded in 2009 with four manufacturing locations in Grand Rapids, Michigan, the Company has grown to be a deeply trusted, world-class contract manufacturer of food products. Today, as the only scale player focused on serving large consumer packaged goods ("CPG") customers in North America, the Company manufactures some of the most valued and recognizable food brands worldwide, with total sales volume of approximately 1,700 million pounds per year.  Currently operating in 28 well-equipped manufacturing and packaging facilities across 11 U.S. states and Canada, and employing approximately 12,100 women and men, the Company is a leading supplier and producer of nutrition bars, frozen packaged foods, meal kits, snacks, sauces, refrigerated trays, overwrap, custom packaging solutions, and more, to companies across the U.S. and Canada.  With best-in-class operational efficiency and a large-scale production network, the Company has become one of the fastest growing co-manufacturing and co-packaging companies in the food industry.

6.      Despite these accomplishments, the Company has experienced a series of operational challenges, including wage rate increase and inflation, industry headwinds, certain labor issues and transitions, and adverse publicity.  These operational challenges have been compounded by the Company's substantial debt service payments of approximately $225.1 million year-to-date in 2024, and prospective maturity of its First Lien Revolving Loans and First Lien Term Loans totaling approximately $2,102.5 million in November 2024 and May 2025, respectively.  In response, the Company implemented various operational initiatives to streamline its business—including network optimization initiatives, transitioning to a more permanent labor workforce, and pricing initiatives.  Between 2022 and 2024, the Company also

---

[2]    Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them in this Declaration.

closed several sale-leaseback transactions and divested certain non-core businesses, refocusing and reinvesting in its core North American business.  In parallel, to explore balance sheet deleveraging transactions, the Company engaged professionals with expertise in complex transactions to analyze additional strategic alternatives, including third-party financings and engagement with the Company's existing capital structure to assess, among other things, possible comprehensive solutions, and also supplemented its governance by appointing experienced independent fiduciaries to its board.

7.      This process has also included the Company's engagement with its capital structure. Starting in May 2024, the Company executed confidentiality agreements with ad hoc groups of holders of the Company's: First Lien Lenders (the "1L AHG"), Second Lien Term Loans (the "2L AHG"), and Senior Unsecured Notes (the "Notes AHG", together with the 1L AHG and the 2L AHG, the "Creditor Groups", and each a "Creditor Group"), to begin discussions around potential strategic alternatives.  With a goal of maintaining transparency and information parity across the Creditor Groups, in the months that followed, the Company held multiple diligence and management meetings, seemingly countless advisors calls and provided over 5,100 pages of diligence through a virtual data room to each set of Creditor Group advisors.  Through this engagement, the Company sought to build consensus around a holistic approach to the Company's financial challenges, operational headwinds, and near-term maturities.

8.      Ultimately, after months of arm's-length, good faith negotiations, the Company reached an agreement with certain Consenting Stakeholders (signatories to the RSA) and executed a Restructuring Support Agreement with holders of approximately 81.2% of the First Lien Lenders, 100% of the Second Lien Term Lenders, 77.7% of the Senior Unsecured Notes, and each of the Sponsors.  The Restructuring Support Agreement is attached hereto as **Exhibit B** (the "RSA").

9.     The RSA contemplates a comprehensive, value-maximizing transaction with a substantially deleveraged capital structure and an infusion of exit capital to revitalize and reinvest in the business.  The comprehensive solution is to be implemented through streamlined pre-arranged cases, funded by cash on hand, consensual use of cash collateral,[3] and a debtor-in-possession (the "DIP") facility that provides for $150 million of new money delayed-draw term loans and $150 million in the form of converted First Lien Term Loans on a dollar-for-dollar basis (the "DIP Financing"). Notably, the Debtors will not seek approval or access to the DIP Financing until the second-day hearing, but having this committed financing package sends a clear message to vendors, customers, and all stakeholders that the Debtors have: access to additional capital—in excess of its already ample liquidity ($212.9 million cash on hand as of the Petition Date), the confidence of the capital markets, and the resources necessary to successfully and efficiently complete their restructuring path through chapter 11.[4]

10.    The RSA provides the Company with a viable path forward and a framework to utilize the benefits and protections of chapter 11 and successfully exit chapter 11 in a timely fashion with the overwhelming support of the Company's prepetition capital structure.  The Company, with the support of the Consenting Stakeholders (as defined in the RSA) determined in its business judgment that filing these chapter 11 cases is the best path to implement and effectuate the restructuring embodied in the RSA, which will maximize value for all stakeholders.

