**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| H-Food Holdings, LLC, *et al.*,[1] | Case No. 24-90586 (ARP) |
| Debtors. | (Jointly Administered) |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF H-FOOD HOLDINGS, LLC AND ITS AFFILIATED DEBTORS**

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
Matthew M. Roose (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

- and -

**ROPES & GRAY LLP**
Stephen L. Iacovo (admitted *pro hac vice*)
191 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Jack M. Eiband (TX Bar No. 24135185)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  December 13, 2024
          Houston, Texas

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783).  The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

## **TABLE OF CONTENTS**

**Page**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**.................................................................................1

| | | |
|---|---|---|
| A. | Defined Terms | 1 |
| B. | Rules of Interpretation | 17 |
| C. | Computation of Time | 17 |
| D. | Governing Law | 18 |
| E. | Reference to Monetary Figures | 18 |
| F. | Reference to the Debtors | 18 |
| G. | Controlling Document | 18 |
| H. | Certain Consent Rights | 18 |

**ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS**.................................18

| | | |
|---|---|---|
| A. | Administrative Claims | 19 |
| B. | DIP Claims | 19 |
| C. | Professional Fee Claims | 20 |
| D. | Priority Tax Claims | 21 |

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ...........21

| | | |
|---|---|---|
| A. | Summary of Classification | 21 |
| B. | Treatment of Claims and Interests | 22 |
| C. | Special Provision Governing Unimpaired Claims | 27 |
| D. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | 27 |
| E. | Subordinated Claims | 28 |
| F. | Elimination of Vacant Classes | 28 |
| G. | Voting Classes; Presumed Acceptance by Non-Voting Classes | 28 |
| H. | Controversy Concerning Impairment | 28 |
| I. | Intercompany Interests | 28 |

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ...............................................28

| | | |
|---|---|---|
| A. | Finality of Distributions | 28 |
| B. | No Substantive Consolidation | 29 |
| C. | Sources of Consideration for Plan Distributions | 29 |
| D. | Letters of Credit | 29 |
| E. | Exit Revolving Facility | 29 |
| F. | Exit First Lien Term Loans | 30 |
| G. | Reorganized Equity | 30 |
| H. | New Organizational Documents | 30 |
| I. | New Board | 31 |
| J. | Employee Matters | 31 |
| K. | Corporate Existence | 31 |
| L. | Vesting of Assets in the Reorganized Company | 32 |
| M. | Cancellation of Existing Interests, Indebtedness, and Other Obligations | 32 |
| N. | Corporate Action | 33 |
| O. | Effectuating Documents; Restructuring Transactions | 34 |
| P. | Equity Rights Offering and Equity Rights Offering Backstop Commitment Agreement | 34 |
| Q. | Exemption from Certain Taxes and Fees | 35 |
| R. | Preservation of Causes of Action | 35 |

S.      Insurance Policies ............................................................................................... 36
T.      Management Incentive Plan .................................................................................. 37
U.      Subordination Agreements .................................................................................... 37
V.      Payment of Second Lien Ad Hoc Group Advisors and Senior Unsecured Notes Ad Hoc
        Group Advisors ..................................................................................................... 38
W.      Closing of Chapter 11 Cases ................................................................................ 38
X.      Dissolution of Certain Debtors ............................................................................ 38

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES .......................................................................................................... 39**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases .................. 39
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ................... 39
C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ................ 40
D.      Dispute Resolution ............................................................................................... 40
E.      Modifications, Amendments, Supplements, Restatements, or Other Agreements ........ 41
F.      Reservation of Rights ........................................................................................... 41
G.      Nonoccurrence of Plan Effective Date; Bankruptcy Code Section 365(d)(4) .............. 41

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ......................................... 42**

A.      Timing and Calculation of Amounts to Be Distributed ............................................ 42
B.      Rights and Powers of Distribution Agent ............................................................... 42
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ................... 42
D.      Securities Registration Exemption ........................................................................ 44
E.      Compliance with Tax Requirements ....................................................................... 45
F.      Allocations .......................................................................................................... 45
G.      No Postpetition Interest on Claims ........................................................................ 45
H.      Setoffs and Recoupment ...................................................................................... 46
I.      Claims Paid or Payable by Third Parties ................................................................ 46

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,
        AND DISPUTED CLAIMS ................................................................................ 47**

A.      Allowance of Claims and Interests ........................................................................ 47
B.      Claims and Interests Administration Responsibilities .............................................. 47
C.      Estimation of Claims ............................................................................................ 47
D.      Adjustment to Claims Register Without Objection .................................................. 48
E.      Time to File Objections to Claims ......................................................................... 48
F.      Disallowance of Claims ........................................................................................ 48
G.      Amendments to Claims ......................................................................................... 48
H.      No Distributions Pending Allowance ..................................................................... 48
I.      Distributions After Allowance ............................................................................... 49
J.      Single Satisfaction of Claims ................................................................................ 49

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
        PROVISIONS ................................................................................................... 49**

A.      Compromise and Settlement of Claims, Interests, and Controversies ......................... 49
B.      Discharge of Claims and Termination of Interests ................................................... 49
C.      Releases by the Debtors ....................................................................................... 50
D.      Releases by Holders of Claims and Interests .......................................................... 51
E.      Exculpation ......................................................................................................... 52
F.      Injunction ........................................................................................................... 52
G.      Subordination Rights ........................................................................................... 54

H.     Release of Liens ........................................................................................................... 54
I.      Waiver of Statutory Limitations on Releases ............................................................... 54

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ................. 55**

A.    Conditions Precedent to the Plan Effective Date ......................................................... 55
B.    Waiver of Conditions .................................................................................................. 56
C.    Substantial Consummation .......................................................................................... 56
D.    Effect of Non-Occurrence of Conditions to the Plan Effective Date ........................... 56

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .............. 56**

A.    Modification and Amendments .................................................................................... 56
B.    Effect of Confirmation on Modifications ..................................................................... 57
C.    Revocation or Withdrawal of the Plan ......................................................................... 57

**ARTICLE XI. RETENTION OF JURISDICTION ..................................................................... 57**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ..................................................................... 59**

A.    Immediate Binding Effect ........................................................................................... 59
B.    Additional Documents ................................................................................................ 60
C.    Payment of Statutory Fees .......................................................................................... 60
D.    Reservation of Rights .................................................................................................. 60
E.    Successors and Assigns ............................................................................................... 60
F.    Service of Documents ................................................................................................. 60
G.    Term of Injunctions or Stays ....................................................................................... 63
H.    Entire Agreement ........................................................................................................ 63
I.     Nonseverability of Plan Provisions ............................................................................. 63
J.     Dissolution of Committee ............................................................................................ 64
K.    Expedited Tax Determination ...................................................................................... 64
L.    Creditor Default .......................................................................................................... 64

## INTRODUCTION

H-Food Holdings, LLC, and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each, a "***Debtor***" and, collectively, the "***Debtors***") jointly propose this *Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and Its Affiliated Debtors*. Capitalized terms used but not otherwise defined shall have the respective meanings ascribed to such terms in <u>ARTICLE I.A</u> of the Plan. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.   *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "***Adjourned Cure Dispute***" shall have the meaning ascribed to such term in <u>ARTICLE V.D</u> of the Plan.

2.    "***Administrative Claim***" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

3.    "***Administrative Claims Bar Date***" means the first Business Day that is thirty (30) days following the Plan Effective Date, except as specifically set forth in the Plan or a Final Order, including the Claims Bar Date Order.

4.    "***Administrative Claims Objection Bar Date***" means the First Business Day that is 180 days after the Plan Effective Date; provided that such date may be extended by the Bankruptcy Court at the Reorganized Debtors' request after notice and a hearing.

5.    "***Affiliates***" means "Affiliates" as set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

6.    "***Allowed***" means, as to a Claim or Interest, a Claim or an Interest expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, the Debtors (with the consent of the Required Consenting First Lien Lenders, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable

nonbankruptcy law; *provided*, *however*, that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

7.      "***Assumption Dispute***" means a pending objection relating to assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

8.      "***Assumption Schedule***" means the schedule of Executory Contracts and/or Unexpired Leases that will be assumed by the Debtors pursuant to the Plan, or assumed by the Debtors and assigned to another Entity pursuant to the Plan, to be Filed as part of the Plan Supplement, and as may be amended, supplemented, or modified from time to time in accordance with the Plan.

9.      "***Avoidance Actions***" means any and all actual or potential claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 552, and 553(b) of the Bankruptcy Code, and applicable non-bankruptcy law.

10.     "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §101–1532, as amended.

11.     "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases, and, to the extent any reference made under section 157 of the Judicial Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of the District Court having jurisdiction over the Chapter 11 Cases under section 151 of the Judicial Code.

12.     "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code, chambers rules, and local bankruptcy rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

13.     "***Business Day***" means any day, other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York.

14.     "***Cash***" means the legal tender of the United States of America or the equivalent thereof.

15.     "***Cash Collateral Order***" means the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition First Lien Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 83].

16.     "***Cause of Action***" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions

arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

17.    "*Chapter 11 Cases*" means (i) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (ii) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

18.    "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

19.    "*Claims Bar Date*" means the applicable bar date by which Proofs of Claim must be Filed, as established by a Final Order of the Bankruptcy Court or the Plan; *provided that* if there is a conflict relating to the bar date for a particular Claim, the Plan shall control.

20.    "*Claims Bar Date Order*" means a Final Order entered by the Bankruptcy Court establishing the Claims Bar Date.

21.    "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) the first Business Day that is at least 180 days after the Plan Effective Date, and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors Filed before the first Business Day that is at least 180 days after the Plan Effective Date.

22.    "*Claims Register*" means the official register of Claims maintained by Kroll Restructuring Administration LLC, as the claims, noticing, and solicitation agent in the Chapter 11 Cases.

23.    "*Class*" means any group of Claims or Interests classified under the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

24.    "*Company Parties*" means Matterhorn Buyer, LLC and each of its debtor affiliates that are signatory to the Restructuring Support Agreement.

25.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

26.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order.

27.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

28.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29.    "*Consenting Creditors*" means the Consenting First Lien Lenders, the Consenting Second Lien Term Loan Lenders, and the Consenting Senior Unsecured Noteholders.

30.    "*Consenting First Lien Lenders*" means the beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, First Lien Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement.

31.     "***Consenting Second Lien Term Loan Lenders***" means the beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement.

32.     "***Consenting Senior Unsecured Noteholders***" means the beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, Senior Unsecured Note Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement.

33.     "***Consenting Sponsors***" means, collectively, SnackTime PG Holdings, Inc., Snack Time Summit Holdings, Inc., and CB Metafora Aggregator, LLC.

34.     "***Consenting Stakeholders***" means, collectively, the Consenting Creditors and the Consenting Sponsors.

35.     "***Consummation***" means the occurrence of the Plan Effective Date.

36.     "***Creditors' Committee***" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on December 4, 2024 [Docket No. 134] and reconstituted on December 5, 2024 [Docket No. 140], as such committee may be further reconstituted from time to time.

37.     "***Cure Claim***" means a Claim based upon the applicable Debtor's monetary defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the applicable Debtor pursuant to section 365 of the Bankruptcy Code.

38.     "***D&O Liability Insurance Policies***" means, collectively, all insurance policies (including any "tail policy" or run-off endorsement) that have been issued at any time to any of the Debtors as a first named insured providing directors', members', trustees', officers', or managers' liability coverage.