---

[3]    In connection with the RSA and with the Creditor Groups' support, the Company has also agreed to dividend all the cash at Hearthside Sub, LLC–the Company's U.S. unrestricted subsidiary, into Hearthside Food Solutions, LLC bank account (the main operating account) for the benefit of the estates.

[4]    The details of the terms and the Company's need for the use of cash collateral and the DIP Financing are detailed in the *Declaration of Robert M. Caruso in Support of Debtors' (I) Emergency Motion for Entry of an Interim Order (A) Authorizing the Debtors' Use of Cash Collateral, (B) Granting Adequate Protection to the Prepetition First Lien Secured Parties, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief; and (II) Motion for Entry of a Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Authorizing the Use of Cash Collateral, (D) Modifying the Automatic Stay, and (E) Granting Related Relief*, filed substantially contemporaneously herewith.

11.     This Declaration is organized in four parts:

- *Part I* describes the Company's corporate history and business operations;

- *Part II* describes the Company's prepetition capital structure;

- *Part III* describes the circumstances leading to the filing of these chapter 11 cases; and

- *Part IV* discusses the First Day Motions.

## I.     Corporate History and Business Operations

12.     The Company was founded in 2009 and soon became the manufacturer of choice to both premier and emerging food companies across North America.  The Company operates a large-scale production network across the U.S. and Canada, consisting of 28 manufacturing facilities in California, Idaho, Illinois, Indiana, Kentucky, Michigan, Minnesota, Ohio, South Dakota, Utah, Virginia, and Canada.

13.     The Company's growth trajectory included a number of strategic acquisitions including its acquisition of Greencore U.S. in 2018—a leader in frozen contract packaging and a top producer of refrigerated sandwiches, entrees, and salad kits and Interbake Foods, LLC and Interbake Canada, Inc. in 2021—a leading baked goods manufacturer of cookies, cones, crackers and wafers.  The Company has grown its revenue from $145.0 million in 2009 to $3,302.9 million for the twelve months ended September 30, 2024.

### A.     The Debtors' Workforce and Headquarters

14.     As of Petition Date, the Debtors' labor force consists of approximately 12,100 total women and men, which includes approximately 11,000 permanent employees and approximately 1,100 temporary employees.  Of the Debtors' employees, approximately 1,200 are salaried employees and 9,800 are paid hourly.  Approximately 1,300 of the employees are hourly union employees represented by various unions which are governed by their respective collective

6

bargaining agreements.  The Debtors' corporate headquarters are located in Downers Grove, Illinois.

### B.    Product Portfolio

15.    The Company's product portfolio spans across four different platforms: (1) Refrigerated & Frozen; (2) Baking; (3) Bars & Components; and (4) Packaging (collectively, the "Business Segments").[5]  The Business Segments is described in more detail below:[6]

1. **Refrigerated & Frozen**:  Refrigerated & Frozen ("R&F") category can be further divided into "refrigerated and frozen" products and "fresh" products.  Products under R&F include sandwiches, ready meals, ingredient packets, and salad kits.  R&F accounted for 40.1% of the Company's net revenues in 2023.

2. **Baking**:  As the Company's leading product category, baking is comprised of two sub-segments: "bakeries" and "cones."  Baking products include cookies, crackers, baked snacks, cones, and ice-cream equipment, which collectively accounted for 32.4% of the Company's net revenues in 2023.

3. **Bars & Components**:  Products under Bars & Components include snack components, snack bars, granola, cereal enrobing, and functional bars.  Bars & Components constituted 15.6% of the Company's net revenues in 2023.

4. **Packaging**: The Company's business also includes packaging of various food products.  The products that the Company packages include snacks, cereal, cookies, crackers, candy, and dry pet food and treats.  Packaging accounted for 11.9% of the Company's net revenues in 2023.

### C.    Customers and Customer Contracts

16.    The Company believes it is the only contract manufacturing and packaging supplier with the capability to serve customers across more than 20 different product categories, making the Company an essential partner to many of its customers in their supply chain.  The criticality of the Company to its customers is reflected in the durability of its customer relationships: the

---

[5]    In 2023, the Company's aggregate net revenues, including all Business Segments, totaled approximately $3,546.9 million.

[6]    These figures were derived pro forma the 2023 sale of the Company's European nutritional functional bars business.

Company's major customers have had an average tenure of approximately 30 years, and the Company benefits from multiple relationship touchpoints with their customers across those organizations.