39.     "***Definitive Documents***" means the following: (a) the New Organizational Documents; (b) the Equity Rights Offering Documents; (c) the Exit Revolving Facility Documents; (d) the Exit First Lien Term Loan Facility Documents; (e) the Plan and the Plan Supplement; (f) the Disclosure Statement, the Disclosure Statement Order, and other Solicitation Materials; (g) the Confirmation Order; (h) the Cash Collateral Order, the DIP Documents and the DIP Order; (i) the non-procedural First Day Pleadings, all documents in connection therewith, and all orders pursuant thereto; (j) any employee or executive retention, incentive, or similar plan or proposal; and (k) any amendments, supplements, exhibits, schedules, appendices, or modifications to any of the foregoing and any related notes, certificates, agreements, and instruments (as applicable); and (l) any material settlement agreement relating to claims or causes of action brought against any Company Party (including, without limitation, any claims asserted by any Governmental Unit or entity).

40.     "***DIP Agent***" means the administrative agent, collateral agent, or similar entity under the DIP Credit Agreement, including any successors thereto.

41.     "***DIP Claims***" means claims arising on account of DIP Obligations.

42.     "***DIP Commitment Letter***" means the commitment letter with respect to the DIP Facility attached to the Restructuring Support Agreement as Exhibit D.

43.     "**DIP Credit Agreement**" means that certain *Superpriority Senior Secured Debtor-in-Possession Credit Agreement*, dated as of [•] (as amended, supplemented, or otherwise modified from time to time in accordance with its terms), by and among H-Food Holdings, LLC, as borrower, Matterhorn Buyer, LLC, as holdings, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, and the DIP Lenders, as approved by the DIP Order.

44.     "**DIP Documents**" means any documents governing the DIP Facility that are entered into in accordance with the Restructuring Term Sheet, the DIP Credit Agreement, the DIP Term Sheet, the DIP budget, the DIP Order, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

45.     "**DIP Facility**" means a super-priority senior secured debtor-in-possession credit facility in an aggregate principal amount of up to $300,000,000, consisting of two tranches: (i) a new money term loan available in two draws in the amount of $150,000,000 and (ii) a term loan facility in an aggregate principal amount of $150,000,000 resulting from the roll-up and exchange of certain of the First Lien Loans.

46.     "**DIP Lenders**" means the lenders with respect to the DIP Facility.

47.     "**DIP Obligations**" means all obligations arising under the DIP Documents.

48.     "**DIP Order**" means the Final Order of the Bankruptcy Court setting forth the terms of the Debtors' consensual use of cash collateral and debtor-in-possession financing.

49.     "**DIP Term Sheet**" means the term sheet attached as Exhibit A to the DIP Commitment Letter.

50.     "**Disallowed**" means any Claim, or any portion thereof, that (i) has been disallowed by Final Order or settlement; (ii) is scheduled at zero or as contingent, disputed, or unliquidated on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law; or (iii) is not scheduled on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law.

51.     "**Disclosure Statement**" means the disclosure statement Filed by the Debtors in support of the Plan, as amended, supplemented or modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, in form and substance reasonably satisfactory to the Required Consenting First Lien Lenders.

52.     "**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement.

53.     "**Disputed**" means, with respect to a Claim, a Claim that is not yet Allowed or Disallowed.

54.     "**Distribution Agent**" means, as applicable, the Debtors or the Reorganized Company or any Entity that the Debtors or the Reorganized Company select to make or to facilitate distributions in accordance with the Plan.

55.    "***Distribution Record Date***" means, other than with respect to any publicly held securities held in the name of, or by a nominee of, DTC (including, without limitation, the Senior Unsecured Notes Claims), two (2) Business Days following the Confirmation Date. Notwithstanding anything to the contrary herein, for the avoidance of doubt, the Distribution Record Date shall not apply to any publicly held securities held in the name of, or by a nominee of, DTC (including, without limitation, the Senior Unsecured Notes Claims), as to which distributions may be made in accordance with the applicable procedures of DTC.

56.    "***DTC***" means the Depository Trust Company.

57.    "***Eligible Offeree***" means each Holder of a First Lien Claim (or, in the case of an Equity Rights Offering Backstop Party or Equity Rights Offering Holdback Party, its designated Affiliate, managed fund or account, in accordance with the terms of the Equity Rights Offering Backstop Commitment Agreement) that is either (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act, or an entity in which all of the equity investors are such institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person), and who, in each case, completes and returns to the subscription agent for the Equity Rights Offering (prior to the expiration thereof) an eligibility questionnaire to such effect.  For the avoidance of doubt, each Equity Rights Offering Backstop Party and each Equity Rights Offering Holdback Party is an Eligible Offeree.

58.    "***Employee Benefit Plans***" means all confidentiality and non-competition agreements and other employment bonus, gainshare and incentive programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards), vacation, holiday pay, severance, retirement, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, health savings accounts, and other health and welfare benefit plans, programs, and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations of the Debtors that are described in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations, and (II) Granting Related Relief.*

59.    "***Entity***" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

60.    "***Equity Rights Offering***" means the equity rights offering to be consummated by the Reorganized Company on the Plan Effective Date in accordance with the Equity Rights Offering Documents, pursuant to which it shall issue shares of Reorganized Equity.

61.    "***Equity Rights Offering Amount***" means, with respect to the Equity Rights Offering Shares, an aggregate purchase price of $200 million (exclusive of the Equity Rights Offering Backstop Premium).

62.    "***Equity Rights Offering Backstop Commitment Agreement***" means an agreement setting forth the terms and conditions of the commitments and obligations of the Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties based on the respective amounts and percentages applicable to each Equity Rights Offering Backstop Party and Equity Rights Offering Holdback Party as set forth therein.

63.    "***Equity Rights Offering Backstop Premium***" shall mean the "Equity Backstop Premium" as defined in the Equity Rights Offering Backstop Commitment Agreement.

64.    "***Equity Rights Offering Backstop Parties***" means the Equity Backstop Parties (as defined in and as set forth in the Equity Rights Offering Backstop Commitment Agreement).

65.    "***Equity Rights Offering Documents***" means, collectively, the Equity Rights Offering Procedures, the Subscription Form, and other material documents necessary to implement the Equity Rights Offering, including the Equity Rights Offering Order and Equity Rights Offering Backstop Commitment Agreement.

66.    "***Equity Rights Offering Holdback***" means, with respect to the Equity Rights Offering Amount, a 35% holdback available only to the Equity Rights Offering Holdback Parties.

67.    "***Equity Rights Offering Holdback Parties***" means the Direct Investment Parties (as defined in and as set forth in the Equity Rights Offering Backstop Commitment Agreement).

68.    "***Equity Rights Offering Holdback Shares***" means the Equity Rights Offering Shares that are issued to the Equity Rights Offering Holdback Parties on account of the Equity Rights Offering Holdback based on the respective amounts and percentages applicable to each Equity Rights Offering Holdback Party as set forth in the Equity Rights Offering Backstop Commitment Agreement.

69.    "***Equity Rights Offering Order***" means the Final Order approving the Equity Rights Offering Procedures, which may be the Disclosure Statement Order.

70.    "***Equity Rights Offering Procedures***" means those certain rights offering procedures with respect to the Equity Rights Offering, as approved by the Bankruptcy Court, which shall be in form and substance acceptable to the Required Consenting First Lien Lenders.

71.    "***Equity Rights Offering Shares***" means the shares of Reorganized Equity that are issued in connection with the Equity Rights Offering.

72.    "***Estate***" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

73.    "***Exculpated Fiduciaries***" means, collectively, and in each case in their capacities as such during the Chapter 11 Cases (i) the Debtors and (ii) the Creditors' Committee.

74.    "***Exculpated Parties***" means each of the Exculpated Fiduciaries in their capacity as such and, in each case, to the maximum extent permitted by law.

75.    "***Executory Contract***" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

76.    "***Existing Equity Interests***" means all Interests in HFS Matterhorn Topco, Inc.

77.    "***Exit First Lien Term Loans***" means the term loans issued to holders of First Lien Claims pursuant to the Exit First Lien Term Loan Facility.

78.    "***Exit First Lien Term Loan Facility***" means the term loan credit facility in an aggregate principal amount of $825 million to be provided on the terms and conditions set forth in the Restructuring Term Sheet and the Exit First Lien Term Loan Facility Documents.

79. "***Exit First Lien Term Loan Facility Documents***" means, collectively, all agreements, documents, and instruments delivered or entered into in connection with the Exit First Lien Term Loans (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

80. "***Exit Revolving Facility***" means the asset-based lending facility up to $375 with the capacity for the issuance of letters of credit entered into pursuant to the Exit Revolving Facility Documents.

81. "***Exit Revolving Facility Documents***" means the agreements memorializing the Exit Revolving Facility, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages, deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Exit Revolving Facility.

82. "***File***" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

83. "***Final Order***" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court that has not been reversed, vacated, revoked, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; underlined provided, underlined that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

84. "***First Day Pleadings***" means the first-day and second-day pleadings that the Company Parties determine are necessary or desirable to File with the Bankruptcy Court.

85. "***First Lien Ad Hoc Group***" means certain of the Consenting First Lien Lenders that are members of an ad hoc group represented by the First Lien Ad Hoc Group Advisors.

86. "***First Lien Ad Hoc Group Advisors***" means, collectively, (a) Gibson, Dunn & Crutcher LLP as legal advisors, (b) PJT Partners, Inc. as investment banker, (c) JZ Advisors LLC, as restructuring advisor, (d) Lyons, Benenson & Company Inc. as compensation consultant, (e) Howley Law PLLC as local counsel, (f) Spencer Stuart International (U.S.) Inc. as executive/board search advisor, and (g) any other professionals or advisors retained by the First Lien Ad Hoc Group.

87. "***First Lien Agent***" means Goldman Sachs Lending Partners LLC, in its capacities as administrative agent and collateral agent under the First Lien Credit Agreement and the other First Lien Documents, including any successor and permitted assign thereto.

88. "***First Lien Claims***" means any Claim arising from or related to the First Lien Credit Agreement, including, for the avoidance of doubt, any deficiency claims.

89.     "***First Lien Credit Agreement***" means the *Credit Agreement*, dated as of May 23, 2018, between H-Food Holdings, LLC, as the U.S. Borrower (as defined in the First Lien Credit Agreement), Hearthside Bidco B.V., as the Dutch Borrower (as defined in the First Lien Credit Agreement), Matterhorn Buyer, LLC, as Holdings (as defined in the First Lien Credit Agreement), Goldman Sachs Lending Partners LLC, as Administrative Agent and Collateral Agent (each as defined in the First Lien Credit Agreement), and the lenders party thereto (as amended, restated, supplemented, or otherwise modified from time to time).

90.     "***First Lien Documents***" means the First Lien Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the First Lien Credit Agreement.

91.     "***First Lien Loans***" means the First Lien Term Loans and the First Lien Revolving Loans, in the aggregate.

92.     "***First Lien Term Loans***" means term loans outstanding under the First Lien Credit Agreement.

93.     "***First Lien Revolving Loans***" means revolving commitments outstanding under the First Lien Credit Agreement.

94.     "***General Unsecured Claim***" means any Claim that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court and is not a: (a) DIP Claim; (b) Administrative Claim; (c) First Lien Claim; (d) Intercompany Claim; (e) Priority Non-Tax Claim; (f) Other Secured Claim; (g) Priority Tax Claim; (h) Professional Fee Claim; (i) Section 510 Claim; (j) Second Lien Term Loan Claim; or (k) Senior Unsecured Notes Claim.  For the avoidance of doubt, General Unsecured Claims shall include any Claims or cause of action, whether existing now or arising in the future, known or unknown, and whether held by any governmental or quasi-governmental entity—including but not limited to local, state, federal, or foreign or private party, against any of the Debtors (or their Affiliates) in any way arising out of or relating to the labor practices of the Debtors (or their Affiliates and any independent contractors or third party staffing agencies) or any of their respective predecessors prior to the Plan Effective Date, including, for the avoidance of doubt and without limitation, Claims for indemnification (contractual or otherwise), contribution, or reimbursement against any of the Debtors (or their Affiliates) in any way arising out of or relating to the labor practices of the Debtors (or their Affiliates and any independent contractors or third party staffing agencies) or any of their respective predecessors prior to the Plan Effective Date.