17.     The Company's contracts with its customers typically range between one to ten years in length and are structured into a master agreement which governs the overall relationship. In addition to the master agreement, there are specific project- or service-level agreements that outline the specific manufacturing and/or packaging relationship between the Company and the customer.  Generally, these contracts are structured to include descriptions of the key business terms (such as products and shipping terms, pricing, and yield allowances), the funding structure of the project (such as which party will bear the capital cost), and the backstop features (such as volume commitments and make-whole payments if volumes are not achieved to allow return on capital investment).

18.     The Company is also party to supplier finance agreements with certain of its customers pursuant to which the Company monetizes its receivables in exchange for cash to manage the Company's liquidity and operational flexibility (the "Supplier Finance Agreements"). These Supplier Finance Agreements have terms for as long as the Company's right to receive payment remains outstanding but are generally terminable on notice and have payment terms that vary between 5 to 16 days while the underlying receivables have payment terms between 30 to 120 days.  To provide the counterparties with additional comfort of the Company's continued intent to operate under the Supplier Finance Agreements, which are critical to preserving the Company's working capital, the Debtors have filed a motion contemporaneously herewith seeking continuation of the Supplier Finance Agreements.  Additional details can be found in the motion thereto.

## II.  THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

19.    A chart summarizing the Debtors' corporate structure is attached hereto as **Exhibit A**.  As of the Petition Date, the Debtors have approximately $2,752.5 million of funded principal debt obligations, consisting of the: (i) First Lien Loans; (ii) Second Lien Term Loans; and (iii) Senior Unsecured Notes.  Additionally, the Debtors' balance sheet includes capital lease obligations totaling approximately $304.8 million in the aggregate as of the Petition Date.

20.    The following table summarizes the Debtors' prepetition capital structure (as of the Petition Date) with respect to funded debt obligations outstanding in principal and capital lease obligations.

| Instrument | Approx. Amount Outstanding as of the Petition Date | Rate (Maturity) | Security |
|---|---|---|---|
| **First Lien Credit Agreement** | $2,102,468,969.5 | | |
| First Lien Revolving Loan | $199,999,804.6 excluding $0.8 million letter of credit obligations | Floating, SOFR + 2.25% ~ 2.75% (November 23, 2024) | Substantially all assets of each Borrower and each Guarantor, subject to customary exceptions and exclusions. |
| First Lien Term Loans | $1,902,469,164.9 | Floating, SOFR + 3.69% ~ 5.00% with 1.00% SOFR Floor as applicable (May 23, 2025) | |
| **Second Lien Credit Agreement** | | | |
| Second Lien Term Loan | $300,000,000.0 | Floating, SOFR + 7.00% (March 2, 2026) | Substantially all assets of each Borrower and each Guarantor, subject to customary exceptions and exclusions. |
| **Senior Unsecured Notes Indenture** | | | |
| Senior Unsecured Notes | $350,000,000.0 | Fixed, 8.50% (June 1, 2026) | No security; the Senior Unsecured Notes are general unsecured obligations of each Debtor |
| **Capital Lease Obligations** | | | |
| Sale-Leaseback | $304,849,000.0 | N/A | N/A |
| **Total (Approx.)** | **$3,057,317,969.5** | | |

A.      **First Lien Credit Agreement**

21.     On May 23, 2018, the Company entered into that certain credit agreement (as amended by that certain First Incremental Amendment to Credit Agreement, dated as of November 25, 2018, that certain Second Incremental Amendment to Credit Agreement, dated as of June 10, 2020, that certain Third Amendment to Credit Agreement, dated as of November 15, 2021, that certain Fourth Amendment and Third Incremental Amendment to Credit Agreement, dated as of December 29, 2021, that certain Fifth Amendment to Credit Agreement, dated as of June 12, 2023, and as further amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "<u>First Lien Credit Agreement</u>"), among Debtors H-Food Holdings, LLC (in such capacity, the "<u>First Lien US Borrower</u>") and Hearthside Bidco B.V (in such capacity the "<u>First Lien Dutch Borrower</u>", together with the First Lien US Borrower, the "<u>First Lien Borrowers</u>") as borrowers, Goldman Sachs Lending Partners LLC, as administrative and collateral agent (the "<u>First Lien Agent</u>"), and the lenders from time to time parties thereto.  The First Lien Credit Agreement consists of (i) a revolving credit facility in an aggregate principal amount equal to $200.0 million (the "<u>First Lien Revolving Loan</u>") with a maturity date of November 23, 2024 and bears an interest at a floating rate of SOFR plus a rate spread from 2.25% to 2.75% depending on certain leverage ratios, and a commitment fee based on the unused portion of the facility at a rate of 0.25% to 0.50% per annum depending on the applicable first lien net leverage ratio then in effect, and (ii) first lien term loans in the aggregate principal amount of $1,902.5 million (the "<u>First Lien Term Loan</u>") with a maturity date of May 23, 2025 and bears an interest at a floating rate of SOFR plus 3.6875% to 5.00% with 0.00% or 1.00% SOFR floor, as applicable.  Of the First Lien Term Loan, $62.2 million was allocated to the First Lien Dutch Borrower (the "<u>Dutch Allocation</u>").  The Dutch Allocation has since been paid in full,

and Hearthside Cooperatief U.A. and Hearthside Bidco B.V. have been released from their obligations as security providers and/or guarantors with respect to the First Lien Loans.[7]