95.     "***General Unsecured Claims Cash Recovery***" means $2.4 million in Cash.

96.     "***Governmental Unit***" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

97.     "***Holder***" means a Person or Entity holding a Claim against, or an Interest in, any Debtor, as applicable.

98.     "***Impaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

99.     "***Indemnification Obligations***" has the meaning set forth in <u>ARTICLE IV.S.2</u> of the Plan.

100.    "***Intercompany Claim***" means any Claim against a Debtor held by another Debtor.

101.     "***Intercompany Interest***" means any Interest in a Debtor held by another Debtor.

102.     "***Intercreditor Agreement***" means the *Junior Lien Intercreditor Agreement* dated as of November 25, 2018, between Goldman Sachs Lending Partners LLC, in its capacity as collateral agent under the First Lien Credit Agreement, as Representative for the First Lien Credit Agreement Secured Parties, and Ares Capital Corporation, in its capacity as collateral agent under the Second Lien Credit Agreement, as Representative for the Initial Second Priority Secured Parties, and each additional Senior Priority Representative and Second Priority Representative that from time to time becomes a party thereto. Capitalized terms in the foregoing shall have the meanings set forth in the Intercreditor Agreement.

103.     "***Interest***" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security, including any Section 510(b) Claims.

104.     "***Judicial Code***" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

105.     "***Lien***" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

106.     "***Management Incentive Plan***" means a post-Plan Effective Date equity incentive plan that reserves 10.0% of the Reorganized Equity outstanding immediately after the Plan Effective Date, on a fully diluted basis, on the terms set forth in the Management Incentive Plan Term Sheet, which plan shall include customary anti-dilution protections.

107.     "***Management Incentive Plan Term Sheet***" means the term sheet setting forth that the Management Incentive Plan, such term sheet to be included in the Plan Supplement.

108.     "***Milestone***" has the meaning set forth in Section 4.01 of the Restructuring Support Agreement.

109.     "***New Board***" means the initial board of directors of Reorganized Company selected in accordance with <u>ARTICLE IV.I</u> of the Plan, whose identities shall be set forth as part of the Plan Supplement.

110.     "***New Organizational Documents***" means the organizational and governance documents for each of the Reorganized Debtors, including, without limitation, certificates of incorporation (including any certificate of designations), certificates of formation or certificates of limited partnership (or equivalent organizational documents), certificates of designation, bylaws, limited liability company agreements, shareholders' agreements, and limited partnership agreements (or equivalent governing documents), as applicable, in each case, materially consistent with the terms and conditions set forth in the Restructuring Support Agreement.

111.     "***New Reorganized Debt***" means collectively, the Exit Revolving Facility and the Exit First Lien Term Loan Facility.

112.     "***New Reorganized Debt Documents***" means collectively, the Exit Revolving Facility Documents and the Exit First Lien Term Loan Facility Documents.

113. "***Other Secured Claim***" means any Secured Claim against the Debtors other than the DIP Claims and First Lien Claims.

114. "***Person***" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

115. "***Petition Date***" means the November 22, 2024.

116. "***Plan***" means this joint chapter 11 plan of reorganization, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code, and the terms hereof.

117. "***Plan Distribution***" means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under this Plan.

118. "***Plan Effective Date***" means the date that is the first business day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Plan Effective Date set forth in the Plan have been satisfied or waived in accordance with the terms of the Plan. Any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable thereafter.

119. "***Plan Supplement***" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court, as may be amended, modified, or supplemented from time to time on or prior to the Plan Effective Date.

120. "***Postpetition Intercompany Claim***" means any Claim held by a Debtor or a non-Debtor direct or indirect subsidiary of a Debtor against a Debtor arising after the Petition Date.

121. "***Priority Non-Tax Claim***" means any Claim other than an Administrative Claim, Priority Tax Claim, or DIP Claim, entitled to priority in right of payment under Section 507(a) of the Bankruptcy Code.

122. "***Priority Tax Claim***" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

123. "***Pro Rata***" means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

124. "***Professional***" means any Entity (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

125. "***Professional Fee Claims***" means any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

126.    "***Professional Fee Escrow***" means an escrow account established and funded pursuant to ARTICLE II.C.2 of the Plan.

127.    "***Professional Fee Reserve Amount***" means the aggregate unpaid Professional Fee Claims through and including the Plan Effective Date, as estimated in accordance with ARTICLE II.C.3 of the Plan.

128.    "***Professional Fees***" means fees and expenses (including transaction and success fees) incurred by a Professional.

129.    "***Proof of Claim***" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

130.    "***Reinstate, Reinstated***, **or** ***Reinstatement***" means leaving a Claim Unimpaired under the Plan.

131.    "***Rejection Schedule***" means the schedule of Executory Contracts and/or Unexpired Leases to be rejected pursuant to the Plan, as set forth in the Plan Supplement, as may be amended, supplemented, or modified from time to time.

132.    "***Related Party***" means, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

133.    "***Released Parties***" means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the First Lien Agent, (v) the Second Lien Agent, (vi) the Senior Unsecured Notes Trustee, and (vii) each Holder of a First Lien Claim, Second Lien Term Loan Claim or Senior Unsecured Notes Claim that votes for, and does not object to, the Plan, and (b) with respect to each of the foregoing Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law; *provided*, that any Entity or Person that opts out of or timely objects either through (1) a formal objection Filed on the docket of the Chapter 11 Cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before confirmation to the releases set forth in ARTICLE VIII.D of the Plan shall not be deemed a Released Party.

134.    "***Releasing Parties***" means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (v) each Released Party, (vi) each Related Party to each Entity in clause (i) through (v) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or

through an entity in clause (i) through (v); *provided*, *that*, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases set forth in <u>ARTICLE VIII.D</u> of this Plan; or (y) timely objects to the releases set forth in <u>ARTICLE VIII.D</u> of this Plan, either through (1) a formal objection Filed on the docket of the Chapter 11 Cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before confirmation.

135.    "***Reorganized Company***" means HFS Matterhorn Topco, Inc. or any successors thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date.

136.    "***Reorganized Debtors***" means, collectively, each of the Debtors and any successors thereto, by merger, consolidation, or otherwise, as reorganized on or after the Plan Effective Date, in accordance with the Plan.

137.    "***Reorganized Equity***" means the common stock in the Reorganized Company to be issued on the Plan Effective Date.

138.    "***Required Consenting First Lien Lenders***" means, as of the relevant date, three or more unaffiliated Consenting First Lien Lenders holding at least 50.01% of the aggregate outstanding principal amount of First Lien Claims that are held by Consenting First Lien Lenders.

139.    "***Required Consenting Second Lien Term Lenders***" means, as of the relevant date, Consenting Second Lien Term Lenders holding at least 66.67% of the aggregate outstanding principal amount of Second Lien Term Loan Claims that are held by Consenting Second Lien Term Loan Lenders.

140.    "***Required Consenting Senior Unsecured Noteholders***" means, as of the relevant date, Consenting Senior Unsecured Noteholders holding at least 50.01% of the aggregate outstanding principal amount of Senior Unsecured Notes Claims that are held by Consenting Senior Unsecured Noteholders.

141.    "***Required Consenting Stakeholders***" means the Required Consenting First Lien Lenders, the Required Consenting Second Lien Term Lenders, the Required Consenting Senior Unsecured Noteholders, and each of the Consenting Sponsors.

142.    "***Restructuring***" means the restructuring of Debtors' capital structure on the terms and conditions set forth in this Plan and Plan Supplement, and subject to the terms of the Restructuring Support Agreement.

143.    "***Restructuring Expenses***" means the reasonable and documented fees, costs, and out-of-pocket expenses of the First Lien Agent, the DIP Agent, and the First Lien Ad Hoc Group Advisors (which shall include, for the avoidance of doubt, the advisors to the First Lien Agent and the DIP Agent under the First Lien Credit Agreement and the DIP Facility), which are incurred (a) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of the Restructuring Support Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing and, to the extent applicable, and/or (b)(i) consistent with any engagement letters or fee reimbursement letters entered into between the Company Parties on the one hand, and the applicable First Lien Ad Hoc Group Advisors and advisors to the First Lien Agent or DIP Agent, on the other hand (as supplemented and/or modified by this Agreement), (ii) provided in the First Lien Credit Agreement, and/or (iii) as provided in the Cash Collateral Order and DIP Order and/or the Confirmation Order.

144. "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of November 22, 2024, by and between the Company Parties, the Consenting First Lien Lenders, the Consenting Second Lien Term Lenders, the Consenting Senior Unsecured Noteholders, and the Consenting Sponsor, as the same may be amended, supplemented, or modified from time to time in accordance with its terms, which, for the avoidance of doubt, includes all of the exhibits, annexes, and schedules thereto in accordance with Section 16.02 of the Restructuring Support Agreement (including the Restructuring Term Sheet).

145. "*Restructuring Term Sheet*" means the Restructuring Term Sheet annexed to the Restructuring Support Agreement as Exhibit B thereto.

146. "*Restructuring Transactions*" shall have the meaning set forth in ARTICLE IV.O of the Plan, such transactions described therein and related transactions or steps to effectuate the Restructuring Support Agreement and the Restructuring Term Sheet.

147. "*Retained Causes of Action*" means the Causes of Action identified on the Schedule of Retained Causes of Action.

148. "*Schedule of Retained Causes of Action*" means a schedule of certain Claims and Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan; provided, that in no instance shall Claims or Causes of Action against any Released Party or any Exculpated Party be retained.

149. "*Schedules*" means, collectively, any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs Filed by the Debtors with the Bankruptcy Court and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, supplemented, or otherwise modified from time to time, to the extent the filing of such documents is not waived or extended beyond the Plan Effective Date pursuant, in each case, to an order of the Bankruptcy Court.

150. "*Second Lien Ad Hoc Group*" means the ad hoc group of creditors holding Second Lien Term Loan Claims represented by the Second Lien Ad Hoc Group Advisors.

151. "*Second Lien Ad Hoc Group Advisors*" means, collectively, (a) Proskauer Rose LLP, as legal counsel, (b) Gray Reed, as co-counsel, and (c) FTI Consulting, Inc., as financial advisor.

152. "*Second Lien Ad Hoc Group Advisor Fees*" means the reasonable and documented fees and expenses of the Second Lien Ad Hoc Group Advisors.

153. "*Second Lien Agent*" means Ares Capital Corporation, in its capacities as administrative agent and collateral agent under the Second Lien Credit Agreement and the other Second Lien Documents, including any successor and permitted assign thereto.

154. "*Second Lien Credit Agreement*" means the *Second Lien Credit Agreement*, dated as of November 25, 2018, between Matterhorn Buyer, LLC, as Holdings (as defined in the Second Lien Credit Agreement), H-Food Holdings, LLC, as the Borrower (as defined in the Second Lien Credit Agreement), Ares Capital Corporation, as Administrative Agent and Collateral Agent (each as defined in the Second Lien Credit Agreement), and the lenders party thereto (as amended, restated, supplemented, or otherwise modified from time to time).

155. "**Second Lien Documents**" means the Second Lien Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the Second Lien Credit Agreement.

156. "**Second Lien Term Loans**" means term loans outstanding under the Second Lien Credit Agreement.

157. "**Second Lien Term Loan Claims**" means any Claim arising from or related to the Second Lien Credit Agreement.

158. "**Second Lien Term Loan Claims Cash Recovery**" means Cash in the amount of $18 million, *less* the aggregate amount of Second Lien Ad Hoc Group Advisors Fees paid by the Debtors on or after the Agreement Effective Date as defined in the Restructuring Support Agreement (including in connection with <u>ARTICLE IV.V</u>).