22.     As of the Petition Date, approximately $200.0 million of principal remains outstanding on the First Lien Revolving Loan, excluding approximately $0.8 million in outstanding letters of credit obligations and approximately $1,902.5 million of principal remains outstanding on the First Lien Term Loans.

23.     Pursuant to that certain Guaranty, dated as of May 23, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified, the "First Lien Guaranty Agreement"), the obligations of the First Lien Borrowers under the First Lien Credit Agreement are guaranteed by Matterhorn Buyer, LLC and certain subsidiaries of Matterhorn Buyer, LLC (the "Guarantors"). Each of the Debtors other than HFS Matterhorn Topco, Inc., Matterhorn Parent, LLC, and Matterhorn Intermediate, LLC, are either obligors or Guarantors with respect to the First Lien Loans.[8]

24.     The obligations of the First Lien Borrowers and Guarantors under the First Lien Credit Agreement are secured by substantially all of the assets of each of the First Lien Borrowers and the First Lien Guarantors pursuant to that certain First Lien Security Agreement, dated as of May 23, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified the "First Lien Security Agreement"), subject to customary exceptions and exclusions. Notably, the Debtors' bank accounts are not subject to deposit account control agreements in favor of the collateral agent for the First Lien Term Loan.

---

[7]     Contemporaneously with the release from the First Lien Loans, Hearthside Cooperatief U.A. and Hearthside Bidco B.V. were also released from their obligations as security providers and/or guarantors from the Second Term Loan and Senior Unsecured Notes.

[8]     The non-Debtor subsidiaries, including the US Unsub are not Guarantors or otherwise obligors with respect to the First Lien Loans.

###### B.      Second Lien Credit Agreement

25.      On November 25, 2018, Debtors H-Food Holdings, LLC entered into that certain second lien credit agreement (as amended by that certain First Amendment to Second Lien Credit Agreement, dated as of June 23, 2024, and as further amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Second Lien Credit Agreement"), among H-Food Holdings, LLC as borrower (in such capacity, the "Second Lien Borrower"), Ares Capital Corporation as administrative and collateral agent (the "Second Lien Agent"), and the lenders from time to time parties thereto (the "Second Lien Term Lenders"), pursuant to which the Second Lien Term Lenders agreed to provide the Second Lien Borrower with a second lien term loan facility in the aggregate principal amount of $300.0 million (the "Second Lien Term Loan").

26.      The Second Lien Term Loan has a maturity date of March 2, 2026 and bears interest at a floating rate of SOFR plus 6.50% to 7.00% with a 0.00% SOFR floor, as applicable.  As of the Petition Date, there is $300.0 million of principal outstanding on the Second Lien Term Loan. Pursuant to that certain Second Lien Guaranty, dated as of November 25, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Second Lien Guaranty Agreement"), the obligations of the Second Lien Borrower under the Second Lien Credit Agreement are guaranteed by the Guarantors.  Each of the Debtors other than HFS Matterhorn Topco, Inc., Matterhorn Parent, LLC, and Matterhorn Intermediate, LLC are either obligors or Guarantors with respect to the Second Lien Term Loan.[9]

27.      The obligations of the Second Lien Borrower and Guarantors under the Second Lien Credit Agreement are secured by substantially all of the assets of Second Lien Borrower and

---

[9]      For the avoidance of doubt, the non-Debtor subsidiaries, including the US Unsub are not Guarantors or otherwise obligors with respect to the Second Lien Loans.

the Guarantors pursuant to the Second Lien Security Agreement, dated as of November 25, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified the "<u>Second Lien Security Agreement</u>"), subject to customary exception and exclusions.  The Debtors' bank accounts are not subject to deposit account control agreements in favor of the collateral agent for the Second Lien Term Loan.