159. "**Section 510(b) Claims**" means any Claim against any Debtor: (a) arising from the recission of a purchase or sale of an equity security as defined in section 101(17) of the Bankruptcy Code (including the Employee Partnership Sale Units) of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such an equity security made to the Debtors prior to the Petition Date; or (c) for reimbursement or contribution Allowed under section 502(e) of the Bankruptcy Code on account of such Claim; and (d) any other Claim determined to be subordinated under section 510 of the Bankruptcy Code.

160. "**Secured Claim**" means a Claim (a) secured by a lien on any Debtor's interest in property to the extent of the value of such interest as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code (including the DIP Order) or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

161. "**Securities Act**" means the Securities Act of 1933, as amended.

162. "**Senior Unsecured Notes**" means the notes issued under the Senior Unsecured Notes Indenture.

163. "**Senior Unsecured Notes Ad Hoc Group**" means the ad hoc group of creditors holding Senior Unsecured Notes Claims represented by the Senior Unsecured Notes Ad Hoc Group Advisors.

164. "**Senior Unsecured Notes Ad Hoc Group Advisors**" means collectively, (a) Paul Hastings LLP, as legal counsel, and (b) Perella Weinberg Partners LP, as investment banker.

165. "**Senior Unsecured Notes Ad Hoc Group Advisor Fees**" means the reasonable and documented fees and expenses accrued from the inception of their respective engagements of the Senior Unsecured Notes Ad Hoc Group Advisors, whether incurred before, on or after the Petition Date and paid by the Debtors on or after the Agreement Effective Date as defined in the Restructuring Support Agreement (including in connection with <u>ARTICLE IV.V</u>).

166. "**Senior Unsecured Notes Cash Recovery**" means Cash in the amount of $21 million, *less* the aggregate amount of Senior Unsecured Notes Ad Hoc Group Advisors Fees.

167. "**Senior Unsecured Notes Claims**" means any Claim arising from or related to that certain Senior Unsecured Notes Indenture.

168.     "*Senior Unsecured Notes Documents*" means the Senior Unsecured Notes Indenture and all related agreements and documents executed by any of the Debtors in connection with the Senior Unsecured Notes Indenture.

169.     "*Senior Unsecured Notes Indenture*" means the *Indenture*, dated as of May 23, 2018, between H-Food Holdings, LLC, and Hearthside Finance Company, Inc., as Issuers, certain subsidiaries of the Company as Subsidiary Guarantors, and U.S. Bank National Association as Trustee for 8.500% Senior Notes due 2026 (as amended, restated, supplement, or otherwise modified from time to time).

170.     "*Senior Unsecured Notes Trustee*" means U.S. Bank, National Association, in its capacity as indenture trustee under the Senior Unsecured Notes Indenture and the other Senior Unsecured Notes Documents, including any successor and permitted assign thereto.

171.     "*Solicitation Materials*" means the Disclosure Statement and all documents, forms and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

172.     "*Stockholders*" means the current and former holders of HFS Matterhorn Topco, Inc. Interests from time to time, including the Consenting Sponsors.

173.     "*Stockholders Agreement*" means any stockholders agreement, equity holders agreement, operating agreement, or other similar agreement for Reorganized Company, as applicable, to which Holders of Reorganized Equity shall become party to on or immediately after the Plan Effective Date governing, among other things, the relative rights of the Holders of the Reorganized Equity.

174.     "*Subscription Form*" means the subscription form to be completed by holders of Allowed First Lien Claims electing to subscribe for Reorganized Equity in the Equity Rights Offering.

175.     "*Subscription Rights*" means the rights of holders of First Lien Claims to subscribe for and purchase, as part of the Equity Rights Offering, their Pro Rata allocation of the Equity Rights Offering, subject to the Equity Rights Offering Holdback and the conditions set forth in ARTICLE IV.P of the Plan.

176.     "*Surviving First Lien Credit Agreement Provisions*" means any provisions of the First Lien Credit Agreement that by their terms survive the termination of the First Lien Credit Agreement.

177.     "*Surviving Second Lien Credit Agreement Provisions*" means any provisions of the Second Lien Credit Agreement that by their terms survive the termination of the Second Lien Credit Agreement.

178.     "*Surviving Senior Unsecured Notes Provisions*" means any provisions of the Senior Unsecured Notes Documents that by their terms survive the termination of the Senior Unsecured Notes Documents.

179.     "*U.S. Trustee*" means the Office of the United States Trustee for Region 7.

180.     "*UCC Fees*" means all Allowed Professional Fees and expenses incurred by any Creditors' Committee as of the Plan Effective Date.

181.     "*UCC Fees Threshold*" means $13 million in the aggregate of UCC Fees.

182.    "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

183.    "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

184.    "***Unsecured Claims Cash Recovery***" means, collectively, the General Unsecured Claims Cash Recovery, the Second Lien Term Loan Claims Cash Recovery, and the Senior Unsecured Notes Cash Recovery.

B.    *Rules of Interpretation*

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (xii) references to "stockholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (xiv) except as otherwise provided, any references to the Plan Effective Date shall mean the Plan Effective Date or as soon as reasonably practicable thereafter; and (xv) any reference to an Entity as a Holder of a Claim or Interest includes such Entity's permitted successors and assigns.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, that corporate or limited liability company governance matters relating to the Debtors not incorporated or formed (as applicable) in the State of New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Company shall mean the Debtors and the Reorganized Company, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each.  If there is any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

H.      *Certain Consent Rights*

Notwithstanding anything in the Plan to the contrary, any and all consent rights set forth in the Restructuring Support Agreement with respect to the form and substance of the Plan and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I.A of the Plan) and fully enforceable as if stated in full herein.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims and Administrative Claims, including Professional Fee Claims and Postpetition Intercompany Claims, have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in ARTICLE III of the Plan.

A.    *Administrative Claims*

Except with respect to Professional Fee Claims, and Restructuring Expenses, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) on the Plan Effective Date, if such Administrative Claim is Allowed as of the Plan Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) or (ii) if such Administrative Claim is not Allowed as of the Plan Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; provided that if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

On the Plan Effective Date, the Debtors or the Reorganized Company, as applicable, shall pay all Restructuring Expenses that have accrued and are unpaid as of the Plan Effective Date.

Except as otherwise provided in this ARTICLE II.A or the Claims Bar Date Order, and except with respect to Administrative Claims that are Restructuring Expenses, or Professional Fee Claims, requests for payment of Administrative Claims must be Filed and served on the Reorganized Company pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business.

Objections to requests for payment of Administrative Claims that are Filed with the Bankruptcy Court (other than Professional Fee Claims) must be Filed and served on the requesting party by the Administrative Claims Objection Bar Date.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, THE ESTATES, OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE PLAN EFFECTIVE DATE.**

B.    *DIP Claims*

All DIP Claims shall be deemed Allowed as of the Plan Effective Date in an amount equal to the aggregate amount of the DIP Obligations, including, without limitation, (a) the principal amount outstanding under the DIP Facility on such date; (b) all interest accrued and unpaid thereon through and including the date of payment; and (c) all accrued and unpaid fees, discounts, expenses, costs and indemnification obligations payable under the DIP Documents. On the Plan Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, Cash in an amount equal to such Allowed DIP Claim, except to the extent of any portion of such DIP Claims (including both the funded amount and the amount of any accrued but unpaid interest, premiums and fees, but excluding expenses and professional fees) elected by the Holder thereof to be used as consideration in the Equity Rights Offering (which such portion shall be deemed fully and finally satisfied, settled, released and discharged upon, and in connection with, the consummation of the Equity Rights Offering). Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the provisions of the DIP Documents that expressly survive termination or maturity

of the DIP Facility (including those provisions relating to the rights of the DIP Agent and the other DIP Lenders to expense reimbursement, indemnification, and other similar amounts) shall continue in full force and effect after the Plan Effective Date in accordance with the terms hereof.

C.    *Professional Fee Claims*

1.    <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is sixty (60) calendar days after the Confirmation Date unless otherwise ordered by the Bankruptcy Court. Objections to any Professional Fee Claims must be Filed and served on counsel to the Debtors, counsel to the Creditors' Committee, the U.S. Trustee, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors and the party requesting compensation of a Professional Fee Claim).

2.    <u>Professional Fee Escrow</u>

If the Professional Fee Reserve Amount is greater than zero, as soon as reasonably practicable before, but in no event later than the Confirmation Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Reserve Amount, and no Liens, claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the Exit Revolving Facility, the Exit First Lien Term Loan Facility or otherwise). The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors, the Estates, or the Reorganized Company and (ii) shall be held in trust for the Professionals; <u>provided</u>, <u>that</u> to the extent surplus funds remain in the Professional Fee Escrow after all Professional Fee Claims have been resolved by the Bankruptcy Court or settled, such funds shall be returned to the Reorganized Debtors. Allowed Professional Fee Claims shall be paid in Cash by the Debtors or the Reorganized Company, as applicable, to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; <u>provided</u>, <u>that</u> the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.  If the amount in any Professional Fee Escrow account is insufficient to fund payment in full of all Allowed amounts owing to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow without any further action or order of the Bankruptcy Court.

3.    <u>Professional Fee Reserve Amount</u>

No later than five (5) Business Days prior to the Confirmation Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors prior to approval by the Bankruptcy Court through and including the Confirmation Date, including any fees and expenses projected to be outstanding as of the Confirmation Date, and the Debtors shall escrow such estimated amounts for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties; <u>provided</u>, <u>that</u> such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of a Professional's final request for payment of Filed Professional Fee Claims. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors shall estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim. When all Professional Fee Claims have been Allowed and paid in full or Disallowed, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Company without any further action or order of the Bankruptcy Court.

4.        Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Reorganized Company shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Reorganized Company may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.        *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims shall receive interest on such Allowed Priority Tax Claims after the Plan Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.        *Summary of Classification*

All Claims and Interests, except for Claims addressed in ARTICLE II of the Plan, are classified in the Classes set forth in this ARTICLE III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in ARTICLE III.F of the Plan.

1.        Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 2 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 3 | First Lien Claims | Impaired | Entitled to Vote |

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 4 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 5 | Senior Unsecured Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired or Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept or Deemed Not to Accept) |
| 8 | Section 510 Claims | Impaired | Not Entitled to Vote (Deemed Not to Accept) |
| 9 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed Not to Accept) |

B.  *Treatment of Claims and Interests*

   1.  Class 1 – Other Secured Claims

       a.  *Classification*: Class 1 consists of all Other Secured Claims.

       b.  *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for, each Allowed Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor and with the reasonable consent of the Required Consenting First Lien Lenders, either:

           i.  payment in full in cash of its Allowed Other Secured Claim;

           ii. the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

           iii. Reinstatement of its Allowed Other Secured Claim; or

           iv. such other treatment in rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

       c.  *Voting*: Class 1 is Unimpaired under the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Other Secured Claims.

   2.  Class 2 – Priority Non-Tax Claims

       a.  *Classification*: Class 2 consists of all Priority Non-Tax Claims.

       b.  *Treatment*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange

22

for, each Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive cash in an amount equal to such Allowed Priority Non-Tax Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

c.    *Voting*: Class 2 is Unimpaired under the Plan. Each Holder of a Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Priority Non-Tax Claims.

3.    <u>Class 3 – First Lien Claims</u>

a.    *Classification*: Class 3 consists of all First Lien Claims.

b.    *Allowance*: The First Lien Claims are Allowed in the aggregate amount of $2,146,809,609.32, plus fees, expenses, and other amounts arising and payable under and in accordance with the First Lien Documents, to the extent permitted by the Bankruptcy Code.

c.    *Treatment*: Except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment of such Claim, each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date, its elected Pro Rata share of:

i.    100% of the Exit First Lien Term Loans;

ii.    100% of the Reorganized Equity, subject to dilution by the Equity Rights Offering and the Management Incentive Plan; and

iii.    if any of the Second Lien Term Loan Claims Class, the Senior Unsecured Notes Claims Class, or the General Unsecured Claims Class do not vote to accept the Plan, the cash distribution that would otherwise have been made to any such rejecting Class(es).

Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) that properly exercises its Equity Rights Offering rights to purchase Reorganized Equity shall receive such Reorganized Equity on the Plan Effective Date.

d.    *Voting*: Class 3 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – Second Lien Term Loan Claims</u>

a.    *Classification*: Class 4 consists of all Second Lien Term Loan Claims.

b.    *Allowance*: The Second Lien Term Loan Claims are Allowed in the aggregate principal amount of $300,000,000, plus fees, expenses, and other amounts arising

and payable under and in accordance with the Second Lien Documents, to the extent permitted by the Bankruptcy Code.

c.    *Treatment*: Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment of such Claim, each Holder of a Second Lien Term Loan Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

　　　i.    ***if Class 4 votes to <u>accept</u> the Plan***: (1) its Pro Rata share of 100% of the Second Lien Term Loan Claims Cash Recovery; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the Second Lien Term Loan Claims Cash Recovery shall be reduced on a ratable basis (determined based on the Second Lien Term Loan Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Senior Unsecured Notes Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Second Lien Term Loan Claims Cash Recovery, and (2) the Required Lenders (as defined in the First Lien Credit Agreement) shall waive, and shall cause the applicable First Lien Agent to waive, any turnover or similar rights in favor of holders of First Lien Claims with respect to such distribution on account of the Intercreditor Agreement; or

　　　ii.   ***if Class 4 votes to <u>reject</u> the Plan***, no recovery or distribution on account of such Claim, and all Second Lien Term Loan Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect;

　　　　*provided* that, to the extent the Senior Unsecured Notes Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Second Lien Term Loan Claims Class, then the Second Lien Term Loan Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms.

d.    *Voting*: Class 4 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – Senior Unsecured Notes Claims</u>

a.    *Classification*: Class 5 consists of all Senior Unsecured Notes Claims.

b.    *Allowance*: The Senior Unsecured Notes Claims are Allowed in the aggregate principal amount of $350,000,000, plus fees, expenses, and other amounts arising and payable under and in accordance with the Senior Unsecured Notes Documents, to the extent permitted by the Bankruptcy Code.

c.  *Treatment*: Except to the extent that a Holder of an Allowed Senior Unsecured Notes Claim agrees to a less favorable treatment of such Claim, each Holder of a Senior Unsecured Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

  i.  ***if Class 5 votes to <u>accept</u> the Plan***, its Pro Rata share of 100% of the Senior Unsecured Notes Cash Recovery; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the Senior Unsecured Notes Cash Recovery shall be reduced on a ratable basis (determined based on the Senior Unsecured Notes Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided, further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Senior Unsecured Notes Cash Recovery; or

  ii.  ***if Class 5 votes to <u>reject</u> the Plan***, no recovery or distribution on account of such Claim, and all Senior Unsecured Notes Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect;

    *provided* that, to the extent the Second Lien Term Loan Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Senior Unsecured Notes Claims Class, then the Senior Unsecured Notes Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms.

d.  *Voting*: Class 5 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

6.  <u>Class 6 – General Unsecured Claims</u>

  a.  *Classification*: Class 6 consists of all General Unsecured Claims.

  b.  *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each Holder of a General Unsecured Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

  i.  ***if Class 6 votes to <u>accept</u> the Plan***, the lower of: (1) its Pro Rata share of 100% of the General Unsecured Claims Cash Recovery; and (2) Cash in an amount equal to 6.0% of such Allowed General Unsecured Claim; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the General Unsecured Claims Cash Recovery shall be reduced on a ratable basis (determined based on the General Unsecured Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery

provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and Senior Unsecured Notes Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the General Unsecured Claims Cash Recovery; or

ii. ***if Class 6 votes to <u>reject the Plan</u>***, no recovery or distribution on account of such Claim, and all General Unsecured Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect.

c. *Voting:* Class 6 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

7. <u>Class 7 – Intercompany Claims</u>

a. *Classification*: Class 7 consists of all prepetition Intercompany Claims.

b. *Treatment*: On or after the Plan Effective Date, each allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the reasonable consent of the Required Consenting First Lien Lenders), either reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan.

c. *Voting*: Class 7 is Impaired or Unimpaired under the Plan. Holders of Intercompany Claims are either (i) deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Intercompany Claims.

8. <u>Class 8 – Section 510(b) Claims</u>

a. *Classification*: Class 8 consists of all Section 510(b) Claims.

b. *Treatment*: On the Plan Effective Date, all Section 510(b) Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims.

c. *Voting*: Each Holder of a Section 510(b) Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited with respect to 510(b) Claims.

9. <u>Class 9 – Intercompany Interests</u>

a. *Classification*: Class 9 consists of all Intercompany Interests.

    b.     *Treatment*: On the Plan Effective Date, all Intercompany Interests shall be Reinstated for administrative convenience.

    c.     *Voting*: Class 9 is Unimpaired under the Plan. Each Holder of an Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Intercompany Interests.

10.    <u>Class 10 – Existing Equity Interests</u>

    a.     *Classification*: Class 10 consists of all Existing Equity Interests.

    b.     *Treatment*: On the Plan Effective Date, all Existing Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing Equity Interests shall not receive any distribution on account thereof.

    c.     *Voting*: Class 10 is Impaired under the Plan. Holders of Existing Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited with respect to Existing Equity Interests.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Company's rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims, and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Debtors and the Reorganized Company shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and the Reorganized Company's legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Plan Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

D.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by any Impaired Class of Claims. The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.      *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510(b) of the Bankruptcy Code, the Debtors and the Reorganized Company reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

G.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Intercompany Interests*

Distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders the Reorganized Equity, and in exchange for the Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, any Intercompany Interest in non-debtor Affiliates owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor unless provided otherwise by this Plan.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *Finality of Distributions*

As discussed in greater detail in the Disclosure Statement and as otherwise discussed herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, reflecting the agreement among the Consenting

Stakeholders pursuant to the Restructuring Support Agreement and for the payment of Professional Fees as provided for therein. The Plan shall be deemed a motion to approve good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to ARTICLE VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be and shall be final.

B.      *No Substantive Consolidation*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

C.      *Sources of Consideration for Plan Distributions*

The Reorganized Company shall fund distributions under the Plan with (i) cash on hand, (ii) the issuance of the Reorganized Equity, (iii) proceeds of the Equity Rights Offering, (iv) the Exit First Lien Term Loans, and (v) the Exit Revolving Facility.

D.      *Letters of Credit*

Any letters of credit that remain outstanding on the Plan Effective Date shall be (i) cash collateralized by the Debtors or Reorganized Debtors, as applicable, pursuant to arrangements reasonably satisfactory to the applicable agent, (ii) terminated, cancelled, or returned undrawn to the applicable issuer, or (iii) otherwise addressed through arrangements acceptable to the applicable agent, issuer, and the Debtors.

E.      *Exit Revolving Facility*

One or more Reorganized Debtors shall enter into the Exit Revolving Facility on the Plan Effective Date, on terms set forth in the Exit Revolving Facility Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the Exit Revolving Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Company (or the applicable subsidiary issuing the Exit Revolving Facility) shall be authorized to execute and deliver those documents necessary or appropriate to cause its applicable subsidiary to issue and incur the Exit Revolving Facility and related guarantees, including the Exit Revolving Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Company may deem to be necessary to consummate the Exit Revolving Facility. The obligations incurred by the Reorganized Company (or the applicable subsidiary issuer) pursuant to the Exit Revolving Facility and the Exit Revolving Facility Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Exit Revolving Facility Documents.

F.    *Exit First Lien Term Loans*

The Reorganized Company shall cause one of its subsidiaries to issue the Exit First Lien Term Loans and provide any related guarantees, and the Exit First Lien Term Loans will be made available to the Reorganized Company, pursuant to and subject to the terms and conditions set forth in the Exit First Lien Term Loan Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the Exit First Lien Term Loans (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Company (or the applicable subsidiary issuing the Exit First Lien Term Loans) shall be authorized to execute and deliver those documents necessary or appropriate to cause the applicable subsidiary issuer to issue and incur the Exit First Lien Term Loans and related guarantees, including the Exit First Lien Term Loan Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Company may deem to be necessary to consummate the Exit First Lien Term Loans. The obligations incurred by the Reorganized Company (or the applicable subsidiary issuer) pursuant to the Exit First Lien Term Loans and the Exit First Lien Term Loan Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Exit First Lien Term Loan Documents.

G.    *Reorganized Equity*

The Reorganized Company is authorized to issue or cause to be issued and shall issue, and the Reorganized Company is authorized to distribute and shall distribute, the Reorganized Equity without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The Reorganized Equity shall be issued and distributed free and clear of all Liens, claims, and other interests.

Any Person's acceptance of Reorganized Equity shall be deemed to constitute its agreement to be bound by the Stockholders Agreement, if any, and the New Organizational Documents, as the same may be amended, supplemented, or modified from time to time following the Plan Effective Date in accordance with their terms. The Stockholders Agreement, if any, and the New Organizational Documents shall be binding on all holders of the Reorganized Equity (and their respective successors and assigns), whether such Reorganized Equity is received or to be received on or after the Plan Effective Date and regardless of whether such holder executes or delivers a signature page to the Stockholders Agreement, if any, or the New Organizational Documents. Notwithstanding the foregoing, the Reorganized Company may condition the receipt of any Reorganized Equity issued pursuant to the Plan upon the receipt of duly executed counter - signature pages to the Stockholders Agreement, if any.

All of the Reorganized Equity distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid, and non-assessable. Each distribution and issuance of the Reorganized Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

H.    *New Organizational Documents*

On or prior to the Plan Effective Date, the New Organizational Documents shall be filed with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or

countries of incorporation or organization in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or organization. The New Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Plan Effective Date, the New Organizational Documents may be amended and restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

For the avoidance of doubt, any claimant's acceptance of Reorganized Equity shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Plan Effective Date in accordance with its terms.

I.     *New Board*

As of the Plan Effective Date, except as set forth in this <u>ARTICLE IV.I</u>, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the New Board.

[The New Board shall consist of [seven (7) directors, consisting of (i) the Reorganized Company's Chief Executive Officer and (ii) six (6) directors designated by the Required Consenting First Lien Lenders [(the initial directors to be so designated in consultation with the Reorganized Company's Chief Executive Officer)]. Each such director shall serve from and after the Plan Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents of the Reorganized Company.]]

J.     *Employee Matters*

On the Plan Effective Date, the Reorganized Company shall be deemed to have assumed all Employee Benefit Plans, and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; <u>provided</u>, <u>that</u> the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control" or "change in control" under any Employee Benefit Plans.

As of the Plan Effective Date, any provision of an Employee Benefit Plan that provides for equity-based awards, including any termination-related provisions with respect to equity-based awards, shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

The Reorganized Company shall continue to honor all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code, and the obligations thereunder shall be paid in accordance with the terms thereof.