        **C.**      **Intercreditor Agreement**

28.     On November 25, 2018, the First Lien Agent, acting in its capacity as the First Lien Agent and representative of holders of First Lien Loans, and Second Lien Agent, acting in its capacity as the Second Lien Agent and representative of holders of Second Lien Term Loans entered into that certain junior lien intercreditor agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition) (the "<u>Intercreditor Agreement</u>").

29.     The Intercreditor Agreement, among other things, governs the relative contractual rights of the lenders of First Lien Loans (the "<u>First Lien Lenders</u>") and the Second Lien Term Lenders. The Intercreditor Agreement controls the rights and obligations of holders of obligations outstanding under the First Lien Credit Agreement and the Second Lien Credit Agreement with respect to, among other things, priority, matters of debtor-in-possession financing, the use of cash collateral and adequate protection. Any liens held by or on behalf of the First Lien Agent or any First Lien Lender on the Common Collateral (as defined in the Intercreditor Agreement) that secures obligations under the First Lien Credit Agreement are senior in priority to liens granted to the Second Lien Agent or any Second Lien Term Lender on the Common Collateral (as defined in the Intercreditor Agreement) that secures obligations under the First Lien Credit Agreement.

D.      **Senior Unsecured Notes Indenture**

30.      H-Food Holdings, LLC and Hearthside Finance Company, Inc. (together, in such capacities as "<u>Issuers</u>") entered into that certain Indenture, dated as of May 23, 2018 (as supplemented by Supplemental Indenture No. 1, dated as of May 23, 2018, as supplemented by the First Supplemental Indenture dated as of November 26, 2018, supplemented by Supplemental Indenture No. 2, dated as of March 29, 2022, as supplemented by the Supplemental Indenture dated as of September 11, 2024, and as further amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "<u>Senior Unsecured Notes Indenture</u>") with U.S. Bank National Association as trustee (the "<u>Senior Unsecured Notes Indenture Trustee</u>"), pursuant to which the Issuers issued senior unsecured notes in an original principal amount of $350.0 million in exchange for cash in the same amount (all such notes issued pursuant to the Senior Unsecured Notes Indenture, the "<u>Senior Unsecured Notes</u>").

31.      The Senior Unsecured Notes have a maturity date of June 1, 2026, and bear interest at a fixed rate of 8.50%.  As of the Petition Date, there is $350.0 million of principal outstanding under the Senior Unsecured Notes Indenture.  The obligations of Issuers under the Senior Unsecured Notes Indenture are guaranteed by the Guarantors pursuant to the Senior Unsecured Notes Indenture.  Each of the Debtors, other than HFS Matterhorn Topco, Inc., Matterhorn Parent, LLC, and Matterhorn Intermediate, LLC are either Issuers or Guarantors with respect to the Senior Unsecured Notes.

E.      **Capital Leases**

32.      The Company is  also party to a series of capital leases entered-into in connection with a series of sale-leaseback transactions occurring in 2022 and 2023 (collectively, the "<u>Sale-Leaseback Transactions</u>").   The Company accounts for the Sale-Leaseback Transactions as financing transactions with the purchaser of the properties in accordance with relevant accounting

standards, as these agreements are deemed to be capital leases. As of the October 2024, the Debtors' books and records reflect a balance totaling approximately $304.8 million on account of such capital leases.

**F.      General Unsecured Claims**

33.      In the ordinary course of business, the Company incurs obligations to vendors, suppliers, and trade counterparties, including, but not limited to, employees, critical vendors, and customers. As of the Petition Date, the Debtors estimate they have approximately $164.2 million in accounts payable outstanding before application of any setoffs, credits, or deductions that may be available to the Debtors, including claims that may be entitled to priority (e.g., under section 503(b)(9)) of the Bankruptcy Code.

**III.    EVENTS LEADING TO THESE CHAPTER 11 CASES**

34.      As detailed herein, these chapter 11 cases arose from a number of factors that led to the need to de-lever the Company's balance sheet, with chapter 11 being the best option to accomplish such goal while maximizing value for all stakeholders.

**A.      Wage Rates, Inflation, Industry Headwinds, Labor Transition and Capital Structure Overhang**

**1.      Wage Rates and Inflation**

35.      Significant wage rate increases connected to overall inflation growth has adversely affected the Company's financials. In the last three years, wage rates have increased by 17.2% in the aggregate compared to 2021. Such wage pressure has, in turn, imposed substantial pressure on the Company's operating margins as the Company has been unable to completely "pass through" such increased costs. For example, price increases on certain of the Company's customer contracts are tied to changes in the Producer Price Index (PPI) or the Consumer Price Index (CPI), which

have not moved in lockstep with overall wage inflation. Additionally, the Company's more general efforts to increase pricing has been challenged by food price inflation more generally.