K.     *Corporate Existence*

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Plan Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the

respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Plan Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

L.      *Vesting of Assets in the Reorganized Company*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Plan Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or the Confirmation Order. On and after the Plan Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

M.      *Cancellation of Existing Interests, Indebtedness, and Other Obligations*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Plan Effective Date (i) the First Lien Credit Agreement, the other First Lien Documents, the Second Lien Credit Agreement, the other Second Lien Documents, the Senior Unsecured Notes Indenture, the other Senior Unsecured Notes Documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed cancelled, discharged and of no force or effect, except, with respect to the First Lien Credit Agreement, the other First Lien Documents, the Second Lien Credit Agreement, the other Second Lien Documents, the Senior Unsecured Notes Indenture, and the other Senior Unsecured Notes Documents, as applicable, as necessary to (a) enforce the rights, claims and interests of the First Lien Agent, the Second Lien Agent, or the Senior Unsecured Notes Trustee, as applicable, and any predecessor thereof vis-a-vis parties other than the Released Parties; (b) allow the receipt of and to make distributions under the Plan in accordance with the terms of the First Lien Credit Agreement, the Second Lien Credit Agreement, or the Senior Unsecured Notes Indenture, as applicable; (c) preserve any rights of (1) the First Lien Agent, the Second Lien Agent, and any predecessor thereof as against any money or property distributable to Holders of First Lien Claims or Second Lien Term Loan Claims, including any priority in respect of payment and the right to exercise any charging Liens, and (2) the Senior Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of Senior Unsecured Notes Claims; and (d) allow the First Lien Agent, the Second Lien Agent, or the Senior Unsecured Notes Trustee to appear and participate in the Chapter 11 Cases or any other proceeding with respect to clauses (a) through (c) above, as applicable, and any other proceedings or appeals related to the Plan; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, or similar documents governing the equity, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, that notwithstanding confirmation or the occurrence of the Plan Effective Date, any agreement that governs the rights of a Holder of a Claim shall also continue in effect to allow each of the First Lien Agent, the Second

32

Lien Agent, or the Senior Unsecured Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court to enforce the respective obligations owed to such parties under the Plan.  Notwithstanding anything to the contrary herein, all rights under the First Lien Credit Agreement and Second Lien Credit Agreement shall remain subject to any intercreditor agreements.

Except for the foregoing, (i) subject to the performance by the First Lien Agent and the Second Lien Agent of their obligations under the Plan, the First Lien Agent and the Second Lien Agent and their agents shall be relieved of all further duties and responsibilities related to the First Lien Credit Agreement and the Second Lien Credit Agreement upon the occurrence of the Plan Effective Date (provided, that the Surviving First Lien Credit Agreement Provisions and Surviving Second Lien Credit Agreement Provisions shall survive in accordance with the terms of the First Lien Documents and the Second Lien Documents); and (ii) subject to the performance by the Senior Unsecured Notes Trustee of its obligations under the Plan, the Senior Unsecured Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Senior Unsecured Notes Documents upon the occurrence of the Plan Effective Date (provided, that the Surviving Senior Unsecured Notes Provisions shall survive in accordance with the terms of the Senior Unsecured Notes Documents).

The commitments and obligations (if any) of the Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the First Lien Credit Agreement and the Second Lien Credit Agreement, as applicable, shall fully terminate and be of no further force or effect on the Plan Effective Date.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

N.      *Corporate Action*

Upon the Plan Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable (i) the issuance of the Reorganized Equity; (ii) implementation of the Restructuring Transactions; (iii) incurrence of the New Reorganized Debt; (iv) implementation of the Equity Rights Offering; and (v) all other actions contemplated by the Plan (whether to occur before, on, or after the Plan Effective Date). Upon the Plan Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Company, and any corporate or other organizational action required by the Debtors or the Reorganized Company, shall be deemed to have occurred and shall be in effect on the Plan Effective Date, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Company. Before, on, or after the Plan Effective Date, as applicable, the appropriate officers of the Debtors and the Reorganized Company, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Debtors or the Reorganized Company, as applicable, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this ARTICLE IV.N shall be effective notwithstanding any requirements under non-bankruptcy law.

O.    *Effectuating Documents; Restructuring Transactions*

    1.    <u>Restructuring Transactions</u>

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors and the Reorganized Company, as applicable, may take all actions as may be necessary or appropriate in their discretion to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) the issuance of securities; and (v) all other actions that the Debtors or the Reorganized Company determines to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule or the governing documents of the Debtors or the Reorganized Company (collectively, the "***Restructuring Transactions***").

P.    *Equity Rights Offering and Equity Rights Offering Backstop Commitment Agreement*

    1.    <u>Equity Rights Offering</u>

Following approval by the Bankruptcy Court of the Disclosure Statement and the Equity Rights Offering Documents, one or more of the Debtors shall conduct the Equity Rights Offering. In accordance with the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Procedures and the Subscription Form, 35% of the Equity Rights Offering Shares (exclusive of the Equity Rights Offering Backstop Premium) offered pursuant to the Equity Rights Offering will be reserved for, and separately sold to, the Equity Rights Offering Holdback Parties, and holders of Allowed First Lien Claims (including the Equity Rights Offering Holdback Parties and the Equity Rights Offering Backstop Parties) who are Eligible Offerees will be entitled to purchase their Pro Rata portion of the remaining 65% of the Equity Rights Offering Shares (exclusive of the Equity Rights Offering Backstop Premium).  The Equity Rights Offering Shares will be offered in the Equity Rights Offering for Cash; *provided*, *that*, any Holders of Allowed First Lien Claims who are DIP Lenders will be entitled to utilize all or a portion of their DIP Claims (including both the funded amount and the amount of any accrued and unpaid interest, premiums and fees (other than expenses and professional fees)) as consideration in exchange for the Equity Rights Offering Shares in the Equity Rights Offering.

The proceeds of the Equity Rights Offering shall be used to (i) repay outstanding amounts under the DIP Facility, (ii) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, and (iii) ensure at least $100 million of Reorganized Company pro forma cash at emergence.

    2.    <u>Equity Rights Offering Backstop Commitment Agreement</u>

In accordance with the Equity Rights Offering Backstop Commitment Agreement and subject to the terms and conditions thereof:

- (i) each of the Equity Rights Offering Backstop Parties and Equity Rights Offering Holdback Parties shall fully exercise all of its Subscription Rights, (ii) each of the Equity Rights Offering Holdback Parties shall purchase its portion of the Equity Rights Offering Holdback Shares in accordance with the Equity Rights Offering Backstop Commitment Agreement; and (iii) each of the Equity Rights Offering Backstop Parties shall purchase their respective pro rata share of any unsubscribed Equity Rights Offering Shares that are not purchased by Holders of Allowed First Lien Claims that are not Equity Rights Offering Backstop Parties; and

- in exchange for providing their respective commitments under the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Backstop Parties will receive their respective allocations of the Equity Rights Offering Backstop Premium.

Upon and in connection with (i) the purchase by the Equity Rights Offering Backstop Parties of their respective portions of the unsubscribed Equity Rights Offering Shares, (ii) the payment of the Equity Rights Offering Backstop Premium, (iii) the exercise of the Subscription Rights by the Holders of Allowed First Lien Claims (in each case pursuant to the terms of the Equity Rights Offering Procedures), and (iv) the purchase by the Equity Rights Offering Holdback Parties of the Equity Rights Offering Holdback Shares, the Reorganized Company shall be authorized to issue the Reorganized Equity issuable pursuant to such purchases and payment in accordance with ARTICLE IV.G hereof.

Q.      *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the New Reorganized Debt Documents, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

R.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to ARTICLE VIII of the Plan, the Reorganized Company shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in ARTICLE VIII of the Plan, which shall be deemed released and waived as of the Plan Effective Date.

The Reorganized Company may pursue such Retained Causes of Action in accordance with the best interests of the Reorganized Company. The Reorganized Company shall retain and may exclusively

enforce any and all such Retained Causes of Action. The Reorganized Company shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Reorganized Company shall not pursue any and all available Causes of Action against it, except as otherwise expressly provided in the Plan, including this ARTICLE IV and ARTICLE VIII of the Plan. Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Causes of Action shall be expressly reserved by the Reorganized Company for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

S.      *Insurance Policies*

1.      Director and Officer Liability Insurance

Each insurance policy, including the D&O Liability Insurance Policies, to which the Debtors are a party as of the Plan Effective Date, shall be deemed Executory Contracts and shall be assumed by the Reorganized Company on behalf of the applicable Debtor effective as of the Plan Effective Date unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Confirmation Hearing, and coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies. In addition, after the Plan Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Plan Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Petition Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Plan Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

2.      Survival of Debtors' Indemnification Obligations

Subject to the investigation of the special committee of officers of Matterhorn Buyer, LLC, to the fullest extent permitted by applicable law, any obligations of the Debtors in place as of the Plan Effective Date pursuant to their corporate charters, by-laws, limited liability company agreements, memoranda and articles of association, or other organizational documents and agreements to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors (collectively, the "Indemnification Obligations") shall not be discharged, impaired, or otherwise affected by the Plan; provided that the Debtors or the Reorganized Company shall not indemnify officers, directors, agents, or employees of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that for which indemnification is barred under applicable law or that is excluded under the terms of the foregoing organizational documents or applicable agreements governing the Debtors' Indemnification Obligations; provided, further, that the Indemnifications Obligations shall only include such obligations to former direct and indirect directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors that were serving in such role from and after the Plan Effective Date. All Indemnification Obligations shall be deemed

Executory Contracts assumed by the Reorganized Company under the Plan unless such obligation (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Confirmation Hearing.

        3.      <u>Other Insurance Policies</u>

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Plan Effective Date, each insurance policy to which the Debtors are a party as of the Plan Effective Date shall be assumed by the Reorganized Company unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Confirmation Hearing.

Except as set forth in <u>ARTICLE IV.S.1</u> of the Plan, nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening) (a) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of the Debtors' insurance policies, including the D&O Liability Insurance Policies, or (b) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Reorganized Company or draw on any collateral or security therefor; for the avoidance of doubt, the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in this Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (x) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (y) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (i) workers' compensation claims, (ii) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (iii) all costs in relation to each of the foregoing.

Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, insureds, Debtors, and the Reorganized Company, as applicable, under the insurance policies in any manner, and such insurance carriers, insureds, Debtors, and the Reorganized Company, as applicable, shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the insureds and the Reorganized Company, as applicable, in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Plan Effective Date.

T.      *Management Incentive Plan*

On or after the Plan Effective Date, the Management Incentive Plan shall be established by the Reorganized Company pursuant to the terms of the Management Incentive Plan Term Sheet.

U.      *Subordination Agreements*

Pursuant to section 510(a) of the Bankruptcy Code, all subordination agreements, including but not limited to, the Intercreditor Agreement, governing Claims or Interests shall be enforced in accordance with such agreement's terms; *provided*, that if the Second Lien Term Loan Claims Class votes in favor of the Plan, Required Lenders (as defined in the First Lien Credit Agreement) shall waive, and shall cause the First Lien Agent to waive, any turnover or similar rights in favor of the First Lien Lenders on account of

the Intercreditor Agreement with respect to any distribution to which the Holders of Second Lien Term Loan Claims are entitled pursuant to <u>ARTICLE III.B.5</u> of the Plan.

V.   *Payment of Second Lien Ad Hoc Group Advisors and Senior Unsecured Notes Ad Hoc Group Advisors*

On the Plan Effective Date, the Debtors shall (a) if Class 4 votes to accept the Plan, pay all outstanding Second Lien Ad Hoc Group Advisor Fees in accordance with <u>ARTICLE III.B.4</u>; *provided, that*, for the avoidance of doubt, the payment of Second Lien Ad Hoc Group Advisor Fees shall in no event exceed $18 million, subject to ratable reduction if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold as set forth in <u>ARTICLE III.B.4.c.i</u> and (b) if Class 5 votes to accept the Plan, pay all Senior Unsecured Notes Ad Hoc Group Advisor Fees in accordance with <u>ARTICLE III.B.6</u>; *provided, that*, for the avoidance of doubt, the payment of the Senior Unsecured Notes Ad Hoc Group Advisors Fees shall in no event exceed $21 million, subject to ratable reduction if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold as set forth in <u>ARTICLE III.B.5.c.i</u>; *provided, further*, that the Second Lien Ad Hoc Group Advisors and the Senior Unsecured Notes Ad Hoc Group Advisors, as applicable, submit an invoice, in summary form to the Debtors, no later than five (5) Business Days prior to Plan Effective Date.  The summary invoice shall not be required to include time entry detail but shall include a summary regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates (except for financial advisors compensated on other than an hourly basis), and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or for any benefits of the attorney work-product doctrine; provided that the Debtors reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals, subject to redaction for privilege.