### 2.   Industry Headwinds

36.     In addition to the inflationary pressures, the Company, like many similarly situated businesses, has been impacted by the industry headwinds. Post-COVID, stay-at-home trends have reversed, resulting in consumption pullback of retail and at-home food products. In addition, consumer behavior had oriented towards value shopping and lower price, lower margin products, which has continued into 2024. As of November 2024, market volume trends have remained relatively flat across all four of the Company's platforms: Refrigerated & Frozen, Baking, Bars & Components, and Packaging. Key customers' external guidance has highlighted the same trends; including a softness in volume and challenges in driving increased revenue via pricing.



37.     These challenges in consumer demand have been particularly damaging for co-manufacturers such as the Company relative to the CPGs. For example, certain customer contracts allow customers to reduce volume from the Company without any penalties because there are no minimal annual volume requirements, as opposed to "take or pay" agreements. Thus, where the CPG is the main manufacturer, it often responds to declining demand by reducing excess

manufacturing volumes contracted to co-manufacturers like the Company, while leaving in-house volumes unchanged for as long as possible.  When this occurs, it leaves the co-manufacturers (like the Company) with open capacity and fixed overhead costs, leading to lower profitability.

38.     The combination of these industry and operational challenges are contributing causes for the Company's operating results declining from adjusted EBITDA of $258 million for the year ended December 31, 2021[10] to the projected full-year adjusted EBITDA of approximately $184 million for the year ended December 31, 2024.

### 3.     Labor Considerations and Transition

39.     In February 2023, the Company was the subject of a *New York Times* article raising certain labor issues which the Company maintains were principally connected to one or more third-party staffing agencies.  The Company vigorously disputes the bases for the allegations raised by the *New York Times*, but the effects of that article were immediate and severe: adverse media attention, customer scrutiny, and a series of investigations begun by different government bodies.

40.     For its part, the Company responded forcefully to review, assess, and further enhance its own labor policies and practices.  The Company has made significant investments to ensure its ability to provide a strong employee base that is fully compliant with applicable laws and regulations, including by substantially reducing its use of third-party staffing agencies and ensuring that all employees are subject to appropriate identification, eligibility, and verification procedures.  Additionally, the Company has been fully cooperative and actively engaged with government officials and regulators.  Although certain of these government investigations remain ongoing, the Company does not expect such investigations to result in material judgments, fines,

---

[10] This figure was derived pro forma the 2023 sale of the Company's European nutritional functional bars business.

or penalties, if any; but the ultimate amounts cannot be predicted with any certainty. The Debtors intend to vigorously assert their rights with respect to judgments, fines, or penalties, if any.

41.     The Company has communicated to its labor force, as well as to its customers and applicable regulators, the proactive investments made, and actions taken, by the Company to ensure it has the best-in-class workforce across its facilities.

### 4.     Capital Structure Overhang

42.     These operational challenges have, in turn, created additional challenges with respect to the Company's funded debt load. As noted above, the Company's debt balance totals approximately $3,057.3 million including capital leases. In 2024, debt service payments will total approximately $301.5 million including debt service payments otherwise falling due in December 2024. The Company also estimates that debt-service payments for 2025 will total approximately $283.2 million if the capital structure remains unchanged. The substantial size of the debt-service payments and its maturity profile put significant pressure on the business. The Company's First Lien Revolving Loans, with a total of approximately $200 million outstanding[11], matures on November 23, 2024, and the Company's First Lien Term Loans, with a total of approximately $1,902.5 million outstanding, matures in May 2025.

43.     The Company's balance sheet profile has also been the subject of focus from ratings agencies, with the Company experiencing downgrades including a downgrade to 'CCC-' from 'CCC' by S&P Global Ratings in June 2024, and a downgrade to 'Caa3' from 'Caa1' by Moody's Rating in April 2024. Such downgrades have, in turn, exacerbated the Company's substantial operating challenges.

---

[11]   Excluding outstanding letters of credit totaling approximately $0.8 million.

**B.      Prepetition Operational Initiatives**

44.      The Company implemented various strategic actions to deliver EBITDA and margin expansion which included growing its commercial engine and implementing various operational initiatives.   Among other things, the Company focused on strengthening its relationship with existing customers, gaining further market share in existing product categories, expanding into Private Label offerings and new product categories with opportunities to win new customers, and initiating pricing optimization strategies to account for inflationary pressures. Furthermore, the Company also implemented network consolidation by closing certain of its underperforming plants and moving the existing volume to other plants to leverage fixed overhead costs.