W.   *Closing of Chapter 11 Cases*

After an Estate has been fully administered, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules; provided that, as of the Plan Effective Date, the Reorganized Debtors may submit orders to the Bankruptcy Court under certification of counsel closing individual Chapter 11 Cases and changing the caption of the Chapter 11 cases accordingly; provided further that, matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

X.   *Dissolution of Certain Debtors*

On or after the Plan Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or similar governing body of the Debtors or the Reorganized Debtors. The Reorganized Debtors shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable: (1) file a certificate of dissolution for such entities, together with all other necessary corporate and company documents, to effect the dissolution of such entities under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of such Debtors, as determined under applicable tax laws; and (3) represent the interests of such Debtors before any taxing authority in all tax matters, including any action, proceeding or audit.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Plan Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease (including those set forth in the Assumption Schedule) shall be assumed and assigned to the applicable Reorganized Debtor in accordance with the provisions and requirements of section 365 and 1123 of the Bankruptcy Code, other than: (i) those that are identified on the Rejection Schedule; (ii) those that have been previously rejected by a Final Order; (iii) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (iv) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Plan Effective Date.

Subject to the occurrence of the Plan Effective Date, entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumption Schedule, and the Rejection Schedule pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Company has provided adequate assurance of future performance under such assumed Executory Contracts and Unexpired Leases; provided, however, that any assumption of an Executory Contract or Unexpired Lease is further subject to the resolution of any Assumption Dispute in accordance with ARTICLE V.D of the Plan and payment of the applicable Cure Claim, if any. Except as otherwise specifically set forth herein or in the Confirmation Order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Plan Effective Date.

Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume or assume and assign Executory Contracts or Unexpired Leases pending on the Plan Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Plan Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Company with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Plan Effective Date.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control" or "change in control" under any lease, contract, or agreement to which a Debtor is a party.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by thirty (30) days from the date of entry of an order of the Bankruptcy Court approving such rejection (including the Confirmation Order). **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as**

**applicable, the Debtors or the Reorganized Company, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Company, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and may be objected to in accordance with the provisions of <u>ARTICLE VII.E</u> of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash, on the Plan Effective Date, or as soon as reasonably practicable thereafter, of the cure amount set forth on the Assumption Schedule for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon the payment of the Cure Claim. The Debtors may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Any party that fails to object to the applicable cure amount listed on the Assumption Schedule within seven (7) calendar days of the filing thereof shall be forever barred, estopped, and enjoined from disputing the cure amount set forth on the Assumption Schedule (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Assumption Schedule.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Dispute Resolution*

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Debtors or the Reorganized Company to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or the cure of defaults required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by (x) a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or (y) as may be agreed upon by the Debtors and the counterparty to the Executory Contract or Unexpired Lease without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; <u>provided</u>, <u>that</u> the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the party or parties to such Executory Contract or Unexpired Lease or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtor or Reorganized Debtor,

as applicable. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (an "***Adjourned Cure Dispute***"); <u>provided</u>, <u>that</u> the Reorganized Company may settle any Adjourned Cure Dispute after the Plan Effective Date without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests in favor of the Debtors, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumption Schedule, or the Rejection Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or, after the Plan Effective Date, the Reorganized Company shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

G.      *Nonoccurrence of Plan Effective Date; Bankruptcy Code Section 365(d)(4)*

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Plan Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Allowed Claim or Allowed Interest in the amount that the Plan provides. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in <u>ARTICLE VII</u> of the Plan. Except as specifically provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Plan Effective Date.

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; <u>provided</u>, <u>that</u> Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor. Any such Claims shall be released pursuant to <u>ARTICLE VIII</u> of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

B.    *Rights and Powers of Distribution Agent*

The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

C.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    <u>Record Date for Distribution</u>

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date; <u>provided</u>, <u>that</u> the Distribution Record Date shall not apply to any publicly held securities held in the name of, or by a nominee of, DTC (including, without limitation, the Senior Unsecured Notes Claims), as to which distributions may be made in accordance with the applicable procedures of DTC.

2.    <u>Delivery of Distributions</u>

Subject to Bankruptcy Rule 9010, all distributions to any Holder or permitted designee, as applicable, of an Allowed Claim or Allowed Interest shall be made to the Distribution Agent, who shall transmit such distribution to the applicable Holders or permitted designees of Allowed Claims or Allowed Interests on behalf of the applicable Debtors. All distributions shall be deemed completed when made to the Distribution Agent. In the event that any distribution to any Holder or permitted designee is returned as undeliverable, no further distributions shall be made to such Holder or such permitted designee unless and until the Distribution Agent is notified in writing of such Holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such Holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Distribution Agent to attempt to locate Holders or permitted designees, as applicable, of undeliverable distributions.

Notwithstanding the foregoing, all distributions of Cash on account of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims, if any, shall be deposited with the First Lien Agent, the Second Lien Agent, and the Senior Unsecured Notes Trustee, as applicable, for distribution to Holders of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims in accordance with the terms of the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Senior Unsecured Notes Indenture, as applicable. All distributions other than of Cash on account of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims, if any, may, with the consent of the First Lien Agent, the Second Lien Agent, and the Senior Unsecured Notes Trustee, as applicable, be made by the Distribution Agent directly to Holders of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims in accordance with the terms of the Plan, the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Senior Unsecured Notes Indenture, as applicable. To the extent the First Lien Agent, the Second Lien Agent, or the Senior Unsecured Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the First Lien Agent, the Second Lien Agent, and the Senior Unsecured Notes Trustee shall be deemed a "Distribution Agent" for purposes of the Plan. Notwithstanding the foregoing, with respect to any Claims held in the name of, or by a nominee of, DTC, the Reorganized Company and the Distribution Agent shall make such distribution through the facilities of DTC.

The amount of any reasonable and documented fees and expenses incurred by the Distribution Agent in connection with making distributions (including, without limitation, reasonable attorneys' fees and expenses) shall be paid in Cash by the Reorganized Company and will not be deducted from distributions made to Holders of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims, as applicable. The foregoing reasonable and documented fees and expenses shall be paid in the ordinary course, upon presentation of reasonably detailed invoices to the Reorganized Company and without the need for approval by the Bankruptcy Court.

All securities to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent or the Reorganized Debtors, as determined by the Debtors or the Reorganized Debtors, as applicable.

3.    No Fractional Shares

No fractional shares or units of Reorganized Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of shares or units of Reorganized Equity that is not a whole number, such Reorganized Equity shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof. The total number of authorized

and/or issued shares or units of Reorganized Equity to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

    4.    <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then- current address of such Holder, at which time such distribution shall be made to such Holder without interest; <u>provided that</u> such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of this <u>ARTICLE VI.C.4</u>, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed), except for such unclaimed Reorganized Equity, which shall be cancelled, and all other unclaimed property or interests in property shall revert to and vest in the Reorganized Company without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Distribution Agent of an intent to accept a particular distribution; (iii) responded to the Distribution Agent's requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

D.    *Securities Registration Exemption*

The issuance and distribution under the Plan of the Reorganized Equity to Holders of First Lien Claims on account of their Allowed Claims shall, in each case, be exempt from registration under the Securities Act or any other applicable securities laws to the fullest extent permitted by section 1145(a) of the Bankruptcy Code or, with respect to any "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act.

With respect to the foregoing securities issued pursuant to section 1145(a) of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The issuance and distribution under the Plan of the Subscription Rights and the Reorganized Equity in the Equity Rights Offering, including upon the exercise of the Subscription Rights, to the Equity Rights Offering Backstop Parties on account of any unsubscribed Equity Rights Offering Shares that are not purchased by Holders of Allowed First Lien Claims that are not Equity Rights Offering Backstop Parties as part of the Equity Rights Offering, any Equity Rights Offering Holdback Shares, and any Reorganized Equity issued on account of the Equity Rights Offering Backstop Premium, will be issued pursuant to the exemption from registration provided by Section 4(a)(2) of the Securities Act. Such Reorganized Equity will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

None of the Debtors, the Reorganized Company, or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the

Reorganized Equity under applicable securities laws. DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Equity are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

Notwithstanding anything to the contrary in this Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the Reorganized Equity are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

E.    *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Distribution Agent and Reorganized Company, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. In the case of a Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Allowed Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent and Reorganized Company, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, requiring the intended recipient of such distribution to provide an amount of Cash sufficient to satisfy such withholding tax or establishing any other mechanisms they believe are reasonable and appropriate. If an intended recipient of a Plan Distribution has agreed to provide the Distribution Agent or Reorganized Company, as applicable, with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution. The Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

F.    *Allocations*

Unless otherwise required by law (as reasonably determined by the Debtors), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed herein.

G.    *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be

paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

H.      *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Debtors or the Reorganized Company, as applicable, may, but shall not be required to, set off against or recoup from any claims of any nature whatsoever that the Debtors or the Reorganized Company may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Company of any such claim they may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or the Reorganized Company, as applicable, unless (i) the Debtors have consented (which consent shall not be unreasonably withheld) and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

I.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the Reorganized Company, or the Distribution Agent. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Reorganized Company, or the Distribution Agent on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the Debtor, the Reorganized Company, or the Distribution Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. In the event such Holder fails to timely repay or return such distribution, the Debtors or the Reorganized Company may pursue any rights and remedies against such Holder under applicable law.

2.      Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein

constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
# PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims and Interests*

After the Plan Effective Date, the Reorganized Company shall have and retain any and all rights and defenses each Debtor had with respect to any Claim or Interest immediately before the Plan Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order, Allowing such Claim or Interest.

B.      *Claims and Interests Administration Responsibilities*

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Plan Effective Date, the Reorganized Company shall have the authority (i) to file, withdraw, or litigate to judgment objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Plan Effective Date, the Reorganized Company shall have and retain any and all rights and defenses the Debtors had immediately prior to the Plan Effective Date with respect to any Disputed Claim or Disputed Interest, including the Retained Causes of Action.

C.      *Estimation of Claims*

Before or after the Plan Effective Date, the Debtors or the Reorganized Company, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Reorganized Company, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim or Interest is estimated. All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims Register Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Company upon stipulation between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

The Debtors and the Reorganized Company, as applicable, shall exclusively be entitled to object to Claims. After the Plan Effective Date, except as expressly provided herein to the contrary, the Reorganized Company shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim and requests for payment of Administrative Claims shall be served and Filed on or before the Claims Objection Deadline. The expiration of such period shall not limit or affect the Debtors' or the Reorganized Company's rights to dispute Claims asserted in the ordinary course of business other than through a Proof of Claim.

F.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable pursuant to a Cause of Action under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable pursuant to a Cause of Action under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Company. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

G.      *Amendments to Claims*

On or after the Claims Bar Date and Administrative Claims Bar Date, as applicable, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Company. Absent such authorization, any new or amended Claim Filed after the Claims Bar Date and Administrative Claims Bar Date, as applicable, shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

H.      *No Distributions Pending Allowance*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

I.      *Distributions After Allowance*

As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Reorganized Company shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Plan Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable nonbankruptcy law.

J.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one-hundred percent (100%) of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Reorganized Company may compromise and settle Claims against, and Interests in, the Debtors and their Estates and the Retained Causes of Action.

B.      *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan (including with respect to Claims that are Reinstated by the Plan) or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such

debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring, and, upon the Plan Effective Date, all Holders of such Claims and Interests shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors, the Reorganized Company, or any of their Assets or property.

C.      *Releases by the Debtors*

Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Plan Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in this ARTICLE VIII.C shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness

or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.

D.    *Releases by Holders of Claims and Interests*

Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Plan Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in this ARTICLE VIII.D shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii)

releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

E.      *Exculpation*

Without affecting or limiting the releases set forth in <u>ARTICLE VIII.C</u> and <u>ARTICLE VIII.D</u> of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Reorganized Debt and the Equity Rights Offering, the pursuit of consummation of the Plan Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.