45.      To streamline the Company's business and focus on the Company's core platforms, the Company also engaged in various asset sales in 2023 and 2024.  In 2023, the Company sold its European nutritional functional bars business which generated approximately €235.0 million, with such cash proceeds held by ROS B.V., the Company's Dutch unrestricted subsidiary.  In July 2024, the Company repatriated approximately $187.9 million of the cash proceeds to Hearthside Sub, LLC, (the "US Unsub"),[12] which for the avoidance of doubt, is not an obligor or guarantor on the Company's prepetition debt.  In the first quarter of 2024, the Company continued to divest its non-core assets.

**C.      Strategic Review and Lender Engagement**

**1.      Engagement of Restructuring Advisors**

46.      In November 2022, the Company engaged Ropes & Gray LLP ("Ropes & Gray") and Evercore Inc. ("Evercore"), to assist with operational and balance sheet concerns, and

---

[12]   The remaining balance on these sale proceeds was utilized to, among other things, pay in full the Dutch Allocation totaling approximately $62.2 million

assistance with prepetition initiatives and engagement with the existing lenders under the Company's capital structure.  In September 2023, the Company also engaged me and my team—A&M, to assist in the Company's operational and strategic analyses.

### 2.    Appointment of Special Committee

47.    In November 2023, two experienced independent fiduciaries, Patrick Bartels and Carol Flaton, were appointed to the Company's board.  Mr. Bartels and Ms. Flaton constitute a supervisory committee tasked with authority to oversee the Debtors' strategic initiatives (the "Special Committee") and Mr. Bartels and Ms. Flaton have exercised day-to-day oversight over the Company's strategic process since December 2023.  Additionally, Mr. Bartels and Ms. Flaton were delegated the investigative authority with respect to affiliate transactions and potential claims and causes of action against directors and officers.

### 3.    Financing Efforts

48.    Beginning in early 2024, with the assistance of the Company's advisors and in anticipation of the upcoming maturities and desire to reach a comprehensive solution while it still had liquidity runway, the Company engaged in earnest with its prepetition creditors and various potential third-party financing sources, regarding, among other things an accounts-receivables securitization and a "1.5 lien" financing structure.  In this process, the Company, with the assistance of their advisors, engaged with a number of prospective financing parties and provided substantial access, diligence, and analysis.  Albeit these financing efforts produced few actional proposals, none offered a holistic resolution to the Company's challenges—including the significant, looming debt maturities.

### 4. Strategic Engagement

49.     In May 2024, the Company signed confidentiality agreements with each Creditor Group to explore a comprehensive strategic transaction.  As noted above, this process involved extensive diligence, engagement, and dialogue.  Among other things, the Company held management meetings and diligence calls to explain the Company's business trajectory, development pipeline, and profile, and sought to encourage parties to engage constructively in turn.  This process also involved numerous in-person and virtual meetings between advisors and principals.  Finally, after months of good faith, arm's-length negotiations, the Company was successful in driving consensus around a comprehensive restructuring transaction with holders of approximately 81.2% of First Lien Loans, 100% of Second Lien Term Loans, and 77.7% of Senior Unsecured Notes and the Sponsors.

50.     The RSA contemplates, among other things: (i) the consensual use of cash collateral on an interim; (ii) a DIP facility that provides for $150 million of new money delayed-draw term loans, and $150 million in the form of converted First Lien Term Loans on a dollar-to-dollar basis, to be approved on a final basis (together with the final approval of the use of cash collateral) (iii) a $200 million equity rights offering; (iv) certain case milestones to drive forward a streamlined case timeline, and (v) importantly, support by the Consenting Stakeholders who represent a substantial majority of the Company's prepetition capital structure.  Also, in connection with the RSA and the Creditor Group consensus, the Company has agreed to dividend the US Unsub cash to Hearthside Food Solutions, LLC bank account (the main operating account) for the benefit of the estates.

51.     Importantly, the RSA provides the Company with a viable path forward and a framework to successfully exit chapter 11 in a timely fashion with the support of a substantial majority of the Company's capital structure.  The restructuring made possible by the RSA presents

the most cost-effective path to a timely emergence from chapter 11 through settlement and compromise rather than litigation.  The signing of the RSA was undertaken only after careful consideration by the Company's management, the Special Committee, and the governing bodies, in consultation with their experienced financial and legal advisors.  Critically, the Company's obligations under the RSA remain subject to their fiduciary duties as debtors and debtors in possession to maximize the value of their estates.  Based on the foregoing, the Company believes they have exercised reasonable business judgment in their decision to execute the RSA and that such execution was in the best interest of all parties in interest.