F.      *Injunction*

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER

THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE PLAN EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE VIII.E OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASES PRIOR TO THE PLAN EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH DEBTOR, REORGANIZED DEBTOR, OR RELEASED PARTY. THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.

BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR ALLOWED INTEREST EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN WILL BE DEEMED TO HAVE AFFIRMATIVELY AND SPECIFICALLY CONSENTED TO BE BOUND BY THE PLAN, INCLUDING, WITHOUT LIMITATION, THE INJUNCTIONS SET FORTH IN THIS ARTICLE VIII.F.

THE INJUNCTIONS IN THIS <u>ARTICLE VIII.F</u> SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

G.     *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise that a Holder of a Claim or Interest may have against other Holders of Claims or Interests with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

H.     *Release of Liens*

Except (i) with respect to the Liens securing the New Reorganized Debt or (ii) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Company, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Company and its successors and assigns. On and after the Plan Effective Date, the Reorganized Company (and any of its respective agents, attorneys or designees) shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases or such other forms or release documents as may be necessary or appropriate to evidence such releases and implement the provisions of this <u>ARTICLE VIII.H</u>.

I.     *Waiver of Statutory Limitations on Releases*

Each Releasing Party in each of the releases contained in this Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party. The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, or foreseen or unforeseen.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Plan Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Plan Effective Date (or shall be waived pursuant to ARTICLE IX.B of the Plan):

1.      the Restructuring Support Agreement shall not have been terminated as to the Required Consenting First Lien Lenders and shall be in full force and effect;

2.      the Bankruptcy Court shall have entered the Cash Collateral Order and the DIP Order, the latter of which shall be in full force and effect;

3.      the Equity Rights Offering Backstop Commitment Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall be in full force and effect;

4.      the Equity Rights Offering (including the Equity Rights Offering Procedures) shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall have been consummated in accordance with its terms;

5.      all Milestones shall have been met or waived in accordance with the terms of the Restructuring Support Agreement;

6.      the Exit First Lien Term Loan Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting First Lien Lenders), other than such conditions that related to the effectiveness of the Plan and related transactions;

7.      the Reorganized Equity shall have been issued;

8.      the Professional Fee Escrow shall have been established and funded;

9.      all (i) Restructuring Expenses and in accordance with ARTICLE IV.V, (ii) if Class 4 votes to accept the Plan, the Second Lien Ad Hoc Group Advisor Fees and (iii) if Class 5 votes to accept the Plan, all Senior Unsecured Notes Ad Hoc Group Advisors Fees shall have been paid in full in Cash;

10.     the Definitive Documents shall (i) be materially consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms materially consistent with the Restructuring Support Agreement and the Restructuring Term Sheet;

11.     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions; and

12.     there shall be no outstanding complaint for the determination of dischargeability of a debt in excess of $5,000,000 pursuant to section 523 of the Bankruptcy Code and/or Bankruptcy Rule 4007 (a "***Dischargeability Complaint***") (and no outstanding request for extension of time to file the same) and the Bankruptcy Court shall not have ruled in favor of any such complaint and/or request; *provided*, *that*, pending resolution of a Dischargeability Complaint, the Milestone for the Plan Effective Date shall be automatically extended one time by forty-five (45) days;

*provided*, *that*, notwithstanding when a condition precedent to the Plan Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously with the other conditions precedent to the Plan Effective Date; provided, further, that to the extent a condition precedent (a "***Prerequisite Condition***") may be required to occur prior to another condition precedent (a "***Subsequent Condition***") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

B.      *Waiver of Conditions*

The conditions to the Plan Effective Date set forth in this ARTICLE IX may be waived only by the Debtors, with the consent of the Required Consenting First Lien Lenders (such consent not to be unreasonably withheld), as applicable, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

C.      *Substantial Consummation*

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Plan Effective Date.

D.      *Effect of Non-Occurrence of Conditions to the Plan Effective Date*

If the Plan Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

The Debtors, with the consent of the Required Consenting First Lien Lenders, reserve the right to modify the Plan and seek confirmation of the Plan consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan; *provided*, *however*, that if the proposed modification of the Plan has a material and adverse effect on the economic rights or releases of the Required Consenting Second Lien Term Lenders, the Required Consenting Senior Unsecured Noteholders, or the Consenting Sponsors, then such modification shall require the consent of the Required Consenting Second Lien Term Lenders, the Required Consenting Senior Unsecured Noteholders, or the Consenting Sponsors, as applicable (which consent shall not be unreasonably withheld, conditioned, or delayed). Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of the

Required Consenting First Lien Lenders, expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

Notwithstanding the above, prior to the Plan Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court.

B.     *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan or if confirmation and consummation of the Plan do not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, on and after the Plan Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.     Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests; provided, that for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Company, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to (i) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may

be liable in any manner (whether through amendment of the Assumption Schedule or Rejection Schedule or otherwise) and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease and (ii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Plan Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action related to the Chapter 11 Cases;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, injunctions, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in ARTICLE VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to ARTICLE VI.I of the Plan;

13.      to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a cure amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

14.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16. adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order, in each case, in accordance with the Restructuring Support Agreement;

18. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

20. hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

21. hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan;

22. enforce all orders previously entered by the Bankruptcy Court;

23. hear any other matter not inconsistent with the Bankruptcy Code and the Judicial Code;

24. enter an order concluding or closing the Chapter 11 Cases;

25. recover all assets of the Debtors and property of the Debtors' Estates, wherever located

26. to enter a final decree closing each of the Chapter 11 Cases; and

27. enforce the compromise, settlement, discharge, injunction, release, and exculpation provisions set forth in ARTICLE VIII of the Plan.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to ARTICLE IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Plan Effective Date, upon the effectiveness of the Plan, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and the Reorganized Company, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order

and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.  *Additional Documents*

On or before the Plan Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.  *Payment of Statutory Fees*

All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Plan Effective Date shall be paid by the Debtors or the Reorganized Debtors as applicable.  On and after the Plan Effective Date, the Reorganized Company shall pay any and all such fees in full in Cash when due and payable and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

D.  *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with ARTICLE IX.A of the Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any other party, including the Released Parties, with respect to the Holders of Claims or Interests or any other matter prior to the Plan Effective Date.

E.  *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, Related Party, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.  *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors and the Consenting Stakeholders shall be served on:

Debtors:                          H-Food Holdings, LLC
                                  3333 Finley Rd., Suite 800
                                  Downers Grove, IL 60515
                                  Attn:   Roger E. Harris

Email:  RHarris@hearthsidefood.com

Proposed Counsel to the Debtors:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Attn:    Ryan Preston Dahl
         Matthew M. Roose
         Natasha S. Hwangpo
Email:  Ryan.Dahl@ropesgray.com
       Matthew.Roose@ropesgray.com
       Natasha.Hwangpo@ropesgray.com

- and -

Proposed Co-Counsel to the Debtors:

Porter Hedges LLP
1000 Main Street
36th Floor
Houston, TX 77002
Attn:    John F. Higgins
        M. Shane Johnson
Email:  jhiggins@porterhedges.com
       sjohnson@porterhedges.com

Counsel to the First Lien Ad Hoc Group:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attn:    Scott J. Greenberg
        Matthew J. Williams
        Joshua Brody
Email:  SGreenberg@gibsondunn.com
       MJWilliams@gibsondunn.com
       JBrody@gibsondunn.com

- and -

Howley Law PLLC
700 Louisiana Street
Suite 4545
Houston, TX 77002
Attn:    Tom Howley
        Eric Terry
Email:  tom@howley-law.com
       eric@howley-law.com

Counsel to the Second Lien Ad Hoc Group:

Proskauer Rose LLP
11 Times Square
New York, NY 10036-8299
Attn:    Vincent Indelicato
        Matthew R. Koch
Email:  VIndelicato@proskauer.com
       MKoch@proskauer.com

|  | - and -                                                        |
|--|----------------------------------------------------------------|

Gray Reed
1300 Post Oak Boulevard
Suite 2000
Houston, TX 77056
Attn:   Jason S. Brookner
Email:  jbrookner@grayreed.com

| Counsel to the Senior Unsecured Notes Ad Hoc Group: | Paul Hastings LLP<br>200 Park Avenue<br>New York, NY 10166<br>Attn:   Kris Hansen<br>        Jon Canfield<br>Email:  KrisHansen@paulhastings.com<br>        JonCanfield@paulhastings.com |
|--|--|

- and -

2001 Ross Avenue, Suite 2700
Dallas, TX 75201
Attn:   Charles Persons
Email:  CharlesPersons@paulhastings.com

- and -

4655 Executive Drive, Suite 350
San Diego, CA 92121
Attn:   Jason Pierce
Email:  JasonPierce@paulhastings.com

| Counsel to SnackTime PG Holdings, Inc. and Snack Time Summit Holdings, Inc.: | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001-2163<br>Attn:   Samuel A. Khalil<br>Email:  SKhalil@milbank.com |
|--|--|
| Counsel to CB Metafora Aggregator, LLC: | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn:   Brian Schartz<br>        Jimmy Ryan<br>Email:  Brian.Schartz@kirkland.com<br>        Jimmy.Ryan@kirkland.com |
| Proposed Counsel to the Creditors' Committee: | Lowenstein Sandler LLP<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Attn:   Jeffrey L. Cohen<br>        David M. Posner<br>        Bruce S. Nathan<br>Email:  jcohen@lowenstein.com<br>        dposner@lowenstein.com |

bnathan@lowenstein.com

| | |
|---|---|
| Proposed Co-Counsel to the Creditors' Committee: | McDermott Will & Emery LLP<br>845 Texas Avenue, Suite 40000<br>Houston, TX 77002-1656<br>Attn:  Charles R. Gibbs (TX Bar No. 07846300)<br>       Grayson Williams (TX Bar No. 24124561)<br>Email: crgibbs@mwe.com<br>       gwilliams@mwe.com |

After the occurrence of the Plan Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, and such entities must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not File such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Plan Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have Filed such renewed requests.

G.     *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.     *Entire Agreement*

The Plan, Plan Supplement, Confirmation Order, and the Restructuring Support Agreement (assumption of which agreements is approved by the Confirmation Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

I.     *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, at the request of the Debtors, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be reasonably acceptable to (x) the Debtors and (y) the Required Consenting First Lien Lenders. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent (such consent not to be unreasonably withheld, conditioned, or delayed) from (x) the Debtors and (y) the Required Consenting First Lien Lenders; and (iii) nonseverable and mutually dependent.

J.      *Dissolution of Committee*

On the Plan Effective Date, any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve; provided that following the Plan Effective Date, any such committees, including the Creditors' Committee, shall continue in existence solely for the purpose of filing and prosecuting applications for allowance of Professional Fee Claims.  Upon the dissolution of any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, such committee members and their respective Professionals shall cease to have any duty, obligation, or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

K.      *Expedited Tax Determination*

The Debtors and Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed or to be filed for or on behalf of the Debtors for all taxable periods ending after the Petition Date through the Plan Effective Date.

L.      *Creditor Default*

An act or omission by a Holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and may be entitled to reimbursement for their reasonable attorneys' fees and costs incurred in remedying such default. Upon the finding of such a default by a Holder of a Claim or Interest, the Bankruptcy Court may: (1) designate a party to appear, sign, and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (2) enforce the Plan by order of specific performance; (3) award judgment against such defaulting Holder of a Claim or Interest in favor of the Reorganized Debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (4) make such other Order as may be equitable that does not materially alter the terms of the Plan.

Respectfully submitted, as of December 13, 2024

H-Food Holdings, LLC
(on behalf of itself and its Debtor affiliates)

By:   */s/ Robert M. Caruso*
      Name:  Robert M. Caruso
      Title:   Chief Restructuring Officer
            H-Food Holdings, LLC, and
            its Debtor affiliates