## IV.     FIRST DAY MOTIONS AND RELATED RELIEF REQUESTED

52.     In connection with the filing of their chapter 11 petitions, the Debtors filed the below-listed First Day Motions requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption and loss of value during these chapter 11 cases.  The facts set forth in each of the First Day Motions are incorporated herein in their entirety.[13]

> (i)      **Administrative Motions:**
>
> (1)      Joint Administration Motion.  *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief*;
>
> (2)      Claims Agent Application.  *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent*;
>
> (3)      Creditor Matrix Motion.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to File a Consolidated (A) Creditor Matrix and (B) Top 30 Creditors List, (II) Authorizing Redaction of Certain Personal Identification Information, (III) Approving Form and Manner of Notifying Creditors of*

---

[13]   Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

*Commencement of Chapter 11 Cases and (IV) Granting Related Relief*; and

(4)    <u>Schedules and SOFA Extension Motion</u>.  *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, and (D) Statements of Financial Affairs, and (II) Granting Related Relief*.

**(ii)    Financing Motions:**

(5)    <u>Supplier Finance Motion</u>.  *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors' Continuation of Certain Supplier Financing Arrangements and (B) Granting Related Relief*; and

(6)    <u>Hedging Motion.</u>  *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Performing Under Their Prepetition Hedge Contracts and (B) Enter Into, and Perform Under, New Postpetition Hedge Contracts, (II) Modifying the Automatic Stay, and (III) Authorizing Debtors to Assume Prepetition Hedge Contracts*.

**(iii)    Operational Motions:**

(7)    <u>Cash Management Motion</u>.  *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions, and (II) Granting Related Relief*;

(8)    <u>Insurance Motion</u>.  *Debtors' <u>Emergency</u> Motion for Entry of An Order (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage And (Ii) Granting Related Relief*;

(9)    <u>Taxes Motion</u>.  *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief*;

(10)    <u>Utilities Motion</u>.  *Debtors' <u>Emergency</u> Motion for Entry of an Order (I)(A) Approving Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Services, (B) Approving Debtors' Proposed Procedures for Resolving Adequate Assurance Requests,*

*and (C) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (II) Granting Related Relief;*

(11) <u>Wages Motion</u>. *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations, and (II) Granting Related Relief;*

(12) <u>Critical Vendor Motion</u>. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors, Section 503(b)(9) Claimants, Paca Claimants, and Lien Claimants, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests, and (III) Granting Related Relief;*

(13) <u>Customer Programs Motion</u>. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Performing Under Customer Contracts, (B) Honor Certain Prepetition and Postpetition Customer Obligations, and (C) Honor Prepetition Obligations Related Thereto in the Ordinary Course of Business, and (II) Granting Related Relief; and*

(14) <u>Lease Rejection Motion</u>. *Motion of Debtors for an Order (I) Authorizing Rejection of an Unexpired Lease Nunc Pro Tunc to Petition Date and (II) Granting Related Relief.*

**(iv)  Other Relief**

(15) <u>NOL Motion</u>. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in Debtors and (B) Claims of Certain Worthless Stock Deductions and (II) Granting Related Relief.*

53.   The First Day Motions request authority to, among other things, honor workforce-related compensation and benefits obligations, pay claims of certain taxing authorities and critical vendors, continue to honor certain customer programs, extend the deadline for filing schedules of assets and liabilities and statements of financial affairs, reject certain unexpired lease, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these chapter 11

cases. For the avoidance of doubt, the Debtors request authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

54. The Debtors have tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates. I believe an orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm. Other requests for relief will be deferred for consideration at a later hearing.

55. I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein. The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other corporate officers and advisors and I can attest to such facts. I believe the relief requested in each of the First Day Motions listed above (a) is necessary to allow the Debtors to operate with minimal disruption and productivity losses during these chapter 11 cases, (b) is critical to ensure the maximization of value of the Debtors' estates, (c) is essential to achieving a successful reorganization, and (d) serves the best interests of the Debtors' stakeholders.

## CONCLUSION

56. The Debtors' ultimate goal in these chapter 11 cases is to achieve an orderly, efficient, consensual, and successful reorganization and value maximizing result for the Debtors' stakeholders. To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of these chapter 11 cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief

requested by the First Day Motions, the prospect for achieving these objectives will be substantially enhanced.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 22, 2024                    /s/ *Robert M. Caruso*
                                            Robert M. Caruso
                                            Chief Restructuring Officer
                                            H-Food Holdings, LLC, and its debtor
                                            affiliates