United States Bankruptcy Court
Southern District of Texas

**ENTERED**

January 24, 2025

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| H-Food Holdings, LLC, *et al.*,[1] | Case No. 24-90586 (ARP) |
| Debtors. | (Jointly Administered) |

**ORDER (I) APPROVING THE PROPOSED DISCLOSURE
STATEMENT, (II) APPROVING THE SOLICITATION AND NOTICE
PROCEDURES WITH RESPECT TO CONFIRMATION OF THE DEBTORS' JOINT
CHAPTER 11 PLAN, (III) APPROVING THE FORM OF BALLOTS, (IV) APPROVING
THE EQUITY RIGHTS OFFERING PROCEDURES AND RELATED MATERIALS,
(V) SCHEDULING A PLAN CONFIRMATION HEARING, (VI) ESTABLISHING
NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION
OF THE PROPOSED PLAN, AND (VII) GRANTING RELATED RELIEF**

[Relates to Docket No. 189]

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"): (a) approving the adequacy of

the *Disclosure Statement for the Joint Chapter 11 Plan of H-Food Holdings, LLC, and its Affiliated*

*Debtors* [Docket No. 188] (as amended by the *Disclosure Statement for the Second Amended Joint*

*Chapter 11 Plan of H-Food Holdings, LLC, and its Affiliated Debtors* [Docket No. [●]] the

"Disclosure Statement"); (b) approving the form and manner of notice of the (i) Publication Notice,

---

1   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783).  The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

2   Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

and (ii) Confirmation Hearing Notice; (c) approving the Solicitation Procedures with respect to confirmation of the Plan, including the forms of Ballots; (d) approving the Equity Rights Offering Procedures and related materials; (e) approving the form and manner of the Notice of Non-Voting Status and the Opt-Out Form; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. § 1408; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

IT IS FOUND AND DETERMINED THAT:

**I.    Approval of the Disclosure Statement.**

A.    All objections to this Order are resolved and to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

B.    The Disclosure Statement, in the form attached hereto as **Exhibit 1**, is hereby approved as providing Holders of Claims and Interests entitled to vote on the Plan with adequate

information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

C.      The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims, Holders of Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in <u>Article VIII</u> of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).  No further information is necessary.

**II.      Approval of the Publication Notice and Confirmation Hearing Notice.**

D.      The procedures set forth in the Motion regarding notice to all parties of the Confirmation Hearing and Plan Confirmation Objection Deadline, including the form and content of the Confirmation Hearing Notice, provide due, proper, and adequate notice, comport with due process and comply with Bankruptcy Rules 2002, 3017, and 3020.  No further notice is necessary.

**III.      Approval of the Solicitation Procedures, Forms of Ballots and Cover Letter.**

E.      The proposed distribution and contents of the Solicitation Package comply with Bankruptcy Rules 2002 and 3017 and constitute sufficient notice to all interested parties of the Voting Record Date, Voting Deadline, Plan Confirmation Objection Deadline, Confirmation Hearing, and other related matters.  No further notice is necessary.

F.      The period proposed by the Debtors in this Order during which the Debtors will solicit votes to accept the Plan is a reasonable and sufficient period of time for Holders of Claims or Interests in the Voting Classes to make an informed decision regarding whether to accept or reject the Plan and timely return Ballots evidencing such decision.

G.      The procedures set forth in the Motion for the solicitation and tabulation of votes to accept or reject the Plan provide for a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

H.      Debtors shall solicit, receive, and tabulate votes to accept or reject the Plan in accordance with the Solicitation Procedures, including the forms of Ballots attached hereto as **Exhibits 4A**, **4B**, **4C**, **4D**, and **4E**, which are hereby approved in their entirety as consistent with Official Bankruptcy Form No. B 314, in addressing the particular needs of these chapter 11 cases, and in providing adequate information and instructions for each party entitled to vote to accept or reject the Plan.  No further information or instructions are necessary.

**IV.      Parties Entitled to Vote.**

I.      Pursuant to the Plan, Holders of Claims in Class 3 (First Lien Claims), Class 4 (Second Lien Term Loan Claims), Class 5 (Senior Unsecured Notes Claims), and Class 6 (General Unsecured Claims) are Impaired and are entitled to receive distributions under the Plan. Accordingly, holders of Allowed Claims in such Classes are entitled to vote on account of such Claims (to the extent set forth herein).

**V.      Parties Not Entitled to Vote.**

J.      Pursuant to the Plan, Holders of Claims or Interests in Class 1 (Other Secured Claims), Class 2 (Priority Non-Tax Claims), and Class 9 (Intercompany Interests) are Unimpaired and, accordingly, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to accept the Plan and are not entitled to vote on account of such Claims and Interests.

K.      Pursuant to the Plan, Holders of Claims or Interests in Class 8 (Section 510(b) Claims) and Class 10 (Existing Equity Interests) are Impaired and will receive no recovery and, accordingly, pursuant to section 1126(g) of the Bankruptcy Code, are conclusively deemed not to accept the Plan and are not entitled to vote on account of such Claims or Interests.

L.      Pursuant to the Plan, Holders of Claims in Class 7 (Intercompany Claims) are Impaired or Unimpaired and, accordingly, are either (i) conclusively presumed to accept the Plan

4

and are not entitled to vote on account of such Claims pursuant to section 1126(f) of the Bankruptcy Code, or (ii) conclusively deemed not to accept the Plan and are not entitled to vote on account of such Claims pursuant to section 1126(g) of the Bankruptcy Code.

**VI.    Non-Voting Status Notice and Opt-Out Form.**

M.    The Non-Voting Status Notice, substantially in the form attached hereto as **Exhibit 8**, and the Opt-Out Form, substantially in the form attached hereto as **Exhibit 9**, comply with the Bankruptcy Code, applicable Bankruptcy Rules, and applicable Local Rules and Complex Case Procedures and provide adequate notice to holders of Claims or Interests in Class 1 (Other Secured Claims), Class 2 (Priority Non-Tax Claims), Class 8 (Section 510(b) Claims), and Class 10 (Existing Equity Interests) of their non-voting status.  No further notice is necessary.

**VII.    Approval of the Equity Rights Offering Backstop Commitment Agreement**

N.    The Equity Rights Offering Procedures, substantially in the form attached hereto as **Exhibit 6**, and the Equity Backstop Commitment Agreement, substantially in the form attached hereto as **Exhibit 7**, are approved.

IT IS HEREBY ORDERED THAT:

1.    The Disclosure Statement contains adequate information in accordance with section 1125 of the Bankruptcy Code and is APPROVED.

2.    The Disclosure Statement (including all applicable exhibits thereto) provides sufficient notice of the proposed injunction, exculpation, and release provisions contained in Article VIII of the Plan, in accordance with Bankruptcy Rule 3016(c).

3.    All objections, if any, to the Disclosure Statement, the Motion, or any of the procedures or exhibits referenced therein that have not been withdrawn or resolved as provided for in the record of the Disclosure Statement Hearing are overruled.

4.     The form and manner of service of the Publication Notice and the Confirmation Hearing Notice complies with all applicable Bankruptcy Rules and Local Rules and no further notice is necessary.

5.     The Confirmation Schedule is hereby approved as follows, subject to modification as necessary:

| SOLICITATION AND CONFIRMATION TIMELINE | |
|---|---|
| **Event** | **Date and Time (prevailing Central Time)** |
| Disclosure Statement Objection Deadline | **Within twenty-eight (28) days after the filing of the Disclosure Statement** |
| Disclosure Statement Hearing | **January 24, 2025 at 9:00 a.m. (prevailing Central Time)** |
| Voting Record Date | **January 24, 2025** |
| Confirmation Hearing Notice Mailing Deadline | **Within seven (7) days after entry of the Order, or as soon as reasonably practicable thereafter** |
| Deadline to Publish the Publication Notice | **Within seven (7) days after entry of the Order, or as soon as reasonably practicable thereafter** |
| Deadline to Mail Solicitation Packages | **Within twelve (12) days after entry of the Order** |
| Deadline to File Plan Supplements | **February 14, 2025** |
| Deadline to Object to Claims for Estimation Purposes | **February 18, 2025 at 4:00 p.m. (prevailing Central Time)** |
| Rule 3018(a) Motion Deadline | **February 25, 2025 at 4:00 p.m. (prevailing Central Time** |
| Voting Deadline | **March 3, 2025 at 4:00 p.m. (prevailing Central Time)** |
| Plan Confirmation Objection Deadline | **March 3, 2025 at 4:00 p.m. (prevailing Central Time)** |
| Deadline to File (i) Reply to Plan Objection(s) (ii) Brief in Support of Plan Confirmation, (iii) Declarations in Support of Confirmation, and (iv) Voting Certification | **March 8, 2025** |
| Confirmation Hearing | **March 10, 2025 at 1:00 p.m. (prevailing Central Time)** |

6.      The Disclosure Statement Hearing and/or the Confirmation Hearing may be adjourned or continued from time to time by the Court or the Debtors without further notice other than adjournments announced in open Court and a notice of adjournment filed by the Debtors on the Court's docket and served on all parties entitled to notice.

7.      Pursuant to the Plan, Holders of Claims in Class 3 (First Lien Claims), Class 4 (Second Lien Term Loan Claims), Class 5 (Senior Unsecured Notes Claims), and Class 6 (General Unsecured Claims) are Impaired and are entitled to receive distributions under the Plan. Accordingly, holders of Allowed Claims in such Classes are entitled to vote on account of such Claims (to the extent set forth herein).[3]   Nevertheless, a creditor that holds a Claim in a Voting Class is nonetheless not entitled to vote to the extent that:

a.      as of the Voting Record Date (as defined below), the outstanding amount of such creditor's Claim is zero ($0.00);

b.      as of the Voting Record Date, such creditor's Claim has been disallowed, expunged, disqualified or suspended;

c.      such creditor has not timely filed a proof of claim in accordance with the *Order (I) Establishing (A) Bar Dates and (B) Related Procedures for Filing Proofs of Claim, (II) Approving the Form and Manner of Notice Thereof and (III) Granting Related Relief* [Docket No. 208] as of the Voting Record Date and the Debtors have not scheduled such creditor's Claim or scheduled such creditor's Claim in an undetermined amount or as contingent, unliquidated, or disputed; or

d.      such creditor's Claim is subject to an objection or request for estimation filed on or before February 21, 2025, subject to the procedures set forth below.

8.      The record holders of Claims shall be determined, as of the Voting Record Date, based upon the records of the Debtors and the Claims and Noticing Agent.  Accordingly, any notice of claim transfer received by the record holder of the Debtors' debt securities, the Debtors, the

---

[3]   Holders of Claims in such Voting Classes shall be deemed to have voted only the aggregate unpaid principal amount of such Claims, excluding any accrued but unpaid prepetition interest with respect to the Claims voted.

Claims and Noticing Agent, or other similarly situated registrar after the Voting Record Date shall not be recognized for purposes of voting or receipt of the Plan confirmation materials.

9.      With respect to transfers of Claims filed pursuant to Bankruptcy Rule 3001(e), the transferee shall be entitled to receive a Solicitation Package and, if the holder of such Claim is otherwise entitled to vote with respect to the Plan, cast a Ballot on account of such Claim only if: (i) all actions necessary to transfer such Claim are completed by the Voting Record Date or (ii) the transferee files by the Voting Record Date (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer.  In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote or election on the Plan made by the holder of such Claim as of the Voting Record Date.

10.      Any party that has previously submitted to the Claims and Noticing Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Claims and Noticing Agent prior to the Voting Deadline a subsequent properly completed Ballot.  If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, valid Ballot shall be deemed to reflect that Holder's intent and shall supersede and revoke any Ballot previously received by the Claims and Noticing Agent from such Holder.  After the Voting Deadline, no Ballot may be withdrawn or amended without the written consent of the Debtors.

11.      Except as otherwise provided in the preceding paragraph, any party that has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Claims and Noticing Agent at any time prior to the Voting Deadline.  To be valid, a notice of withdrawal must (i) contain the

description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Claims and Noticing Agent prior to the Voting Deadline.  The Debtors shall retain the right to contest the validity of any such withdrawals of Ballots.

12.     First Lien Claims. The amount of each First Lien Claim in Class 3 (First Lien Claims), for voting purposes only will be established by reference to the list of participant lenders to the First Lien Credit Agreement and those participant lenders' corresponding amounts as of the Voting Record Date as reflected on the loan register maintained by the First Lien Agent (as defined in the Plan), which shall be provided by the First Lien Agent to Kroll in Microsoft Excel or similar format no later than one (1) Business Day following the Voting Record Date.

13.     Second Lien Term Loan Claims. The amount of each Second Lien Term Loan Claim in Class 4 (Second Lien Term Loan Claims), for voting purposes only, will be established by reference to the list of participant lenders to the Second Lien Credit Agreement and those participant lenders' corresponding amounts as of the Voting Record Date as reflected on the loan register maintained by the Second Lien Agent (as defined in the Plan), which shall be provided by the Second Lien Agent to Kroll in Microsoft Excel or similar format no later than one (1) Business Day following the Voting Record Date.

14.     Senior Unsecured Notes Claims. The amount of each Senior Unsecured Notes Claim in Class 5 (Senior Unsecured Notes Claims), for voting purposes only, will be established through the indenture trustee or applicable Nominees (as defined herein), as the case may be, in the amount of the applicable positions held by such registered Holders as of the Voting Record

Date, as evidenced by the securities position report(s) from the Depository Trust Company, the applicable indenture trustee, or other applicable depository firm.

15.     <u>General Unsecured Claims</u>. The amount of each General Unsecured Claim in Class 6 (General Unsecured Claims), for voting purposes only, shall be established pursuant to the following hierarchy:

a.      If a Claim has been estimated or otherwise Allowed for voting purposes by order of this Court, such Claim is temporarily Allowed in the amount so estimated or Allowed by this Court;

b.      If (a) does not apply, but the Claim has been estimated or otherwise Allowed for voting purposes pursuant to a stipulation, settlement, or other agreement reached between the Debtors and the holder of the Claim (whether such stipulation, settlement, or agreement is filed or not), such Claim is temporarily Allowed for voting purposes in the amount set forth in the stipulation, settlement, or other agreement;

c.      If neither (a) nor (b) applies, then in the liquidated, non-contingent, and undisputed amount set forth on a proof of claim timely filed in accordance with the Bar Date Order as of the Voting Record Date, provided that if the amount set forth on a timely-submitted proof of claim is wholly unliquidated, contingent, and/or disputed, then the Claim shall be temporarily allowed for voting purposes in the amount of $1.00;

d.      If neither (a), (b), nor (c) apply, then in the liquidated, non-contingent, and undisputed amount set forth on the Debtors' Schedules, provided that if Claim appearing on the Debtors' Schedules is unliquidated, contingent, disputed, or in a $0.00 amount, and the Claims Bar Date has not expired, then the Claim shall be temporarily allowed for voting purposes in the amount of $1.00, and if the Claims Bar Date has expired without filing a proof of claim, then the Claim shall be disallowed for voting purposes;

e.      For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code separate Claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one Claim against the Debtor in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan;

f.      Creditors who have filed or purchased duplicate Claims within the same Voting Class shall be provided with only one Solicitation Package and one ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims;

g.      If a proof of claim has been amended by a later proof of claim that is filed on or prior to the Voting Record Date, the later filed amending claim shall be entitled to vote in a manner consistent with these tabulation rules, and the earlier filed claim shall be disallowed for voting purposes, regardless of whether the Debtors have objected to such amended claim. Except as otherwise ordered by the Court, any amendments to proofs of claim after the Voting Record Date shall not be considered for purposes of these tabulation rules; and

h.      Notwithstanding anything to the contrary herein, a Holder shall only be entitled to vote on account of a Claim arising from the rejection of an Executory Contract or Unexpired Lease if the Claim is filed by the Voting Record Date.

16.     If the Debtors have filed an objection to, or a request for estimation of a Claim on or before **February 18, 2025**, such Claim shall be temporarily disallowed for voting purposes, except as ordered by this Court before the Voting Deadline; provided, however, that, if the Debtors' objection seeks only to reclassify or reduce the Allowed amount of such Claim, then such Claim is temporarily Allowed for voting purposes in the reduced amount and/or as reclassified (as applicable), except as may be ordered by this Court prior to or concurrent with entry of an order confirming the Plan.

17.     If any creditor seeks to challenge the amount of its Claim for voting purposes, such creditor shall file with this Court a Rule 3018(a) Motion. Any Rule 3018(a) Motion must be filed with the Court and served on the Notice Parties so as to be actually received not later than **4:00 p.m. (Prevailing Central Time) on February 25, 2025**.

18.     Upon the filing of any such motion, such creditor's Ballot shall be counted in accordance with the below-designated guidelines, unless temporarily Allowed in a different amount by an order of this Court entered prior to or concurrent with entry of an order confirming the Plan.

19.     Within seven (7) days after entry of this Order, or as soon as reasonably practicable thereafter, the Debtors shall cause the Claims and Noticing Agent to distribute to (i) Holders of Claims in the Voting Classes, (ii) Holders of Claims and Interests in the Non-Voting Classes and

(iii) all parties on the Debtors' creditor matrix, as of the Voting Record Date, the Confirmation Hearing Notice attached to this Order as **Exhibit 3**.  The Confirmation Hearing may be adjourned or continued from time to time by the Court or the Debtors without further notice other than adjournments announced in open Court and a notice of adjournment filed by the Debtors on the Court's docket and served on all parties entitled to notice.

20.     The Solicitation Package to be transmitted within twelve (12) days after entry of the Order to Holders of Claims in Classes entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby APPROVED:

      i.    the Disclosure Statement attached hereto as **Exhibit 1** and any exhibits thereto;

      ii.    the Cover Letter attached hereto as **Exhibit 5**;

      iii.    a statement from the Creditors' Committee (the "Committee Statement") attached hereto as **Exhibit 10** (for the avoidance of doubt, this Statement shall only be distributed to Holders of Senior Unsecured Notes Claims in Class 5 and General Unsecured Claims in Class 6);

      iv.    the Confirmation Hearing Notice attached hereto as **Exhibit 3**;

      v.    a copy of this Order (without exhibits); and

      vi.    an appropriate Ballot (with a prepaid, preaddressed business reply envelope), the forms of which are attached hereto as **Exhibits 4A**, **4B**, **4C**, **4D**, and **4E**, for each Voting Class in which such Holder holds a Claim.

21.     The Solicitation Package provides the Holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code and the Local Rules.

22.     The Debtors shall distribute the Solicitation Package to all Holders of Claims entitled to vote on the Plan within twelve (12) days after entry of this Order.  The Debtors are authorized, in their discretion, to provide the Disclosure Statement and this Order (without

exhibits) in electronic format on a USB flash drive. The Cover Letter, Committee Statement (for the avoidance of doubt, the Committee Statement shall only be distributed to Holders of Senior Unsecured Notes Claims in Class 5 and General Unsecured Claims in Class 6), Confirmation Hearing Notice, Ballots, and such other materials as the Court may order included in the Solicitation Package, shall be provided in paper format. Solicitation materials provided in electronic format shall be made available in paper format, free of charge, to Holders of Claims in the Voting Classes upon request to the Claims and Noticing Agent. The Claims and Noticing Agent shall serve the Solicitation Package (without a Ballot) on the United States Trustee, counsel to the Creditors' Committee, and parties that have requested service pursuant to applicable provisions of Bankruptcy Rule 2002 within twelve (12) days after entry of this Order. Such service shall satisfy the requirements of the Bankruptcy Code, Bankruptcy Rules, and Local Rules. The Plan and Disclosure Statement are also available free of charge on the Debtors' case website at https://cases.ra.kroll.com/HFS/.

23.     With respect to addresses from which Solicitation Packages and Notices are returned as undeliverable by the United States Postal Service, the Debtors are excused from mailing Solicitation Packages or any other materials related to voting or confirmation of the Plan to those entities listed at such addresses unless the Debtors are provided with accurate addresses for such entities before the Voting Deadline, and failure to mail Solicitation Packages or any other materials related to voting or confirmation of the Plan to such entities will not constitute inadequate notice of the Confirmation Hearing or the Voting Deadline and shall not constitute a violation of Bankruptcy Rule 3017. Furthermore, the Debtors and Claims and Noticing Agent are relieved of any obligation to conduct independent research to discover valid address information with respect to solicitation materials or bankruptcy notices returned as undeliverable such that the Claims and

Noticing Agent is authorized to rely on address information provided to it, as of the Voting Record Date, by the Debtors or applicable administrative or transfer agent, as applicable, as to Holders in the Voting Classes and Non-Voting Classes alike.

24.     The Claims and Noticing Agent is authorized to assist the Debtors in (a) distributing the Solicitation Package, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims, (c) responding to inquires from Holders of Claims and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Package, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors and equity holders regarding the Plan.

25.     The following tabulation procedures are approved:

| Votes Not Counted | <ul><li>Any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;</li><li>Any Ballot that is not actually received by the Claims and Noticing Agent by the Voting Deadline, unless the Debtors, in consultation with the Creditors' Committee for any Ballot cast by a Holder of a Claim in Class 6, determine otherwise or as permitted by the Court;</li><li>Any unsigned Ballot;</li><li>Any Ballot that partially rejects and partially accepts the Plan in a particular Voting Class;</li><li>Any Ballot not marked to accept or reject the Plan in a particular Voting Class or marked both to accept and reject the Plan in a particular Voting Class;</li><li>Any Ballot submitted by any means other than as expressly provided herein as set forth in the Ballots;</li><li>Any Ballot cast by an entity that did not hold a Claim in a Voting Class as of the Voting Record Date;</li><li>Any Ballot cast or vote submitted by a Holder of a Class 5 Senior Unsecured Notes Claim whose position in the Senior Unsecured Notes was not validated by a Nominee as of the Voting Record Date;</li><li>Any Ballot superseded by a later, timely submitted valid Ballot; and</li><li>Any improperly submitted Ballot.</li></ul> |

| | |
|---|---|
| **No Vote Splitting** | ▪ Holders are required to vote all of their Claims in a particular Voting Class to either accept or reject the Plan and are not permitted to split any votes in a particular Voting Class. |
| **Retention of Solicitation Materials** | ▪ The Claims and Noticing Agent shall retain all paper copies of Ballots and all solicitation-related correspondence for one (1) year following the Effective Date, whereupon the Claims and Noticing Agent is authorized to destroy and/or otherwise dispose of all paper copies of Ballots, printed solicitation materials including unused copies of the Solicitation Package and all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Court in writing within such one (1) year period. |
| **Establishing Claim Amounts** | ▪ Holders must indicate the aggregate Claims amounts for each Voting Class in which the Holder votes Claims, as applicable;<br>▪ Upon return of a completed Ballot to the Claims and Noticing Agent, the aggregate amounts of Claims held in each Voting Class in which a Holder votes Claims as indicated on the Ballot shall be reconciled against the applicable lender registry for each Voting Class; and<br>▪ To the extent that any discrepancy exists between the aggregate Claims amount as indicated on a Ballot by a Holder of Claims in one or more Voting Classes and the aggregate Claims amount as listed on the applicable lender registry for each Voting Class in which a Holder votes Claims, the aggregate Claims amount as listed on the applicable lender registry shall govern for tabulation purposes. |

Notwithstanding the foregoing, if any Ballot (a) is not counted for voting purposes for any reason, including because it does not conform to the instructions set forth in this Order or the Ballot, but (b) the Ballot indicates a valid election to opt-out of the third-party releases provided in Article VIII.D and, if applicable, Article VIII.E of the Plan, such election shall be deemed valid and such Holder of a Claim or Interest who makes such election shall not be deemed a "Releasing Party" under the Plan, so long as the Ballot is actually received by the Claims and Noticing Agent by the Voting Deadline.

26.     To assist in the solicitation process, the Claims and Noticing Agent may, but is not obligated to, contact parties that submit incomplete or otherwise deficient ballots to make a reasonable effort to cure such deficiencies. Unless waived, any defects or irregularities in

connection with deliveries of Ballots must be cured within such time as the Debtors (or the Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

27.     The Debtors and/or their Claims and Noticing Agent, as applicable, in consultation with the Creditors' Committee for any Ballot cast by a Holder of a Claim in Class 6, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots, which determination, absent a contrary order of the Court, will be final and binding.

28.     The Debtors are authorized to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors and their counsel, as applicable, be unlawful.

29.     If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

30.     In addition to receiving Ballots and Opt-Out Forms via regular mail, overnight courier, or hand delivery to the Kroll address set forth in the Ballots and Opt-Out Forms, the Claims and Noticing Agent is authorized to accept Ballots and Opt-Out Forms submitted via electronic, online transmission, solely through a customized online submission portal accessible on the Debtors' case website to be maintained by the Claims and Noticing Agent.  Holders entitled to vote on the Plan or submit an Opt-Out Form may cast an electronic Ballot or Opt-Out Form

instantly by utilizing the online submission portal (which allows a Holder to submit an electronic signature). The encrypted data and audit trail created by such electronic submission shall become part of the record of any Ballots or Opt-Out Forms submitted in this manner and the Holder's electronic signature shall be deemed to be immediately legally valid and effective. Such online transmission shall be the only acceptable means of electronic Ballot or Opt-Out Form submission. Ballots and Opt-Out Forms submitted by electronic mail or facsimile, or any other means of electronic submission shall not be accepted, provided that Master Ballots submitted by Nominees on behalf of their Beneficial Holder clients and "pre-validated" Beneficial Ballots from Beneficial Holders may be submitted to the Claims and Noticing Agent by electronic mail (with the signatures appended thereto being immediately legally valid and effective).

31. With respect to service of Solicitation Packages to Holders of Senior Unsecured Notes Claims entitled to vote on the Plan, the Debtors shall deliver Solicitation Packages with appropriate Ballots to record Holders of such Claims, including, without limitation, brokers, banks, commercial banks, trust companies, dealers, or other agents or nominees (collectively, the "Nominees") in "street name" on behalf of the underlying beneficial Holders (the "Beneficial Holders"). Once the Voting Record Date has passed, the Debtors shall cause to be distributed, to each Holder of Claims entitled to vote, including Nominees, reasonably sufficient numbers of Solicitation Packages, including sufficient Beneficial Ballots (the "Beneficial Ballots"), to distribute via first class mail to the Beneficial Holders of such Claims as of the Voting Record Date for whom such Nominee acts. The Debtors will also cause a Master Ballot to be distributed to each Nominee for use in tabulating votes cast on Beneficial Ballots submitted to such Nominee (as described more fully below). Consistent with industry standard, Nominees are authorized to dispense with the requirement of forwarding flash drives containing or paper copies of the

17

Solicitation Packages and Beneficial Ballots to their Beneficial Holder clients and to employ the Nominee's customary practice of providing notice of the voting event and the terms thereof to their Beneficial Holder clients as well as collecting their Beneficial Holder clients' votes and opt-out elections. If it is a Nominee's customary and accepted practice to forward the Solicitation Packages to (and collect votes or elections from) Beneficial Holders by voter information form, electronic mail, telephone, or other customary means of communication, as applicable, including online submission of votes, the Nominee may employ that method of communication or submission, such as a voter information form, in lieu of, or in addition to, sending the full Solicitation Package and/or Beneficial Ballot. Moreover, if it is the Nominee's customary internal practice to provide Beneficial Holders with an electronic link to solicitation materials (including, but not limited to, the Disclosure Statement and Plan), the Nominee may follow such customary practice in lieu of forwarding the flash drive containing or paper copies of the Disclosure Statement and Plan.

32.    Nominees shall, upon receipt of the Solicitation Packages, promptly distribute (and in no event later than five (5) Business Days after receipt of the Solicitation Packages) such Solicitation Packages including Beneficial Ballots (or a summary thereof) to Beneficial Holders using one of the following two methods (to be selected by the Nominee):

(1)    **Pre-Validated Ballots**: The Nominee may "pre-validate" a Beneficial Ballot by (i) signing the Beneficial Ballot and applying a medallion guarantee stamp thereto, certifying the Beneficial Holder's position in the Senior Unsecured Notes as of the Voting Record Date (in lieu of a medallion guarantee stamp the Nominee may append a list of its authorized signers to the Beneficial Ballot); (ii) indicating on the Beneficial Ballot the amount and the account number of the Claims held by the Nominee for the Beneficial Holder; and (iii) forwarding such Beneficial Ballot, together with the Disclosure Statement, a pre-addressed, postage- paid return envelope addressed to Kroll, and other materials requested to be forwarded, to the Beneficial Holder for voting. The Beneficial

18

Holder must then complete the information requested in the Beneficial Ballot and return the Beneficial Ballot directly to Kroll in the pre-addressed, postage-paid return envelope or otherwise according to instructions provided by the Nominee so that it is ACTUALLY RECEIVED by Kroll on or before the Voting Deadline. A list of "pre-validated" Beneficial Holders to whom "pre-validated" Beneficial Ballots were delivered should be maintained by Nominees for inspection for at least one (1) year from the Voting Deadline.

(2) **Master Ballots**: If the Nominee elects not to pre-validate Beneficial Ballots, the Nominee may obtain the votes of Beneficial Holders by forwarding to the Beneficial Holders the unsigned Beneficial Ballots, VIF, e-mail, or other customary method of collecting votes from a Beneficial Holder, including via an online voting platform, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such Beneficial Holder must then indicate his, her, or its vote on the Beneficial Ballot or via such other means of submission as the Nominee may employ and direct the Beneficial Holder to utilize, complete the information requested on the Beneficial Ballot, review the certifications contained on the Beneficial Ballot, execute the Beneficial Ballot, and return the Beneficial Ballot to the Nominee. If it is the accepted practice for a Nominee to collect votes through a VIF, e-mail, online voting platform, or other customary method of submission, the Beneficial Holder shall follow the Nominee's instruction for completing and submitting its vote to the Nominee, including any internal submission deadline the Nominee may require to enable it to process votes from its Beneficial Holder clients and timely submit a Master Ballot (as defined below) containing such votes to the Claims and Noticing Agent. After collecting the Beneficial Holders' votes, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Holders, execute the Master Ballot, and deliver the Master Ballot to Kroll per submission instructions contained therein so that it is ACTUALLY RECEIVED by Kroll on or before the Voting Deadline. All Nominees are required to retain the Beneficial Ballots cast by their respective Beneficial Holders (or a record thereof if such vote was otherwise cast in accordance with the Nominees' customary practices) for inspection for a period of one year following the Voting Deadline. EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL HOLDERS TO RETURN THEIR BENEFICIAL BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO KROLL

SO THAT IT IS ACTUALLY RECEIVED BY KROLL ON OR BEFORE THE VOTING DEADLINE.

(3)    A single Nominee may complete and deliver to the Solicitation Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots shall be counted, except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the latest received valid Master Ballot received prior to the Voting Deadline shall, to the extent of such inconsistency, supersede and revoke any prior dated Master Ballot.  Likewise, if a Beneficial Holder submits more than one Beneficial Ballot to its Nominee, (i) the latest received Beneficial Ballot received before the submission deadline imposed by the Nominee shall be deemed to supersede any prior Beneficial Ballot submitted by the Beneficial Holder, and (ii) the Nominee shall complete the Master Ballot accordingly.

(4)    If a Beneficial Holder holds a Senior Unsecured Notes Claims through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Ballot and each such Beneficial Holder should execute a separate Beneficial Ballot for each block of Senior Unsecured Notes Claims that it holds through any Nominee and must return each such Beneficial Ballot to the appropriate Nominee.

(5)    Votes cast by Beneficial Holders through a Master Ballot submitted by a Nominee (or its agent) shall be applied against the positions held by such Nominee in the securities as of the Voting Record Date, as evidenced by the record and depository listings.  Votes submitted by a Nominee (or its agent) shall not be counted in excess of the record amount of such securities held by such Nominee; provided that the Solicitation Agent may adjust such record amount to reflect the amount in accordance with subparagraph (7) below.

(6)    If conflicting votes or "over-votes" are submitted by a Nominee, the Debtors, with the assistance of the Claims and Noticing Agent, shall use reasonable efforts to reconcile discrepancies with the Nominee,

(7)    If over-votes on a Master Ballot are not reconciled prior to the preparation of the Voting Report, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position, as of the Voting Record Date, of Senior Unsecured Notes Claims.

(8) For the purposes of tabulating votes, each Beneficial Holder shall be deemed (regardless of whether such Holder includes interest in the amount counted on its Ballot) to have voted only the principal amount of its position in the applicable Senior Unsecured Notes Claim; provided, however, that the Claims and Noticing Agent may be requested to adjust the principal amount to reflect the corresponding Claim amount.

33.     The Debtors, in consultation with the Creditors' Committee for any Ballot cast by a Holder of a Claim in Class 6, are further authorized to reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their Claim holders.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, in consultation with the Creditors' Committee for any Ballot cast by a Holder of a Claim in Class 6, in accordance with the foregoing sentence will be final and binding on all parties.

34.     The Notice of Non-Voting Status and Opt-Out Form are APPROVED.

35.     To the Holders of Claims or Interests in Class 1 (Other Secured Claims), Class 2 (Priority Non-Tax Claims), Class 8 (Section 510(b) Claims), and Class 10 (Existing Equity Interests) the Debtors shall mail a Confirmation Hearing Notice, Notice of Non-Voting Status, and Opt-Out Form, substantially in the forms attached hereto as **Exhibits 3**, **8**, and **9**, respectively, in lieu of the Solicitation Package.  The Confirmation Hearing Notice, Notice of Non-Voting Status, and Opt-Out Form, substantially in the forms attached hereto as **Exhibits 3**, **8**, and **9**, shall also be mailed to all current and former employees of the Debtors over the past two years, to the extent such individuals are not Holders of Claims or Interests in any Class listed in this paragraph.

36.     Any requirement to serve the Confirmation Hearing Notice, the Notice of Non-Voting Status, or the Opt-Out Form is hereby waived with respect to Class 7 (Intercompany Claims) and Class 9 (Intercompany Interests).

37.     The Equity Rights Offering Procedures, substantially in the form attached hereto as **Exhibit 6**, are hereby APPROVED.

38.     The Equity Rights Offering Backstop Commitment Agreement, substantially in the form attached hereto as **Exhibit 7**, is hereby APPROVED.  For the avoidance of doubt, any fees, premiums, and expenses provided for by the Equity Rights Offering Backstop Commitment Agreement are hereby approved as reasonable and the Debtors are authorized to pay such fees, premiums, and expenses.

39.     The Debtors are authorized to commence and conduct the Equity Rights Offering in accordance with the terms and conditions of the Equity Rights Offering Procedures and the Equity Rights Offering Backstop Commitment Agreement.  The Debtors are authorized to distribute the Equity Rights Offering Procedures and to each Eligible Offeree as of the Equity Rights Offering Record Date set forth in the Equity Rights Offering Procedures.

40.     Each Eligible Offeree (other than the Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties) intending to participate in the Equity Rights Offering must affirmatively make a binding election to exercise its Subscription Rights on or prior to the applicable Equity Rights Offerings Expiration Date and must otherwise timely satisfy each of the terms and conditions set forth in the Equity Rights Offering Procedures and the Equity Rights Offering Materials, and will be deemed to have relinquished and waived all rights to participate in the Equity Rights Offering to the extent such Eligible Offeree fails to timely satisfy each of the terms and conditions set forth in the Equity Rights Offering Procedures and Equity Rights Offerings Materials.

41.     Objections to the Plan will not be considered by the Court unless such objections are timely filed on or before the Plan Confirmation Objection Deadline and properly served in

accordance with this Order.  Specifically, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, must: (a) be in writing; (b) conform to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court so as to be actually received on or before the Plan Confirmation Objection Deadline.

42.    Pursuant to Bankruptcy Rule 3020(b), if no objection is timely filed, this Court may determine that the Plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues.

43.    The Debtors reserve the right to modify the Plan, in accordance with the terms thereof and the Restructuring Support Agreement, without further order of the Court in accordance with Article X of the Plan and the Restructuring Support Agreement, including, without limitation, the right to withdraw the Plan as to an individual Debtor at any time before confirmation.

44.    Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

45.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

46.    The contents of the Motion satisfy the requirements of Bankruptcy Rule 6004(a).

47.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

48.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

49.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.


Signed: January 24, 2025

Alfredo R Pérez
United States Bankruptcy Judge

**<u>EXHIBIT 1</u>**

**Disclosure Statement**

*SOLICITATION VERSION*

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| H-Food Holdings, LLC, *et al.*,[1] | Case No. 24-90586 (ARP) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR THE
## SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
## H-FOOD HOLDINGS, LLC AND ITS AFFILIATED DEBTORS

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
Matthew M. Roose (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

- and -
**ROPES & GRAY LLP**
Stephen L. Iacovo (admitted *pro hac vice*)
191 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500

*Counsel to the Debtors
and Debtors in Possession*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Jack M. Eiband (TX Bar No. 24135185)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331

*Co-Counsel to the Debtors
and Debtors in Possession*

Dated:   January 24, 2025
               Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822)f; Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783). The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................... 1

    A.    Definitions and Exhibits ................................................................................. 6
    B.    Notice to Creditors......................................................................................... 7
    C.    Background and Overview of the Plan ........................................................... 7
    D.    Restructuring Support Agreement ................................................................ 12
    E.    Equity Rights Offering.................................................................................. 13
    F.    Exit Revolving Facility ................................................................................ 15
    G.    Exit First Lien Term Loans .......................................................................... 15
    H.    Disclosure Statement Enclosures ................................................................. 16
    I.    Inquiries ....................................................................................................... 16

II.    OVERVIEW OF THE DEBTORS' OPERATIONS ........................................... 17

    A.    The Debtors' Workforce and Headquarters ................................................. 17
    B.    Product Portfolio.......................................................................................... 17
    C.    Customers and Customer Contracts ............................................................. 18
    D.    Prepetition Capital Structure ....................................................................... 18
    E.    Events Leading to Commencement of the Chapter 11 Cases ........................ 22

III.    OVERVIEW OF THE CHAPTER 11 CASES .................................................... 27

    A.    First Day Motions and Related Relief Requested ......................................... 27
    B.    Procedural Motions ...................................................................................... 28
    C.    Retention of Chapter 11 Professionals ......................................................... 28
    D.    Restructuring Support Agreement ................................................................ 28
    E.    Appointment of Creditors' Committee ......................................................... 28
    F.    Statements and Schedules, Rule 2015.3 Financial Reports, and Claims Bar Dates ......... 29
    G.    Exclusivity ................................................................................................... 30
    H.    Executory Contracts and Unexpired Leases ................................................. 30
    I.    Postpetition Settlement ................................................................................ 30
    J.    Key Employee Incentive and Retention Programs ....................................... 30

IV.    SUMMARY OF THE PLAN................................................................................. 31

    A.    General ......................................................................................................... 31
    B.    Administrative Claims and Priority Claims .................................................. 31
    C.    Classification and Treatment of Claims and Interests ................................... 34
    D.    Means for Implementation of the Plan.......................................................... 41
    E.    Treatment of Executory Contracts and Unexpired Leases............................ 52
    F.    Provisions Governing Distributions.............................................................. 55
    G.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ................... 60
    H.    Settlement, Release, Injunction, and Related Provisions............................... 62
    I.    Conditions Precedent to Consummation of the Plan ..................................... 68
    J.    Modification, Revocation, or Withdrawal of the Plan ................................... 70
    K.    Retention of Jurisdiction .............................................................................. 71
    L.    Miscellaneous Provisions ............................................................................. 73

V.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............. 78

    A.    Alternative Plan of Reorganization.............................................................. 78
    B.    Sale under Section 363 of the Bankruptcy Code .......................................... 78

**TABLE OF CONTENTS**
**(continued)**

VI.    TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL
SECURITIES LAW ................................................................................................78

    A.    Section 1145 of the Bankruptcy Code ..........................................................79
    B.    Section 4(a)(2) of the Securities Act ............................................................79

VII.    CERTAIN TAX CONSEQUENCES OF THE PLAN ...........................................81

    A.    Consequences to Debtors..............................................................................82
    B.    Consequences to Holders of Certain Claims ................................................86
    C.    Withholding on Distributions and Information Reporting.............................92

VIII.    VOTING PROCEDURES AND REQUIREMENTS .............................................92

    A.    Voting Deadline............................................................................................92
    B.    Voting Procedures.........................................................................................94
    C.    Parties Entitled to Vote ................................................................................95
    D.    Waivers of Defects, Irregularities, etc. ........................................................98
    E.    Further Information, Additional Copies .......................................................99

IX.    RISK FACTORS TO CONSIDER BEFORE VOTING.........................................99

    A.    Factors Relating to the Debtors' Business Operations and Financial Condition ............99
    B.    Certain Bankruptcy Law Considerations ...................................................102
    C.    Factors Relating to Securities to Be Issued................................................105
    D.    Additional Factors ......................................................................................108

X.    CONFIRMATION OF THE PLAN....................................................................108

    A.    Acceptance of the Plan ...............................................................................108
    B.    Best Interests Test .......................................................................................109
    C.    Feasibility...................................................................................................110
    D.    Valuation....................................................................................................111
    E.    Notices and Confirmation Hearing .............................................................111

XI.    CONCLUSION AND RECOMMENDATION ...................................................114

**EXHIBITS**

Exhibit A - Plan
Exhibit B - Restructuring Support Agreement
Exhibit C - Debtors' Organizational Structure
Exhibit D - Financial Projections
Exhibit E - Liquidation Analysis
Exhibit F - Valuation Analysis

I.       **INTRODUCTION**

This is the disclosure statement (the "**Disclosure Statement**") of the Debtors (together with their non-Debtor affiliates, "**Hearthside**" or the "**Company**"), in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), filed pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") and in connection with the *Second Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC, and Its Affiliated Debtors* dated January 10, 2024 (the "**Plan**"), a copy of which is annexed to this Disclosure Statement as **Exhibit A**. The Plan constitutes a separate chapter 11 plan for each Debtor. All Exhibits to this Disclosure Statement are incorporate into and are a part of this Disclosure Statement as if set forth in full herein.

Pursuant to the Restructuring Support Agreement, the Plan is currently supported by the Debtors and certain Consenting Stakeholders that have executed the Restructuring Support Agreement, including holders of approximately 97.8% of the First Lien Claims, 100% of the Second Lien Term Loan Claims, 79.3% of the Senior Unsecured Notes Claims, and the Sponsors.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

The Debtors urge each holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan (in its entirety), and each proposed transaction contemplated by the Plan. This Disclosure Statement summarizes the terms of the Plan, but such summary is qualified in its entirety by the actual terms and provisions of the Plan. Accordingly, if there are any inconsistencies between the Plan and this Disclosure Statement, the terms of the Plan shall control.

**SOLICITATION OF VOTES ON THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF H-FOOD HOLDINGS, LLC AND ITS AFFILIATED DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING:**

| Voting class | Name of Class Under the Plan |
|---|---|
| Class 3 | First Lien Claims |
| Class 4 | Second Lien Term Loan Claims |
| Class 5 | Senior Unsecured Notes Claims |
| Class 6 | General Unsecured Claims |

**IF YOU ARE IN CLASS 3, 4, 5, OR 6 YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE. THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS JANUARY 24, 2025 (THE "VOTING RECORD DATE").**

**BALLOTS FOR VOTING TO ACCEPT OR REJECT THE PLAN MUST BE RECEIVED BY MARCH 3, 2025, AT 4:00 P.M. (PREVAILING CENTRAL TIME) (THE "VOTING DEADLINE").**

**IF YOU ARE A HOLDER OF CLAIMS IN CLASS 4 AND VOTE TO ACCEPT THE PLAN, BUT CLASS 4 DOES NOT VOTE TO ACCEPT THE PLAN, YOU SHALL RECEIVE NO RECOVERY ON ACCOUNT OF YOUR CLASS 4 CLAIMS.**

**IF YOU ARE A HOLDER OF CLAIMS IN CLASS 5 AND VOTE TO ACCEPT THE PLAN, BUT CLASS 5 DOES NOT VOTE TO ACCEPT THE PLAN, YOU SHALL RECEIVE NO RECOVERY ON ACCOUNT OF YOUR CLASS 5 CLAIMS.**

**IF YOU ARE A HOLDER OF CLAIMS IN CLASS 6 AND VOTE TO ACCEPT THE PLAN, BUT CLASS 6 DOES NOT VOTE TO ACCEPT THE PLAN, YOU SHALL RECEIVE NO RECOVERY ON ACCOUNT OF YOUR CLASS 6 CLAIMS.**

---

**DELIVERY OF BALLOTS**

**FOR ALL VOTING CLASSES**

**BALLOTS MAY BE RETURNED IN THE ENCLOSED PRE-PAID, PRE-ADDRESSED RETURN ENVELOPE WITH THE BALLOT OR TO AN ADDRESS BELOW, AND MUST BE RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS MARCH 3, 2025 AT 4:00 P.M. (PREVAILING CENTRAL TIME).**

**IF BY FIRST CLASS MAIL, HAND DELIVERY OR OVERNIGHT MAIL AT:**

H-Food Holdings, LLC Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

IF YOU WOULD LIKE TO COORDINATE HAND DELIVERY OF YOUR BALLOT, PRE-VALIDATED BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, PLEASE EMAIL THE SOLICITATION AGENT AT HFSBALLOTS@RA.KROLL.COM (WITH "HFS BALLOT DELIVERY" IN THE SUBJECT LINE) AT LEAST 24 HOURS PRIOR TO YOUR ARRIVAL AT THE KROLL ADDRESS ABOVE AND PROVIDE THE ANTICIPATED DATE AND TIME OF DELIVERY.

**FOR CLASSES 3, 4, AND 6:**

**IF BY ELECTRONIC, ONLINE SUBMISSION:**

ONLINE PORTAL AT HTTPS://CASES.RA.KROLL.COM/HFS/. CLICK ON THE "SUBMIT E-BALLOT" SECTION OF THE DEBTORS' WEBSITE AND FOLLOW THE DIRECTIONS TO SUBMIT YOUR E-BALLOT.  IF YOU CHOOSE TO SUBMIT YOUR BALLOT VIA KROLL'S E-BALLOT SYSTEM (THE "**E-BALLOT PORTAL**"), YOU SHOULD NOT ALSO RETURN A HARD COPY OF YOUR BALLOT

VOTING HOLDERS IN CLASSES 3, 4, AND 6 ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.

BALLOTS RECEIVED VIA EMAIL, FACSIMILE OR OTHER ELECTRONIC MEANS OF TRANSMISSION WILL NOT BE COUNTED.

---

**FOR CLASS 5 BENEFICIAL HOLDERS OF THE SENIOR UNSECURED NOTES AND NOMINEES ONLY(PREFERRED METHOD):**

MASTER AND PRE-VALIDATED BENEFICIAL HOLDER BALLOTS VIA E-MAIL AT HFSBALLOTS@RA.KROLL.COM (PLEASE REFERENCE "HFS MASTER BALLOT" OR "HFS PRE-VALIDATED BALLOT" IN THE SUBJECT LINE, AS APPLICABLE)

*If you are a noteholder and received an envelope addressed to your nominee, please return your ballot to your nominee, allowing enough time for your nominee to cast your vote on a master ballot before the Voting Deadline.*

**PLEASE CHOOSE ONLY <u>ONE</u> METHOD TO RETURN YOUR BALLOT.**

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AGENT AT:**

<u>BY E-MAIL TO</u>: **HFSINFO@RA.KROLL.COM** WITH A REFERENCE TO "H-FOOD HOLDINGS" IN THE SUBJECT LINE

<u>BY TELEPHONE</u>: **(888) 510-7189** (<u>US/CANADA</u> TOLL FREE) OR <u>+1 (646) 937-7810</u> (INTERNATIONAL TOLL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM

<u>**RECOMMENDATION BY THE DEBTORS:**</u>

**IT IS THE DEBTORS' OPINION THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN AND TRANSACTIONS CONTEMPLATED THEREBY IS FAIR AND EQUITABLE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS, AND EQUITY INTEREST HOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.**

**THEREFORE, EACH OF THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT VOTES TO <u>ACCEPT</u> THE PLAN.**

**A HEARING TO CONSIDER CONFIRMATION OF THE PLAN (THE "<u>CONFIRMATION HEARING</u>") WILL BE HELD BEFORE THE HONORABLE JUDGE ALFREDO PEREZ, UNITED STATES BANKRUPTCY JUDGE, VIRTUALLY, TELEPHONICALLY, AND VIA ZOOM, ON MARCH 10, 2025, AT 1:00 P.M. (PREVAILING CENTRAL TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD. THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE MARCH 3, 2025, AT 4:00 P.M. (PREVAILING CENTRAL TIME) (THE "<u>PLAN CONFIRMATION OBJECTION DEADLINE</u>")**

**THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (I) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT THE PLAN, (II) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN, (III) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES BY THE PLAN, (IV) ALL HOLDERS OF ALL CLAIMS OR**

**INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES, (V) EACH RELEASE PARTY, (VI) EACH RELATED PARTY TO EACH ENTITY IN CLAUSE (I) THROUGH (V); <u>PROVIDED THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS TO OPT OUT OF THE THIRD PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD PARTY RELEASE, EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE CONFIRMATION.</u>**

**HOLDERS OF CLAIMS IN NON-VOTING CLASSES (CLASS 1, CLASS 2, CLASS 7, CLASS 8, CLASS 9, AND CLASS 10) WILL RECEIVE A RELEASE OPT-OUT FORM AND NOTICE OF NON-VOTING STATUS AND NOTICE OF RIGHT TO OPT OUT OF CERTAIN RELEASES. SEE SECTION IV.H FOR A DESCRIPTION OF THE RELEASES AND RELATED PROVISIONS.**

**IF YOU FAIL TO OPT OUT OF THE RELEASES BY MARCH 3, 2025, YOU WILL BE DEEMED TO CONSENT TO AND BE BOUND BY THE RELEASES SET FORTH IN THE PLAN, TO THE EXTENT APPLICABLE.**

<u>**FEDERAL AND STATE SECURITIES LAW NOTICES:**</u>

**NONE OF THE PLAN, THIS DISCLOSURE STATEMENT, THE MOTION SEEKING APPROVAL THEREOF, OR THE SOLICITATION OF VOTES ON THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS UNLAWFUL.**

**THE ISSUANCE AND DISTRIBUTION UNDER THE PLAN OF THE REORGANIZED EQUITY SHALL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OR ANY OTHER APPLICABLE SECURITIES LAWS TO THE FULLEST EXTENT PERMITTED BY SECTION 1145(A) OF THE BANKRUPTCY CODE OR, TO THE EXTENT SECTION 1145 IS NOT AVAILABLE, SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR REGULATION D PROMULGATED THEREUNDER (AND. IN EACH CASE, EQUIVALENT STATE LAW REGISTRATION EXEMPTIONS).**

**WITH RESPECT TO THE FOREGOING SECURITIES ISSUED PURSUANT TO SECTION 1145(A) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES. WITH RESPECT TO THE FOREGOING SECURITIES ISSUED IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR REGULATION D THEREUNDER, SUCH SECURITIES WILL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUCH AS,**

UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OF THE SECURITIES ACT.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE PLAN EFFECTIVE DATE.

NEITHER THE PLAN NOR THIS DISCLOSURE STATEMENT HAS BEEN FILED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY COMPARABLE STATE AUTHORITY. THE SECURITIES TO BE ISSUED PURSUANT TO THE PLAN WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, AND HAVE NOT BEEN APPROVED OR DISAPPROVED BY, THE SEC OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

### CERTAIN STATEMENT BY THE CREDITORS' COMMITTEE

The Official Committee of Unsecured Creditors (the "**Creditors' Committee**") has requested that the Debtors include the following statement in this Disclosure Statement.  The Debtors do not confirm or endorse the following statement: **THE CREDITORS' COMMITTEE IS ACTIVELY INVESTIGATING, AMONG OTHER THINGS, ALLEGED LABOR LAW VIOLATIONS, THE SALE OF THE DEBTORS' EUROPEAN NUTRITIONAL BARS BUSINESS AND REPATRIATION OF RELATED CASH PROCEEDS, THE SALE-LEASEBACK TRANSACTIONS THE FACTS AND CIRCUMSTANCES SURROUNDING THE FORMULATION OF THE RESTRUCTURING SUPPORT AGREEMENT, PLAN AND THE PROPOSED RELEASES, AND POTENTIAL CLAIMS RELATED THERETO AGAINST, AMONG OTHERS, THE DEBTORS' CURRENT AND FORMER DIRECTORS AND OFFICERS. THE CREDITORS' COMMITTEE DOES NOT HAVE SUFFICIENT INFORMATION TO SUPPORT THE PLAN, INCLUDING THE PLAN'S TREATMENT OF UNSECURED CREDITORS OF THE DEBTORS EMBODIED THEREIN, AT THIS TIME.**

### DISCLAIMER:

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION (SUCH AS THAT REFERRED TO IN THE PRECEDING PARAGRAPH AND UNDER THE CAPTION "FINANCIAL PROJECTIONS" ELSEWHERE IN THIS DISCLOSURE STATEMENT) AND THE LIQUIDATION ANALYSIS ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT, AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY, SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," "CONTINUE," OR THE NEGATIVES THEREOF, AS WELL AS ANY SIMILAR OR COMPARABLE LANGUAGE. FORWARD-LOOKING STATEMENTS ARE INHERENTLY SPECULATIVE, AND BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF

1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL HEREIN. PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN. FURTHERMORE, THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS AND INTEREST, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

## A. **Definitions and Exhibits**

### 1. **Definitions**

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan or as the context otherwise requires.

### 2. **Exhibits**

The following exhibits to this Disclosure Statement are incorporated as if fully set forth herein and part of this Disclosure Statement:

- **Exhibit A** - Plan
- **Exhibit B** - Restructuring Support Agreement
- **Exhibit C** - Debtors' Organizational Structure
- **Exhibit D** - Financial Projections
- **Exhibit E** - Liquidation Analysis
- **Exhibit F** - Valuation Analysis

Included in the solicitation materials is a letter from the Creditors' Committee, which for the avoidance of doubt, shall only be distributed to the Holders of Senior of Unsecured Notes Claims in Class 5 and Holders of General Unsecured Claims in Class 6.  The Debtors do not confirm or endorse the Creditors' Committee letter or statements made therein.

**B.      Notice to Creditors**

The purpose of this Disclosure Statement is to set forth information that (1) summarizes the Plan, (2) advises holders of Claims and Interests of their rights under the Plan, (3) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (4) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

**C.      Background and Overview of the Plan[2]**

The Plan encompasses a comprehensive restructuring of the Debtors, which is the product of the Debtors' arm's-length negotiations and an agreement with certain Consenting Stakeholders that have executed the Restructuring Support Agreement, including holders of approximately 97.8% of the First Lien Claims, 100% of the Second Lien Term Loan Claims, 79.3% of the Unsecured Notes Claims, and the Sponsors.

At this time the Debtors believe the transactions contemplated in the Plan will maximize value, provide the best recovery to stakeholders, represents the best available option for completing the Chapter 11 Cases in an effective and efficient manner, and allow for the Debtors' business to reorganize with a substantially reduced debt load and increasing their cash flow on a go-forward basis. The Debtors strongly recommend that holders of claims or interests that may vote on the Plan <u>vote to accept</u> the Plan.

**HOLDERS OF CLAIMS OR INTERESTS MAY VOTE**

Specifically, the proposed restructuring contemplates, among others, things:

(i)      a reduction of the Debtors' funded debt as of Petition Date of approximately $2.0 billion;

(ii)      a backstopped equity rights offering (the "**Equity Rights Offering**") providing for subscription rights to purchase $200 million of the Reorganized Equity (subject to dilution from the MIP) which the proceeds of such Equity Rights Offering will be used to (i) repay outstanding amounts under the DIP Facility, (ii) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, and (iii) ensure at least $100 million of Reorganized Company pro forma cash balance at emergence; and

(iii)      the Reorganized Company to (i) incur a secured term loan facility in the aggregate principal amount of $725 million (the "**Exit First Lien Term Loan Facility**"), and (ii) use commercially reasonable efforts to raise a revolving facility with up to $375 million in commitments (the "**Exit Revolving Facility**"), through a super-senior balance sheet asset-based revolver.

**In the event the Debtors proceed to confirmation under a different structure than currently contained in the Plan, holders of Claims or Interests could receive different forms of consideration than currently contemplated under the Plan. Pursuant to Bankruptcy Rule 3019, the Debtors may**

---

[2]  **This overview is qualified in its entirety by reference to the Plan**. The treatment of Claims and Interests under the Plan is not intended to, and will not, waive, compromise, or limit any rights, claims, or causes of action if the Plan is not confirmed. You should read the Plan in its entirety before voting to accept or reject the Plan.

**proceed to confirmation under such a modified Plan without resoliciting votes on the Plan so long as the modified Plan does not adversely change the treatment of the Claim or Interest of any holder thereof. If the Bankruptcy Court finds, after a hearing on notice to the parties in interest in the Chapter 11 Cases, that the proposed modification does not adversely change the treatment of the Claim or Interest of any holder thereof who has not accepted in writing the proposed modification, the Bankruptcy Court may deem the Plan to be accepted by all holders of Claims or Interests who have previously accepted the Plan. For the avoidance of doubt, any and all rights of holders of Claims against the Debtors or Interests in the Debtors are expressly reserved under Bankruptcy Rule 3019 and any other applicable provisions under the Bankruptcy Rules, Local Rules of the Bankruptcy Court, or Bankruptcy Code.**

The following table provides a summary of the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan:

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[3] |
|---|---|---|---|
| 1<br>Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for, each Allowed Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor and with the reasonable consent of the Required Consenting First Lien Lenders, either: (i) payment in full in cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment in rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired<br>**Not Entitled** to Vote (Conclusively Presumed to Accept) | **Estimated Allowed Amount:** N/A<br>**Estimated Percentage Recovery:** 100% |
| 2<br>Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive cash in an amount equal to such Allowed Priority Non-Tax Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired<br>**Not Entitled** to Vote (Conclusively Presumed to Accept) | **Estimated Allowed Amount:** N/A<br>**Estimated Percentage Recovery:** 100% |

---

[3]   Recoveries are based on a midpoint of total enterprise value of approximately $1.4 billion for the Debtors, together with their non-debtor affiliates.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[3] |
|---|---|---|---|
| 3 First Lien Claims | Except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment of such Claim, each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date, its elected Pro Rata share of: (i) 100% of the Exit First Lien Term Loans; (ii) 100% of the Reorganized Equity, subject to dilution by the Equity Rights Offering and the Management Incentive Plan; and (iii) if any of the Second Lien Term Loan Claims Class, the Senior Unsecured Notes Claims Class, or the General Unsecured Claims Class do not vote to accept the Plan, the cash distribution that would otherwise have been made to any such rejecting Class(es).\n\nEach Holder of a First Lien Claim (or its designated Affiliate managed fund or account or other designee) that properly exercises its Equity Rights Offering rights to purchase Reorganized Equity shall receive such Reorganized Equity on the Plan Effective Date. | Impaired **Entitled** to Vote | **Estimated Allowed Amount:** $2,146,809,609.32 plus fees, expenses, and other amounts under First Lien Documents, to the extent permitted by the Bankruptcy Code **Estimated Percentage Recovery:** 41% – 46%[4] |
| 4 Second Lien Term Loan Claims | Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment of such Claim, each Holder of a Second Lien Term Loan Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date: (i) if Class 4 <u>votes to accept the Plan</u>: (1) its Pro Rata share of 100% of the Second Lien Term Loan Claims Cash Recovery; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fee Threshold, the Second Lien Term Loan Claims Cash Recovery shall be reduced on a ratable basis (determined based on the Second Lien Term Loan Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Senior Unsecured Notes Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided, further,* that, for the | Impaired **Entitled** to vote | **Estimated Allowed Amount:** $308,545,026 plus fees, expenses, and other amounts under Second Lien Documents, to the extent permitted by the Bankruptcy Code **Estimated Percentage Recovery:** 6% |

---

[4]  Recoveries shown include value in respect of rights to participate in the Equity Rights Offering. The low end of the range of recovery assumes a Holder of an Allowed First Lien Claim does not participate in the Equity Rights Offering, whereas the high end of the range of the recovery assumes a Holder of an Allowed First Lien Claim fully participates in the Equity Rights Offering.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[3] |
|---|---|---|---|
| | avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Second Lien Term Loan Claims Cash Recovery, and (2) the Required Lenders (as defined in the First Lien Credit Agreement) shall waive, and shall cause the applicable First Lien Agent to waive, any turnover or similar rights in favor of the holders of First Lien Claim with respect to such distribution on account of the Intercreditor Agreement; or (ii) if Class 4 votes to reject the Plan, no recovery or distribution on account of such Claim, and all Second Lien Term Loan Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect; *provided*, that to the extent the Senior Unsecured Notes Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Second Lien Term Loan Claims Class, then the Second Lien Term Loan Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms. | | |
| 5 Senior Unsecured Notes Claims | Except to the extent that a Holder of an Allowed Senior Unsecured Notes Claim agrees to a less favorable treatment of such Claim, each Holder of a Senior Unsecured Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date: (i) if Class 5 votes to accept the Plan, its Pro Rata share of 100% of the Senior Unsecured Notes Cash Recovery; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the Senior Unsecured Notes Cash Recovery shall be reduced on a ratable basis (determined based on the Senior Unsecured Notes Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided, further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Senior Unsecured Notes Cash Recovery; or (ii) if Class 5 votes to reject the Plan, no recovery or distribution on account of such Claim, and all Senior Unsecured Notes Claims shall be cancelled, released, discharged, and extinguished and shall be of no | Impaired **Entitled** to Vote | **Estimated Allowed Amount:** $364,131,250 plus fees, expenses, and other amounts arising and payable under and in accordance with the Senior Unsecured Notes Documents, to the extent permitted by the Bankruptcy Code **Estimated Percentage Recovery:** 6% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[3] |
|---|---|---|---|
| | further force or effect; *provided* that, to the extent the Second Lien Term Loan Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Senior Unsecured Notes Claims Class, then the Senior Unsecured Notes Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms. | | |
| 6 General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each Holder of a General Unsecured Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date: (i) if Class 6 votes to accept the Plan, the lower of: (1) its Pro Rata share of 100% of the General Unsecured Claims Cash Recovery; and (2) Cash in an amount equal to 6.0% of such Allowed General Unsecured Claim; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fee Threshold, the General Unsecured Claims Cash Recovery shall be reduced on a ratable basis (determined based on the General Unsecured Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and Senior Unsecured Notes Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided, further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the General Unsecured Claims Cash Recovery; or (ii) if Class 6 votes to reject the Plan, no recovery or distribution on account of such Claim, and all General Unsecured Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect. | Impaired **Entitled** to Vote | **Estimated Allowed Amount:** N/A **Estimated Percentage Recovery:** 6% |
| 7 Intercompany Claims | On or after the Plan Effective Date, each allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the reasonable consent of the Required Consenting First Lien Lenders), either reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan. | Impaired or Unimpaired **Not Entitled** to Vote (Deemed to Reject or Conclusively Presumed to Accept) | **Estimated Allowed Amount:** N/A **Estimated Percentage Recovery:** N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery[3] |
|---|---|---|---|
| 8 Section 510(b) Claims | On the Plan Effective Date, all Section 510(b) Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims | Impaired **Not Entitled** to Vote (Deemed to Reject) | **Estimated Allowed Amount:** N/A **Estimated Percentage Recovery:** 0% |
| 9 Intercompany Interests | On the Plan Effective Date, all Intercompany Interests shall be Reinstated for administrative convenience. | Unimpaired **Not Entitled** to Vote (Conclusively Presumed to Accept) | **Estimated Allowed Amount:** N/A **Estimated Percentage Recovery:** N/A |
| 10 Existing Equity Interests | On the Plan Effective Date, all Existing Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing Equity Interests shall not receive any distribution on account thereof. | Impaired **Not Entitled** to Vote (Deemed to Reject) | **Estimated Allowed Amount:** N/A **Estimated Percentage Recovery:** 0% |

### D.    Restructuring Support Agreement

In connection with negotiation of the Plan, the Debtors entered into the *Restructuring Support Agreement*, dated as of November 22, 2024 (as amended from time to time, the "**Restructuring Support Agreement**"), a copy of which is annexed hereto as **Exhibit B**, with holders of approximately (i) 97.8% of the aggregate outstanding principal amount of First Lien Claims; (ii) 100% of the aggregate outstanding principal amount of Second Lien Term Loan Claims; (iii) 79.3% of the aggregate outstanding principal amount of the Senior Note Claims, and (iv) the Sponsors.

The Restructuring Support Agreement provides that the Consenting Stakeholders will support the Plan and the restructuring transactions contemplated thereby, subject to the terms and provisions of the Restructuring Support Agreement.

In addition, pursuant to the Restructuring Support Agreement, the Debtors have agreed to move forward expeditiously with confirmation and consummation of the Plan and to be subject to certain milestones which, if not achieved, enable the Requisite Consenting Creditors to terminate the Restructuring Support Agreement. The relevant milestones to be achieved include:

(a)    no later than the date that is twenty-one (21) days after the Petition Date, the Company Parties shall have filed the Plan, this Disclosure Statement, and Disclosure Statement Motion;

(b)    subject to the Bankruptcy Court availability, no later than the date that is thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the DIP Order;

(c)    subject to the Bankruptcy Court availability, no later than the date that is sixty-five (65) days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order;

(d)        subject to the Bankruptcy Court availability, no later than the date that is one hundred and ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(e)        no later than the date that one hundred and twenty-five (125) days after the Petition Date, the Plan Effective Date shall have occurred; provided that, if the only outstanding impediment to consummation of the Plan Effective Date is the failure to obtain necessary regulatory approvals associated with the Restructuring Transactions that remain pending as of such date, this date shall automatically be extended for another thirty (30) days; provided, further, that, pending resolution of Dischargeability Complaint, the Milestone for the Plan Effective Date shall be automatically extended one time by forty-five (45) days.

The Debtors' Special Committee (as defined herein) reviewed and approved the Restructuring Support Agreement, as well as the Plan, and this Disclosure Statement.

### E.        **Equity Rights Offering**

In parallel with the plan solicitation process, the Debtors intend to commence the subscription process for the Equity Rights Offering contemplated by the Plan. The Debtors originally contemplated consummating a backstopped Equity Rights Offering providing for subscription rights to purchase $200 million of the Reorganized Equity valued at a 35% discount (measured on a pro forma basis for the proceeds from the Equity Rights Offering) to the "stipulated equity value" of $470 million and otherwise in accordance with the Restructuring Support Agreement, the Equity Rights Offering Backstop Commitment Agreement and Equity Rights Offering Procedures.

As further noted below in Article I.G. of this Disclosure Statement, the Debtors and Required Consenting First Lien Lenders have agreed to a reduction of the aggregate Exit First Lien Term Loan Facility by $100 million, from the originally contemplated $825 million to $725 million, and to waive any amortization payments for the first two years post-emergence.  The reduction in post-emergence indebtedness will increase the Reorganized Debtors' equity value by a corresponding amount, *i.e.*, increasing the Reorganized Equity value range by $100 million, to a range of $350 million to $750 million with a midpoint of $550 million, as provided in the Debtors' updated Valuation Analysis attached as **Exhibit F** of this Disclosure Statement.  The  $470 million stipulated equity value for the Equity Rights Offering and the 35% discount to the stipulated equity value remains unchanged, and the stipulated equity value remains in the equity value range as provided in the Debtors' updated Valuation Analysis.  Using the midpoint of the revised Reorganized Equity value range, the implied discount percentage increases but remains similar to rights offering in other large chapter 11 cases.

As set forth in the Plan, the Restructuring Support Agreement, the Equity Rights Offering Backstop Commitment Agreement, and the Equity Rights Offering Procedures, (i) holders of Allowed First Lien Claims (including the Equity Rights Offering Holdback Parties and the Equity Rights Offering Backstop Parties) who are Eligible Offerees will be offered Subscription Rights entitling them to subscribe for and purchase their Pro Rata portion of shares of Reorganized Equity in the Equity Rights Offering in an aggregate amount equal to 65% of the Equity Rights Offering Amount (exclusive of the Equity Rights Offering Backstop Premium), and (ii) the Equity Rights Offering Holdback Parties will agree to purchase (based on the respective amounts and percentages applicable thereto as set forth in the Equity Rights Offering Backstop Commitment Agreement) their respective portion of shares of Reorganized Equity in the Equity Rights Offering in an aggregate amount equal to 35% of the Equity Rights Offering Amount (exclusive of the Equity Rights Offering Backstop Premium) (such amount, the "Holdback Rights Offering Amount" and, such aggregate number of Equity Rights Offering Shares to be purchased on account of the Holdback Rights Offering Amount, the "Direct Investment Shares"). The Equity Rights Offering will be offered in the Equity Rights Offering for Cash, provided that any holders of Allowed First Lien Claims who

are DIP Lenders will be entitled to utilize all or a portion of their DIP Claims (including both the funded amount and the amount of any accrued and unpaid interest, premiums and fees (other than expenses and professional fees)) as consideration in exchange for the Equity Rights Offering Shares in the Equity Rights Offering.

To avoid the potential expense and delay of registering the securities to be issued pursuant to the Equity Rights Offering with the SEC during these Chapter 11 Cases, the Debtors will seek to issue the securities pursuant to the Equity Rights Offering without registration under the Securities Act of 1933, as amended (the "**Securities Act**"), or any state or local law requiring registration for the offer and sale of a security, in reliance upon the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, or another available exemption from registration under the Securities Act. Thus, in simple terms, the Equity Rights Offering will not involve a public offer, and only Eligible Offerees are eligible to participate in the Equity Rights Offering. Pursuant to such exemption from registration under the Securities Act, only holders of Allowed First Lien Claims that represent as to, and qualify as, either (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, or (b) an institutional "accredited investor" (within the meaning of Rule 501(a)(1), (2), (3), or (7) under the Securities Act) or an entity in which all of the equity investors are such institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person), are eligible to participate in the Equity Rights Offering. The Debtors believe that all holders of Allowed First Lien Claims, including the Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties, are Eligible Offerees.

Only holders of Allowed First Lien Claims as of the record date set for the Equity Rights Offering by the Debtors who are Eligible Offerees shall be allowed to participate pursuant to the Plan and Equity Rights Offering Procedures, subject to transfer rights set forth in the Equity Rights Offering Procedures. In accordance with the Restructuring Support Agreement, the Subscription Expiration Deadline (as defined in the Equity Rights Offering Procedures) for holders of Allowed First Lien Claims to elect to participate in the Equity Rights Offering is the Voting Deadline. For more information regarding subscription to the Equity Rights Offering, holders of Allowed First Lien Claims should refer to the Equity Rights Offering Procedures attached as Exhibit 6 to the Proposed Order (as defined in the *Debtors' Motion For Entry of an Order (I) Approving the Proposed Disclosure Statement and Form and Manner of Notice of the Disclosure Statement Hearing, (II) Approving the Solicitation and Notice Procedures With Respect to Confirmation of the Debtors' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Approving the Equity Rights Offering Procedures and Related Materials, (V) Scheduling a Plan Confirmation Hearing, (VI) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan, and (VII) Granting Related Relief* (the "**Disclosure Statement Motion**")), and the Subscription Form attached as Exhibit A to the Equity Rights Offering Procedures. The Equity Rights Offering Procedures have been designed to efficiently transmit all materials necessary for participation in the Equity Rights Offering in compliance with applicable bankruptcy and non-bankruptcy law. Moreover, the Subscription Form is designed to assure the clear communication of the requirements for, and to facilitate, such participation. In connection with the foregoing, the Debtors intend to conduct the Equity Rights Offering in accordance with the following schedule of proposed dates:

| Event | Date |
|---|---|
| Equity Rights Offering Record Date | **February 4, 2025 at 4:00 p.m. (prevailing Central Time)** |
| Subscription Commencement Date | **February 5, 2025** |
| Subscription Expiration Deadline | **March 3, 2025 at 4:00 p.m. (prevailing Central Time)** |

THE COMMENCEMENT OF THE EQUITY RIGHTS OFFERING IS SUBJECT TO ENTRY BY THE BANKRUPTCY COURT OF AN ORDER APPROVING THE EQUITY RIGHTS OFFERING PROCEDURES AND AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE EQUITY RIGHTS OFFERING BACKSTOP COMMITMENT AGREEMENT.

F.     **Exit Revolving Facility**

On the Plan Effective Date, the Reorganized Company will use commercially reasonable efforts to raise a revolving facility with up to $300 million in commitments (the "**Exit Revolving Facility**"), through a super-senior balance sheet asset-based revolver with a first lien on A/R and inventory (the "**Exit Revolver Facility Collateral**"), and a second lien on the substantially all assets of the Reorganized Company, excluding the Exit Facility Collateral, and the Reorganized Company will have the ability to upsize the Exit Facility to $375 million in commitments if the Company's existing factoring agreements are unwound.

Confirmation shall be deemed approval of the issuance and incurrence of the Exit Revolving Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Company (or the applicable subsidiary issuing the Exit Revolving Facility) shall be authorized to execute and deliver those documents necessary or appropriate to cause one of its subsidiaries to issue and incur the Exit Revolving Facility and related guarantees, including the Exit Revolving Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Company may deem to be necessary to consummate the Exit Revolving Facility. The obligations incurred by the Reorganized Company (or the applicable subsidiary issuer) pursuant to the Exit Revolving Facility and the Exit Revolving Facility Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Exit Revolving Facility Documents. The Creditors' Committee is analyzing whether the Exit Revolving Facility and Exit First Lien Term Loan are sufficient funding for the Debtors go-forward operations.

G.     **Exit First Lien Term Loans**

The Reorganized Company shall cause one of its subsidiaries to issue a new first lien "take back" term loan facility in the aggregate principal amount of $725 million (the "**Exit First Lien Term Loan**", and together with the Exit Facility, the "**New Reorganized Debt**"), to be provided by the holders of First Lien Claims via a conversion of a *pro rata* portion of their First Lien Claims pursuant to applicable credit documentation (the "**Exit First Lien Term Loan Credit Agreement**"). The New First Lien Term Loan shall have a first lien on substantially all assets of the applicable subsidiary of the Reorganized Company that issued the Exit First Lien Term Loan, excluding the Exit Revolver Facility Collateral (the "Exit First Lien Term Loan Collateral"), and second lien on the Exit Revolver Facility Collateral.

Pursuant to the RSA and on the Petition Date, the Exit First Lien Term Loan was originally contemplated to be an aggregate principal amount of $825 million.  Following ongoing engagement with the First Lien Ad Hoc Group, however, the Debtors and the Required Consenting First Lien Lenders have agreed to reduce the aggregate Exit First Lien Term Loan Facility by $100 million, from $825 million to $725 million and to waive any amortization payments for the first two years post-emergence, allowing the Debtors to emerge from Chapter 11 Cases with $100 million of less debt and reduced leverage, and permitting the Debtors to use incremental cash savings to fund operations, capital expenditures, and reinvestment.

Confirmation shall be deemed approval of the issuance and incurrence of the Exit First Lien Term Loans (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Company (or the applicable subsidiary issuing the Exit First Lien Term Facility) shall be authorized to execute and deliver those documents necessary or appropriate to cause the applicable subsidiary to issue and incur the Exit First Lien Term Loans and related guarantees, including the Exit First Lien Term Loan Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Company may deem to be necessary to consummate the Exit First Lien Term Loans. The obligations incurred by the Reorganized Company (or the applicable subsidiary issuer) pursuant to the Exit First Lien Term Loans and the Exit First Lien Term Loan Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Exit First Lien Term Loan Documents.  The Creditors' Committee is analyzing whether the Exit Revolving Facility and Exit First Lien Term Loan are sufficient funding for the Debtors go-forward operations.

### H.    Disclosure Statement Enclosures

The following three (3) enclosures accompany this Disclosure Statement:

**1.**    **Disclosure Statement Order**. A copy of the Disclosure Statement Order (without exhibits), which, among other things, approves this Disclosure Statement, establishes procedures for voting on the Plan (the "**Voting Procedures**"), and schedules the Confirmation Hearing and the deadline for objecting to confirmation of the Plan.

**2.**    **Confirmation Hearing Notice**. A copy of the notice of the Voting Deadline, which sets out, among other things, notice of the date, time, and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan. This Confirmation Hearing Notice may be separately noticed and served in the Debtors' discretion.

**3.**    **Ballots**. One or more Ballots (and return envelopes) for voting to accept or reject the Plan (unless you are not entitled to vote because you are (a) not impaired under the Plan and are presumed to accept the Plan, (b) deemed to reject the Plan, or (c) a holder of a Claim subject to an objection filed by the Debtors, which Claim is temporarily disallowed for voting purposes). See **Section VIII** of this Disclosure Statement for an explanation of which parties are entitled to vote and a description of the Voting Procedures.

### I.    Inquiries

If you have any questions about the packet of materials you have received, please contact Kroll Restructuring Administration LLC, the Debtors' voting agent (the "**Voting Agent**"), at **(888) 510-7189** (domestic toll- free) or **+1 (646) 937-7810** (international). Additional copies of this Disclosure Statement, the Plan, or the Plan Supplement (when filed) are available upon written request made to the Voting Agent at the following address:

H-Food Holdings Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

Copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed) are also available on the Voting Agent's website, https://cases.ra.kroll.com/HFS. PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

## II.   OVERVIEW OF THE DEBTORS' OPERATIONS

The Company was founded in 2009 and soon became the manufacturer of choice to both premier and emerging food companies across North America. The Company operates a large-scale production network across the U.S. and Canada, consisting of 28 manufacturing facilities in California, Idaho, Illinois, Indiana, Kentucky, Michigan, Minnesota, Ohio, South Dakota, Utah, Virginia, and Canada.

The Company's growth trajectory included a number of strategic acquisitions including its acquisition of Greencore U.S. in 2018—a leader in frozen contract packaging and a top producer of refrigerated sandwiches, entrees, and salad kits and Interbake Foods, LLC and Interbake Canada, Inc. in 2021—a leading baked goods manufacturer of cookies, cones, crackers and wafers. The Company has grown its revenue from $145.0 million in 2009 to $3,302.9 million for the twelve months ended September 30, 2024.

### A.   The Debtors' Workforce and Headquarters

As of Petition Date, the Debtors' labor force consists of approximately 12,100 total women and men, which includes approximately 11,000 permanent employees and approximately 1,100 temporary employees. Of the Debtors' employees, approximately 1,200 are salaried employees and 9,800 are paid hourly. Approximately 1,300 of the employees are hourly union employees represented by various unions which are governed by their respective collective bargaining agreements. The Debtors' corporate headquarters are located in Downers Grove, Illinois.

### B.   Product Portfolio

The Company's product portfolio spans across four different platforms: (1) Refrigerated & Frozen; (2) Baking; (3) Bars & Components; and (4) Packaging (collectively, the "Business Segments").[5] The Business Segments is described in more detail below:[6]

**1.     Refrigerated & Frozen**: Refrigerated & Frozen ("R&F") category can be further divided into "refrigerated and frozen" products and "fresh" products. Products under R&F include sandwiches, ready meals, ingredient packets, and salad kits. R&F accounted for 40.1% of the Company's net revenues in 2023.

**2.     Baking**: As the Company's leading product category, baking is comprised of two sub-segments: "bakeries" and "cones." Baking products include cookies, crackers, baked snacks, cones, and ice-cream equipment, which collectively accounted for 32.4% of the Company's net revenues in 2023.

**3.     Bars & Components**: Products under Bars & Components include snack components, snack bars, granola, cereal enrobing, and functional bars. Bars & Components constituted 15.6% of the Company's net revenues in 2023.

---

[5] In 2023, the Company's aggregate net revenues, including all Business Segments, totaled approximately $3,546.9 million.

[6] These figures were derived pro forma the 2023 sale of the Company's European nutritional functional bars business.

**4.** **Packaging**: The Company's business also includes packaging of various food products. The products that the Company packages include snacks, cereal, cookies, crackers, candy, and dry pet food and treats. Packaging accounted for 11.9% of the Company's net revenues in 2023.

### C.    Customers and Customer Contracts

The Company believes it is the only contract manufacturing and packaging supplier with the capability to serve customers across more than 20 different product categories, making the Company an essential partner to many of its customers in their supply chain. The criticality of the Company to its customers is reflected in the durability of its customer relationships: the Company's major customers have had an average tenure of approximately 30 years, and the Company benefits from multiple relationship touchpoints with their customers across those organizations.

The Company's contracts with its customers typically range between one to ten years in length and are structured into a master agreement which governs the overall relationship. In addition to the master agreement, there are specific project- or service-level agreements that outline the specific manufacturing and/or packaging relationship between the Company and the customer. Generally, these contracts are structured to include descriptions of the key business terms (such as products and shipping terms, pricing, and yield allowances), the funding structure of the project (such as which party will bear the capital cost), and the backstop features (such as volume commitments and make-whole payments if volumes are not achieved to allow return on capital investment).

The Company is also party to supplier finance agreements with certain of its customers pursuant to which the Company monetizes its receivables in exchange for cash to manage the Company's liquidity and operational flexibility (the "Supplier Finance Agreements"). These Supplier Finance Agreements have terms for as long as the Company's right to receive payment remains outstanding but are generally terminable on notice and have payment terms that vary between 5 to 16 days while the underlying receivables have payment terms between 30 to 120 days. To provide the counterparties with additional comfort of the Company's continued intent to operate under the Supplier Finance Agreements, which are critical to preserving the Company's working capital, the Debtors have filed a motion contemporaneously herewith seeking continuation of the Supplier Finance Agreements. Additional details can be found in the motion thereto.

### D.    Prepetition Capital Structure

As of the Petition Date, the Debtors have approximately $2,752.5 million of funded principal debt obligations, consisting of the: (i) First Lien Loans; (ii) Second Lien Term Loans; and (iii) Senior Unsecured Notes. Additionally, the Debtors' balance sheet includes capital lease obligations totaling approximately $304.8 million in the aggregate as of the Petition Date.

The following table summarizes the Debtors' prepetition capital structure (as of the Petition Date) with respect to funded debt obligations outstanding in principal and capital lease obligations.

| Instrument | Approx. Amount Outstanding as of the Petition Date | Rate (Maturity) | Security |
|---|---|---|---|
| **First Lien Credit Agreement** | **$2,102,468,969.5** | | |
| First Lien Revolving Loan | $199,999,804.6 excluding $0.8 million letter of credit obligations | Floating, SOFR + 2.25% ~ 2.75% (November 23, 2024) | Substantially all assets of each Borrower and each Guarantor, subject |

| Instrument | Approx. Amount Outstanding as of the Petition Date | Rate (Maturity) | Security |
|---|---|---|---|
| First Lien Term Loans | $1,902,469,164.9 | Floating, SOFR + 3.69% ~ 5.00% with 1.00% SOFR Floor as applicable (May 23, 2025) | to customary exceptions and exclusions. |
| **Second Lien Credit Agreement** | | | |
| Second Lien Term Loan | $300,000,000.0 | Floating, SOFR + 7.00% (March 2, 2026) | Substantially all assets of each Borrower and each Guarantor, subject to customary exceptions and exclusions. |
| **Senior Unsecured Notes Indenture** | | | |
| Senior Unsecured Notes | $350,000,000.0 | Fixed, 8.50% (June 1, 2026) | No security; the Senior Unsecured Notes are general unsecured obligations of each Debtor. |
| **Capital Lease Obligations** | | | |
| Sale-Leaseback | $304,849,000.0 | N/A | N/A |
| **Total (Approx.)** | **$3,057,317,969.5** | | |

## 1.     First Lien Credit Agreement

On May 23, 2018, the Company entered into that certain credit agreement (as amended by that certain First Incremental Amendment to Credit Agreement, dated as of November 25, 2018, that certain Second Incremental Amendment to Credit Agreement, dated as of June 10, 2020, that certain Third Amendment to Credit Agreement, dated as of November 15, 2021, that certain Fourth Amendment and Third Incremental Amendment to Credit Agreement, dated as of December 29, 2021, that certain Fifth Amendment to Credit Agreement, dated as of June 12, 2023, and as further amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "First Lien Credit Agreement"), among Debtors H-Food Holdings, LLC (in such capacity, the "First Lien US Borrower") and Hearthside Bidco B.V (in such capacity the "First Lien Dutch Borrower", together with the First Lien US Borrower, the "First Lien Borrowers") as borrowers, Goldman Sachs Lending Partners LLC, as administrative and collateral agent (the "First Lien Agent"), and the lenders from time to time parties thereto. The First Lien Credit Agreement consists of (i) a revolving credit facility in an aggregate principal amount equal to $200.0 million (the "First Lien Revolving Loan") with a maturity date of November 23, 2024 and bears an interest at a floating rate of SOFR plus a rate spread from 2.25% to 2.75% depending on certain leverage ratios, and a commitment fee based on the unused portion of the facility at a rate of 0.25% to 0.50% per annum depending on the applicable first lien net leverage ratio then in effect, and (ii) first lien term loans in the aggregate principal amount of $1,902.5 million (the "First Lien Term Loan") with a maturity date of May 23, 2025 and bears an interest at a floating rate of SOFR plus 3.6875% to 5.00% with 0.00% or 1.00% SOFR floor, as applicable. Of the First Lien Term Loan, $62.2 million was allocated to the First Lien Dutch Borrower (the "Dutch Allocation"). The Dutch Allocation has since been

paid in full, and Hearthside Cooperatief U.A. and Hearthside Bidco B.V. have been released from their obligations as security providers and/or guarantors with respect to the First Lien Loans.[7]

As of the Petition Date, approximately $200.0 million of principal remains outstanding on the First Lien Revolving Loan, excluding approximately $0.8 million in outstanding letters of credit obligations and approximately $1,902.5 million of principal remains outstanding on the First Lien Term Loans.

Pursuant to that certain Guaranty, dated as of May 23, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified, the "**First Lien Guaranty Agreement**"), the obligations of the First Lien Borrowers under the First Lien Credit Agreement are guaranteed by Matterhorn Buyer, LLC and certain subsidiaries of Matterhorn Buyer, LLC (the "**Guarantors**"). Each of the Debtors other than HFS Matterhorn Topco, Inc., Matterhorn Parent, LLC, and Matterhorn Intermediate, LLC, are either obligors or Guarantors with respect to the First Lien Loans.[8]

The obligations of the First Lien Borrowers and Guarantors under the First Lien Credit Agreement are secured by substantially all of the assets of each of the First Lien Borrowers and the First Lien Guarantors pursuant to that certain First Lien Security Agreement, dated as of May 23, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified the "**First Lien Security Agreement**"), subject to customary exceptions and exclusions. Notably, the Debtors' bank accounts are not subject to deposit account control agreements in favor of the collateral agent for the First Lien Term Loan.

### 2.      Second Lien Credit Facility

On November 25, 2018, Debtors H-Food Holdings, LLC entered into that certain second lien credit agreement (as amended by that certain First Amendment to Second Lien Credit Agreement, dated as of June 23, 2024, and as further amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "**Second Lien Credit Agreement**"), among H-Food Holdings, LLC as borrower (in such capacity, the "**Second Lien Borrower**"), Ares Capital Corporation as administrative and collateral agent (the "**Second Lien Agent**"), and the lenders from time to time parties thereto (the "**Second Lien Term Lenders**"), pursuant to which the Second Lien Term Lenders agreed to provide the Second Lien Borrower with a second lien term loan facility in the aggregate principal amount of $300.0 million (the "**Second Lien Term Loan**").

The Second Lien Term Loan has a maturity date of March 2, 2026 and bears interest at a floating rate of SOFR plus 6.50% to 7.00% with a 0.00% SOFR floor, as applicable. As of the Petition Date, there is $300.0 million of principal outstanding on the Second Lien Term Loan. Pursuant to that certain Second Lien Guaranty, dated as of November 25, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Second Lien Guaranty Agreement"), the obligations of the Second Lien Borrower under the Second Lien Credit Agreement are guaranteed by the Guarantors. Each of the Debtors other than HFS Matterhorn Topco, Inc., Matterhorn Parent, LLC, and Matterhorn Intermediate, LLC are either obligors or Guarantors with respect to the Second Lien Term Loan.[9]

---

[7]   Contemporaneously with the release from the First Lien Loans, Hearthside Cooperatief U.A. and Hearthside Bidco B.V. were also released from their obligations as security providers and/or guarantors from the Second Term Loan and Senior Unsecured Notes.

[8]   The non-Debtor subsidiaries, including the US Unsub are not Guarantors or otherwise obligors with respect to the First Lien Loans.

[9]   For the avoidance of doubt, the non-Debtor subsidiaries, including the US Unsub are not Guarantors or otherwise obligors with respect to the Second Lien Loans.

### 3.  Intercreditor Agreement

On November 25, 2018, the First Lien Agent, acting in its capacity as the First Lien Agent and representative of holders of First Lien Loans, and Second Lien Agent, acting in its capacity as the Second Lien Agent and representative of holders of Second Lien Term Loans entered into that certain junior lien intercreditor agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition) (the "**Intercreditor Agreement**").

The Intercreditor Agreement, among other things, governs the relative contractual rights of the lenders of First Lien Loans (the "**First Lien Lenders**") and the Second Lien Term Lenders. The Intercreditor Agreement controls the rights and obligations of holders of obligations outstanding under the First Lien Credit Agreement and the Second Lien Credit Agreement with respect to, among other things, priority, matters of debtor-in-possession financing, the use of cash collateral and adequate protection. Any liens held by or on behalf of the First Lien Agent or any First Lien Lender on the Common Collateral (as defined in the Intercreditor Agreement) that secures obligations under the First Lien Credit Agreement are senior in priority to liens granted to the Second Lien Agent or any Second Lien Term Lender on the Common Collateral (as defined in the Intercreditor Agreement) that secures obligations under the First Lien Credit Agreement.

### 4.  Unsecured Notes Indenture

H-Food Holdings, LLC and Hearthside Finance Company, Inc. (together, in such capacities as "**Issuers**") entered into that certain Indenture, dated as of May 23, 2018 (as supplemented by Supplemental Indenture No. 1, dated as of May 23, 2018, as supplemented by the First Supplemental Indenture dated as of November 26, 2018, supplemented by Supplemental Indenture No. 2, dated as of March 29, 2022, as supplemented by the Supplemental Indenture dated as of September 11, 2024, and as further amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "**Senior Unsecured Notes Indenture**") with U.S. Bank National Association as trustee (the "**Senior Unsecured Notes Indenture Trustee**"), pursuant to which the Issuers issued senior unsecured notes in an original principal amount of $350.0 million in exchange for cash in the same amount (all such notes issued pursuant to the Senior Unsecured Notes Indenture, the "**Senior Unsecured Notes**").

The Senior Unsecured Notes have a maturity date of June 1, 2026, and bear interest at a fixed rate of 8.50%. As of the Petition Date, there is $350.0 million of principal outstanding under the Senior Unsecured Notes Indenture. The obligations of Issuers under the Senior Unsecured Notes Indenture are guaranteed by the Guarantors pursuant to the Senior Unsecured Notes Indenture. Each of the Debtors, other than HFS Matterhorn Topco, Inc., Matterhorn Parent, LLC, and Matterhorn Intermediate, LLC are either Issuers or Guarantors with respect to the Senior Unsecured Notes.

### 5.  Capital Leases

The Company is also party to capital leases entered-into in connection with sale-leaseback transactions occurring in 2022 and 2023 (collectively, the "**Sale-Leaseback Transactions**").[10]

---

[10] On December 8, 2023, Interbake Canada, Inc (the "**Canadian Seller**"), a Canadian non-debtor subsidiary of the Company completed a sale-leaseback transaction (the "**2023 Canadian Sale-Leaseback Transaction**") of one manufacturing property located in Canada by and among the Canadian Seller and 10005222782 Ontario Inc. as buyer. The 2023 Canadian Sale-Leaseback Transaction produced net cash proceeds of approximately $18.6 million, which were used for corporate purposes.

- On July 26, 2022, Hearthside Food Solutions, LLC, Hearthside USA, LLC and Interbake Foods, LLC (the "**2022 Sellers**") completed a sale-leaseback transaction (the "**2022 Sale-Leaseback Transaction**") of 20 manufacturing and warehouse properties by and among the 2022 Sellers and subsidiaries of a real-estate financing company as buyers. The 2022 Sale-Leaseback Transaction produced net cash proceeds of approximately $238.3 million which were used for general corporate purposes.

- On October 6, 2023, Hearthside Food Solutions, LLC (the "**2023 Seller**") completed a sale-leaseback transaction (the "**2023 Sale-Leaseback Transaction**") for two manufacturing properties by and among the 2023 Seller and Store Master Funding XXXII, LLC as buyer. The 2023 Sale-Leaseback Transaction produced net cash proceeds of approximately $23.3 million, which were used for general corporate purposes.

The Company accounts for the Sale-Leaseback Transactions as financing transactions with the purchaser of the properties in accordance with relevant accounting standards, as these agreements are deemed to be capital leases. As of the October 2024, the Debtors' books and records reflect a balance totaling approximately $304.8 million on account of such capital leases. The Creditors' Committee is investigating the circumstances of the Sale-Leaseback Transactions, including whether any estate causes of action exist in connection with such transactions.

### 6.        General Unsecured Claims

In the ordinary course of business, the Company incurs obligations to vendors, suppliers, and trade counterparties, including, but not limited to, employees, critical vendors, and customers. As of the Petition Date, the Debtors estimate they have approximately $164.2 million in accounts payable outstanding before application of any setoffs, credits, or deductions that may be available to the Debtors, including claims that may be entitled to priority (e.g., under section 503(b)(9) of the Bankruptcy Code).

### E.        Events Leading to Commencement of the Chapter 11 Cases

As detailed herein, these Chapter 11 Cases arose from a number of factors that led to the need to de-lever the Company's balance sheet, with chapter 11 being the best option to accomplish such goal while maximizing value for all stakeholders.

### 1.        Wage Rates, Inflation, Industry Headwinds, Labor Transition and Capital Structure Overhang

#### i.        Wage Rates and Inflation

Significant wage rate increases connected to overall inflation growth has adversely affected the Company's financials. In the last three years, wage rates have increased by 17.2% in the aggregate compared to 2021. Such wage pressure has, in turn, imposed substantial pressure on the Company's operating margins as the Company has been unable to completely "pass through" such increased costs. For example, price increases on certain of the Company's customer contracts are tied to changes in the Producer Price Index (PPI) or the Consumer Price Index (CPI), which have not moved in lockstep with overall wage inflation. Additionally, the Company's more general efforts to increase pricing has been challenged by food price inflation more generally.

### ii.        Industry Headwinds

In addition to the inflationary pressures, the Company, like many similarly situated businesses, has been impacted by the industry headwinds. Post-COVID, stay-at-home trends have reversed, resulting in consumption pullback of retail and at-home food products. In addition, consumer behavior had oriented towards value shopping and lower price, lower margin products, which has continued into 2024. As of November 2024, market volume trends have remained relatively flat across all four of the Company's platforms: Refrigerated & Frozen, Baking, Bars & Components, and Packaging. Key customers' external guidance has highlighted the same trends; including a softness in volume and challenges in driving increased revenue via pricing.

These challenges in consumer demand have been particularly damaging for co-manufacturers such as the Company relative to the CPGs. For example, certain customer contracts allow customers to reduce volume from the Company without any penalties because there are no minimal annual volume requirements, as opposed to "take or pay" agreements. Thus, where the CPG is the main manufacturer, it often responds to declining demand by reducing excess manufacturing volumes contracted to co-manufacturers like the Company, while leaving in-house volumes unchanged for as long as possible. When this occurs, it leaves the co-manufacturers (like the Company) with open capacity and fixed overhead costs, leading to lower profitability.

The combination of these industry and operational challenges are contributing causes for the Company's operating results declining from adjusted EBITDA of $258 million for the year ended December 31, 2021 to the projected full-year adjusted EBITDA of approximately $184 million for the year ended December 31, 2024.

### iii.       Labor Considerations and Transition

In February 2023, the Company was the subject of a *New York Times* article raising certain labor issues which the Company maintains were principally connected to one or more third-party staffing agencies. The Company vigorously disputes the bases for the allegations raised by the *New York Times* but the effects of that article, however, were immediate and severe: adverse media attention, customer scrutiny, and a series of investigations begun by different government bodies.

For its part, the Company responded forcefully to review, assess, and further enhance its own labor policies and practices.  The Company has made significant investments to ensure its ability to provide a strong employee base that is fully compliant with applicable laws and regulations, including by substantially reducing its use of third-party staffing agencies and ensuring that all employees are subject to appropriate identification, eligibility, and verification procedures.

Additionally, the Company has been fully cooperative and actively engaged with government officials and regulators.  In particular, since the Petition Date, the Company has settled the investigation by the Office of the Illinois Attorney General and Illinois Department of Labor for an amount of $4,500,000 and received releases and a discharge with respect to the investigation.  *See* Section III.I. for additional information.  As of today, to the Debtors' knowledge, the only ongoing investigation with respect to the Debtors' labor practices is by the U.S. Department of Labor (the "**DOL**").  The Company has never knowingly employed underage labor in any of its facilities and believes that its labor issues are connected to one or more third-party staffing agencies with whom the Company no longer conducts business.  As stated above, the Company has already committed substantial resources and doubled-down on the prioritization and implementation of best-in-class employment practices (including but not limited to ongoing audits, significant reduction in the number of staffing companies, a substantial transition into direct labor, strengthened training and reporting systems, and enhanced hiring policies).  The Company has also

communicated to its labor force, as well as to its customers and applicable regulators, the proactive investments made, and actions taken, by the Company to ensure it has the best-in-class workforce across its facilities.  As a result, Company does not expect such investigations to result in material judgments, fines, or penalties, if any, although the ultimate amounts cannot be predicted with any certainty.  Further, the Debtors expect that any monetary judgment, fine, or penalty on account of the DOL's investigation on the Company's labor practices will be a general unsecured claim and will not significantly impair these Chapter 11 Cases' timeline or feasibility.

The Creditors' Committee has requested that the Debtors include the following statement in this Disclosure Statement; the Debtors do not confirm or endorse the following statement: The Creditors' Committee is actively investigating the allegations set forth in the February 2023 *New York Times* article and the actions taken by the Company in response, including the existence of estate causes of action against the Debtors' former third-party staffing agencies and the Debtors' current and former directors and officers in connection with the same.

### iv.  Capital Structure Overhang

These operational challenges have, in turn, created additional challenges with respect to the Company's funded debt load. As noted above, the Company's debt balance totals approximately $3,057.3 million including capital leases. In 2024, debt service payments would have totaled approximately $301.5 million including debt service payments scheduled to come due in December 2024. The Company also estimates that debt-service payments for 2025 would have totaled approximately $283.2 million if the capital structure remained unchanged. The substantial size of the debt-service payments and its maturity profile put significant pressure on the business. In particular, the Company's First Lien Revolving Loans, with a total of approximately $200 million outstanding, maturing on November 23, 2024, served as a timing catalyst for these Chapter 11 Cases. Moreover, the Company's First Lien Term Loans, with a total of approximately $1,902.5 million outstanding, was set to mature in May 2025.

The Company's balance sheet profile has also been the subject of focus from ratings agencies, with the Company experiencing downgrades including a downgrade to 'CCC-' from 'CCC' by S&P Global Ratings in June 2024, and a downgrade to 'Caa3' from 'Caa1' by Moody's Rating in April 2024. Such downgrades exacerbated the Company's substantial operating challenges.  The Creditors' Committee has requested that the Debtors include the following statement which the Debtors do not confirm or endorse: The Creditors' Committee is investigating the specific reasons behind these downgrades and evaluating whether any claims, including mismanagement and breach of fiduciary duty claims, may exist against the Debtors' current and former directors and officers.

### 2.  Prepetition Operational Initiatives

The Company implemented various strategic actions to deliver EBITDA and margin expansion which included growing its commercial engine and implementing various operational initiatives. Among other things, the Company focused on strengthening its relationship with existing customers, gaining further market share in existing product categories, expanding into Private Label offerings and new product categories with opportunities to win new customers, and initiating pricing optimization strategies to account for inflationary pressures. Furthermore, the Company also implemented network consolidation by closing certain of its underperforming plants and moving the existing volume to other plants to leverage fixed overhead costs.

To streamline the Company's business and focus on the Company's core platforms, the Company also engaged in various asset sales in 2023 and 2024. In 2023, the Company sold its European nutritional functional bars business (the "**European Business**") which generated approximately €235.0 million, with

such cash proceeds held by ROS B.V., the Company's Dutch unrestricted subsidiary.  Following the sale the European Business, the Company no longer had operations in Europe and the entities would ultimately be wound down.  As such, the decision was made to repatriate a majority of the cash proceeds of the sale of the European Business to the U.S. (after deducting the necessary wind-down costs, including for example, taxes), and subsequently wind-down the Company's presence in Europe.  In July 2024, the Company repatriated approximately $187.9 million of the cash proceeds to Hearthside Sub, LLC, (the "**US Unsub**")[11], which for the avoidance of doubt, is not an obligor or guarantor on the Company's prepetition debt.

Additionally, in the first quarter of 2024, the Company continued to divest its non-core assets in its "fresh" and "cones" businesses.

- February 2024:  The Company closed the sale of Jacksonville manufacturing plant, which generated net proceeds of approximately $11.9 million.

- March 2024: The Company closed on the sale of (a) Woodridge and Seattle plants, which generated net proceeds of approximately $15.5 million (b) the Company's ice-cream cones business which included plants in Green Bay, Columbus, and Somerset, which generated approximately $8.9 million of cash proceeds in the aggregate.

### 3.    Strategic Review and Lender Engagement

#### i.    Engagement of Restructuring Advisors

In November 2022, the Company engaged Ropes & Gray LLP ("**Ropes & Gray**") and Evercore Inc. ("**Evercore**"), to assist with operational and balance sheet concerns, and assistance with prepetition initiatives and engagement with the existing lenders under the Company's capital structure. In September 2023, the Company also engaged Alvarez & Marsal North America LLC ("**A&M**"), to assist in the Company's operational and strategic analyses.

#### ii.    Appointment of Special Committee

In November 2023, two experienced independent fiduciaries, Patrick Bartels and Carol Flaton, were appointed to the Company's board. Mr. Bartels and Ms. Flaton constitute a supervisory committee tasked with authority to oversee the Debtors' strategic initiatives (the "**Special Committee**") and Mr. Bartels and Ms. Flaton have exercised day-to-day oversight over the Company's strategic process since December 2023.  On October 18, 2024, Mr. Bartels and Ms. Carol were appointed as special officers to the Officer Special Committee of Matterhorn Buyer, LLC ("**Officer Special Committee**") and the Officer Special Committee was delegated the authority to investigate potential claims or causes of action the Company may hold related to: (i) directors, officers, agents, or any other person affiliated with the Company; or (ii) any transactions involving affiliates or insiders of the Company (the "**Investigation**").

The Officer Special Committee retained Vinson & Elkins, LLP ("**V&E**") as counsel to assist with conducting the Investigation. The Investigation covered the time period from May 2018 to the commencement of the Chapter 11 Cases on November 22, 2024.  As part of the Investigation, V&E reviewed over 5,100 documents obtained from the Company and the Sponsors, in addition to reviewing thousands of emails from certain Company employees and former employees.  V&E also conducted 14 interviews with the Company's former and current directors and officers, Sponsor representatives, and the

---

[11] The remaining balance on these sale proceeds was utilized to, among other things, pay in full the Dutch Allocation totaling approximately $62.2 million

Company's outside legal counsel. The Investigation covered, among other things, the Company's acquisitions and divestitures, Sponsor transactions, the conduct of directors and officers, and employment and labor related issues. The Investigation examined potential claims and causes of action of the Company arising under bankruptcy law, federal law, state law, or common law, including claims and causes of action for (1) actual fraudulent transfer; (2) constructive fraudulent transfer; (3) avoidance of preferential transfers; (4) breach of fiduciary duty; and (5) breach of contract. In addition to considering factual and legal issues related to potential claims and causes of action, the Investigation also assessed other factors to determine whether any colorable claims and causes of action are worth pursuing, including, among others: likelihood of success in litigation, cost of litigation, disruption to the Company and to management that litigation would cause, magnitude of potential damages, and recoverability/collectability.

Based on the Investigation, and considering the totality of the circumstances, the Officer Special Committee has concluded that the Company does not have any colorable claims or causes of action that are worth pursuing and, as a result, the proposed releases by the Debtors in the Plan are reasonable and appropriate. The Investigation remains open to review and consider any additional facts or issues that may arise

### iii.   Financing Efforts

Beginning in early 2024, with the assistance of the Company's advisors and in anticipation of the upcoming maturities and desire to reach a comprehensive solution while it still had liquidity runway, the Company engaged in earnest with certain of its prepetition creditors and various potential third-party financing sources, regarding, among other things an accounts-receivables securitization and a "1.5 lien" financing structure. In this process, the Company, with the assistance of their advisors, engaged with a number of prospective financing parties and provided substantial access, diligence, and analysis. Although these financing efforts produced a few potentially actional proposals, none offered a holistic resolution to the Company's challenges—including the significant, looming debt maturities described above.

### iv.   Strategic Engagement

In May 2024, the Company signed confidentiality agreements with each Creditor Group to explore a comprehensive strategic transaction. As noted above, this process involved extensive diligence, engagement, and dialogue. Among other things, the Company held management meetings and diligence calls to explain the Company's business trajectory, development pipeline, and profile, and sought to encourage parties to engage constructively in turn. This process also involved numerous in-person and virtual meetings between advisors and principals. Finally, after months of good faith, arm's-length negotiations, the Company was successful in driving consensus around a comprehensive restructuring transaction with holders of approximately 97.8% of First Lien Loans, 100% of Second Lien Term Loans, and 79.3% of Senior Unsecured Notes and the Sponsors.

The RSA contemplates, among other things: (i) the consensual use of cash collateral on an interim; (ii) a DIP facility that provides for $150 million of new money delayed-draw term loans, and $150 million in the form of converted First Lien Term Loans "rolled up" as DIP on a dollar-to-dollar basis, to be approved on a final basis (together with the final approval of the use of cash collateral) (iii) a $200 million Equity Rights Offering; (iv) certain case milestones to drive forward a streamlined case timeline, and (v) importantly, support by the Consenting Stakeholders who represent a substantial majority of the Company's prepetition capital structure. Also, as contemplated by the RSA and with support of its key creditor constituencies, prior to the Petition Date, the Company dividended the US Unsub cash to Hearthside Food Solutions, LLC bank account (the main operating account) for the benefit of the estates.

Importantly, the RSA provides the Company with a viable path forward and a framework to successfully exit chapter 11 in a timely fashion with the support of a substantial majority of the Company's capital structure. The restructuring made possible by the RSA presents the most cost-effective path to a timely emergence from chapter 11 through settlement and compromise rather than litigation. The signing of the RSA was undertaken only after careful consideration by the Company's management, the Special Committee, and the governing bodies, in consultation with their experienced financial and legal advisors. Critically, the Company's obligations under the RSA remain subject to their fiduciary duties as debtors and debtors in possession to maximize the value of their estates. Based on the foregoing, the Company believes they have exercised reasonable business judgment in their decision to execute the RSA and that such execution was in the best interest of all parties in interest.

## III.   OVERVIEW OF THE CHAPTER 11 CASES

### A.   First Day Motions and Related Relief Requested

In connection with the filing of their chapter 11 petitions, the Debtors filed the below-listed First Day Motions requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption and loss of value during these Chapter 11 Cases.  The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions.

#### 1.   Administrative Motions

- Jointly administer the Chapter 11 Cases of the Debtors [Docket No. 2];
- Appoint Kroll Restructuring Administration LLC as the Claims and Noticing Agent [Docket No. 4];
- File top 30 creditors list of the Debtors and redact certain personal identification information [Docket No. 13]; and
- Extend the time for the Debtors to file schedules of assets and liabilities and statements of financial affairs [Docket No. 16].

#### 2.   Financing Motions

- Use the Debtors' cash collateral, grant adequate protection to affected secured parties, and obtain debtor-in-possession post-petition financing [Docket No. 28]; and
- Continue the Debtors' certain financing arrangements [Docket No. 26].

#### 3.   Operational Motions

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket No. 24];
- Continue insurance programs, and renew, supplement, modify, or purchase insurance coverage [Docket No. 19];
- Pay certain prepetition taxes and assessments [Docket No. 17];
- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 18];
- Continue paying employee wages and benefits [Docket No. 25];
- Pay certain prepetition claims of critical vendors and claims arising under Perishable Agricultural Commodities Act [Docket No. 23];
- Reject certain unexpired lease [Docket No. 6]; and

- Continue performing under Debtors' customer contracts, honor prepetition and postpetition customer obligations [Docket No. 21].

   **4.     Other Relief**

- Establish notification procedures and restrictions on (i) certain transfer of interests in debtors and (ii) claims of certain worthless stock deductions [Docket No. 22]; and
- Continue performing under certain financial derivative contracts to hedge the Debtors' exposure to commodity price risks [Docket No. 20].

### B.     Procedural Motions

The Debtors have filed various motions regarding procedural issues common to chapter 11 cases of similar size and complexity. The Bankruptcy Court granted all of the relief requested in such motions and entered various orders authorizing the Debtors to, among other things:

- Establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals [Docket No. 174]; and
- Employ professionals utilized by the Debtors in the ordinary course of business [Docket No. 175].

### C.     Retention of Chapter 11 Professionals

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include (i) Alvarez & Marsal North America, LLC as financial advisor [Docket No. 171]; (ii) Evercore Group L.L.C. as investment banker [Docket No. 172]; (iii) Ropes & Gray LLP as counsel to the Debtors [Docket No. 170]; (iv) Vinson & Elkins LLP as counsel to the Officer Special Committee of Matterhorn Buyer, LLC; and (v) Porter Hedges LLP [Docket No. 226] as co-counsel to the Debtors. A retention application is currently pending for Deloitte Tax LLP [Docket No. 337] as the tax advisory services provider for the Debtors.

### D.     Restructuring Support Agreement

Prior to the Petition Date, the Debtors continued to negotiate with, and provided substantial diligence to, the Consenting Stakeholders. These negotiations culminated with the Consenting Stakeholders and the Debtors' entry into the Restructuring Support Agreement on November 22, 2024 (as may be further amended). A copy of the Restructuring Support Agreement is attached hereto **Exhibit B**.

### E.     Appointment of Creditors' Committee

On December 4, 2024, the Creditors' Committee was appointed by the Office of the United States Trustee for Southern District of Texas (the "**U.S. Trustee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases [Docket Nos. 134, 140]. The members of the Creditors' Committee are: (1) Archer Daniels Midland Co.; (2) Applied Products, Inc.; (3) PepsiCo, Inc.; (4) U.S. Bank Trust Co., Indenture Trustee; and (5) Benjamin Mathes.  Bunge North America, Inc., and National Sugar Marketing were initially members of the Creditors' Committee but subsequently resigned.

The Creditors' Committee has engaged Lowenstein Sandler as counsel [Docket No. 300], McDermott Will & Emery LLP as co-counsel [Docket No. 301], and Berkeley Research Group, LLC as its

financial advisor [Docket No. 302]. The retention applications of the Creditors' Committee professionals are currently pending.

The Creditors' Committee has requested that the Debtors include the following statement in this Disclosure Statement. The Debtors do not confirm or endorse the following statement: Beginning in early December 2024, the Creditors' Committee commenced an investigation regarding potential claims that the Debtors may have against the First Lien Lenders, the Second Lien Term Lenders, the Debtors' current and former directors and officers, and the Debtors' sponsors, serving document requests on the Debtors and the Officer Special Committee. The Creditors' Committee is investigating, among other things, claims arising in connection with alleged labor law violations, the sale of the Debtors' European nutritional bars business and related repatriation of cash proceeds, the Sale-Leaseback Transactions, and the circumstances surrounding the formulation of the Restructuring Support Agreement, Plan, and proposed releases and conducting a lien analysis to determine whether unencumbered assets exist. The Committee is also assessing potential claims of DOL in advance of the Governmental Bar Date but is not able to estimate such potential claims, if any, at this time. Because the Creditors' Committee's investigation is ongoing and certain document requests remain outstanding, the Creditors' Committee is presently unable to make a recommendation to unsecured creditors as to whether they should cast a vote in favor of, or against, the Plan.

### F. Statements and Schedules, Rule 2015.3 Financial Reports, and Claims Bar Dates

On November 22, 2024, the Debtors filed the *Debtors' Emergency Motion for entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules for Executory Contracts and Unexpired Leases, and (D) Statements of Financial Affairs, and (II) Granting Related Relief* [Docket No. 16] seeking an extension of the deadline by 30 days, for a total of 44 days from the Petition Date. On November 25, 2024, the Bankruptcy Court entered an order extending the deadline through and including January 5, 2025 [Docket No. 93].

On December 23, 2024 the Debtors filed (a) their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules**") and (b) the periodic report pursuant to Bankruptcy Rule 2015.3 detailing known claims against the Debtors.

On November 25, 2024, the Debtors filed the *Debtors' Motion for Entry of Order (I) Establishing (A) Bar Dates and (B) Related Procedures for Filing Proofs of Claim, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* (the "**Claims Bar Date Motion**"). On December 17, 2024 the Bankruptcy Court entered an order (the "**Claims Bar Date Order**") approving (i) January 24, 2025 at 5:00 p.m. prevailing Central Time as the deadline for any entity to file proofs of claim based on a prepetition claim, including requests for payment under section 503(b)(9) of the Bankruptcy Code (the "**General Bar Date**"); (ii) May 21, 2025 at 5:00 p.m. prevailing Central Time as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases against any Debtor (the "**Governmental Bar Date**"); (iii) the later of (x) the General Bar Date or (y) 5:00 p.m. (prevailing Central Time) on the date that is twenty-one (21) days from the date that the Debtors provide written notice to the affected creditor that the Schedules (as defined in the Claims Bar Date Motion) have been amended as the deadline by which creditors holding claims affected by any amendment to the Schedules must file a proof of claim (the "**Amended Schedules Bar Date**"); (iv) the later of (x) the General Bar Date or Governmental Bar Date, as applicable, (y) the date set forth in an order authorizing the Debtors to reject an executory contract or expired lease of the Debtors (the "**Rejection Damages Bar Date**" and, collectively with the General Bar Date, the Governmental Bar Date, and Amended Schedules Bar Date, the "**Bar Dates**"), as the deadline by which any entity asserting claims resulting from the Debtors' rejection of an executory contract or unexpired lease must file proofs of claim for damages arising from such rejection.

G.      **Exclusivity**

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods. The Exclusive Periods currently remain in effect.

H.      **Executory Contracts and Unexpired Leases**

As of the Petition Date, the Debtors are party to approximately 36 unexpired leases of nonresidential real property.  On the Petition Date, the Debtors filed a motion to reject the lease in Downers Grove, Illinois (the "**Downers Grove Lease**") *nunc pro tunc* to the Petition Date [Docket No. 6].  On December 12, 2024, the Bankruptcy Court entered an order authorizing the rejection of the Downers Grove Lease [Docket No. 191].  On December 31, 2024, the Debtors also filed a motion to reject the lease in Nashville, Tennessee (as amended, the "**Nashville Lease**") which is pending before this Bankruptcy Court.

Section 365(d)(4)(A) of the Bankruptcy Code provides that a debtor has a period of 120 days after the commencement of the chapter 11 case to assume, assign, or reject unexpired Leases (the "**Lease Assumption Period**"). Pursuant to section 365(d)(4)(B), the Bankruptcy Court may, upon a showing of cause, extend the Lease Assumption Period an additional ninety (90) days.

The Debtors are currently reviewing their executory contracts and unexpired leases and may reject certain contracts and leases pursuant to separate motion or the Plan (including, the Plan Supplement).

I.       **Postpetition Settlement**

On December 6, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement Agreement By and Among the Office of the Illinois Attorney General, Illinois Department of Labor, and Hearthside Food Solutions, LLC and (II) Granting Related Relief* [Docket No. 143] (the "**Settlement Motion**"). Among other things, the Settlement Motion seeks to provide a complete resolution of the Investigation and ensure the reorganized Debtors will benefit from a "new start." The material terms of the settlement are as follows: (a) settlement payment by the Debtors to the ILAG and IL DOL of $4,500,000; (b) release and discharge of HFS and its current and former equity holders, parents, subsidiaries, successors, and affiliates and their officers, members of any governing body, employees and agents from all claims with respect to alleged Illinois Labor Law violations specifically identified in the Settlement Agreement beginning in March 2020 through and including the date upon which the Parties reached agreement; and (c) no admission or finding as to liability, wrongdoing, or any violation of Illinois Labor Law as specifically identified in the Settlement Agreement. The Debtors respectfully submit that the Settlement Agreement represents a fair and reasonable compromise of the subject matter driving the Investigation and will deliver significant value to the Debtors and their estates, which will inure to the benefit of stakeholders.  On January 3, 2025, the Bankruptcy Court entered an order approving the Settlement Motion. [Docket No. 294].

J.       **Key Employee Incentive and Retention Programs**

On January 15, 2025, the Debtors filed with the Bankruptcy Court a motion (the "**KEIP/KERP Motion**") seeking authority to implement a key employee incentive program (the "**Proposed KEIP**") and

a key employee retention program (the "**Proposed KERP**") [Docket No. 338]. Under the Proposed KEIP, eight (8) members of the Debtors' senior management team would be eligible to receive awards based on their ability to meet performance targets. The performance targets are an equal weighting of a sales-based metric and a profit-based metric. The KEIP's initial performance period consists of the four months ending on March 31, 2025. Thereafter, to the extent the Plan is not yet consummated, there shall be supplemental performance periods running in three-months increments. The maximum amount expected to be earned during the initial performance period is $7,406,667, and the maximum amount that may be earned if Plan is not consummated by March 31, 2025 is $24,071,666. The Debtors will file a notice with the performance metrics for supplemental performance period if the Plan is not consummated by March 31, 2025.

Under the Proposed KERP, 157 of the Debtors' non-executive employees would be eligible to receive awards in quarterly installments of $1,764,790 if such employees remained with the Company until the earlier of (i) twelve (12) months, *i.e.* until November 30, 2025, and (ii) the Debtors' emergence from these Chapter 11 Cases. The first installment under the key employee retention program (the "**KERP**") was paid prepetition to the KERP participants, subject to a clawback until March 31, 2025. The remaining installments will be paid quarterly on the following dates: March 31, 2025, August 31, 2025, and November 30, 2025. Upon consummation of the Plan, the KERP award will be pro-rated for the quarter in which the Plan is consummated. The Debtors engaged in vigorous negotiations, substantial diligence, and constructive dialogue with the First Lien Ad Hoc Group ahead of filing the KEIP/KERP Motion and previewed the same with the Creditors' Committee, and intends to work with all parties on any questions.

## IV.    SUMMARY OF THE PLAN

### A.    General

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan. **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (1) divides claims and equity interests into separate classes, (2) specifies the consideration that each class is to receive under the plan and (3) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (1) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (2) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class. Under the Plan, Classes 3, 4, 5, and 6, and, potentially, Class 7 are impaired, and holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan. Ballots are being furnished herewith to all Holders of Claims in Classes 3, 4, 5, and 6 that are entitled to vote to facilitate their voting to accept or reject the Plan. Class 7, potentially, is deemed to reject the Plan and, therefore, holders of Claims or Interests in such Classes will not vote on the Plan.

### B.    Administrative Claims and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims and Administrative Claims, including Professional Fee Claims and Postpetition Intercompany Claims, have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III of the Plan.

1. **Administrative Claims**

Except with respect to Professional Fee Claims and Restructuring Expenses, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) on the Plan Effective Date, if such Administrative Claim is Allowed as of the Plan Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) or (ii) if such Administrative Claim is not Allowed as of the Plan Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; provided that if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

On the Plan Effective Date, the Debtors or the Reorganized Company, as applicable, shall pay all Restructuring Expenses that have accrued and are unpaid as of the Plan Effective Date.

Except as otherwise provided in Article II.A of the Plan or the Claims Bar Date Order, and except with respect to Administrative Claims that are Restructuring Expenses or Professional Fee Claims, requests for payment of Administrative Claims must be Filed and served on the Reorganized Company pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business.

Objections to requests for payment of Administrative Claims that are Filed with the Bankruptcy Court (other than Professional Fee Claims) must be Filed and served on the requesting party by the Administrative Claims Objection Bar Date.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS <u>BY THE ADMINISTRATIVE CLAIMS BAR DATE</u> SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, THE ESTATES, OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE PLAN EFFECTIVE DATE.**

2. **DIP Claims**

All DIP Claims shall be deemed Allowed as of the Plan Effective Date in an amount equal to the aggregate amount of the DIP Obligations, including, without limitation, (a) the principal amount outstanding under the DIP Facility on such date; (b) all interest accrued and unpaid thereon through and including the date of payment; and (c) all accrued and unpaid fees, discounts, expenses, costs and indemnification obligations payable under the DIP Documents. On the Plan Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, Cash in an amount equal to such Allowed DIP Claim, except to the extent of any portion of such DIP Claims (including both the funded amount and the amount of any accrued but unpaid interest, premiums and fees, but excluding expenses and professional fees) elected by the Holder thereof to be used as consideration in the Equity Rights Offering (which such portion shall be deemed fully and finally satisfied, settled, released and discharged upon, and in connection with, the consummation of the Equity Rights Offering). Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the provisions of the DIP Documents that expressly survive termination or maturity

of the DIP Facility (including those provisions relating to the rights of the DIP Agent and the other DIP Lenders to expense reimbursement, indemnification, and other similar amounts) shall continue in full force and effect after the Plan Effective Date in accordance with the terms hereof.

### 3. Professional Fee Claims

#### (a) Final Fee Applications

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is sixty (60) calendar days after the Confirmation Date unless otherwise ordered by the Bankruptcy Court. Objections to any Professional Fee Claims must be Filed and served on counsel to the Debtors, counsel to the Creditors' Committee, the U.S. Trustee, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors and the party requesting compensation of a Professional Fee Claim).

#### (b) Professional Fee Escrow

If the Professional Fee Reserve Amount is greater than zero, as soon as reasonably practicable before, but in no event later than the Confirmation Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Reserve Amount, and no Liens, claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the Exit Revolving Facility, the Exit First Lien Term Loan Facility or otherwise). The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors, the Estates, or the Reorganized Company and (ii) shall be held in trust for the Professionals; provided, that to the extent surplus funds remain in the Professional Fee Escrow after all Professional Fee Claims have been resolved by the Bankruptcy Court or settled, such funds shall be returned to the Reorganized Debtors. Allowed Professional Fee Claims shall be paid in Cash by the Debtors or the Reorganized Company, as applicable, to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; provided, that the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow. If the amount in any Professional Fee Escrow account is insufficient to fund payment in full of all Allowed amounts owing to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow without any further action or order of the Bankruptcy Court.  For the avoidance of doubt, the Professional Fee Escrow shall not constitute collateral, including for the DIP Lenders, the First Lien Agent, the Holders of First Lien Claims, the Second Lien Agent, and the Holders of Second Lien Claims, or be subject to claims, including any DIP Claims, DIP Superpriority Claims (as defined in the DIP Order), Adequate Protection Claims (as defined in the DIP Order), 507(b) Claims (as defined in the DIP Order), or claims held by the Prepetition Secured Parties (as defined in the DIP Order), and shall not be subject to any cash sweep and/or foreclosure provisions in the First Lien Documents, the Second Lien Documents, or the DIP Documents, nor shall the Prepetition Secured Parties or the DIP Secured Parties (as defined in the DIP Order) be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the First Lien Documents, the DIP Documents, or the DIP Order.

#### (c) Professional Fee Reserve Amount

No later than five (5) Business Days prior to the Confirmation Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors prior to approval by the Bankruptcy Court through and including the Confirmation Date, including any fees and expenses projected to be outstanding as of the Confirmation Date, and the Debtors

shall escrow such estimated amounts for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties; provided, that such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of a Professional's final request for payment of Filed Professional Fee Claims. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors shall estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim. When all Professional Fee Claims have been Allowed and paid in full or Disallowed, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Company without any further action or order of the Bankruptcy Court.

### (d)    Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Reorganized Company shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Reorganized Company may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### (e)    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims shall receive interest on such Allowed Priority Tax Claims after the Plan Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

### C.    Classification and Treatment of Claims and Interests

### 1.    Summary of Classification

All Claims and Interests, except for Claims addressed in Article II of the Plan, are classified in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F of the Plan.

**(a)        Class Identification**

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Designation | Treatment | Entitled to Vote |
|:---:|---|:---:|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 2 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 5 | Senior Unsecured Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired or Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept or Deemed Not to Accept) |
| 8 | Section 510 Claims | Impaired | Not Entitled to Vote (Deemed Not to Accept) |
| 9 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed Not to Accept) |

**2.        Treatment of Claims and Interests**

(a)        <u>Class 1 – Other Secured Claims</u>

(i)        *Classification*: Class 1 consists of all Other Secured Claims.

(ii)        *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for, each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor and with the reasonable consent of the Required Consenting First Lien Lenders, either:

1.   payment in full in cash of its Allowed Other Secured Claim;

2.   the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

3.   reinstatement of its Allowed Other Secured Claim; or

4.   such other treatment in rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii)        *Voting*: Class 1 is Unimpaired under the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Other Secured Claims.

(b)        <u>Class 2 – Priority Non-Tax Claims</u>

(i)     *Classification*: Class 2 consists of all Priority Non-Tax Claims.

(ii)     *Treatment*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive cash in an amount equal to such Allowed Priority Non-Tax Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(iii)     *Voting*: Class 2 is Unimpaired under the Plan. Each Holder of a Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Priority Non-Tax Claims.

(c)     <u>Class 3 – First Lien Claims</u>

(i)     *Classification*: Class 3 consists of all First Lien Claims.

(ii)     *Allowance*: The First Lien Claims are Allowed in the aggregate amount of $2,146,809,609.32, plus fees, expenses, and other amounts arising and payable under and in accordance with the First Lien Documents, to the extent permitted by the Bankruptcy Code.

(iii)     *Treatment*: Except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment of such Claim, each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date, its elected Pro Rata share of:

    1.   100% of the Exit First Lien Term Loans;

    2.   100% of the Reorganized Equity, subject to dilution by the Equity Rights Offering and the Management Incentive Plan; and

    3.   if any of the Second Lien Term Loan Claims Class, the Senior Unsecured Notes Claims Class, or the General Unsecured Claims Class do not vote to accept the Plan, the cash distribution that would otherwise have been made to any such rejecting Class(es).

Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) that properly exercises its Equity Rights Offering rights to purchase Reorganized Equity shall receive such Reorganized Equity on the Plan Effective Date.

(iv)     *Voting*: Class 3 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

(d)     <u>Class 4 – Second Lien Term Loan Claims</u>

(i)     *Classification*: Class 4 consists of all Second Lien Term Loan Claims.

(ii)     *Allowance*: The Second Lien Term Loan Claims are Allowed in the aggregate principal amount of $300,000,000, plus fees, expenses, and other amounts arising and payable under and in accordance with the Second Lien Documents, to the extent permitted by the Bankruptcy Code.

(iii) *Treatment*: Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment of such Claim, each Holder of a Second Lien Term Loan Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

1. if Class 4 votes to accept the Plan: (1) its Pro Rata share of 100% of the Second Lien Term Loan Claims Cash Recovery; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the Second Lien Term Loan Claims Cash Recovery shall be reduced on a ratable basis (determined based on the Second Lien Term Loan Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Senior Unsecured Notes Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided, further,* that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Second Lien Term Loan Claims Cash Recovery, and (2) the Required Lenders (as defined in the First Lien Credit Agreement) shall waive, and shall cause the applicable First Lien Agent to waive, any turnover or similar rights in favor of the holders of First Lien Claims with respect to such distribution on account of the Intercreditor Agreement; or

2. if Class 4 votes to reject the Plan, no recovery or distribution on account of such Claim, and all Second Lien Term Loan Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect; *provided*, that to the extent the Senior Unsecured Notes Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Second Lien Term Loan Claims Class, then the Second Lien Term Loan Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms.

(iv) *Voting*: Class 4 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

(e) Class 5 – Senior Unsecured Notes Claims

(i) *Classification*: Class 5 consists of all Senior Unsecured Notes Claims.

(ii) *Allowance*: The Senior Unsecured Notes Claims are Allowed in the aggregate principal amount of $350,000,000, plus fees, expenses, and other amounts arising and payable under and in accordance with the Senior Unsecured Notes Documents, to the extent permitted by the Bankruptcy Code.

(iii) *Treatment*: Except to the extent that a Holder of an Allowed Senior Unsecured Notes Claim agrees to a less favorable treatment of such Claim, each Holder of a Senior Unsecured Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

1. if Class 5 votes to accept the Plan, its Pro Rata share of 100% of the Senior Unsecured Notes Cash Recovery; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the Senior Unsecured Notes Cash Recovery shall be reduced on a ratable basis (determined based on the Senior Unsecured Notes Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Senior Unsecured Notes Cash Recovery; or

2. if Class 5 votes to reject the Plan, no recovery or distribution on account of such Claim, and all Senior Unsecured Notes Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect; *provided* that, to the extent the Second Lien Term Loan Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Senior Unsecured Notes Claims Class, then the Senior Unsecured Notes Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms.

(iv)     *Voting*: Class 5 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

(f)     Class 6 – General Unsecured Claims

(i)     *Classification*: Class 6 consists of all General Unsecured Claims.

(ii)     *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each Holder of a General Unsecured Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

1. if Class 6 votes to accept the Plan, the lower of: (1) its Pro Rata share of 100% of the General Unsecured Claims Cash Recovery; and (2) Cash in an amount equal to 6.0% of such Allowed General Unsecured Claim; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the General Unsecured Claims Cash Recovery shall be reduced on a ratable basis (determined based on the General Unsecured Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and Senior Unsecured Notes Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the General Unsecured Claims Cash Recovery; or

2.  if Class 6 <u>votes to reject the Plan</u>, no recovery or distribution on account of such Claim, and all General Unsecured Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect.

(iii)    *Voting*: Class 6 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

(g)    <u>Class 7 – Intercompany Claims</u>

(i)    *Classification*: Class 7 consists of all prepetition Intercompany Claims.

(ii)    *Treatment*: On or after the Plan Effective Date, each allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the reasonable consent of the Required Consenting First Lien Lenders), either reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan.

(iii)    *Voting*: Class 7 is Impaired or Unimpaired under the Plan. Holders of Intercompany Claims are either (i) deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Intercompany Claims.

(h)    <u>Class 8 - Section 510(b) Claims</u>

(i)    *Classification*: Class 8 consists of all Section 510(b) Claims.

(ii)    *Treatment*: On the Plan Effective Date, all Section 510(b) Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims.

(iii)    *Voting*: Each Holder of a Section 510(b) Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited with respect to 510(b) Claims.

(i)    <u>Class 9 - Intercompany Interests</u>

(i)    *Classification*: Class 9 consists of all Intercompany Interests.

(ii)    *Treatment*: On the Plan Effective Date, all Intercompany Interests shall be Reinstated for administrative convenience.

(iii)    *Voting*: Class 9 is Unimpaired under the Plan. Each Holder of an Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Intercompany Interests.

(j)    <u>Class 10 – Existing Equity Interests</u>

(i)    *Classification*: Class 10 consists of all Existing Equity Interests.

(ii)      *Treatment*: On the Plan Effective Date, all Existing Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing Equity Interests shall not receive any distribution on account thereof.

(iii)      *Voting*: Class 10 is Impaired under the Plan. Holders of Existing Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited with respect to Existing Equity Interests.

### 3.      Special Provision Governing Unimpaired Claims

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Company's rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims, and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Debtors and the Reorganized Company shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and the Reorganized Company's legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by the Plan may be asserted after the Confirmation Date and the Plan Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 4.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by any Impaired Class of Claims. The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

### 5.      Subordinated Claims

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510(b) of the Bankruptcy Code, the Debtors and the Reorganized Company reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 6.      Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject

the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 7.      Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

### 8.      Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 9.      Intercompany Interests

Distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders the Reorganized Equity, and in exchange for the Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, any Intercompany Interest in non-debtor Affiliates owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor unless provided otherwise by the Plan.

### D.      Means for Implementation of the Plan

### 1.      Finality of Distributions

As discussed in greater detail in this Disclosure Statement and as otherwise discussed herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, reflecting the agreement among the Consenting Stakeholders pursuant to the Restructuring Support Agreement and for the payment of Professional Fees as provided for therein. The Plan shall be deemed a motion to approve good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be and shall be final.

### 2.      No Substantive Consolidation

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

3. **Sources of Consideration for Plan Distributions**

The Reorganized Company shall fund distributions under the Plan with (i) cash on hand, (ii) the issuance of the Reorganized Equity, (iii) proceeds of the Equity Rights Offering, (iv) the Exit First Lien Term Loans, and (v) the Exit Revolving Facility.

4. **Letters of Credit**

Any letters of credit that remain outstanding on the Plan Effective Date shall be (i) cash collateralized by the Debtors or Reorganized Debtors, as applicable, pursuant to arrangements reasonably satisfactory to the applicable agent, (ii) terminated, cancelled, or returned undrawn to the applicable issuer, or (iii) otherwise addressed through arrangements acceptable to the applicable agent, issuer, and the Debtors.

5. **Exit Revolving Facility**

One or more Reorganized Debtors shall enter into the Exit Revolving Facility on the Plan Effective Date, on terms set forth in the Exit Revolving Facility Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the Exit Revolving Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Company (or the applicable subsidiary issuing the Exit Revolving Facility) shall be authorized to execute and deliver those documents necessary or appropriate to cause its applicable subsidiary to issue and incur the Exit Revolving Facility and related guarantees, including the Exit Revolving Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Company may deem to be necessary to consummate the Exit Revolving Facility. The obligations incurred by the Reorganized Company (or the applicable subsidiary issuer) pursuant to the Exit Revolving Facility and the Exit Revolving Facility Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Exit Revolving Facility Documents.

6. **Exit First Lien Term Loans**

The Reorganized Company shall cause one of its subsidiaries to issue the Exit First Lien Term Loans and provide any related guarantees, and the Exit First Lien Term Loans will be made available to the Reorganized Company, pursuant to and subject to the terms and conditions set forth in the Exit First Lien Term Loan Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the Exit First Lien Term Loans (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Company (or the applicable subsidiary issuing the Exit First Lien Term Loans) shall be authorized to execute and deliver those documents necessary or appropriate to cause the applicable subsidiary issuer to issue and incur the Exit First Lien Term Loan Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Company may deem to be necessary to consummate the Exit First Lien Term Loans. The obligations incurred by the Reorganized Company (or the applicable subsidiary issuer) pursuant to the Exit

First Lien Term Loans and the Exit First Lien Term Loan Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Exit First Lien Term Loan Documents.

## 7.  Reorganized Equity

The Reorganized Company, which may be converted into a Delaware limited liability company on the Plan Effective Date, is authorized to issue or cause to be issued and shall issue, and the Reorganized Company is authorized to distribute and shall distribute, the Reorganized Equity without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The Reorganized Equity shall be issued and distributed free and clear of all Liens, claims, and other interests.

Any Person's acceptance of Reorganized Equity shall be deemed to constitute its agreement to be bound by the Stockholders Agreement, if any, and the New Organizational Documents, as the same may be amended, supplemented, or modified from time to time following the Plan Effective Date in accordance with their terms. The Stockholders Agreement, if any, and the New Organizational Documents shall be binding on all holders of the Reorganized Equity (and their respective successors and assigns), whether such Reorganized Equity is received or to be received on or after the Plan Effective Date and regardless of whether such holder executes or delivers a signature page to the Stockholders Agreement, if any, or the New Organizational Documents. Notwithstanding the foregoing, the Reorganized Company may condition the receipt of any Reorganized Equity issued pursuant to the Plan upon the receipt of duly executed counter - signature pages to the Stockholders Agreement, if any.

All of the Reorganized Equity distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid, and non-assessable. Each distribution and issuance of the Reorganized Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

## 8.  New Organizational Documents

On or prior to the Plan Effective Date, the New Organizational Documents shall be filed with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or organization. The New Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Plan Effective Date, the New Organizational Documents may be amended and restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

For the avoidance of doubt, any claimant's acceptance of Reorganized Equity shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Plan Effective Date in accordance with its terms.

## 9.  New Board

As of the Plan Effective Date, except as set forth in Article IV.I of the Plan, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the New Board.

The New Board shall consist of seven (7) directors, consisting of (i) the Reorganized Company's Chief Executive Officer and (ii) six (6) directors designated by the Required Consenting First Lien Lenders (the initial directors to be so designated in consultation with the Reorganized Company's Chief Executive Officer). Each such director shall serve from and after the Plan Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents of the Reorganized Company.

### 10. Employee Matters

On the Plan Effective Date, the Reorganized Company shall be deemed to have assumed all Employee Benefit Plans, and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; provided, that the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control" or "change in control" under any Employee Benefit Plans.

As of the Plan Effective Date, any provision of an Employee Benefit Plan that provides for equity-based awards, including any termination-related provisions with respect to equity-based awards, shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

The Reorganized Company shall continue to honor all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code, and the obligations thereunder shall be paid in accordance with the terms thereof.

### 11. Corporate Existence

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Plan Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Plan Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### 12. Vesting of Assets in the Reorganized Company

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Plan Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or the Confirmation Order. On and after the Plan Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## 13.        Cancellation of Existing Interests, Indebtedness, and Other Obligations

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Plan Effective Date (i) the First Lien Credit Agreement, the other First Lien Documents, the Second Lien Credit Agreement, the other Second Lien Documents, the Senior Unsecured Notes Indenture, the other Senior Unsecured Notes Documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed cancelled, discharged and of no force or effect, except, with respect to the First Lien Credit Agreement, the other First Lien Documents, the Second Lien Credit Agreement, the other Second Lien Documents, the Senior Unsecured Notes Indenture, and the other Senior Unsecured Notes Documents, as applicable, as necessary to (a) enforce the rights, claims and interests of the First Lien Agent, the Second Lien Agent, or the Senior Unsecured Notes Trustee, as applicable, and any predecessor thereof vis-a-vis parties other than the Released Parties; (b) allow the receipt of and to make distributions under the Plan in accordance with the terms of the First Lien Credit Agreement, the Second Lien Credit Agreement, or the Senior Unsecured Notes Indenture, as applicable; (c) preserve any rights of (1) the First Lien Agent, the Second Lien Agent, and any predecessor thereof as against any money or property distributable to Holders of First Lien Claims or Second Lien Term Loan Claims, including any priority in respect of payment and the right to exercise any charging Liens, and (2) the Senior Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of Senior Unsecured Notes Claims; and (d) allow the First Lien Agent, the Second Lien Agent, or the Senior Unsecured Notes Trustee to appear and participate in the Chapter 11 Cases or any other proceeding with respect to clauses (a) through (c) above, as applicable, and any other proceedings or appeals related to the Plan; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, or similar documents governing the equity, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, that notwithstanding confirmation or the occurrence of the Plan Effective Date, any agreement that governs the rights of a Holder of a Claim shall also continue in effect to allow each of the First Lien Agent, the Second Lien Agent, or the Senior Unsecured Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court to enforce the respective obligations owed to such parties under the Plan. Notwithstanding anything to the contrary herein, all rights under the First Lien Credit Agreement and Second Lien Credit Agreement shall remain subject to any intercreditor agreements.

Except for the foregoing, (i) subject to the performance by the First Lien Agent and the Second Lien Agent of their obligations under the Plan, the First Lien Agent and the Second Lien Agent and their agents shall be relieved of all further duties and responsibilities related to the First Lien Credit Agreement and the Second Lien Credit Agreement upon the occurrence of the Plan Effective Date (provided, that the Surviving First Lien Credit Agreement Provisions and Surviving Second Lien Credit Agreement Provisions shall survive in accordance with the terms of the First Lien Documents and the Second Lien Documents); and (ii) subject to the performance by the Senior Unsecured Notes Trustee of its obligations under the Plan, the Senior Unsecured Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Senior Unsecured Notes Documents upon the occurrence of the Plan Effective Date (provided, that the Surviving Senior Unsecured Notes Provisions shall survive in accordance with the terms of the Senior Unsecured Notes Documents).

The commitments and obligations (if any) of the Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the First Lien Credit Agreement and the Second Lien Credit Agreement, as applicable, shall fully terminate and be of no further force or effect on the Plan Effective Date.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 14.    Corporate Action

Upon the Plan Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable (i) the issuance of the Reorganized Equity; (ii) implementation of the Restructuring Transactions; (iii) incurrence of the New Reorganized Debt; (iv) implementation of the Equity Rights Offering; and (v) all other actions contemplated by the Plan (whether to occur before, on, or after the Plan Effective Date). Upon the Plan Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Company, and any corporate or other organizational action required by the Debtors or the Reorganized Company, shall be deemed to have occurred and shall be in effect on the Plan Effective Date, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Company. Before, on, or after the Plan Effective Date, as applicable, the appropriate officers of the Debtors and the Reorganized Company, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Debtors or the Reorganized Company, as applicable, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by Article IV.N of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 15.    Effectuating Documents; Restructuring Transactions

#### (a)    Restructuring Transactions

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors and the Reorganized Company, as applicable, may take all actions as may be necessary or appropriate in their discretion to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) the issuance of securities; and (v) all other actions that the Debtors or the Reorganized Company determines to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan, all of which shall be

authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule or the governing documents of the Debtors or the Reorganized Company (collectively, the "**Restructuring Transactions**"). For the avoidance of doubt, the Debtors may include in the Plan Supplement, additional corporate Transaction Steps necessary for tax and legal efficiency and administrative purposes.

### 16. Equity Rights Offering and Equity Rights Offering Backstop Commitment Agreement

#### (a) Equity Rights Offering

Following approval by the Bankruptcy Court of this Disclosure Statement and the Equity Rights Offering Documents, one or more of the Debtors shall conduct the Equity Rights Offering. In accordance with the Plan, the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Procedures, and the Subscription Form, (i) holders of Allowed First Lien Claims (including the Equity Rights Offering Holdback Parties and the Equity Rights Offering Backstop Parties) who are Eligible Offerees will be offered Subscription Rights entitling them to subscribe for and purchase their Pro Rata portion of shares of Reorganized Equity in the Equity Rights Offering in an aggregate amount equal to 65% of the Equity Rights Offering Amount (exclusive of the Equity Rights Offering Backstop Premium) (such amount, the "Non-Holdback Rights Offering Amount"), and (ii) the Equity Rights Offering Holdback Parties will agree to purchase (based on the respective amounts and percentages applicable thereto as set forth in the Equity Rights Offering Backstop Commitment Agreement) their respective portion of shares of Reorganized Equity in the Equity Rights Offering in an aggregate amount equal to 35% of the Equity Rights Offering Amount (exclusive of the Equity Rights Offering Backstop Premium) (such amount, the "Holdback Rights Offering Amount" and, such aggregate number of Equity Rights Offering Shares to be purchased on account of the Holdback Rights Offering Amount, the "Direct Investment Shares"). The Equity Rights Offering Shares will be offered in the Equity Rights Offering for Cash; *provided*, *that*, any Holders of Allowed First Lien Claims who are DIP Lenders will be entitled to utilize all or a portion of their DIP Claims (including both the funded amount and the amount of any accrued and unpaid interest, premiums and fees (other than expenses and professional fees)) as consideration in exchange for the Equity Rights Offering Shares in the Equity Rights Offering.

The proceeds of the Equity Rights Offering shall be used to (i) repay outstanding amounts under the DIP Facility, (ii) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, and (iii) ensure at least $100 million of Reorganized Company pro forma cash at emergence.

#### (b) Equity Rights Offering Backstop Commitment Agreement

In accordance with the Equity Rights Offering Backstop Commitment Agreement and subject to the terms and conditions thereof:

- (i) each of the Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties shall fully exercise all of its Subscription Rights, (ii) each of the Equity Rights Offering Holdback Parties shall purchase its portion of the Direct Investment Shares in accordance with the Equity Rights Offering Backstop Commitment Agreement; and (iii) each of the Equity Rights Offering Backstop Parties shall purchase their respective share (in accordance with the amounts and percentages applicable thereto as set forth in the Equity Rights Offering Backstop Commitment Agreement) of any Equity Rights Offering Shares that are not purchased by the Holders of Allowed First Lien Claims; and

- in exchange for providing their respective commitments under the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Backstop Parties will receive their respective allocations of the Equity Rights Offering Backstop Premium.

Upon and in connection with (i) the purchase by the Equity Rights Offering Backstop Parties of their respective portions of the Equity Rights Offering Shares that are not purchased by the Holders of Allowed First Lien Claims, (ii) the payment of the Equity Rights Offering Backstop Premium, (iii) the exercise of the Subscription Rights by the Holders of Allowed First Lien Claims (in each case pursuant to the terms of the Equity Rights Offering Procedures), and (iv) the purchase by the Equity Rights Offering Holdback Parties of the Direct Investment Shares, the Reorganized Company shall be authorized to issue the Reorganized Equity issuable pursuant to such purchases and payment in accordance with Article IV.G of the Plan.

## 17.    Exemption from Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the New Reorganized Debt Documents, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

## 18.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Company shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived as of the Plan Effective Date.

The Reorganized Company may pursue such Retained Causes of Action in accordance with the best interests of the Reorganized Company. The Reorganized Company shall retain and may exclusively enforce any and all such Retained Causes of Action. The Reorganized Company shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any Causes of Action against it as any indication that the Reorganized Company shall not pursue any and all available Causes of Action against it, except as otherwise expressly provided in the Plan, including Article IV and Article VIII of the Plan. Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Causes of Action shall be expressly reserved by the Reorganized Company for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

19.     **Insurance Policies**

(a)     **Director and Officer Liability Insurance**

Each insurance policy, including the D&O Liability Insurance Policies, to which the Debtors are a party as of the Plan Effective Date, shall be deemed Executory Contracts and shall be assumed by the Reorganized Company on behalf of the applicable Debtor effective as of the Plan Effective Date unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Confirmation Hearing, and coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies. In addition, after the Plan Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Plan Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Petition Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Plan Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

(b)     **Survival of Debtors' Indemnification Obligations**

Subject to the investigation of the special committee of officers of Matterhorn Buyer, LLC, to the fullest extent permitted by applicable law, any obligations of the Debtors in place as of the Plan Effective Date pursuant to their corporate charters, by-laws, limited liability company agreements, memoranda and articles of association, or other organizational documents and agreements to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors (collectively, the "**Indemnification Obligations**") shall not be discharged, impaired, or otherwise affected by the Plan; provided that the Debtors or the Reorganized Company shall not indemnify officers, directors, agents, or employees of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that for which indemnification is barred under applicable law or that is excluded under the terms of the foregoing organizational documents or applicable agreements governing the Debtors' Indemnification Obligations; provided, further, that the Indemnifications Obligations shall only include such obligations to former direct and indirect directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors that were serving in such role from and after the Plan Effective Date. All Indemnification Obligations shall be deemed Executory Contracts assumed by the Reorganized Company under the Plan unless such obligation (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Confirmation Hearing.

(c)        **Other Insurance Policies**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Plan Effective Date, each insurance policy to which the Debtors are a party as of the Plan Effective Date shall be assumed by the Reorganized Company unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Confirmation Hearing.

Except as set forth in Article IV.S.1 of the Plan, nothing in the Plan, the Plan Supplement, this Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening) (a) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of the Debtors' insurance policies, including the D&O Liability Insurance Policies, or (b) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Reorganized Company or draw on any collateral or security therefor; for the avoidance of doubt, the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (x) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (y) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (i) workers' compensation claims, (ii) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (iii) all costs in relation to each of the foregoing.

Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, insureds, Debtors, and the Reorganized Company, as applicable, under the insurance policies in any manner, and such insurance carriers, insureds, Debtors, and the Reorganized Company, as applicable, shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the insureds and the Reorganized Company, as applicable, in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Plan Effective Date.

## 20.      **Management Incentive Plan**

On or after the Plan Effective Date, the Management Incentive Plan shall be established by the Reorganized Company pursuant to the terms of the Management Incentive Plan Term Sheet.

## 21.      **Subordination Agreements**

Pursuant to section 510(a) of the Bankruptcy Code, all subordination agreements, including but not limited to, the Intercreditor Agreement, governing Claims or Interests shall be enforced in accordance with such agreement's terms; *provided*, that if the Second Lien Term Loan Claims Class votes in favor of the Plan, Required Lenders (as defined in the First Lien Credit Agreement) shall waive, and shall cause the First Lien Agent to waive, any turnover or similar rights in favor of the First Lien Lenders on account of the Intercreditor Agreement with respect to any distribution to which the Holders of Second Lien Term Loan Claims are entitled pursuant to Article III.B.4 of the Plan.

22.     **Payment of Second Lien Ad Hoc Group Advisors and Senior Unsecured Notes Ad Hoc Group Advisors**

On the Plan Effective Date, the Debtors shall (a) if Class 4 votes to accept the Plan, pay all outstanding Second Lien Ad Hoc Group Advisor Fees in accordance with Article III.B.4 of the Plan; *provided*, *that*, for the avoidance of doubt, the payment of Second Lien Ad Hoc Group Advisor Fees shall in no event exceed $18 million, subject to ratable reduction if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold as set forth in Article III.B.4.c.i of the Plan and (b) if Class 5 votes to accept the Plan, pay all Senior Unsecured Notes Ad Hoc Group Advisor Fees in accordance with Article III.B.5 of the Plan; *provided*, *that*, for the avoidance of doubt, the payment of the Senior Unsecured Notes Ad Hoc Group Advisor Fees shall in no event exceed $21 million, subject to ratable reduction if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold as set forth in Article III.B.5.c.i of the Plan; *provided*, *further*, that the Second Lien Ad Hoc Group Advisors and the Senior Unsecured Notes Ad Hoc Group Advisors, as applicable, submit an invoice, in summary form to the Debtors, no later than five (5) Business Days prior to Plan Effective Date.  The summary invoice shall not be required to include time entry detail but shall include a summary regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates (except for financial advisors compensated on other than an hourly basis), and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or for any benefits of the attorney work-product doctrine; provided that the Debtors reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals, subject to redaction for privilege.

23.     **Closing of Chapter 11 Cases**

After an Estate has been fully administered, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules; provided that, as of the Plan Effective Date, the Reorganized Debtors may submit orders to the Bankruptcy Court under certification of counsel closing individual Chapter 11 Cases and changing the caption of the Chapter 11 cases accordingly; provided further that, matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

24.     **Dissolution of Certain Debtors**

On or after the Plan Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or similar governing body of the Debtors or the Reorganized Debtors. The Reorganized Debtors shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable: (1) file a certificate of dissolution for such entities, together with all other necessary corporate and company documents, to effect the dissolution of such entities under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of such Debtors, as determined under applicable tax laws; and (3) represent the interests of such Debtors before any taxing authority in all tax matters, including any action, proceeding or audit.

E.    **Treatment of Executory Contracts and Unexpired Leases**

1.    **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Plan Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease (including those set forth in the Assumption Schedule) shall be assumed and assigned to the applicable Reorganized Debtor in accordance with the provisions and requirements of section 365 and 1123 of the Bankruptcy Code, other than: (i) those that are identified on the Rejection Schedule; (ii) those that have been previously rejected by a Final Order; (iii) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (iv) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Plan Effective Date.

Subject to the occurrence of the Plan Effective Date, entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumption Schedule, and the Rejection Schedule pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Company has provided adequate assurance of future performance under such assumed Executory Contracts and Unexpired Leases; provided, however, that any assumption of an Executory Contract or Unexpired Lease is further subject to the resolution of any Assumption Dispute in accordance with Article V.D of the Plan and payment of the applicable Cure Claim, if any. Except as otherwise specifically set forth herein or in the Confirmation Order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Plan Effective Date.

Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume or assume and assign Executory Contracts or Unexpired Leases pending on the Plan Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Plan Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Company with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Plan Effective Date.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control" or "change in control" under any lease, contract, or agreement to which a Debtor is a party.

2.    **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by an order of the Bankruptcy Court, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by thirty (30) days from the date of entry of an order of the Bankruptcy Court approving such rejection (including the Confirmation Order). **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors or the Reorganized Company, or property of the foregoing parties, without**

the need for any objection by the Debtors or the Reorganized Company, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and may be objected to in accordance with the provisions of Article VII.E of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

### 3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash, on the Plan Effective Date, or as soon as reasonably practicable thereafter, of the cure amount set forth on the Assumption Schedule for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon the payment of the Cure Claim. The Debtors may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Any party that fails to object to the applicable cure amount listed on the Assumption Schedule within fourteen (14) calendar days of the filing thereof shall be forever barred, estopped, and enjoined from disputing the cure amount set forth on the Assumption Schedule (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Assumption Schedule.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 4. Dispute Resolution

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Debtors or the Reorganized Company to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or the cure of defaults required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by (x) a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or (y) as may be agreed upon by the Debtors and the counterparty to the Executory Contract or Unexpired Lease without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided, that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the party or parties to such Executory Contract or Unexpired Lease or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtor or Reorganized Debtor, as applicable. To the extent that the Assumption Dispute is resolved or determined unfavorably to the

Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (an "**Adjourned Cure Dispute**"); provided, that the Reorganized Company may settle any Adjourned Cure Dispute after the Plan Effective Date without any further notice to any party or any action, order, or approval of the Bankruptcy Court..

## 5. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests in favor of the Debtors, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## 6. Reservation of Rights

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumption Schedule, or the Rejection Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or, after the Plan Effective Date, the Reorganized Company shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

## 7. Nonoccurrence of Plan Effective Date; Bankruptcy Code Section 365(d)(4)

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

### F.    Provisions Governing Distributions

#### 1.    Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Plan Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Allowed Claim or Allowed Interest in the amount that the Plan provides. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as specifically provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Plan Effective Date.

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; provided, that Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor. Any such Claims shall be released pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

#### 2.    Rights and Powers of Distribution Agent

The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

#### 3.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

##### (a)    Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date; provided, that the Distribution Record Date shall not apply to any publicly held securities held in the name of, or by a nominee of, DTC (including, without limitation, the Senior Unsecured Notes Claims), as to which distributions may be made in accordance with the applicable procedures of DTC.

### (b)       Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any Holder or permitted designee, as applicable, of an Allowed Claim or Allowed Interest shall be made to the Distribution Agent, who shall transmit such distribution to the applicable Holders or permitted designees of Allowed Claims or Allowed Interests on behalf of the applicable Debtors. All distributions shall be deemed completed when made to the Distribution Agent. In the event that any distribution to any Holder or permitted designee is returned as undeliverable, no further distributions shall be made to such Holder or such permitted designee unless and until the Distribution Agent is notified in writing of such Holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such Holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Distribution Agent to attempt to locate Holders or permitted designees, as applicable, of undeliverable distributions.

Notwithstanding the foregoing, all distributions of Cash on account of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims, if any, shall be deposited with the First Lien Agent, the Second Lien Agent, and the Senior Unsecured Notes Trustee, as applicable, for distribution to Holders of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims in accordance with the terms of the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Senior Unsecured Notes Indenture, as applicable. All distributions other than of Cash on account of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims, if any, may, with the consent of the First Lien Agent, the Second Lien Agent, and the Senior Unsecured Notes Trustee, as applicable, be made by the Distribution Agent directly to Holders of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims in accordance with the terms of the Plan, the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Senior Unsecured Notes Indenture, as applicable. To the extent the First Lien Agent, the Second Lien Agent, or the Senior Unsecured Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the First Lien Agent, the Second Lien Agent, and the Senior Unsecured Notes Trustee shall be deemed a "Distribution Agent" for purposes of the Plan. Notwithstanding the foregoing, with respect to any Claims held in the name of, or by a nominee of, DTC, the Reorganized Company and the Distribution Agent shall make such distribution through the facilities of DTC.

The amount of any reasonable and documented fees and expenses incurred by the Distribution Agent in connection with making distributions (including, without limitation, reasonable attorneys' fees and expenses) shall be paid in Cash by the Reorganized Company and will not be deducted from distributions made to Holders of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims, as applicable. The foregoing reasonable and documented fees and expenses shall be paid in the ordinary course, upon presentation of reasonably detailed invoices to the Reorganized Company and without the need for approval by the Bankruptcy Court.

All securities to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent or the Reorganized Debtors, as determined by the Debtors or the Reorganized Debtors, as applicable.

### (c)       No Fractional Shares

No fractional shares or units of Reorganized Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of shares or units of Reorganized Equity that is not a whole number, such Reorganized Equity shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number and (ii) fractions of one-half or less shall be rounded

to the next lower whole number with no further payment on account thereof. The total number of authorized and/or issued shares or units of Reorganized Equity to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

### (d)      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then- current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of Article VI.C.4 of the Plan, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed), except for such unclaimed Reorganized Equity, which shall be cancelled, and all other unclaimed property or interests in property shall revert to and vest in the Reorganized Company without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Distribution Agent of an intent to accept a particular distribution; (iii) responded to the Distribution Agent's requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

### 4.      Securities Registration Exemption

The issuance and distribution under the Plan of the Reorganized Equity to Holders of First Lien Claims on account of their Allowed Claims shall, in each case, be exempt from registration under the Securities Act or any other applicable securities laws to the fullest extent permitted by section 1145(a) of the Bankruptcy Code or, with respect to any "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act.

With respect to the foregoing securities issued pursuant to section 1145(a) of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The issuance and distribution under the Plan of the Subscription Rights and the Reorganized Equity in the Equity Rights Offering, including upon the exercise of the Subscription Rights, to the Equity Rights Offering Backstop Parties on account of any Equity Rights Offering Shares that are not purchased by Holders of Allowed First Lien Claims as part of the Equity Rights Offering, any Direct Investment Shares, and any Reorganized Equity issued on account of the Equity Rights Offering Backstop Premium, will be issued pursuant to the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act. Such Reorganized Equity will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

None of the Debtors, the Reorganized Company, or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the Reorganized Equity under applicable securities laws. DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Equity are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

Notwithstanding anything to the contrary in the Plan and this Disclosure Statement, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the Reorganized Equity are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### 5.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Distribution Agent and Reorganized Company, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. In the case of a Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Allowed Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent and Reorganized Company, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, requiring the intended recipient of such distribution to provide an amount of Cash sufficient to satisfy such withholding tax or establishing any other mechanisms they believe are reasonable and appropriate. If an intended recipient of a Plan Distribution has agreed to provide the Distribution Agent or Reorganized Company, as applicable, with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution. The Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### 6.    Allocations

Unless otherwise required by law (as reasonably determined by the Debtors), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed herein.

### 7. No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 8. Setoffs and Recoupment

Except as otherwise expressly provided herein, the Debtors or the Reorganized Company, as applicable, may, but shall not be required to, set off against or recoup from any claims of any nature whatsoever that the Debtors or the Reorganized Company may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Company of any such claim they may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or the Reorganized Company, as applicable, unless (i) the Debtors have consented (which consent shall not be unreasonably withheld) and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

### 9. Claims Paid or Payable by Third Parties

#### (a) Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the Reorganized Company, or the Distribution Agent. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Reorganized Company, or the Distribution Agent on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the Debtor, the Reorganized Company, or the Distribution Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. In the event such Holder fails to timely repay or return such distribution, the Debtors or the Reorganized Company may pursue any rights and remedies against such Holder under applicable law.

#### (b) Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      <strong>Applicability of Insurance Policies</strong>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**G.**      <u>**Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**</u>

**1.**      **Allowance of Claims and Interests**

After the Plan Effective Date, the Reorganized Company shall have and retain any and all rights and defenses each Debtor had with respect to any Claim or Interest immediately before the Plan Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order, Allowing such Claim or Interest.

**2.**      **Claims and Interests Administration Responsibilities**

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Plan Effective Date, the Reorganized Company shall have the authority (i) to file, withdraw, or litigate to judgment objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Plan Effective Date, the Reorganized Company shall have and retain any and all rights and defenses the Debtors had immediately prior to the Plan Effective Date with respect to any Disputed Claim or Disputed Interest, including the Retained Causes of Action.

**3.**      **Estimation of Claims**

Before or after the Plan Effective Date, the Debtors or the Reorganized Company, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Reorganized Company, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim or Interest is estimated. All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims and Interests

60

may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4. Adjustment to Claims Register Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Company upon stipulation between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5. Time to File Objections to Claims

The Debtors and the Reorganized Company, as applicable, shall be entitled to object to Claims. After the Plan Effective Date, except as expressly provided herein to the contrary, the Reorganized Company shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim and requests for payment of Administrative Claims shall be served and Filed on or before the Claims Objection Deadline. The expiration of such period shall not limit or affect the Debtors' or the Reorganized Company's rights to dispute Claims asserted in the ordinary course of business other than through a Proof of Claim.

### 6. Disallowance of Claims

Any Claims held by Entities from which property is recoverable pursuant to a Cause of Action under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable pursuant to a Cause of Action under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Company. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7. Amendments to Claims

On or after the Claims Bar Date and Administrative Claims Bar Date, as applicable, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Company. Absent such authorization, any new or amended Claim Filed after the Claims Bar Date and Administrative Claims Bar Date, as applicable, shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

### 8. No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 9.      Distributions After Allowance

As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Reorganized Company shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Plan Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable nonbankruptcy law.

### 10.      Single Satisfaction of Claims

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one-hundred percent (100%) of the underlying Allowed Claim plus applicable interest, if any.

### H.      Settlement, Release, Injunction, and Related Provisions

### 1.      Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Reorganized Company may compromise and settle Claims against, and Interests in, the Debtors and their Estates and the Retained Causes of Action.

### 2.      Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan (including with respect to Claims that are Reinstated by the Plan) or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or

Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring, and, upon the Plan Effective Date, all Holders of such Claims and Interests shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors, the Reorganized Company, or any of their Assets or property.

### 3. Releases by the Debtors

Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Plan Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, this Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in Article VIII.C of the plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations

of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.

### 4.       Releases by Holders of Claims and Interests

Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Plan Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, this Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in Article VIII.D of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the

Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

### 5.      Releases of Directors and Officers of Wage and Labor Laws

As of the Effective Date, all current and former directors, managers, officers, employees, and managing agents of the Debtors who are provided notice of the release set forth in ARTICLE VIII.E of the Plan will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by all current and former employees, full-time workers, part-time workers, temporary workers, or workers placed by third-party staffing agencies (each, an "**Employee**") unless such Employee expressly elects in writing to opt-out of the releases (via timely (1) submitting an opt-out form, (2) Filing a formal objection on the docket of the Chapter 11 Cases, or (3) providing an informal objection to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before confirmation), from any and all Claims and Causes of Action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Employee or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them have, had or would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any Employee or other Person, arising out of or relating to, in whole or in part, the employment of the Employee by the Debtors, including any Claims arising under or related to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., or any related or similar federal or state wage and labor laws.

### 6.      Exculpation

Without affecting or limiting the releases set forth in ARTICLE VIII.C and ARTICLE VIII.D of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan, the Plan Supplement, this Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of consummation of the Plan, the solicitation of votes on the Plan, or participation in the New Reorganized Debt and the Equity Rights Offering, the pursuit of consummation of the Plan Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to

have constituted intentional fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability**.**

### 7.    Injunction

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE PLAN EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE VIII.F OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE INJUNCTIONS IN ARTICLE VIII.G OF THE PLAN SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, IF A HOLDER OF A CLAIM OR INTEREST TIMELY OPTS OUT OF OR OBJECTS TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE THE CONFIRMATION DATE, SUCH HOLDER SHALL NOT BE BOUND BY THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN OR THE INJUNCTION SET FORTH IN ARTICLE VIII.G OF THE PLAN WITH RESPECT TO THE RELEASED PARTIES (OTHER THAN THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES); PROVIDED THAT, THE INJUNCTION SET FORTH IN ARTICLE VIII.G OF THE PLAN SHALL STILL APPLY TO (I) CLAIMS SUBJECT TO THE EXCULPATION SET FORTH IN ARTICLE VIII.F OF THE PLAN AND (II) ANY ACTIONS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES; PROVIDED FURTHER, THAT THE INJUNCTION PROTOCOL SET FORTH IN ARTICLE VIII.G.1 OF THE PLAN SHALL STILL APPLY AND ANY SUCH HOLDER SHALL BE BOUND BY THE INJUNCTION PROTOCOL.**

      **(a)**      **Injunction Protocol**

**NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASES PRIOR TO THE PLAN EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH DEBTOR, REORGANIZED DEBTOR, OR RELEASED PARTY (THE "INJUNCTION PROTOCOL"). THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.**

      **8.**      **Subordination Rights**

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise that a Holder of a Claim or Interest may have against other Holders of Claims or Interests with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

9.        **Release of Liens**

Except (i) with respect to the Liens securing the New Reorganized Debt or (ii) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Company, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Company and its successors and assigns. On and after the Plan Effective Date, the Reorganized Company (and any of its respective agents, attorneys or designees) shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases or such other forms or release documents as may be necessary or appropriate to evidence such releases and implement the provisions of ARTICLE VIII.I of the Plan.

10.        **Waiver of Statutory Limitations on Releases**

Each Releasing Party in each of the releases contained in the Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party. The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, or foreseen or unforeseen.

I.        <u>**Conditions Precedent to Consummation of the Plan**</u>

1.        **Conditions Precedent to the Plan Effective Date**

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Plan Effective Date (or shall be waived pursuant to Article IX.B of the Plan):

(a)        the Restructuring Support Agreement shall not have been terminated as to the Required Consenting First Lien Lenders and shall be in full force and effect;

(b)        the Bankruptcy Court shall have entered the Cash Collateral Order and the DIP Order, the latter of which shall be in full force and effect;

(c)        the Equity Rights Offering Backstop Commitment Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall be in full force and effect;

(d)        the Equity Rights Offering (including the Equity Rights Offering Procedures) shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall have been consummated in accordance with its terms;

(e)     all Milestones shall have been met or waived in accordance with the terms of the Restructuring Support Agreement;

(f)     the Exit First Lien Term Loan Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting First Lien Lenders), other than such conditions that related to the effectiveness of the Plan and related transactions;

(g)     the Reorganized Equity shall have been issued;

(h)     the Professional Fee Escrow shall have been established and funded;

(i)     all (i) Restructuring Expenses and in accordance with ARTICLE IV.V of the Plan, (ii) if Class 4 votes to accept the Plan, the Second Lien Ad Hoc Group Advisor Fees and (iii) if Class 5 votes to accept the Plan, all Senior Unsecured Notes Ad Hoc Group Advisor Fees shall have been paid in full in Cash;

(j)     the Definitive Documents shall (i) be materially consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms materially consistent with the Restructuring Support Agreement and the Restructuring Term Sheet;

(k)     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions; and

(l)     there shall be no outstanding complaint for the determination of dischargeability of a debt in excess of $5,000,000 pursuant to section 523 of the Bankruptcy Code and/or Bankruptcy Rule 4007 (a "***Dischargeability Complaint***") (and no outstanding request for extension of time to file the same) and the Bankruptcy Court shall not have ruled in favor of any such complaint and/or request; *provided*, *that*, pending resolution of a Dischargeability Complaint, the Milestone for the Plan Effective Date shall be automatically extended one time by forty-five (45) days;

*provided*, *that*, notwithstanding when a condition precedent to the Plan Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously with the other conditions precedent to the Plan Effective Date; *provided, further,* that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

## 2.      Waiver of Conditions

The conditions to the Plan Effective Date set forth in Article IX of the Plan may be waived only by the Debtors, with the consent of the Required Consenting First Lien Lenders (such consent not to be unreasonably withheld), as applicable, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

### 3.    Substantial Consummation

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Plan Effective Date.

### 4.    Effect of Non-Occurrence of Conditions to the Plan Effective Date

If the Plan Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.

### 5.    Notice of Plan Effective Date

The Debtors shall file in the Chapter 11 Cases a notice of Plan Effective Date within two (2) Business Days of the Plan Effective Date.

### J.    Modification, Revocation, or Withdrawal of the Plan

### 1.    Modification and Amendments

The Debtors, with the consent of the Required Consenting First Lien Lenders, reserve the right to modify the Plan and seek confirmation of the Plan consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan; *provided*, *however*, that if the proposed modification of the Plan has a material and adverse effect on the economic rights or releases of the Required Consenting Second Lien Term Lenders, the Required Consenting Senior Unsecured Noteholders, or the Consenting Sponsors, then such modification shall require the consent of the Required Consenting Second Lien Term Lenders, the Required Consenting Senior Unsecured Noteholders, or the Consenting Sponsors, as applicable (which consent shall not be unreasonably withheld, conditioned, or delayed). Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of the Required Consenting First Lien Lenders, expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, this Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

Notwithstanding the above, prior to the Plan Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.

### 2.    Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.  **Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan or if confirmation and consummation of the Plan do not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**K.**  **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, on and after the Plan Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

(a)  Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests; provided, that for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Company, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

(b)  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)  resolve any matters related to (i) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner (whether through amendment of the Assumption Schedule or Rejection Schedule or otherwise) and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease and (ii) any dispute regarding whether a contract or lease is or was executory or unexpired;

(d)  adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

(e)  adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Plan Effective Date;

(f)  adjudicate, decide, or resolve any and all matters related to Causes of Action related to the Chapter 11 Cases;

(g)  adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h)    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, injunctions, indentures, and other agreements or documents created in connection with the Plan or this Disclosure Statement;

(i)    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(j)    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

(k)    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(l)    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.I of the Plan;

(m)    to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, this Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a cure amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(n)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(o)    determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order, or the Plan Supplement;

(p)    adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

(q)    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order, in each case, in accordance with the Restructuring Support Agreement;

(r)    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

(s)    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(t)    hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

(u)      hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan;

(v)      enforce all orders previously entered by the Bankruptcy Court;

(w)      hear any other matter not inconsistent with the Bankruptcy Code and the Judicial Code;

(x)      enter an order concluding or closing the Chapter 11 Cases;

(y)      recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

(z)      enter a final decree closing each of the Chapter 11 Cases; and

(aa)      enforce the compromise, settlement, discharge, injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

### L.      Miscellaneous Provisions

#### 1.      Immediate Binding Effect

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Plan Effective Date, upon the effectiveness of the Plan, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and the Reorganized Company, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

#### 2.      Additional Documents

On or before the Plan Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

#### 3.      Payment of Statutory Fees

All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Plan Effective Date shall be paid by the Debtors or the Reorganized Debtors as applicable. On and after the Plan Effective Date, the Reorganized Company shall pay any and all such fees in full in Cash when due and payable and

shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

### 4.      Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with Article IX.A of the Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, this Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any other party, including the Released Parties, with respect to the Holders of Claims or Interests or any other matter prior to the Plan Effective Date.

### 5.      Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, Related Party, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 6.      Service of Documents

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors and the Consenting Stakeholders shall be served on:

| | |
|---|---|
| Debtors: | H-Food Holdings, LLC |
| | 3333 Finley Rd., Suite 800 |
| | Downers Grove, IL 60515 |
| | Attn:   Roger E. Harris |
| | Email:  RHarris@hearthsidefood.com |
| | |
| Counsel to the Debtors: | Ropes & Gray LLP |
| | 1211 Avenue of the Americas |
| | New York, NY 10036-8704 |
| | Attn:    Ryan Preston Dahl |
| | Matthew M. Roose |
| | Natasha S. Hwangpo |
| | Email:  Ryan.Dahl@ropesgray.com |
| | Matthew.Roose@ropesgray.com |
| | Natasha.Hwangpo@ropesgray.com |
| | |
| Co-Counsel to the Debtors: | Porter Hedges LLP |
| | 1000 Main Street |
| | 36th Floor |
| | Houston, TX 77002 |
| | Attn:    John F. Higgins |
| | M. Shane Johnson |

|  | Email:  jhiggins@porterhedges.com |
|  | sjohnson@porterhedges.com |

Counsel to the First Lien Ad Hoc Group:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attn:    Scott J. Greenberg
          Matthew J. Williams
          Joshua Brody
Email:  SGreenberg@gibsondunn.com
          MJWilliams@gibsondunn.com
          JBrody@gibsondunn.com

- and -

Howley Law PLLC
700 Louisiana Street
Suite 4545
Houston, TX 77002
Attn:    Tom Howley
          Eric Terry
Email:  tom@howley-law.com
          eric@howley-law.com

Counsel to the Second Lien Ad Hoc Group:

Proskauer Rose LLP
11 Times Square
New York, NY 10036-8299
Attn:    Vincent Indelicato
          Matthew R. Koch
Email:  VIndelicato@proskauer.com
          MKoch@proskauer.com

- and -

Gray Reed
1300 Post Oak Boulevard
Suite 2000
Houston, TX 77056
Attn:    Jason S. Brookner
Email:  jbrookner@grayreed.com

Counsel to the Senior Unsecured Notes Ad Hoc Group:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attn:    Kris Hansen
          Jon Canfield
Email:  KrisHansen@paulhastings.com
          JonCanfield@paulhastings.com

- and -

2001 Ross Avenue, Suite 2700
Dallas, TX 75201
Attn:    Charles Persons
Email:  CharlesPersons@paulhastings.com

- and -

4655 Executive Drive, Suite 350

|                                                      | San Diego, CA 92121<br>Attn:  Jason Pierce<br>Email:  JasonPierce@paulhastings.com |
|------------------------------------------------------|-----------------------------------------------------------------------------------|
| Counsel to SnackTime PG<br>Holdings, Inc. and Snack Time<br>Summit Holdings, Inc.: | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001-2163<br>Attn:  Samuel A. Khalil<br>Email:  SKhalil@milbank.com |
| Counsel to CB Metafora<br>Aggregator, LLC: | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn:  Brian Schartz<br>      Jimmy Ryan<br>Email:  Brian.Schartz@kirkland.com<br>       Jimmy.Ryan@kirkland.com |
| Proposed Counsel to the Creditors'<br>Committee: | Lowenstein Sandler LLP<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Attn:  Jeffrey L. Cohen<br>      David M. Posner<br>      Bruce S. Nathan<br>Email:  jcohen@lowenstein.com<br>       dposner@lowenstein.com<br>       bnathan@lowenstein.com |
| Proposed Co-Counsel to the<br>Creditors' Committee: | McDermott Will & Emery LLP<br>845 Texas Avenue, Suite 40000<br>Houston, TX 77002-1656<br>Attn:  Charles R. Gibbs (TX Bar No. 07846300)<br>      Grayson Williams (TX Bar No. 24124561)<br>Email:  crgibbs@mwe.com<br>       gwilliams@mwe.com |

After the occurrence of the Plan Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, and such entities must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not File such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Plan Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have Filed such renewed requests.

## 7.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date. All

injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 8.  Entire Agreement

The Plan, Plan Supplement, Confirmation Order, and the Restructuring Support Agreement (assumption of which agreements is approved by the Confirmation Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### 9.  Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, at the request of the Debtors, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be reasonably acceptable to (x) the Debtors and (y) the Required Consenting First Lien Lenders. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent (such consent not to be unreasonably withheld, conditioned, or delayed) from (x) the Debtors and (y) the Required Consenting First Lien Lenders; and (iii) nonseverable and mutually dependent.

### 10.  Dissolution of Committee

On the Plan Effective Date, any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve; provided that following the Plan Effective Date, any such committees, including the Creditors' Committee, shall continue in existence solely for the purpose of filing and prosecuting applications for allowance of Professional Fee Claims. Upon the dissolution of any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, such committee members and their respective Professionals shall cease to have any duty, obligation, or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

### 11.  Expedited Tax Determination

The Debtors and Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed or to be filed for or on behalf of the Debtors for all taxable periods ending after the Petition Date through the Plan Effective Date.

### 12.  Creditor Default

The Plan provides that an act or omission by a Holder of a Claim or an Interest in contravention of the provisions of the Plan shall be deemed an event of default under the Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and may be entitled to reimbursement for their reasonable attorneys' fees and costs incurred in remedying such default. Upon the finding of such a default by a Holder of a Claim or Interest, the Bankruptcy Court may: (1) designate a party to appear, sign, and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (2) enforce the Plan by order of specific

performance; (3) award judgment against such defaulting Holder of a Claim or Interest in favor of the Reorganized Debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (4) make such other Order as may be equitable that does not materially alter the terms of the Plan.

## V.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan reflects a consensus among the Debtors and the Consenting Stakeholders. The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative reorganization; (ii) the sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.   Alternative Plan of Reorganization

Subject to the Restructuring Support Agreement, if the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve: (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of their assets. The Debtors, however, believe that the Plan, as described herein, enables their creditors to realize the most value under the circumstances. In addition, if the Plan is not confirmed under the terms of the Restructuring Support Agreement, the Consenting Stakeholders have the right to terminate the Restructuring Support Agreement and all obligations thereunder.

### B.   Sale under Section 363 of the Bankruptcy Code

Subject to the Restructuring Support Agreement, if the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code. The First Lien Agent, pursuant to section 363(k) of the Bankruptcy Code, may credit bid claims under the First Lien Credit Agreement and subject to the applicable junior lien intercreditor agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition) (the "**Intercreditor Agreement**") on any assets constituting collateral under the First Lien Security Agreement, dated as of May 23, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified the "**First Lien Security Agreement**").

## VI.   TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAW

Each of the Reorganized Equity, and the Subscription Rights (including the Reorganized Equity issued upon the exercise thereof) issued in the Equity Rights Offering, are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

The issuance and distribution under the Plan of the Reorganized Equity to Holders of First Lien Claims on account of their Allowed Claims shall, in each case, be exempt from registration under the Securities Act or any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code or, with respect to any "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act.

The issuance and distribution under the Plan Subscription Rights and the Reorganized Equity in the Equity Rights Offering, including (i) upon the exercise of the Subscription Rights, (ii) to the Equity

Rights Offering Backstop Parties on account of any Equity Rights Offering Shares that are not purchased by holders of Allowed First Lien Claims as part of the Equity Rights Offering, (iii) any Direct Investment Shares, and (iv) any Reorganized Equity issued on account of the Equity Rights Offering Backstop Premium, will be made pursuant to the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act.

## A.      Section 1145 of the Bankruptcy Code

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the above-described securities issued pursuant to section 1145 of the Bankruptcy Code (the "**1145 Securities**") will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim against, or interest in, a debtor with a view to distribution of any security to be received in exchange for the claim or interest, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution and under an agreement in connection with the plan, with the consummation of the plan or with the offer and sale of securities under the plan, or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. While there is no precise definition of a "controlling" stockholder, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act ("Rule 144") which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

## B.      Section 4(a)(2) of the Securities Act

With respect to the above described securities issued in reliance on the exemption from registration under the Securities Act set forth in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated

thereunder (the "**Private Placement Securities**"), such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements under the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act ("**Rule 144**").

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act. Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 (or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker). Second, the manner of sale requirement provides that the restricted securities must be sold in a brokers' transaction (within the meaning of section 4(a)(4) of the securities act), directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC (electronically for reporting issuers or three copies in paper for non-reporting issuers) a notice of proposed sale on Form 144.

The Debtors believe that the Rule 144 exemption will not be available with respect to any Private Placement Securities (whether held by non-affiliates or affiliates) until at least one year after the Plan Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, non-affiliated holders of Private Placement Securities will be required to hold their Private Placement Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. It is currently contemplated that the Reorganized Debtors will not be subject to the reporting requirements of Section 13 or 15(b) of the Exchange Act.

*****

*Legends.* To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing Reorganized Equity held by holders who are underwriters as defined in section 1145(b) of the Bankruptcy Code, and all Private Placement Securities, will bear a legend substantially in the form below:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON THE PLAN EFFECTIVE DATE, HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Debtors and Reorganized Company, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of any such securities. The Debtors and Reorganized Company, as applicable, also reserve the right to stop the transfer of any such securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive such securities will be deemed to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any such securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) such securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) UNDER THE SECURITIES ACT, AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## VII.   CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of the First Lien Claims, Second Lien Term Loan Claims, Senior Unsecured Notes Claims and General Unsecured Claims. This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are unimpaired or deemed to reject the Plan, holders of Claims not entitled to vote on the Plan or to holders of Claims acting in their capacity as Commitment Parties under the Equity Rights Offering Backstop Commitment Agreement.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations (the "**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the

contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, non-U.S. taxpayers, controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes.

This discussion assumes that all First Lien Claims, Second Lien Term Loan Claims, Senior Unsecured Notes Claims, General Unsecured Claims, Reorganized Equity and Exit First Lien Term Loans are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated) and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

The Debtors currently contemplate, and the following discussion assumes, that the Reorganized Company will be Debtor Parent (and not a reincorporated entity or a new entity, subject to the potential Tax-Free Conversion described below in **Section A.1** – "Transaction Steps") (the "**Current Structure**"). However, under the Plan, the definition of "Reorganized Company" allows for alternative structures, including the possibility that Reorganized Company could be another Debtor (an entity formed by the Debtors) or a different entity that acquires the assets of the Debtors or the equity of any Debtor (or an entity formed by the Debtors). Any deviations from the Current Structure could materially change the U.S. federal income tax consequences of the Plan to the Debtors and holders of Claims described herein.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon individual circumstances. All holders of Claims and Interests are urged to consult their own tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.**

### A.     Consequences to Debtors

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations (or are disregarded entities all of whose income, gains, losses and deductions are taken into account by a member of the group) the common parent of which is HFS Matterhorn Topco, Inc., a Debtor ("**Debtor Parent**," and such affiliated group, the "**Debtor Affiliated Group**"). Debtor Parent has not previously filed a consolidated tax return for the Debtor Affiliated Group for U.S. federal income tax purposes, but may choose to do so for the tax period including the Plan Effective Date. Otherwise, each corporation that is a member of the Debtor Affiliated Group would file a separate tax return on a non-consolidated basis for U.S. federal income tax purposes.

As of the Petition Date, the entity that is the First Lien U.S. Borrower, the Second Lien Borrower and one of the Issuers of the Unsecured Notes (the "**Current Issuer**") is classified for U.S. federal income

tax purposes as an entity disregarded as separate from Debtor Parent, which, together with its disregarded subsidiaries, is a holding company. In addition, as of the Petition Date, all the operations of the Debtors are conducted through Hearthside USA – Corporate, Inc. ("**OpCo**") and its disregarded subsidiaries. OpCo is a wholly-owned indirect subsidiary of Debtor Parent and is classified as a corporation for U.S. federal income tax purposes.

### 1.      Transaction Steps

Pursuant to the Plan, the Debtors will engage in the Transaction Steps set forth in the Plan Supplement. Under the Current Structure, such transactions are expected to include (and herein assumed to include) an issuance of equity interests in Debtor Parent and debt interests in the Current Issuer to certain holders of Claims in satisfaction of their Claims. It is possible that the Transaction Steps instead may contemplate alternative restructuring transactions. For example, the Transaction Steps may include an actual or deemed sale of the assets of the Debtors to an unrelated corporation (to be directly or indirectly owned by certain holders of Claims), or certain holders of Claims receiving the equity of another Debtor (or an entity formed by Debtors) in satisfaction of their Claims. If the Transaction Steps includes one of these alternative transactions, the U.S. federal income tax consequences to the Debtors and holders of Claims would be materially different from those discussed herein.

Even under the Current Struture, as described in Article IV.G of the Plan, Debtor Parent may convert into a Delaware limited liability company on the Effective Date, in which case Debtor Parent would elect, effective on the Plan Effective Date, to be classified as an association taxable as a corporation for U.S. federal income tax purposes.  Any such conversion, together with such  entity classification election (the "**Tax-Free Conversion**"), is intended to be treated as a tax-free "reorganization" within the meaning of section 368(a)(1)(F) of the Tax Code, with no adverse U.S. federal income tax consequences to the Debtors.  Unless otherwise stated, the remaining discussion assumes that the Tax-Free Conversion will not occur.

### 2.      Tax Attributes

The Debtors estimate that, as of December 31, 2023, (i) OpCo had net operating loss ("**NOL**") carryforwards, for U.S. federal income tax purposes of approximately $355 million in the aggregate and (ii) Debtor Parent had carryforwards of disallowed business interest expense of approximately $152 million in the aggregate. The Debtors expect to incur additional NOLs for the period through the Plan Effective Date. The amount of any such NOLs and other tax attributes ("**Tax Attributes**") remains subject to audit and potential adjustment by the IRS.

In addition, certain trading activity and certain other actions prior to the Plan Effective Date relating to direct and indirect ownership of equity and securities of the Debtors could result in an "ownership change" of the Debtors independent of the Plan which could adversely affect the ability to fully utilize the Debtors' Tax Attributes. In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors obtained a protective trading order at the inception of the Chapter 11 Cases.

### 3.      Cancellation of Debt

In general, absent an exception, a debtor will realize and recognize cancellation of debt ("**COD**") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. Under section 108 of the Tax Code, any COD income of a debtor is excluded from gross income if the debtor is

under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. As a consequence of such exclusion, a debtor generally must reduce its tax attributes by the amount of COD income that it excluded from gross income. In general, tax attributes of the debtor are reduced in the following order: (a) NOLs; (b) general business credit carryovers; (c) alternative minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets, which includes the stock of subsidiaries; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Carryforwards of disallowed business interest expense are not reduced. In applying this attribute reduction rule to the tax basis in assets, the tax law limits the reduction in tax basis to the amount by which the tax basis exceeds the debtor's post-emergence liabilities (often referred to as the "**liability floor**"). The debtor may elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. If the amount of excluded COD income exceeds available tax attributes, the excess generally is not subject to U.S. federal income tax and has no other U.S. federal income tax impact. Any reduction in tax attributes in respect of COD generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.  The Treasury Regulations address the method and order for applying tax attribute reduction to a debtor that joins in the filing of a consolidated U.S. federal income tax return. Pursuant thereto, the tax attributes of each debtor member of an affiliated group of corporations that is excluding COD are first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look-through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD exceeds its tax attributes, the excess COD is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

Debtor Parent (as the regarded owner for U.S. federal income tax purposes of the First Lien U.S. Borrower, Second Lien Borrower and one of the Issuers of the Unsecured Notes) expects to incur a substantial amount of COD as a result of the implementation of the Plan. The amount of such COD and resulting reduction in Tax Attributes will depend primarily upon the fair market value of the Reorganized Equity and the issue price (as determined for tax purposes) of the Exit First Lien Term Loans distributed to holders of First Lien Claims, and will also depend on whether Debtor Parent files a consolidated U.S. federal income tax return for the Debtor Affiliated Group for the tax period including the Plan Effective Date, as outlined below.

If a consolidated U.S. federal income tax return is filed for the Debtor Affiliated Group for the tax period including the Plan Effective Date, the Tax Attributes of the Debtors (other than any carryforward of disallowed business interest, which are not reduced) are expected to be substantially reduced or potentially eliminated as a result of the implementation of the Plan, and the aggregate tax basis in the Debtors' assets may be reduced to the maximum extent permitted by the liability floor, in each case taking into account the consolidated group look-through rule described above.

If each corporation that is a member of the Debtor Affiliated Group files a separate tax return on a non-consolidated basis for U.S. federal income tax purposes for the tax period including the Plan Effective Date, Debtor Parent's Tax Attributes (other than carryforwards of disallowed business interest, which are not reduced) would in that case be expected to consist solely of the basis in its stock of OpCo, and such basis would thus be reduced to the maximum extent permitted by the liability floor. If OpCo would later liquidate for U.S. federal income tax purposes, section 1245 of the Tax Code would require the Reorganized Company to recognize ordinary income up to the amount by which its adjusted basis in the stock of OpCo is reduced under these rules, regardless of whether such liquidation would otherwise be entitled to nonrecognition treatment under another section of the Tax Code. OpCo would not be expected to incur COD as a result of implementation of the Plan.

### 4.        Limitation of NOL Carryforwards and Other Tax Attributes

Under the Tax Code, any NOL carryforwards, disallowed interest expense carryforwards and certain other tax attributes of a corporation (collectively, "**Pre-Change Losses**") may be subject to an annual limitation if the corporation undergoes an "ownership change" within the meaning of section 382 of the Tax Code. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the COD arising in connection with the Plan.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally are subject to an annual limitation.

The issuance of the Reorganized Equity pursuant to the Plan is expected to constitute an "ownership change" as of the Plan Effective Date of each of the Reorganized Debtors that is a regarded entity for U.S. federal income tax purposes.

If each corporation that is a member of the Debtor Affiliated Group instead continues to file a separate tax return on a non-consolidated basis for U.S. federal income tax purposes, the impact of these rules on Tax Attributes of Debtor Parent would be expected to be limited because, as discussed above, due to the resulting attribute reduction from the incurrence of COD, Debtor Parent's Tax Attributes (other than any carryforward of disallowed business interest) are expected to be substantially reduced or potentially eliminated as of the end of the taxable year in which the Plan becomes effective. However, these rules are expected to affect Tax Attributes of OpCo and the Tax Attributes of the Debtor Affiliated Group to the extent that a consolidated U.S. federal income tax return is filed for it; the Tax Attributes of OpCo (or such consolidated group), already subject to limitation under section 382 of the Tax Code as a result of prior "ownership changes" may be subject to further limitation as a result of the implementation of the Plan.

### (a)        Annual Limitation

In the event of an "ownership change," the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change will be subject is generally equal to the product of (A) the fair market value of the stock of the corporation (or consolidated group) immediately before the "ownership change" (with certain adjustments) multiplied by (B) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (*e.g.*, 3.43% for ownership changes occurring in December 2024). As discussed below, this annual limitation potentially may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately after (rather than before) the "ownership change" after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's (or consolidated group's) assets. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

In addition, if a loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an "ownership change," any built-in gains recognized (or, according to a currently effective IRS notice treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular annual allowance. Alternatively, if a loss corporation (or consolidated

group) has a net unrealized built-in loss at the time of an "ownership change" (taking into account most assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the actual amount of such gain or loss is greater than the lesser of (1) $10,000,000.00 or (2) fifteen percent (15%) of the fair market value of its assets (with certain adjustments) before the ownership change. Special rules apply in determining the net unrealized built-in loss and/or gain of a consolidated group. The application of these rules may result in a materially different amount of such loss and/or gain as compared to the result as determined on a separate company basis.

If a corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the "ownership change," the annual limitation resulting from the "ownership change" is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to the recognition of any built-in gains as of the time of the ownership change).

### (b)      Section 382(l)(5) Bankruptcy Exception

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where "qualified creditors" of a debtor corporation receive, in respect of their claims, at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. The Debtors do not expect this exception to be of any material benefit, even if otherwise applicable. If this exception is applicable, the Debtors expect to elect not to utilize it.

### B.      **Consequences to Holders of Certain Claims**

As used herein, the term "U.S. holder" means a beneficial owner of a First Lien Claim, Second Lien Term Loan Claim, Senior Unsecured Notes Claim, General Unsecured Claim, or Reorganized Equity that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;
- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;
- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or
- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds a Claim, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. Partners in a partnership holding any such instruments are urged to consult their own tax advisors.

As discussed above in **Article VII.A.1** of this Disclosure Statement – "Transaction Steps," if the Plan Supplement contemplates transactions other than the Current Structure, the U.S. federal income tax consequences to holders of Claims would be materially different from those discussed herein.

### 1.    U.S. Holders of Allowed First Lien Claims

Pursuant to the Plan, and in complete and final satisfaction of their First Lien Claims, holders of First Lien Claims will receive (i) Reorganized Equity, (ii) Subscription Rights to acquire Reorganized Equity pursuant to the Equity Rights Offering (iii) Exit First Lien Term Loans, and (iv) if any of the Second Lien Term Loan Claims Class, Senior Unsecured Notes Claims Class, or General Unsecured Claims Class do not vote to accept the Plan, the cash distribution that would otherwise have been made to any such rejecting Classes. The exchange of First Lien Claims for Exit First Lien Term Loans is expected result in an exchange or "significant modification" of the First Lien Claims (and accordingly a realization event for U.S. federal income tax purposes). The U.S. federal income tax consequences of the Plan to a U.S. holder of First Lien Claims, will depend in part on whether the First Lien Term Loan Claims constitute "securities" for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five (5) years or less do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. Additionally, the IRS has ruled that new debt obligations with a term of less than five (5) years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form.

The First Lien Term Loans consist of several different tranches. The 2018 Term Loan had a seven (7) year maturity at issuance. The 2018 Incremental Term Loan had a maturity at issuance of approximately six-and-a-half (6.5) years. The 2020 Incremental Term Loan had a maturity at issuance of slightly less than five (5) years. The 2021 Incremental Term Loan was intended to be fungible with the 2020 Incremental Term Loan for U.S. federal income tax purposes, and is expected to be treated as having the same maturity at issuance as the 2021 Incremental Term Loan for these purposes, but it is possible that these would be treated for these purposes as having a shorter maturity at issuance.

The following discusses the potential treatment of the First Lien Term Loans as "securities" for U.S. federal income tax purposes, but takes no position as to the treatment of any tranche thereof. *U.S. holders of First Lien Claims are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of their Claims and the respective consideration received as "securities" for U.S. federal income tax purposes.*

An exchange of First Lien Term Loan Claims that qualify as "securities" for (in whole or in part) stock or securities should qualify as a tax "reorganization" within the meaning of section 368(a) of the Tax Code ("**Recapitalization**"), with the consequences described below in "Recapitalization Treatment." As to any First Lien Claims that do not qualify as "securities" for U.S. federal income tax purposes (including First Lien Revolving Loan claims, which are not expected to so qualify), the restructuring should be a fully taxable transaction with the consequences described below in "Fully Taxable Exchange." If a U.S. holder of First Lien Claims holds First Lien Claims that qualify "securities" as well as First Lien Claims that do not qualify as "securities," in each case for U.S. federal income tax purposes, then a portion of the consideration received would be treated as received in respect of the "securities" and may qualify as a Recapitalization as described below, while another portion of the consideration received would be treated

as received in respect of the First Lien Claims that do not qualify as "securities" in a fully taxable exchange as described below.

### (a)  Recapitalization Treatment

If the exchange by a U.S. holder of First Lien Claims for Reorganized Equity and Exit First Lien Term Loans qualifies for Recapitalization treatment, the U.S. holder generally will not recognize gain or loss. However, a U.S. holder would have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or possibly accrued original issue discount ("**OID**") not previously included in income. *See* **Section VII.B.4** — "Distributions in Respect of Accrued But Unpaid Interest or OID," below. In addition, if any portion of the consideration received for such First Lien Claims does not qualify as "stock or securities" for U.S. federal income tax purposes (including any cash), then a U.S. holder will generally recognize gain up to the lesser of (i) the gain that would be recognized if the holder of the First Lien Claim disposed of such First Lien Claim for U.S. federal income tax purposes and (ii) the value of such portion of the consideration that does not qualify as "stock or securities" for U.S. federal income tax purposes.

In an exchange that qualifies for Recapitalization treatment, a U.S. holder's aggregate tax basis in the Reorganized Equity, Subscription Rights under the Equity Rights Offering, and Exit First Lien Term Loans received in exchange for its First Lien Claims would equal such U.S. holder's aggregate adjusted tax basis in the First Lien Claims exchanged therefor, increased by any gain and interest income recognized in the exchange, and decreased by any deductions claimed in respect of any previously accrued but unpaid interest. A U.S. holder's holding period in the Reorganized Equity, Subscription Rights under the Equity Rights Offering, and Exit First Lien Term Loans received in exchange for its First Lien Claims would include its holding period in the First Lien Claims exchanged therefor, except to the extent of any consideration received in respect of accrued but unpaid interest or possibly accrued OID or treated as imputed interest income.

### (b)  Fully Taxable Exchange

In the case of a taxable exchange, a U.S. holder of a First Lien Claim generally would recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the fair market value of the Reorganized Equity, Subscription Rights under the Equity Rights Offering, and Exit First Lien Term Loans received (other than, in each case, to the extent received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. holder's adjusted tax basis in the First Lien Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). See **Section VII.B.3** — "Character of Gain or Loss," below. A U.S. holder would have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or possibly accrued OID not previously included in income. *See* **Section VII.B.4** — "Distributions in Respect of Accrued But Unpaid Interest or OID," below.

In the case of a taxable exchange, a U.S. holder of a First Lien Claim's tax basis in the Reorganized Equity, Subscription Rights under the Equity Rights Offering, and Exit First Lien Term Loans received would equal the fair market value of such Reorganized Equity, Subscription Rights under the Equity Rights Offering, and Exit First Lien Term Loans. The U.S. holder's holding period in the Reorganized Equity, Subscription Rights under the Equity Rights Offering, and Exit First Lien Term Loans generally begins on the day following the Plan Effective Date.

In the case of a taxable exchange, a U.S. holder's tax basis in the New Common Equity Interests or Warrants, received would equal the fair market value of such New Common Equity Interests or Warrants,

as applicable. The U.S. holder's holding period in the New Common Equity Interests or Warrants (as applicable) generally begins on the day following the Plan Effective Date.

### 2. U.S. Holders of Allowed Second Lien Term Loan Claims, Senior Unsecured Notes Claims and General Unsecured Claims

Holders of Second Lien Term Loan Claims, Senior Unsecured Notes Claims, and General Unsecured Claims, in each case, to the extent that the applicable Class votes to accept the Plan, will receive cash in complete and final satisfaction of their respective claims pursuant to the Plan.

A U.S. holder of a Second Lien Term Loan Claim, Senior Unsecured Notes Claim or General Unsecured Claim who is subject to this treatment is expected to recognize loss equal to: (a) the holder's adjusted tax basis in its Claims, minus (b) the cash received. Holders of Claims should consult with their own tax advisors regarding the treatment of any consideration other than cash that may be received pursuant to the Plan. For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID or market discount, (which differs from the treatment described above), see **Section VII.B.3** — "Character of Gain or Loss," and **Section VII.B.4** — "Distributions in Respect of Accrued But Unpaid Interest or OID," below.

### 3. Character of Gain or Loss

When gain or loss is recognized by a U.S. holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss is determined by a number of factors, including the tax status of the U.S. holder, whether the U.S. holder's Claim constitutes a capital asset in the hands of the U.S. holder and how long it has been held, whether such Claim was acquired at a market discount, and whether and to what extent the U.S. holder previously claimed a bad debt deduction in respect of the Claim.

In addition, a U.S. holder that acquired a Claim from a prior holder at a "market discount" may be subject to the market discount rules of the Tax Code. A U.S. holder that purchased its Claim from a prior holder would be considered to have purchased such Claim with "market discount" if the U.S. holder's adjusted tax basis in its Claim is less than the adjusted issue price of such Claim by at least a statutorily defined *de minimis* amount. Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally would be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. holder, on a constant yield basis) during the U.S. holder's period of ownership, unless the U.S. holder elected to include the market discount in income as it accrued. If a U.S. holder of Claims did not elect to include market discount in income as it accrued and, thus, under these rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would in the case of a fully taxable exchange become deductible at the time of the exchange (but would continue to be deferred in the event of Recapitalization treatment).

In the event of Recapitalization treatment, the Tax Code indicates that, under Treasury Regulations to be issued, any accrued market discount in respect of the First Lien Claim in excess of the gain recognized in the exchange (which, in this instance, is all such accrued market discount) is not expected to be currently includible in income. However, such accrued market discount would carry over to any non-recognition property received in exchange therefor, i.e., to the relevant Reorganized Equity and Exit First Lien Loans. Any gain recognized by a U.S. holder upon a subsequent disposition of such property would be treated as ordinary income to the extent of any accrued market discount carried over not previously included in income. To date, specific Treasury Regulations implementing this rule have not been issued.

### 4. Distributions in Respect of Accrued But Unpaid Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. holder of a Claim is received in satisfaction of accrued interest during the U.S. holder's holding period, such amount would be taxable to the U.S. holder as interest income (if not previously included in the U.S. holder's gross income). Conversely, a U.S. holder generally recognizes a deductible loss to the extent any accrued interest or accrued OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with respect to any accrued but unpaid OID. Accordingly, it is also unclear whether, in similar circumstances or by analogy, any U.S. holder of a First Lien Claim would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID with respect to such First Lien Claim that is not paid in full.

The Plan provides that, unless otherwise required by law (as reasonably determined by the Reorganized Company), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed therein (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). See Article VI.F of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. *You are urged to consult your own tax advisor regarding the allocation of consideration and the inclusion and deductibility of accrued but unpaid interest for U.S. federal income tax purposes.*

### 5. Treatment of Equity Rights Offering

Although not entirely free from doubt, the Reorganized Debtors intend to take the position that a holder of a First Lien Claim that elects to exercise its Subscription Rights should be treated as purchasing, in exchange for its Subscription Rights and the amount of cash paid by the holder to exercise such Subscription Rights, Reorganized Equity. Such a purchase should generally be treated as the exercise of an option under general U.S. federal income tax principles, and such holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises the Subscription Rights. A holder's aggregate tax basis in the Reorganized Equity should equal the sum of (a) the amount of cash paid by the holder to exercise the Subscription Rights, plus (b) such holder's tax basis in the Subscription Rights immediately before the Subscription Rights are exercised. A U.S. Holder's holding period for the Reorganized Equity received pursuant to such exercise should begin on the day following the Plan Effective Date.

A holder that elects not to exercise the Subscription Rights may be entitled to claim a (likely short-term capital) loss equal to the amount of tax basis allocated to such Subscription Rights, subject to any limitation on such holder's ability to utilize capital losses. Holders electing not to exercise their Subscription Rights should consult with their own tax advisors as to the tax consequences of such decision.

### 6. Disposition on, or Taxable Disposition of, Reorganized Equity

The Reorganized Equity is expected to be Debtor Parent stock unless the Tax-Free Conversion occurs, in which case the Reorganized Equity is expected to be limited liability company interests in the converted Debtor Parent. A U.S. holder's basis and holding period in the Reorganized Equity and the other treatment described below are not expected to be affected if the Tax-Free Conversion occurs.

The gross amount of any distribution of cash or property made to a U.S. holder with respect to Reorganized Equity generally would be includible in gross income by a U.S. holder as dividend income to

the extent such distribution is paid out of current or accumulated earnings and profits of Debtor Parent as determined under U.S. federal income tax principles. Dividends received by non-corporate U.S. holders may qualify for reduced rates of taxation. Subject to applicable limitations, a distribution which is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends-received deduction if such amount is distributed to a U.S. holder that is a corporation and certain holding period and other requirements are satisfied. Any dividend received by a U.S. holder that is a corporation may be subject to the "extraordinary dividend" provisions of the Tax Code.

Distributions in excess of current and accumulated earnings and profits of Debtor Parent, as determined under U.S. federal income tax principles, first would be treated as a non-taxable return of capital to the extent of the U.S. holder's adjusted tax basis in its Reorganized Equity and would be applied against and reduce (but not below zero) such basis dollar-for-dollar, and, thereafter as gain from the sale or exchange of stock, which would be treated as long-term capital gain if such U.S. holder's holding period in its Reorganized Equity exceeds one year as of the date of the distribution.

Except as discussed below, U.S. holders of Reorganized Equity generally would recognize capital gain or loss upon a subsequent sale or other taxable disposition of such Reorganized Equity in an amount equal to the difference between the U.S. holder's adjusted tax basis in the Reorganized Equity and the sum of the cash plus the fair market value of any property received from such sale or other disposition. Any such gain or loss generally would be long-term capital gain or loss if the U.S. holder's holding period for its Reorganized Equity is more than one year at the time of sale or other disposition. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. holders. The deductibility of capital loss is subject to significant limitations.

Any gain recognized by a U.S. holder upon a subsequent disposition of the Reorganized Equity received (or any stock or property received for it in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any accrued market discount carried over from the U.S. holder's First Lien Claims to the U.S. holder's Reorganized Equity not previously included in income (*see* **Section VII.B.3** — "Character of Gain or Loss," above), (ii) any ordinary loss deductions incurred upon exchange or previously as a result of the write-down of the U.S. holder's First Lien Claims that were exchanged for Reorganized Equity in the Plan decreased by any income (other than interest income) recognized by the U.S. holder in such exchange, and (iii) with respect to a cash-basis U.S. holder and in addition to clause (ii) above, any amounts which would have been included in its gross income if the U.S. holder's First Lien Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### 7. Tax Reporting for Assets Allocable to Disputed General Unsecured Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary or the receipt of a determination by the IRS, the Disbursing Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Accordingly, any assets reserved with respect to Disputed General Unsecured Claims will be subject to tax annually on a separate entity basis on any net income earned with respect to the assets of the reserve - including any gain recognized upon the actual or deemed disposition of such assets, such as in connection with the allowance of Disputed General Unsecured Claims. Accordingly, any appreciation in value in the Warrants held in the Disputed Claims Reserve would be taxable in connection with the subsequent release of such Warrants from the reserve. All taxes imposed on assets or income of the Disputed Claims Reserve shall be payable from the assets of the Disputed Claims Reserve. If, as is likely with respect to the Warrants, the reserve has insufficient Cash to pay any taxes imposed on the reserve (including any

income that may arise upon the distribution of the assets in such reserve), the assets of the reserve can be sold to pay the tax liability.

All distributions to holders of Allowed General Unsecured Claims from the Disputed Claims Reserve will be treated as distributed directly by the Debtors in respect of such Allowed General Unsecured Claims. All parties (including, without limitation, the Debtors, the Reorganized Debtors, the Disbursing Agent and the holders of General Unsecured Claims) will be required to report for tax purposes consistent with the foregoing.

### C.  Withholding on Distributions and Information Reporting

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

**The foregoing summary has been provided for informational purposes only. All holders of Claims and Interests are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.**

### VIII.  VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a Claim entitled to vote (each, a "**Voting Creditor**") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

### A.  Voting Deadline

All Voting Creditors have been sent a Ballot together with this Disclosure Statement. Such Holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote. Special procedures are set forth below for the beneficial holders of securities ("**Beneficial Holders**") who hold such securities in "street name" through a broker, dealer, commercial bank, trust company, or other agent or nominee ("**Nominee**").

The Debtors have engaged Kroll Restructuring Administration LLC as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW, OR SUBMITTED THROUGH THE VOTING AGENT'S E-BALLOT PORTAL (AS DEFINED BELOW), ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING CENTRAL TIME) ON MARCH 3, 2025 UNLESS EXTENDED BY THE DEBTORS.**

A BENEFICIAL HOLDER OF THE UNSECURED NOTES HOLDING SUCH NOTES IN "STREET NAME" THROUGH A NOMINEE MAY VOTE AS FURTHER DESCRIBED BELOW.

IF IT IS A NOMINEE'S CUSTOMARY AND ACCEPTED PRACTICE TO COLLECT VOTES FROM BENEFICIAL HOLDERS BY VOTER INFORMATION FORM ("**VIF**"), E-MAIL, TELEPHONE, OR OTHER CUSTOMARY MEANS OF COMMUNICATION, THE NOMINEE MAY EMPLOY THAT METHOD OF COMMUNICATION IN LIEU OF COLLECTING PAPER BENEFICIAL HOLDER BALLOTS.

IF YOU MUST RETURN YOUR BALLOT (OR OTHERWISE CONVEY YOUR VOTE) TO YOUR NOMINEE, YOU MUST RETURN YOUR BALLOT (OR OTHER CUSTOMARY COMMUNICATION) TO YOUR NOMINEE IN SUFFICIENT TIME FOR YOUR NOMINEE TO PROCESS YOUR VOTE AND RETURN A MASTER BALLOT INCORPORATING YOUR VOTE TO THE VOTING AGENT BEFORE THE VOTING DEADLINE.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**H-Food Holdings Ballot Processing Center**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue, Suite 412**
**Brooklyn, NY 11232**

**Telephone: (888) 510-7189 (domestic toll-free) or +1 (646) 937-7819 (international)**
**E-mail: HFSInfo@ra.kroll.com with "H-Food Holdings" in the subject line**

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B.    Voting Procedures

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials, a Ballot, and a unique E-Ballot ID for online balloting (collectively, a "**Solicitation Package**") to Voting Creditors. Record Holders of certain Claims may include Nominees. If such Nominees do not hold Claims for their own account, they must provide copies of the Solicitation Package to their customers that are the Voting Creditors thereof as of the Record Date. If it is a Nominee's customary and accepted practice to forward the solicitation information to Beneficial Holders by e-mail, telephone, or other customary means of communication, the Nominee may employ that method of communication in lieu of sending the paper Beneficial Ballot and/or Solicitation Package. Any Voting Creditor that is a Beneficial Holder and has not received a Ballot should contact its Nominee. Any Voting Creditor that is not a Beneficial Holder and has not received a Ballot should contact the Voting Agent.

Voting Creditors should provide all of the information requested by the Ballot and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot either to the Voting Agent or their Nominee, as applicable.

In addition to accepting hard-copy Ballots, the Debtors seek authorization to accept Ballots (from voting parties that are not required to vote through a Nominee) via electronic, online transmissions, solely through a customized online balloting portal on the Debtors' case website maintained by the Voting Agent (the "**E-Ballot Portal**").[12] Parties entitled to vote may cast an electronic Ballot and electronically sign and submit the Ballot instantly by utilizing the E-Ballot Portal (which allows a holder to submit an electronic signature). If applicable, instructions for electronic, online transmission of Ballots will be set forth on the forms of Ballots and Solicitation Notices. The encrypted ballot data and audit trail created by such electronic submission through the E-Ballot Portal shall become part of the record of any Ballot submitted in this manner, and the Voting Creditor's electronic signature will be deemed to be immediately legally valid and effective.

The Record Date for determining which Holders are entitled to vote on the Plan is January 24, 2025. The agent or indenture trustee under any debt documents will not vote on behalf of its respective Holders. Such Holders must submit their own Ballot.

---

[12]    The Debtor's case website maintained by the Voting Agent may be found at https://cases.ra.kroll.com/HFS.

C.       **Parties Entitled to Vote**

Under the Bankruptcy Code, only Holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan. Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, Holders of such Claims and Interests do not actually vote on the Plan and will not receive a Ballot. If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or Interest to have accepted the Plan and, accordingly, Holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of (i) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan and (ii) Interests as acceptance by interest Holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

The Claims in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

- **Class 3** – First Lien Claims;
- **Class 4** – Second Lien Term Loan Claims;
- **Class 5** – Senior Unsecured Notes Claims; and
- **Class 6** – General Unsecured Claims

1.       **Voting Creditors (Who Are Not Beneficial Holders)**

A Voting Creditor that holds a Claim as a record holder in its own name should vote on the Plan by completing and signing a Ballot and returning it directly to the Voting Agent on or before the Voting Deadline (i) using the enclosed pre-addressed, postage-paid return envelope or (ii) via the E-Ballot Portal. The Voting Agent will not accept Ballots submitted by e-mail or facsimile; provided, however, that the Voting Agent will accept Master Ballots submitted by Nominees by e-mail.

2.       **Beneficial Holders**

A Voting Creditor holding a Claim as a Beneficial Holder in "street name" through a Nominee may vote on the Plan by one of the following two methods (as selected by such Beneficial Holder's Nominee):

- Complete and sign a Ballot for use by a Beneficial Holder to convey its vote to its Nominee (each, a "**Beneficial Ballot**"). Return the Beneficial Ballot to your Nominee as promptly as possible and in

sufficient time to allow such Nominee to process your instructions and return a completed "master" Ballot (each, a "**Master Ballot**") to the Voting Agent by the Voting Deadline; or

- Complete and sign the pre-validated Beneficial Ballot (as described below) provided to you by your Nominee. Return the pre-validated Beneficial Ballot to the Voting Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

If it is a Nominee's customary and accepted practice to forward the solicitation information to (and collect votes from) Beneficial Holders by e-mail, telephone, or other customary means of communication, the Nominee may employ that method of communication in lieu of sending the paper Beneficial Ballot and/or Solicitation Package.

Any Beneficial Ballot returned to a Nominee by a Voting Creditor will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Voting Agent that Beneficial Ballot (properly validated) or a Master Ballot casting the vote of such Voting Creditor.

If a Beneficial Holder holds Claims in Class 5 through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Ballot and each such Beneficial Holder should execute a separate Beneficial Ballot for each block of Claims in Class 5 that it holds through any Nominee and must return each such Beneficial Ballot to the appropriate Nominee. Votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees, as of the Record Date, as evidenced by the applicable securities position report(s) obtained from DTC. Votes submitted by a Nominee pursuant to a Master Ballot will not be counted in excess of the amount of such Claims held by such Nominee as of the Record Date.

If a Holder is registered directly with the applicable indenture trustee, the voting amounts of those Claims shall be the amounts set forth on the books and records of the applicable indenture trustee as of the Record Date.

### 3. Nominees

A Nominee that, on the Record Date, is the record holder of Claims for one or more Voting Creditors can obtain and/or convey the votes of the Beneficial Holders of such Claims, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

#### (a) Pre-Validated Ballots

The Nominee may "pre-validate" a Beneficial Ballot by (i) signing the Beneficial Ballot; (ii) indicating on the Beneficial Ballot the amount and the account number of the Claims held by the Nominee for the Beneficial Holder; and (iii) forwarding such Beneficial Ballot, together with this Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, the Voting Agent, and other materials requested to be forwarded, to the Beneficial Holder for voting. The Beneficial Holder must then complete the information requested in the Beneficial Ballot, and return the executed Beneficial Ballot directly to the Voting Agent in the pre-addressed, postage-paid return envelope so that it is RECEIVED by the Voting Agent on or before the Voting Deadline. A list of the Beneficial Holders to whom "pre-validated" Beneficial Ballots were delivered should be maintained by Nominees for inspection for at least one (1) year from the Voting Deadline.

(b)      **Master Ballots**

If the Nominee elects not to pre-validate Beneficial Ballots, the Nominee may obtain the votes of Beneficial Holders by forwarding to the Beneficial Holders the unsigned Beneficial Ballots, VIF, e-mail, or other customary method of collecting votes from a Beneficial Holder, together with this Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such Beneficial Holder must then indicate his, her, or its vote on the Beneficial Ballot, complete the information requested on the Beneficial Ballot, review the certifications contained on the Beneficial Ballot, execute the Beneficial Ballot, and return the executed Beneficial Ballot to the Nominee. If it is accepted practice for a Nominee to collect votes via e-mail, telephone, or other customary method of communication, the Beneficial Holder shall follow the Nominee's instruction for completing and submitting its votes to the Nominee. After collecting the Beneficial Holders' votes, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Holders, execute the Master Ballot, and deliver the executed Master Ballot to the Voting Agent so that it is RECEIVED by the Voting Agent on or before the Voting Deadline.[13] All Beneficial Ballots returned by Beneficial Holders should either be forwarded to the Voting Agent (along with the Master Ballot) or retained by Nominees for inspection for at least one (1) year from the Voting Deadline. EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL HOLDERS TO RETURN THEIR BENEFICIAL BALLOTS (OR OTHERWISE CONVEY THEIR VOTES) TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE VOTING AGENT SO THAT IT IS RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.[14]

4.      **Miscellaneous**

All Ballots must be signed by the Voting Creditor, or any person who has obtained a properly completed Ballot proxy from the Voting Creditor, by the Voting Deadline. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan shall not be counted. If you return more than one Ballot voting different Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot (other than a Master Ballot) that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Voting Creditors will reflect the principal amount of such Voting Creditor's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Voting Creditor's Claim to reflect the amount of the Claim actually voted, including prepetition interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Voting Creditors that actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent or its Nominee will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

---

[13]      Nominees will be permitted to submit their Master Ballots to the Voting Agent by e-mail.

[14]      Notwithstanding the foregoing, Nominees are authorized to transmit Solicitation Packages and collect votes to accept or to reject the Plan from Beneficial Holders in accordance with their customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 5.    Fiduciaries and Other Representatives

If a Beneficial Holder Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Beneficial Holder Ballot of each Voting Creditor for whom they are voting.

UNLESS THE BALLOT OR THE MASTER BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; *PROVIDED THAT* THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT TO BE COUNTED.

### 6.    Agreements upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the voter with respect to such Ballot to accept (a) all of the terms of, and conditions to, this solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpations set forth in Article VIII of the Plan. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### 7.    Change of Vote

Any party that has previously submitted a properly completed Ballot to the Voting Agent before the Voting Deadline may revoke such Ballot and change its vote by submitting to the Voting Agent a subsequent, properly completed Ballot for acceptance or rejection of the Plan before the Voting Deadline.

### 8.    Requirement to File a Proof of Claim

Any person or entity that is required to timely file a proof of claim in the form and manner specified by the Claims Bar Date Order and who failed to do so on or before the Bar Date associated with such claim shall not, with respect to such claim, be treated as a creditor of the Debtors for the purposes of voting on the Plan.

### D.    Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent or the Debtors, as applicable, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in

connection with deliveries of Ballots must be cured prior to the Voting Deadline or within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### E.    Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

## IX.    RISK FACTORS TO CONSIDER BEFORE VOTING

Before voting to accept or reject the Plan, holders of Claims entitled to vote should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

### A.    Factors Relating to the Debtors' Business Operations and Financial Condition

#### 1.    Debtors' Operations Are Subject to High Competition

Companies operating in the food co-manufacturing industry face a high level of competition, and results of the Debtors' operations are sensitive to, and may be adversely affected by, competitive pricing, promotional pressures, and other factors. The Reorganized Debtors' ability to successfully implement their business plan depends on their ability to attract and retain customers in this highly competitive environment.

#### 2.    Operating in Bankruptcy for a Prolonged Period May Adversely Affect the Debtors

The Debtors' future results will be dependent upon the timely and successful confirmation and implementation of a plan of reorganization. If a restructuring is protracted, it could adversely affect the Debtors' operating results, including their relationships with advertising customers, business partners, and employees. The longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers will lose confidence in the Debtors' ability to reorganize their businesses successfully and seek to establish alternative commercial relationships. If the Debtors experience a protracted reorganization, there is a significant risk that the value of the enterprise would be substantially eroded to the detriment of all stakeholders.

The loss of any large customer, a significant reduction of purchases by any our large customers or a discontinuation by customers of any of the key brands the Debtors produce for an extended length of time could adversely affect the Debtors' revenues or results of operations. In addition, many of our contracts include change-of-control provisions related to changes in control of the Company.

3.      **Business May Be Volatile and the Debtors May Experience Supply Chain Disruption**

The Debtors are subject to damage or disruption to raw materials supplies or manufacturing or distribution capability due to weather, including any potential effects of climate change, natural disaster, fire, terrorism, adverse changes in geopolitical conditions or political unrest, pandemic, strikes, labor shortages, freight transportation availability, disruption in logistics, import restrictions, or other factors that impair our ability to manufacture or sell our products. For example, the impact of the recent pandemic on the global supply chain has disrupted and may continue to materially disrupt our supply chain, operations and routes to market, as well as those of our suppliers, external manufacturing partners, distributors or other business partners. Failure to take adequate steps to mitigate the likelihood or potential impact of such events, or to effectively manage such events if they occur by either the Debtors or its suppliers, external manufacturing partners, distributors and other business partners, could adversely affect our business, financial condition, and results of operations, as well as require additional resources to restore the supply chain. Further, the Debtors could face business distributions from failure of its information technology systems, mechanical failures, outages, or accidents relating to its plants and machinery, and if its manufacturing or supplier locations experience a disruption for any reason. Additionally, governmental or regulatory responses to any of the foregoing events may negatively impact our business, impose restrictions on operations or disrupt our ability to manufacture and distribute our products.

4.      **Debtors' Business is Subject to Risks Associated with its Industry and May Experience Liquidity Issues**

The Reorganized Debtors' ability to generate cash to fund their operations and make scheduled payments on or refinance their debt obligations following emergence depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. If the Debtors' cash flow from operations decreases as a result of decreased customer demand, or otherwise, the Debtors may not have the ability to expend the capital necessary to service indebtedness, or improve or maintain their current operations, resulting in decreased revenues over time.

5.      **Pending and Future Litigation and Government Investigation May Have a Material Adverse Effect on the Debtors Financial Condition**

There is, or may be in the future, certain litigation and government investigations that could result in a material judgment, fine, or a penalty, against the Debtors or the Reorganized Debtors; but the ultimate amounts cannot be predicted with any certainty. Such litigation, and any judgment in connection therewith, could have a material negative effect on the Debtors or the Reorganized Debtors.  As further discussed in Article II.E. of this Disclosure Statement, to Debtors' knowledge, the only ongoing government investigation with respect to the Debtors' labor practices is the investigation by the U.S. Department of Labor.

Additionally, the Debtors, as manufacturers of food products, face the risk of exposure to product liability claims and adverse public relations in the event its quality control procedures fail or are inadequate, the consumption of our products causes injury or illness. If a product liability claim is successful, the Debtors' insurance may not be adequate to cover all liabilities we may incur, and we may not be able to continue to maintain such insurance, or obtain comparable insurance at a reasonable cost, if at all. If the Debtors did not have adequate insurance or contractual indemnification available, product liability claims relating to defective products could have a material adverse effect on the Debtors' business reputation and earnings. In addition, even if a product liability claim is unsuccessful or is not fully pursued, the negative

publicity surrounding any assertion that our products caused illness or injury could have a material adverse effect on our reputation with existing and potential customers and on our business, results of operations or financial condition.

**6.      Certain Claims May Not Be Discharged and Have a Material Adverse Effect on the Debtors' Financial Condition and Result of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

**7.      Loss of Employees Could Adversely Affect the Debtors' Operations**

As a result of the Chapter 11 Cases, the Debtors may experience increased levels of employee attrition, and their employees may face considerable distraction and uncertainty. A loss of key personnel or material erosion of employee morale could adversely affect the Debtors' business and results of operations. The Debtors' ability to engage, motivate and retain key employees or take other measures intended to motivate and incent key employees to remain with them through the pendency of the Chapter 11 Cases is limited by restrictions on implementation of incentive programs under the Bankruptcy Code. The loss of services of members of the Debtors' senior management team could impair the Debtors' ability to execute their strategy and implement operational initiatives, which would be likely to have a material adverse effect on their financial condition, liquidity and results of operations.

Additionally, the Debtors face increased labor costs from inflationary pressures, shortages in the labor market, and increased competition for talented employees, which has negatively impacted the Debtors' profitability. Labor shortages or lack of skilled labor have led to increases in costs to meet demand as the Debtors pay overtime and roll out incremental programs to attract and retain talent. Labor shortages may also negatively impact the Debtor from servicing all demand or operating the manufacturing and distribution facilities efficiently. Additionally, an inability to enhance or develop robotic technology to automate processes in the manufacturing and distribution facilities could make the Debtors dependent on a labor force in tighter markets. Any substantial increase in these costs could negatively impact the Debtors' business, results of operations, financial condition or profitability. Furthermore, the Debtors' labor costs include the cost of providing employee benefits, including health, welfare and retirement plan benefits. The Debtors' annual labor costs, therefore, vary with increased costs of such benefits, which could further negatively impact profitability. Further, labor strikes or work stoppages by the Debtors' employees could harm the business.

**8.      New Operational Initiatives**

As described herein, the Company has implemented numerous operational initiatives in response to the macro-economic factors to ensure stability of its labor force, supply chain, and safety of its products, and anticipates that it will continue to implement such measures in the future for an indeterminate period of time. The Company also anticipates that it may unwind certain initiatives, as appropriate, to adapt to changing business landscapes and consumer preferences. Certain of these measures are likely to be untested and may not guaranty the Debtors' ability to compete effectively in the current or future food co-manufacturing industry.

### B.     Certain Bankruptcy Law Considerations

#### 1.     Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Voting Classes vote in favor of the Plan or the requirements for "cram down" are met with respect to any Class that rejects or is deemed to reject the Plan, the Bankruptcy Court may exercise discretion as a court of equity and choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests would ultimately receive with respect to their Claims or Interests in a subsequent plan of reorganization or otherwise.

#### 2.     Non-Consensual Confirmation and Conversion into Chapter 7 Cases

If any impaired class of Claims or Interests does not accept or is deemed not to accept a plan of reorganization, a Bankruptcy Court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any Class votes to reject or is deemed to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class. The Debtors believe that the Plan satisfies these requirements.

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

#### 3.     Financial Projections

The Debtors have prepared financial projections on a consolidated basis with respect to the Reorganized Debtors based on certain assumptions, as set forth in **Exhibit D** hereto. The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, consumer demand for the Reorganized Debtors' products and services, inflation, and other unanticipated market and economic conditions. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or public health pandemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

The Debtors' projections reflect the projected impact of value-creating programs, including ongoing lease negotiations with their landlords. However, the Debtors cannot state with certainty that such value-creating programs will achieve their targeted results.

### 4. Allowed Claims Could Exceed Estimates

There can be no assurance that the Allowed amount of Claims participating in distributions will not be significantly more than projected, which in turn, could cause the value of distributions to Holders of such Allowed Claims to be reduced. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary materially from the Debtors' projections and feasibility analysis.

### 5. U.S. Federal Income Tax Risks

For a discussion of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to Holders of certain Claims and Interests, *see* **Section VII** of this Disclosure Statement.

### 6. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Plan Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Plan Effective Date. If the conditions precedent to the Plan Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 7. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### 8. Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9. **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

10. **Debtors Cannot Predict the Amount of Time Spent in Bankruptcy**

The Debtors Chapter 11 Cases could be extended considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived. Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses.

11. **Risk of Termination of the Restructuring Support Agreement or Other Plan Documents**

The Restructuring Support Agreement contains certain provisions that give the Consenting Stakeholders (as defined in the Restructuring Support Agreement) the ability to terminate the Restructuring Support Agreement if various conditions are satisfied. Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.

In addition, the Equity Rights Offering Backstop Commitment Agreement provides that the Consenting Stakeholders' and the Debtors' obligations with respect to the Equity Rights Offering will, in each case, be terminable upon the occurrence of certain events or the continuation of certain conditions, as set forth therein. Termination of the Equity Rights Offering could prevent the Debtors from consummating the Plan.

12. **Risks Related to Modification of the Equity Rights Offering Procedures**

The Debtors may modify the Equity Rights Offering Procedures with the approval of the Required Consenting Stakeholders, to, among other things, adopt additional detailed procedures if necessary to administer the distribution and exercise of Subscription Rights or to comply with applicable law. Such modifications may adversely affect the rights of those participating in the Equity Rights Offering.

### 13. Risks Related to Exit Facility and Post-Plan Date Indebtedness

The Exit Facility is intended to provide the Debtors liquidity to operate their business and carry out their business plan after the Plan Effective Date. However, there is no assurance that the Reorganized Debtors will be able to meet all of the terms and conditions of the Exit Facility, which may hinder the Debtors' ability to consummate the Plan. There is a risk that the Reorganized Debtors default under the Exit Facility and the lenders thereunder take enforcement actions against the Reorganized Debtors, including execution or foreclosure against assets thereof. The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their compliance with affirmative and negative covenants, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond their control. They may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures. In addition, if they need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### C. Factors Relating to Securities to Be Issued

#### 1. Market for Securities

There is currently no market for the Reorganized Equity, and there can be no assurance as to the development or liquidity of any market for any such securities. The Reorganized Debtors are under no obligation to list the Reorganized Equity on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Plan Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

#### 2. Restrictions on Ability to Resell Reorganized Equity

The Reorganized Equity will not be registered under applicable federal or state securities law and will not be listed on a national securities exchange. Absent such registration, the Reorganized Equity may be offered and sold only in transactions that are not subject to, or that are exempt from, the registration requirements of applicable securities laws. These restrictions could significantly limit holders' ability to resell the Reorganized Equity.

In particular, the Reorganized Equity issued in the Equity Rights Offering and any Reorganized Equity issued to an entity that is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities, will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In addition, and subject to the foregoing, while the 1145 Securities may generally be resold by the holder thereof without registration under the Securities Act, such securities will not be freely tradable if, at the time of transfer, the holder thereof is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

Furthermore, the liquidity of any market for the Reorganized Equity will depend upon, among other things, the number of holders of the Reorganized Equity, the Reorganized Company's financial performance, and the market for similar securities, none of which can be determined or predicted. Additionally, the Reorganized Equity is expected to be subject to certain restrictions on transfer under the New Organizational Documents. Accordingly, there can be no assurance that an active trading market for the Reorganized Equity will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell the Reorganized Equity may be substantially limited. For a discussion of transfer restrictions on the Reorganized Equity under applicable federal or state securities law, see **Section VI** of this Disclosure Statement.

### 3. The Acquisition of Reorganized Equity, including through the Plan and the Equity Rights Offering, may be Subject to Regulatory Restrictions

The acquisition of Reorganized Equity, including through the Plan and the Equity Rights Offering, and the ability to vote such Reorganized Equity, may be subject to compliance with regulatory requirements and/or prior regulatory approvals by the holder or acquirer of Reorganized Equity. Such regulatory approvals may include, without limitation, approvals from any other regulatory body or bodies, or the satisfaction of any notification and waiting period requirements, such as those of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules promulgated thereunder (the "**HSR Act**"). The applicability of regulatory approvals may depend on the amount of Reorganized Equity to be acquired or to be voted, as applicable, or, in the case of the HSR Act, if certain size of parties and size of transaction thresholds are satisfied and no exemption is applicable. The ability to obtain regulatory approvals may depend upon the business activities of the proposed acquirers of Reorganized Equity, and the affiliates of such proposed acquirers. Regulatory approvals may be denied, conditioned, or delayed and may not be available. Denial, condition or delay could prevent a proposed holder from acquiring Reorganized Equity, and could prevent a holder from voting its securities. A holder or acquirer of Reorganized Equity should consult with its own legal counsel with regard to compliance with and/or obtaining appropriate regulatory approvals. The acquisition of Reorganized Equity, or voting of the same, prior to obtaining and/or complying with any necessary regulatory approvals, may result in liability including potentially substantial civil penalties.

### 4. Potential Dilution

The ownership percentage represented by the Reorganized Equity distributed under the Plan as of the Plan Effective Date will be subject to dilution from the equity issued in connection the Management Incentive Plan, the Equity Rights Offering (including the Equity Rights Offering Backstop Premium) and any other equity that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other equity issuances by the Reorganized Debtors could adversely affect the value of the Reorganized Equity. The amount and dilutive effect of any of the foregoing could be material.

### 5. Significant Holders of Reorganized Equity

Certain holders of First Lien Claims are expected to acquire a significant ownership interest in the Reorganized Equity issued pursuant to the Plan. These Holders may exercise a controlling influence over the business and affairs of the Reorganized Debtors, and, if their decisions are aligned, may be in a position to control the outcome of all actions requiring stockholder approval, including, among other things, the power to elect directors, control the appointment of a majority of the board of directors, and approve significant mergers and other material corporate transactions, without the approval of other stockholders.

This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the Reorganized Equity. Further, the possibility that one or more holders of significant numbers of the Reorganized Equity may determine to sell all or a large portion of their Reorganized Equity in a short period of time may adversely affect the market price of the Reorganized Equity.

### 6. Interests Subordinated to the Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the Reorganized Equity would rank below all debt claims against the Reorganized Debtors. As a result, holders of the Reorganized Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all applicable holders of debt have been paid in full.

### 7. The Reorganized Debtors will be a Private Company

The Reorganized Debtors do not expect to be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act. As a result, holders of the Reorganized Equity may receive less information with respect to the Reorganized Debtors' business than they would have received if the Reorganized Debtors were subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

### 8. The Implied Valuation, Stipulated Equity Value, as well as the Offering Price in the Equity Rights Offering of the Reorganized Equity, is not Intended to Represent the Trading Value of the Reorganized Equity

Neither the valuation of the Reorganized Debtors nor the offering price in the Equity Rights Offering is intended to represent the trading value of Reorganized Equity in public or private markets, and such trading value is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the Reorganized Equity is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the Reorganized Equity to rise and fall. Accordingly, the implied and stipulated values, stated herein and in the Plan, of the Reorganized Equity to be issued or sold in the Equity Rights Offering does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the Reorganized Equity in the public or private markets.

### 9. Dividends

The Reorganized Debtors may not pay any dividends on the Reorganized Equity, and covenants in the Reorganized Debtors' debt instruments on and after the Plan Effective Date are expected to restrict the ability of the Reorganized Debtors to pay dividends. In such circumstances, the success of an investment in the Reorganized Debtors will depend entirely upon any future appreciation in the value of the Reorganized Equity and the ability to resell such Reorganized Equity in order to realize such appreciation. There is, however, no guarantee that the Reorganized Equity will appreciate in value or even maintain its initial implied or stipulated valuation, or that a holder thereof will be able to resell such Reorganized Equity at such valuation or at all.

D.     **Additional Factors**

    1.     **Debtors Could Withdraw the Plan**

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

    2.     **Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

    3.     **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

    4.     **No Legal or Tax Advice Is Provided by this Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

    5.     **No Admission Made**

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

X.     **CONFIRMATION OF THE PLAN**

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the Holders of Claims and Interests impaired under the Plan; and (C) feasible.

A.     **Acceptance of the Plan**

The Bankruptcy Code defines "acceptance" of a plan by a class of (i) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan and (ii) Interests as acceptance by interest Holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots

for acceptance or rejection of the Plan. Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied in order for the Plan to be confirmed, depending on the type of claims or interests in such class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

### B.    Best Interests Test

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (1) accept the Plan or (2) receive or retain under the Plan property of a value, as of the Plan Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is customarily referred to as the "best interests" test. The Debtors believe that the value of any distributions to Holders of Allowed Claims and Interests in a chapter 7 case would be less than the value of distributions under the Plan.

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the amount such holder would receive or retain in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit E**.

The Debtors believe that any liquidation analysis is subjective, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit E** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.    <u>Feasibility</u>

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor under the Plan.

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the consolidated financial projections (collectively, the "**Financial Projections**"), attached hereto as **Exhibit D**. Moreover, **Section X** hereof sets forth certain risk factors that could impact the feasibility of the Plan.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date, unless required to do so by the SEC or other regulatory bodies. In connection with the

planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan. The Financial Projections assume that the Plan will be implemented in accordance with its stated terms. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by a variety of factors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

### D.      Valuation

The Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of Evercore, produced the Valuation Analysis that is set forth in **Exhibit F** attached hereto. The estimated recoveries set forth in this Disclosure Statement are based on such implied enterprise value.

As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount of its funded-debt obligations. Accordingly, the Valuation Analysis further supports the Debtors conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

### E.      Notices and Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Confirmation Hearing is scheduled for **March 10, 2025 at 1:00 p.m. (Prevailing Central Time)**. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of Judge Alfredo Perez, together with proof of service thereof, and served upon all of the below parties.

| | |
|---|---|
| Debtors: | H-Food Holdings, LLC |
| | 3333 Finley Rd., Suite 800 |
| | Downers Grove, IL 60515 |
| | Attn:    Roger E. Harris |
| | Email:  RHarris@hearthsidefood.com |

| | |
|---|---|
| Counsel to the Debtors: | Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY 10036-8704<br>Attn:  Ryan Preston Dahl<br>        Matthew M. Roose<br>        Natasha S. Hwangpo<br>Email:  Ryan.Dahl@ropesgray.com<br>        Matthew.Roose@ropesgray.com<br>        Natasha.Hwangpo@ropesgray.com |
| Co-Counsel to the Debtors: | Porter Hedges LLP<br>1000 Main Street<br>36th Floor<br>Houston, TX 77002<br>Attn:  John F. Higgins<br>        M. Shane Johnson<br>Email:  jhiggins@porterhedges.com<br>        sjohnson@porterhedges.com |
| Counsel to the First Lien Ad Hoc Group: | Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>Attn:  Scott J. Greenberg<br>        Matthew J. Williams<br>        Joshua Brody<br>Email:  SGreenberg@gibsondunn.com<br>        MJWilliams@gibsondunn.com<br>        JBrody@gibsondunn.com<br>- and -<br>Howley Law PLLC<br>700 Louisiana Street<br>Suite 4545<br>Houston, TX 77002<br>Attn:  Tom Howley<br>        Eric Terry<br>Email:  tom@howley-law.com<br>        eric@howley-law.com |

| | |
|---|---|
| Counsel to the Second Lien Ad Hoc Group: | Proskauer Rose LLP<br>11 Times Square<br>New York, NY 10036-8299<br>Attn:   Vincent Indelicato<br>        Matthew R. Koch<br>Email:  VIndelicato@proskauer.com<br>        MKoch@proskauer.com<br>- and -<br>Gray Reed<br>1300 Post Oak Boulevard<br>Suite 2000<br>Houston, TX 77056<br>Attn:   Jason S. Brookner<br>Email:  jbrookner@grayreed.com |
| Counsel to the Senior Unsecured Notes Ad Hoc Group: | Paul Hastings LLP<br>200 Park Avenue<br>New York, NY 10166<br>Attn:   Kris Hansen<br>       Jon Canfield<br>Email:  KrisHansen@paulhastings.com<br>        JonCanfield@paulhastings.com<br>- and -<br>2001 Ross Avenue, Suite 2700<br>Dallas, TX 75201<br>Attn:   Charles Persons<br>Email:  CharlesPersons@paulhastings.com<br>- and -<br>4655 Executive Drive, Suite 350<br>San Diego, CA 92121<br>Attn:   Jason Pierce<br>Email:  JasonPierce@paulhastings.com |
| Counsel to SnackTime PG Holdings, Inc. and Snack Time Summit Holdings, Inc.: | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001-2163<br>Attn:   Samuel A. Khalil<br>Email:  SKhalil@milbank.com |
| Counsel to CB Metafora Aggregator, LLC: | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn:   Brian Schartz<br>       Jimmy Ryan<br>Email:  Brian.Schartz@kirkland.com<br>        Jimmy.Ryan@kirkland.com |

| | |
|---|---|
| Proposed Counsel to the<br>Creditors' Committee: | Lowenstein Sandler LLP<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Attn:   Jeffrey L. Cohen<br>         David M. Posner<br>         Bruce S. Nathan<br>Email: jcohen@lowenstein.com<br>         dposner@lowenstein.com<br>         bnathan@lowenstein.com |
| Proposed Co-Counsel to the<br>Creditors' Committee | McDermott Will & Emery LLP<br>845 Texas Avenue, Suite 40000<br>Houston, TX 77002-1656<br>Attn:   Charles R. Gibbs (TX Bar No. 07846300)<br>         Grayson Williams (TX Bar No. 24124561)<br>Email: crgibbs@mwe.com<br>         gwilliams@mwe.com |

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

## XI.    <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders, preferable to all other available alternatives, and urge the Holders of Claims in Classes 3, 4, 5, or 6 to vote to accept the Plan and support Confirmation of the Plan.

Dated:    January 24, 2025

Respectfully submitted,

H-Food Holdings, LLC
(on behalf of itself and its affiliated Debtors)

By:        _/s/ Robert M. Caruso_
Name:   Robert M. Caruso
Title:    Chief Restructuring Officer
        H-Food Holdings, LLC, and
        its affiliated Debtors

**Exhibit A**

**Plan**

*SOLICITATION VERSION*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| H-Food Holdings, LLC, *et al.*,[1] | Case No. 24-90586 (ARP) |
| Debtors. | (Jointly Administered) |

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF
## REORGANIZATION OF H-FOOD HOLDINGS, LLC AND ITS AFFILIATED DEBTORS

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
Matthew M. Roose (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

- and -

**ROPES & GRAY LLP**
Stephen L. Iacovo (admitted *pro hac vice*)
191 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500

*Counsel to the Debtors*
*and Debtors in Possession*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Jack M. Eiband (TX Bar No. 24135185)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  January 24, 2025
　　　　Houston, Texas

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783).  The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

**TABLE OF CONTENTS**

**Page**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ......................................................................... 1

A.   Defined Terms ................................................................................................ 1
B.   Rules of Interpretation ................................................................................. 17
C.   Computation of Time .................................................................................... 17
D.   Governing Law .............................................................................................. 18
E.   Reference to Monetary Figures .................................................................... 18
F.   Reference to the Debtors .............................................................................. 18
G.   Controlling Document ................................................................................... 18
H.   Certain Consent Rights ................................................................................. 18

**ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS** ...................... 18

A.   Administrative Claims ................................................................................... 19
B.   DIP Claims ..................................................................................................... 19
C.   Professional Fee Claims ................................................................................ 20
D.   Priority Tax Claims ........................................................................................ 21

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ........... 21

A.   Summary of Classification ............................................................................ 21
B.   Treatment of Claims and Interests ............................................................... 22
C.   Special Provision Governing Unimpaired Claims ...................................... 27
D.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................. 28
E.   Subordinated Claims ..................................................................................... 28
F.   Elimination of Vacant Classes ...................................................................... 28
G.   Voting Classes; Presumed Acceptance by Non-Voting Classes .................. 28
H.   Controversy Concerning Impairment ........................................................... 28
I.   Intercompany Interests .................................................................................. 28

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** .............................. 29

A.   Finality of Distributions ................................................................................ 29
B.   No Substantive Consolidation ....................................................................... 29
C.   Sources of Consideration for Plan Distributions ......................................... 29
D.   Letters of Credit ............................................................................................ 29
E.   Exit Revolving Facility .................................................................................. 29
F.   Exit First Lien Term Loans ........................................................................... 30
G.   Reorganized Equity ....................................................................................... 30
H.   New Organizational Documents .................................................................... 31
I.   New Board ...................................................................................................... 31
J.   Employee Matters .......................................................................................... 31
K.   Corporate Existence ...................................................................................... 32
L.   Vesting of Assets in the Reorganized Company ........................................... 32
M.   Cancellation of Existing Interests, Indebtedness, and Other Obligations ........ 32
N.   Corporate Action ........................................................................................... 33
O.   Effectuating Documents; Restructuring Transactions .................................. 34
P.   Equity Rights Offering and Equity Rights Offering Backstop Commitment Agreement ......... 34
Q.   Exemption from Certain Taxes and Fees ...................................................... 35
R.   Preservation of Causes of Action .................................................................. 36

S.      Insurance Policies ................................................................................................. 36
T.      Management Incentive Plan ................................................................................... 38
U.      Subordination Agreements .................................................................................... 38
V.      Payment of Second Lien Ad Hoc Group Advisors and Senior Unsecured Notes Ad Hoc
        Group Advisors ..................................................................................................... 38
W.      Closing of Chapter 11 Cases ................................................................................. 38
X.      Dissolution of Certain Debtors .............................................................................. 39

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED**
         **LEASES ............................................................................................... 39**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.................... 39
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases .................... 40
C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ................. 40
D.      Dispute Resolution ................................................................................................ 41
E.      Modifications, Amendments, Supplements, Restatements, or Other Agreements ......... 41
F.      Reservation of Rights ............................................................................................. 41
G.      Nonoccurrence of Plan Effective Date; Bankruptcy Code Section 365(d)(4) ............... 42

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .................................... 42**

A.      Timing and Calculation of Amounts to Be Distributed ............................................. 42
B.      Rights and Powers of Distribution Agent ................................................................ 42
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ................... 43
D.      Securities Registration Exemption .......................................................................... 44
E.      Compliance with Tax Requirements ........................................................................ 45
F.      Allocations ........................................................................................................... 46
G.      No Postpetition Interest on Claims ......................................................................... 46
H.      Setoffs and Recoupment ....................................................................................... 46
I.      Claims Paid or Payable by Third Parties ................................................................. 46

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,**
          **AND DISPUTED CLAIMS .......................................................... 47**

A.      Allowance of Claims and Interests ......................................................................... 47
B.      Claims and Interests Administration Responsibilities ............................................... 47
C.      Estimation of Claims ............................................................................................. 47
D.      Adjustment to Claims Register Without Objection ................................................... 48
E.      Time to File Objections to Claims .......................................................................... 48
F.      Disallowance of Claims ......................................................................................... 48
G.      Amendments to Claims .......................................................................................... 48
H.      No Distributions Pending Allowance ...................................................................... 49
I.      Distributions After Allowance ................................................................................ 49
J.      Single Satisfaction of Claims ................................................................................. 49

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED**
           **PROVISIONS .......................................................................... 49**

A.      Compromise and Settlement of Claims, Interests, and Controversies ......................... 49
B.      Discharge of Claims and Termination of Interests .................................................... 49
C.      Releases by the Debtors ......................................................................................... 50
D.      Releases by Holders of Claims and Interests ........................................................... 51
E.      Releases of Directors and Officers of Wage and Labor Laws .................................... 52
F.      Exculpation .......................................................................................................... 52
G.      Injunction ............................................................................................................ 53

H.    Subordination Rights ................................................................................................. 55
I.    Release of Liens ......................................................................................................... 55
J.    Waiver of Statutory Limitations on Releases ........................................................... 55

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN .................55**

A.    Conditions Precedent to the Plan Effective Date ...................................................... 55
B.    Waiver of Conditions ................................................................................................ 57
C.    Substantial Consummation ........................................................................................ 57
D.    Effect of Non-Occurrence of Conditions to the Plan Effective Date ........................ 57
E.    Notice of Plan Effective Date .................................................................................... 57

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN.............57**

A.    Modification and Amendments................................................................................... 57
B.    Effect of Confirmation on Modifications .................................................................. 58
C.    Revocation or Withdrawal of the Plan ...................................................................... 58

**ARTICLE XI. RETENTION OF JURISDICTION ............................................................58**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ...........................................................60**

A.    Immediate Binding Effect.......................................................................................... 60
B.    Additional Documents ............................................................................................... 61
C.    Payment of Statutory Fees ........................................................................................ 61
D.    Reservation of Rights................................................................................................. 61
E.    Successors and Assigns.............................................................................................. 61
F.    Service of Documents ................................................................................................ 61
G.    Term of Injunctions or Stays ..................................................................................... 64
H.    Entire Agreement ....................................................................................................... 64
I.    Nonseverability of Plan Provisions ........................................................................... 64
J.    Dissolution of Committee .......................................................................................... 64
K.    Expedited Tax Determination .................................................................................... 65
L.    Creditor Default ......................................................................................................... 65

**INTRODUCTION**

H-Food Holdings, LLC, and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each, a "*Debtor*" and, collectively, the "*Debtors*") jointly propose this *Second Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and Its Affiliated Debtors*. Capitalized terms used but not otherwise defined shall have the respective meanings ascribed to such terms in ARTICLE I.A of the Plan. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*Adjourned Cure Dispute*" shall have the meaning ascribed to such term in ARTICLE V.D of the Plan.

2.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

3.    "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days following the Plan Effective Date, except as specifically set forth in the Plan or a Final Order, including the Claims Bar Date Order.

4.    "*Administrative Claims Objection Bar Date*" means the First Business Day that is 180 days after the Plan Effective Date; provided that such date may be extended by the Bankruptcy Court at the Reorganized Debtors' request after notice and a hearing.

5.    "*Affiliates*" means "Affiliates" as set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

6.    "*Allowed*" means, as to a Claim or Interest, a Claim or an Interest expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, the Debtors (with the consent of the Required Consenting First Lien Lenders), may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable

nonbankruptcy law; *provided*, *however*, that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. "**Allowance**" and "**Allowing**" shall have correlative meanings.

7.　　"**Assumption Dispute**" means a pending objection relating to assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

8.　　"**Assumption Schedule**" means the schedule of Executory Contracts and/or Unexpired Leases that will be assumed by the Debtors pursuant to the Plan, or assumed by the Debtors and assigned to another Entity pursuant to the Plan, to be Filed as part of the Plan Supplement, and as may be amended, supplemented, or modified from time to time in accordance with the Plan.

9.　　"**Avoidance Actions**" means any and all actual or potential claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 552, and 553(b) of the Bankruptcy Code, and applicable non-bankruptcy law.

10.　　"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §101–1532, as amended.

11.　　"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases, and, to the extent any reference made under section 157 of the Judicial Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of the District Court having jurisdiction over the Chapter 11 Cases under section 151 of the Judicial Code.

12.　　"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code, chambers rules, and local bankruptcy rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

13.　　"**Business Day**" means any day, other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York.

14.　　"**Cash**" means the legal tender of the United States of America or the equivalent thereof.

15.　　"**Cash Collateral Order**" means the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition First Lien Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 83].

16.　　"**Cause of Action**" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions

arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

17. "***Chapter 11 Cases***" means (i) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (ii) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

18. "***Claim***" has the meaning set forth in section 101(5) of the Bankruptcy Code.

19. "***Claims Bar Date***" means the applicable bar date by which Proofs of Claim must be Filed, as established by a Final Order of the Bankruptcy Court or the Plan; *provided that* if there is a conflict relating to the bar date for a particular Claim, the Plan shall control.

20. "***Claims Bar Date Order***" means a Final Order entered by the Bankruptcy Court establishing the Claims Bar Date.

21. "***Claims Objection Deadline***" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) the first Business Day that is at least 180 days after the Plan Effective Date, and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors Filed before the first Business Day that is at least 180 days after the Plan Effective Date.

22. "***Claims Register***" means the official register of Claims maintained by Kroll Restructuring Administration LLC, as the claims, noticing, and solicitation agent in the Chapter 11 Cases.

23. "***Class***" means any group of Claims or Interests classified under the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

24. "***Company Parties***" means Matterhorn Buyer, LLC and each of its debtor affiliates that are signatory to the Restructuring Support Agreement.

25. "***Confirmation***" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

26. "***Confirmation Date***" means the date upon which the Bankruptcy Court enters the Confirmation Order.

27. "***Confirmation Hearing***" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

28. "***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29. "***Consenting Creditors***" means the Consenting First Lien Lenders, the Consenting Second Lien Term Loan Lenders, and the Consenting Senior Unsecured Noteholders.

30. "***Consenting First Lien Lenders***" means the beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, First Lien Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement.

31.    "***Consenting Second Lien Term Loan Lenders***" means the beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement.

32.    "***Consenting Senior Unsecured Noteholders***" means the beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, Senior Unsecured Note Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement.

33.    "***Consenting Sponsors***" means, collectively, SnackTime PG Holdings, Inc., Snack Time Summit Holdings, Inc., and CB Metafora Aggregator, LLC.

34.    "***Consenting Stakeholders***" means, collectively, the Consenting Creditors and the Consenting Sponsors.

35.    "***Consummation***" means the occurrence of the Plan Effective Date.

36.    "***Creditors' Committee***" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on December 4, 2024 [Docket No. 134] and reconstituted on December 5, 2024 [Docket No. 140], as such committee may be further reconstituted from time to time.

37.    "***Cure Claim***" means a Claim based upon the applicable Debtor's monetary defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the applicable Debtor pursuant to section 365 of the Bankruptcy Code.

38.    "***D&O Liability Insurance Policies***" means, collectively, all insurance policies (including any "tail policy" or run-off endorsement) that have been issued at any time to any of the Debtors as a first named insured providing directors', members', trustees', officers', or managers' liability coverage.

39.    "***Definitive Documents***" means the following: (a) the New Organizational Documents; (b) the Equity Rights Offering Documents; (c) the Exit Revolving Facility Documents; (d) the Exit First Lien Term Loan Facility Documents; (e) the Plan and the Plan Supplement; (f) the Disclosure Statement, the Disclosure Statement Order, and other Solicitation Materials; (g) the Confirmation Order; (h) the Cash Collateral Order, the DIP Documents and the DIP Order; (i) the non-procedural First Day Pleadings, all documents in connection therewith, and all orders pursuant thereto; (j) any employee or executive retention, incentive, or similar plan or proposal; and (k) any amendments, supplements, exhibits, schedules, appendices, or modifications to any of the foregoing and any related notes, certificates, agreements, and instruments (as applicable); and (l) any material settlement agreement relating to claims or causes of action brought against any Company Party (including, without limitation, any claims asserted by any Governmental Unit or entity).

40.    "***DIP Agent***" means the administrative agent, collateral agent, or similar entity under the DIP Credit Agreement, including any successors thereto.

41.    "***DIP Claims***" means claims arising on account of DIP Obligations.

42.    "***DIP Commitment Letter***" means the commitment letter with respect to the DIP Facility attached to the Restructuring Support Agreement as Exhibit D.

43.    "**DIP Credit Agreement**" means that certain *Superpriority Senior Secured Debtor-in-Possession Credit Agreement*, dated as of December 23, 2024 (as amended, supplemented, or otherwise modified from time to time in accordance with its terms), by and among H-Food Holdings, LLC, as borrower, Matterhorn Buyer, LLC, as holdings, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, and the DIP Lenders, as approved by the DIP Order.

44.    "**DIP Documents**" means any documents governing the DIP Facility that are entered into in accordance with the Restructuring Term Sheet, the DIP Credit Agreement, the DIP Term Sheet, the DIP budget, the DIP Order, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

45.    "**DIP Facility**" means a super-priority senior secured debtor-in-possession credit facility in an aggregate principal amount of up to $150,000,000, consisting of a new money term loan available in two draws in the amount of $150,000,000.

46.    "**DIP Lenders**" means the lenders with respect to the DIP Facility.

47.    "**DIP Obligations**" means all obligations arising under the DIP Documents.

48.    "**DIP Order**" means the Final Order of the Bankruptcy Court setting forth the terms of the Debtors' consensual use of cash collateral and debtor-in-possession financing.

49.    "**DIP Term Sheet**" means the term sheet attached as Exhibit A to the DIP Commitment Letter.

50.    "**Direct Investment Shares**" means the Equity Rights Offering Shares that are issued to the Equity Rights Offering Holdback Parties on account of the Holdback Rights Offering Amount based on the respective amounts and percentages applicable to each Equity Rights Offering Holdback Party as set forth in the Equity Rights Offering Backstop Commitment Agreement.

51.    "**Disallowed**" means any Claim, or any portion thereof, that (i) has been disallowed by Final Order or settlement; (ii) is scheduled at zero or as contingent, disputed, or unliquidated on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law; or (iii) is not scheduled on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law.

52.    "**Disclosure Statement**" means the disclosure statement Filed by the Debtors in support of the Plan, as amended, supplemented or modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, in form and substance reasonably satisfactory to the Required Consenting First Lien Lenders.

53.    "**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement.

54.    "**Disputed**" means, with respect to a Claim, a Claim that is not yet Allowed or Disallowed.

55.     "***Distribution Agent***" means, as applicable, the Debtors or the Reorganized Company or any Entity that the Debtors or the Reorganized Company select in consultation with the Creditors' Committee, to make or to facilitate distributions in accordance with the Plan.

56.     "***Distribution Record Date***" means, other than with respect to any publicly held securities held in the name of, or by a nominee of, DTC (including, without limitation, the Senior Unsecured Notes Claims), two (2) Business Days following the Confirmation Date. Notwithstanding anything to the contrary herein, for the avoidance of doubt, the Distribution Record Date shall not apply to any publicly held securities held in the name of, or by a nominee of, DTC (including, without limitation, the Senior Unsecured Notes Claims), as to which distributions may be made in accordance with the applicable procedures of DTC.

57.     "***DTC***" means the Depository Trust Company.

58.     "***Eligible Offeree***" means each Holder of a First Lien Claim (or, in the case of an Equity Rights Offering Backstop Party or Equity Rights Offering Holdback Party, its designated Affiliate, managed fund or account, in accordance with the terms of the Equity Rights Offering Backstop Commitment Agreement) that is either (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), or (7) under the Securities Act, or an entity in which all of the equity investors are such institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person), and who, in each case, completes and returns to the subscription agent for the Equity Rights Offering (prior to the expiration thereof) an eligibility questionnaire to such effect.  For the avoidance of doubt, each Equity Rights Offering Backstop Party and each Equity Rights Offering Holdback Party is an Eligible Offeree.

59.     "***Employee Benefit Plans***" means all confidentiality and non-competition agreements and other employment bonus, gainshare and incentive programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards), vacation, holiday pay, severance, retirement, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, health savings accounts, and other health and welfare benefit plans, programs, and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations of the Debtors that are described in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations, and Other Compensation and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations, and (II) Granting Related Relief.*

60.     "***Entity***" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

61.     "***Equity Rights Offering***" means the equity rights offering to be consummated by the Reorganized Company on the Plan Effective Date in accordance with the Equity Rights Offering Documents, pursuant to which it shall issue shares of Reorganized Equity.

62.     "***Equity Rights Offering Amount***" means, with respect to the Equity Rights Offering Shares, an aggregate purchase price of $200 million (exclusive of the Equity Rights Offering Backstop Premium), which may be increased with the consent of the Required Consenting First Lien Lenders.

63.     "***Equity Rights Offering Backstop Commitment Agreement***" means an agreement setting forth the terms and conditions of the commitments and obligations of the Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties based on the respective amounts and percentages applicable to each Equity Rights Offering Backstop Party and Equity Rights Offering Holdback Party as set forth therein.

64.     "**_Equity Rights Offering Backstop Parties_**" means the Equity Rights Offering Backstop Parties (as defined in and as set forth in the Equity Rights Offering Backstop Commitment Agreement).

65.     "**_Equity Rights Offering Backstop Premium_**" shall mean the "Equity Rights Offering Backstop Premium" as defined in the Equity Rights Offering Backstop Commitment Agreement.

66.     "**_Equity Rights Offering Documents_**" means, collectively, the Equity Rights Offering Procedures, the Subscription Form, and other material documents necessary to implement the Equity Rights Offering, including the Equity Rights Offering Order and Equity Rights Offering Backstop Commitment Agreement.

67.     "**_Equity Rights Offering Holdback Parties_**" means the Direct Investment Parties (as defined in and as set forth in the Equity Rights Offering Backstop Commitment Agreement).

68.     "**_Equity Rights Offering Order_**" means the Final Order approving the Equity Rights Offering Procedures, which may be the Disclosure Statement Order.

69.     "**_Equity Rights Offering Procedures_**" means those certain rights offering procedures with respect to the Equity Rights Offering, as approved by the Bankruptcy Court, which shall be in form and substance acceptable to the Required Consenting First Lien Lenders.

70.     "**_Equity Rights Offering Shares_**" means the shares of Reorganized Equity that are issued in connection with the Equity Rights Offering.

71.     "**_Estate_**" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

72.     "**_Exculpated Fiduciaries_**" means, collectively, and in each case in their capacities as such during the Chapter 11 Cases (i) the Debtors and (ii) the Creditors' Committee.

73.     "**_Exculpated Parties_**" means each of the Exculpated Fiduciaries in their capacity as such and, in each case, to the maximum extent permitted by law.

74.     "**_Executory Contract_**" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

75.     "**_Existing Equity Interests_**" means all Interests in HFS Matterhorn Topco, Inc.

76.     "**_Exit First Lien Term Loan Facility_**" means the term loan credit facility in an aggregate principal amount of $725 million with no amortization payments for the first two years post-Plan Effective Date, to be provided on the terms and conditions set forth in the Restructuring Term Sheet and the Exit First Lien Term Loan Facility Documents.

77.     "**_Exit First Lien Term Loan Facility Documents_**" means, collectively, all agreements, documents, and instruments delivered or entered into in connection with the Exit First Lien Term Loans (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

78.     "**_Exit First Lien Term Loans_**" means the term loans issued to holders of First Lien Claims pursuant to the Exit First Lien Term Loan Facility.

79.   "***Exit Revolving Facility***" means the asset-based lending facility up to $375 with the capacity for the issuance of letters of credit entered into pursuant to the Exit Revolving Facility Documents.

80.   "***Exit Revolving Facility Documents***" means the agreements memorializing the Exit Revolving Facility, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages, deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Exit Revolving Facility.

81.   "***File***" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

82.   "***Final Order***" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court that has not been reversed, vacated, revoked, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

83.   "***First Day Pleadings***" means the first-day and second-day pleadings that the Company Parties determine are necessary or desirable to File with the Bankruptcy Court.

84.   "***First Lien Ad Hoc Group***" means certain of the Consenting First Lien Lenders that are members of an ad hoc group represented by the First Lien Ad Hoc Group Advisors.

85.   "***First Lien Ad Hoc Group Advisors***" means, collectively, (a) Gibson, Dunn & Crutcher LLP as legal advisors, (b) PJT Partners, Inc. as investment banker, (c) JZ Advisors LLC, as restructuring advisor, (d) Lyons, Benenson & Company Inc. as compensation consultant, (e) Howley Law PLLC as local counsel, (f) Spencer Stuart International (U.S.) Inc. as executive/board search advisor, and (g) any other professionals or advisors retained by the First Lien Ad Hoc Group.

86.   "***First Lien Agent***" means Goldman Sachs Lending Partners LLC, in its capacities as administrative agent and collateral agent under the First Lien Credit Agreement and the other First Lien Documents, including any successor and permitted assign thereto.

87.   "***First Lien Claims***" means any Claim arising from or related to the First Lien Credit Agreement, including, for the avoidance of doubt, any deficiency claims.

88.   "***First Lien Credit Agreement***" means the *Credit Agreement*, dated as of May 23, 2018, between H-Food Holdings, LLC, as the U.S. Borrower (as defined in the First Lien Credit Agreement), Hearthside Bidco B.V., as the Dutch Borrower (as defined in the First Lien Credit Agreement), Matterhorn Buyer, LLC, as Holdings (as defined in the First Lien Credit Agreement), Goldman Sachs Lending Partners LLC, as Administrative Agent and Collateral Agent (each as defined in the First Lien Credit Agreement), and the lenders party thereto (as amended, restated, supplemented, or otherwise modified from time to time).

89. "*First Lien Documents*" means the First Lien Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the First Lien Credit Agreement.

90. "*First Lien Revolving Loans*" means revolving commitments outstanding under the First Lien Credit Agreement.

91. "*First Lien Term Loans*" means term loans outstanding under the First Lien Credit Agreement.

92. "*General Unsecured Claim*" means any Claim that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court and is not a: (a) DIP Claim; (b) Administrative Claim; (c) First Lien Claim; (d) Intercompany Claim; (e) Priority Non-Tax Claim; (f) Other Secured Claim; (g) Priority Tax Claim; (h) Professional Fee Claim; (i) Section 510 Claim; (j) Second Lien Term Loan Claim; or (k) Senior Unsecured Notes Claim.  For the avoidance of doubt, General Unsecured Claims shall include any Claims or cause of action, whether existing now or arising in the future, known or unknown, and whether held by any governmental or quasi-governmental entity—including but not limited to local, state, federal, or foreign or private party, against any of the Debtors (or their Affiliates) in any way arising out of or relating to the labor practices of the Debtors (or their Affiliates and any independent contractors or third party staffing agencies) or any of their respective predecessors prior to the Plan Effective Date, including, for the avoidance of doubt and without limitation, Claims for indemnification (contractual or otherwise), contribution, or reimbursement against any of the Debtors (or their Affiliates) in any way arising out of or relating to the labor practices of the Debtors (or their Affiliates and any independent contractors or third party staffing agencies) or any of their respective predecessors prior to the Plan Effective Date.

93. "*General Unsecured Claims Cash Recovery*" means $2.4 million in Cash.

94. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

95. "*Holdback Rights Offering Amount*" means 35% of the Equity Rights Offering Amount, offered only to the Equity Rights Offering Holdback Parties.

96. "*Holder*" means a Person or Entity holding a Claim against, or an Interest in, any Debtor, as applicable.

97. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

98. "*Indemnification Obligations*" has the meaning set forth in ARTICLE IV.S.2 of the Plan.

99. "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

100. "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor.

101. "*Intercreditor Agreement*" means the *Junior Lien Intercreditor Agreement* dated as of November 25, 2018, between Goldman Sachs Lending Partners LLC, in its capacity as collateral agent under the First Lien Credit Agreement, as Representative for the First Lien Credit Agreement Secured Parties, and Ares Capital Corporation, in its capacity as collateral agent under the Second Lien Credit Agreement, as Representative for the Initial Second Priority Secured Parties, and each additional Senior

Priority Representative and Second Priority Representative that from time to time becomes a party thereto. Capitalized terms in the foregoing shall have the meanings set forth in the Intercreditor Agreement.

102. "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security, including any Section 510(b) Claims.

103. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

104. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

105. "*Management Incentive Plan*" means a post-Plan Effective Date equity incentive plan that reserves 10.0% of the Reorganized Equity outstanding immediately after the Plan Effective Date, on a fully diluted basis, on the terms set forth in the Management Incentive Plan Term Sheet, which plan shall include customary anti-dilution protections.

106. "*Management Incentive Plan Term Sheet*" means the term sheet setting forth that the Management Incentive Plan, such term sheet to be included in the Plan Supplement.

107. "*Milestone*" has the meaning set forth in Section 4.01 of the Restructuring Support Agreement.

108. "*New Board*" means the initial board of directors of Reorganized Company selected in accordance with ARTICLE IV.I of the Plan, whose identities shall be set forth as part of the Plan Supplement.

109. "*New Organizational Documents*" means the organizational and governance documents for each of the Reorganized Debtors, including, without limitation, certificates of incorporation (including any certificate of designations), certificates of formation or certificates of limited partnership (or equivalent organizational documents), certificates of designation, bylaws, limited liability company agreements, shareholders' agreements, and limited partnership agreements (or equivalent governing documents), as applicable, in each case, materially consistent with the terms and conditions set forth in the Restructuring Support Agreement.

110. "*New Reorganized Debt*" means collectively, the Exit Revolving Facility and the Exit First Lien Term Loan Facility.

111. "*New Reorganized Debt Documents*" means collectively, the Exit Revolving Facility Documents and the Exit First Lien Term Loan Facility Documents.

112. "*Other Secured Claim*" means any Secured Claim against the Debtors other than the DIP Claims and First Lien Claims.

113. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

114. "*Petition Date*" means the November 22, 2024.

115.    "**Plan**" means this amended joint chapter 11 plan of reorganization, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code, and the terms hereof.

116.    "**Plan Distribution**" means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under this Plan.

117.    "**Plan Effective Date**" means the date that is the first business day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Plan Effective Date set forth in the Plan have been satisfied or waived in accordance with the terms of the Plan.  Any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable thereafter.

118.    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court, as may be amended, modified, or supplemented from time to time on or prior to the Plan Effective Date.

119.    "**Postpetition Intercompany Claim**" means any Claim held by a Debtor or a non-Debtor direct or indirect subsidiary of a Debtor against a Debtor arising after the Petition Date.

120.    "**Priority Non-Tax Claim**" means any Claim other than an Administrative Claim, Priority Tax Claim, or DIP Claim, entitled to priority in right of payment under Section 507(a) of the Bankruptcy Code.

121.    "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

122.    "**Pro Rata**" means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

123.    "**Professional**" means any Entity (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

124.    "**Professional Fee Claims**" means any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

125.    "**Professional Fee Escrow**" means an escrow account established and funded pursuant to <u>ARTICLE II.C.2</u> of the Plan.

126. "***Professional Fee Reserve Amount***" means the aggregate unpaid Professional Fee Claims through and including the Plan Effective Date, as estimated in accordance with ARTICLE II.C.3 of the Plan.

127. "***Professional Fees***" means fees and expenses (including transaction and success fees) incurred by a Professional.

128. "***Proof of Claim***" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

129. "***Reinstate,***" "***Reinstated***," **or** "***Reinstatement***" means leaving a Claim Unimpaired under the Plan.

130. "***Rejection Schedule***" means the schedule of Executory Contracts and/or Unexpired Leases to be rejected pursuant to the Plan, as set forth in the Plan Supplement, as may be amended, supplemented, or modified from time to time.

131. "***Related Party***" means, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

132. "***Released Parties***" means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the First Lien Agent, (v) the Second Lien Agent, (vi) the Senior Unsecured Notes Trustee, (vii) the DIP Agent, (viii) the DIP Lenders, and (ix) each Holder of a First Lien Claim, Second Lien Term Loan Claim or Senior Unsecured Notes Claim that votes for, and does not object to, the Plan, and (b) with respect to each of the foregoing Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law; *provided*, that any Entity or Person that opts out of or timely objects either through (1) a formal objection Filed on the docket of the Chapter 11 Cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before confirmation to the releases set forth in ARTICLE VIII.D of the Plan shall not be deemed a Released Party.

133. "***Releasing Parties***" means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (v) each Released Party, (vi) each Related Party to each Entity in clause (i) through (v) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clause (i) through (v); *provided*, *that*, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases set forth in ARTICLE VIII.D of this Plan; or (y) timely objects

to the releases set forth in ARTICLE VIII.D of this Plan, either through (1) a formal objection Filed on the docket of the Chapter 11 Cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before confirmation; *provided further*, *that*, for the avoidance of doubt, in no case, shall a minor (as defined under applicable state law) be a Releasing Party.

134. "***Reorganized Company***" means HFS Matterhorn Topco, Inc. or any successors thereto, by merger, consolidation, or otherwise, or such other entity as set forth in the Transaction Steps, on or after the Plan Effective Date.

135. "***Reorganized Debtors***" means, collectively, each of the Debtors and any successors thereto, by merger, consolidation, or otherwise, as reorganized on or after the Plan Effective Date, in accordance with the Plan.

136. "***Reorganized Equity***" means the common stock, limited liability company interest, or other equivalent common equity interest, as applicable, in the Reorganized Company to be issued on the Plan Effective Date.

137. "***Required Consenting First Lien Lenders***" means, as of the relevant date, three or more unaffiliated Consenting First Lien Lenders holding at least 50.01% of the aggregate outstanding principal amount of First Lien Claims that are held by Consenting First Lien Lenders.

138. "***Required Consenting Second Lien Term Lenders***" means, as of the relevant date, Consenting Second Lien Term Lenders holding at least 66.67% of the aggregate outstanding principal amount of Second Lien Term Loan Claims that are held by Consenting Second Lien Term Loan Lenders.

139. "***Required Consenting Senior Unsecured Noteholders***" means, as of the relevant date, Consenting Senior Unsecured Noteholders holding at least 50.01% of the aggregate outstanding principal amount of Senior Unsecured Notes Claims that are held by Consenting Senior Unsecured Noteholders.

140. "***Restructuring***" means the restructuring of Debtors' capital structure on the terms and conditions set forth in this Plan and Plan Supplement, and subject to the terms of the Restructuring Support Agreement.

141. "***Restructuring Expenses***" means the reasonable and documented fees, costs, and out-of-pocket expenses of the First Lien Agent, the DIP Agent, and the First Lien Ad Hoc Group Advisors (which shall include, for the avoidance of doubt, the advisors to the First Lien Agent and the DIP Agent under the First Lien Credit Agreement and the DIP Facility), which are incurred (a) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of the Restructuring Support Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing and, to the extent applicable, and/or (b)(i) consistent with any engagement letters or fee reimbursement letters entered into between the Company Parties on the one hand, and the applicable First Lien Ad Hoc Group Advisors and advisors to the First Lien Agent or DIP Agent, on the other hand (as supplemented and/or modified by this Agreement), (ii) provided in the First Lien Credit Agreement, and/or (iii) as provided in the Cash Collateral Order and DIP Order and/or the Confirmation Order.

142. "***Restructuring Support Agreement***" means that certain Restructuring Support Agreement, dated as of November 22, 2024, by and between the Company Parties, the Consenting First Lien Lenders, the Consenting Second Lien Term Lenders, the Consenting Senior Unsecured Noteholders, and the

Consenting Sponsor, as the same may be amended, supplemented, or modified from time to time in accordance with its terms, which, for the avoidance of doubt, includes all of the exhibits, annexes, and schedules thereto in accordance with Section 16.02 of the Restructuring Support Agreement (including the Restructuring Term Sheet).

143.     "*Restructuring Term Sheet*" means the Restructuring Term Sheet annexed to the Restructuring Support Agreement as Exhibit B thereto.

144.     "*Restructuring Transactions*" shall have the meaning set forth in <u>ARTICLE IV.O</u> of the Plan, such transactions described therein and related transactions or steps (including the Transaction Steps) to effectuate the Restructuring Support Agreement and the Restructuring Term Sheet.

145.     "*Retained Causes of Action*" means the Causes of Action identified on the Schedule of Retained Causes of Action.

146.     "*Schedule of Retained Causes of Action*" means a schedule of certain Claims and Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan; <u>provided</u>, that in no instance shall Claims or Causes of Action against any Released Party or any Exculpated Party be retained.

147.     "*Schedules*" means, collectively, any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs Filed by the Debtors with the Bankruptcy Court and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, supplemented, or otherwise modified from time to time, to the extent the filing of such documents is not waived or extended beyond the Plan Effective Date pursuant, in each case, to an order of the Bankruptcy Court.

148.     "*Second Lien Ad Hoc Group*" means the ad hoc group of creditors holding Second Lien Term Loan Claims represented by the Second Lien Ad Hoc Group Advisors.

149.     "*Second Lien Ad Hoc Group Advisors*" means, collectively, (a) Proskauer Rose LLP, as legal counsel, (b) Gray Reed, as co-counsel, and (c) FTI Consulting, Inc., as financial advisor.

150.     "*Second Lien Ad Hoc Group Advisor Fees*" means the reasonable and documented fees and expenses of the Second Lien Ad Hoc Group Advisors.

151.     "*Second Lien Agent*" means Ares Capital Corporation, in its capacities as administrative agent and collateral agent under the Second Lien Credit Agreement and the other Second Lien Documents, including any successor and permitted assign thereto.

152.     "*Second Lien Credit Agreement*" means the *Second Lien Credit Agreement*, dated as of November 25, 2018, between Matterhorn Buyer, LLC, as Holdings (as defined in the Second Lien Credit Agreement), H-Food Holdings, LLC, as the Borrower (as defined in the Second Lien Credit Agreement), Ares Capital Corporation, as Administrative Agent and Collateral Agent (each as defined in the Second Lien Credit Agreement), and the lenders party thereto (as amended, restated, supplemented, or otherwise modified from time to time).

153.     "*Second Lien Documents*" means the Second Lien Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the Second Lien Credit Agreement.

154.    "*Second Lien Term Loan Claims*" means any Claim arising from or related to the Second Lien Credit Agreement.

155.    "*Second Lien Term Loans*" means term loans outstanding under the Second Lien Credit Agreement.

156.    "*Second Lien Term Loan Claims Cash Recovery*" means Cash in the amount of $18 million, *less* the aggregate amount of Second Lien Ad Hoc Group Advisors Fees paid by the Debtors on or after the Agreement Effective Date as defined in the Restructuring Support Agreement (including in connection with ARTICLE IV.V).

157.    "*Section 510(b) Claims*" means any Claim against any Debtor: (a) arising from the recission of a purchase or sale of an equity security as defined in section 101(17) of the Bankruptcy Code (including the Employee Partnership Sale Units) of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such an equity security made to the Debtors prior to the Petition Date; or (c) for reimbursement or contribution Allowed under section 502(e) of the Bankruptcy Code on account of such Claim; and (d) any other Claim determined to be subordinated under section 510 of the Bankruptcy Code.

158.    "*Secured Claim*" means a Claim (a) secured by a lien on any Debtor's interest in property to the extent of the value of such interest as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code (including the DIP Order) or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

159.    "*Securities Act*" means the Securities Act of 1933, as amended.

160.    "*Senior Unsecured Notes*" means the notes issued under the Senior Unsecured Notes Indenture.

161.    "*Senior Unsecured Notes Ad Hoc Group*" means the ad hoc group of creditors holding Senior Unsecured Notes Claims represented by the Senior Unsecured Notes Ad Hoc Group Advisors.

162.    "*Senior Unsecured Notes Ad Hoc Group Advisor Fees*" means the reasonable and documented fees and expenses accrued from the inception of their respective engagements of the Senior Unsecured Notes Ad Hoc Group Advisors, whether incurred before, on or after the Petition Date and paid by the Debtors on or after the Agreement Effective Date as defined in the Restructuring Support Agreement (including in connection with ARTICLE IV.V).

163.    "*Senior Unsecured Notes Ad Hoc Group Advisors*" means collectively, (a) Paul Hastings LLP, as legal counsel, and (b) Perella Weinberg Partners LP, as investment banker.

164.    "*Senior Unsecured Notes Cash Recovery*" means Cash in the amount of $21 million, *less* the aggregate amount of Senior Unsecured Notes Ad Hoc Group Advisors Fees.

165.    "*Senior Unsecured Notes Claims*" means any Claim arising from or related to that certain Senior Unsecured Notes Indenture.

166.    "*Senior Unsecured Notes Documents*" means the Senior Unsecured Notes Indenture and all related agreements and documents executed by any of the Debtors in connection with the Senior Unsecured Notes Indenture.

167. "*Senior Unsecured Notes Indenture*" means the *Indenture*, dated as of May 23, 2018, between H-Food Holdings, LLC, and Hearthside Finance Company, Inc., as Issuers, certain subsidiaries of the Company as Subsidiary Guarantors, and U.S. Bank National Association as Trustee for 8.500% Senior Notes due 2026 (as amended, restated, supplement, or otherwise modified from time to time).

168. "*Senior Unsecured Notes Trustee*" means U.S. Bank, National Association, in its capacity as indenture trustee under the Senior Unsecured Notes Indenture and the other Senior Unsecured Notes Documents, including any successor and permitted assign thereto.

169. "*Solicitation Materials*" means the Disclosure Statement and all documents, forms and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

170. "*Stockholders*" means the current and former holders of HFS Matterhorn Topco, Inc. Interests from time to time, including the Consenting Sponsors.

171. "*Stockholders Agreement*" means any stockholders agreement, equity holders agreement, operating agreement, or other similar agreement for Reorganized Company, as applicable, to which Holders of Reorganized Equity shall become party to on or immediately after the Plan Effective Date governing, among other things, the relative rights of the Holders of the Reorganized Equity.

172. "*Subscription Form*" means the subscription form to be completed by holders of Allowed First Lien Claims electing to subscribe for Reorganized Equity in the Equity Rights Offering.

173. "*Subscription Rights*" means the rights of holders of First Lien Claims to subscribe for and purchase, as part of the Equity Rights Offering, their Pro Rata allocation of the Equity Rights Offering Shares, subject to the Holdback Rights Offering Amount and the conditions set forth in ARTICLE IV.P of the Plan.

174. "*Surviving First Lien Credit Agreement Provisions*" means any provisions of the First Lien Credit Agreement that by their terms survive the termination of the First Lien Credit Agreement.

175. "*Surviving Second Lien Credit Agreement Provisions*" means any provisions of the Second Lien Credit Agreement that by their terms survive the termination of the Second Lien Credit Agreement.

176. "*Surviving Senior Unsecured Notes Provisions*" means any provisions of the Senior Unsecured Notes Documents that by their terms survive the termination of the Senior Unsecured Notes Documents.

177. "*Transaction Steps*" means the steps agreed to between the Debtors and the Required Consenting First Lien Lenders to implement the Restructuring Transactions, which shall be included in the Plan Supplement.

178. "*U.S. Trustee*" means the Office of the United States Trustee for Region 7.

179. "*UCC Fees*" means all Allowed Professional Fees and expenses incurred by any Creditors' Committee as of the Plan Effective Date.

180. "*UCC Fees Threshold*" means $13 million in the aggregate of UCC Fees.

181.    "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

182.    "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

183.    "***Unsecured Claims Cash Recovery***" means, collectively, the General Unsecured Claims Cash Recovery, the Second Lien Term Loan Claims Cash Recovery, and the Senior Unsecured Notes Cash Recovery.

B.    *Rules of Interpretation*

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (xii) references to "stockholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (xiv) except as otherwise provided, any references to the Plan Effective Date shall mean the Plan Effective Date or as soon as reasonably practicable thereafter; and (xv) any reference to an Entity as a Holder of a Claim or Interest includes such Entity's permitted successors and assigns.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, that corporate or limited liability company governance matters relating to the Debtors not incorporated or formed (as applicable) in the State of New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Reference to the Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Company shall mean the Debtors and the Reorganized Company, as applicable, to the extent the context requires.

G.    *Controlling Document*

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each. If there is any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

H.    *Certain Consent Rights*

Notwithstanding anything in the Plan to the contrary, any and all consent rights set forth in the Restructuring Support Agreement with respect to the form and substance of the Plan and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I.A of the Plan) and fully enforceable as if stated in full herein.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims and Administrative Claims, including Professional Fee Claims and Postpetition Intercompany Claims, have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in ARTICLE III of the Plan.

A.     *Administrative Claims*

Except with respect to Professional Fee Claims, and Restructuring Expenses, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) on the Plan Effective Date, if such Administrative Claim is Allowed as of the Plan Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) or (ii) if such Administrative Claim is not Allowed as of the Plan Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; provided that if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

On the Plan Effective Date, the Debtors or the Reorganized Company, as applicable, shall pay all Restructuring Expenses that have accrued and are unpaid as of the Plan Effective Date.

Except as otherwise provided in this ARTICLE II.A or the Claims Bar Date Order, and except with respect to Administrative Claims that are Restructuring Expenses or Professional Fee Claims, requests for payment of Administrative Claims must be Filed and served on the Reorganized Company pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business.

Objections to requests for payment of Administrative Claims that are Filed with the Bankruptcy Court (other than Professional Fee Claims) must be Filed and served on the requesting party by the Administrative Claims Objection Bar Date.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, THE ESTATES, OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE PLAN EFFECTIVE DATE.**

B.     *DIP Claims*

All DIP Claims shall be deemed Allowed as of the Plan Effective Date in an amount equal to the aggregate amount of the DIP Obligations, including, without limitation, (a) the principal amount outstanding under the DIP Facility on such date; (b) all interest accrued and unpaid thereon through and including the date of payment; and (c) all accrued and unpaid fees, discounts, expenses, costs and indemnification obligations payable under the DIP Documents.  On the Plan Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, Cash in an amount equal to such Allowed DIP Claim, except to the extent of any portion of such DIP Claims (including both the funded amount and the amount of any accrued but unpaid interest, premiums and fees, but excluding expenses and professional fees) elected by the Holder thereof to be used as consideration in the Equity Rights Offering (which such portion shall be deemed fully and finally satisfied, settled, released and discharged upon, and in connection with, the consummation of the Equity Rights Offering).  Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the provisions of the DIP Documents that expressly survive termination or maturity

of the DIP Facility (including those provisions relating to the rights of the DIP Agent and the other DIP Lenders to expense reimbursement, indemnification, and other similar amounts) shall continue in full force and effect after the Plan Effective Date in accordance with the terms hereof.

C.   *Professional Fee Claims*

      1.    <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is sixty (60) calendar days after the Confirmation Date unless otherwise ordered by the Bankruptcy Court. Objections to any Professional Fee Claims must be Filed and served on counsel to the Debtors, counsel to the Creditors' Committee, the U.S. Trustee, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors and the party requesting compensation of a Professional Fee Claim).

      2.    <u>Professional Fee Escrow</u>

If the Professional Fee Reserve Amount is greater than zero, as soon as reasonably practicable before, but in no event later than the Confirmation Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Reserve Amount, and no Liens, claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the Exit Revolving Facility, the Exit First Lien Term Loan Facility or otherwise). The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors, the Estates, or the Reorganized Company and (ii) shall be held in trust for the Professionals; <u>provided</u>, <u>that</u> to the extent surplus funds remain in the Professional Fee Escrow after all Professional Fee Claims have been resolved by the Bankruptcy Court or settled, such funds shall be returned to the Reorganized Debtors. Allowed Professional Fee Claims shall be paid in Cash by the Debtors or the Reorganized Company, as applicable, to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; <u>provided</u>, <u>that</u> the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.  If the amount in any Professional Fee Escrow account is insufficient to fund payment in full of all Allowed amounts owing to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow without any further action or order of the Bankruptcy Court.  For the avoidance of doubt, the Professional Fee Escrow shall not constitute collateral, including for the DIP Lenders, the First Lien Agent, the Holders of First Lien Claims, the Second Lien Agent, and the Holders of Second Lien Claims, or be subject to claims, including any DIP Claims, DIP Superpriority Claims (as defined in the DIP Order), Adequate Protection Claims (as defined in the DIP Order), 507(b) Claims (as defined in the DIP Order), or claims held by the Prepetition Secured Parties (as defined in the DIP Order), and shall not be subject to any cash sweep and/or foreclosure provisions in the First Lien Documents, the Second Lien Documents, or the DIP Documents, nor shall the Prepetition Secured Parties or the DIP Secured Parties (as defined in the DIP Order) be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the First Lien Documents, the DIP Documents, or the DIP Order.

      3.    <u>Professional Fee Reserve Amount</u>

No later than five (5) Business Days prior to the Confirmation Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors prior to approval by the Bankruptcy Court through and including the Confirmation Date, including any fees and expenses projected to be outstanding as of the Confirmation Date, and the Debtors

shall escrow such estimated amounts for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties; provided, that such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of a Professional's final request for payment of Filed Professional Fee Claims. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors shall estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim. When all Professional Fee Claims have been Allowed and paid in full or Disallowed, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Company without any further action or order of the Bankruptcy Court.

### 4.   Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Reorganized Company shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Reorganized Company may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### D.   *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims shall receive interest on such Allowed Priority Tax Claims after the Plan Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.   *Summary of Classification*

All Claims and Interests, except for Claims addressed in ARTICLE II of the Plan, are classified in the Classes set forth in this ARTICLE III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in ARTICLE III.F of the Plan.

### 1.   Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 2 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 5 | Senior Unsecured Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired or Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept or Deemed Not to Accept) |
| 8 | Section 510 Claims | Impaired | Not Entitled to Vote (Deemed Not to Accept) |
| 9 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Conclusively Presumed to Accept) |
| 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed Not to Accept) |

B.      *Treatment of Claims and Interests*

1.      Class 1 – Other Secured Claims

a.      *Classification*: Class 1 consists of all Other Secured Claims.

b.      *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for, each Allowed Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor and with the reasonable consent of the Required Consenting First Lien Lenders, either:

i.      payment in full in cash of its Allowed Other Secured Claim;

ii.     the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii.    reinstatement of its Allowed Other Secured Claim; or

iv.     such other treatment in rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

c.      *Voting*: Class 1 is Unimpaired under the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Other Secured Claims.

2. <u>Class 2 – Priority Non-Tax Claims</u>

 a. *Classification*: Class 2 consists of all Priority Non-Tax Claims.

 b. *Treatment*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive cash in an amount equal to such Allowed Priority Non-Tax Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

 c. *Voting*: Class 2 is Unimpaired under the Plan. Each Holder of a Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Priority Non-Tax Claims.

3. <u>Class 3 – First Lien Claims</u>

 a. *Classification*: Class 3 consists of all First Lien Claims.

 b. *Allowance*: The First Lien Claims are Allowed in the aggregate amount of $2,146,809,609.32, plus fees, expenses, and other amounts arising and payable under and in accordance with the First Lien Documents, to the extent permitted by the Bankruptcy Code.

 c. *Treatment*: Except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment of such Claim, each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date, its elected Pro Rata share of:

  i. 100% of the Exit First Lien Term Loans;

  ii. 100% of the Reorganized Equity, subject to dilution by the Equity Rights Offering and the Management Incentive Plan; and

  iii. if any of the Second Lien Term Loan Claims Class, the Senior Unsecured Notes Claims Class, or the General Unsecured Claims Class do not vote to accept the Plan, the cash distribution that would otherwise have been made to any such rejecting Class(es).

   Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) that properly exercises its Equity Rights Offering rights to purchase Reorganized Equity shall receive such Reorganized Equity on the Plan Effective Date.

 d. *Voting*: Class 3 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

23

4.   <u>Class 4 – Second Lien Term Loan Claims</u>

    a.    *Classification*: Class 4 consists of all Second Lien Term Loan Claims.

    b.    *Allowance*: The Second Lien Term Loan Claims are Allowed in the aggregate principal amount of $300,000,000, plus fees, expenses, and other amounts arising and payable under and in accordance with the Second Lien Documents, to the extent permitted by the Bankruptcy Code.

    c.    *Treatment*: Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment of such Claim, each Holder of a Second Lien Term Loan Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

        i.    **if Class 4 votes to <u>accept</u> the Plan**: (1) its Pro Rata share of 100% of the Second Lien Term Loan Claims Cash Recovery; *provided* that, if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the Second Lien Term Loan Claims Cash Recovery shall be reduced on a ratable basis (determined based on the Second Lien Term Loan Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Senior Unsecured Notes Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Second Lien Term Loan Claims Cash Recovery, and (2) the Required Lenders (as defined in the First Lien Credit Agreement) shall waive, and shall cause the applicable First Lien Agent to waive, any turnover or similar rights in favor of the holders of First Lien Claims with respect to such distribution on account of the Intercreditor Agreement; or

        ii.    **if Class 4 votes to <u>reject</u> the Plan**, no recovery or distribution on account of such Claim, and all Second Lien Term Loan Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect;

            *provided* that, to the extent the Senior Unsecured Notes Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Second Lien Term Loan Claims Class, then the Second Lien Term Loan Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms.

    d.    *Voting*: Class 4 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

5.     <u>Class 5 – Senior Unsecured Notes Claims</u>

    a.     *Classification*: Class 5 consists of all Senior Unsecured Notes Claims.

    b.     *Allowance*: The Senior Unsecured Notes Claims are Allowed in the aggregate principal amount of $350,000,000, plus fees, expenses, and other amounts arising and payable under and in accordance with the Senior Unsecured Notes Documents, to the extent permitted by the Bankruptcy Code.

    c.     *Treatment*: Except to the extent that a Holder of an Allowed Senior Unsecured Notes Claim agrees to a less favorable treatment of such Claim, each Holder of a Senior Unsecured Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

        i.     ***if Class 5 votes to <u>accept</u> the Plan***, its Pro Rata share of 100% of the Senior Unsecured Notes Cash Recovery; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the Senior Unsecured Notes Cash Recovery shall be reduced on a ratable basis (determined based on the Senior Unsecured Notes Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided, further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Senior Unsecured Notes Cash Recovery; or

        ii.     ***if Class 5 votes to <u>reject</u> the Plan***, no recovery or distribution on account of such Claim, and all Senior Unsecured Notes Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect;

            *provided* that, to the extent the Second Lien Term Loan Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Senior Unsecured Notes Claims Class, then the Senior Unsecured Notes Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms.

    d.     *Voting*: Class 5 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

6.     <u>Class 6 – General Unsecured Claims</u>

    a.     *Classification*: Class 6 consists of all General Unsecured Claims.

    b.     *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each Holder of a General Unsecured Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

i.   *if Class 6 votes to __accept__ the Plan*, the lower of: (1) its Pro Rata share of 100% of the General Unsecured Claims Cash Recovery; and (2) Cash in an amount equal to 6.0% of such Allowed General Unsecured Claim; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the General Unsecured Claims Cash Recovery shall be reduced on a ratable basis (determined based on the General Unsecured Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and Senior Unsecured Notes Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the General Unsecured Claims Cash Recovery; or

ii.   *if Class 6 votes to __reject__ the Plan*, no recovery or distribution on account of such Claim, and all General Unsecured Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect.

c.   *Voting:* Class 6 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

7.   Class 7 – Intercompany Claims

a.   *Classification*: Class 7 consists of all prepetition Intercompany Claims.

b.   *Treatment*: On or after the Plan Effective Date, each allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the reasonable consent of the Required Consenting First Lien Lenders), either reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan.

c.   *Voting*: Class 7 is Impaired or Unimpaired under the Plan. Holders of Intercompany Claims are either (i) deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Intercompany Claims.

8.   Class 8 – Section 510(b) Claims

a.   *Classification*: Class 8 consists of all Section 510(b) Claims.

b.   *Treatment*: On the Plan Effective Date, all Section 510(b) Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims.

c.   *Voting*: Each Holder of a Section 510(b) Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.   Therefore, Holders of

26

Section 510(b) Claims are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited with respect to 510(b) Claims.

9.    Class 9 – Intercompany Interests

    a.    *Classification*: Class 9 consists of all Intercompany Interests.

    b.    *Treatment*: On the Plan Effective Date, all Intercompany Interests shall be Reinstated for administrative convenience.

    c.    *Voting*: Class 9 is Unimpaired under the Plan. Each Holder of an Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Intercompany Interests.

10.    Class 10 – Existing Equity Interests

    a.    *Classification*: Class 10 consists of all Existing Equity Interests.

    b.    *Treatment*: On the Plan Effective Date, all Existing Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing Equity Interests shall not receive any distribution on account thereof.

    c.    *Voting*: Class 10 is Impaired under the Plan. Holders of Existing Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited with respect to Existing Equity Interests.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Company's rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims, and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Debtors and the Reorganized Company shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and the Reorganized Company's legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Plan Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

D.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by any Impaired Class of Claims. The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.      *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510(b) of the Bankruptcy Code, the Debtors and the Reorganized Company reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

G.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Intercompany Interests*

Distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders the Reorganized Equity, and in exchange for the Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, any Intercompany Interest in non-debtor Affiliates owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor unless provided otherwise by this Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Finality of Distributions*

As discussed in greater detail in the Disclosure Statement and as otherwise discussed herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, reflecting the agreement among the Consenting Stakeholders pursuant to the Restructuring Support Agreement and for the payment of Professional Fees as provided for therein. The Plan shall be deemed a motion to approve good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to ARTICLE VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be and shall be final.

B.      *No Substantive Consolidation*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

C.      *Sources of Consideration for Plan Distributions*

The Reorganized Company shall fund distributions under the Plan with (i) cash on hand, (ii) the issuance of the Reorganized Equity, (iii) proceeds of the Equity Rights Offering, (iv) the Exit First Lien Term Loans, and (v) the Exit Revolving Facility.

D.      *Letters of Credit*

Any letters of credit that remain outstanding on the Plan Effective Date shall be (i) cash collateralized by the Debtors or Reorganized Debtors, as applicable, pursuant to arrangements reasonably satisfactory to the applicable agent, (ii) terminated, cancelled, or returned undrawn to the applicable issuer, or (iii) otherwise addressed through arrangements acceptable to the applicable agent, issuer, and the Debtors.

E.      *Exit Revolving Facility*

One or more Reorganized Debtors shall enter into the Exit Revolving Facility on the Plan Effective Date, on terms set forth in the Exit Revolving Facility Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the Exit Revolving Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Company (or the applicable subsidiary issuing the Exit Revolving Facility) shall be authorized to execute and deliver those documents necessary or appropriate to cause its applicable subsidiary to issue and incur the Exit Revolving Facility and related guarantees, including the Exit Revolving Facility Documents, without further notice to or order

of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Company may deem to be necessary to consummate the Exit Revolving Facility. The obligations incurred by the Reorganized Company (or the applicable subsidiary issuer) pursuant to the Exit Revolving Facility and the Exit Revolving Facility Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Exit Revolving Facility Documents.

F.      *Exit First Lien Term Loans*

The Reorganized Company shall cause one of its subsidiaries to issue the Exit First Lien Term Loans and provide any related guarantees, and the Exit First Lien Term Loans will be made available to the Reorganized Company, pursuant to and subject to the terms and conditions set forth in the Exit First Lien Term Loan Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the Exit First Lien Term Loans (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Company (or the applicable subsidiary issuing the Exit First Lien Term Loans) shall be authorized to execute and deliver those documents necessary or appropriate to cause the applicable subsidiary issuer to issue and incur the Exit First Lien Term Loans and related guarantees, including the Exit First Lien Term Loan Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Company may deem to be necessary to consummate the Exit First Lien Term Loans. The obligations incurred by the Reorganized Company (or the applicable subsidiary issuer) pursuant to the Exit First Lien Term Loans and the Exit First Lien Term Loan Documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Exit First Lien Term Loan Documents.

G.      *Reorganized Equity*

The Reorganized Company, which may be converted into a Delaware limited liability company on the Plan Effective Date, is authorized to issue or cause to be issued and shall issue, and the Reorganized Company is authorized to distribute and shall distribute, the Reorganized Equity without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The Reorganized Equity shall be issued and distributed free and clear of all Liens, claims, and other interests.

Any Person's acceptance of Reorganized Equity shall be deemed to constitute its agreement to be bound by the Stockholders Agreement, if any, and the New Organizational Documents, as the same may be amended, supplemented, or modified from time to time following the Plan Effective Date in accordance with their terms. The Stockholders Agreement, if any, and the New Organizational Documents shall be binding on all holders of the Reorganized Equity (and their respective successors and assigns), whether such Reorganized Equity is received or to be received on or after the Plan Effective Date and regardless of whether such holder executes or delivers a signature page to the Stockholders Agreement, if any, or the New Organizational Documents. Notwithstanding the foregoing, the Reorganized Company may condition the receipt of any Reorganized Equity issued pursuant to the Plan upon the receipt of duly executed counter - signature pages to the Stockholders Agreement, if any.

All of the Reorganized Equity distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid, and non-assessable. Each distribution and issuance of the Reorganized Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such

distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

H.      *New Organizational Documents*

On or prior to the Plan Effective Date, the New Organizational Documents shall be filed with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or organization. The New Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Plan Effective Date, the New Organizational Documents may be amended and restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

For the avoidance of doubt, any claimant's acceptance of Reorganized Equity shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Plan Effective Date in accordance with its terms.

I.      *New Board*

As of the Plan Effective Date, except as set forth in this <u>ARTICLE IV.I</u>, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the New Board.

The New Board shall consist of seven (7) directors, consisting of (i) the Reorganized Company's Chief Executive Officer and (ii) six (6) directors designated by the Required Consenting First Lien Lenders (the initial directors to be so designated in consultation with the Reorganized Company's Chief Executive Officer). Each such director shall serve from and after the Plan Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents of the Reorganized Company.

J.      *Employee Matters*

On the Plan Effective Date, the Reorganized Company shall be deemed to have assumed all Employee Benefit Plans, and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; <u>provided</u>, <u>that</u> the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control" or "change in control" under any Employee Benefit Plans.

As of the Plan Effective Date, any provision of an Employee Benefit Plan that provides for equity-based awards, including any termination-related provisions with respect to equity-based awards, shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

The Reorganized Company shall continue to honor all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code, and the obligations thereunder shall be paid in accordance with the terms thereof.

K.      *Corporate Existence*

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Plan Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Plan Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

L.      *Vesting of Assets in the Reorganized Company*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Plan Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or the Confirmation Order. On and after the Plan Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

M.      *Cancellation of Existing Interests, Indebtedness, and Other Obligations*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Plan Effective Date (i) the First Lien Credit Agreement, the other First Lien Documents, the Second Lien Credit Agreement, the other Second Lien Documents, the Senior Unsecured Notes Indenture, the other Senior Unsecured Notes Documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed cancelled, discharged and of no force or effect, except, with respect to the First Lien Credit Agreement, the other First Lien Documents, the Second Lien Credit Agreement, the other Second Lien Documents, the Senior Unsecured Notes Indenture, and the other Senior Unsecured Notes Documents, as applicable, as necessary to (a) enforce the rights, claims and interests of the First Lien Agent, the Second Lien Agent, or the Senior Unsecured Notes Trustee, as applicable, and any predecessor thereof vis-a-vis parties other than the Released Parties; (b) allow the receipt of and to make distributions under the Plan in accordance with the terms of the First Lien Credit Agreement, the Second Lien Credit Agreement, or the Senior Unsecured Notes Indenture, as applicable; (c) preserve any rights of (1) the First Lien Agent, the Second Lien Agent, and any predecessor thereof as against any money or property distributable to Holders of First Lien Claims or Second Lien Term Loan Claims, including any priority in respect of payment and the right to exercise any charging Liens, and (2) the Senior Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of Senior Unsecured Notes Claims; and (d) allow the First Lien Agent, the Second Lien Agent, or the Senior Unsecured Notes Trustee to appear and participate in the Chapter 11 Cases or any other proceeding with

respect to clauses (a) through (c) above, as applicable, and any other proceedings or appeals related to the Plan; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, or similar documents governing the equity, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, that notwithstanding confirmation or the occurrence of the Plan Effective Date, any agreement that governs the rights of a Holder of a Claim shall also continue in effect to allow each of the First Lien Agent, the Second Lien Agent, or the Senior Unsecured Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court to enforce the respective obligations owed to such parties under the Plan.  Notwithstanding anything to the contrary herein, all rights under the First Lien Credit Agreement and Second Lien Credit Agreement shall remain subject to any intercreditor agreements.

Except for the foregoing, (i) subject to the performance by the First Lien Agent and the Second Lien Agent of their obligations under the Plan, the First Lien Agent and the Second Lien Agent and their agents shall be relieved of all further duties and responsibilities related to the First Lien Credit Agreement and the Second Lien Credit Agreement upon the occurrence of the Plan Effective Date (provided, that the Surviving First Lien Credit Agreement Provisions and Surviving Second Lien Credit Agreement Provisions shall survive in accordance with the terms of the First Lien Documents and the Second Lien Documents); and (ii) subject to the performance by the Senior Unsecured Notes Trustee of its obligations under the Plan, the Senior Unsecured Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Senior Unsecured Notes Documents upon the occurrence of the Plan Effective Date (provided, that the Surviving Senior Unsecured Notes Provisions shall survive in accordance with the terms of the Senior Unsecured Notes Documents).

The commitments and obligations (if any) of the Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the First Lien Credit Agreement and the Second Lien Credit Agreement, as applicable, shall fully terminate and be of no further force or effect on the Plan Effective Date.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

N.      *Corporate Action*

Upon the Plan Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable (i) the issuance of the Reorganized Equity; (ii) implementation of the Restructuring Transactions; (iii) incurrence of the New Reorganized Debt; (iv) implementation of the Equity Rights Offering; and (v) all other actions contemplated by the Plan (whether to occur before, on, or after the Plan Effective Date). Upon the Plan Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Company, and any corporate or other organizational action required by the Debtors or the Reorganized Company, shall be deemed to have occurred and shall be in

effect on the Plan Effective Date, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Company. Before, on, or after the Plan Effective Date, as applicable, the appropriate officers of the Debtors and the Reorganized Company, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Debtors or the Reorganized Company, as applicable, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this ARTICLE IV.N shall be effective notwithstanding any requirements under non-bankruptcy law.

O.      *Effectuating Documents; Restructuring Transactions*

   1.      Restructuring Transactions

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors and the Reorganized Company, as applicable, may take all actions as may be necessary or appropriate in their discretion to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) the issuance of securities; and (v) all other actions that the Debtors or the Reorganized Company determines to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule or the governing documents of the Debtors or the Reorganized Company (collectively, the "***Restructuring Transactions***").  For the avoidance of doubt, the Debtors may include in the Plan Supplement additional corporate Transaction Steps necessary for tax and legal efficiency and administrative purposes.

P.      *Equity Rights Offering and Equity Rights Offering Backstop Commitment Agreement*

   1.      Equity Rights Offering

Following approval by the Bankruptcy Court of the Disclosure Statement and the Equity Rights Offering Documents, one or more of the Debtors shall conduct the Equity Rights Offering. In accordance with this Plan, the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Procedures, and the Subscription Form, (i) holders of Allowed First Lien Claims (including the Equity Rights Offering Holdback Parties and the Equity Rights Offering Backstop Parties) who are Eligible Offerees will be offered Subscription Rights entitling them to subscribe for and purchase their Pro Rata portion of shares of Reorganized Equity in the Equity Rights Offering in an aggregate amount equal to 65% of the Equity Rights Offering Amount (exclusive of the Equity Rights Offering Backstop Premium) (such amount, the "Non-Holdback Rights Offering Amount"), and (ii) the Equity Rights Offering Holdback Parties will agree to purchase (based on the respective amounts and percentages applicable thereto as set forth in the Equity Rights Offering Backstop Commitment Agreement) their respective portion of shares of Reorganized Equity in the Equity Rights Offering in an aggregate amount equal to 35% of the Equity Rights Offering Amount (exclusive of the Equity Rights Offering Backstop Premium) (such amount, the "Holdback Rights Offering Amount" and such aggregate number of Equity Rights Offering Shares to be purchased on account of the Holdback Rights Offering Amount, the "Direct Investment Shares").  The

Equity Rights Offering Shares will be offered in the Equity Rights Offering for Cash; *provided*, *that*, any Holders of Allowed First Lien Claims who are DIP Lenders will be entitled to utilize all or a portion of their DIP Claims (including both the funded amount and the amount of any accrued and unpaid interest, premiums and fees (other than expenses and professional fees)) as consideration in exchange for the Equity Rights Offering Shares in the Equity Rights Offering.

The proceeds of the Equity Rights Offering shall be used to (i) repay outstanding amounts under the DIP Facility, (ii) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, and (iii) ensure at least $100 million of Reorganized Company pro forma cash at emergence.

2.      Equity Rights Offering Backstop Commitment Agreement

In accordance with the Equity Rights Offering Backstop Commitment Agreement and subject to the terms and conditions thereof:

- (i) each of the Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties shall fully exercise all of its Subscription Rights, (ii) each of the Equity Rights Offering Holdback Parties shall purchase its portion of the Direct Investment Shares in accordance with the Equity Rights Offering Backstop Commitment Agreement; and (iii) each of the Equity Rights Offering Backstop Parties shall purchase their respective share (in accordance with the amounts and percentages applicable thereto as set forth in the Equity Rights Offering Backstop Commitment Agreement) of any Equity Rights Offering Shares that are not purchased by the Holders of Allowed First Lien Claims; and

- in exchange for providing their respective commitments under the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Backstop Parties will receive their respective allocations of the Equity Rights Offering Backstop Premium.

Upon and in connection with (i) the purchase by the Equity Rights Offering Backstop Parties of their respective portions of the Equity Rights Offering Shares that are not purchased by the Holders of Allowed First Lien Claims, (ii) the payment of the Equity Rights Offering Backstop Premium, (iii) the exercise of the Subscription Rights by the Holders of Allowed First Lien Claims (in each case pursuant to the terms of the Equity Rights Offering Procedures), and (iv) the purchase by the Equity Rights Offering Holdback Parties of the Direct Investment Shares, the Reorganized Company shall be authorized to issue the Reorganized Equity issuable pursuant to such purchases and payment in accordance with ARTICLE IV.G hereof.

Q.      *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the New Reorganized Debt Documents, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the

Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

R.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to <u>ARTICLE VIII</u> of the Plan, the Reorganized Company shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in <u>ARTICLE VIII</u> of the Plan, which shall be deemed released and waived as of the Plan Effective Date.

The Reorganized Company may pursue such Retained Causes of Action in accordance with the best interests of the Reorganized Company. The Reorganized Company shall retain and may exclusively enforce any and all such Retained Causes of Action. The Reorganized Company shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Reorganized Company shall not pursue any and all available Causes of Action against it, except as otherwise expressly provided in the Plan, including this <u>ARTICLE IV</u> and <u>ARTICLE VIII</u> of the Plan. Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Causes of Action shall be expressly reserved by the Reorganized Company for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

S.      *Insurance Policies*

1.      <u>Director and Officer Liability Insurance</u>

Each insurance policy, including the D&O Liability Insurance Policies, to which the Debtors are a party as of the Plan Effective Date, shall be deemed Executory Contracts and shall be assumed by the Reorganized Company on behalf of the applicable Debtor effective as of the Plan Effective Date unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Confirmation Hearing, and coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies. In addition, after the Plan Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Plan Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Petition Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Plan Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

2.      Survival of Debtors' Indemnification Obligations

Subject to the investigation of the special committee of officers of Matterhorn Buyer, LLC, to the fullest extent permitted by applicable law, any obligations of the Debtors in place as of the Plan Effective Date pursuant to their corporate charters, by-laws, limited liability company agreements, memoranda and articles of association, or other organizational documents and agreements to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors (collectively, the "Indemnification Obligations") shall not be discharged, impaired, or otherwise affected by the Plan; provided that the Debtors or the Reorganized Company shall not indemnify officers, directors, agents, or employees of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that for which indemnification is barred under applicable law or that is excluded under the terms of the foregoing organizational documents or applicable agreements governing the Debtors' Indemnification Obligations; provided, further, that the Indemnifications Obligations shall only include such obligations to former direct and indirect directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors that were serving in such role from and after the Plan Effective Date. All Indemnification Obligations shall be deemed Executory Contracts assumed by the Reorganized Company under the Plan unless such obligation (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Confirmation Hearing.

3.      Other Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Plan Effective Date, each insurance policy to which the Debtors are a party as of the Plan Effective Date shall be assumed by the Reorganized Company unless such insurance policy (i) was rejected by the Debtors pursuant to a Bankruptcy Court order or (ii) is the subject of a motion to reject pending on the date of the Confirmation Hearing.

Except as set forth in ARTICLE IV.S.1 of the Plan, nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening) (a) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of the Debtors' insurance policies, including the D&O Liability Insurance Policies, or (b) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Reorganized Company or draw on any collateral or security therefor; for the avoidance of doubt, the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in this Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (x) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (y) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (i) workers' compensation claims, (ii) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (iii) all costs in relation to each of the foregoing.

Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, insureds, Debtors, and the Reorganized Company, as applicable, under the insurance policies in any manner, and such insurance carriers, insureds, Debtors, and the Reorganized Company, as applicable, shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be

enforceable by and against, the insureds and the Reorganized Company, as applicable, in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Plan Effective Date.

T.     *Management Incentive Plan*

On or after the Plan Effective Date, the Management Incentive Plan shall be established by the Reorganized Company pursuant to the terms of the Management Incentive Plan Term Sheet.

U.     *Subordination Agreements*

Pursuant to section 510(a) of the Bankruptcy Code, all subordination agreements, including but not limited to, the Intercreditor Agreement, governing Claims or Interests shall be enforced in accordance with such agreement's terms; *provided*, that if the Second Lien Term Loan Claims Class votes in favor of the Plan, Required Lenders (as defined in the First Lien Credit Agreement) shall waive, and shall cause the First Lien Agent to waive, any turnover or similar rights in favor of the First Lien Lenders on account of the Intercreditor Agreement with respect to any distribution to which the Holders of Second Lien Term Loan Claims are entitled pursuant to ARTICLE III.B.4 of the Plan.

V.     *Payment of Second Lien Ad Hoc Group Advisors and Senior Unsecured Notes Ad Hoc Group Advisors*

On the Plan Effective Date, the Debtors shall (a) if Class 4 votes to accept the Plan, pay all outstanding Second Lien Ad Hoc Group Advisor Fees in accordance with ARTICLE III.B.4; *provided*, *that*, for the avoidance of doubt, the payment of Second Lien Ad Hoc Group Advisor Fees shall in no event exceed $18 million, subject to ratable reduction if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold as set forth in ARTICLE III.B.4.c.i and (b) if Class 5 votes to accept the Plan, pay all Senior Unsecured Notes Ad Hoc Group Advisor Fees in accordance with ARTICLE III.B.5; *provided*, *that*, for the avoidance of doubt, the payment of the Senior Unsecured Notes Ad Hoc Group Advisors Fees shall in no event exceed $21 million, subject to ratable reduction if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold as set forth in ARTICLE III.B.5.c.i; *provided*, *further*, that the Second Lien Ad Hoc Group Advisors and the Senior Unsecured Notes Ad Hoc Group Advisors, as applicable, submit an invoice, in summary form to the Debtors, no later than five (5) Business Days prior to Plan Effective Date.  The summary invoice shall not be required to include time entry detail but shall include a summary regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates (except for financial advisors compensated on other than an hourly basis), and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or for any benefits of the attorney work-product doctrine; provided that the Debtors reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals, subject to redaction for privilege.

W.     *Closing of Chapter 11 Cases*

After an Estate has been fully administered, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules; provided that, as of the Plan Effective Date, the Reorganized Debtors may submit orders to the Bankruptcy Court under certification of counsel closing individual Chapter 11 Cases and changing the caption of the Chapter 11 cases accordingly; provided further that, matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

X.      *Dissolution of Certain Debtors*

On or after the Plan Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or similar governing body of the Debtors or the Reorganized Debtors. The Reorganized Debtors shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable: (1) file a certificate of dissolution for such entities, together with all other necessary corporate and company documents, to effect the dissolution of such entities under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of such Debtors, as determined under applicable tax laws; and (3) represent the interests of such Debtors before any taxing authority in all tax matters, including any action, proceeding or audit.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Plan Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease (including those set forth in the Assumption Schedule) shall be assumed and assigned to the applicable Reorganized Debtor in accordance with the provisions and requirements of section 365 and 1123 of the Bankruptcy Code, other than: (i) those that are identified on the Rejection Schedule; (ii) those that have been previously rejected by a Final Order; (iii) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (iv) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Plan Effective Date.

Subject to the occurrence of the Plan Effective Date, entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumption Schedule, and the Rejection Schedule pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Company has provided adequate assurance of future performance under such assumed Executory Contracts and Unexpired Leases; provided, however, that any assumption of an Executory Contract or Unexpired Lease is further subject to the resolution of any Assumption Dispute in accordance with ARTICLE V.D of the Plan and payment of the applicable Cure Claim, if any. Except as otherwise specifically set forth herein or in the Confirmation Order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Plan Effective Date.

Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume or assume and assign Executory Contracts or Unexpired Leases pending on the Plan Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Plan Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Company with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Plan Effective Date.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such

provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control" or "change in control" under any lease, contract, or agreement to which a Debtor is a party.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by thirty (30) days from the date of entry of an order of the Bankruptcy Court approving such rejection (including the Confirmation Order). **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors or the Reorganized Company, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Company, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and may be objected to in accordance with the provisions of <u>ARTICLE VII.E</u> of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash, on the Plan Effective Date, or as soon as reasonably practicable thereafter, of the cure amount set forth on the Assumption Schedule for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon the payment of the Cure Claim. The Debtors may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Any party that fails to object to the applicable cure amount listed on the Assumption Schedule within fourteen (14) calendar days of the filing thereof shall be forever barred, estopped, and enjoined from disputing the cure amount set forth on the Assumption Schedule (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Assumption Schedule.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Dispute Resolution*

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Debtors or the Reorganized Company to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or the cure of defaults required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by (x) a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or (y) as may be agreed upon by the Debtors and the counterparty to the Executory Contract or Unexpired Lease without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided, that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the party or parties to such Executory Contract or Unexpired Lease or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtor or Reorganized Debtor, as applicable. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (an "***Adjourned Cure Dispute***"); provided, that the Reorganized Company may settle any Adjourned Cure Dispute after the Plan Effective Date without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests in favor of the Debtors, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumption Schedule, or the Rejection Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or, after the Plan Effective Date, the Reorganized Company shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

G.    *Nonoccurrence of Plan Effective Date; Bankruptcy Code Section 365(d)(4)*

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Plan Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Allowed Claim or Allowed Interest in the amount that the Plan provides. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in <u>ARTICLE VII</u> of the Plan. Except as specifically provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Plan Effective Date.

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; <u>provided</u>, <u>that</u> Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor. Any such Claims shall be released pursuant to <u>ARTICLE VIII</u> of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

B.    *Rights and Powers of Distribution Agent*

The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy

Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

C.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.     Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date; provided, that the Distribution Record Date shall not apply to any publicly held securities held in the name of, or by a nominee of, DTC (including, without limitation, the Senior Unsecured Notes Claims), as to which distributions may be made in accordance with the applicable procedures of DTC.

2.     Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any Holder or permitted designee, as applicable, of an Allowed Claim or Allowed Interest shall be made to the Distribution Agent, who shall transmit such distribution to the applicable Holders or permitted designees of Allowed Claims or Allowed Interests on behalf of the applicable Debtors. All distributions shall be deemed completed when made to the Distribution Agent. In the event that any distribution to any Holder or permitted designee is returned as undeliverable, no further distributions shall be made to such Holder or such permitted designee unless and until the Distribution Agent is notified in writing of such Holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such Holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Distribution Agent to attempt to locate Holders or permitted designees, as applicable, of undeliverable distributions.

Notwithstanding the foregoing, all distributions of Cash on account of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims, if any, shall be deposited with the First Lien Agent, the Second Lien Agent, and the Senior Unsecured Notes Trustee, as applicable, for distribution to Holders of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims in accordance with the terms of the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Senior Unsecured Notes Indenture, as applicable. All distributions other than of Cash on account of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims, if any, may, with the consent of the First Lien Agent, the Second Lien Agent, and the Senior Unsecured Notes Trustee, as applicable, be made by the Distribution Agent directly to Holders of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims in accordance with the terms of the Plan, the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Senior Unsecured Notes Indenture, as applicable. To the extent the First Lien Agent, the Second Lien Agent, or the Senior Unsecured Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the First Lien Agent, the Second Lien Agent, and the Senior Unsecured Notes Trustee shall be deemed a "Distribution Agent" for purposes of the Plan. Notwithstanding the foregoing, with respect to any Claims held in the name of, or by a nominee of, DTC, the Reorganized Company and the Distribution Agent shall make such distribution through the facilities of DTC.

The amount of any reasonable and documented fees and expenses incurred by the Distribution Agent in connection with making distributions (including, without limitation, reasonable attorneys' fees and expenses) shall be paid in Cash by the Reorganized Company and will not be deducted from distributions made to Holders of First Lien Claims, Second Lien Term Loan Claims, and Senior Unsecured Notes Claims, as applicable. The foregoing reasonable and documented fees and expenses shall be paid in

the ordinary course, upon presentation of reasonably detailed invoices to the Reorganized Company and without the need for approval by the Bankruptcy Court.

All securities to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent or the Reorganized Debtors, as determined by the Debtors or the Reorganized Debtors, as applicable.

3. <u>No Fractional Shares</u>

No fractional shares or units of Reorganized Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of shares or units of Reorganized Equity that is not a whole number, such Reorganized Equity shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof. The total number of authorized and/or issued shares or units of Reorganized Equity to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

4. <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then- current address of such Holder, at which time such distribution shall be made to such Holder without interest; <u>provided</u> <u>that</u> such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of this <u>ARTICLE VI.C.4</u>, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed), except for such unclaimed Reorganized Equity, which shall be cancelled, and all other unclaimed property or interests in property shall revert to and vest in the Reorganized Company without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Distribution Agent of an intent to accept a particular distribution; (iii) responded to the Distribution Agent's requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

D. *Securities Registration Exemption*

The issuance and distribution under the Plan of the Reorganized Equity to Holders of First Lien Claims on account of their Allowed Claims shall, in each case, be exempt from registration under the Securities Act or any other applicable securities laws to the fullest extent permitted by section 1145(a) of the Bankruptcy Code or, with respect to any "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act.

With respect to the foregoing securities issued pursuant to section 1145(a) of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an

"underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The issuance and distribution under the Plan of the Subscription Rights and the Reorganized Equity in the Equity Rights Offering, including upon the exercise of the Subscription Rights, to the Equity Rights Offering Backstop Parties on account of any Equity Rights Offering Shares that are not purchased by Holders of Allowed First Lien Claims as part of the Equity Rights Offering, any Direct Investment Shares, and any Reorganized Equity issued on account of the Equity Rights Offering Backstop Premium, will be issued pursuant to the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act. Such Reorganized Equity will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

None of the Debtors, the Reorganized Company, or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the Reorganized Equity under applicable securities laws. DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Equity are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

Notwithstanding anything to the contrary in this Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the Reorganized Equity are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

E.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Distribution Agent and Reorganized Company, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. In the case of a Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Allowed Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent and Reorganized Company, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, requiring the intended recipient of such distribution to provide an amount of Cash sufficient to satisfy such withholding tax or establishing any other mechanisms they believe are reasonable and appropriate. If an intended recipient of a Plan Distribution has agreed to provide the Distribution Agent or Reorganized Company, as applicable, with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such

distribution. The Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

F.      *Allocations*

Unless otherwise required by law (as reasonably determined by the Debtors), distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed herein.

G.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

H.      *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Debtors or the Reorganized Company, as applicable, may, but shall not be required to, set off against or recoup from any claims of any nature whatsoever that the Debtors or the Reorganized Company may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Company of any such claim they may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or the Reorganized Company, as applicable, unless (i) the Debtors have consented (which consent shall not be unreasonably withheld) and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

I.      *Claims Paid or Payable by Third Parties*

        1.      Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the Reorganized Company, or the Distribution Agent. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Reorganized Company, or the Distribution Agent on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the Debtor, the Reorganized Company, or the Distribution Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. In the event such Holder fails to timely repay or return such distribution, the Debtors or the Reorganized Company may pursue any rights and remedies against such Holder under applicable law.

        2.      Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

A.     *Allowance of Claims and Interests*

After the Plan Effective Date, the Reorganized Company shall have and retain any and all rights and defenses each Debtor had with respect to any Claim or Interest immediately before the Plan Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order, Allowing such Claim or Interest.

B.     *Claims and Interests Administration Responsibilities*

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Plan Effective Date, the Reorganized Company shall have the authority (i) to file, withdraw, or litigate to judgment objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Plan Effective Date, the Reorganized Company shall have and retain any and all rights and defenses the Debtors had immediately prior to the Plan Effective Date with respect to any Disputed Claim or Disputed Interest, including the Retained Causes of Action.

C.     *Estimation of Claims*

Before or after the Plan Effective Date, the Debtors or the Reorganized Company, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the

appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Reorganized Company, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim or Interest is estimated. All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.       *Adjustment to Claims Register Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Company upon stipulation between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.       *Time to File Objections to Claims*

The Debtors and the Reorganized Company, as applicable, shall be entitled to object to Claims. After the Plan Effective Date, except as expressly provided herein to the contrary, the Reorganized Company shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim and requests for payment of Administrative Claims shall be served and Filed on or before the Claims Objection Deadline. The expiration of such period shall not limit or affect the Debtors' or the Reorganized Company's rights to dispute Claims asserted in the ordinary course of business other than through a Proof of Claim.

F.       *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable pursuant to a Cause of Action under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable pursuant to a Cause of Action under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Company. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

G.       *Amendments to Claims*

On or after the Claims Bar Date and Administrative Claims Bar Date, as applicable, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Company. Absent such authorization, any new

or amended Claim Filed after the Claims Bar Date and Administrative Claims Bar Date, as applicable, shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

H.      *No Distributions Pending Allowance*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

I.      *Distributions After Allowance*

As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Reorganized Company shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Plan Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable nonbankruptcy law.

J.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one-hundred percent (100%) of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Reorganized Company may compromise and settle Claims against, and Interests in, the Debtors and their Estates and the Retained Causes of Action.

B.      *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan (including with respect to Claims that are Reinstated by the Plan) or in a contract, instrument, or

other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring, and, upon the Plan Effective Date, all Holders of such Claims and Interests shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors, the Reorganized Company, or any of their Assets or property.

C.      *Releases by the Debtors*

Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Plan Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered

into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in this ARTICLE VIII.C shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.

D.      *Releases by Holders of Claims and Interests*

Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Plan Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of

confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in this ARTICLE VIII.D shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

E.    *Releases of Directors and Officers of Wage and Labor Laws*

As of the Effective Date, all current and former directors, managers, officers, employees, and managing agents of the Debtors who are provided notice of the release set forth in this ARTICLE VIII.E will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by all current and former employees, full-time workers, part-time workers, temporary workers, or workers placed by third-party staffing agencies (each, an "***Employee***") unless such Employee expressly elects in writing to opt-out of the releases (via timely (1) submitting an opt-out form, (2) Filing a formal objection on the docket of the Chapter 11 Cases, or (3) providing an informal objection to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before confirmation), from any and all Claims and Causes of Action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Employee or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them have, had or would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any Employee or other Person, arising out of or relating to, in whole or in part, the employment of the Employee by the Debtors, including any Claims arising under or related to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., or any related or similar federal or state wage and labor laws.

F.    *Exculpation*

Without affecting or limiting the releases set forth in ARTICLE VIII.C and ARTICLE VIII.D of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP

Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Reorganized Debt and the Equity Rights Offering, the pursuit of consummation of the Plan Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.

G.     *Injunction*

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE PLAN EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE VIII.F OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF

ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE INJUNCTIONS IN THIS ARTICLE VIII.G SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

**NOTWTHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF A HOLDER OF A CLAIM OR INTEREST TIMELY OPTS OUT OF OR OBJECTS TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE THE CONFIRMATION DATE, SUCH HOLDER SHALL NOT BE BOUND BY THE RELEASES SET FORTH IN D OR THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G WITH RESPECT TO THE RELEASED PARTIES (OTHER THAN THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES); PROVIDED THAT, THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G SHALL STILL APPLY TO (I) CLAIMS SUBJECT TO THE EXCULPATION SET FORTH IN ARTICLE VIII.F AND (II) ANY ACTIONS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES; PROVIED FURTHER, THAT THE INJUNCTION PROTOCOL SET FORTH IN ARTICLE VIII.G.1 SHALL STILL APPLY AND ANY SUCH HOLDER SHALL BE BOUND BY THE INJUNCTION PROTOCOL.**

1.     Injunction Protocol

**NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASES PRIOR TO THE PLAN EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH DEBTOR, REORGANIZED DEBTOR, OR RELEASED PARTY (THE "INJUNCTION PROTOCOL").  THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.**

H.      *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise that a Holder of a Claim or Interest may have against other Holders of Claims or Interests with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

I.      *Release of Liens*

Except (i) with respect to the Liens securing the New Reorganized Debt or (ii) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Company, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Company and its successors and assigns. On and after the Plan Effective Date, the Reorganized Company (and any of its respective agents, attorneys or designees) shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases or such other forms or release documents as may be necessary or appropriate to evidence such releases and implement the provisions of this ARTICLE VIII.I.

J.      *Waiver of Statutory Limitations on Releases*

Each Releasing Party in each of the releases contained in this Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party. The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, or foreseen or unforeseen.

### ARTICLE IX.
### CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Plan Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Plan Effective Date (or shall be waived pursuant to ARTICLE IX.B of the Plan):

1.      the Restructuring Support Agreement shall not have been terminated as to the Required Consenting First Lien Lenders and shall be in full force and effect;

2.      the Bankruptcy Court shall have entered the Cash Collateral Order and the DIP Order, the latter of which shall be in full force and effect;

3.      the Equity Rights Offering Backstop Commitment Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall be in full force and effect;

4.      the Equity Rights Offering (including the Equity Rights Offering Procedures) shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall have been consummated in accordance with its terms;

5.      all Milestones shall have been met or waived in accordance with the terms of the Restructuring Support Agreement;

6.      the Exit First Lien Term Loan Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting First Lien Lenders), other than such conditions that related to the effectiveness of the Plan and related transactions;

7.      the Reorganized Equity shall have been issued;

8.      the Professional Fee Escrow shall have been established and funded;

9.      all (i) Restructuring Expenses and in accordance with <u>ARTICLE IV.V</u>, (ii) if Class 4 votes to accept the Plan, the Second Lien Ad Hoc Group Advisor Fees and (iii) if Class 5 votes to accept the Plan, all Senior Unsecured Notes Ad Hoc Group Advisors Fees shall have been paid in full in Cash;

10.     the Definitive Documents shall (i) be materially consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms materially consistent with the Restructuring Support Agreement and the Restructuring Term Sheet;

11.     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions; and

12.     there shall be no outstanding complaint for the determination of dischargeability of a debt in excess of $5,000,000 pursuant to section 523 of the Bankruptcy Code and/or Bankruptcy Rule 4007 (a "***Dischargeability Complaint***") (and no outstanding request for extension of time to file the same) and the Bankruptcy Court shall not have ruled in favor of any such complaint and/or request; *provided*, *that*, pending resolution of a Dischargeability Complaint, the Milestone for the Plan Effective Date shall be automatically extended one time by forty-five (45) days;

*provided*, *that*, notwithstanding when a condition precedent to the Plan Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously with the other conditions precedent to the Plan Effective Date; <u>provided</u>, <u>further</u>, that to the extent a condition precedent (a "***Prerequisite Condition***") may be required to occur prior to another condition precedent (a "***Subsequent Condition***") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred

immediately prior to the Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

B.     *Waiver of Conditions*

The conditions to the Plan Effective Date set forth in this <u>ARTICLE IX</u> may be waived only by the Debtors, with the consent of the Required Consenting First Lien Lenders (such consent not to be unreasonably withheld), as applicable, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

C.     *Substantial Consummation*

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Plan Effective Date.

D.     *Effect of Non-Occurrence of Conditions to the Plan Effective Date*

If the Plan Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.

E.     *Notice of Plan Effective Date*

The Debtors shall file in the Chapter 11 Cases a notice of Plan Effective Date within two (2) Business Days of the Plan Effective Date.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.     *Modification and Amendments*

The Debtors, with the consent of the Required Consenting First Lien Lenders, reserve the right to modify the Plan and seek confirmation of the Plan consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan; *provided*, *however*, that if the proposed modification of the Plan has a material and adverse effect on the economic rights or releases of the Required Consenting Second Lien Term Lenders, the Required Consenting Senior Unsecured Noteholders, or the Consenting Sponsors, then such modification shall require the consent of the Required Consenting Second Lien Term Lenders, the Required Consenting Senior Unsecured Noteholders, or the Consenting Sponsors, as applicable (which consent shall not be unreasonably withheld, conditioned, or delayed). Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of the Required Consenting First Lien Lenders, expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

Notwithstanding the above, prior to the Plan Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan or if confirmation and consummation of the Plan do not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, on and after the Plan Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.    Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests; provided, that for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Company, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to (i) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner (whether through amendment of the Assumption Schedule or Rejection Schedule or otherwise) and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease and (ii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Plan Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action related to the Chapter 11 Cases;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, injunctions, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in ARTICLE VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to ARTICLE VI.I of the Plan;

13.     to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a cure amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order, in each case, in accordance with the Restructuring Support Agreement;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

20.     hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan;

22.     enforce all orders previously entered by the Bankruptcy Court;

23.     hear any other matter not inconsistent with the Bankruptcy Code and the Judicial Code;

24.     enter an order concluding or closing the Chapter 11 Cases;

25.     recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

26.     to enter a final decree closing each of the Chapter 11 Cases; and

27.     enforce the compromise, settlement, discharge, injunction, release, and exculpation provisions set forth in ARTICLE VIII of the Plan.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to ARTICLE IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Plan Effective Date, upon the effectiveness of the Plan, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and the Reorganized Company, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.     *Additional Documents*

On or before the Plan Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees*

All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Plan Effective Date shall be paid by the Debtors or the Reorganized Debtors as applicable.  On and after the Plan Effective Date, the Reorganized Company shall pay any and all such fees in full in Cash when due and payable and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

D.     *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with ARTICLE IX.A of the Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any other party, including the Released Parties, with respect to the Holders of Claims or Interests or any other matter prior to the Plan Effective Date.

E.     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, Related Party, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.     *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors and the Consenting Stakeholders shall be served on:

| | |
|---|---|
| Debtors: | H-Food Holdings, LLC<br>3333 Finley Rd., Suite 800<br>Downers Grove, IL 60515<br>Attn:    Roger E. Harris<br>Email:  RHarris@hearthsidefood.com |
| Counsel to the Debtors: | Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY 10036-8704 |

|  | Attn:  Ryan Preston Dahl |
|--|--|

Attn:  Ryan Preston Dahl
         Matthew M. Roose
         Natasha S. Hwangpo
Email:  Ryan.Dahl@ropesgray.com
         Matthew.Roose@ropesgray.com
         Natasha.Hwangpo@ropesgray.com

Co-Counsel to the Debtors:

Porter Hedges LLP
1000 Main Street
36th Floor
Houston, TX 77002
Attn:  John F. Higgins
       M. Shane Johnson
Email:  jhiggins@porterhedges.com
       sjohnson@porterhedges.com

Counsel to the First Lien Ad Hoc Group:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attn:  Scott J. Greenberg
       Matthew J. Williams
       Joshua Brody
Email:  SGreenberg@gibsondunn.com
       MJWilliams@gibsondunn.com
       JBrody@gibsondunn.com

- and -

Howley Law PLLC
700 Louisiana Street
Suite 4545
Houston, TX 77002
Attn:  Tom Howley
       Eric Terry
Email:  tom@howley-law.com
       eric@howley-law.com

Counsel to the Second Lien Ad Hoc Group:

Proskauer Rose LLP
11 Times Square
New York, NY 10036-8299
Attn:  Vincent Indelicato
       Matthew R. Koch
Email:  VIndelicato@proskauer.com
       MKoch@proskauer.com

- and -

Gray Reed
1300 Post Oak Boulevard
Suite 2000
Houston, TX 77056

|  | Attn:   Jason S. Brookner |
|  | Email:  jbrookner@grayreed.com |

| Counsel to the Senior Unsecured Notes Ad Hoc Group: | Paul Hastings LLP<br>200 Park Avenue<br>New York, NY 10166<br>Attn:   Kris Hansen<br>          Jon Canfield<br>Email:  KrisHansen@paulhastings.com<br>          JonCanfield@paulhastings.com |

- and -

2001 Ross Avenue, Suite 2700
Dallas, TX 75201
Attn:   Charles Persons
Email:  CharlesPersons@paulhastings.com

- and -

4655 Executive Drive, Suite 350
San Diego, CA 92121
Attn:   Jason Pierce
Email:  JasonPierce@paulhastings.com

| Counsel to SnackTime PG Holdings, Inc. and Snack Time Summit Holdings, Inc.: | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001-2163<br>Attn:   Samuel A. Khalil<br>Email:  SKhalil@milbank.com |

| Counsel to CB Metafora Aggregator, LLC: | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn:   Brian Schartz<br>          Jimmy Ryan<br>Email:  Brian.Schartz@kirkland.com<br>          Jimmy.Ryan@kirkland.com |

| Proposed Counsel to the Creditors' Committee: | Lowenstein Sandler LLP<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Attn:   Jeffrey L. Cohen<br>          David M. Posner<br>          Bruce S. Nathan<br>Email:  jcohen@lowenstein.com<br>          dposner@lowenstein.com<br>          bnathan@lowenstein.com |

Proposed Co-Counsel to the Creditors'
Committee:

McDermott Will & Emery LLP
845 Texas Avenue, Suite 40000
Houston, TX 77002-1656
Attn:    Charles R. Gibbs (TX Bar No. 07846300)
         Grayson Williams (TX Bar No. 24124561)
Email:  crgibbs@mwe.com
         gwilliams@mwe.com

After the occurrence of the Plan Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, and such entities must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not File such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Plan Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have Filed such renewed requests.

G.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.    *Entire Agreement*

The Plan, Plan Supplement, Confirmation Order, and the Restructuring Support Agreement (assumption of which agreements is approved by the Confirmation Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

I.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, at the request of the Debtors, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be reasonably acceptable to (x) the Debtors and (y) the Required Consenting First Lien Lenders. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent (such consent not to be unreasonably withheld, conditioned, or delayed) from (x) the Debtors and (y) the Required Consenting First Lien Lenders; and (iii) nonseverable and mutually dependent.

J.    *Dissolution of Committee*

On the Plan Effective Date, any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve; provided that following the Plan Effective Date, any such committees, including the Creditors' Committee, shall continue in existence solely for the purpose of filing

and prosecuting applications for allowance of Professional Fee Claims.  Upon the dissolution of any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, such committee members and their respective Professionals shall cease to have any duty, obligation, or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

K.      *Expedited Tax Determination*

The Debtors and Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed or to be filed for or on behalf of the Debtors for all taxable periods ending after the Petition Date through the Plan Effective Date.

L.      *Creditor Default*

An act or omission by a Holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and may be entitled to reimbursement for their reasonable attorneys' fees and costs incurred in remedying such default. Upon the finding of such a default by a Holder of a Claim or Interest, the Bankruptcy Court may: (1) designate a party to appear, sign, and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (2) enforce the Plan by order of specific performance; (3) award judgment against such defaulting Holder of a Claim or Interest in favor of the Reorganized Debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (4) make such other Order as may be equitable that does not materially alter the terms of the Plan.

Respectfully submitted, as of January 24, 2025

H-Food Holdings, LLC
(on behalf of itself and its affiliated Debtors)

By:     */s/ Robert M. Caruso*
        Name:  Robert M. Caruso
        Title:   Chief Restructuring Officer
                H-Food Holdings, LLC, and
                its affiliated Debtors

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO.  ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE RULES, STATUTES OR DOCTRINES OF SIMILAR IMPORT PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS, WHETHER ARISING UNDER FEDERAL OR STATE LAW.

THIS RESTRUCTURING SUPPORT AGREEMENT IS FOR DISCUSSION PURPOSES ONLY AND DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT IN ALL RESPECTS TO THE COMPLETION OF DEFINITIVE DOCUMENTS REFLECTING THE TERMS AND CONDITIONS SET FORTH HEREIN.  THE CLOSING OF ANY SUCH TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

### *THIRD AMENDED & RESTATED RESTRUCTURING SUPPORT AGREEMENT*

This THIRD AMENDED & RESTATED RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with <u>Section 16.02</u>, this "**Agreement**") is made and entered into as of November 22, 2024 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (v) of this preamble, collectively, the "**Parties**"):

(i)     Matterhorn Buyer, LLC, a company formed under the Laws of Delaware ("**Matterhorn Buyer**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

(ii)    the undersigned beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, First Lien Claims (as defined below) that have executed and delivered counterpart signature pages to this Agreement (in each case solely in their capacity as such, together with

each First Lien Lender (as defined below) that executed and delivers a Transfer Agreement to counsel to the Company Parties, collectively, the "**Consenting First Lien Lenders**") to counsel to the Company Parties and counsel to the Consenting First Lien Lenders;

(iii) the undersigned beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, Second Lien Term Loan Claims (as defined below) that have executed and delivered counterpart signature pages to this Agreement (in each case solely in their capacity as such, together with each Second Lien Term Lender (as defined below) that executed and delivers a Transfer Agreement to counsel to the Company Parties, collectively, the "**Consenting Second Lien Term Lenders**") to counsel to the Company Parties and counsel to the Consenting Second Lien Term Lenders;

(iv) the undersigned beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, Senior Note Claims (as defined below) that have executed and delivered counterpart signature pages to this Agreement (in each case solely in their capacity as such, together with each Senior Noteholder (as defined below) that executed and delivers a Transfer Agreement to counsel to the Company Parties, collectively, the "**Consenting Senior Unsecured Noteholders**") to counsel to the Company Parties and counsel to the Consenting Senior Unsecured Noteholders; and

(v) SnackTime PG Holdings, Inc., Snack Time Summit Holdings, Inc., CB Metafora Aggregator, LLC, and other affiliated equity holders that have executed and delivered counterpart signature pages to this Agreement (each, a "**Consenting Sponsor**" and, together with the Consenting First Lien Lenders, the Consenting Second Lien Term Lenders, and the Consenting Senior Unsecured Noteholders, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, and related transactions or steps to be taken in connection therewith, the "**Restructuring Transactions**"), the interim cash collateral order setting forth the terms of the Debtors' consensual use of cash collateral substantially in the form attached as **Exhibit C** hereto (the "**Cash Collateral Order**"), and the DIP Commitment Letter attached as **Exhibit D** hereto (the "**DIP Commitment Letter**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary prearranged cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**");

**WHEREAS**, on the date hereof: (a) the Company Parties and (b) the Consenting Stakeholders have agreed to the Restructuring Term Sheet, which sets forth the principal economic terms of the Restructuring Transactions that shall be consummated upon the execution of final documents containing terms consistent in all material respects with those set forth in the Restructuring Term Sheet and such other terms as agreed to by the Parties;

**WHEREAS**, the Parties have agreed to support the Restructuring Transactions subject to and in accordance with the terms of this Agreement and desire to work together to complete the negotiation of the terms of the documents and the completion of each of the actions necessary or desirable to effectuate the Restructuring Transactions; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants, representations, warranties, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**      ***Definitions and Interpretation.***

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**<u>Affiliate</u>**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**<u>Agent</u>**" means any administrative agent, collateral agent, or similar Entity under the First Lien Credit Agreement, or Second Lien Credit Agreement, including any successors thereto.

"**<u>Agents/Trustees</u>**" means, collectively, each of the Agents and Trustees.

"**<u>Agreement</u>**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with <u>Section 16.02</u> (including the Restructuring Term Sheet).

"**<u>Agreement Effective Date</u>**" means the date on which the conditions set forth in <u>Section 2</u> have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**<u>Agreement Effective Period</u>**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**<u>Alternative Restructuring Transaction</u>**" means any written proposal, term sheet, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment,

3

equity investment, liquidation, tender offer, recapitalization, chapter 11 plan, share exchange, business combination, or similar transaction involving all, substantially all or a material portion of the Company Parties and/or their assets that is an alternative to one or more of the Restructuring Transactions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral Order**" has the meaning set forth in the recitals to this Agreement.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the First Lien Claims, the Second Lien Term Loans Claims, and the Senior Unsecured Notes Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Company Releasing Party**" means each of the Company Parties, and, to the maximum extent permitted by law, each of the Company Parties, on behalf of their respective Affiliates and Related Parties.

4

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Junior Stakeholders**" means the Consenting Second Lien Term Lenders, the Consenting Senior Unsecured Noteholders, and each Consenting Sponsor.

"**Consenting Second Lien Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Senior Unsecured Noteholders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting Sponsor**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sponsors' Advisors**" means, (a) Kirkland & Ellis LLP as counsel to Charlesbank Capital Partners LLC, (b) Milbank LLP as legal counsel to Partners Group (USA) Inc., and (c) local counsel to be engaged by the Consenting Sponsors, and (d) Greenhill & Co., LLC as investment banker to Charlesbank Capital Partners LLC and Partners Group (USA) Inc.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholder Releasing Party**" means, each of, and in each case in its capacity as such: (a) the Consenting Stakeholders; (b) the Agents/Trustees; (c) and to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (d); and (d) to the maximum extent permitted by Law, each Related Party of each Entity in clause (a) through this clause (d).

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Claims**" means claims arising on account of the DIP Obligations.

"**DIP Commitment Letter**" has the meaning set forth in the recitals to this Agreement.

"**DIP Documents**" means any documents governing the DIP Facility that are entered into in accordance with the Restructuring Term Sheet, the DIP Loan Agreement, the DIP Term Sheet, the DIP Budget, the DIP Order, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"**DIP Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**DIP Lenders**" means the lenders with respect to the DIP Facility.

"**DIP Loan Agreement**" means the credit agreement with respect to the DIP Facility, as may be amended, supplemented, or otherwise modified from to time.

"**DIP Obligations**" has the meaning set forth in the Restructuring Term Sheet.

"**DIP Order**" means the final order of the Bankruptcy Court setting forth the terms of the Debtors' consensual use of cash collateral and debtor-in-possession financing.

"**Disclosable Economic Interest**" shall have the meaning set forth in Rule 2019 of the Federal Rules of Bankruptcy Procedure.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, including all exhibits and schedules thereto, as amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

"**Disclosure Statement Motion**" means the motion filed with the Bankruptcy Court seeking entry of the Disclosure Statement Order.

"**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the adequacy of the Disclosure Statement pursuant to sections 1125, 1126(b), and 1145 of the Bankruptcy Code, which order may be the Confirmation Order.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Equity Rights Offering**" means the equity rights offering to be consummated by Reorganized Company on the Plan Effective Date in accordance with the Equity Rights Offering Documents, pursuant to which it shall issue shares of New Common Stock.

"**Equity Rights Offering Documents**" means, collectively, the Equity Rights Offering Procedures and other material documents necessary to implement the Equity Rights Offering.

"**Equity Rights Offering Procedures**" means those certain rights offering procedures with respect to the Equity Rights Offering, as approved by the Bankruptcy Court, which shall be in form and substance acceptable to the Required Consenting First Lien Lenders.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit First Lien Term Loan Facility**" means the term loan credit facility in an aggregate principal amount of $725 million to be provided on the terms and conditions set forth in the Exit First Lien Term Loans Term Sheet and the Exit First Lien Term Loan Facility Documents.

"**Exit First Lien Term Loan Facility Documents**" means collectively, all agreements, documents, and instruments delivered or entered into in connection with the Exit First Lien Term Loans (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

"**Exit Revolving Facility**" means the asset-based lending facility up to $375 million with the capacity for the issuance of letters of credit entered into pursuant to the Exit Revolving Facility Documents.

"**Exit Revolving Facility Documents**" means the agreements memorializing the Exit Revolving Facility, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages, deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Exit First Lien Term Loan Facility.

"**First Day Pleadings**" means the first-day and second-day pleadings that the Company Parties determine are necessary or desirable to file with the Bankruptcy Court.

"**First Lien Ad Hoc Group**" means certain of the Consenting First Lien Lenders that are members of an ad hoc group represented by the First Lien Ad Hoc Group Advisors.

"**First Lien Ad Hoc Group Advisors**" means, collectively, (a) Gibson, Dunn & Crutcher LLP as legal advisor, (b) PJT Partners, Inc. as investment banker, (c) JZ Advisors LLC, as restructuring advisor, (d) Lyons, Benenson & Company Inc. as compensation consultant, (e) Howley Law PLLC as local counsel, (f) Spencer Stuart International (U.S.) Inc. as executive/board search advisor, and (g) any other professionals or advisors retained by the First Lien Ad Hoc Group; provided, that, prior to the engagement of further professionals or advisors under (f) hereof, the First Lien Ad Hoc Group Advisors consult with the Company Parties.

"**First Lien Ad Hoc Group Restructuring Expenses**" means the reasonable and documented fees, costs, and out-of-pocket expenses of the Agent and the First Lien Ad Hoc Group Advisors (which shall include, for the avoidance of doubt, the advisors to the Agents under the First Lien Credit Agreement and the DIP Facility), which are incurred (a) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing and, to the extent applicable, and/or (b)(i) consistent with any engagement letters or fee reimbursement letters entered into between the Company Parties on the one hand, and the applicable First Lien Ad Hoc Group Advisors and advisors to the Agents on the other hand (as supplemented and/or modified by this Agreement),

(ii) provided in the First Lien Credit Agreement, and/or (iii) as provided in the Cash Collateral Order and  DIP Order and/or the Confirmation Order.

"**First Lien Claims**" means any Claim on account of the First Lien Loans.

"**First Lien Credit Agreement**" means the *Credit Agreement*, dated as of May 23, 2018, between H-Food Holdings, LLC, as the U.S. Borrower (as defined in the First Lien Credit Agreement), Hearthside Bidco B.V., as the Dutch Borrower (as defined in the First Lien Credit Agreement), Matterhorn Buyer, LLC, as Holdings (as defined in the First Lien Credit Agreement), Goldman Sachs Lending Partners LLC, as Administrative Agent and Collateral Agent (each as defined in the First Lien Credit Agreement), and the lenders party thereto (as amended, restated, supplemented, or otherwise modified from time to time).

"**First Lien Loans**" means the First Lien Term Loans and the First Lien Revolver Loans, in the aggregate.

"**First Lien Lender**" means a "Lender" as defined in the First Lien Credit Agreement.

"**First Lien Term Loan**" means term loans outstanding under the First Lien Credit Agreement.

"**First Lien Revolver Loans**" means revolving commitments outstanding under the First Lien Credit Agreement.

"**Insolvency Proceeding**" means any chapter 11 proceeding under the Bankruptcy Code with respect to any of the Company Parties.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Matterhorn Buyer**" has the meaning set forth in the preamble to this Agreement.

"**Milestone**" has the meaning set forth in Section 4.01 of this Agreement.

"**New Common Stock**" means the common stock in the Reorganized Company to be issued on the Plan Effective Date.

"**New Organizational Documents**" means the organizational and governance documents for each of the Reorganized Debtors, including, without limitation, certificates of incorporation (including any certificate of designations), certificates of formation or certificates of limited partnership (or equivalent organizational documents), certificates of designation, bylaws, limited liability company agreements, shareholders' agreements, and limited partnership agreements (or equivalent governing documents), as applicable, in each case, materially consistent with the terms and conditions set forth in this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan filed by the Debtors under chapter 11 of the Bankruptcy Code that implements the Restructuring Transactions.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court, as may be amended, modified, or supplemented from time to time on or prior to the Plan Effective Date.

"**Prepetition Facilities**" means, collectively, the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Senior Unsecured Notes Indenture.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Qualified Marketmaker Joinder Date**" has the meaning set forth in Section 9.05 of this Agreement.

"**Related Party**" shall have the meaning set forth in Annex 1 of Exhibit B.

"**Released Claim**" means, with respect to any Releasing Party, any Claim, or Cause of Action that is released by such Releasing Party under Section 15 of this Agreement.

"**Released Parties**" shall have the meaning set forth in Annex 1 of Exhibit B.

"**Releases**" means the releases contained in the Restructuring Term Sheet.

"**Releasing Parties**" shall have the meaning set forth in Annex 1 of Exhibit B.

"**Reorganized Company**" means HFS Matterhorn Topco, Inc. or any successors thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date.

"**Reorganized Debtors**" mean collectively, each of the Debtors and any successors thereto, by merger, consolidation, or otherwise, as reorganized on or after the Plan Effective Date, in accordance with the Plan.

"**Reorganized Equity**" means the common equity interests in the Reorganized Company.

"**Required Consenting First Lien Lenders**" means, as of the relevant date, three or more unaffiliated Consenting First Lien Lenders holding at least 50.01% of the aggregate outstanding principal amount of First Lien Loans that are held by Consenting First Lien Lenders.

"**Required Consenting Junior Stakeholders**" means the Required Consenting Second Lien Term Lenders, the Required Consenting Senior Unsecured Noteholders, and each Consenting Sponsor.

"**Required Consenting Second Lien Term Lenders**" means, as of the relevant date, Consenting Second Lien Term Lenders holding at least 66.67% of the aggregate outstanding principal amount of Second Lien Term Loans that are held by Consenting Second Lien Term Lenders.

"**Required Consenting Senior Unsecured Noteholders**" means, as of the relevant date, Consenting Senior Unsecured Noteholders holding at least 50.01% of the aggregate outstanding principal amount of Senior Unsecured Notes that are held by Consenting Senior Unsecured Noteholders.

"**Required Consenting Stakeholders**" means the Required Consenting First Lien Lenders, the Required Consenting Second Lien Term Lenders, the Required Consenting Senior Unsecured Noteholders, and each Consenting Sponsor.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of Regulation D under the Securities Act.

"**Second Lien Term Loans and Senior Unsecured Notes Advisors**" means, collectively, (i) Proskauer Rose LLP, (ii) FTI Consulting, (iii) Paul Hasting LLP, and (iv) Perella Weinberg Partners LP.

"**Second Lien Credit Agreement**" means the *Second Lien Credit Agreement*, dated as of November 25, 2018, between Matterhorn Buyer, LLC, as Holdings (as defined in the Second Lien Credit Agreement), H-Food Holdings, LLC, as the Borrower (as defined in the Second Lien Credit Agreement), Ares Capital Corporation, as Administrative Agent and Collateral Agent (each as defined in the Second Lien Credit Agreement), and the lenders party thereto (as amended, restated, supplemented, or otherwise modified from time to time).

"**Second Lien Term Lender**" means a "Lender" as defined in the Second Lien Credit Agreement.

"**Second Lien Term Loan**" means term loans outstanding under the Second Lien Credit Agreement.

"**Second Lien Term Loan Claims**" means any Claim on account of the Second Lien Term Loan.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Senior Unsecured Noteholder**" means a "Holder" as defined in the Senior Unsecured Notes Indenture.

"**Senior Unsecured Notes**" means the notes issued under the Senior Unsecured Notes Indenture.

"**Senior Unsecured Notes Indenture**" means the *Indenture*, dated as of May 23, 2018, between H-Food Holdings, LLC, and Hearthside Finance Company, Inc., as Issuers, certain subsidiaries of the Company as Subsidiary Guarantors, and U.S. Bank National Association as Trustee for 8.500% Senior Unsecured Notes due 2026 (as amended, restated, supplemented, or otherwise modified from time to time).

"**Senior Unsecured Notes Claim**" means any Claim on account of the Senior Unsecured Notes.

"**Solicitation Materials**" means the Disclosure Statement and all documents, forms and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"**Subscription Agreement**" means the subscription agreement setting forth the terms and conditions of the issuance of Reorganized Equity.

"**Tax Code**" means the Internal Revenue Code of 1986 (as amended).

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 13.01, 13.02, 13.03, 13.04, 13.05, or 13.06.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions),  including of any interest (including the granting of any proxies, depositing into a voting trust, entering into a voting agreement, or similar transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit E**.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under the Senior Unsecured Notes.

1.02.   Interpretation.  For purposes of this Agreement:

(a)     in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)     capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)     unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," or "officers" shall also include "members" or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not;

(j)     the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 16.11 other than counsel to the Company Parties;

(k)     unless otherwise specified herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein; and

(l)     the word "or" shall not be exclusive.

**Section 2.     *Effectiveness of this Agreement.*** This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each Company Party shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement:

      (i)     holders of at least two-thirds of the aggregate outstanding principal amount of First Lien Loans;

      (ii)     holders of at least two-thirds of the aggregate outstanding principal amount of Second Lien Term Loans;

      (iii)     holders of at least two-thirds of the aggregate outstanding principal amount of Senior Unsecured Notes; and

      (iv)     each of SnackTime PG Holdings, Inc., Snack Time Summit Holdings, Inc., and CB Metafora Aggregator, LLC shall have executed and delivered counterpart signature pages of this Agreement;

(c)     the Company Parties shall have executed any relevant engagement letters or fee arrangements of the First Lien Ad Hoc Group Advisors and paid, or caused to be paid, all First Lien Ad Hoc Group Restructuring Expenses for which an invoice with sufficient detail has been received by the Company Parties not less than two (2) Business Days prior to the Agreement Effective Date;

(d)     the DIP Commitment Letter shall have been executed and the Commitment Fee (as defined in the DIP Commitment Letter) shall have been paid;

(e)     Hearthside Sub, LLC shall have dividended all of the cash held by it in account number x8325 and account number x3148, in an amount of not less than $190,238,000, to Hearthside Food Solutions, LLC; and

(f)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 16.11 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.**     *Definitive Documents.*

3.01.     The definitive documents and material agreements related to or otherwise utilized to implement, effectuate, or govern the Restructuring Transactions (the "**Definitive Documents**") shall consist of the following:  (a) the New Organizational Documents; (b) the Equity Rights Offering Documents; (c) the Subscription Agreement; (d) the Exit Revolving Facility Documents; (e) the Exit First Lien Term Loan Facility Documents; (f) the Plan and the Plan Supplement; (g) the Disclosure Statement, the Disclosure Statement Order, and other Solicitation Materials; (h) Confirmation Order; (i) the Cash Collateral Order, the DIP Documents and the DIP Order; (j) the non-procedural First Day Pleadings, all documents in connection therewith, and all orders pursuant thereto; (k) any employee or executive retention, incentive, or similar plan or proposal; and (l) any amendments, supplements, exhibits, schedules, appendices, or modifications to any of the

foregoing and any related notes, certificates, agreements, and instruments (as applicable); and (m) any material settlement agreement relating to claims or causes of action brought against any Company Party (including, without limitation, any claims asserted by a governmental entity).

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date (a) remain subject to negotiation and completion and (b) shall be consistent in all material respects with and shall contain, the material terms and conditions set forth in this Agreement.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with <u>Section 14</u>.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and to the Required Consenting First Lien Lenders; <u>provided</u>, however, that the New Organizational Documents shall be (1) in form and substance acceptable to the Required Consenting First Lien Lenders in their sole discretion and (2) consistent in all material respects with the management incentive plan term sheet, such term sheet to be included in the Plan Supplement, and otherwise acceptable to the Company Parties and the Required Consenting First Lien Lenders; <u>provided</u>, further, that any Definitive Document that affects each Consenting Sponsors' Releases shall be subject to the reasonable consent of each Consenting Sponsor.

**Section 4.** *Milestones.*

4.01.    The following Milestones shall apply to this Agreement unless extended or waived in writing (email being sufficient) by the Required Consenting First Lien Lenders (each of the following, a "**Milestone**" and collectively, the "**Milestones**"):

(a)    no later than November 23, 2024, the Petition Date shall have occurred;

(b)    no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Cash Collateral Order;

(c)    no later than the date that is twenty-one (21) days after the Petition Date, the Company Parties shall have filed the Plan, the Disclosure Statement, and the Disclosure Statement Motion;

(d)    subject to the Bankruptcy Court's availability, no later than the date that is thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the DIP Order, if applicable;

(e)    subject to the Bankruptcy Court's availability, no later than the date that is sixty-five (65) days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order;

(f)    subject to the Bankruptcy Court's availability, no later than the date that is one hundred and ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(g)      no later than the date that is one hundred and twenty-five (125) days after the Petition Date, the Plan Effective Date shall have occurred; provided that, if the only outstanding impediment to consummation of the Plan Effective Date is the failure to obtain necessary regulatory approvals associated with the Restructuring Transactions that remain pending as of such date, this date shall automatically be extended for another thirty (30) days; provided, further, that, pending resolution of a Dischargeability Complaint (as defined in the Restructuring Term Sheet), the Milestone for the Plan Effective Date shall be automatically extended one time by forty-five (45) days.

**Section 5.      *Commitments    of    the    Consenting    Stakeholders.*** General   Commitments, Forbearances, and Waivers.

(a)      During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests on the terms and subject to the conditions of this Agreement, to use commercially reasonable efforts to:

(i)      support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case on the terms and subject to the conditions of this Agreement in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)      validly and timely submit, and not withdraw (including causing its nominee or custodian, if applicable, on behalf of itself and the accounts, funds, or affiliates for which it is acting as investment advisor, sub-advisor, or manager to validly and timely deliver and not withdraw), any consents, waivers, proxies, signature pages, tenders, instructions or directions to agents, ballots, and/or other means of voting or participating in the Restructuring Transactions with respect to all of its Company Claims/Interests now owned or hereafter acquired by such Consenting Stakeholder (or for which such Consenting Stakeholder serves as the nominee, investment manager, or advisor for holders thereof);

(iii)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended or revoked) any vote or election referred to in the immediately preceding clause (i) or (ii);

(iv)      cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(v)      without creating any obligation to incur any out-of-pocket costs that are not First Lien Ad Hoc Group Restructuring Expenses payable under this Agreement by the Companies Parties or provide anything in the nature of an indemnity or otherwise, cooperate with and assist the Company Parties' efforts to obtain, as applicable, any and all federal, state, local, and foreign governmental, regulatory, and/or third-party approvals as may be reasonably requested by the Company Parties;

(vi)      without creating any obligation to incur any out-of-pocket costs that are not First Lien Ad Hoc Group Restructuring Expenses payable under this Agreement by the Companies

Parties or provide anything in the nature of an indemnity or otherwise, oppose any party or person from taking any actions contemplated in <u>Section 5.02(b)</u>;

        (vii)    to the extent not prohibited by applicable Law, as soon as reasonably practicable, promptly notify the Company Parties in writing of any material governmental or third-party complaints, litigations, investigations, or hearings (or written communications indicating that the same may be contemplated or threatened) with respect to the Restructuring Transactions;

        (viii)    upon reasonable request by Company Parties or their advisors, as soon as reasonably practicable, promptly provide the aggregate principal amount of each Consenting Stakeholder's Company Claims/Interests, on an issuance-by-issuance basis as of the date of such request;

        (ix)    without creating any obligation to incur any out-of-pocket costs that are not First Lien Ad Hoc Group Restructuring Expenses payable under this Agreement by the Companies Parties or provide anything in the nature of an indemnity or otherwise, (1) as applicable, cooperate with the Company Parties' efforts to support, defend, and seek Bankruptcy Court approval of the Cash Collateral Order, DIP Order, and adequate protection obligations contained therein, and (2) give any notice, order, instruction, or direction to the Agent necessary to give effect to the Restructuring Transactions or to issue a notice or letter recommending First Lien Lenders to vote in favor of the Plan; and

        (x)    negotiate in good faith and execute and implement the Definitive Documents and any other required agreements to effectuate the Restructuring Transaction that are consistent with this Agreement to which it is required to be a party.

        (b)    During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

        (i)    object to, delay, impede, or take any other action (including by directing or encouraging any other Entity to take any action) to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

        (ii)    propose, file, seek, solicit, support, or vote for any Alternative Restructuring Transaction;

        (iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

        (iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

        (v)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties; or

(vi)    object to, delay, impede, or take any other action (including by directing or encouraging any other Entity to take any action) to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.02.    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above, <u>provided</u>, <u>however</u>, that such votes or elections shall be immediately revoked and deemed void *ab initio* upon the occurrence of a Termination Date described in <u>Section 13.06</u>;

(iv)    not object to, join in any objection to, delay, impede, or take any other action (including by directing or encouraging any other Entity to take any action) to interfere with any pleading or document filed by the Company that is consistent with this Agreement; and

(v)    without creating any obligation to incur any out-of-pocket costs that are not First Lien Ad Hoc Group Restructuring Expenses payable under this Agreement by the Companies Parties or provide anything in the nature of an indemnity or otherwise, use commercially reasonable efforts to support the Company in opposing any motion filed with the Bankruptcy Court by any party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases.

(b)    During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action (including by directing or encouraging any other Entity to take any action) to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 6.**      *Additional Provisions Regarding the Consenting Stakeholders' Commitments.*

Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection not prohibited by this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of a Consenting Stakeholder under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Case, so long as the exercise of any such right is not inconsistent with such Consenting Stakeholder's obligations hereunder; (e) limit the ability of a Consenting Stakeholder to purchase, sell, or enter into any transactions regarding the Company Claims/Interests, subject to Section 9 of this Agreement; (f) constitute a waiver or amendment of any term or provision of the Prepetition Facilities or any intercreditor agreement; (g) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under the Prepetition Facilities; (h) require any Consenting Stakeholder to incur, assume, become liable in respect of, or suffer to exist any obligation to incur any out-of-pocket costs or other obligations or liabilities that are not First Lien Ad Hoc Group Restructuring Expenses payable under this Agreement by the Company Parties; (i) subject to any notice provisions hereunder, prevent a Consenting Stakeholder from taking any action that is required to comply with applicable Law; (j) prohibit any Consenting Stakeholder from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (k) obligate a non-breaching Consenting Stakeholder to deliver a vote to support the Plan (or any other Restructuring Transactions) or prohibit a non-breaching Consenting Stakeholder from withdrawing such vote, in each case, from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); provided that upon the withdrawal of any such vote after the Termination Date subject to Section 13.06 (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void *ab initio* and such Consenting Stakeholder shall have the opportunity to change its vote; or (l) require any Consenting Stakeholder to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal or professional privilege.

**Section 7.**      *Commitments of the Company Parties.*

7.01.   Affirmative Commitments.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to use commercially reasonable efforts to:

(a)      support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)      the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take steps necessary and desirable to address any such impediment in reasonable consultation with the Consenting Stakeholders;

(c)     obtain any and all required regulatory and third-party approvals for the Restructuring Transactions in reasonable consultation with the Required Consenting Stakeholders;

(d)     negotiate in good faith and to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)     seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent and to the extent the Company Parties receive any Transfer Agreements, as soon as reasonably practicable notify counsel to the Consenting Stakeholders of such Transfer Agreements via email as set forth in Section 16.11;

(f)     consult with the Required Consenting First Lien Lenders regarding (a) which Company Parties will file Chapter 11 Cases (collectively, the "**Filing Entities**") and the venue of such filing, and (b) timing of an Insolvency Proceeding; provided that, for the avoidance of doubt the any Company Parties (including any foreign or domestic subsidiaries or Affiliates, whether or not such Entities are Filing Entities or signatories to this Agreement) shall not voluntarily commence any corporate action or case, or file any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, in each case without prior consultation with the Required Consenting First Lien Lenders; provided, further, that, for the avoidance of doubt, this Section 7.01(f) shall be subject to the fiduciary obligations of the Company Parties and their governing bodies and subject to the rights set forth in Section 8.01;

(g)     consult with the Required Consenting First Lien Lenders as to which material executory contracts are to be assumed;

(h)     (i) provide counsel for the Consenting First Lien Lenders, the Consenting Second Lien Term Lenders, and the Consenting Senior Unsecured Noteholders  an opportunity to review draft copies of all material motions or pleadings and First Day Pleadings, and (ii) to the extent reasonably practicable, provide a reasonable opportunity to counsel to any Consenting Stakeholders materially affected by such filing to review draft copies of other documents that the Company Parties intend to file with the Bankruptcy Court, as applicable; provided that the foregoing shall not apply to any retention or fee applications of any of the advisors to the Company Parties or procedures with respect to the Debtors' retention and compensation of ordinary course professionals;

(i)     continue ordinary course practices to maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases;

(j)     except as otherwise expressly set forth in this Agreement, operate their businesses and operations in the ordinary course in a manner that is consistent with this Agreement and consistent with the Company's past practice, and use commercially reasonable efforts to preserve intact the Company Parties' business organization and relationships with third parties (including,

19

without limitation, suppliers, customers, and governmental and regulatory authorities and employees);

(k)     inform, as soon as reasonably practicable, the advisors to the Consenting Stakeholders in writing (email being sufficient) as soon as reasonably practicable after becoming aware (and in any event within two (2) Business Days after becoming so aware) of:  (i) any event or circumstance that has occurred, or that is reasonably likely to occur, that would permit any Party to terminate, or that would result in the termination of, this Agreement; (ii) any matter or circumstance that is, or is reasonably likely to be, a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) the threat or commencement of any involuntary Insolvency Proceeding, material lawsuit, investigation, hearing, or enforcement action from or by any person or entity in respect of any Company Party; (iv) a breach of this Agreement by any Party; or (v) any material representation or statement made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made;

(l)     from the Agreement Effective Date through and including the Petition Date, promptly execute any outstanding engagement letters of the First Lien Ad Hoc Group Advisors, pay in full and in cash all First Lien Ad Hoc Group Restructuring Expenses when properly incurred and invoiced in accordance with the relevant engagement letters and/or fee arrangements, but solely to the extent that the Company actually receives invoices for such First Lien Ad Hoc Group Restructuring Expenses no later than three (3) Business Days prior to the Petition Date, and continue to pay such amounts as they come due, and otherwise in accordance with the applicable engagement letters and/or fee arrangements of the First Lien Ad Hoc Group Advisors (and not terminate such engagement letters and/or fee arrangements or seek to reject them in the Chapter 11 Cases); provided that (i) all accrued and unpaid First Lien Ad Hoc Group Restructuring Expenses (including First Lien Ad Hoc Group Restructuring Expenses incurred following the Petition Date) as of the Plan Effective Date including any reasonable estimate of such First Lien Ad Hoc Group Restructuring Expenses, shall be paid by the Company Parties on the Plan Effective Date and (ii) in the event a Termination Date occurs with respect to the Company Parties, the Company Parties shall remain obligated to pay all First Lien Ad Hoc Group Restructuring Expenses accrued and unpaid as of and up to such Termination Date in accordance with the applicable engagement letters and/or fee arrangements of the advisors to the Consenting Stakeholders;

(m)     support, defend, and seek Bankruptcy Court approval of the Cash Collateral Order and DIP Order pursuant to the terms and conditions of this Agreement, including by responding to any objections received (formal or informal) that contest such relief;

(n)     subject to Section 8, actively and timely oppose and object to the efforts of any person seeking in any manner to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the Debtors' timely filing of objections or written responses in the Chapter 11 Cases) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions in consultation with the Required Consenting First Lien Lenders;

(o)      provide timely responses to all reasonable diligence requests sent to the Company by and through the First Lien Ad Hoc Group Advisors on a continuing and rolling basis during the Agreement Effective Period, including but not limited to, (i) updates regarding the material business and financial (including liquidity) performance of the Company Parties, (ii) the status of obtaining any necessary or desirable authorizations (including consents) from each Required Consenting Stakeholder, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or exchange, and (iii) the general status and progress of the Restructuring Transactions, including progress in relation to the documentation and negotiations of the Definitive Documents;

(p)      promptly provide information to the Consenting Stakeholders, as soon as reasonably practicable after becoming aware (and in any event within two (2) Business Days after becoming so aware) of such information, regarding any discussions or any actions or inaction relating to material claims or causes of action brought against any Company Party (or any Affiliate) relating to or arising out of the Company's labor practices (including, without limitation, any claims asserted by a governmental entity), including copies of any materials provided to or provided by the Company Parties with respect to such claims and causes of action, as necessary to keep the Consenting Stakeholders reasonably contemporaneously informed as to the status and substance of the foregoing;

(q)      (i) deliver drafts to the First Lien Ad Hoc Group Advisors and the Consenting Sponsors' Advisors all Company Party press releases, public filings, public announcements, or other communications with any news media, or material mass communications that constitute disclosure of the existence or terms of this Agreement or any amendment thereto, the Chapter 11 Cases, the Restructuring Transactions, or any settlement or proposed settlement of any material claims or causes of action held by or brought against any Company Party (including, without limitation, any claims asserted by a governmental entity) to the general public (each, a "**Public Disclosure**") as soon as reasonably practicable but no later than two (2) Business Days in advance of making any such Public Disclosure (it being understood that such period may be shortened by agreement of the Parties to the extent there are exigent circumstances) and (ii) use commercially reasonable, good faith efforts to consult the First Lien Ad Hoc Group Advisors on public relations strategy and consider and incorporate any reasonable input or comments from the First Lien Ad Hoc Group Advisors on each Public Disclosure, who shall be authorized to share such Public Disclosure with the steering committee of the First Lien Ad Hoc Group, and which Public Disclosure shall be reasonably acceptable to the Required Consenting First Lien Lenders;

(r)      pay, on the Plan Effective Date in accordance with and subject to the terms of the Restructuring Term Sheet, the reasonable and documented fees, costs, and out-of-pocket expenses of the Second Lien Term Loans and Senior Unsecured Notes Advisors which are incurred (a) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing and, to the extent applicable, and/or (b) consistent with any engagement letters or fee reimbursement letters of the applicable Second Lien Term Loans and Senior Unsecured Notes Advisors (as supplemented and/or modified by this Agreement);

(s)      (i) provide to the First Lien Ad Hoc Group Advisors, on a professional eyes only basis, a copy of any written Alternative Restructuring Transaction as soon as practicable but in any event within three (3) Business Days of the Company Parties' or their advisors' receipt of such Alternative Restructuring Transaction and (ii) promptly provide such information to the First Lien Ad Hoc Group Advisors regarding such discussions or any actions or inaction pursuant to Section 8 hereof (including copies of any materials provided to or provided by the Company Parties with respect to the applicable Alternative Restructuring Transaction) as necessary to keep the First Lien Ad Hoc Group Advisors reasonably contemporaneously informed as to the status and substance of the foregoing; in each case, to the extent that the board of directors, board of managers, or such similar governing body of a Company Party determines, after consultation with outside counsel, the foregoing is not inconsistent with applicable Law or its fiduciary obligations under applicable Law; and

(t)      give prompt notice (email being sufficient) to the First Lien Ad Hoc Group Advisors within one (1) day if any Company Party or the board of directors, board of managers, or such similar governing body of a Company Party, acting in good faith and after consulting with counsel, determines (i) to pursue, assist in, consent to, vote for, or enter into any agreement regarding any unsolicited Alternative Restructuring Transaction in accordance with Section 8 hereof, or (ii) that proceeding with the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law.

7.02.   <u>Negative Commitments</u>.  Except as set forth in <u>Section 8</u>, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in, this Agreement, the Definitive Documents, or the Plan;

(c)      (i) seek to waive, amend, or modify any of the Definitive Documents, in a manner that is materially inconsistent with this Agreement, or (ii) file any pleading with the Bankruptcy Court that is materially inconsistent with this Agreement or seeking authorization to accomplish or effect any of the foregoing, in each case if such action is otherwise not in form and substance acceptable in accordance with the terms set forth in <u>Section 3</u> of this Agreement;

(d)      except as permitted by <u>Section 8</u> hereof, without the prior written consent of the Required Consenting First Lien Lenders, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(e)      take any action with respect to the disposition, treatment, or dissolution of any material Company Party (including any foreign or domestic subsidiaries or Affiliates, whether or not such Entities are Filing Entities or signatory to this Agreement), except as permitted by <u>Section 3</u> hereof without the prior consultation with the Required Consenting First Lien Lenders;

(f)      modify or execute the Definitive Documents in a manner that is inconsistent with this Agreement and the Restructuring Term Sheet in any material respect; <u>provided</u>, <u>that</u>, the

foregoing may be cured by the Company Parties within three (3) Business Day following the delivery of a written notice in accordance with Section 16.11;

(g)      file any Definitive Document, motion, or pleading with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that is materially inconsistent with this Agreement or the Restructuring Term Sheet or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3 hereof;

(h)      (i) commence any proceeding or other action that challenges (A) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting Stakeholders, or (B) the validity, enforceability, or perfection of any lien or other encumbrance securing (or purporting to secure) of any Company Claims/Interests of any of the Consenting Stakeholders or (ii) support any person in connection with any of the acts described the foregoing clauses;

(i)      materially amend or change any of their respective existing organizational documents without the prior written consent of the Required Consenting First Lien Lenders and each Consenting Sponsor;

(j)      (i) authorize, create, issue, sell, or grant any additional Equity Interests of HFS Matterhorn Topco, Inc., or (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Equity Interests, in each case without the prior written consent of the Required Consenting First Lien Lenders and each Consenting Sponsor;

(k)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(l)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(m)      in a transaction outside of the ordinary course, sell any assets (including, without limitation, any intellectual property) in a transaction or a series of transaction having a fair market value of $5,000,000.00 or greater without the prior written consent of the Required Consenting Stakeholders;

(n)      except in accordance with the Restructuring Transactions or in the ordinary course of business and consistent with past practice, incur any indebtedness or guarantee any indebtedness of another entity involving amounts greater than $5,000,000.00 in principal amount in the aggregate across all such transactions without the prior written consent of the Required Consenting Stakeholders;

(o)      except in the ordinary course of business and consistent with past practice, terminate or release (i) any obligors or guarantors of their obligations under the Prepetition Facilities or (ii) any of the liens on, security interests in, or guarantees of any of the assets of the Company Parties that secure the obligations under the Prepetition Facilities, in each case without the prior written consent of the Required Consenting First Lien Lenders; or

(p)      settle any (i) material claims or causes of action brought against any Company Party (or any Affiliate) (including, without limitation, any claims asserted by a governmental entity) other than in the ordinary course of business and consistent with past practice or (ii) claims or causes of action brought against any Company Party (or any Affiliate) involving principal amounts greater than $5,000,000, in each case without the prior written consent of the Required Consenting First Lien Lenders.

**Section 8.** *Additional      Provisions      Regarding      Company      Parties' Commitments.*Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or such similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this <u>Section 8.01</u> shall not be deemed to constitute a breach of this Agreement.

8.02.    Notwithstanding anything to the contrary in this Agreement (but subject to <u>Section 8.01</u>), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, solicit, or develop proposals with respect to  Alternative Restructuring Transactions; (b) provide access to non-public information concerning any Company Party to any Entity that (x) the Company Parties may reasonably determine may submit a proposal with respect to an Alternative Restructuring Transaction and (y) has entered into a reasonable and customary Confidentiality Agreement or a reasonable and customary nondisclosure agreement with the Company Party; <u>provided</u>, <u>however</u>, that subsequent to the Agreement Effective Date, no Company Party shall enter into any Confidentiality Agreement or nondisclosure agreement with any such party to the extent such Confidentiality Agreement or nondisclosure agreement would restrict any Company Party's ability to share any documents or terms concerning such Alternative Restructuring Transaction with the First Lien Ad Hoc Group Advisors in accordance with the terms of this Agreement; (c) maintain or continue discussions or negotiations with respect to any Alternative Restructuring Transactions if such person or entity, acting in good faith and after consulting with counsel, determines that the failure to take such action would be inconsistent with its fiduciary duties or applicable Law; and (d) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting First Lien Lender), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions.

8.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or (c) require any Company to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal or professional privilege.

**Section 9.** *Transfer of Interests and Securities.* During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      in the case of any Company Claims/Interests, the authorized transferee is: (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (ii) an institutional "accredited investor" (as described in the Rules), (iii) not a "U.S. person" (as defined in Rule 902(k) of Regulation S under the Securities Act), and is acquiring such Company Claims/Interests in an offshore transaction in compliance with Rule 904 of Regulation S under the Securities Act and not participating on behalf of, or on account of, a "U.S. person," or (iv) a Consenting Stakeholder; and

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties, before the effectiveness of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides written notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer, but in no event later than five (5) Business Days of such acquisition.

9.02.    Upon compliance with the requirements of <u>Section 9.01</u>, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of <u>Section 9.01</u> shall be void *ab initio*.

9.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; <u>provided</u>, <u>however</u>, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties and the First Lien Ad Hoc Group as soon as practicable, but in any event within ten (10) Business Days of such acquisition.

9.04.    This <u>Section 9</u> shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding <u>Section 9.01</u>, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement

25

in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within seven (7) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 9.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 9.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee. Notwithstanding the foregoing, if, at the time of the proposed Transfer of such Company Claims/Interests to the Qualified Marketmaker, such Company Claims/Interests (x) may be voted on (1) the Plan or (2) any Alternative Restructuring Transaction, the proposed transferor Consenting Stakeholder must first vote such Company Claims/Interests in accordance with the requirements of Section 5.01(a)(i), or (y) have not yet been and may not yet be voted on the Plan or any Alternative Restructuring Transaction and such Qualified Marketmaker does not Transfer such Company Claims/Interests to a subsequent transferee prior to the fifth (5th) Business Day prior to the expiration of the voting deadline (such date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) Business Day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Stakeholder with respect to such Company Claims/Interests in accordance with the terms hereof (provided that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Stakeholder with respect to such Company Claims/Interests at such time that the transferee of such Company Claims/Interests becomes a Consenting Stakeholder with respect to such Company Claims/Interests).

9.06.   During the Agreement Effective Period, each Consenting Sponsor shall not and shall cause each of its affiliates to not, without the prior written consent (not to be unreasonably withheld) of the Required Consenting First Lien Lenders and the Company Parties: (a) claim any worthless stock deduction with respect to the Company Parties or any direct or indirect subsidiary thereof for any tax year ending on or prior to the Plan Effective Date, but with respect to this clause (a), the Company Parties and the Required Consenting First Lien Lenders shall not withhold consent for a Consenting Sponsor to claim a worthless stock deduction if the Consenting Sponsors and/or the Company Parties provide a tax opinion from a nationally reputable law firm or accounting firm reasonably satisfactory to the Company Parties and the Required Consenting First Lien Lenders that it is more likely than not that such worthless stock deduction does not cause an "ownership change" of any Company Party or any direct or indirect subsidiary thereof, for purposes of Section 382 of the Tax Code; (b) pledge, encumber, assign, sell, or otherwise transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, directly or indirectly, any portion of its right, title, or interests in any of its shares, stock, or other interests in the Company Parties or any direct or indirect subsidiary thereof, to the extent such pledge, encumbrance, assignment, sale, or other transaction or event may result in an "ownership change" of any Company Party, or any direct or indirect subsidiary thereof, for purposes of Section 382 of the Tax Code; or (c) acquire any outstanding indebtedness of the Company Parties, or any direct or indirect subsidiary thereof, to the extent such acquisition would reasonably be expected

to impair or adversely affect any of the tax attributes of the Company Parties or any direct or indirect subsidiary thereof under Sections 108 or 1017 of the Tax Code.

9.07.   Notwithstanding anything to the contrary in this <u>Section 9</u>, the restrictions on Transfer set forth in this <u>Section 9</u> shall not apply to the grant of any liens or encumbrances (i) on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests, or (ii) in favor of any lender, noteholder, agent, or trustee to secure obligations under indebtedness issued or held by a managed fund or account, including any collateralized loan obligation or collateralized debt obligation.

**Section 10.   *Representations and Warranties of Consenting Stakeholders.*** Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement or a Transfer Agreement and as of the Plan Effective Date:it is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not (nor are any investment funds, accounts, and other investment vehicles managed by it) the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to <u>Section 9</u>);

(b)   it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)   such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)   it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)   solely with respect to holders of Company Claims/Interests, (i) it is (A) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (B) an institutional "accredited investor" (as described in the Rules), or (C) not a "U.S. person" (as defined in Rule 902(k) of Regulation S under the Securities Act) and (ii) although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, an offering of securities, such holder represents, warrants, and acknowledges that (1) it has been furnished with all materials it considers relevant to making an investment decision with respect to any securities acquired by it in connection with the Restructuring Transactions, (2) it has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its prospective investment in such securities, and the ability to bear the economic risks of its prospective investment and can afford the complete loss of such investment, and acknowledges that such investment involves a high degree of risk, (3) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for

investment and not with a view to distribution or resale in violation of the Securities Act, and (4) understand that any securities contemplated by this Agreement and any Definitive Document have not been, and are not contemplated to be, registered under the Securities Act, and may not be resold without registration under the Securities Act or pursuant to an exemption from the registration requirements under the Securities Act.

**Section 11.** *Representations and Warranties of Company Parties.* Each Company Party representative and warrants that, as of the date such Company Party executes and delivers this Agreement, entry into this Agreement is consistent with the exercise of such Company Party's fiduciary duties.

**Section 12.** *Mutual Representations, Warranties, and Covenants.* Each of the Consenting Stakeholders, severally and not jointly, and each of the Company Parties, jointly and severally, but solely with respect to the Company Parties, subject to any necessary Bankruptcy Court approval, as and to the extent applicable, hereby represents, warrants, and covenants to each other, as of the date such Party executed and delivers this Agreement:it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)   except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)   the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)   except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)   except as expressly provided in this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 13.** *Termination Events.*

13.01.   <u>Consenting First Lien Lender Termination Events</u>.   This Agreement may be terminated with respect to the Consenting First Lien Lenders, by the Required Consenting First Lien Lenders by the delivery to the Company Parties of a written notice in accordance with <u>Section 16.11</u> hereof upon the occurrence of the following events:

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured for five (5) Business Days after such terminating Consenting First Lien Lenders transmit a written notice in accordance with <u>Section 16.11</u> hereof detailing any such breach; <u>provided</u>, <u>that</u>, the foregoing shall not apply to any breach by any Company Party of any representations, warranties, or covenants made to, and solely for the benefit of, the Consenting Junior Stakeholders;

(b)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) days after such terminating Consenting First Lien Lenders transmit a written notice in accordance with <u>Section 16.11</u> hereof detailing any such issuance; <u>provided</u> that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)      any Company Party (i) publicly announces, or states in writing to any of the Consenting First Lien Lenders or other holders of Company Claims/Interests (including but not limited to <u>Section 8</u> hereof), its intention not to support or pursue the Restructuring Transactions; or (ii) exercises any right pursuant to <u>Section 8</u> that constitutes a material breach pursuant to this Agreement;

(d)      the board of directors, board of managers, or such similar governing body of any Company Party, acting in good faith and after consulting with counsel, determines (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to enter into an Alternative Restructuring Transaction;

(e)      the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of a terminating Consenting First Lien Lender in violation of its obligations under this Agreement; <u>provided</u>,  that, the failure to occur of any Milestone on or within the timeframes contemplates in Section 4.01 may be cured by the Company Parties at any time prior to delivery of a notice purporting to terminate this Agreement on account of such Milestone;

(f)      the Bankruptcy Court enters an order denying confirmation of the Plan and such order shall not have been reversed or vacated within fourteen (14) days of entry;

(g)      (i) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order that is not stayed, vacated, or withdrawn fourteen (14) days from entry, or (ii) the filing of a motion or application in the Bankruptcy Court by any Company Party that is not been withdrawn five (5) days after filing, in each case without the prior written consent of the Required Consenting First Lien Lenders), (1) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (2) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (3) rejecting this Agreement, (4) dismissing one or more of the Chapter 11 Cases of a material Company Party, or (5) invalidating, disallowing, subordinating, or limiting

the enforceability, priority, or validity of any of the Company Claims or Interests held by any of the Consenting First Lien Lenders;

(h)     upon the commencement of an involuntary case against any of the Company Parties or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief in respect of the Company Parties or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar law now or hereafter in effect; provided that such involuntary proceeding is not dismissed within a period of forty-five (45) days after the filing thereof;

(i)     any Company Party files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement and such motion has not been withdrawn or amended within two (2) Business Days of receipt by the Company Parties of written notice from the party that such motion or pleading is inconsistent with this Agreement; provided that in the event that a Consenting Junior Stakeholder files such a motion or pleading with the Bankruptcy Court that has not been with withdrawn or amended within two (2) Business Days, the Required Consenting First Lien Lenders may terminate this Agreement as to the breaching Consenting Junior Stakeholder;

(j)     a Company Party files or directly supports another party in filing any motion, application, adversary proceeding, or other pleading challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any Claims of the Consenting First Lien Lenders arising under any of the Prepetition Facilities and such Company filing is not withdrawn after five (5) Business Days of a written request from the Required Consenting First Lien Lenders; provided that in the event that a Consenting Junior Stakeholder files or supports another party in filing such a motion or pleading with the Bankruptcy Court that has not been with withdrawn or amended within five (5) Business Days, the Required Consenting First Lien Lenders may terminate this Agreement as to the breaching Consenting Junior Stakeholder;

(k)     any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(l)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset (other than with respect to insurance proceeds) of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions and such order is not reversed after fourteen (14) days from the Bankruptcy Court's entry;

(m)     the Company Parties fail to support, defend, or seek Bankruptcy Court approval of the Cash Collateral Order or DIP Order pursuant to the terms and conditions of this Agreement and the Cash Collateral Order and DIP Order; provided that, if otherwise required by this agreement, a Consenting Junior Stakeholder fails to support, defend, or seek Bankruptcy Court approval of the Cash Collateral Order or DIP Order pursuant to the terms and conditions of this Agreement and the Cash Collateral Order and DIP Order, the Required Consenting First Lien Lenders or the Company Parties may terminate this Agreement as to the breaching Consenting Junior Stakeholder;

(n)      this Agreement or any Definitive Document is amended, waived, or modified in any manner that is inconsistent with the terms of this Agreement unless (i) such amendment, waiver, or modification has been approved in writing by the Required Consenting First Lien Lenders or (ii) such amendment, waiver, or modification is annulled, deemed invalid, or otherwise modified such that it is consistent with the terms of this Agreement within five (5) Business Days from its purported effectiveness;

(o)      (i) a Company Party files a motion or application seeking an order (without the prior written consent of the Required Consenting First Lien Lenders) vacating or modifying the Cash Collateral Order or the DIP Order, (ii) any of the Cash Collateral Order or the DIP Order are reversed, stayed, dismissed, vacated, reconsidered modified or amended in a manner that is materially inconsistent with the terms of this Agreement without the consent of the Required Consenting First Lien Lenders, (iii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company Parties have failed to timely object to such motion, or (iv) the Bankruptcy Court enters any order authorizing the use of postpetition financing that is not in the form materially consistent with the DIP Order or otherwise reasonably acceptable to the Required Consenting First Lien Lenders;

(p)      occurrence of an "Event of Default" under (and as defined in) the Cash Collateral Order and/or the DIP Order or the DIP Documents that results in an acceleration of the DIP Obligations or, prior to entry of the DIP Order, a termination of the consensual use of cash collateral;

(q)      the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Company Claims/Interests of any of the Required Consenting First Lien Lenders and such order is not reversed after fourteen (14) days from the Bankruptcy Court's entry;

(r)      breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach; provided, however, that so long as, as applicable, (i) the non-breaching Consenting First Lien Lenders continue to hold or control at least two-thirds of then outstanding principal amount of First Lien Loans; (ii) the non-breaching Consenting Second Lien Term Lenders continue to hold or control at least two-thirds of then outstanding principal amount of Second Lien Term Loans, or (iii) the non-breaching Consenting Senior Unsecured Noteholders continue to hold or control at least two-thirds of then outstanding principal amount of Senior Unsecured Notes, such termination shall be effective only with respect to such breaching Consenting Stakeholder;

(s)      any Company Party revokes the Restructuring Transaction without the prior consent of the Required Consenting First Lien Lenders, including the withdrawal of the Plan, as applicable, or support therefor, or publicly announces its intention to take any such act;

(t)      failure of the Company Parties to pay any and all First Lien Ad Hoc Group Restructuring Expenses, as and when required under this Agreement and such First Lien Ad Hoc Group Restructuring Expenses have not been paid within three (3) Business Days of receipt by the Company Parties of written notice; provided that, the above events, as applicable, may be cured at

any time prior to delivery of a written notice terminating this Agreement in accordance with Section 16.11; or

(u)     any Company Party settles any (i) material claims or causes of action brought against any Company Party (or any Affiliate) (including, without limitation, any claims asserted by a governmental entity) other than in the ordinary course of business and consistent with past practice or (ii) claims or causes of action brought against any Company Party (or any Affiliate) involving principal amounts greater than $5,000,000, in each case without the prior written consent of the Required Consenting First Lien Lenders; or

(v)     the Bankruptcy Court determines that any material claims or causes of action brought against any Company Party (including, without limitation, any claims asserted by a governmental entity) in excess of $5,000,000 are nondischargeable.

13.02.  <u>Consenting Junior Stakeholder Termination Events</u>.  This Agreement may be terminated:  (a) with respect to the Consenting Second Lien Term Lenders, by the Required Consenting Second Lien Term Lenders; (b) with respect to the Consenting Senior Unsecured Noteholders, by the Required Consenting Senior Unsecured Noteholders; or (c) with respect to each Consenting Sponsor, by each Consenting Sponsor; in each case, by the delivery to the Company Parties of a written notice in accordance with Section 16.11 hereof upon the occurrence of the following events (<u>provided</u> that each of the following must have a material and adverse effect on the economic rights or releases of such Consenting Junior Stakeholder in order for such Consenting Junior Stakeholder to terminate this Agreement in accordance with the foregoing clauses (a)-(c)):

(a)     the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) has a material and adverse effect on the economic rights of the Consenting Second Lien Term Lenders, Consenting Senior Unsecured Noteholders, or any Consenting Sponsor seeking termination pursuant to this provision and (ii) remains uncured for five (5) Business Days after such terminating Consenting Junior Stakeholder transmits a written notice in accordance with Section 16.11 hereof detailing any such breach;

(b)     issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) days after such terminating Consenting Second Lien Term Lender, Consenting Senior Unsecured Noteholder, or Consenting Sponsor transmits a written notice in accordance with Section 16.11 hereof detailing any such issuance; <u>provided</u> that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)     any Company Party (i) publicly announces, or states in writing to any of the Consenting Second Lien Term Lenders, Consenting Senior Unsecured Noteholders, or any Consenting Sponsor or other holders of Company Claims/Interests (including but not limited to Section 8 hereof), its intention not to support or pursue the Restructuring Transactions; or

(ii) exercises any right pursuant to <u>Section 8</u> that constitutes a material breach pursuant to this Agreement;

(d)      the board of directors, board of managers, or such similar governing body of any Company Party, acting in good faith and after consulting with counsel, determines (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to enter into an Alternative Restructuring Transaction;

(e)      this Agreement or any Definitive Document is amended, waived, or modified in any manner that is inconsistent with the terms of this Agreement and has a material and adverse effect on the economic rights or releases of the Consenting Junior Stakeholders unless (i) such amendment, waiver, or modification has been approved in writing, as applicable, by the Required Consenting Second Lien Lenders, Required Consenting Senior Unsecured Noteholders, or Consenting Sponsor that is materially and adversely affected or (ii) such amendment, waiver, or modification is annulled, deemed invalid, or otherwise modified such that it is consistent with the terms of this Agreement within eight (8) days from effectiveness;

(f)      the entry of an order by the Bankruptcy Court denying confirmation of the Plan and such order shall not have been reversed or vacated within fourteen (14) days of entry;

(g)      any Company Party files any motion or pleading with the Bankruptcy Court seeking to implement the Restructuring Transactions pursuant to a prepackaged plan of reorganization (as opposed to a prearranged plan of reorganization);

(h)      the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Company Claims/Interests of any of the Required Consenting Second Lien Lenders or Required Consenting Senior Unsecured Noteholders, as applicable, and such order is not reversed after fourteen (14) days from the Bankruptcy Court's entry;

(i)      (i) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order that is not stayed, vacated, or withdrawn fourteen (14) days from entry, or (ii) the filing of a motion or application in the Bankruptcy Court by any Company Party that is not been withdrawn five (5) days after filing, in each case without the prior written consent of the Required Consenting Second Lien Lenders, Required Consenting Senior Unsecured Noteholders, or Consenting Sponsor, as applicable), (1) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (2) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (3) rejecting this Agreement, (4) dismissing one or more of the Chapter 11 Cases of a material Company Party, or (5) invalidating, disallowing, subordinating, or limiting the enforceability, priority, or validity of any of the Company Claims or Interests held by any of the Consenting Second Lien Lenders, Consenting Senior Unsecured Noteholders, or Consenting Sponsors;

(j)       any Consenting Sponsor receives, directly or indirectly, any economic recovery from any Debtor, from any subsidiary of any Debtor, or otherwise from or on behalf of the Debtors' estates;

(k)       any Company Party revokes the Restructuring Transactions without the prior consent of the Required Consenting Second Lien Lenders, the Required Consenting Senior Unsecured Noteholders, or Consenting Sponsor, as applicable, including the withdrawal of the Plan, as applicable, or support therefor, or publicly announces its intention to take any such act; or

(l)       with respect to any Consenting Junior Stakeholder, the Bankruptcy Court indicates in writing, whether in connection with the approval of the Disclosure Statement, the Plan, or otherwise, that it will not approve the Release, if any, with respect to such Consenting Junior Stakeholder.

13.03.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties (other than pursuant to <u>Section 13.03(a)</u> or <u>Section 13.03(d)</u>) upon prior written notice to all Parties in accordance with <u>Section 16.11</u> hereof upon the occurrence of any of the following events:

(a)       with respect to the applicable Consenting Stakeholder only, breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach; <u>provided</u>, <u>however</u>, that so long as, as applicable, (i) the non-breaching Consenting First Lien Lenders continue to hold or control at least two-thirds of then outstanding principal amount of First Lien Loans; (ii) the non-breaching Consenting Second Lien Term Lenders continue to hold or control at least two-thirds of then outstanding principal amount of Second Lien Term Loans, or (iii) the non-breaching Consenting Senior Unsecured Noteholders continue to hold or control at least two-thirds of then outstanding principal amount of Senior Unsecured Notes, such termination shall be effective only with respect to such breaching Consenting Stakeholder;

(b)       the board of directors, board of managers, or such similar governing body of any Company Party, and after consulting with counsel, determines (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Transaction;

(c)       the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with <u>Section 16.11</u> hereof detailing any such issuance;

(d)       if any Consenting Stakeholder (i) publicly announces their intention not to support the Restructuring Transaction or (ii) validly terminates this Agreement as to themselves pursuant to <u>Section 13</u>, in which case the Company can terminate only with respect to such Consenting

Stakeholder this Agreement shall otherwise remain in full force and effect with respect to each non-terminating or non-breaching Consenting Stakeholder;

(e)     the Bankruptcy Court enters an order denying confirmation of the Plan and such order shall not have been reversed or vacated within fourteen (14) days of entry;

(f)     the entry of an order by the Bankruptcy Court or the filing of a motion or application by any Consenting Stakeholder, (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iv) dismissing one or more of the Chapter 11 Cases of a material Company Party;

(g)     upon the commencement of an involuntary case against any of the Company Parties or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief in respect of the Company Parties or their debts, or of a substantial part of their assets, under any federal, state, or foreign bankruptcy, insolvency, administrative, receivership, or similar law now or hereafter in effect; provided that such involuntary proceeding is not dismissed within a period of forty-five (45) days after the filing thereof;

(h)     any Consenting Stakeholder files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement and such motion has not been withdrawn or amended within two (2) Business Days of receipt by any Company Party of written notice from the Company Party that such motion or pleading is inconsistent with this Agreement; provided, however, that so long as, as applicable, (i) the non-breaching Consenting First Lien Lenders continue to hold or control at least two-thirds of then outstanding principal amount of First Lien Loans; (ii) the non-breaching Consenting Second Lien Term Lenders continue to hold or control at least two-thirds of then outstanding principal amount of Second Lien Term Loans, or (iii) the non-breaching Consenting Senior Unsecured Noteholders continue to hold or control at least two-thirds of then outstanding principal amount of Senior Unsecured Notes, such termination shall be effective only with respect to such breaching Consenting Stakeholder; or

(i)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset (other than with respect to insurance proceeds) of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions.

13.04.   Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting First Lien Lenders; and (b) each Company Party.

13.05.   Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.   For the avoidance of doubt, the Company Parties' obligations (or the obligations of their successors in interest) to promptly pay in full and in cash all earned and accrued First Lien Ad Hoc Group Restructuring

Expenses through and including the Plan Effective Date and to continue to pay such amounts as they come due in accordance with the applicable engagement letters and/or fee arrangements of the set forth in <u>Section 7</u> shall survive termination of this Agreement on account of <u>Section 13.06</u>.

13.06.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action; <u>provided</u> that in no event shall any such termination relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination, notwithstanding any termination of this Agreement by any other Party, and (ii) obligations under this Agreement which expressly survive any such termination.   The right to terminate this Agreement pursuant to <u>Section 13.01</u>, <u>13.02</u>, <u>13.03</u>, <u>13.04</u>, <u>13.05</u>, or <u>13.06</u> (other than pursuant to <u>Section 13.03(b)</u>) shall not be available to any Party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the occurrence of a termination event.   Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the applicable Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; <u>provided</u>, <u>however</u>, that any Consenting Stakeholder withdrawing or changing its vote pursuant to this <u>Section 13.06</u> shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.   Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.   Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.   No purported termination of this Agreement shall be effective under this <u>Section 13.06</u> or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to <u>Section 13.02(d)</u>, <u>Section 13.03(b)</u>, or <u>Section 13.03(e)</u>.   Nothing in this <u>Section 13.06</u> shall restrict any Company Party's right to terminate this Agreement in accordance with <u>Section 13.03(b)</u>.

**Section 14.**     *Amendments and Waivers.*

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this <u>Section 14</u>; <u>provided</u>, <u>that</u>, notwithstanding anything to the contrary herein, this <u>Section 14</u> may

36

not be modified, amended, or supplemented in any manner except with the prior written consent of all Parties hereto.

(b)      Any proposed modification, amendment, waiver or supplement that does not comply with this <u>Section 14</u> shall be ineffective and void *ab initio*.

(c)      This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived in writing by:  (a) each Company Party and (b) Required Consenting First Lien Lenders; <u>provided</u>, <u>however</u>, that if the proposed modification, amendment, waiver, or supplement has a material and adverse effect on the economic rights or Releases of the Consenting Second Lien Term Lenders, the Consenting Senior Unsecured Noteholders, or any Consenting Sponsor, then such modification, amendment, waiver, or supplement shall require the consent (not to be unreasonably withheld) of the Required Consenting Second Lien Term Lenders, the Required Consenting Senior Unsecured Noteholders, and/or the Consenting Sponsors, as applicable; <u>provided</u>, <u>further</u>, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on (i) any of the First Lien Claims held by a Consenting First Lien Lender as compared to the other First Lien Lenders, (ii) the Second Lien Claims held by a Consenting Second Lien Lender as compared to the other Consenting Second Lien Lenders, or (iii) the Senior Unsecured Notes Claims held by a Consenting Senior Unsecured Noteholder as compared to the other Consenting Senior Unsecured Noteholders, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement.

(d)      At any time prior to the Termination Date, the Company, on the one hand, and the Required Consenting Stakeholders, on the other, to the extent legally permitted, may (i) extend the time for the performance of any of the obligations of any other Party, (ii) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements, covenants or conditions for the benefit of such Party contained herein.

(e)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.      *Mutual Releases.*** Releases.  Each Consenting Stakeholder agrees to support the inclusion of a release in the Plan in substantially the form of the Releases.

15.02.   <u>Releases of Unknown Claims</u>.  Each of the Releasing Parties in each of the Releases contained in this Agreement expressly acknowledges that although ordinarily a general release may not extend to Released Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the

above Releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives and relinquishes any and all rights such Party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the Release or which may in any way limit the effect or scope of the Releases with respect to Released Claims which such Party did not know or suspect to exist in such Party's favor at the time of providing the Release, which in each case if known by it may have materially affected its settlement with any Released Party. Each of the Releasing Parties expressly acknowledges that the Releases and covenants not to sue contained in this Agreement are effective regardless of whether those released matters or Released Claims are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.  Notwithstanding anything to the contrary in the foregoing, to the extent that the special committee of the board of directors of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

15.03.   Turnover of Subsequently Recovered Assets.  In the event that any Releasing Party (including any successor or assignee thereof and including through any third party, trustee, debtor in possession, creditor, estate, creditors' committee, or similar Entity) is successful in pursuing or receives, directly or indirectly, any funds, property, or other value on account of any Claim, Cause of Action, or litigation against any Released Party that was released pursuant to the Release (or would have been released pursuant to the Release if the party bringing such claim were a Releasing Party), such Releasing Party (i) shall not commingle any such recovery with any of its other assets and (ii) agrees that it shall promptly turnover and assign any such recoveries to, and hold them in trust for, such Released Party.

15.04.   Certain Limitations on Releases.   For the avoidance of doubt, nothing in this Agreement and the Releases contained in this Section 15 shall or shall be deemed to result in the waiving or limiting by (a) the Company Parties, or any officer, director, member of any governing body, or employee thereof, of (i) any indemnification against any Company Party, any of their insurance carriers, or any other Entity, (ii) any rights as beneficiaries of any insurance policies, (iii) wages, salaries, compensation, or benefits, (iv) intercompany claims, or (v) any Interest held by a Company Party; (b) the Consenting Stakeholders or the Agents/Trustee of any Claims or "Obligations" under and as defined in each of the First Lien Credit Agreement, Second Lien Credit Agreement, or Senior Unsecured Notes Indenture, or any other financing document (except as may be expressly amended or modified by the Plan, or any other financing document under and as defined therein); and (c) any Party or other Entity of any post-Agreement Effective Date obligations under this Agreement or post-Plan Effective Date obligations under the Plan, the Confirmation Order, the Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan.

15.05.   Covenant Not to Sue.  Each of the Releasing Parties hereby further agrees and covenants not to, and shall not, commence or prosecute, or assist or otherwise aid any other Entity

in the commencement or prosecution of, whether directly, derivatively or otherwise, any Released Claims.

## Section 16.   *Miscellaneous.*

16.01.   <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, or other applicable Law.

16.02.   <u>Exhibits Incorporated by Reference; Conflicts</u>.   Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03.   <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

16.04.   <u>Complete Agreement</u>.   Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05.   <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:   (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

16.06.   <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07.   <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart,

when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and, except as set forth in Section 9 of this Agreement, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

16.10. <u>Relationship Among the Parties.</u> It is understood and agreed that no Party to this Agreement has any duty of trust or confidence in any form with any other Party, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them. In this regard, it is understood and agreed that any Party to this Agreement may trade in Company Claims/Interests without the consent of the Company Parties, as the case may be, or any other Party, subject to applicable securities laws, the terms of any applicable Confidentiality Agreement or non-disclosure agreement, and the terms of this Agreement; <u>provided</u> that no Party shall have any responsibility for any such trading by any other Party by virtue of this Agreement. No prior history, pattern, or practice of sharing confidence among or between the Parties shall in any way affect or negate this understanding and agreement.

16.11. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by email, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

    (a)    if to a Company Party, to:

    H-Food Holdings, LLC
    3500 Lacey Road, Suite 300
    Downers Grove, IL 60515
    Attn:  Roger E. Harris
    Email: rharris@hearthsidefood.com

    with copies to:

    Ropes & Gray, LLP
    1211 Avenue of Americas
    New York, NY 10036-8704
    Attn:  Ryan Preston Dahl

           Matthew M. Roose
           Natasha S. Hwangpo
       Email: Ryan.Dahl@ropesgray.com
            Matthew.Roose@ropesgray.com
            Natasha.Hwangpo@ropesgray.com

(b)     if to a Consenting First Lien Lender, to:

       Gibson, Dunn & Crutcher LLP
       200 Park Avenue
       New York, NY 10166-0193
       Attn:   Scott J. Greenberg
            Matthew J. Williams
            Joshua Brody
       Email: SGreenberg@gibsondunn.com
            MJWilliams@gibsondunn.com
            JBrody@gibsondunn.com

(c)     if to a Consenting Second Lien Term Lender, to:

       Proskauer Rose LLP
       Eleven Times Square
       New York, NY 10036-8299
       Attn:   Vincent Indelicato
            Matthew Koch
       Email: vindelicato@proskauer.com
            mkoch@proskauer.com

(d)     if to a Consenting Senior Unsecured Noteholder, to:

       Paul Hastings LLP
       200 Park Avenue
       New York, NY 10166
       Attn:   Kris Hansen
            Charles Persons
       Email: krishansen@paulhastings.com
            charlespersons@paulhastings.com

(e)     if to SnackTime PG Holdings, Inc., to:

       Milbank LLP
       55 Hudson Yards
       New York, NY 10001-2163
       Attn:   Samuel A. Khalil
            Michael Price
       Email: skhalil@milbank.com
            mprice@milbank.com

    (f)      if to CB Metafora Aggregator, LLC, to:

           Kirkland & Ellis LLP
           601 Lexington Avenue
           New York, NY 10022
           Attn:   Brian Schartz
                     Patricia Walsh Loureiro
                     Jimmy Ryan
           Email: brian.schartz@kirkland.com
                     patricia.loureiro@kirkland.com
                     jimmy.ryan@kirkland.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.12.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.  Each Consenting Stakeholder acknowledges and agrees that it is not relying on any representation or warranties other than as set forth in this Agreement.

16.13.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required; provided, that, nothing herein shall prejudice any Party's rights to argue that the exercise of termination rights was not proper under the terms of this Agreement.

16.14.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.17.  <u>Remedies Cumulative; Specific Performance</u>.

(a)　　All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

(b)　　It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

(c)　　Without limiting any of the Company's foregoing remedies, it is understood and agreed that, in addition to any other remedy in favor of the Company arising in law or at equity, (i) the Company's remedies shall include the Company's designation, pursuant to section 1126(e) of the Bankruptcy Code, of any vote by a Consenting Stakeholder where such Consenting Stakeholder is in breach of its obligations under this Agreement and (ii) such Consenting Stakeholder shall not be permitted to object to, and shall be deemed to have consented to such designation.

16.18.  Capacities of Consenting Stakeholders.  Each Consenting Stakeholder has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

16.19.  Survival.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 8.01, Section 14, and any defined terms needed for the interpretation of any such Sections, and the Confidentiality Agreements shall survive such Transfer or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.  For the avoidance of doubt, the Parties acknowledge and agree that if this Agreement is terminated, Section 12 shall survive such termination, and any and all Releases as approved by the Bankruptcy Court shall remain in full force and effect as of the Plan Effective Date.

16.20.  Email Consents.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 14, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including email) between each such counsel without representations or warranties of any kind on behalf of such counsel.

16.21.  Representation by Counsel.  Each Party acknowledges that it has had an opportunity to receive information from the Company Parties and that it has been, or is part of a group that has been, or has had an opportunity to be, represented by counsel in connection with this Agreement

and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**COMPANY PARTIES**

**MATTERHORN BUYER, LLC**
**HFS SUB, LLC**
**HFS MATTERHORN TOPCO, INC.**
**MATTERHORN PARENT, LLC**
**MATTERHORN INTERMEDIATE, LLC**
**H-FOOD HOLDINGS, LLC**
**HEARTHSIDE USA - CORPORATE, INC.**
**HEARTHSIDE HOLDCO, LLC**
**HEARTHSIDE FINANCE COMPANY, INC.**
**HEARTHSIDE FOOD SOLUTIONS, LLC**
**INTERBAKE FOODS, LLC**
**RYT-WAY MIDCO, LLC**
**PEACOCK ENGINEERING COMPANY II, LLC**
**HEARTHSIDE USA, LLC**
**HEARTHSIDE USA – CPG PARTNERS, LLC**
**OAK STATE PRODUCTS, LLC**
**STANDARD FUNCTIONAL FOODS GROUP, LLC**
**QUALITY BAKERY PRODUCTS, LLC**
**TOLL PACKAGING SERVICES LLC**
**RYT-WAY INDUSTRIES, LLC**
**MATTERHORN SUB, LLC**
**PEACOCK FOODS LLC AND**
**HEARTHSIDE USA – PRODUCE & FOODSERVICE, LLC**

By: _Robert Caruso_
DocuSigned by:
C5F2713A0A304CF...

Name: Robert M. Caruso
Title:   Chief Restructuring Officer

[Redacted]

## EXHIBIT A

### Company Parties

1. HFS Sub, LLC
2. HFS Matterhorn Topco, Inc.
3. Matterhorn Parent, LLC
4. Matterhorn Intermediate, LLC
5. H-Food Holdings, LLC
6. Hearthside USA - Corporate, Inc.
7. Hearthside Holdco, LLC
8. Hearthside Finance Company, Inc.
9. Hearthside Food Solutions, LLC
10. Interbake Foods, LLC
11. Ryt-way Midco, LLC
12. Peacock Engineering Company II, LLC
13. Hearthside USA, LLC
14. Hearthside USA – CPG Partners, LLC
15. Oak State Products, LLC
16. Standard Functional Foods Group, LLC
17. Quality Bakery Products, LLC
18. Toll Packaging Services LLC
19. Ryt-way Industries, LLC
20. Matterhorn Sub, LLC
21. Peacock Foods LLC and
22. Hearthside USA – Produce & Foodservice, LLC

## EXHIBIT B

**Restructuring Term Sheet**

## H-Food Holdings, LLC, *et al*.
## RESTRUCTURING TERM SHEET[1]

THIS TERM SHEET (THE "RESTRUCTURING TERM SHEET") SETS FORTH THE PRINCIPAL TERMS OF THE RESTRUCTURING TRANSACTIONS AND CERTAIN RELATED TRANSACTIONS CONCERNING THE COMPANY PARTIES AGREED TO BY THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS.  THIS RESTRUCTURING TERM SHEET DOES NOT CONTAIN A COMPLETE LIST OF ALL TERMS AND CONDITIONS OF THE POTENTIAL TRANSACTIONS DESCRIBED HEREIN.  SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT TO WHICH THIS RESTRUCTURING TERM SHEET IS ATTACHED, THE RESTRUCTURING TRANSACTIONS SHALL BE CONSUMMATED THROUGH A PREARRANGED PLAN OF REORGANIZATION IN THE CHAPTER 11 CASES.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THIS RESTRUCTURING TERM SHEET AND THE UNDERTAKINGS CONTEMPLATED HEREIN ARE SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION, AND DELIVERY OF DEFINITIVE DOCUMENTATION REASONABLY ACCEPTABLE TO THE COMPANY PARTIES AND THE REQUIRED CONSENTING FIRST LIEN LENDERS (AND, IF APPLICABLE, PURSUANT TO AND CONSISTENT WITH THE CONSENT RIGHTS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT, THE REQUIRED CONSENTING STAKEHOLDERS).  THIS RESTRUCTURING TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS.  ACCORDINGLY, THIS RESTRUCTURING TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON OR ENTITY PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE RULE, STATUTE, OR DOCTRINE OF SIMILAR IMPORT PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS, WHETHER ARISING UNDER FEDERAL OR STATE LAW.  UNTIL PUBLICLY DISCLOSED UPON THE PRIOR WRITTEN AGREEMENT OF THE COMPANY PARTIES AND REQUIRED CONSENTING STAKEHOLDERS, THIS RESTRUCTURING TERM SHEET SHALL REMAIN STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY OTHER PARTY OR PERSON WITHOUT THE CONSENT OF THE COMPANY PARTIES AND REQUIRED CONSENTING STAKEHOLDERS.

THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS AND EFFECTS RELATED TO THE RESTRUCTURING TRANSACTIONS OR ANY RELATED RESTRUCTURING OR SIMILAR TRANSACTION HAVE NOT BEEN FULLY EVALUATED AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY RESTRUCTURING TRANSACTIONS OR RELATED TRANSACTIONS.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW, INCLUDING THE BANKRUPTCY CODE.

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement.

| **Restructuring Term Sheet** | |
|---|---|
| **Restructuring Overview** | |
| **Debtors** | The Company Parties that are listed on <u>Exhibit A</u> to the Restructuring Support Agreement, which shall also be signatories to the Restructuring Support Agreement (each a "***Debtor***" and collectively, the "***Debtors***"). |
| **Restructuring Overview** | The Restructuring Transactions shall be implemented pursuant to the Definitive Documents through confirmation of a prearranged chapter 11 plan (the "***Plan***") in cases to be commenced by the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, *et seq.* (as amended, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***" and such cases, the "***Chapter 11 Cases***").<br><br>The Restructuring Transactions shall be subject to the Definitive Documents, the terms of the Restructuring Support Agreement (including the exhibits thereto), and the consent rights set forth therein.<br><br>The Restructuring Transactions provide for among other things:<br><br>(i)    The Chapter 11 Cases will be financed by (a) cash on hand; (b) the consensual use of cash collateral on final terms to be reasonably acceptable to the Required Consenting First Lien Lenders; and (c) a "new money" postpetition senior secured debtor-in-possession financing (the "***DIP Facility***") and backstopped by certain of the Required Consenting First Lien Lenders on the terms and conditions set forth herein and in the Definitive Documentation.<br><br>(ii)    Stakeholder recoveries as set forth in the "Treatment of Claims and Interests" section herein. |
| **Cash Collateral and DIP Facility** | The Company Parties shall seek, and the Consenting First Lien Lenders shall support, entry of (1) an order approving the consensual use of cash collateral (the "***Cash Collateral Order***"), substantially in the form attached to the Restructuring Support Agreement as <u>Exhibit C</u> and (2) a final order approving each of the consensual use of cash collateral and the DIP Facility (the "***DIP Order***") on a final basis, which shall be consistent in all material respects with the Cash Collateral Order, the DIP Term Sheet, this Term Sheet and otherwise reasonably acceptable to the Required DIP Lenders, the Required Consenting First Lien Lenders and the Company Parties.<br><br>Contemporaneously with execution of the Restructuring Support Agreement, the Company Parties shall cause all cash at Hearthside Sub, LLC to be dividended to Hearthside Food Solutions, LLC<br><br><u>DIP Facility</u>. DIP Facility terms set forth in the DIP Term Sheet attached as <u>Exhibit A</u> (the "***DIP Term Sheet***") to the DIP Commitment Letter |

| | |
|---|---|
| | attached to the Restructuring Support Agreement as <u>Exhibit D</u>.<br><br><u>Professional Fee Reserve</u>. As provided for the Cash Collateral Order.<br><br><u>Carve-Out</u>. As provided for the Cash Collateral Order.<br><br><u>Adequate Protection</u>. As provided for in the Cash Collateral Order.<br><br><u>Other.</u> Waivers of marshalling, 506(c) and 552(b) subject to entry of the DIP Order. |
| **Exit Revolving Facility** | The Debtors will use commercially reasonable efforts to raise a revolving facility with up to $300 million in commitments (the "***Exit Revolving Facility***"), through a super-senior balance sheet asset-based revolver with a first lien on A/R and inventory (the "***Exit Revolver Facility Collateral***"), and a second lien on the collateral subject to a first lien under the Exit First Lien Term Loan Facility; provided, that the Debtors will have the ability to upsize the Exit Revolver Facility to $375 million in commitments if the Debtors' existing factoring agreements are unwound.<br><br><u>Maturity</u>. January 2030<br><br><u>Interest Rate</u>. TBD subject to third-party financing process<br><br><u>Other</u>. Usual and customary market terms materially consistent with this Restructuring Term Sheet and otherwise reasonably acceptable to the Required Consenting First Lien Lenders and the Company Parties. |
| **Exit First Lien Term Loan Facility** | On the Plan Effective Date, the Reorganized Debtors shall incur a secured term loan facility in the aggregate principal amount of $725 million (the "***Exit First Lien Term Loan Facility***") under an exit financing credit agreement (the "***Exit First Lien Term Loan Credit Agreement***" and related loan documents, the "***Exit First Lien Term Loan Documents***") which shall be in form and substance reasonably acceptable to the Company Parties and the Required Consenting First Lien Lenders, with a first lien on substantially all of the Reorganized Debtors' assets excluding the Exit Revolver Facility Collateral, and a second lien on Exit Revolver Facility Collateral.<br><br>The Exit First Lien Term Loan Facility shall consist of term loans issued to the Holders of First Lien Secured Claims (the "***Exit First Lien Term Loans***") pursuant to the following terms:<br><br><u>Maturity</u>. March 2030<br><br><u>Interest Rate</u>. S + 650 | 2.00% Floor paid in cash<br><br><u>OID/Fees</u>. None<br><br><u>Call Schedule</u>. NC-1 / 103 / par<br><br><u>Amortization</u>. 1.0% per annum; *provided however*, no amortization payments to be made within the first twenty-four (24) months following the Plan Effective Date |

| | |
|---|---|
| | <u>Other</u>.  Market financing on more favorable terms to the Reorganized Debtors may be raised in lieu of the Exit First Lien Term Loan Facility with cash proceeds used to paydown existing first lien loans. |
| **Rights Offering** | The Plan shall provide for a rights offering of Reorganized Equity (the "***Rights Offering***") on the terms and conditions set forth herein and subject to the execution of definitive documentation, including, but not limited to, the procedures governing the Rights Offering (the "***Rights Offering Procedures***") in accordance with the Restructuring Support Agreement.<br><br>The Required Consenting First Lien Lenders (and any other lenders under the First Lien Credit Agreement that opt to participate in the Rights Offering) will provide, pro rata based on their respective amounts of the First Lien Secured Claims, the amounts to be raised in the Rights Offering based on terms acceptable in all respects to the Required Consenting First Lien Lenders and the Company Parties.  For the avoidance of doubt, the right to participate in the Rights Offering shall be freely tradable, subject to compliance with applicable securities laws, and the Rights Offering shall be conducted as a private placement pursuant to an exemption from registration under applicable U.S. securities laws.<br><br>The Rights Offering will be backstopped by the steering committee of the First Lien Ad Hoc Group  (the "***ERO Backstop Parties***") on a pro rata basis based on their respective amounts/percentages applicable to each ERO Backstop Party identified on **<u>Annex 2</u>** attached hereto, in accordance with, and subject to the terms and conditions of, a backstop commitment agreement (the "***Backstop Commitment Agreement***" and, together with the Rights Offering Procedures and the Rights Offering Order, and the other definitive documents governing the Rights Offering, the "***Rights Offering Documents***").  The obligation to backstop the Rights Offering shall be a several (and not joint and several) liability of the ERO Backstop Parties and shall be subject to the satisfaction of all conditions under the Backstop Commitment Agreement (including the payment of all fees and premiums due under the Backstop Commitment Agreement, including the Backstop Fee (as defined below) and any other premium).<br><br>Each DIP lender shall be entitled to exchange all or a portion of its DIP claim (including both funded amount and any fees), on a dollar for dollar basis, for new equity interests pursuant to the terms of the Rights Offering.<br><br><u>Rights Offering Size</u>. $200 million<br><br><u>Pro Forma Capital Structure</u>. (i) Up to $375 million new undrawn Exit Revolving Facility raise at close; (ii) $725 million Exit First Lien Term Loans; (iii) $305 million sale-leaseback; and (iv) $100 million of minimum cash.<br><br><u>Discount to Stipulated Equity Value</u>. 35.0% discount (measured on a pro forma basis for the Rights Offering proceeds) |

|  | <u>Allocation of Rights Offering</u>.  35.0% holdback for the ERO Backstop Parties; 65.0% offered to First Lien Secured Parties on a pro rata basis (including ERO Backstop Parties). <br><br> <u>Backstop Fee</u>.  10.0% paid in equity at discounted value, calculated on entire Rights Offering balance. <br><br> <u>Use of Proceeds</u>.  General working capital; repayment of any outstanding DIP amounts and to ensure $100 million of pro forma cash at exit. |
|--|--|

| Treatment of Claims and Interests |
|---|

Each Holder of an allowed Claim or Interest, as applicable, shall receive the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's allowed Claim or Interest.

| Type of Claim | Treatment | Impairment/ Voting |
|---|---|---|
| **Administrative Claims** | Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | N/A |
| **Priority Tax Claims** | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in Section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Other Secured Claims** | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor and with the reasonable consent of the Required Consenting First Lien Lenders, either: <br><br> (i)     payment in full in cash of its Allowed Other Secured Claim; <br><br> (ii)    the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; | Unimpaired / Presumed to Accept |

| | (iii) Reinstatement of its Allowed Other Secured Claim; or<br><br>(iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | |
|---|---|---|
| **Priority Non-Tax Claims** | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Claim, each Holder of an Other Priority Claims shall receive cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| **First Lien Secured Claims** | Each Holder of a First Lien Secured Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date, its elected pro rata share of:<br><br>(i) $725 million of Exit First Lien Term Loans;<br><br>(ii) 100% of the Reorganized Equity (subject to dilution by the Rights Offering and the MIP); and<br><br>(iii) If any of the Second Lien Claims Class, the Senior Unsecured Notes Claims Class, or General Unsecured Claims Class do <u>not</u> vote to accept the Plan, the cash distribution that would have otherwise been made to any such rejecting class(es).<br><br>Each Holder of a First Lien Secured Claim (or its designated Affiliate, managed fund or account or other designee) that properly exercises its Rights Offering Rights to purchase Reorganized Equity shall receive such Reorganized Equity on the Plan Effective Date. | Impaired / Entitled to Vote |
| **First Lien Deficiency Claims** | On the Plan Effective Date, First Lien Deficiency Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of First Lien Deficiency Claims shall not receive any distribution on account of such First Lien Deficiency Claims. | Impaired / Entitled to Vote[2] |
| **Second Lien Claims** | On the Plan Effective Date, Second Lien Claims:<br><br>(i) shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of existing Second Lien Claims shall not receive any distribution on account thereof; provided however,<br><br>(ii) if the Second Lien Claims Class <u>votes in favor</u> of the | Impaired / Entitled to Vote |

---

[2] First Lien Secured Claims and First Lien Deficiency Claims will receive one combined ballot.

Plan, (a) each Holder of a Second Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date, its pro rata share of $18.0 million in cash (less any professional fees of the ad hoc group of Second Lien claimants paid by the Company Parties on or after the Agreement Effective Date) (the "*Second Lien Claims Cash Recovery*"); provided that if the allowed professional fees and expenses incurred by any official committee of unsecured creditors as of the Plan Effective Date (collectively, the "*UCC Fees*") exceeds $13.0 million in the aggregate (the "*UCC Fee Threshold*"), the Second Lien Claims Cash Recovery shall be reduced on a ratable basis (determined based on the Second Lien Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the cash recovery provided to (or would have been provided to had such class voted to accept the Plan) and on account of Senior Unsecured Notes Claims and General Unsecured Claims until the UCC Fees exceed $25.0 million in the aggregate, after which no further deduction shall apply, and (b) the Required Lenders (as defined in the First Lien Credit Agreement) shall waive, and shall cause the applicable collateral or administrative agent to waive, any turnover or similar rights in favor of the First Lien Lenders with respect to such distribution on account of the Intercreditor Agreement.[3]  For the avoidance of doubt, any UCC Fees in excess of $25.0 million shall not reduce the Second Lien Claims Cash Recovery.

To the extent the Second Lien Claims Class or the Senior Unsecured Notes Claims Class are offered, as a class, rights, opportunities (including, without limitation, the opportunity to participate in the Rights Offering) or treatment that is more favorable on a ratable basis than provided to the other class (compared to what is provided for in this Restructuring Term Sheet), then the class that does not receive the more favorable treatment shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms.

---

[3]   "Intercreditor Agreement" means the *Junior Lien Intercreditor Agreement* dated as of November 25, 2018, between Goldman Sachs Lending Partners LLC, in its capacity as collateral agent under the First Lien Credit Agreement, as Representative for the First Lien Credit Agreement Secured Parties, and Ares Capital Corporation, in its capacity as collateral agent under the Second Lien Credit Agreement, as Representative for the Initial Second Priority Secured Parties, and each additional Senior Priority Representative and Second Priority Representative that from time to time becomes a party thereto.  Capitalized terms in the foregoing shall have the meanings set forth in the Intercreditor Agreement.

| | | |
|---|---|---|
| **Senior Unsecured Notes Claims** | On the Plan Effective Date, Senior Unsecured Notes Claims:<br><br>(i)     shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of existing Senior Unsecured Claims shall not receive any distribution on account thereof; provided however,<br><br>(ii)    if the Senior Unsecured Notes Class <u>votes in favor</u> of the Plan, (a) each Holder of a Senior Unsecured Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date, its pro rata share of $21.0 million in cash (amounts including any professional fees of the ad hoc group of Senior Unsecured Notes claimants paid by the Company Parties) (the "***Senior Unsecured Notes Cash Recovery***"); provided that if the UCC Fee Threshold is exceeded, the Senior Unsecured Notes Cash Recovery shall be reduced on a ratable basis (determined based on the Senior Unsecured Notes Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the cash recovery provided to (or would have been provided to had such class voted to accept the Plan) and on account of Second Lien Claims and General Unsecured Claims until the UCC Fees exceed $25.0 million in the aggregate, after which no further deduction shall apply. For the avoidance of doubt, any UCC Fees in excess of $25.0 million shall not reduce the Senior Unsecured Notes Cash Recovery.<br><br>To the extent the Second Lien Claims Class or the Senior Unsecured Notes Claims Class are offered, as a class, rights, opportunities (including, without limitation, the opportunity to participate in the Rights Offering) or treatment that is more favorable on a ratable basis than provided to the other class (compared to what is provided for in this Restructuring Term Sheet), then the class that does not receive the more favorable treatment shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms. | Impaired / Entitled to Vote |
| **General Unsecured Claims** | On the Plan Effective Date, General Unsecured Claims:<br><br>(i)     shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of existing General Unsecured Claims shall not receive any distribution on account thereof; provided however,<br><br>(ii)    if the General Unsecured Claims Class <u>votes in favor</u> of the Plan, each Holder of a General Unsecured | Impaired / Entitled to Vote |

| | Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date, the lower of: (a) its pro rata share of: $2.4 million (the "**General Unsecured Claims Cash Recovery**" together with the Second Lien Claims Cash Recovery and the Senior Unsecured Notes Cash Recovery, the "**Unsecured Claims Cash Recovery**") and (b) 6.0% of the Allowed claim; provided that if the UCC Fee Threshold is exceeded, the General Unsecured Claims Cash Recovery shall be reduced on a ratable basis (determined based on the General Unsecured Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the cash recovery provided to (or would have been provided to had such class voted to accept the Plan) and on account of Second Lien Claims and Senior Unsecured Notes Claims until the UCC Fees exceed $25.0 million in the aggregate, after which no further deduction shall apply. For the avoidance of doubt, any UCC Fees in excess of $25.0 million shall not reduce the General Unsecured Claims Cash Recovery. | |
|---|---|---|
| **Intercompany Claims** | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the reasonable consent of the Required Consenting First Lien Lenders), either reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan. | Impaired / Deemed to Reject or Unimpaired / Presumed to Accept |
| **Section 510 Claims** | On the Plan Effective Date, all Section 510 Claims (including all claims on account of the Employee Partnership Sale Units) shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims. | Impaired / Deemed to Reject |
| **Intercompany Interests** | On the Plan Effective Date, each Allowed Intercompany Interest shall be reinstated for administrative convenience. | Unimpaired / Presumed to Accept |
| **Existing Equity Interests** | On the Plan Effective Date, existing Equity Interests:<br><br>(i)   shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of existing Equity Interests shall not receive any distribution on account thereof. | Impaired / Deemed to Reject |

| **Additional Terms** | |
|---|---|
| **Definitive Documents** | This Restructuring Term Sheet does not include a description of all the terms, conditions, and other provisions that will be contained in the Definitive Documents, which shall be as set forth in the applicable term sheets referred to herein and otherwise subject to the consent rights set forth in the Restructuring Support Agreement. |
| **Organizational Documents and Governance** | Any documentation evidencing the corporate governance for the Reorganized Debtors, including charters, bylaws, limited liability company agreements, shareholder agreements and any other customary organizational documents shall be consistent with the Restructuring Support Agreement. |
| **New Board of Directors** | The board of directors of the Reorganized Company (the "***New Board***") shall be consistent with the terms set forth in the Restructuring Support Agreement and their identities shall be set forth as part of the Plan Supplement. |
| **Releases** | The Plan shall provide for the releases attached hereto as **Annex 1**. |
| **Exculpation** | The Plan shall provide for customary exculpation provisions in favor of released and indemnified parties. |
| **Indemnification** | The Plan shall provide for the assumption each of the Debtors' indemnification obligations in place, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals.[4] |
| **Management Incentive Plan** | The Reorganized Debtors shall reserve a pool of the fully diluted Reorganized Equity that are issued and outstanding on the Plan Effective Date for a post-Plan Effective Date management incentive plan (the "***MIP***") on terms to be agreed to between the Company and the Required Consenting First Lien Lenders and to be filed as part of the Plan Supplement. |
| **Tax Matters** | The Restructuring Transactions shall be structured in a tax-efficient manner to the Reorganized Debtors and the tax structure shall be subject to the reasonable consent of the Required Consenting First Lien Lenders and the Company Parties. |
| **Professional Fee Escrow** | The Plan shall provide for the establishment of, on the Plan Effective Date, an interest-bearing escrow account established and funded on or prior to the Plan Effective Date in an amount not less than aggregate unpaid professional fee claims as estimated in good faith by the respective estate professional (the "***Professional Fee Escrow***") for the benefit and exclusive purpose of satisfying such claims. The Professional Fee Escrow shall not be and shall not be deemed property of the |

---

[4]     Subject to Special Committee investigation.

| | |
|---|---|
| | Debtors or the Reorganized Debtors or encumbered in any way; provided, that to the extent surplus funds remain in the Professional Fee Escrow after all professional fee claims have been resolved by the Bankruptcy Court or settled, such funds shall be returned to the Reorganized Debtors; provided, further that the Debtors' and Reorganized Debtors' obligations with respect to professional fee claims shall not be limited nor deemed limited in any way to the balance of funds held in the Professional Fee Escrow. |
| **Restructuring Expenses** | The Debtors shall pay, as set forth in the Restructuring Support Agreement (and subject to any limitations set forth therein), the reasonable and documented fees and expenses of the First Lien Ad Hoc Group Advisors. |
| **Milestones** | The Restructuring Transactions shall be effectuated in accordance with the Milestones set forth in Section 4 of the Restructuring Support Agreement. |
| **Conditions Precedent to the Plan Effective Date** | It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived (in accordance with customary waiver provisions to be contained in the Plan): <br><br> (a) The Restructuring Support Agreement shall not have been terminated as to the Required Consenting First Lien Lenders and shall be in full force and effect; <br><br> (b) The Bankruptcy Court shall have entered the Cash Collateral Order and the DIP Order, the latter of which shall be in full force and effect; <br><br> (c) The Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with and subject to the consent rights set forth in the Restructuring Support Agreement (including this Restructuring Term Sheet); <br><br> (d) The Backstop Agreement (as defined in the Rights Offering Term Sheet) shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall be in full force and effect; <br><br> (e) The Rights Offering (including the Rights Offering Procedures) shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall have been consummated in accordance with its terms; <br><br> (f) All Milestones shall have been met or waived in accordance with the terms of the Restructuring Support Agreement; <br><br> (g) The Exit First Lien Term Loan Documents shall have been executed (or deemed executed) and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting First Lien Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions; <br><br> (h) The Reorganized Equity shall have been issued; <br><br> (i) The Professional Fee Escrow shall have been established and funded; |

(j)   All Restructuring Expenses, shall have been paid in full in cash;

(k)   The Definitive Documents shall (i) be materially consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms materially consistent with the Restructuring Support Agreement and this Restructuring Term Sheet;

(l)   The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions; and

(m)  There shall be no outstanding complaint for the determination of dischargeability of a debt in excess of $5,000,000 pursuant to Bankruptcy Code section 523 and/or Bankruptcy Rule 4007 (a "Dischargeability Complaint") (and no outstanding request for extension of time to file the same) and the Bankruptcy Court shall not have ruled in favor of any such complaint and/or request; provided, that, pending resolution of a Dischargeability Complaint, the Milestone for the Plan Effective Date shall be automatically extended one time by forty-five (45) days.

| **Certain Plan Definitions** | |
|---|---|
| **Allowed** | With respect to any Claim or Interest, a Claim or an Interest expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors (with the consent of the Required Consenting First Lien Lenders, which shall not be unreasonably withheld, delayed, or conditioned), may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law; *provided, however* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. |
| **Confirmation Date** | The date upon which the Bankruptcy Court confirms the Plan pursuant to Section 1129 of the Bankruptcy Code. |
| **Plan Effective Date** | The date that is the first business day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Plan Effective Date set forth in the Plan have been satisfied or waived in accordance with the terms of the Plan. Any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable thereafter. |
| **First Lien Claims** | Any claim arising from or related to that certain *Credit Agreement*, dated as of May 23, 2018, between H-Food Holdings, LLC, as the U.S. Borrower (as defined in the First Lien Credit Agreement), Matterhorn Buyer, LLC, as Holdings (as defined in the First |

| | |
|---|---|
| | Lien Credit Agreement), Goldman Sachs Lending Partners LLC, as Administrative Agent and Collateral Agent (each as defined in the First Lien Credit Agreement), and the lenders party thereto (as amended, restated, supplemented, or otherwise modified from time to time). |
| **First Lien Deficiency Claims** | To the extent that any First Lien Claims are undersecured, an unsecured Claim equal to the difference in value between the full amount of such First Lien Claim and the value of the collateral securing such First Lien Claim. |
| **First Lien Secured Claims** | To the extent that any First Lien Claims are undersecured, a secured Claim equal to the value of the collateral securing such First Lien Claim. |
| **General Unsecured Claims** | Any Claim that is not a: (a) DIP Claim; (b) Administrative Claim; (c) First Lien Secured Claim; (d) Intercompany Claim; (e) Other Priority Claim; (f) Other Secured Claim; (g) Priority Tax Claim; (h) Professional Fee Claim; (i) or Section 510 Claim, (j) the First Lien Deficiency Claims; (k) Second Lien Claim; or (l) Senior Unsecured Notes Claim. For the avoidance of doubt, General Unsecured Claims shall include any Claims or cause of action, whether existing now or arising in the future, known or unknown, and whether held by any governmental or quasi-governmental entity—including but not limited to local, state, federal, or foreign or private party, against any of the Debtors (or their Affiliates) in any way arising out of or relating to the labor practices of the Debtors (or their Affiliates and any independent contractors or third party staffing agencies) or any of their respective predecessors prior to the Plan Effective Date, including, for the avoidance of doubt and without limitation, Claims for indemnification (contractual or otherwise), contribution, or reimbursement against any of the Debtors (or their Affiliates) in any way arising out of or relating to the labor practices of the Debtors (or their Affiliates and any independent contractors or third party staffing agencies) or any of their respective predecessors prior to the Plan Effective Date (any such claim, a "***General Unsecured Claim***"). |
| **Holder** | A Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable. |
| **Impaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of Section 1124 of the Bankruptcy Code |
| **Intercompany Claims** | Any Claim against a Debtor held by another Debtor. |
| **Intercompany Interests** | Any Interest in a Debtor held by another Debtor. |
| **Other Priority Claims** | Any Claim, other than an Administrative Claim, Priority Tax Claim, DIP Claim, entitled to priority in right of payment under Section 507(a) of the Bankruptcy Code. |
| **Other Secured Claims** | Any Secured Claim against the Debtors other than the DIP Claims and First Lien Secured Claims. |
| **Professional** | Any Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with Sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services |

| | |
|---|---|
| | rendered prior to or on the Confirmation Date, pursuant to Sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code. |
| **Professional Fee Claim** | Any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. |
| **Second Lien Claims** | Any Claim arising from or related to that certain *Second Lien Credit Agreement*, dated as of November 25, 2018, between Matterhorn Buyer, LLC, as Holdings (as defined in the Second Lien Credit Agreement), H-Food Holdings, LLC, as the Borrower (as defined in the Second Lien Credit Agreement), Ares Capital Corporation, as Administrative Agent and Collateral Agent (each as defined in the Second Lien Credit Agreement), and the lenders party thereto (as amended, restated, supplemented, or otherwise modified from time to time). |
| **Section 510 Claims** | Any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of an equity security as defined in Section 101(17) of the Bankruptcy Code (including the Employee Partnership Sale Units) of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such an equity security made to the Debtors prior to the Petition Date; (c) for reimbursement or contribution allowed under Section 502(e) of the Bankruptcy Code on account of such a Claim; and (d) any other claim determined to be subordinated under Section 510 of the Bankruptcy Code. |
| **Senior Unsecured Notes Claim** | Any Claim arising from or related to that certain *Indenture*, dated as of May 23, 2018, between H-Food Holdings, LLC, and Hearthside Finance Company, Inc., as Issuers, certain subsidiaries of the Company as Subsidiary Guarantors, and U.S. Bank National Association as Trustee. |
| **Stipulated Equity Value**[5] | $470 million |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of Section 1124 of the Bankruptcy Code. |

---

[5]    The Rights Offering backstopped by the ERO Backstop Parties, sophisticated financial institutions that are familiar with the Debtors' operations and the co-manufacturing industry, is the culmination of good faith, arm's length, extensive negotiations among the Debtors and the ERO Backstop Parties and their respective financial and legal advisers based on in-depth due diligence in the months leading up to the Petition Date.  The Restructuring Support Agreement contemplates, among other things, the Debtors or the Reorganized Debtors raising $200 million of capital through the Rights Offering at a 35% discount to an implied $470 million equity value (the "***Stipulated Equity Value***"), measured on a pro forma basis for the Rights Offering proceeds.  Such capital raise would be difficult to consummate without the material deleveraging and equitization contemplated by the Restructuring Support Agreement.  This further implies a total enterprise value of the Reorganized Debtors upon emergence of approximately $1.3 billion.

**<u>Annex 1</u>**

**Mutual Releases**

A.       *Debtor Release*

(a)       Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolver Facility, Exit First Lien Term Loan Facility, the Rights Offering, the Definitive Documents, or related   contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in this [Article [●]] shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan

Supplement) executed to implement the Plan, and (II) to the extent that the special committee of the board of directors of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.

B.     *Third Party Releases*

(b)     Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolver Facility, Exit First Lien Term Loan Facility, the Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth

2

in this [Article [●]] shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of the board of directors of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

C.      *Definition of Releasing Parties*

"***Releasing Parties***" means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (v) each Released Party, (vi) each Related Party to each Entity in clause (i) through (v) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clause (i) through (v); provided that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release, either through (1) a formal objection Filed on the docket of the Chapter 11 Cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before confirmation.

D.      *Definition of Related Party*

"***Related Party***" means, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

E.      *Definition of Released Parties*

"***Released Parties***" means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the First Lien Agent, (v) the Second Lien Agent, (vi) the Indenture Trustee, and (vii) each Holder of a First Lien Claim, Second Lien Term Loan Claim or Senior Unsecured Notes Claim that votes for, and does not object to, the Plan, and (b) with respect to each of the foregoing Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law; *provided*, that any Entity or Person that opts out of or timely objects either through (1) a formal objection Filed on the docket of the Chapter 11 Cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before confirmation to the releases set forth in [Article [●]] of the Plan shall not be deemed a Released Party.

**Annex 2**

**DIP & ERO Backstop Parties and Rights Offering Holdback Parties**

[Redacted]

# EXHIBIT C

**Cash Collateral Order**

[Filed Separately on the Docket]

# **EXHIBIT D**

## **DIP Commitment Letter**

*Execution Version*

Confidential

November 22, 2024

**DIP Facility Backstop Commitment Letter**

<u>PRIVILIGED AND CONFIDENTIAL</u>

H-Food Holdings, LLC
3333 Finley Road, Suite 800
Downers Grove, IL 60515
Attention: Nick Hewitt, Chief Financial Officer
and Robert Caruso, Chief Restructuring Officer

Ladies and Gentlemen:

Reference is made to that certain Restructuring Support Agreement, dated as of November 22, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>RSA</u>") by and among Matterhorn Buyer, LLC, a Delaware limited liability company ("<u>Holdings</u>"), H-Food Holdings, LLC, a Delaware limited liability company (the "<u>Company</u>" or "<u>you</u>") the other Company Parties (as defined therein) party thereto, the Consenting First Lien Lenders (as defined therein) party thereto, the Consenting Second Lien Term Lenders (as defined therein) party thereto, the Consenting Senior Noteholders (as defined therein) party thereto, SnackTime PG Holdings, Inc., Snack Time Summit Holdings, Inc., CB Metafora Aggregator, LLC and the other Consenting Sponsors (as defined therein) party thereto.

You have informed Jefferies Capital Services, LLC, in its capacity as fronting lender of the DIP Facility (as defined below) ("<u>JCS</u>", the "<u>Commitment Party</u>", "<u>we</u>" or "<u>us</u>"), that the Company and certain of its affiliates and subsidiaries are contemplating filing (the date of such filing, the "<u>Petition Date</u>") voluntary petitions for relief (collectively, the "<u>Chapter 11 Cases</u>") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of Texas.  In connection therewith, you have advised us that you are seeking a superpriority senior secured debtor-in-possession term loan facility (the "<u>DIP Facility</u>") in an amount equal to $300,000,000 (the "<u>Commitment Amount</u>"), in the form of up to $150,000,000 of new money loans (the "<u>New Money Loans</u>") and $150,000,000 in converted First Lien Claims on a dollar-for-dollar basis (the "<u>Roll-Up Loans</u>" and together with the New Money Loans, collectively, the "<u>DIP Loans</u>"), on the terms set forth in the RSA and which shall be used as set forth in the DIP Term Sheet (as defined below).  Capitalized terms used herein but not defined shall have the meanings assigned to them in the indicative summary of terms attached hereto as <u>Exhibit A</u> (the "<u>DIP Term Sheet</u>"; the DIP Term Sheet, together with this letter, the "<u>Commitment Letter</u>").

1.      <u>Commitments</u>.

In connection with the Chapter 11 Cases, JCS is pleased to advise you of its commitment to provide the New Money Loans upon the terms set forth in this Commitment Letter (including the DIP Term Sheet) and subject to the satisfaction of the "Conditions Precedent to Funding" set forth in the DIP Term Sheet. Upon the satisfaction (or waiver by the Commitment Party) of such conditions, the funding of the New Money Loans shall be available to be drawn and, subject to the conditions in the DIP Term Sheet, the Roll-Up Loans shall be deemed funded on the second draw of the New Money Loans.

JCS has agreed to act as an initial lender with respect to the New Money Loans, fund the New Money Loans in an aggregate amount equal to $150,000,000 and execute this Commitment Letter as the Commitment Party.  JCS, in its capacity as a fronting lender, may assign its rights and obligations with respect to the New Money Loans under the DIP Facility to certain financial institutions (including the DIP Lenders) as set forth in that certain Master Consent to Assignment (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Master Consent to Assignment"), to be dated as of the Closing Date, by and among the Company, as the borrower, Wilmington Savings Fund Society, FSB, as agent for the lenders under the DIP Credit Agreement (the "Administrative Agent"), and JCS, subject to the completion of definitive documentation evidencing such assignment in form and substance satisfactory to JCS and such financial institution and acceptance of such assignment by such financial institution.  Notwithstanding any other provision of this Commitment Letter to the contrary, (i) the Commitment Party shall not be relieved or novated from its obligations hereunder (including its obligation to fund the New Money Loans) in connection with any syndication, assignment or participation of the DIP Facility, including its commitments in respect thereof, until the earlier of (x) the initial funding of the New Money Loans or (y) the termination of this Commitment Letter in accordance with the terms hereof, and (ii) no assignment or novation shall become effective with respect to all or any portion of the Commitment Party's commitments in respect of the DIP Facility until the initial funding of the New Money Loans.

2.    Information.

You hereby represent and covenant that to the best of your knowledge, all written information and data prepared by you and delivered after the date hereof concerning the Debtors or the Chapter 11 Cases (the "Information") which is made available in writing to the Commitment Party or any of its affiliates or related funds by the Debtors or any authorized representative of the Debtors in connection with the transactions contemplated hereby (as subsequently updated or corrected), and (b) any projections (the "Projections") that will be made available to us by or on behalf of you after the date hereof in connection with the transactions contemplated hereby, in each case, have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished.  The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of any Commitment Party.  In connection with the transactions contemplated hereby, the Commitment Party will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized).

3.    Backstop Premium.

As consideration for the agreement of JCS set forth herein, you agree to pay JCS (i) a fronting fee as more fully set forth in that certain Fee Letter, dated as of the date hereof, by and between the Company and JCS (and related fees and expenses as set forth therein) and (ii) a backstop commitment premium as defined in the DIP Term Sheet as the "Backstop Premium".  The Backstop Premium shall be earned, due and payable, in U.S. dollars in immediately available funds, upon execution of this Commitment Letter. All payments payable hereunder shall be in addition to reimbursement of the DIP Lenders' reasonable fees, costs and expenses as provided for in the DIP Documents and the DIP Term Sheet, and shall not be refundable under any circumstances and shall not be creditable against any other amount payable in connection with the DIP Credit Agreement or otherwise, and in all cases shall be paid free and clear of, and without deduction for, any and all present or future applicable taxes, levies, imposts, deductions, charge or withholdings, and all liabilities with respect thereto (with full gross-up for withholding taxes), except as

2

otherwise required by law. Your obligation to pay the foregoing fees and other amounts will not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute relating to any other matter. You agree that we may, in our sole discretion, allocate all or a portion of any of the payments payable pursuant to this Commitment Letter to (i) any of the Commitment Party's affiliates or related funds and/or (ii) any of the DIP Lenders or their respective affiliates or related funds. The parties agree that each of them shall treat the applicable fees with respect to the commitment as set forth in the DIP Term Sheet. For the avoidance of doubt, nothing in this letter or related legal documents requires the Commitment Party or any DIP Lender to provide any services to the you or any of your affiliates or their affiliates and the Backstop Premium is a payment for the use of capital, but not for any services.

4.     <u>Conditions</u>.

Notwithstanding anything in this Commitment Letter, the DIP Documents or any other letter agreement or other undertaking concerning the financing of the transactions contemplated hereby to the contrary, the commitments of JCS hereunder to perform the services described herein are subject to the "Conditions Precedent to Funding".

5.     <u>Indemnification; Expenses</u>.

You agree to indemnify and hold harmless the Commitment Party and each of its respective affiliates and controlling persons and their affiliates and controlling persons and the respective directors, officers, managers, members, employees, partners, advisors, attorneys, agents and other representatives and the successors of each of the foregoing and their respective successors (each, an "<u>Indemnified Party</u>") from and against any and all losses, claims, damages, liabilities (including, fees and disbursements of counsel) and reasonable out-of-pocket and documented expenses, joint or several, to which any such Indemnified Party may become subject arising out of, resulting from, or in connection with this Commitment Letter (including the DIP Term Sheet) or any claim, litigation, investigation or proceeding (a "<u>Proceeding</u>") relating to any of the foregoing, regardless of whether any Indemnified Party is a party hereto or thereto, whether or not such Proceedings are brought by you or your equity holders, affiliates, creditors or any other person, and to reimburse each Indemnified Party within ten (10) days of written demand for any reasonable and documented out-of-pocket legal fees and expenses of counsel or other reasonable out-of-pocket fees and expenses incurred in connection with investigating, responding to, or defending any of the foregoing (but limited, in the case of legal fees and expenses, to one counsel at a time and, if reasonably necessary, one local counsel to the Commitment Party in each applicable jurisdiction and, in the case of a conflict of interest, one additional counsel to the affected Indemnified Parties taken as a whole, and, if reasonably necessary, one local counsel to the Party in each applicable jurisdiction). None of the Indemnified Parties or you or any of your affiliates or the respective directors, officers, employees, advisors, attorneys and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the DIP Facility or the transactions contemplated hereby; <u>provided</u> that, nothing contained in this sentence shall limit your indemnification and reimbursement obligations to the extent expressly set forth herein or in the DIP Documents.

You shall not be liable for any settlement of any Proceeding (or expenses related thereto) effected without your consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with your written consent, or if there is a judgment against an Indemnified Party in any such Proceeding, you agree to indemnify and hold harmless each Indemnified Party to the extent and in the manner set forth above. You shall not, without the prior written consent of an Indemnified Party, effect any settlement of any pending or threatened Proceeding against an Indemnified Party in respect of which indemnity could have been sought hereunder by such Indemnified Party unless (a) such settlement includes an unconditional release of such Indemnified Party in form and substance satisfactory to such Indemnified Party from all liability or claims that are the subject matter of such Proceeding and (b) such settlement does

3

not include any statement as to any admission of fault, culpability, wrongdoing or a failure to act by or on behalf of any Indemnified Party.

In case any Proceeding is instituted involving any Indemnified Party for which indemnification is to be sought hereunder by such Indemnified Party, then such Indemnified Party will promptly notify you of the commencement of any Proceeding; provided, however, that the failure so to notify you will not relieve you from any liability that you may have to such Indemnified Party pursuant to this Section 5.

Notwithstanding anything to the contrary contained herein, upon the execution and effectiveness of the DIP Documents, (a) the relevant provisions of such definitive documentation shall supersede the provisions of the preceding paragraphs in this Section 6 and (b) you shall be released from this provision of the Commitment Letter and shall have no further liability or obligation pursuant to this Commitment Letter to reimburse of an Indemnified Party for losses, claims, damages, liabilities, expenses, fees or any such indemnifies obligations or any other expense reimbursement (other than with respect to provisions therein that expressly survive termination).

6.     Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities.

You acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and us is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Party or any of its affiliates have advised or are advising you on other matters, (b) the Commitment Party, on the one hand, and you, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of the Commitment Party (and you hereby agree not to assert, to the fullest extent permitted by law, any claims that you may have against any of the Commitment Party and their affiliates with respect to any breach or alleged breach of fiduciary duty and agree that the Commitment Party shall not have any liability (whether direct or indirect) to you in respect of such fiduciary duty claim or to any person asserting a fiduciary duty on behalf of or in right of you, including your equity holders, employees or creditors, in each case in connection with the transactions contemplated hereby), (c) in connection therewith and with the process leading to the Chapter 11 Cases, the Commitment Party and its affiliates (as the case may be) are acting solely as a principal and not as agents or fiduciaries of you, (d) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (e) you have consulted legal and financial advisors to the extent you deemed appropriate and (f) you have been advised that the Commitment Party and its affiliates are engaged in a broad range of transactions that may involve interests that differ from your interests and that they have no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship.

7.     Confidentiality.

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of their terms shall be disclosed to any other person, except (a) your officers, directors, employees, affiliates, members, partners, stockholders, co-investors, attorneys, accountants, agents and advisors, in each case, on a confidential and "need-to-know" basis, (b) as used for customary accounting purposes, including accounting for deferred accounting costs or as part of projections, pro forma information and a generic disclosure of aggregate sources and uses, in each case, on a confidential and "need-to- know" basis, (c) in any legal, regulatory, judicial or administrative proceeding or as otherwise required by applicable law, rule or regulation or as requested by a governmental authority, including any public filing as may be required under the Securities Exchange Act of 1934 (in which case you agree, to the extent permitted by law, rule or regulation, to inform us promptly thereof) provided that nothing in this Agreement prohibits or restricts you from reporting possible violations of federal, state, or local law or

4

regulation to, or discussing any such possible violations with, any governmental agency or entity or self-regulatory organization, including by initiating communications directly with, responding to any inquiry from, or providing testimony before any federal, state, or local regulatory authority or agency or self-regulatory organization, including without limitation the Securities and Exchange Commission, the Commodities Futures Trading Commission, the Financial Industry Regulatory Authority, and the Occupational Safety and Health Administration, recovering an award provided in connection with the provision of such information, or making any other disclosures that are protected by the whistleblower provisions of any federal, state, or local law or regulation, (d) in connection with the exercise of any remedy or enforcement of any right under this Commitment Letter, (e) to the extent any such information becomes publicly available other than by reason of disclosure by you, your subsidiaries or your representatives in violation of this Commitment Letter, (f) to the office of the U.S. Trustee, any *ad-hoc* or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (g) to the extent required in motions, in a redacted manner in form and substance reasonably satisfactory to the Commitment Party, to be filed with the Bankruptcy Court approving the Company's execution, delivery and performance of this Commitment Letter, the definitive DIP Documents, and the order approving the DIP Facility on a final basis and (h) with the Commitment Party's consent. Your obligations under this paragraph shall remain in effect until the date that is two (2) years from the date hereof, regardless of whether the DIP Documents shall have been executed and delivered by the parties hereto.

8.    <u>Miscellaneous</u>.

This Commitment Letter shall not be assignable by any party hereto without the prior written consent of the other parties hereto (and any purported assignment without such consent shall be null and void), and is intended to be solely for the benefit of the parties hereto and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and the Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or other electronic transmission (e.g., "<u>pdf</u>" or "<u>tif</u>") shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature," and words of like import herein shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on the electronic platform DocuSign, digital copies of a signatory's manual signature, and deliveries or the keeping of records in electronic form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. This Commitment Letter and the RSA are the only agreement that has been entered into among us and you with respect to the DIP Facility and set forth the entire understanding of the parties with respect thereto. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to principles of conflicts of law, to the extent that the same are not mandatorily applicable by statute and would require or permit the application of the law of another jurisdiction. Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement with respect to the subject matter herein, including an agreement to negotiate in good faith the DIP Documents by you and us in a manner consistent with this Commitment Letter and notwithstanding that the funding of the DIP Facility is subject to certain conditions, including the execution and delivery of the DIP Documents. You and we shall proceed with the negotiation in good faith of the DIP Documents for the purpose of executing and delivering the DIP Documents substantially simultaneously with the commencement of the Chapter 11 Cases. Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

Each of the parties hereto irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any federal court sitting in the Borough of Manhattan in the City of New York or, if that court does not have subject matter jurisdiction, in any stated court located in the City and County of New York and the Bankruptcy Court, and any appellate court from any thereof, over any suit, action or proceeding arising out of or relating to the transactions contemplated hereby, this Commitment Letter or the performance of services hereunder or thereunder or for recognition or enforcement of any judgment and agrees that all claims in respect of any such action or proceeding shall be heard and determined in the aforesaid courts; provided, however, that the Commitment Party shall be entitled to assert jurisdiction over you and your property in any court in which jurisdiction may be held over you or your property, and (b) agrees that a final and non- appealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  You and we agree that service of any process, summons, notice or document by registered mail addressed to any of the parties hereto at the applicable addresses above shall be effective service of process for any suit, action or proceeding brought in any such court.  You and we hereby irrevocably and unconditionally waive, to the fullest extent you and we may legally and effectively do so, any objection to the laying of venue of any such suit, action or proceeding brought in any court in accordance with clause (a) of the first sentence of this paragraph and any claim that any such suit, action or proceeding has been brought in any inconvenient forum.  YOU AND WE HEREBY IRREVOCABLY WAIVE (TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW) TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THE DIP FACILITY CONTEMPLATED HEREUNDER, THIS COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.

The Commitment Party hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (as amended, the "PATRIOT Act"), they are required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow the Commitments Party or any other DIP Lender to identify the Borrower and each Guarantor in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Party and each other DIP Lender.

The fees, indemnification, expense reimbursement, absence of fiduciary duty, jurisdiction, waiver of jury trial, service of process, venue, governing law and confidentiality provisions contained herein shall remain in full force and effect regardless of whether the DIP Documents shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided that, your obligations under this Commitment Letter shall automatically terminate and be superseded by the provisions of the DIP Documents upon the execution and effectiveness thereof and you shall automatically be released from all liability in connection therewith at such time.  You may terminate the Commitment Party's commitments hereunder at any time subject to the provisions of the preceding sentence.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to us executed counterparts of this Commitment Letter not later than 5:00 p.m., New York City time, on November 22, 2024.  This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence, unless we shall, in our sole discretion, agree in writing to an extension.  Unless we shall, in our sole discretion, agree to an extension, this Commitment Letter and the commitments hereunder shall automatically terminate on the first to occur of (a) the Petition Date, unless each of the Jefferies Commitment Fee (as defined in the Fee Letter) and the Backstop Premium shall have been paid in U.S. dollars in immediately available funds prior to the filing of the Chapter 11 Cases; (b) the Closing Date of the DIP Facility does not occur on or

before 11:59 p.m., New York City time, on the date that is forty-seven (47) calendar days following the Petition Date, (c) the Petition Date has not occurred on or before 11:59 p.m. New York City time on November 22, 2024 and (d) execution and delivery of the DIP Documents with respect to the DIP Facility.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

148688031_6

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

JEFFERIES CAPITAL SERVICES, LLC,
as the Commitment Party

By: _____
Name:     Mark Sahler
Title:    Managing Director

[Siganture Page to DIP Commitment Letter]

Accepted and agreed to as of
the date first above written:

H-FOOD HOLDINGS, LLC

By: _Robert M. Caruso_____
Name: Robert M. Caruso
Title:   Chief Restructuring Officer

[Signature Page to DIP Commitment Letter]

**Exhibit A**

**DIP Term Sheet**

(See attached).

Execution Version

**Exhibit A**

## DIP TERM SHEET

## MATTERHORN BUYER, LLC, *ET AL.*

This summary of terms and conditions (this "***DIP Term Sheet***") sets forth the material terms of a proposed debtor-in-possession financing facility that the DIP Lenders (as defined below) are contemplating providing to H-Food Holdings, LLC, and certain of the Borrower's affiliates and subsidiaries that will be debtors and debtors-in-possession (collectively, the "***Debtors***") in connection with the chapter 11 cases (the "***Chapter 11 Cases***") to be filed by the Debtors under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***").   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Commitment Letter to which this DIP Term Sheet is attached, or the RSA or the Cash Collateral Order, as applicable.

This DIP Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financings described herein, but rather is intended to be a summary outline of certain basic items, which shall be set forth in final documentation, which documentation shall be acceptable in all respects to the Debtors, the DIP Agent (as defined below), and the DIP Lenders (as defined below).

| 1. **Borrower** | H-Food Holdings, LLC |
|---|---|
| 2. **Guarantors** | The obligations of the Borrower shall be unconditionally guaranteed, on a joint and several basis, by each of Matterhorn Buyer, LLC, a Delaware limited liability company ("***Holdings***"), and each Subsidiary Guarantor under the Prepetition Facilities and each other Debtor (collectively, the "***Guarantors***"; the Guarantors, together with the Borrower, collectively, the "***DIP Loan Parties***").  All obligations of the Borrower under the DIP Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors. |
| 3. **DIP Facility** | The $300.0 million super-senior secured debtor-in-possession financing facility (the "***DIP Facility***") in accordance with the terms of a debtor-in-possession credit agreement (the "***DIP Credit Agreement***") and the other definitive documentation, the forms of which shall be reasonably acceptable to the DIP Agent (as defined below), the DIP Lenders (as defined below) and the Borrower (collectively with the DIP Credit Agreement and the related security, guaranty and ancillary documents, collectively, the "***DIP Documents***", and all obligations arising thereunder, the "***DIP Obligations***") which shall consist of (a) $150.0 million in the form of converted First Lien Claims on a dollar-for-dollar basis (the "***Roll-Up Loans***"), such conversion to occur on the second funding of New Money Loans (other than as a result of a Post Confirmation Funding) and (b) delayed draw term loans (two (2) draws) in an aggregate principal amount equal to $150.0 million (the "***New Money Loans***" and together with the Roll-Up Loans, collectively, the "***DIP Loans***") which shall be available upon entry of the Final DIP Order, subject to the funding conditions set forth in this DIP Term Sheet and DIP Credit Agreement. |

|  | The New Money Loans may be funded in two (2) or less draws; *provided* that, (i) the Borrower shall provide at least three (3) Business Days' notice prior to any draw of New Money Term Loans and (ii) the aggregate principal amount of each draw of New Money Term Loans shall be no less than the lesser of (x) $75 million and (y) the remaining unfunded New Money Term Loan Commitments. |
|---|---|
|  | If any New Money Loans are undrawn as of confirmation of the Plan (as defined in the RSA), the Borrower shall draw the remaining New Money Loans prior to the Plan Effective Date (as defined in the RSA) ("***Post Confirmation Fund***") and such drawn New Money Loans may, at the election of each individual DIP Lender, be converted to equity as part of the Rights Offering (as defined in the RSA).  In the event of a Post Confirmation Funding, no Roll-Up Loans shall be deemed funded under the DIP Facility. |
|  | If a Restructuring Transaction in the RSA is consummated, the conversion of the First Lien Claims into Roll-Up Loans (if any) shall be deemed unwound, with all Roll-Up Loan remaining First Lien Claims under the Prepetition Credit Agreement. |
| **4.  DIP Facility Interest Rate** | <u>New Money Loans</u>: Adjusted term SOFR + the DIP Margin; paid in cash <br><br> <u>Roll-Up Loans</u>: Adjusted term SOFR + the DIP Margin; paid in kind; *provided* that, if the Restructuring Transactions (as defined in the RSA) are consummated, the interest on the Roll-Up Loans shall be waived. <br><br> <u>DIP Margin</u>: 8.50% p.a. |
| **5.  Default Interest** | Upon the election of the Required DIP Lenders during the continuance of an Event of Default, any overdue principal on the DIP Loans will bear interest at an additional 2.00% per annum and any other overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate *plus* an additional 2.00% per annum.  Default interest shall be payable in cash on demand. |
| **6.  DIP Facility Amortization** | None |
| **7.  Premiums** | <u>DIP Commitment Premium</u>.  2.5% of the total amount of each DIP Lender's New Money Loan commitments, to be earned upon entry of the Final DIP Order and paid in cash on the Closing Date, which shall be treated as a put option premium for U.S. federal income tax purposes. <br><br> <u>Backstop Premium</u>.  10.0% of the aggregate total amount of the DIP Lender's New Money Loan commitments, to be paid to Jefferies Capital Services, LLC ("***JCS***"), as fronting lender, in accordance with the Commitment Letter, for the benefit of the DIP Backstop Parties on a pro rata basis based on their respective percentages applicable to each DIP Backstop Party identified on **<u>Annex A</u>** attached hereto. |

| | |
|---|---|
| | Exit Premium.  A premium of 1.5% of the total amount of each DIP Lender's New Money Loans, to be earned upon entry of the Final DIP Order and paid upon the earlier of (a) concurrently with each repayment or prepayment of DIP Loans in the amount of 1.5% of such repayment or prepayment and (b) the date of acceleration of the DIP Loans and the termination of the DIP Lenders' commitments under the DIP Facility pursuant to the terms of the DIP Credit Agreement.  The Backstop Premium and Exit Fee shall be treated as OID for U.S. federal income tax purposes.<br><br>Unused / Ticking Premium.  A premium equal to ½ of the DIP Margin with respect to New Money Loans paid on the last business day of the month on the DIP Lenders' unfunded DIP commitments, which shall be treated as a put option premium for U.S. federal income tax purposes. |
| **8.  DIP Facility Maturity** | All obligations under the DIP Facility will be due and payable in full in cash on the earliest of: (a) the date that is nine (9) months after the date of execution and delivery of the definitive documentation for the DIP Facility; (b) the date of acceleration of the DIP Loans and the termination of the DIP Lenders' commitments under the DIP Facility pursuant to the terms of the DIP Credit Agreement; (c) the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a Chapter 7 liquidation or the dismissal of the Chapter 11 case of any Debtor; (d) the substantial consummation (as defined in 11 U.S.C. § 1101(2)) of a plan of reorganization of the Debtors which has been confirmed by the Confirmation Order; (e) the appointment of a Chapter 11 trustee or other Bankruptcy Court-mandated fiduciary with decision-making authority (including an examiner with expanded powers); (f) the date of consummation of a sale of all or substantially all of the Debtors' assets; (g) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases; and (h) other customary circumstances to be mutually agreed (such earliest date, the "***Maturity Date***"). |
| **9.  DIP Agent** | Wilmington Savings Fund Society, FSB (the "***DIP Agent***"). |
| **10. DIP Lenders** | The DIP Facility shall be provided by certain holders of First Lien Loans that elect to participate in the DIP Facility (in their capacity as lenders under the DIP Facility, collectively, the "***DIP Lenders***") and backstopped by certain members of the steering committee of the ad hoc group of lenders under the Prepetition Credit Agreement (as defined below) (the "***Ad Hoc Group***", and solely in their capacity as backstopping parties, collectively, the "***DIP Backstop Parties***") represented by Gibson Dunn & Crutcher LLP and PJT Partners, Inc. (the "***First Lien Ad Hoc Group Advisors***").<br><br>It shall be a condition precedent to participation in the DIP Facility that each DIP Lender has executed the RSA.<br><br>Each DIP Lender may participate in the DIP Facility on behalf of some or all accounts and funds managed by such DIP Lender and some or all accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such DIP Lender, and may allocate its DIP |

3

| | |
|---|---|
| | Loans among such funds in its sole discretion by making such election by the Election Deadline Date. |
| **11. Election Procedures** | Each First Lien Lender that is not a DIP Backstop Party that becomes a party to the RSA (in such capacity, each an "***Electing DIP Lender***") may participate with the other Electing DIP Lenders to provide its *pro rata* portion of the DIP Loans by signing a joinder to the RSA by no later than a date to be agreed by the DIP Backstop Parties and the Borrower, which date shall be no later than three (3) Business Days prior to the date the final hearing in connection with the DIP Facility is scheduled (the "***Election Deadline Date***").  Such participation shall be on a *pro rata* basis in accordance with the proportion of (1) the obligations under the Prepetition Credit Agreement owed to each such First Lien Lender to (2) the obligations owed to all First Lien Lenders under the Prepetition Credit Agreement on the Election Deadline Date. |
| **12. Security and Priority** | Subject to the Carve Out, the DIP Facility shall be secured by automatically perfected liens and security interests in all DIP Collateral, including the proceeds thereof, on a first priority priming basis.  All DIP Loan Parties shall execute all collateral documents and take all actions reasonably requested by the DIP Agent to perfect such liens and security interests. <br><br> The DIP Facility shall also benefit from superpriority administrative expense claims against all Debtor DIP Loan Parties that are senior to all other administrative expenses or other claims against the DIP Loan Parties, but which shall be junior to the Carve Out and, subject to permitted liens. |
| **13. Use of Proceeds** | The proceeds of the DIP Facility will be used, among other things, (a) for working capital and general corporate purposes, (b) to fund the administration of the Chapter 11 Cases, including transaction costs, fees, adequate protection, interest, liabilities and expenses, and other administrative costs, (c) to fund adequate protection payments in respect of post-petition interest on the First Lien Claims and (d) to fund the Carve Out, in the case of each of the foregoing (other than funding the Carve Out), solely in accordance with the DIP Budget (subject to Permitted Variance). |
| **14. Closing Date; Conditions Precedent to Funding** | The closing date of the DIP Facility (the "***Closing Date***") shall occur within three (3) business days of the entry of the Final DIP Order and the DIP Lenders' funding obligations thereunder shall be subject to the satisfaction of the conditions precedent set forth below (subject to waiver by the Required DIP Lenders and the Commitment Party): <br><br> (a) Entry of the Final DIP Order; <br><br> (b) Execution and delivery of the DIP Documents in form and substance reasonably acceptable to the DIP Agent, the Required DIP Lenders, the Commitment Party and the Borrower consistent with the term set forth in this DIP Term Sheet; <br><br> (c) Receipt of a DIP Budget acceptable to the Required DIP Lenders; |

<table>
<tr><td></td><td>

(d) The absence of a default or an event of default under the DIP Documents;

(e) The representations and warranties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" or similar qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding;

(f) Other than the Chapter 11 Cases and proceedings as a result of the commencement and continuation of the Chapter 11 Cases, there shall not exist any law, regulation, ruling, judgment, order, injunction, or other restraint that prohibits, restricts, or imposes a materially adverse condition on the DIP Facility or the exercise by the DIP Agent of its rights as a secured party on a material portion of the DIP Collateral;

(g) The payment of all then accrued and unpaid reasonable and documented fees and out-of-pocket expenses of the advisors to the Ad Hoc Group;

(h) The RSA shall be in full force and effect;

(i) There shall be no defaults by the Debtors under the RSA;

(j) The DIP Loan Parties shall have delivered such collateral documents and taken such actions reasonably requested by the DIP Agent (acting at the direction of the Required DIP Lenders);

(k) The Master Consent to Assignment shall have been executed and delivered by the Borrower and the DIP Agent;

(l) The Borrower shall have provided to JCS all information reasonably requested in writing by JCS not less than five (5) Business Days prior to the Closing Date in connection with any "know your customer" rules and JCS shall have completed its "know your customer" review of the Borrower and any other Loan Parties. For the avoidance of doubt, as of the Petition Date, JCS has confirmed that this condition (l) has been satisfied;

(m) Compliance with all Milestones; and

(n) Such other conditions customary for facilities of this type and reasonably acceptable to the DIP Agent, Required DIP Lenders and Borrower.

</td></tr>
<tr><td>**15. Final DIP Order**</td><td>

The order approving the DIP Facility on a final basis, which shall be in form and substance, and upon terms and conditions, reasonably acceptable in all respects to the Required DIP Lenders and consistent with the Cash Collateral Order (the "**Final DIP Order**") and shall authorize and approve, among other matters, (i) the DIP Loan Parties' entry into the DIP

</td></tr>
</table>

5

| | |
|---|---|
| | Documents, (ii) the making of the DIP Loans (including the Roll-Up Loans, as applicable), (iii) the granting of the super-priority claims and liens against the DIP Collateral in accordance with the DIP Documents, (iv) the use of cash collateral solely in accordance with the terms of the DIP Documents, (v) the granting of adequate protection as provided herein, (vi) granting waivers of Debtors' rights to seek non-consensual use of cash collateral under Section 363 of the Bankruptcy Code, (vii) granting other waivers satisfactory to the DIP Lenders (including, without limitation, surcharge waivers under Section 506(c) of the Bankruptcy Code, equities of the case waiver under Section 552 of the Bankruptcy Code, and marshaling requirements) with respect to the DIP Obligations and the DIP Collateral; and (vii) granting releases in favor of the prepetition First Lien Lenders. |
| **16. Stipulations** | The Final DIP Order shall contain customary stipulations and waivers consistent with the Cash Collateral Order. |
| **17. Adequate Protection** | The Final DIP Order shall provide the prepetition First Lien Claim holders with adequate protection in form and substance reasonably acceptable to the Required Consenting First Lien Lenders and the DIP Loan Parties consisting of the following, subject in all respects to the Carve Out: (i) the provision of replacement liens immediately junior to the liens on all DIP Collateral securing the DIP Facility; (ii) liens on all DIP Collateral immediately junior to liens on all DIP Collateral securing the DIP Facility; (iii) reimbursement of the reasonable and documented fees and expenses of the First Lien Ad Hoc Group (including, without limitation, the reasonable and documented fees and expenses of the First Lien Ad Hoc Group Advisors); (iv) customary reporting requirements reasonably acceptable to the DIP Loan Parties, Required Consenting First Lien Lenders and Required DIP Lenders; (v) superpriority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code solely to the extent of any diminution in value; and (vi) upon entry of the Final DIP Order, the DIP Loan Parties shall become obligated to pay one quarter of all interest under the Prepetition Credit Agreement as and when it becomes due and payable pursuant to the terms thereof. <br><br> "**_Required Consenting First Lien Lenders_**" means holders of First Lien Claims holding a majority in outstanding amount of First Lien Claims. |
| **18. Carve-Out** | Carve-Out has the meaning set forth on **Annex B** attached hereto. |
| **19. Releases** | The releases shall be as set forth on Annex C. |
| **20. Indemnification** | The Final DIP Order shall provide that the DIP Secured Parties and the Prepetition First Lien Secured Parties**,** respectively, have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, respectively, any challenges or objections to the DIP Facility, or the use of Cash Collateral, the DIP Documents, and all other documents related to and |

6

| | |
|---|---|
| | all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, the Prepetition First Lien Secured Parties and DIP Secured Parties shall be indemnified (as applicable) as provided in the respective Prepetition First Lien Credit Documents and the DIP Documents, as applicable. The Debtors shall agree that no exception or defense in contract, law, or equity exists as of the date of the Final DIP Order to any obligation set forth, as the case may be, of the Final DIP Order, the DIP Documents, or the Prepetition First Lien Credit Documents to indemnify and/or hold harmless the DIP Agent, any other DIP Secured Party, the Prepetition First Lien Agent, or any Prepetition First Lien Secured Party, as the case may be, and any such defenses are waived. |
| **21. Challenge Deadline** | The Final DIP Order shall contain a Challenge Deadline consistent with the Cash Collateral Order. |
| **22. Milestones** | Consistent with the milestones set forth in Section 4 of the RSA. |
| **23. Mandatory Prepayments** | Subject to the Documentation Standard and any other mandatory prepayments reasonably agreed to by the Borrower and the Required DIP Lenders, consistent with the Prepetition Credit Agreement subject to modification as necessary to reflect the commencement of the Chapter 11 Cases or otherwise customary for facilities of this type. |
| **24. Covenants** | The affirmative and negative covenants in the DIP Documents shall be subject to the Documentation Standard and generally consistent with the Prepetition Credit Agreement, subject to (i) customary modifications necessary to reflect the Chapter 11 Cases, (ii) the addition of customary holding company covenants applicable to Holdings, (iii) customary additional restrictions on transactions between DIP Loan Parties and affiliates of Borrower and Holdings that are not DIP Loan Parties, and (iv) customary covenants regarding the Budget (including variance testing) as further specified below and milestones. |
| **25. Rating** | The Borrower shall use commercially reasonable efforts to have DIP Facility rated within 30 days of Closing Date by Moody's and S&P. For the avoidance of doubt, no specific rating shall be required. |
| **26. DIP Budget** | The Debtors shall use the Cash Collateral and any other cash in accordance with the budget attached to the Final DIP Order (as may be amended, replaced, supplemented, or otherwise modified in accordance with the terms of the Cash Collateral Order, the "*Budget*"), subject to Permitted Variances (as defined below); *provided* that, notwithstanding the foregoing, for the avoidance of doubt, the Budget will not operate as a cap on professional fees. |
| | "*Budget Testing Period*" means the rolling cumulative four-week period ending Saturday, with the first such Budget Testing Period ending on Saturday, December 21, 2024, and each Saturday thereafter. |
| | On or before 5:00 p.m. on each Thursday after the first full week after the date of entry of the Cash Collateral Order, or if such Thursday is a federally |

recognized holiday, on the first business day thereafter, the Debtors shall prepare and deliver to the the First Lien Ad Hoc Group, and the Prepetition First Lien Advisors, in form and substance satisfactory to the Required Consenting First Lien Lenders, a variance report (the "**Budget Variance Report**") comparing for each applicable Budget Testing Period the actual results against anticipated results under the applicable Budget, on an aggregate basis and in the same level of detail set forth in the Budget, together with a written explanation for all variances greater than the applicable permitted variance for any given testing period.

The Debtors shall not permit: (A) actual aggregate receipts for such Budget Testing Period to be less than 80% of the forecasted aggregate receipts for such Budget Testing Period in the applicable Budget; and (B) actual aggregate disbursements for such Budget Testing Period to be greater than 120% of the forecasted aggregate disbursements for such Budget Testing Period in the applicable Budget (such deviations from the applicable projected amounts set forth in the Budget satisfying both (A) and (B), the "**Permitted Variances**"); *provided* that the cash disbursements considered for determining compliance with this covenant shall exclude the Debtors' disbursements in respect of (i) the restructuring professional fees and expenses of the advisors to the Debtors, the Committee, the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties on account of professional fees), (ii) employee retention or incentive payments, (iii) government penalties or fines (clause (iii) subject to the Required Consenting First Lien Lenders' consent to the extent as set forth in the Restructuring Support Agreement), and (iv) U.S. Trustee's fees.

By no later than 5:00 p.m. commencing on the fourth Friday after the Petition Date (i.e., December 20, 2024), and each fourth Friday thereafter, the Debtors shall deliver to the First Lien Ad Hoc Group Advisors a rolling 13-week cash flow forecast of the Debtors in the form of the budget agreed to by the Required Consenting First Lien Lenders (each, a "**Proposed Budget**"), which Proposed Budget (including any subsequent revisions to any such Proposed Budget), shall be deemed approved unless the Required Consenting First Lien Lenders object in writing (with email from the Prepetition First Lien Advisors being sufficient) within five (5) days of receipt.  In the event the conditions for the most recently delivered Proposed Budget to constitute the Budget are not satisfied and the Debtors and the Required Consenting First Lien Lenders cannot agree on the Proposed Budget, the prior Budget shall remain in full force and effect; *provided*, *however*, in the event the Proposed Budget is not agreed within ten (10) business days of its delivery, upon five (5) business days' written notice to the Prepetition First Lien Advisors, the Debtors may request an immediate hearing with the Court to seek Court approval of the Proposed Budget to be deemed a Budget for purposes of the Cash Collateral Order.

It shall be a condition precedent to the Debtors' use of Cash Collateral that the Debtors shall have delivered the Budget in form and substance satisfactory to the Required Consenting First Lien Lenders on or prior to the entry of the Cash Collateral Order (it being agreed and understood that a form substantially consistent with the form attached as Schedule 1 to the

| | |
|---|---|
| | Cash Collateral Order is satisfactory to the Required Consenting First Lien Lenders). |
| **27. Equity Rights Offering** | Each DIP lender shall be entitled to exchange (at its option to be exercised in its sole discretion) its New Money Loans (including both the funded amount and any fees), on a dollar-for-dollar basis, for new equity interests pursuant to the terms of the equity rights offering contemplated in the RSA. |
| **28. Reporting** | Subject to the Documentation Standard, consistent with the Prepetition Credit Agreement and acceptable to the Required DIP Lenders and the Borrower (but subject to customary modifications required to reflect the Chapter 11 Cases or other customary reporting for facilities of this type). |
| **29. Representations and Warranties** | Subject to the Documentation Standard, consistent with the Prepetition Credit Agreement and acceptable to the Required DIP Lenders and the Borrower, but subject to modification as provided herein and pursuant to the DIP Documents (but subject to customary modifications required to reflect the Chapter 11 Cases or other customary representations and/or warranties for facilities of this type). |
| **30. Events of Default** | Subject to the Documentation Standard, consistent with the Prepetition Credit Agreement or otherwise customary for facilities of this time, in each case, reasonably acceptable to the Borrower and the Required DIP Lenders; to be subject to modification from customary events of default in Chapter 11 Cases, including: conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; termination of the RSA, other than as a result of a breach by the Consenting First Lien Lenders; the dismissal of any of the Chapter 11 Cases (or any subsequent Chapter 7 Case); extending, staying, vacating, or otherwise modifying in any material respect the Final DIP Order, in each case acceptable to the DIP Lenders. |
| **31. Voting / Thresholds** | Subject to exceptions for certain provisions that require the consent of each affected DIP Lender, a majority of each adversely affected tranche or all DIP Lenders (including in the case of satisfaction of the DIP Loans in a manner other than in cash in full or otherwise in accordance with the Plan), amendments and waivers of the DIP Facility, approval of the DIP Budget, waivers of Events of Default, and modifications of any Milestones will require the approval of DIP Lenders holding more than 50% of the outstanding principal amount of the DIP Loans (collectively, the "***Required DIP Lenders***").  Consents, amendments, waivers, and extensions can be effectuated pursuant to email via counsel from the advisors to the Ad Hoc Group on behalf of the Required DIP Lenders. |
| **32. Transferability** | Subject to customary carve-outs in connection with any "fronting" or "seasoning" arrangement reasonably acceptable to the DIP Lenders, DIP Agent and any fronting or seasoning lender, no DIP Lender may assign all or a portion of its rights and obligations under the DIP Facility (including all or a portion of its commitment and the DIP Loans at the time owing to it) without the prior written consent of the Borrower (not to be unreasonably withheld, delayed or conditioned) and the DIP Agent; *provided*, that (a) the Borrower shall be deemed to consent to any assignment of rights and |

9

| | |
|---|---|
| | obligations under the DIP Facility if there is no objection to such assignment within five (5) business days after receipt of notice thereof; and any DIP Lender may assign all or a portion of its rights and obligations under the DIP Facility (including all or a portion of its commitment and the DIP Loans at time owing to it) to an affiliate, to another DIP Lender (or affiliate thereof), approved fund, or to another party to the RSA without the prior consent of the Borrower or the DIP Agent; and (b) any DIP Lender may assign all or a portion of its rights and obligations under the DIP Facility (including all or a portion of its commitment and the DIP Loans at time owing to it) to an affiliate, to another DIP Lender (or affiliate thereof), approved fund, or to any person at any time that an Event of Default has occurred and is continuing. |
| **33. Rights and Remedies upon Event of Default** | The Final DIP Order shall provide for rights and remedies upon an Event of Default consistent with the Cash Collateral Order. |
| **34. Limitations on the Use of DIP Facility Proceeds, DIP Collateral, Cash and Cash Collateral** | The Final DIP Order shall provide for limitations on the use of DIP Facility proceeds, DIP Collateral, cash and Cash Collateral consistent with the Cash Collateral Order. |
| **35. Automatic Stay** | The automatic stay provisions of section 362 of the Bankruptcy Code shall be modified as necessary to implement and effectuate the terms of the DIP Term Sheet. |
| **36. Waiver of 506(c) and 552(b)** | The Final DIP Order shall provide for a waiver of sections 506(c) and 552(b) of the Bankruptcy Code consistent with the Cash Collateral Order. |
| **37. Governing Law** | New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York (and, to the extent applicable, the Bankruptcy Code). |
| **38. Definitions** | |
| **39. DIP Collateral** | "***DIP Collateral***" means all owned or hereafter acquired assets and property of the DIP Loan Parties and all other subsidiaries of H-Food Holdings, LLC (including, without limitation, cash, inventory, accounts receivable, equipment, property, plant, equipment, material fee owned and ground leased real property, real property leaseholds, investment property, insurance proceeds, deposit accounts, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof and any economic interest therein and/or economic benefit thereof, but not including the Excluded Collateral. |
| **40. DIP Excluded Collateral** | Notwithstanding the foregoing, the DIP Collateral shall not include:  (a) all claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, the "***Avoidance Actions***") and, but not the proceeds of Avoidance Actions (collectively, the "***Avoidance Action Proceeds***")); (b) leased (not owned) real property; (c) |

10

funds held in the Carve-Out Reserve Account; (d) the utilities deposits as set forth in the "first day" motions; and (e) Excluded Assets (as defined below).

"***Excluded Assets***" means (a) all licenses and any other property and assets (including any lease, franchise, charter, license, permit, contract or agreement) (i) to the extent that the DIP Agent may not validly possess a security interest therein under, or such security interest is restricted by, (x) applicable laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or (y) contract, lease, license or other agreement with a counterparty that is not a Debtor or an affiliate thereof and that exists on the Closing Date, or (z) in the case of any lease, license, franchise, charter, authorization, contract or agreement, is prohibited by or in violation of a term, provision or condition of any such lease, license, franchise, charter, authorization, contract or agreement to which such Debtor is a party, (ii) the pledge or creation of a security interest in which would require the consent, approval, license or authorization of (x) a Governmental Authority, (y) a third party that is not a Debtor or an affiliate thereof, which third party right to consent, approve or authorize such a pledge or creation of a security interest exists on the Closing Date and, in each case of clause (i) and (ii), other than to the extent such prohibition or limitation is rendered ineffective under the UCC, the U.S. Bankruptcy Code, other applicable insolvency laws or other applicable law notwithstanding such prohibition or limitation, *provided*, *however*, that Excluded Assets referred to in this clause shall not include any proceeds, economic benefit, substitutions or replacements of or economic interest in any Excluded Assets unless such proceeds, economic benefit, substitutions, replacements or economic interests constitute Excluded Assets in accordance with this clause (a), (b) any intent-to-use (or similar) Trademark application prior to the filing with, and acceptance by, the U.S. Patent and Trademark Office of a "Statement of Use", "Declaration of Use", "Amendment to Allege Use" or similar filing with respect thereto, only to the extent, if any, that, and solely during the period if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use (or similar) Trademark application (or any Trademark registration resulting therefrom) under applicable Requirements of Law, (c) any asset with respect to which the DIP Agent (acting at the direction of the Required DIP Lenders) and the Borrower have reasonably determined that the cost, burden, difficulty or consequence (including any effect on the ability of the relevant Loan Party to conduct its operations and business in the ordinary course of business and including the cost of flood insurance (if necessary) or mortgage, stamp, intangible or other taxes or expenses) of obtaining a security interest therein outweighs, or is excessive in light of, the practical benefit of a security interest to the relevant Secured Parties afforded thereby (and the Collateral that may be provided by any Loan Party may be limited by agreement of the DIP Agent and the Borrower to minimize stamp duty, notarization, registration or other applicable fees, taxes and duties where the DIP Agent (acting at the direction of the Required DIP Lenders) and the Borrower have reasonably determined that the benefit to the Secured Parties of increasing the secured amount is disproportionate to the level of such fees, taxes and duties); *provided*, *however*, that Excluded Assets shall not

| | |
|---|---|
| | include any proceeds, economic benefit, substitutions or replacements of or economic interest in any Excluded Assets unless such proceeds, economic benefit, substitutions, replacements or economic interests constitute Excluded Assets in accordance with clause (a) or (b) above and (d) any Deposit Account or Securities Account exclusively used for trust, payroll, payroll taxes, withholding and employee wage and benefit payments to or for the benefit of any Debtor's employees. |
| **41. Documentation Standard** | The DIP Credit Agreement shall be based on the Prepetition Credit Agreement, modified to reflect the terms and conditions set forth in this DIP Term Sheet and the commencement of the Chapter 11 Cases, that are customary for DIP financings and necessary to reflect the transactions contemplated hereby; baskets, thresholds and exceptions shall be modified in a customary manner for debtor-in-possession facilities of this type, as applicable, and shall be in form and substance acceptable to the Borrower, the Commitment Party and the Required DIP Lenders (the "***Documentation Standard***"). |
| **42. Prepetition Credit Agreement** | That certain Credit Agreement, dated as of May 23, 2018, between H Food Holdings, LLC, as the U.S. Borrower, Hearthside Bidco B.V., as the Dutch Borrower, Matterhorn Buyer, LLC, as Holdings, Goldman Sachs Lending Partners LLC, as Administrative Agent and Collateral Agent, and the lenders party thereto (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time). |

12

[Redacted]

**Annex B**

## Carve Out

(a)      "***Carve Out***" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "***Allowed Professional Fees***") incurred by Persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and together with the Debtor Professionals, the "***Professional Persons***") at any time before or on the first business day following delivery by the Required Lenders (with email from the Prepetition First Lien Advisors being sufficient) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (the amounts set forth in clauses (i) through (iii), the "***Pre-Carve Out Trigger Notice Cap***"); (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $6,000,000 incurred after the first business day following delivery by the Required Lenders (with email from the Prepetition First Lien Advisors being sufficient) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, and (v) all allowed amounts required to be paid on account of any success fees, including all allowed amounts required to be paid to (x) Evercore Group L.L.C. on account of any fees earned in connection with any Amendment, Liability Management, Restructuring, Financing, and/or Sale under and as defined in that certain engagement letter between, inter alia, Evercore Group L.L.C. and the Debtors, dated as of October 11, 2024, and (y) PJT Partners LP on account of any fees earned in connection with any Restructuring and/or Capital Raise under and as defined in that certain engagement letter between, inter alia, PJT Partners LP and the Debtors, dated as of November 19, 2024, incurred at any time (whether before or after delivery of a Carve Out Trigger Notice), and payable under sections 328, 330, and/or 331 of the Bankruptcy Code, solely to the extent allowed by order of this Court (the amounts set forth in clauses (iv) and (v), the "***Post-Carve Out Trigger Notice Cap***").  For purposes of the foregoing, "***Carve Out Trigger Notice***" shall mean a written notice delivered by the Required Lenders (with email from the Prepetition First Lien Advisors being sufficient) to the Debtors, their lead restructuring counsel Ropes & Gray LLP, the U.S. Trustee, counsel to each of the Prepetition First Lien Secured Parties, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of a Cash Collateral Termination Event (as defined in the Final DIP Order), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      <u>*Carve Out Reserves*</u>.  The Debtors shall establish and fund a segregated account (the "***Funded Reserve Account***") for purposes of funding the Carve Out.  The Funded Reserve Account may be funded from Cash Collateral (as defined in the Final DIP Order).  Notwithstanding anything to the contrary in the Cash Collateral Order or the Prepetition First Lien Credit Documents, in no circumstances (which, for the avoidance of doubt, includes but is not limited to a Cash Collateral Termination Event) shall the Debtors be prohibited in any way from accessing or drawing upon Cash Collateral for the purpose of funding the Funded Reserve Account.  Upon entry of the Cash Collateral Order, the Debtors shall deposit in the Funded Reserve Account an amount equal to 120% of the aggregate amount of Allowed Professional Fees projected to accrue in the Budget through December 31, 2024 (the "***Initial Funded Reserve Amount***").  Commencing January 1, 2025 (or the first business day thereafter), on the first business day of each month, the Debtors shall deposit in the Funded Reserve Account an amount equal to 120% of the aggregate amount of Allowed Professional Fees projected to accrue for such month in the Budget (the "***Monthly Funded Reserve Amount***").  Each Professional Person may deliver to the Debtors a good-faith estimate of the

cumulative total amount of unreimbursed fees and expenses incurred in the preceding month (each such statement, a "***Fee Statement***"), and to the extent the amount of Allowed Professional Fees accrued and claimed in a Fee Statement exceeds the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount for the applicable period or month, respectively, and such fees and expenses have otherwise not been paid by the Debtors, the Debtors shall, within one business day, fund additional amounts into the Funded Reserve Account equal to the difference between, as applicable, the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement (each, a "***Top Off Amount***").  At any time, if the Debtors in good faith believe a restructuring, sale, financing, or other success fee has been earned by a Professional Person, the Debtors shall deposit in the Funded Reserve Account an amount equal to such fee.   The Funded Reserve Account shall be maintained, and the funds therein (the "***Funded Reserve Amount***") shall be held in trust for the benefit of Professional Persons.  Any and all amounts in the Funded Reserve Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition First Lien Credit Documents nor shall the Prepetition First Lien Secured Parties shall be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition First Lien Credit Documents or the Cash Collateral Order.

**Annex C**

**Releases**

Subject to the rights and limitations set forth in the Final Order, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtors and each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns (collectively, the "Releasing Parties") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the DIP Secured Parties, the Prepetition First Lien Secured Parties, and each such entities' current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, attorneys (including the DIP Agent Advisors and Prepetition First Lien Advisors), independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "Released Parties") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of this Final Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including, without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition First Lien Secured Indebtedness; *provided* that the foregoing shall not release any claims resulting from fraud, gross negligence, or willful misconduct of any Released Party as determined by a court of competent jurisdiction. This paragraph is in addition to and shall not in any way limit any other Release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties set forth in the chapter 11 plan contemplated by the Restructuring Support Agreement.  At of the entry of this Final Order, the Releases granted in this paragraph are final and binding and are not subject to a Challenge except as expressly outlined herein.

## <u>EXHIBIT E</u>

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of November 22, 2024 (as may be amended, amended and restated, or modified from time to time, the "**Agreement**"),[1] by and among Matterhorn Buyer, LLC and its affiliates bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a ["Consenting First Lien Lender"] ["Consenting Second Lien Term Lender"] ["Consenting Senior Unsecured Noteholder"]  under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Term Loans | |
| Second Lien Term Loans | |
| Senior Unsecured Notes | |
| Equity Interests | |
| Other Claims (identify / describe type) | |

---

[1]  Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**<u>Exhibit C</u>**

**Debtors' Organizational Structure**



## Exhibit D

**Financial Projections**

**FINANCIAL PROJECTIONS**

### I.   Introduction

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan. This confirmation condition is referred to as the "feasibility" of the Plan. In connection with the planning and development of a plan of reorganization, and for the purposes of whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources to operate their business.

For purposes of demonstrating feasibility of the Plan,[1] the Debtors have prepared the forecasted, consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections" or the "Projections") for the annual periods ending December 31, 2025 (fiscal year 2025) through December 31, 2029 (fiscal year 2029) (the "Projection Period"). The Financial Projections were prepared based on assumptions made by the Debtors' management team ("Management"), in consultation with their advisors, as to the future performance of the Reorganized Debtors, and reflect the Debtors' judgment and expectations regarding their future operations and financial position assuming consummation of the Plan.

The Financial Projections have been prepared on a consolidated basis in sufficient detail, as far as is reasonably practicable based on the Debtors' books and records, and provide adequate information in accordance with section 1125 of the Bankruptcy Code.

The Financial Projections should be read in conjunction with the assumptions, qualifications, explanations, and risk factors set forth in Article IX of the Disclosure Statement and in the Plan in their entirety, along with the historical consolidated financial statements (including the notes and schedules thereto).

The Financial Projections are based on the following: (a) market conditions and projected market conditions in each of the Debtors' segments discussed below; (b) the ability to maintain sufficient working capital to fund operations; and (c) confirmation and consummation of the Plan. The Financial Projections assume certain treatment and planning strategies for U.S. federal, state, and foreign income tax purposes.  Actual treatment and realization of planning strategies may vary materially, resulting in substantially greater tax liabilities for the Debtors than is set forth in the Financial Projections.

Although the Debtors, with the assistance of their professional advisors, have prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized. Management continues to monitor industry results and reserves the right (but is under no obligation) to modify the Financial Projections to reflect, among other things, any revised assumptions regarding the overall industry growth rate

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

during the Projection Period.  While Management believes that the assumptions were reasonable when the Financial Projections were prepared, the Debtors can provide no assurance that such Financial Projections and assumptions will be realized.  As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.  In deciding whether to vote to accept or reject the Plan, creditors must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections.

## II.    Accounting Policies and Disclaimers

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (THE "AICPA"), THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB"), OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED, OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY THE DEBTORS' INDEPENDENT PUBLIC ACCOUNTANTS. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF MANAGEMENT. THESE UNCERTAINTIES INCLUDE, AMONG OTHER THINGS, THE ULTIMATE OUTCOME AND CONTENTS OF A CONFIRMED PLAN OF REORGANIZATION AND THE TIMING OF THE CONFIRMATION OF SUCH PLAN. CONSEQUENTLY, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS. HOLDERS OF CLAIMS OR EQUITY INTERESTS MUST MAKE THEIR OWN ASSESSMENT AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. ALTHOUGH MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OTHER

PERSON AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.

THE SIGNIFICANT ASSUMPTIONS USED IN THE PREPARATION OF THE FINANCIAL PROJECTIONS ARE STATED BELOW. THE FINANCIAL PROJECTIONS ASSUME THAT THE DEBTORS WILL EMERGE FROM CHAPTER 11 ON THE ASSUMED EMERGENCE DATE. THE FINANCIAL PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH (1) THE DISCLOSURE STATEMENT, INCLUDING ANY OF THE EXHIBITS THERETO OR INCORPORATED REFERENCES THEREIN, AS WELL AS THE RISK FACTORS SET FORTH THEREIN, AND (2) THE SIGNIFICANT ASSUMPTIONS, QUALIFICATIONS, AND NOTES SET FORTH BELOW.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH OR DISCLOSE THEIR FINANCIAL PROJECTIONS. ACCORDINGLY, THE DEBTORS DO NOT INTEND, AND DISCLAIM ANY OBLIGATION TO, (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS AT ANY TIME IN THE FUTURE, (B) INCLUDE UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION, OR (C) OTHERWISE MAKE UPDATED INFORMATION OR FINANCIAL PROJECTIONS PUBLICLY AVAILABLE. THE SUMMARY FINANCIAL PROJECTIONS AND RELATED INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT AND THE EXHIBITS THERETO HAVE BEEN PREPARED BY MANAGEMENT. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS AND RELATED INFORMATION OR AS TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE FINANCIAL PROJECTIONS AND RELATED INFORMATION, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, EXISTING AND FUTURE

GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS, INCLUDING WITHOUT LIMITATION THOSE SET FORTH HEREIN. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS ARE AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS.

## III.     General Assumptions

### 1.  Overview

(a) The Financial Projections are based upon, and assume the successful implementation of, the Debtors' business plan during the course of the Projection Period.

(b) The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by March 29, 2025 (the "Emergence Date"). Any significant delay in the Emergence Date may have a significant negative effect on the operations and financial performance of the Debtors, including an increased risk or inability to meet sales forecasts and the incurrence of higher reorganization expenses.

(c) The opening post-emergence balance sheet as of March 29, 2025, was prepared utilizing the preliminary trial balance as of November 23, 2024 and projected results of operations and cash flows over the projection period to the assumed Emergence Date. Actual balances may vary from those reflected in the opening balance sheet due to variances in projections and potential changes in cash needed to consummate the Plan. The reorganized pro forma balance sheets for the Projection Period contain certain pro forma adjustments as a result of consummation of the Plan.

(d) The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the impact on the Financial Projections. When the Debtors fully implement fresh start accounting, differences from the depiction presented are anticipated and those differences could be material. Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value." In addition to valuing assets, liabilities, and equity instruments at fair value, the Debtors will have tax professionals analyze any go forward tax implications as a result of the Restructuring. The Financial Projections account for the Restructuring and related transactions pursuant to the Plan, but do not account for the final tax analysis that will be done upon emergence, which may materially impact these Financial Projections.

## 2. Restructuring Assumptions

(a) The Financial Projections assume a post-emergence capital structure consisting of:

    1. <u>Exit First Lien Term Loans</u>: Approximately $725 million at SOFR + 650bps, paid quarterly. Annual amortization (payable in equal quarterly installments beginning at the end of 24 months after the Emergence Date) of 1.0%.

    2. <u>Exit Revolving Facility</u>: $300 million commitment at SOFR + 100bps, paid quarterly. The projections assume no amount is drawn on this facility at Emergence Date and through the Projection Period.

    3. <u>Equity Rights Offering</u>: proceeds of $200 million received on the Emergence Date.

## 3. Operational Assumptions

(a) The Financial Projections assume continued operations of the Company's four key segments:

    1. <u>Refrigerated & Frozen ("R&F")</u>: R&F category can be further divided into "refrigerated and frozen" products and "fresh" products. Products under R&F include sandwiches, ready meals, ingredient packets, and salad kits. R&F accounted for 36.0% of the Company's net revenues in forecasted 2025.

    2. <u>Bakery</u>: As the Company's leading product category, baking is comprised of two sub-segments: "bakeries" and "cones." Baking products include cookies, crackers, baked snacks, cones, and ice-cream equipment, which collectively accounted for 35.3% of the Company's net revenues in forecasted 2025.

    3. <u>Bars & Components</u>: Products under Bars & Components include snack components, snack bars, granola, cereal enrobing, and functional bars. Bars & Components constituted 17.0% of the Company's net revenues in forecasted 2025.

    **4.** <u>Packaging</u>: The Company's business also includes packaging of various food products. The products that the Company packages include snacks, cereal, cookies, crackers, candy, and dry pet food and treats. Packaging accounted for 11.7% of the Company's net revenues in forecasted 2025.

## NON-GAAP UNAUDITED PROJECTED INCOME STATEMENT

*$ in millions*

| | Notes | Fcst FY2025 | Fcst FY2026 | Fcst FY2027 | Fcst FY2028 | Fcst FY2029 |
|---|---|---|---|---|---|---|
| **Volume** | (A) | **1,577** | **1,513** | **1,457** | **1,495** | **1,565** |
| **Net Sales** | (B) | $ **3,067** | $ **2,919** | $ **2,784** | $ **2,842** | $ **2,981** |
| Cost of Goods Sold | (C) | (2,415) | (2,251) | (2,107) | (2,131) | (2,230) |
| **Contribution Margin** | | **652** | **668** | **678** | **711** | **751** |
| Fixed Overhead | (D) | (388) | (392) | (378) | (372) | (384) |
| **Gross Margin** | | **265** | **276** | **300** | **339** | **367** |
| SG&A and Other Expenses | (E) | (120) | (107) | (113) | (121) | (123) |
| **Adj. EBITDA** | | **144** | **169** | **187** | **218** | **244** |
| Interest Expense, Net | (F) | (84) | (100) | (101) | (101) | (101) |
| Depreciation | (G) | (105) | (98) | (94) | (90) | (87) |
| Reorganization Items, Net | (H) | 765 | (17) | (2) | - | - |
| Miscellaneous | | (3) | (1) | (1) | (1) | (1) |
| **Loss from Operations before Income Taxes** | | **717** | **(46)** | **(11)** | **26** | **55** |
| Benefit from (Provision for) Income Taxes | (I) | 12 | 12 | 3 | (6) | (14) |
| **Net Income (Loss)** | | $ **729** | $ **(35)** | $ **(8)** | $ **19** | $ **41** |

*[Remainder of Page Intentionally Left Blank.]*

## NON-GAAP UNAUDITED PROJECTED BALANCE SHEET

*$ in millions*

| | Notes | Fcst FY2025 | Fcst FY2026 | Fcst FY2027 | Fcst FY2028 | Fcst FY2029 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash and Cash Equivalents | (J) | $ 329 | $ 349 | $ 377 | $ 415 | $ 469 |
| Accounts Receivable | (K) | 285 | 259 | 248 | 253 | 265 |
| Inventories | (K) | 205 | 184 | 176 | 182 | 194 |
| Prepaid Expenses and Other | (K) | 65 | 65 | 65 | 65 | 65 |
| **Total Current Assets** | | **884** | **856** | **865** | **914** | **993** |
| | | | | | | |
| Plant, Property, & Equipment, Net | (L) | 500 | 462 | 429 | 399 | 372 |
| Goodwill | (M) | - | - | - | - | - |
| Intangible Assets | (N) | - | - | - | - | - |
| Other Assets | (O) | 94 | 105 | 108 | 103 | 92 |
| Excess Reorganization Value | (P) | 410 | 410 | 410 | 410 | 410 |
| **Total Assets** | | **$ 1,887** | **$ 1,834** | **$ 1,811** | **$ 1,825** | **$ 1,866** |
| | | | | | | |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | |
| Current Portion of Long-Term Debt | | - | 5 | 7 | 7 | 7 |
| Current Lease Liability | | 16 | 16 | 16 | 16 | 16 |
| Accounts Payable | (K) | 162 | 144 | 135 | 136 | 142 |
| Accrued Expenses & Other | (K) | 86 | 86 | 86 | 87 | 87 |
| **Total Current Liabilities** | | **265** | **252** | **244** | **246** | **253** |
| | | | | | | |
| Long-Term Debt | (Q) | 725 | 720 | 712 | 705 | 698 |
| Lease Liability, Net of Current | | 52 | 52 | 52 | 52 | 52 |
| Sale Leaseback Debt | | 303 | 303 | 303 | 303 | 303 |
| Other Long-Term Liabilities | (R) | 28 | 28 | 28 | 28 | 28 |
| Total Stockholders' Equity[1] | (S) | 514 | 480 | 472 | 491 | 532 |
| **Total Liabilities and Stockholders' Equity** | | **$ 1,887** | **$ 1,834** | **$ 1,811** | **$ 1,825** | **$ 1,866** |

[1] The pro forma balance sheet assumes equity value of approximately $550 million for purposes of determining the fair value of assets on the Emergence Date.

*[Remainder of Page Intentionally Left Blank.]*

## NON-GAAP UNAUDITED PRO FORMA BALANCE SHEET AT EMERGENCE

| | | Pro Forma B/S at Emergence | | |
| | | 29-Mar-25 | | |
| | | Estimated | Adjustments | Pro Forma |
|---|---|---|---|---|
| **ASSETS** | **Footnotes** | | | |
| Cash and Cash Equivalents | (1) | $51 | $128 | $179 |
| Accounts Receivable | (2) | 406 | - | 406 |
| Inventories | | 214 | - | 214 |
| Prepaid Expenses and Other | | 61 | - | 61 |
| **Total Current Assets** | | **732** | **128** | **860** |
| Plant, Property, & Equipment, Net | | 533 | - | 533 |
| Goodwill | (3) | 225 | (225) | - |
| Intangible Assets | (3) | 966 | (966) | - |
| Other Assets | | 82 | - | 82 |
| Excess Reorganization Value | | - | 410 | 410 |
| **Total Assets** | | **$2,537** | **($653)** | **$1,884** |
| | | | | |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | |
| Current Portion of Long-Term Debt | (4) | 2,168 | (2,168) | - |
| Lease Liability, Current | | 16 | - | 16 |
| Accounts Payable | (5) | 159 | (28) | 131 |
| Accrued Expenses & Other | | 78 | - | 78 |
| **Total Current Liabilities** | | **2,421** | **(2,196)** | **225** |
| Long-Term Debt | (4) | 625 | 100 | 725 |
| Sale Leaseback Debt | | 304 | - | 304 |
| Lease Liability, Net of Current | | 52 | - | 52 |
| Other Long-Term Liabilities | | 28 | - | 28 |
| Total Stockholders' Equity[1] | (6) | (892) | 1,442 | 550 |
| **Total Liabilities and Stockholders' Equity** | | **$2,537** | **($653)** | **$1,884** |

### Notes

**(1)** Equity rights offering proceeds less settlement costs and other emergence cash flows

**(2)** Assumes supply finance arrangements are cancelled in Jan-25, delaying $80mm of receipts into the post-emergence period

**(3)** Includes an illustrative fresh start accounting adjustment at emergence to zero. Goodwill and intangible assets are subject to material change based on valuation and potential implementation of fresh start accounting in connection with emergence.

**(4)** Extinguishment of prepetition debt (1L, 2L, and Unsecured Notes) and replacement with $725 Exit First Lien Term Loans.

**(5)** Impairment of prepetition accounts payable

**(6)** Includes adjustment to book value of equity to fair value as of emergence

## NON-GAAP UNAUDITED PROJECTED STATEMENT OF CASH FLOWS

*$ in millions*

| | Notes | Fcst FY2025 | Fcst FY2026 | Fcst FY2027 | Fcst FY2028 | Fcst FY2029 |
|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | | |
| **Net Income (Loss)** | | $   729 | (35) | (8) $ | 19 $ | 41 |
| Non-Cash Addbacks | | | | | | |
| Depreciation | | 105 | 98 | 94 | 90 | 87 |
| Taxes | (I) | (12) | (12) | (3) | 5 | 11 |
| Other Non-Cash Items, Net | (T) | (845) | (0) | 0 | (0) | (0) |
| Change in assets and liabilities: | | | | | | |
| Change in working capital | | 8 | 28 | 11 | (9) | (18) |
| **Net cash flows provided by operating activities** | | $   (14) $ | 80 $ | 94 $ | 106 $ | 122 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | | |
| Capital expenditures | | (59) | (60) | (60) | (60) | (60) |
| **Net cash flows from investing activities** | | $   (59) $ | (60) $ | (60) $ | (60) $ | (60) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | | | |
| Net decrease in debt balances | (U) | - | - | (5) | (7) | (7) |
| Other financing activities[1] | (V) | 140 | - | - | - | - |
| **Net cash flows from financing activities** | | $   140 $ | - $ | (5) $ | (7) $ | (7) |
| **Net increase in cash and cash equivalents** | | $   67 $ | 20 $ | 28 $ | 38 $ | 54 |
| Cash and cash equivalents at beginning of period | | 262 | 329 | 349 | 377 | 415 |
| **Cash and cash equivalents at end of period** | | $   329 $ | 349 $ | 377 $ | 415 $ | 469 |
| **Memo: Ending liquidity** | | | | | | |
| Cash and cash equivalents at end of period | | $   329 $ | 349 $ | 377 $ | 415 $ | 469 |
| (+) ABL Availability[2] | (W) | 300 | 300 | 300 | 300 | 300 |
| **Ending Liquidity** | | $   629 $ | 649 $ | 677 $ | 715 $ | 769 |

[1] Excludes Exit ABL interest and fees
[2] Subject to actual borrowing base availability

*[Remainder of Page Intentionally Left Blank.]*

# NOTES TO FINANCIAL PROJECTIONS

## Note A – Volume

The Financial Projections reflect Management's assumptions with respect to, among other things, customer attrition, overall market growth, and new opportunities. Volume is anticipated to decline during the first three years of the Projection Period as a result of anticipated customer losses exceeding new customer growth.  Volume is anticipated to recover in later years as new customer growth plus growth from new projects with existing customers offset customer losses.  Overall, volume is expected to decline over the Projection Period by approximately 0.8%, or 12 million pounds. The Financial Projection assumptions were developed by customer and plant, and specific growth opportunities were considered in the development of these assumptions.

## Note B – Net Sales

Pricing is assumed to be constant during the Projection Period as any incremental price is assumed to be offset by direct cost inflation. Net sales are projected to decrease by approximately 2.8% during the Projection Period, reflecting Management's assumptions with respect to, among other things, specific customer attrition partially offset by market growth and new opportunities.

## Note C – Cost of Goods Sold

Includes direct costs to manufacture the Debtors' products. Such costs include raw materials and supplies, direct labor and variable factory overhead. Direct cost inflation is assumed to be offset by price increases during the Projection Period, and as such, no incremental amount has been included.

## Note D – Fixed Overhead

Includes indirect costs to manufacture the Debtors' products. Such costs include plant lease expenses, production supervision, logistics, plant administration, sanitation, quality, and other expenses. Fixed overhead includes Management's assumptions regarding expected inflation and other cost increases during the Projection Period.

## Note E – Selling, General and Administrative Expenses ("SG&A")

Includes other indirect costs necessary to operate the Debtors' business. Includes corporate salaries and payroll, office rent, insurance, and other professional service fees. SG&A is projected to increase by approximately 0.6% CAGR over the Projection Period. SG&A includes Management's assumptions regarding expecting inflation, merit increases, and cost saving opportunities during the Projection Period.

Note F – Interest Expense

Includes estimated cash interest under the post-emergence capital structure. SOFR rates are assumed to be constant over the Projection Period. Assumes the Exit Revolving Facility will not be utilized, and as such, no interest is reflected for this instrument.

Note G – Depreciation

Reflects non-cash expense representing the portion of fixed assets considered to have been consumed during the Projection Period.

Note H – Reorganization Items, Net

Includes costs associated with the restructuring prior to the Emergence Date, including professional fees, incentive plans for key employees, retention associated with the restructuring, and other non-recurring items. Non-recurring items include restructuring and related expenses, including severance costs and lease termination expenses. Additionally, includes illustrative costs associated with effectuating the Plan and emergence transaction, including the cost to extinguish liabilities subject to compromise, repayment and exit fees, and other items required to be paid to consummate the Plan.

Note I – Income Taxes

Reflects the application of the estimated tax forecast as developed by the Debtors. Consolidated income tax expense is projected to increase through the Projection Period due to increasing profitability levels during the Projection Period and usage of net operating loss carryforward generated post-emergence. FY 2025 tax estimated based on the post-emergence period. These amounts could vary significantly pending final tax analyses.

Note J – Cash and Cash Equivalents

Consolidated cash balance of the Reorganized Debtors and non-Debtor (Interbake Canada Inc.) for all entities and subsidiaries.

Note K – Working Capital Accounts

The Financial Projections assume the Reorganized Debtors' working capital accounts, including accounts receivable, inventory, prepaid expenses, accounts payable, and accrued expenses continue to perform according to historical relationships with respect to revenue and expense activity. Accounts receivable and accounts payable balances are projected based on days outstanding calculations and forecasted to be generally in-line with historical ratios. The Financial Projections assume working capital will continue to normalize and return to terms in line with historical levels, particularly days payable outstanding.

Note L – Plant, Property & Equipment, Net

Primarily includes machinery and equipment, building and improvements, land and improvements, office furniture, fixtures and capitalized software. These assets are stated at cost less accumulated depreciation and reflect the Debtors' capital expenditure assumptions during the Projection Period.

Note M – Goodwill

Includes an illustrative fresh start accounting adjustment at emergence to zero and is held constant over the Projection Period for illustrative purposes. Goodwill is subject to material change based on valuation and potential implementation of fresh start accounting in connection with emergence.

Note N – Intangibles, Net

Includes an illustrative fresh start accounting adjustment at emergence to zero and is held constant over the Projection Period for illustrative purposes. Intangible assets are subject to material change based on valuation and potential implementation of fresh start accounting in connection with emergence.

Note O – Other Assets

Consists of right-of-use assets, representing the Debtors' right to use a leased asset for the duration of the lease term, deferred tax assets, and other assets.

Note P – Excess Reorganization Value

Consists of hypothetical reorganization adjustments and adjustments for illustrative fresh start accounting at emergence. This value is subject to material change upon fully implementing fresh start accounting in connection with emergence.

Note Q – Long-Term Debt

Includes sale-leaseback debt, other capital leases, and an undrawn DIP Facility during the pendency of the Chapter 11 Cases. The Financial Projections assume the DIP Facility, plus all outstanding accrued and unpaid interest and fees, are repaid at emergence. Post-emergence balances comprised of facilities previously mentioned in Restructuring Assumptions as well as the sale-leaseback debt and other capital leases continued post-emergence.

Note R – Other Long-Term Liabilities

Includes long-term deferred revenue, asset retirement obligations to restore leased properties to original conditions if the leases were exited, and other miscellaneous long-term liabilities. The Financial Projections assume there are no changes to these liabilities through the Projection Period. This value is subject to material change upon fully implementing fresh start accounting in connection with emergence.

Note S – Stockholders Equity

Represents the net book value of stockholders' equity. The Financial Projections reflect illustrative assumptions on how prepetition stockholders' equity is treated under the Plan, as noted in the General Assumptions, these illustrative assumptions are subject to material change upon fully implementing fresh start accounting.

Note T – Other Non-Cash Items, Net

Reflects non-cash gains or losses included in Net Income (Loss). FY 2025 includes an estimated non-cash gain from the extinguishment of liabilities subject to compromise at emergence of approximately $2.1 billion partially offset by the write-down of intangible assets of approximately $(1.2) billion.

The Financial Projections reflect illustrative assumptions on how prepetition liabilities are treated under the Plan and include high-level adjustments for fresh start accounting in connection with emergence. As noted in the General Assumptions, these illustrative assumptions are subject to material change upon fully implementing fresh start accounting and accounting for the Plan.

Note U – Net Decrease in Debt Balances

Reflects the change in debt balances associated with the paydown of debt post-emergence.

Note V – Other Financing Activities

Reflects the Equity Rights Offering at emergence of $200 million net of settlement costs (provided as cash recoveries) to various creditor groups outlined in the Restructuring Support Agreement and Plan.

Note W – Liquidity

The Debtors project $179 million of cash on emergence and upon consummation of the Plan. As working capital normalizes, the Debtors generate cash from operations, and the Debtors gain access to the Exit Revolver Facility with an illustrative $300 million of availability, the Debtors project liquidity of approximately $629 million by year-end FY25. The ABL availability is subject to change based on borrowing base availability.

**<u>Exhibit E</u>**

**Liquidation Analysis**

Liquidation Analysis for H-Food Holdings, LLC *et al*.,

THIS LIQUIDATION ANALYSIS[1] IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF A HYPOTEHTICAL CONVERSION DATE. THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.

THE DEBTORS HAVE SOUGHT TO PROVIDE A GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE AVAILABLE IN A HYPOTHETICAL CHAPTER 7 LIQUIDATION. HOWEVER, THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THE ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE VALUES AND RECOVERIES REPRESENTED IN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

## 1. Introduction

Together with Alvarez & Marsal North America, LLC the Debtors, with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**"). This Liquidation Analysis indicates the estimated recoveries that may be obtained by Holders of Claims and Interests in a hypothetical liquidation pursuant to Chapter 7 of the Bankruptcy Code (the "Chapter 7"), as an alternative to the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings given to such terms in the *Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and its Affiliated Debtors* [Docket No. 187] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") or the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and its Affiliated Debtors* [Docket No. 188] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"), as applicable.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each Holder of a Claim or Interest in each Impaired Class: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Plan Effective Date, that is not less than the amount that such Holder would receive if the Debtors were liquidated under Chapter 7. To demonstrate compliance with section 1129(a)(7), this Liquidation Analysis: (1) estimates the cash proceeds (the "**Liquidation Proceeds**") that a Chapter 7 trustee (the "**Trustee**") would generate if each of the Chapter 11 Cases were converted to a Chapter 7 case on the Plan Effective Date and  the  assets of each Debtor's Estate were liquidated; (2) determines the distribution (the "**Liquidation Distribution**") that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in Chapter 7; and (3) compares each Holder's Liquidation Distribution to the distribution under the Plan that such holder is projected to receive if the Plan were confirmed and consummated.  Accordingly, asset values discussed herein may be different than amounts referred to in the Plan.  This Liquidation Analysis is based upon certain assumptions discussed herein.

This Liquidation Analysis should be reviewed with the accompanying "Specific Notes to Liquidation Analysis."

## 2.   Conclusion

The Debtors have determined, as summarized in this Liquidation Analysis (including the table below),[2] that upon the Effective Date, the Plan will provide Holders of Claims and Interests with a recovery that is not less than what they would otherwise receive if the Debtors' Estates were liquidated under Chapter 7. Accordingly, the Debtors believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

| Class | Designation | Treatment | Claim Amount | Estimated Plan Recovery | Estimated Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | $- | 100% | 0% |
| 2 | Priority Non-Tax Claims | Unimpaired | $10 | 100% | 0% |
| 3 | First Lien Claims | Impaired | $2,147 | 44-47% | 22% |
| 4 | Second Lien Term Loan Claims | Impaired | $309 | 6% | 0% |
| 5 | Senior Unsecured Notes Claims | Impaired | $364 | 6% | 0% |
| 6 | General Unsecured Claims | Impaired | $41 | 6% | 0% |
| 7 | Intercompany Claims | Impaired or Unimpaired | $10,920 | 0% | 0% |
| 8 | Section 510 Claims | Impaired | $- | 0% | 0% |
| 9 | Intercompany Interests | Unimpaired | N/A | N/A | N/A |
| 10 | Existing Equity Interests | Impaired | $- | 0% | 0% |

---

[2] This table summarizes this Liquidation Analysis for the aggregated Debtor entities. Projected amount of liquidation claims and recoveries are based on the estimated midpoints.

3. **Basis of Presentation**

The Liquidation Analysis was prepared on a legal entity basis for each Debtor without substantive consolidation and summarized into a consolidated report. It is assumed that all Debtors would undertake parallel liquidations.

This Liquidation Analysis has been prepared assuming that the Debtors would hypothetically convert their cases from Chapter 11 to Chapter 7 on March 29, 2025 (the "**Conversion Date**") and would be liquidated thereafter pursuant to Chapter 7 of the Bankruptcy Code. The pro forma distributable values referenced herein are projected to be as of March 29, 2025, and those values are assumed to be representative of the Debtors' assets as of the Conversion Date. It is assumed that, on the Conversion Date, operations will cease and the only funding available will come from the Debtors current cash on hand and proceeds from asset liquidations. In addition, the Bankruptcy Court would appoint a Trustee who would sell the majority of the Debtors' assets over the course of an assumed six-month wind-down period (the "**Wind-Down Period**"). It is assumed that the Trustee will retain professionals, including lawyers and other necessary financial advisors to assist in the liquidation and wind-down. Throughout this period, in addition to professional expenses, the Trustee would also incur administrative expenses, such as employee related payroll and certain overhead reasonably required to complete the wind-down. The Trustee would distribute the cash proceeds, net of liquidation- related costs, to holders of Claims and Interests in accordance with the priority scheme set forth in Chapter 7. Under section 704 of the Bankruptcy Code, a Trustee must, among other duties, collect and convert property of the Estates as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed recoveries.

The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions which, although considered reasonable by the Debtors' managing officers ("**Management**") and the Debtors' advisors, are inherently subject to significant business, economic, and market uncertainties and contingencies beyond the Debtors' control.

The cessation of business in a liquidation is likely to trigger certain Claims that otherwise would not exist under a Plan (absent a liquidation). Examples of these kinds of Claims include various potential employee Claims (including any severance Claims or Claims related to the WARN Act), unforeseen litigation Claims, qualified pension Claims, and Claims related to rejection of executory contracts and unexpired leases, potential customer damage claims, in addition to other potential Claims. Some of these Claims could be significant and might be entitled to priority in payment over non-priority unsecured Claims. Those priority Claims would be paid before any Liquidation Proceeds would be made available to pay non-priority unsecured Claims.

Professional fees, Trustee fees, administrative expenses, priority Claims, and other such Claims that may arise in a liquidation scenario would have to be fully paid from the Liquidation Proceeds before any proceeds are made available to holders of General Unsecured Claims. Under the priority scheme dictated in Chapter 7, no junior creditor would receive any distributions until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the priority scheme dictated in Chapter 7 of the

Bankruptcy Code.

For purposes of this analysis, no recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions due to, among other issues, the cost of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters. Additionally, this Liquidation Analysis does not include estimates for federal, state, or other local tax consequences that may be triggered upon the liquidation and sale of assets. Such tax consequences may be material.

### 4. Liquidation Process

For purposes of this analysis, the Debtors' hypothetical liquidation would be conducted in a Chapter 7 environment with the Trustee managing the bankruptcy Estate of each Debtor to maximize recoveries in an expedited process. The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of assets for distribution to creditors. The major components of the liquidation and distribution process are as follows:

- generation of cash proceeds from the sale and monetization of assets;
- payment of costs related to the liquidation process, such as Estate wind-down costs and Trustee, professional, broker, and other administrative fees; and
- reconciliation of Claims and distribution of net proceeds generated from asset sales to the holders of allowed Claims and Interests of each Debtor in accordance with the priority scheme under Chapter 7 of the Bankruptcy Code.

### 5. Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to the applicable holders of Claims and Interests of each Debtor in strict priority in accordance with section 726 of the Bankruptcy Code:

- <u>Chapter 7 Liquidation Fees and Costs</u> – includes wind-down costs, estimated fees paid to the Trustee and certain professional and broker fees;
- <u>Superpriority Claims</u> – includes DIP Claims, certain accrued and unpaid statutory fees and Allowed Professional Fees governed by the DIP Order;
- <u>First Lien Claims</u> – includes (i) First Lien Revolving Loans and (ii) First Lien Term Loans and fees, expenses and other amounts arising and payable under and in accordance with the First Lien Documents;
- <u>Second Lien Term Loan Claims</u> – includes the Second Lien Term Loans plus fees, expenses, and other amounts arising and payable under and in accordance with the Second Lien Documents;
- <u>Other Priority Claims</u> – includes amounts related to 503(b)(9) Claims, Priority Tax

Claims and other priority Claims;

- <u>General Unsecured Claims</u> – includes deficiency claims on secured debt, Senior Unsecured Note Claims, trade claims, contract / lease rejections, other General Unsecured Claims, and Intercompany Claims.

*[Continued on Following Page.]*

**Consolidated Debtor Entity Recoveries & Waterfall**

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % Low | Mid | High | Estimated Liquidation Value Low | | Mid | | High |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash | A | $ 51 | 100% | 100% | 100% | $ 51 | $ | 51 | $ | 51 |
| Accounts Receivable - Trade | B | 397 | 57% | 66% | 76% | 225 | | 263 | | 300 |
| Accounts Receivable - Non-Trade | B | 4 | 5% | 10% | 15% | 0 | | 0 | | 1 |
| Inventory | C | 206 | 58% | 65% | 73% | 120 | | 135 | | 150 |
| Prepaids and Other | D | 60 | 0% | 1% | 3% | - | | 1 | | 2 |
| Property, Plant and Equipment, net | E | 416 | 18% | 26% | 33% | 75 | | 107 | | 139 |
| Intangible Assets, net | F | 966 | 0% | 0% | 0% | - | | - | | - |
| **Total** | | **$ 2,170** | **22%** | **26%** | **30%** | **$ 471** | **$** | **557** | **$** | **642** |

| Chapter 7 Liquidation Adjustments | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | (51) | | (48) | | (46) |
| Chapter 7 Trustee Fees | H | | | | | (13) | | (15) | | (18) |
| Chapter 7 Professional & Broker Fees | I | | | | | (13) | | (15) | | (18) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | **(76)** | | **(78)** | | **(81)** |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ 395** | **$** | **478** | **$** | **561** |
| **Disbtributable Value (Prior to Intercompany)** | | | | | | | | | | |
| IBC I/C Recovery | J | | | | | 7 | | 10 | | 13 |
| **Net Distributable Value** | | | | | | **$ 402** | **$** | **488** | **$** | **574** |

*$ in millions*

| | | Total Estimated Claims Low | Mid | High | Total Recovery % Low | Mid | High | Total Recovery $ Low | | Mid | | High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pro Fee Carve Out** | | | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 100% | 100% | 100% | 6 | | 6 | | 6 |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **100%** | **100%** | **100%** | **6** | | **6** | | **6** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | 396 | | 482 | | 568 |
| **Superpriority Claims** | | | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | | - | | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | | **-** | | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | 396 | | 482 | | 568 |
| **1L Claims** | | | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 18% | 22% | 26% | 37 | | 46 | | 54 |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 18% | 22% | 26% | 359 | | 437 | | 515 |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **18%** | **22%** | **26%** | **396** | | **482** | | **568** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | - | | - | | - |
| **2L Claims** | | | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | | - | | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | | **-** | | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | - | | - | | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | | | |
| Other Priority Claims | | 10 | 10 | 10 | 0% | 0% | 0% | - | | - | | - |
| Administrative Expense Claims | | 115 | 115 | 115 | 0% | 0% | 0% | - | | - | | - |
| Severance Liability | | 46 | 46 | 46 | 0% | 0% | 0% | - | | - | | - |
| **Total Admin and Priority Claims** | O | **$ 171** | **$ 171** | **$ 171** | **0%** | **0%** | **0%** | **-** | | **-** | | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | - | | - | | - |
| **Unsecured Claims** | | | | | | | | | | | | |
| 1L Deficiency Claims | | 1,751 | 1,664 | 1,578 | 0% | 0% | 0% | - | | - | | - |
| 2L Deficiency Claims | | 309 | 309 | 309 | 0% | 0% | 0% | - | | - | | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | | - | | - |
| Prepetition A/P | | 26 | 26 | 26 | 0% | 0% | 0% | - | | - | | - |
| Contract/Lease Rejections | | 83 | 83 | 83 | 0% | 0% | 0% | - | | - | | - |
| I/C Liabilities | | 10,920 | 10,920 | 10,920 | 0% | 0% | 0% | - | | - | | - |
| **Total Unsecured Claims** | P | **$ 13,453** | **$ 13,367** | **$ 13,281** | **0%** | **0%** | **0%** | **-** | | **-** | | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | - | | - | | - |
| **Total Claims** | | **$ 16,085** | **$ 15,999** | **$ 15,913** | **2.5%** | **3.1%** | **3.6%** | **$ 402** | **$** | **488** | **$** | **574** |

**Specific Notes to the Liquidation Analysis**

***Total Liquidated Assets***

A.  <u>Cash and Cash Equivalents</u>

    a.  The Debtors' estimated balance of unrestricted cash and cash equivalents as of the Conversion Date is approximately $51 million.

    b.  All Debtors' projected cash and cash equivalents on hand are assumed to be 100% recoverable.

B.  <u>Accounts Receivable ("A/R") - Trade</u>

    a.  The Debtors' estimated net accounts receivable as of the Conversion Date is approximately $397 million.

    b.  Management believes that in the case of liquidation, customers will offset their accounts receivable with accounts payable that they are owed (in the circumstance that they are also a vendor), accounts payable owed to vendors that are specifically directed by that customer, and rebates owed to the customer.  Furthermore, no recovery is assumed for receivables aged over 90 days.

    c.  Additional risks that would potentially offset customer A/R balances would include but not be limited to any costs incurred by the customer for moving cost of customer-owned equipment as well as any potential damage claims that may arise related to contract non-performance.  These risks are not reflected in the analysis.

    d.  After applying those assumptions, the recovery range of the net book value ("NBV") is 57% to 76%.

    e.  Accounts Receivable – Non-Trade includes customer rebates and other non-trade related accruals.  The amounts are assumed to have a recovery range of 5% to 15%.

C.  <u>Inventory</u>

    a.  The Debtors' estimated inventory as of the Conversion Date is approximately $206 million.

    b.  Inventory primarily consists of finished goods, work-in-process, raw materials, and packaging materials with certain offsets relating to customer owned inventory applied to finished goods.

    c. This analysis assumes inventory is sold "as is, where is" as of the Conversion Date; therefore, raw materials and work-in-process inventory are not converted to finished goods.

    d. Recovery assumptions range from 40% for work-in-process inventory to 100% for finished goods inventory. Inventory is assumed to be liquidated to specific customers.

    e. After applying those assumptions, the recovery range of the NBV is 58% to 73%.

D. <u>Prepaids and Other Assets</u>

    a. The Debtors' estimated balance of prepaids and other assets as of the Conversion Date is approximately $60 million.

    b. Prepaid and other assets primarily consist of prepaid inventory, prepaid insurance, income tax receivable, prepaid licenses and other de minimis assets.

    c. De minimis recoveries are assumed for prepaid inventory related to cash in advance payments and prepaid insurance.

    d. The recovery range of the NBV is 0% to 3%.

E. <u>Property, Plant, and Equipment ("PP&E")</u>

    a. PP&E estimated balance as of the Conversion Date is approximately $416 million.

    b. Debtors PP&E primarily consists of machinery and equipment held at various manufacturing locations. The remaining composition includes construction in progress assets, land, and other assets (e.g. computer equipment and software). For machinery and equipment, the estimated balance only includes the Company owned equipment. The value of any customer owned equipment is excluded from this analysis.

    c. Recovery percentages are based on recent market offers on certain assets and Management's expertise. Recovery values reflect the costly de-installation, transportation, and re-installation costs due to size and scale of machinery and equipment.

    d. Based on these assumptions, the recovery range of the NBV is 18% to 33%.

F. <u>Intangible Assets</u>

    a.  Intangible Assets estimated balance as of the Conversion Date is approximately $966 million and includes items such as trade names and customer relationships.

    b.  The estimated value is related to purchase accounting treatment and assumed to have 0% recovery.

### *Chapter 7 Liquidation Adjustments*

G.  <u>Wind-Down Costs</u>

    a.  Wind-down costs consist primarily of general and administrative support functions that would be required to wind-down the Debtors' Estates in Chapter 7, including employee wages, taxes, and benefits, certain operational costs, one-time shut down costs associated with the decommissioning of the manufacturing plants, information technology, and other SG&A costs.

    b.  During the Wind-Down Period, the Chapter 7 Trustee would retain a limited group of Company personnel to assist in the liquidation of substantially all of the remaining assets, market and sale of machinery and equipment, collect outstanding receivables, reconcile Claims, arrange distributions, and other administrative activities to wind-down the Estates.

    c.  The Debtors assume fully loaded employee compensation costs (e.g. salary, benefits, bonuses, etc.) are applied to remaining employees over the Wind-Down period.  The analysis assumes that a subset of the current employee base remains in place and this subset is reduced over the 6-month wind down period.

    d.  In an actual liquidation, the wind-down process and length of time could vary, thereby impacting recoveries.

H.  <u>Trustee Fees</u>

    a.  The Trustee fees are dictated by the fee guidelines of section 326(a) of the Bankruptcy Code. This Liquidation Analysis assumes Chapter 7 Trustee fees are 3.0% of gross liquidation proceeds available for distribution to creditors (excluding cash and intercompany receivables).

I.  <u>Chapter 7 Professional and Broker Fees</u>

    a.   This Liquidation Analysis assumes that professional fees for legal and financial advisors are assumed to be 3.0% of gross liquidation proceeds available for distribution to creditors (excluding cash and intercompany receivables).

J.   <u>Interbake Canada Intercompany Recovery</u>

    a.   The Liquidation Analysis assumes Interbake Canada Inc., a non-debtor subsidiary, is also liquidated as part of this process given that key central functions supporting the non-debtor entity will be eliminated as part of the wind-down and it cannot operate as a standalone.  The recoveries would be used to satisfy outstanding obligations to Debtor entities, which is ultimately collateral and part of the distributable value for claimants.

### *<u>Claims</u>*

K.   <u>Professional Fee Carve Out</u>[3]

    a.   In the DIP Order, each of the DIP Liens , Prepetition First Liens, Adequate Protection Liens, and 507(b) Claims shall be subject to and subordinate to the payment of the Carve Out.  The Carve Out shall have priority over all assets of the Debtors, including the Prepetition First Lien Collateral and Adequate Protection Collateral.   It is assumed any accrued and unpaid professional fees and expenses prior to the Carve Out Trigger Notice for Debtors, Committee, and U.S. Trustee fees are paid prior to the Conversion Date from the Funded Reserve Account (as defined in the DIP order).  The $6 million reflects the Professional Fees of Professional Persons (each, as defined in the DIP Order) incurred after the Post-Carve Out Trigger Notice Cap and entitled to priority treatment as contemplated by the DIP Order.

L.   <u>DIP Claims</u>

    a.   Assumes no draw on the $150 million new money delayed-draw term loan DIP as of the Conversion Date.

M.   <u>First Lien Claims</u>

    a.   First Lien Claims are estimated to total $2,147 million at the Conversion Date.

    b.   The amount consists of the First Lien Revolving Loans ($203 million) and First Lien Term Loans ($1,944 million), which includes principal and accrued interest

---

[3] Capitalized but undefined terms in this Section A shall have meanings ascribed to them in the DIP Order.

    c.  The estimated low and high recovery is 18% and 26%, respectively.

N.  <u>Second Lien Term Loan Claims</u>

    a.  Second Lien Term Loan Claims are estimated to total $309 million at the Conversion Date.  This includes both principal and interest. The estimated recovery is 0%.

O.  <u>Administrative Expense and Priority Claims</u>

    a.  Administrative and other priority claims are estimated to total $171 million at the Conversion Date.  This reflects any unpaid post-petition obligations.  This Liquidation Analysis does not take into account superpriority adequate protection claims in respect of the diminution in value of collateral securing prepetition secured indebtedness, which claims may be substantial.

    b.  The amount consists of other priority claims ($10 million), Administrative Claims ($116 million), and Severance Liability ($46 million).

    c.  The estimated recovery is 0%.

P.  <u>General Unsecured Claims</u>

    a.  General Unsecured Claims are estimated to total $13,367 million at the Conversion Date.  This includes First Lien Deficiency Claim ($1,665 million), Second Lien Deficiency Claim ($309 million), Senior Unsecured Notes Claim ($364 million), prepetition accounts payable ($26 million), contract/lease rejections ($83 million), and intercompany payables ($10,920 million).  The estimated recovery is 0%.

## Recovery & Waterfall Schedule by Debtor

### Hearthside Food Solutions LLC

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $ 18 | 100% | 100% | 100% | $ 18 | $ 18 | $ 18 |
| Accounts Receivable - Trade | B | 166 | 57% | 66% | 76% | 94 | 110 | 125 |
| Accounts Receivable - Non-Trade | B | 3 | 5% | 10% | 15% | 0 | 0 | 0 |
| Inventory | C | 85 | 58% | 65% | 73% | 49 | 56 | 62 |
| Prepaids and Other | D | 46 | 0% | 1% | 3% | - | 1 | 1 |
| Property, Plant and Equipment, net | E | 264 | 18% | 26% | 33% | 48 | 68 | 88 |
| Intangible Assets, net | F | 671 | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ 1,277** | **16%** | **20%** | **23%** | **$ 209** | **$ 252** | **$ 295** |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | |
| Wind Down Costs | G | | | | | (23) | (22) | (21) |
| Chapter 7 Trustee Fees | H | | | | | (6) | (7) | (8) |
| Chapter 7 Professional & Broker Fees | I | | | | | (6) | (7) | (8) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | **(35)** | **(36)** | **(38)** |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ 174** | **$ 216** | **$ 257** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | 3 | 4 | 5 |
| **Net Distributable Value** | | | | | | **$ 177** | **$ 220** | **$ 262** |

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *$ in millions* | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 44% | 45% | 46% | 3 | 3 | 3 |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **44%** | **45%** | **46%** | **3** | **3** | **3** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | 175 | 217 | 260 |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | 175 | 217 | 260 |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 8% | 10% | 12% | 16 | 20 | 25 |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 8% | 10% | 12% | 158 | 197 | 235 |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **8%** | **10%** | **12%** | **175** | **217** | **260** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | 69 | 69 | 69 | 0% | 0% | 0% | - | - | - |
| Severance Liability | | 27 | 27 | 27 | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ 75** | **$ 75** | **$ 75** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | 771 | 749 | 721 | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | 136 | 139 | 141 | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | 16 | 16 | 16 | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | 55 | 55 | 55 | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | 5,281 | 5,281 | 5,281 | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 6,623** | **$ 6,603** | **$ 6,577** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| **Total Claims** | | **$ 9,159** | **$ 9,139** | **$ 9,113** | **1.9%** | **2.4%** | **2.9%** | **$ 177** | **$ 220** | **$ 262** |

## Oak State Products, LLC

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % Low | Mid | High | Estimated Liquidation Value Low | Mid | High |
|---|---|---|---|---|---|---|---|---|
| Cash | A | $ - | 0% | 0% | 0% | $ - | $ - | $ - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | | | |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | | | |
| Inventory | C | 6 | 58% | 65% | 73% | 3 | 4 | 4 |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | 6 | 18% | 26% | 33% | 1 | 2 | 2 |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ 13** | **35%** | **41%** | **48%** | **$ 5** | **$ 6** | **$ 6** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | (1) | (1) | (0) |
| Chapter 7 Trustee Fees | H | | | | | (0) | (0) | (0) |
| Chapter 7 Professional & Broker Fees | I | | | | | (0) | (0) | (0) |
| Total Chapter 7 Liquidation Adjustments | | | | | | (1) | (1) | (1) |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ 4** | **$ 5** | **$ 6** |

| Disbtributable Value (Excl Unencumbered Assets) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$ 4** | **$ 5** | **$ 6** |

*$ in millions*

| | | Total Estimated Claims Low | Mid | High | Total Recovery % Low | Mid | High | Total Recovery $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 1% | 1% | 1% | 0 | 0 | 0 |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **1%** | **1%** | **1%** | **0** | **0** | **0** |
| Remaining Distributable Value after Pro Fee Carve Out | | | | | | | | 4 | 5 | 5 |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after DIP Claims | | | | | | | | 4 | 5 | 5 |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | 0 | 0 | 1 |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | 3 | 4 | 5 |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **0%** | **0%** | **4** | **5** | **5** |
| Remaining Distributable Value after 1L Claims | | | | | | | | - | - | - |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after 2L Claims | | | | | | | | - | - | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after Admin and Priority Claims | | | | | | | | - | - | - |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | 16 | 16 | 15 | 0% | 0% | 0% | | | |
| 2L Deficiency Claims | | 3 | 3 | 3 | 0% | 0% | 0% | | | |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | 3 | 3 | 3 | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 386** | **$ 386** | **$ 385** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after Unsecured Claims | | | | | | | | - | - | - |
| **Total Claims** | | **$ 2,848** | **$ 2,847** | **$ 2,847** | **0.1%** | **0.2%** | **0.2%** | **$ 4** | **$ 5** | **$ 6** |

**Standard Functional Foods Group, LLC**

*$ in millions*

| Liquidated Balance Sheet | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High |
| Cash | $ - | 0% | 0% | 0% | $ - | $ - | $ - |
| Accounts Receivable - Trade | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | - | 0% | 0% | 0% | - | - | - |
| Inventory | 0 | 58% | 65% | 73% | 0 | 0 | 0 |
| Prepaids and Other | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | - | 0% | 0% | 0% | - | - | - |
| **Total** | **$ 0** | **58%** | **65%** | **73%** | **$ 0** | **$ 0** | **$ 0** |

| Chapter 7 Liquidation Adjustments | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wind Down Costs | | | | | (0) | (0) | (0) |
| Chapter 7 Trustee Fees | | | | | (0) | (0) | (0) |
| Chapter 7 Professional & Broker Fees | | | | | (0) | (0) | (0) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | **(0)** | **(0)** | **(0)** |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | **$ 0** | **$ 0** | **$ 0** |
| Disbtributable Value (Excl Unencumbered Assets) | | | | | | | |
| I/C Recovery | | | | | - | - | - |
| **Net Distributable Value** | | | | | **$ 0** | **$ 0** | **$ 0** |

*$ in millions*

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | 0 | 0 | 0 |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **0%** | **0%** | **0%** | **0** | **0** | **0** |
| Remaining Distributable Value after Pro Fee Carve Out | | | | | | | | 0 | 0 | 0 |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after DIP Claims | | | | | | | | 0 | 0 | 0 |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | 0 | 0 | 0 |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | 0 | 0 | 0 |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **0%** | **0%** | **0** | **0** | **0** |
| Remaining Distributable Value after 1L Claims | | | | | | | | - | - | - |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after 2L Claims | | | | | | | | - | - | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after Admin and Priority Claims | | | | | | | | - | - | - |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | 0 | 0 | 0 | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | 0 | 0 | 0 | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 364** | **$ 364** | **$ 364** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after Unsecured Claims | | | | | | | | - | - | - |
| **Total Claims** | | **$ 2,826** | **$ 2,826** | **$ 2,826** | **0.0%** | **0.0%** | **0.0%** | **$ 0** | **$ 0** | **$ 0** |

**Hearthside USA - CPG Partners, LLC**

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $ (0) | 100% | 100% | 100% | $ (0) $ (0) $ (0) | | |
| Accounts Receivable - Trade | B | 168 | 57% | 66% | 76% | 95 | 111 | 127 |
| Accounts Receivable - Non-Trade | B | 1 | 5% | 10% | 15% | 0 | 0 | 0 |
| Inventory | C | 33 | 58% | 65% | 73% | 19 | 21 | 24 |
| Prepaids and Other | D | 4 | 0% | 1% | 3% | - | 0 | 0 |
| Property, Plant and Equipment, net | E | 69 | 18% | 26% | 33% | 12 | 18 | 23 |
| Intangible Assets, net | F | 294 | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ 569** | **22%** | **26%** | **31%** | **$ 127 $ 150 $ 174** | | |
| | | | | | | | | |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | |
| Wind Down Costs | G | | | | | (15) | (14) | (13) |
| Chapter 7 Trustee Fees | H | | | | | (4) | (5) | (5) |
| Chapter 7 Professional & Broker Fees | I | | | | | (4) | (5) | (5) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | **(23)** | **(23)** | **(24)** |
| | | | | | | | | |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ 104** | **$ 127** | **$ 150** |
| | | | | | | | | |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| | | | | | | | | |
| **Net Distributable Value** | | | | | | **$ 104** | **$ 127** | **$ 150** |

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *$ in millions* | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 26% | 26% | 26% | 2 | 2 | 2 |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **26%** | **26%** | **26%** | **2** | **2** | **2** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | **102** | **125** | **149** |
| | | | | | | | | | | |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | **102** | **125** | **149** |
| | | | | | | | | | | |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 5% | 6% | 7% | 10 | 12 | 14 |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 5% | 6% | 7% | 93 | 114 | 135 |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **5%** | **6%** | **7%** | **102** | **125** | **149** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | 3 | 3 | 3 | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | 33 | 33 | 33 | 0% | 0% | 0% | - | - | - |
| Severance Liability | | 13 | 13 | 13 | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ 35** | **$ 35** | **$ 35** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | 452 | 433 | 413 | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | 80 | 80 | 81 | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | 7 | 7 | 7 | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | 4,570 | 4,570 | 4,570 | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 5,473** | **$ 5,455** | **$ 5,435** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **Total Claims** | | **$ 7,970** | **$ 7,952** | **$ 7,932** | **1.3%** | **1.6%** | **1.9%** | **$ 104** | **$ 127** | **$ 150** |

## Hearthside USA, LLC

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % Low | Mid | High | Estimated Liquidation Value Low | Mid | High |
|---|---|---|---|---|---|---|---|---|
| Cash | A | $ 0 | 100% | 100% | 100% | $ 0 | $ 0 | $ 0 |
| Accounts Receivable - Trade | B | 9 | 57% | 66% | 76% | 5 | 6 | 6 |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | 4 | 58% | 65% | 73% | 2 | 2 | 3 |
| Prepaids and Other | D | 0 | 0% | 1% | 3% | - | 0 | 0 |
| Property, Plant and Equipment, net | E | 10 | 18% | 26% | 33% | 2 | 2 | 3 |
| Intangible Assets, net | F | 0 | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ 28** | **31%** | **38%** | **44%** | **$ 9** | **$ 10** | **$ 12** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | (1) | (1) | (1) |
| Chapter 7 Trustee Fees | H | | | | | (0) | (0) | (0) |
| Chapter 7 Professional & Broker Fees | I | | | | | (0) | (0) | (0) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | **(2)** | **(2)** | **(2)** |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ 7** | **$ 9** | **$ 11** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$ 7** | **$ 9** | **$ 11** |

*$ in millions*

| | | Total Estimated Claims Low | Mid | High | Total Recovery % Low | Mid | High | Total Recovery $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 2% | 2% | 2% | 0 | 0 | 0 |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **2%** | **2%** | **2%** | **0** | **0** | **0** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | **7** | **9** | **10** |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | **7** | **9** | **10** |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | 1 | 1 | 1 |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | 6 | 8 | 9 |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **0%** | **0%** | **7** | **9** | **10** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | 0 | 0 | 0 | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | 1 | 1 | 1 | 0% | 0% | 0% | - | - | - |
| Severance Liability | | 0 | 0 | 0 | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ 1** | **$ 1** | **$ 1** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | 31 | 30 | 29 | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | 5 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | 0 | 0 | 0 | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | 2 | 2 | 2 | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | 149 | 149 | 149 | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 552** | **$ 552** | **$ 551** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| **Total Claims** | | **$ 3,015** | **$ 3,014** | **$ 3,013** | **0.2%** | **0.3%** | **0.4%** | **$ 7** | **$ 9** | **$ 11** |

**Hearthside USA - Produce & Foodservice, LLC**

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $ 1 | 100% | 100% | 100% | $ 1 | $ 1 | $ 1 |
| Accounts Receivable - Trade | B | 9 | 57% | 66% | 76% | 5 | 6 | 7 |
| Accounts Receivable - Non-Trade | B | 1 | 5% | 10% | 15% | 0 | 0 | 0 |
| Inventory | C | 7 | 58% | 65% | 73% | 4 | 5 | 5 |
| Prepaids and Other | D | 2 | 0% | 1% | 3% | - | 0 | 0 |
| Property, Plant and Equipment, net | E | 10 | 18% | 26% | 33% | 2 | 2 | 3 |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ 29** | **42%** | **49%** | **56%** | **$ 12** | **$ 14** | **$ 16** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | (1) | (1) | (1) |
| Chapter 7 Trustee Fees | H | | | | | (0) | (0) | (0) |
| Chapter 7 Professional & Broker Fees | I | | | | | (0) | (0) | (0) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | **(2)** | **(2)** | **(2)** |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ 10** | **$ 12** | **$ 14** |
| Disbtributable Value (Excl Unencumbered Assets) | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$ 10** | **$ 12** | **$ 14** |

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *$ in millions* | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 2% | 2% | 2% | 0 | 0 | 0 |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **2%** | **2%** | **2%** | **0** | **0** | **0** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | **10** | **12** | **14** |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | **10** | **12** | **14** |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 1% | 1% | 1 | 1 | 1 |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 1% | 1% | 9 | 11 | 13 |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **1%** | **1%** | **10** | **12** | **14** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | 0 | 0 | 0 | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | 3 | 3 | 3 | 0% | 0% | 0% | - | - | - |
| Severance Liability | | 1 | 1 | 1 | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ 3** | **$ 3** | **$ 3** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | 44 | 41 | 39 | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | 8 | 8 | 8 | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | 1 | 1 | 1 | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | 0 | 0 | 0 | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 416** | **$ 414** | **$ 412** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| **Total Claims** | | **$ 2,881** | **$ 2,878** | **$ 2,876** | **0.3%** | **0.4%** | **0.5%** | **$ 10** | **$ 12** | **$ 14** |

**Interbake Foods, LLC**

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % Low | Mid | High | Estimated Liquidation Value Low | Mid | High |
|---|---|---|---|---|---|---|---|---|
| Cash | A | $ (0) | 100% | 100% | 100% | $ (0) $ (0) $ (0) |  |  |
| Accounts Receivable - Trade | B | 46 | 57% | 66% | 76% | 26 | 30 | 35 |
| Accounts Receivable - Non-Trade | B | (0) | 5% | 10% | 15% | (0) | (0) | (0) |
| Inventory | C | 72 | 58% | 65% | 73% | 42 | 47 | 52 |
| Prepaids and Other | D | 8 | 0% | 1% | 3% | - | 0 | 0 |
| Property, Plant and Equipment, net | E | 57 | 18% | 26% | 33% | 10 | 15 | 19 |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** |  | **$ 222** | **35%** | **41%** | **48%** | **$ 78 $ 92 $ 106** |  |  |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G |  |  |  |  | (9) | (9) | (8) |
| Chapter 7 Trustee Fees | H |  |  |  |  | (2) | (3) | (3) |
| Chapter 7 Professional & Broker Fees | I |  |  |  |  | (2) | (3) | (3) |
| **Total Chapter 7 Liquidation Adjustments** |  |  |  |  |  | (14) | (14) | (15) |

| Net Proceeds from Liquidation Available for Distribution | | | | | | $ 64 $ 78 $ 91 | | |
|---|---|---|---|---|---|---|---|---|

| Disbtributable Value (Excl Unencumbered Assets) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| I/C Recovery | J |  |  |  |  | 0 | 0 | 0 |

| **Net Distributable Value** | | | | | | **$ 64 $ 78 $ 92** | | |
|---|---|---|---|---|---|---|---|---|

*$ in millions*

| | | Total Estimated Claims Low | Mid | High | Total Recovery % Low | Mid | High | Total Recovery $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 16% | 16% | 16% | 1 | 1 | 1 |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **16%** | **16%** | **16%** | **1** | **1** | **1** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | 63 | 77 | 91 |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | 63 | 77 | 91 |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 3% | 4% | 4% | 6 | 7 | 9 |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 3% | 4% | 4% | 57 | 70 | 82 |
| **Total 1L Claims** | M | **$ 2,147 $ 2,147 $ 2,147** | | | **3%** | **4%** | **4%** | **63** | **77** | **91** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | - | - | - |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309 $ 309 $ 309** | | | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | - | - | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | 1 | 1 | 1 | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | 10 | 10 | 10 | 0% | 0% | 0% | - | - | - |
| Severance Liability | | 4 | 4 | 4 | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ 11 $ 11 $ 11** | | | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | - | - | - |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | 278 | 265 | 252 | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | 49 | 49 | 49 | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | 2 | 2 | 2 | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | 24 | 24 | 24 | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | 548 | 548 | 548 | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 1,265 $ 1,252 $ 1,239** | | | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | - | - | - |
| **Total Claims** | | **$ 3,737 $ 3,724 $ 3,711** | | | **1.7%** | **2.1%** | **2.5%** | **$ 64 $ 78 $ 92** | | |

**H-Food Holdings**

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $ 32 | 100% | 100% | 100% | $ 32 | $ 32 | $ 32 |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | 0 | 0% | 1% | 3% | - | 0 | 0 |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ 33** | **100%** | **100%** | **100%** | **$ 32** | **$ 32** | **$ 32** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | - | (0) | (0) |
| Chapter 7 Trustee Fees | H | | | | | - | (0) | (0) |
| Chapter 7 Professional & Broker Fees | I | | | | | - | (0) | (0) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | **-** | **(0)** | **(0)** |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ 32** | **$ 32** | **$ 32** |
| Disbtributable Value (Excl Unencumbered Assets) | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$ 32** | **$ 32** | **$ 32** |

*$ in millions*

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 8% | 7% | 6% | 0 | 0 | 0 |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **8%** | **7%** | **6%** | **0** | **0** | **0** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | 32 | 32 | 32 |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | 32 | 32 | 32 |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 1% | 1% | 1% | 3 | 3 | 3 |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 1% | 1% | 1% | 29 | 29 | 29 |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **1%** | **1%** | **1%** | **32** | **32** | **32** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | - | - | - |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | - | - | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | - | - | - |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | 141 | 111 | 89 | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | 25 | 21 | 17 | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | 229 | 229 | 229 | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 760** | **$ 725** | **$ 700** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | - | - | - |
| **Total Claims** | | **$ 3,221** | **$ 3,186** | **$ 3,161** | **1.0%** | **1.0%** | **1.0%** | **$ 32** | **$ 32** | **$ 32** |

## Hearthside Holdco, LLC

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $    - | 0% | 0% | 0% | $    - | $    - | $    - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$    -** | **0%** | **0%** | **0%** | **$    -** | **$    -** | **$    -** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | **-** | **-** | **-** |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$    -** | **$    -** | **$    -** |

| Distbributable Value (Excl Unencumbered Assets) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| I/C Recovery | J | | | | | 4 | 6 | 7 |
| **Net Distributable Value** | | | | | | **$    4** | **$    6** | **$    7** |

*$ in millions*

| | Notes | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 1% | 1% | 1% | 0 | 0 | 0 |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **1%** | **1%** | **1%** | **0** | **0** | **0** |
| Remaining Distributable Value after Pro Fee Carve Out | | | | | | | | 4 | 6 | 7 |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after DIP Claims | | | | | | | | 4 | 6 | 7 |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | 0 | 1 | 1 |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | 4 | 5 | 7 |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **0%** | **0%** | **4** | **6** | **7** |
| Remaining Distributable Value after 1L Claims | | | | | | | | - | - | - |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after 2L Claims | | | | | | | | - | - | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$    -** | **$    -** | **$    -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after Admin and Priority Claims | | | | | | | | - | - | - |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | 17 | 20 | 21 | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | 3 | 4 | 4 | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 385** | **$ 387** | **$ 389** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after Unsecured Claims | | | | | | | | - | - | - |
| **Total Claims** | | **$ 2,846** | **$ 2,849** | **$ 2,850** | **0.1%** | **0.2%** | **0.3%** | **$    4** | **$    6** | **$    7** |

## Hearthside USA – Corporate Inc

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $ - | 0% | 0% | 0% | $ - | $ - | $ - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | 0 | 0% | 1% | 3% | - | 0 | 0 |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ 0** | **0%** | **1%** | **3%** | **$ -** | **$ 0** | **$ 0** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | - | (0) | (0) |
| Chapter 7 Trustee Fees | H | | | | | - | (0) | (0) |
| Chapter 7 Professional & Broker Fees | I | | | | | - | (0) | (0) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | - | (0) | (0) |
| | | | | | | | | |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ -** | **$ 0** | **$ 0** |
| | | | | | | | | |
| Disbtributable Value (Excl Unencumbered Assets) | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| | | | | | | | | |
| **Net Distributable Value** | | | | | | **$ -** | **$ 0** | **$ 0** |

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *$ in millions* | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | - | 0 | 0 |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **0%** | **0%** | **0%** | **-** | **0** | **0** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | **-** | **0** | **0** |
| | | | | | | | | | | |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | **-** | **0** | **0** |
| | | | | | | | | | | |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | - | 0 | 0 |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | - | 0 | 0 |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **0%** | **0%** | **-** | **0** | **0** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | 0 | 0 | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | 0 | 0 | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | 142 | 142 | 142 | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 506** | **$ 506** | **$ 506** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **Total Claims** | | **$ 2,968** | **$ 2,968** | **$ 2,968** | **0.0%** | **0.0%** | **0.0%** | **$ -** | **$ 0** | **$ 0** |

**HFS Sub LLC**

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % Low | Mid | High | Estimated Liquidation Value Low | Mid | High |
|---|---|---|---|---|---|---|---|---|
| Cash | A | $ - | 0% | 0% | 0% | $ - | $ - | $ - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ -** | **0%** | **0%** | **0%** | **$ -** | **$ -** | **$ -** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | - | - | - |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ -** | **$ -** | **$ -** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$ -** | **$ -** | **$ -** |

*$ in millions*

| | | Total Estimated Claims Low | Mid | High | Total Recovery % Low | Mid | High | Total Recovery $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | - | - | - |
| **Superiority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superiority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | - | - | - |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | - | - | - |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | - | - | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | - | - | - |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 364** | **$ 364** | **$ 364** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | - | - | - |
| **Total Claims** | | **$ 2,825** | **$ 2,825** | **$ 2,825** | **0.0%** | **0.0%** | **0.0%** | **$ -** | **$ -** | **$ -** |

**Peacock Engineering Company II, LLC**

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $ - | 0% | 0% | 0% | $ - | $ - | $ - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ -** | **0%** | **0%** | **0%** | **$ -** | **$ -** | **$ -** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | - | - | - |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ -** | **$ -** | **$ -** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$ -** | **$ -** | **$ -** |

*$ in millions*

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after Pro Fee Carve Out | | | | | | | | - | - | - |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after DIP Claims | | | | | | | | - | - | - |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after 1L Claims | | | | | | | | - | - | - |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after 2L Claims | | | | | | | | - | - | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after Admin and Priority Claims | | | | | | | | - | - | - |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 364** | **$ 364** | **$ 364** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| Remaining Distributable Value after Unsecured Claims | | | | | | | | - | - | - |
| **Total Claims** | | **$ 2,825** | **$ 2,825** | **$ 2,825** | **0.0%** | **0.0%** | **0.0%** | **$ -** | **$ -** | **$ -** |

**HFS Matterhorn Topco, Inc.**

*$ in millions*

| | | | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| **Liquidated Balance Sheet** | **Notes** | **Debtor's PF Book Value** | **Low** | **Mid** | **High** | **Low** | **Mid** | **High** |
| Cash | A | $    - | 0% | 0% | 0% | $    - | $    - | $    - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$    -** | **0%** | **0%** | **0%** | **$    -** | **$    -** | **$    -** |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | |
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | - | - | - |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$    -** | **$    -** | **$    -** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$    -** | **$    -** | **$    -** |

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *$ in millions* | | **Low** | **Mid** | **High** | **Low** | **Mid** | **High** | **Low** | **Mid** | **High** |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | **-** | **-** | **-** |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | **-** | **-** | **-** |
| **1L Claims** | | | | | | | | | | |
| Revolver | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | **$    -** | **$    -** | **$    -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$    -** | **$    -** | **$    -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$    -** | **$    -** | **$    -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | - | - | - | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$    -** | **$    -** | **$    -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| **Total Claims** | | **$    -** | **$    -** | **$    -** | **0.0%** | **0.0%** | **0.0%** | **$    -** | **$    -** | **$    -** |

## Matterhorn Parent LLC

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $ - | 0% | 0% | 0% | $ - | $ - | $ - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ -** | **0%** | **0%** | **0%** | **$ -** | **$ -** | **$ -** |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | |
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | - | - | - |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ -** | **$ -** | **$ -** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$ -** | **$ -** | **$ -** |

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *$ in millions* | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | - | - | - |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | - | - | - |
| **1L Claims** | | | | | | | | | | |
| Revolver | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | - | - | - |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | - | - | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | - | - | - |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | - | - | - | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | - | - | - |
| **Total Claims** | | **$ -** | **$ -** | **$ -** | **0.0%** | **0.0%** | **0.0%** | **$ -** | **$ -** | **$ -** |

## Matterhorn Intermediate, LLC

*$ in millions*

| | | | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Low | Mid | High | Low | Mid | High |
|---|---|---|---|---|---|---|---|---|
| Cash | A | $ - | 0% | 0% | 0% | $ - | $ - | $ - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | $ - | **0%** | **0%** | **0%** | **$ -** | **$ -** | **$ -** |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | |
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | - | - | - |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ -** | **$ -** | **$ -** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$ -** | **$ -** | **$ -** |

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *$ in millions* | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | - | - | - | **0%** | **0%** | **0%** | - | - | - |
| Remaining Distributable Value after Pro Fee Carve Out | | | | | | | | - | - | - |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | - | - | - | **0%** | **0%** | **0%** | - | - | - |
| Remaining Distributable Value after DIP Claims | | | | | | | | - | - | - |
| **1L Claims** | | | | | | | | | | |
| Revolver | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | $ - | $ - | $ - | **0%** | **0%** | **0%** | - | - | - |
| Remaining Distributable Value after 1L Claims | | | | | | | | - | - | - |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | $ - | $ - | $ - | **0%** | **0%** | **0%** | - | - | - |
| Remaining Distributable Value after 2L Claims | | | | | | | | - | - | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | $ - | $ - | $ - | **0%** | **0%** | **0%** | - | - | - |
| Remaining Distributable Value after Admin and Priority Claims | | | | | | | | - | - | - |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | - | - | - | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | $ - | $ - | $ - | **0%** | **0%** | **0%** | - | - | - |
| Remaining Distributable Value after Unsecured Claims | | | | | | | | - | - | - |
| **Total Claims** | | $ - | $ - | $ - | **0.0%** | **0.0%** | **0.0%** | $ - | $ - | $ - |

**Matterhorn Buyer, LLC**

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $ - | 0% | 0% | 0% | $ - | $ - | $ - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ -** | **0%** | **0%** | **0%** | **$ -** | **$ -** | **$ -** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | **-** | **-** | **-** |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ -** | **$ -** | **$ -** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$ -** | **$ -** | **$ -** |

*$ in millions*

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | **-** | | |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | **-** | **-** | **-** |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 364** | **$ 364** | **$ 364** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| **Total Claims** | | **$ 2,825** | **$ 2,825** | **$ 2,825** | **0.0%** | **0.0%** | **0.0%** | **$ -** | **$ -** | **$ -** |

**Hearthside Finance Company, Inc.**

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $    - | 0% | 0% | 0% | $    - | $    - | $    - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$    -** | **0%** | **0%** | **0%** | **$    -** | **$    -** | **$    -** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | **-** | **-** | **-** |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$    -** | **$    -** | **$    -** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$    -** | **$    -** | **$    -** |

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *$ in millions* | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | **-** | **-** | **-** |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | **-** | **-** | **-** |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | **$  2,147** | **$  2,147** | **$  2,147** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$  309** | **$  309** | **$  309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$    -** | **$    -** | **$    -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$  364** | **$  364** | **$  364** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| **Total Claims** | | **$  2,825** | **$  2,825** | **$  2,825** | **0.0%** | **0.0%** | **0.0%** | **$    -** | **$    -** | **$    -** |

**Ryt-Way Midco, LLC**

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $    - | 0% | 0% | 0% | $    - | $    - | $    - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$    -** | **0%** | **0%** | **0%** | **$    -** | **$    -** | **$    -** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | - | - | - |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$    -** | **$    -** | **$    -** |

| Disbtributable Value (Excl Unencumbered Assets) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$    -** | **$    -** | **$    -** |

*$ in millions*

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | **-** | **-** | **-** |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | **-** | **-** | **-** |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | **$  2,147** | **$  2,147** | **$  2,147** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$  309** | **$  309** | **$  309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$    -** | **$    -** | **$    -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$  364** | **$  364** | **$  364** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| **Total Claims** | | **$  2,825** | **$  2,825** | **$  2,825** | **0.0%** | **0.0%** | **0.0%** | **$    -** | **$    -** | **$    -** |

## Quality Bakery Products, LLC

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $   - | 0% | 0% | 0% | $   - | $   - | $   - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$   -** | **0%** | **0%** | **0%** | **$   -** | **$   -** | **$   -** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | **-** | **-** | **-** |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$   -** | **$   -** | **$   -** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$   -** | **$   -** | **$   -** |

*$ in millions*

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | **-** | **-** | **-** |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | **-** | **-** | **-** |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$   -** | **$   -** | **$   -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 364** | **$ 364** | **$ 364** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| **Total Claims** | | **$ 2,825** | **$ 2,825** | **$ 2,825** | **0.0%** | **0.0%** | **0.0%** | **$   -** | **$   -** | **$   -** |

## Toll Packaging Services LLC

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $    - | 0% | 0% | 0% | $    - | $    - | $    - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$    -** | **0%** | **0%** | **0%** | **$    -** | **$    -** | **$    -** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | **-** | **-** | **-** |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$    -** | **$    -** | **$    -** |

| Disbtributable Value (Excl Unencumbered Assets) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$    -** | **$    -** | **$    -** |

*$ in millions*

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | **-** | **-** | **-** |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | **-** | **-** | **-** |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$    -** | **$    -** | **$    -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 364** | **$ 364** | **$ 364** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| **Total Claims** | | **$ 2,825** | **$ 2,825** | **$ 2,825** | **0.0%** | **0.0%** | **0.0%** | **$    -** | **$    -** | **$    -** |

## Ryt-Way Industries, LLC

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $    - | 0% | 0% | 0% | $    - | $    - | $    - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$    -** | **0%** | **0%** | **0%** | **$    -** | **$    -** | **$    -** |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | |
| Wind Down Costs | G | | | | | - | | |
| Chapter 7 Trustee Fees | H | | | | | - | | |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | - | - | |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$    -** | **$    -** | **$    -** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | | |
| **Net Distributable Value** | | | | | | **$    -** | **$    -** | **$    -** |

*$ in millions*

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | - | - | - |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | - | - | - | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | - | - | - |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | $  2,147 | $  2,147 | $  2,147 | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | - | - | - |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | $  309 | $  309 | $  309 | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | - | - | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | $    - | $    - | $    - | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | - | - | - |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | $  364 | $  364 | $  364 | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | - | - | - |
| **Total Claims** | | **$  2,825** | **$  2,825** | **$  2,825** | **0.0%** | **0.0%** | **0.0%** | **$    -** | **$    -** | **$    -** |

**Matterhorn Sub, LLC**

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $ - | 0% | 0% | 0% | $ - | $ - | $ - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ -** | **0%** | **0%** | **0%** | **$ -** | **$ -** | **$ -** |

| Chapter 7 Liquidation Adjustments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | - | - | - |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ -** | **$ -** | **$ -** |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| **Net Distributable Value** | | | | | | **$ -** | **$ -** | **$ -** |

*$ in millions*

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | - | - | - |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | - | - | - | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | - | - | - |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | $ 2,147 | $ 2,147 | $ 2,147 | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | - | - | - |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | $ 309 | $ 309 | $ 309 | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | - | - | - |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | $ - | $ - | $ - | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | - | - | - |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | $ 364 | $ 364 | $ 364 | 0% | 0% | 0% | - | - | - |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | - | - | - |
| **Total Claims** | | **$ 2,825** | **$ 2,825** | **$ 2,825** | **0.0%** | **0.0%** | **0.0%** | **$ -** | **$ -** | **$ -** |

## Peacock Foods LLC

*$ in millions*

| Liquidated Balance Sheet | Notes | Debtor's PF Book Value | Estimated Recovery % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Cash | A | $ - | 0% | 0% | 0% | $ - | $ - | $ - |
| Accounts Receivable - Trade | B | - | 0% | 0% | 0% | - | - | - |
| Accounts Receivable - Non-Trade | B | - | 0% | 0% | 0% | - | - | - |
| Inventory | C | - | 0% | 0% | 0% | - | - | - |
| Prepaids and Other | D | - | 0% | 0% | 0% | - | - | - |
| Property, Plant and Equipment, net | E | - | 0% | 0% | 0% | - | - | - |
| Intangible Assets, net | F | - | 0% | 0% | 0% | - | - | - |
| **Total** | | **$ -** | **0%** | **0%** | **0%** | **$ -** | **$ -** | **$ -** |
| | | | | | | | | |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | |
| Wind Down Costs | G | | | | | - | - | - |
| Chapter 7 Trustee Fees | H | | | | | - | - | - |
| Chapter 7 Professional & Broker Fees | I | | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | - | - | - |
| | | | | | | | | |
| **Net Proceeds from Liquidation Available for Distribution** | | | | | | **$ -** | **$ -** | **$ -** |
| | | | | | | | | |
| **Disbtributable Value (Excl Unencumbered Assets)** | | | | | | | | |
| I/C Recovery | J | | | | | - | - | - |
| | | | | | | | | |
| **Net Distributable Value** | | | | | | **$ -** | **$ -** | **$ -** |

| | | Total Estimated Claims | | | Total Recovery % | | | Total Recovery $ | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *$ in millions* | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Pro Fee Carve Out** | | | | | | | | | | |
| Pro Fee Carve Out | | 6 | 6 | 6 | 0% | 0% | 0% | - | - | - |
| **Total Pro Fee Carve Out** | K | **6** | **6** | **6** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Pro Fee Carve Out** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **Superpriority Claims** | | | | | | | | | | |
| DIP - New Money | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Superpriority Claims** | L | **-** | **-** | **-** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **1L Claims** | | | | | | | | | | |
| Revolver | | 203 | 203 | 203 | 0% | 0% | 0% | - | - | - |
| 2025 1L Term Loan | | 1,944 | 1,944 | 1,944 | 0% | 0% | 0% | - | - | - |
| **Total 1L Claims** | M | **$ 2,147** | **$ 2,147** | **$ 2,147** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 1L Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **2L Claims** | | | | | | | | | | |
| 2L Term Loan | | 309 | 309 | 309 | 0% | 0% | 0% | - | - | - |
| **Total 2L Claims** | N | **$ 309** | **$ 309** | **$ 309** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after 2L Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **Administrative Expense and Priority Claims** | | | | | | | | | | |
| Other Priority Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Administrative Expense Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Severance Liability | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Admin and Priority Claims** | O | **$ -** | **$ -** | **$ -** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Admin and Priority Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **Unsecured Claims** | | | | | | | | | | |
| 1L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| 2L Deficiency Claims | | - | - | - | 0% | 0% | 0% | - | - | - |
| Senior Unsecured Notes | | 364 | 364 | 364 | 0% | 0% | 0% | - | - | - |
| Accounts Payable | | - | - | - | 0% | 0% | 0% | - | - | - |
| Contract/Lease Rejections | | - | - | - | 0% | 0% | 0% | - | - | - |
| I/C Liabilities | | - | - | - | 0% | 0% | 0% | - | - | - |
| **Total Unsecured Claims** | P | **$ 364** | **$ 364** | **$ 364** | **0%** | **0%** | **0%** | **-** | **-** | **-** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **-** | **-** | **-** |
| | | | | | | | | | | |
| **Total Claims** | | **$ 2,825** | **$ 2,825** | **$ 2,825** | **0.0%** | **0.0%** | **0.0%** | **$ -** | **$ -** | **$ -** |

**Exhibit F**

**Valuation Analysis**

<u>VALUATION ANALYSIS</u>

**THE ANALYSIS SET FORTH HEREIN REPRESENTS ESTIMATED VALUATION FOR THE REORGANIZED DEBTORS AND DOES NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE ESTIMATED VALUE OF THE REORGANIZED EQUITY SET FORTH HEREIN DOES NOT PURPORT TO BE OR CONSTITUTE (I) AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE OF THE REORGANIZED DEBTORS, (II) AN OPINION AS TO THE FAIRNESS FROM A FINANCIAL POINT OF VIEW OF THE CONSIDERATION TO BE RECEIVED UNDER THE PLAN, THE TERMS AND PROVISIONS OF THE PLAN, OR ANY RESTRUCTURING TRANSACTION CONTEMPLATED UNDER THE PLAN OR OTHERWISE DESCRIBED THEREIN, OR (III) AN APPRAISAL OF THE ASSETS OF THE REORGANIZED DEBTORS.**

**THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED FROM ANY INDEBTEDNESS OR SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE IN RESPECT OF THE SOLICITATION OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.**

## I.     INTRODUCTION

Solely for the purposes of the Plan and the Disclosure Statement, the Debtors directed their investment banker, Evercore Group L.L.C. ("<u>Evercore</u>"), to prepare this analysis estimating the going-concern value of the Reorganized Debtors. This analysis has been prepared for the Debtors' sole use in connection with the Plan and Disclosure Statement and is based on, among other things, information that the Debtors provided to Evercore. The analysis herein reflects the combined assets and operations of all Debtors and a non-Debtor subsidiary, Interbake Canada, Inc.

Based on the financial projections prepared by the Debtors — a copy of which are attached to the Disclosure Statement as Exhibit E (the "<u>Financial Projections</u>") and subject to the disclaimers and the descriptions of Evercore's methodology set forth herein, and solely for purposes of the Plan and Disclosure Statement, Evercore estimates the total enterprise value of the Reorganized Debtors to be between approximately $1.2 billion and $1.6 billion as of an assumed Plan Effective Date on or around April 1, 2025 (the "<u>Assumed Effective Date</u>"), with a midpoint of $1.4 billion. After deducting estimated pro forma projected funded debt of $1,030 million and adding estimated pro forma emergence cash of $179 million projected as of the Assumed Effective Date, the range of the Reorganized Debtors' total equity value as of the Assumed Effective Date is estimated to be between approximately $350 million and $750 million with a midpoint of approximately $550 million. The estimated total enterprise value for the Reorganized Debtors should be considered as a whole, and the underlying analyses should not be considered indicative of the values of any individual operation of the Reorganized Debtors.

In preparing the estimated total enterprise value range for the Reorganized Debtors, Evercore, among other things: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) met with certain members of the Debtors' senior management and other firms retained by the Debtors to discuss the Debtors' operations, financial profile, and future business prospects; (c) reviewed publicly available financial data and considered the market values of public companies deemed generally relevant to the operating and financial profiles of the Debtors; (d) considered certain economic and industry information relevant to the Debtors' operating businesses; (e) reviewed the Financial Projections; (f) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates and assumptions in the calculation of terminal values; (g) considered the value assigned to certain precedent change-of-control transactions for businesses similar to those of the Debtors; (h) considered the market values of public companies deemed generally comparable to the operating businesses of the Debtors; and (i) considered a range of potential risk factors.

Although Evercore conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans, Evercore relied on the accuracy and completeness of all financial and other information provided by the Debtors and other firms retained by the Debtors in addition to certain publicly available information as to which Evercore does not have independent knowledge.

Evercore has relied on the Debtors' representation and warranty that the Financial Projections (a) were prepared in good faith, (b) were based on fully disclosed assumptions that are reasonable in light of the circumstances under which they were made, (c) reflect the Debtors' best currently available estimates, and (d) reflect the good faith judgment of the Debtors. Evercore does not offer an opinion as to the attainability of the Financial Projections. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors or Evercore, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and, as a result, the actual total enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

Evercore did not conduct an independent verification of the Financial Projections used in this valuation analysis and did not conduct an independent evaluation or appraisal of the Debtors' assets in connection with this valuation. Evercore also did not conduct an independent investigation into any of the legal, tax, or accounting matters affecting the Debtors, and therefore makes no representations as to their impact on the Debtors' financial statements.

## II.     VALUATION METHODOLOGIES

The following is a brief summary of certain financial analyses performed by Evercore to arrive at a range of estimated total enterprise values for the Reorganized Debtors. The following summary does not purport to be a complete description of all of the analyses undertaken to support Evercore's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized. In performing this analysis, Evercore applied the following valuation methodologies as applicable to the operations of the Debtors: (a) the

discounted cash flow methodology; (b) the peer group company trading multiple methodology; and (c) the precedent transaction methodology.

(a)     ***Discounted Cash Flow Methodology.***  Evercore's application of the discounted cash flow methodology involved deriving the unlevered free cash flows that the Debtors' operations would generate assuming their Financial Projections are realized.  To determine the enterprise value range, these cash flows and an estimated terminal value at the end of FY2029 were discounted to derive their present value as of the Assumed Effective Date, using the estimated weighted average cost of capital of the Reorganized Debtors.

(b)     ***Select Public Company Trading Multiples Methodology.***  Evercore's application of the public company trading multiples methodology involved identifying and examining a group of publicly-traded companies whose businesses and operating characteristics are generally relevant to the Reorganized Debtors' go-forward operations, although no selected company is either identical or directly comparable to the business of the Reorganized Debtors' go-forward operations or historical performance.  From a review of this select public company group, Evercore then developed a range of valuation multiples to apply to the Financial Projections to derive a range of implied enterprise values for the Reorganized Debtors' operations.

(c)     ***Precedent Transactions Methodology***.  Evercore's application of the precedent transactions methodology involved identifying and examining public and private merger and acquisition transactions that involved companies whose business and operating characteristics are generally similar to the Reorganized Debtors' operations, although no selected company is either identical or directly comparable to the business of the Reorganized Debtors' operations.  From a review of this group, Evercore then developed a range of valuation multiples to apply to the Projections to derive a range of implied enterprise values for the Reorganized Debtors' operations.

In conducting this analysis, Evercore did not consider any one factor to the exclusion of any other factors.  Accordingly, Evercore believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation.  This analysis includes numerous valuation methodologies.  Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to total enterprise value.

## III.     VALUATION CONSIDERATIONS

This valuation is based upon information available to, and analyses undertaken by, Evercore as of January 9, 2025, and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the Financial Projections.  The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business.  For purposes of this valuation, Evercore has assumed that no changes that would materially affect the value of the Reorganized Debtors' will occur between the date of this Disclosure Statement and the Assumed Effective Date. Events and conditions subsequent to the date hereof, including but not limited to updated Financial Projections, as well as other factors, could have a substantial impact upon the Reorganized Debtors'

value. Neither Evercore nor the Debtors has any obligation to update, revise, or reaffirm this valuation analysis.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, achieving the forecasts reflected in the Financial Projections, the minimum amount of cash required to operate the Debtors' businesses, market conditions, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of the Reorganized Debtors.

Further, the valuation of new securities to be issued upon the Assumed Effective Date is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates and conditions in the financial markets; (b) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (c) other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the estimate of the total enterprise value ascribed in the analysis does not purport to be an estimate of the post-reorganization public or private market trading value of the Reorganized Debtors or their securities. Such trading value may be materially different from the total enterprise value ranges associated with this valuation analysis. Furthermore, in the event that the actual distributions in the Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, the actual recovery of Holders of Claims in Impaired Classes could be significantly higher or lower than estimated by the Debtors.

The estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of the Debtors' businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Reorganized Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

The estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holders of Allowed Claims entitled to vote on the Plan as to how such person should vote or otherwise act with respect to the Plan. The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan. Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Evercore or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

# **EXHIBIT 2**

## **Publication Notice**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| H-Food Holdings, LLC, *et al.*,[1] | Case No. 24-90586 (ARP) |
| Debtors. | (Jointly Administered) |

### NOTICE OF HEARING ON CONFIRMATION OF THE PLAN

**TO:   ALL HOLDERS OF CLAIMS, HOLDERS OF INTERESTS, AND PARTIES IN INTEREST IN THE ABOVE-CAPTIONED CHAPTER 11 CASES**

　　　**PLEASE TAKE NOTICE THAT** on January 24, 2025, the above-captioned debtors in possession (the "Debtors") filed with the United States Bankruptcy Court for the Southern District of Texas (the "Court") the *Second Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC, and its Affiliated Debtors* [Docket No. [●]] (as may be further amended, supplemented, or otherwise modified from time to time, the "Plan") and related disclosure statement [Docket No. [●]], (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement").[2] Copies of the Plan and the Disclosure Statement may be obtained free of charge by (i) visiting the website maintained by the Debtors' claims and noticing agent, Kroll Restructuring Administration LLC (the "Claims and Noticing Agent"), https://cases.ra.kroll.com/HFS/, (ii) calling the Claims and Noticing Agent at (888) 510-7189 (US/Canada Toll-Free) or +1 (646) 937-7810 (International Toll), or (iii) sending an electronic mail message to: hfsballots@ra.kroll.com.

　　　**PLEASE TAKE FURTHER NOTICE THAT** on January 24, 2025, the Court entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing the Debtors to solicit acceptances for the Plan; (b) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the Solicitation

---

[1]　The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783). The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

[2]　Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan or the Disclosure Statement, as applicable.

Package; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) approving the Equity Rights Offering Procedures.

**PLEASE TAKE FURTHER NOTICE THAT** a hearing on the approval of the confirmation of the Plan (the "Confirmation Hearing") will be held before the Honorable Alfredo R. Pérez, United States Bankruptcy Judge, in Room 400 of the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street Houston, Texas 77002, on **March 10, 2025, at 1:00 p.m. (prevailing Central Time).** Please be advised that the Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court and a notice of adjournment filed by the Debtors on the Court's docket and served on all parties entitled to notice.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections (each, an "Objection") to the confirmation of the Plan is **March 3, 2025, at 4:00 p.m. (prevailing Central Time)**. All Objections must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest beneficially owned by the objector; and (d) state the legal and factual bases for the Objection.

Objections to the confirmation of the Plan must be filed with the Court and served, so as to be **actually received** no later than **March 3, 2025 at 4:00 p.m. (prevailing Central Time)**, by those parties who have filed a notice of appearance in the chapter 11 cases as well as the following parties:

| *Debtors* |
|---|
| H-Food Holdings, LLC<br>3333 Finley Rd, Suite 800<br>Downers Grove, IL 60515<br>Attention: Roger E. Harris<br>Email: rharris@hearthsidefoods.com |

| *Counsel to the Debtors* | |
|---|---|
| **Porter Hedges LLP**<br>John F. Higgins (TX Bar No. 09597500)<br>M. Shane Johnson (TX Bar No. 24083263)<br>Jack M. Eiband (TX Bar No. 24135185)<br>1000 Main St., 36th Floor<br>Houston, Texas 77002<br>Email: jhiggins@porterhedges.com<br>          sjohnson@porterhedges.com<br>          jeiband@porterhedges.com | **Ropes & Gray LLP**<br>Ryan Preston Dahl (admitted *pro hac vice*)<br>Natasha S. Hwangpo (admitted *pro hac vice*)<br>Matthew M. Roose (admitted *pro hac vice*)<br>1211 Avenue of the Americas<br>New York, New York 10036<br>E-mail:  ryan.dahl@ropesgray.com<br>          natasha.hwangpo@ropesgray.com<br>          matthew.roose@ropesgray.com<br><br>Stephen L. Iacovo (admitted *pro hac vice*)<br>191 North Wacker Drive, 32nd Floor<br>Chicago, Illinois 60606<br>Email: stephen.iacovo@ropesgray.com |

| *United States Trustee for the Southern District of Texas* |
|---|
| 515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>Attention: Susan B. Hersh<br>Email: susan.hersh@usdoj.gov |

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE IT MAY NOT BE CONSIDERED BY THE COURT.**

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**

> **ARTICLE VIII OF THE PLAN CONTAINS SETTLEMENT, RELEASE, EXCULPATION, INJUNCTION, AND RELATED PROVISIONS, AND ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

> **ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT ELECT TO OPT OUT OF OR OTHERWISE OBJECT TO THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES AS SET FORTH IN ARTICLE VIII OF THE PLAN.**

**YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE DISCHARGE, RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**EXHIBIT 3**

**Confirmation Hearing Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| H-Food Holdings, LLC, *et al.*,[1] | Case No. 24-90586 (ARP) |
| Debtors. | (Jointly Administered) |

**NOTICE OF HEARING TO CONSIDER**
**CONFIRMATION OF THE JOINT CHAPTER 11 PLAN**
**OF REORGANIZATION OF H-FOOD HOLDINGS, LLC AND ITS**
<u>**AFFILIATED DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**</u>

**TO PARTIES IN INTEREST IN THE CHAPTER 11 CASES OF:**

| | |
|---|---|
| H-Food Holdings, LLC | Case No. 24-90586 |
| HFS Sub, LLC | Case No. 24-90585 |
| HFS Matterhorn Topco, Inc. | Case No. 24-90589 |
| Matterhorn Parent, LLC | Case No. 24-90590 |
| Matterhorn Intermediate, LLC | Case No. 24-90591 |
| Matterhorn Buyer, LLC | Case No. 24-90594 |
| Hearthside USA Corporate, Inc. | Case No. 24-90595 |
| Hearthside Holdco, LLC | Case No. 24-90598 |
| Hearthside Finance Company, Inc. | Case No. 24-90592 |
| Hearthside Food Solutions, LLC | Case No. 24-90587 |
| Interbake Foods, LLC | Case No. 24-90596 |
| Ryt-way Midco, LLC | Case No. 24-90599 |
| Peacock Engineering Company II, LLC | Case No. 24-90588 |
| Hearthside USA, LLC | Case No. 24-90601 |
| Hearthside USA – CPG Partners, LLC | Case No. 24-90602 |
| Oak State Products, LLC | Case No. 24-90604 |

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783).  The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

| Standard Functional Foods Group, LLC | Case No. 24-90606 |
| Quality Bakery Products, LLC | Case No. 24-90593 |
| Toll Packaging Services LLC | Case No. 24-90597 |
| Ryt-way Industries, LLC | Case No. 24-90600 |
| Matterhorn Sub, LLC | Case No. 24-90603 |
| Peacock Foods LLC | Case No. 24-90605 |
| Hearthside USA – Produce & Foodservice, LLC | Case No. 24-90607 |

**PLEASE TAKE NOTICE THAT** on **January 24, 2025**, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Second Amended Joint Chapter 11 Plan of H-Food Holdings, LLC and Its Affiliated Debtors* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan");[2] approving the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of H-Food Holdings, LLC and Its Affiliated Debtors* [Docket No. [●] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the Solicitation Package; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) approving the Equity Rights Offering Procedures.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **March 10, 2025 at 1:00 p.m. (prevailing Central Time)**, before the Honorable Alfredo R. Pérez, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 400, Houston, Texas, 77002.

---

**PLEASE BE ADVISED**: THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT AND BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

---

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**. The voting record date is **January 24, 2025**, which is the date for determining which Holders of Claims in Classes 3, 4, 5, and 6, as applicable, are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **March 3, 2025 at 4:00 p.m.**, prevailing Central Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you ***must***: (a) follow the instructions carefully; (b) complete ***all*** of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that your Ballot, or a Master

---

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

2

Ballot with your vote (as applicable), is ***actually received*** by the Debtors' Claims, Noticing and Claims and Noticing Agent, Kroll Restructuring Administration LLC (the "<u>Claims and Noticing Agent</u>") on or before the Voting Deadline. ***A failure to follow such instructions may disqualify your vote***.

**Parties in Interest Entitled to Vote.** Holders of Claims or Interests in Class 3 (First Lien Claims), Class 4 (Second Lien Term Loan Claims), Class 5 (Senior Unsecured Notes Claims), and Class 6 (General Unsecured Claims) are entitled to vote on the Plan and will receive an appropriate form of Ballot. If you disagree with the amount set forth by the Debtors for your Claim or Interest in the Schedules or if you have filed a proof of claim and disagree with either (a) the Debtors' objection to your Claim or Interest and believe that you should be entitled to vote on the Plan or (b) the Debtors' classification or request for estimation of your Claim or Interest and believe that you should be entitled to vote on the Plan in a different amount or class, then you must serve on the parties identified in the paragraph below and file with the Bankruptcy Court a motion (a "<u>Rule 3018(a) Motion</u>") for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing your Claim or Interest in a different amount or in a different class for purposes of voting to accept or reject the Plan. All Rule 3018(a) Motions must be filed on or before **February 25, 2025 at 4:00 p.m. (Prevailing Central Time)**. Rule 3018(a) Motions that are not timely filed and served in the manner set forth above shall not be considered.

**Parties in Interest Not Entitled to Vote.** Holders of Claims or Interests in Class 1 (Other Secured Claims), Class 2 (Priority Non-Tax Claims), Class 7 (Intercompany Claims), Class 8 (Section 510(b) Claims), Class 9 (Intercompany Interests), and Class 10 (Existing Equity Interests) are not entitled to vote on the Plan and will not receive a Ballot.

**Additional Information.** Any party in interest wishing to obtain information about the Solicitation Procedures or copies of the Disclosure Statement, the Plan, or Solicitation Package should contact the Debtors' Claims and Noticing Agent by email at HFSInfo@ra.kroll.com (with "HFS Solicitation Inquiry" in the subject line) or by calling (888) 510-7189 (U.S./Canada, toll-free) or +1 (646) 937-7810 (international). Interested parties may also review the Disclosure Statement and the Plan free of charge at https://cases.ra.kroll.com/HFS. In addition, the Disclosure Statement and Plan are on file with the Bankruptcy Court and may be reviewed for a fee by accessing the Bankruptcy Court's website: https://www.txs.uscourts.gov/page/bankruptcy-court. Note that a PACER password and login are needed to access documents on the Bankruptcy Court's website. A PACER password can be obtained at www.pacer.uscourts.gov.

<u>**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**</u>

<u>ARTICLE VIII</u> OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **<u>ARTICLE VIII.D</u> CONTAINS A THIRD-PARTY <u>RELEASE</u>**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**Plan Confirmation Objection Deadline**. The deadline for filing objections to the Plan is **<u>March 3, 2025, at 4:00 p.m.</u>**, prevailing Central Time (the "<u>Plan Confirmation Objection Deadline</u>"). All objections to the relief sought at the Confirmation Hearing ***must***: (a) be in writing;

(b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court so as to be ***actually received*** on or before the Plan Confirmation Objection Deadline.

**Please be advised that Article VIII of the Plan contains the following release, exculpation, and injunction provisions:**

Article VIII.C of the Plan provides for a release by the Debtors (the "Debtor Release"):

**Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Plan Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or**

omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in **ARTICLE VIII.C** of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.

Article VIII.D of the Plan provides for a third-party release by the Releasing Parties (the "Third-Party Release"):

**Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Plan Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and**

**Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in <u>ARTICLE VIII.D</u> of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.**

Article VIII.E of the Plan provides for releases of Directors and Officers of Wage and Labor Laws:

As of the Effective Date, all current and former directors, managers, officers, employees, and managing agents of the Debtors will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by all current and former employees, full-time workers, part-time workers, temporary workers, or workers placed by third-party staffing agencies (each, an "<u>Employee</u>") unless such Employee expressly elects in writing to opt-out of the releases, from any and all Claims and Causes of Action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Employee or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them have, had or would have been legally entitled to assert in their

own right (whether individually or collectively) or on behalf of any Employee or other Person, arising out of or relating to, in whole or in part, the employment of the Employee by the Debtors, including any Claims arising under or related to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., or any related or similar federal or state wage and labor laws.

Definitions Related to the Debtor Release and the Third-Party Release:

UNDER THE PLAN, *"RELEASED PARTY"* MEANS, COLLECTIVELY, EACH OF THE FOLLOWING IN THEIR CAPACITY AS SUCH: (A)(I) THE DEBTORS, (II) THE REORGANIZED DEBTORS, (III) THE CONSENTING STAKEHOLDERS, (IV) THE FIRST LIEN AGENT, (V) THE SECOND LIEN AGENT, (VI) THE SENIOR UNSECURED NOTES TRUSTEE, AND (VII) EACH HOLDER OF A FIRST LIEN CLAIM, SECOND LIEN TERM LOAN CLAIM OR SENIOR UNSECURED NOTES CLAIM THAT VOTES FOR, AND DOES NOT OBJECT TO, THE PLAN, AND (B) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES AND PERSONS IN CLAUSE (A), ALL OF THEIR RESPECTIVE RELATED PARTIES TO THE MAXIMUM EXTENT PERMITTED BY LAW; *PROVIDED*, THAT ANY ENTITY OR PERSON THAT OPTS OUT OF OR TIMELY OBJECTS EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE CONFIRMATION TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN SHALL NOT BE DEEMED A RELEASED PARTY.

UNDER THE PLAN, *"RELEASING PARTIES"* MEANS, COLLECTIVELY, EACH OF THE FOLLOWING IN THEIR CAPACITY AS SUCH: (I) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT THE PLAN, (II) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN, (III) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN, (IV) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (V) EACH RELEASED PARTY, (VI) EACH RELATED PARTY TO EACH ENTITY IN CLAUSE (I) THROUGH (V) SOLELY TO THE EXTENT SUCH RELATED PARTY MAY ASSERT CLAIMS OR CAUSES OF ACTION ON BEHALF OF OR IN A DERIVATIVE CAPACITY BY OR THROUGH AN ENTITY IN CLAUSE (I) THROUGH (V); *PROVIDED*, *THAT*, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN; OR (Y) TIMELY OBJECTS TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE CONFIRMATION; *PROVIDED FURTHER*, *THAT,* FOR THE AVOIDANCE OF DOUBT, IN

NO CASE, SHALL A MINOR (AS DEFINED UNDER APPLICABLE STATE LAW) BE A RELEASING PARTY.

UNDER THE PLAN, "***RELATED PARTY***" MEANS, WITH RESPECT TO (X) ANY ENTITY OR PERSON, SUCH ENTITY'S OR PERSON'S PREDECESSORS, SUCCESSORS AND ASSIGNS, PARENTS, SUBSIDIARIES, AFFILIATES, AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, MANAGED OR ADVISED ACCOUNTS, FUNDS, OR OTHER ENTITIES, AND INVESTMENT ADVISORS, SUB-ADVISORS, OR MANAGERS, (Y) WITH RESPECT TO EACH OF THE FOREGOING IN CLAUSE (X), SUCH ENTITY'S OR PERSON'S RESPECTIVE CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY AND ANY FUND MANAGERS, FIDUCIARIES, OR OTHER AGENTS WITH ANY INVOLVEMENT RELATED TO THE DEBTORS), MEMBERS, PARTNERS, EMPLOYEES, AGENTS, TRUSTEES, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, ACTUARIES, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS AND OTHER PROFESSIONALS; AND (Z) WITH RESPECT TO EACH OF THE FOREGOING IN CLAUSE (X), SUCH ENTITY'S OR PERSON'S RESPECTIVE HEIRS, EXECUTORS, ESTATES, SERVANTS, AND NOMINEES.

Article VIII.F of the Plan provides for an exculpation of certain parties (the "Exculpation"):

**Without affecting or limiting the releases set forth in <u>ARTICLE VIII.C</u> and <u>ARTICLE VIII.D</u> of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Reorganized Debt and the Equity Rights Offering, the pursuit of consummation of the Plan Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith**

**and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.**

Definitions Related to the Exculpation:

UNDER THE PLAN, "***EXCULPATED PARTIES***" MEANS EACH OF THE EXCULPATED FIDUCIARIES IN THEIR CAPACITY AS SUCH AND, IN EACH CASE, TO THE MAXIMUM EXTENT PERMITTED BY LAW.

UNDER THE PLAN, "***EXCULPATED FIDUCIARIES***" MEANS, COLLECTIVELY, AND IN EACH CASE IN THEIR CAPACITIES AS SUCH DURING THE CHAPTER 11 CASES (I) THE DEBTORS AND (II) THE CREDITORS' COMMITTEE.

Article VIII.G of the Plan establishes an injunction (the "<u>Injunction</u>"):

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE PLAN EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO <u>ARTICLE VIII.F</u> OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND,

DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE INJUNCTIONS IN THIS ARTICLE VIII.G SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

**NOTWTHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF A HOLDER OF A CLAIM OR INTEREST TIMELY OPTS OUT OF OR OBJECTS TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE THE CONFIRMATION DATE, SUCH HOLDER SHALL NOT BE BOUND BY THE RELEASES SET FORTH IN ARTICLE VIII.D OR THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G WITH RESPECT TO THE RELEASED PARTIES (OTHER THAN THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES); PROVIDED THAT, THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G SHALL STILL APPLY TO (I) CLAIMS SUBJECT TO THE EXCULPATION SET FORTH IN ARTICLE VIII.F AND (II) ANY ACTIONS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES; PROVIED FURTHER, THAT THE INJUNCTION PROTOCOL SET FORTH IN ARTICLE VIII.G.1 SHALL STILL APPLY AND ANY SUCH HOLDER SHALL BE BOUND BY THE INJUNCTION PROTOCOL.**

1.    Injunction Protocol

**NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED**

TO THE CHAPTER 11 CASES PRIOR TO THE PLAN EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH DEBTOR, REORGANIZED DEBTOR, OR RELEASED PARTY (THE "INJUNCTION PROTOCOL"). THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.

## ADDITIONAL INFORMATION

**Obtaining the Solicitation Package**. The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received a flash drive), please feel free to contact the Debtors' Claims and Noticing Agent, by: (a) visiting the Debtors' restructuring website at https://cases.ra.kroll.com/HFS/, (b) emailing HFSInfo@ra.kroll.com (with "HFS Solicitation Inquiry" in the subject line), (c) calling (888) 510-7189 (U.S./Canada, toll free) or +1 (646) 937-7810 (international), or (d) writing to H-Food Holdings Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232.  You may also obtain copies of any pleadings filed in these chapter 11 cases for free at https://cases.ra.kroll.com/HFS/ or for a fee via PACER at: http://www.txs.uscourts. gov (the required PACER password can be obtained at www.pacer.uscourts.gov).

Please be advised that the Claims and Noticing Agent is authorized to answer questions about, and provide additional copies of, the Solicitation Package, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement**. The Debtors will file the Plan Supplement (as defined in the Plan) on or before **February 14, 2025**, and will serve notice on all Holders of Claims and Interests entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

**Notice of Assumption of Executory Contracts and Unexpired Leases and Related Procedures**.  Please take notice that, in accordance with Article V of the Plan, each Executory Contract and Unexpired Lease (including those set forth in the Assumption Schedule) shall be assumed and assigned to the applicable Reorganized Debtor in accordance with the provisions and requirements of section 365 and 1123 of the Bankruptcy Code, other than: (i) those that are identified on the Rejection Schedule; (ii) those that have been previously rejected by a Final Order; (iii) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (iv) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

**<u>BINDING NATURE OF THE PLAN</u>:**

IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS OR INTERESTS TO THE <u>MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW,</u> <u>WHETHER OR NOT SUCH HOLDER</u> WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM OR INTEREST IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

IF YOU FAIL TO OPT OUT OF OR OBJECT BY MARCH 3, 2025 EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE CONFIRMATION TO THE RELEASES SET FORTH IN <u>ARTICLE VIII</u> OF THE PLAN, YOU WILL BE DEEMED TO CONSENT TO AND BE BOUND BY THE RELEASES SET FORTH IN THE PLAN, TO THE EXTENT APPLICABLE.

**<u>EXHIBIT 4A</u>**

**Form of Class 3 Ballot**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| H-Food Holdings, LLC, *et al.*,[1] | ) Case No. 24-90586 (ARP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## CLASS 3 – FIRST LIEN CLAIMS BALLOT FOR
## ACCEPTING OR REJECTING THE JOINT CHAPTER 11
## PLAN OF H-FOOD HOLDINGS, LLC, AND ITS AFFILIATED DEBTORS

- IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE DEBTORS' CLAIMS AND NOTICING AGENT, KROLL RESTRUCTURING ADMINISTRATION LLC (THE "CLAIMS AND NOTICING AGENT") BY, EMAIL AT HFSINFO@RA.KROLL.COM (WITH "HFS SOLICITATION INQUIRY" IN THE SUBJECT LINE), OR CALLING (888) 510-7189 (U.S./CANADA, TOLL-FREE) OR +1 (646) 937-7810 (INTERNATIONAL).

- PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS BALLOT. THIS BALLOT IS BEING SUBMITTED TO YOU TO SOLICIT YOUR VOTE ON THE DEBTORS' PLAN (INCLUDING THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN).

- THIS BALLOT MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT BEFORE **4:00 P.M., PREVAILING CENTRAL TIME, ON MARCH 3, 2025 (THE "VOTING DEADLINE")**.

- IF THE COURT CONFIRMS THE PLAN, IT WILL BIND YOU REGARDLESS OF WHETHER YOU HAVE VOTED.

- NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIALS MAILED WITH THIS BALLOT.

- CONFIRMATION OF THE PLAN IS EXPRESSLY CONDITIONED UPON BANKRUPTCY COURT APPROVAL OF THE RELEASES BY RELEASING PARTIES (AS DESCRIBED BELOW AND LOCATED IN ARTICLE VIII OF THE PLAN), WHICH, IF APPROVED BY THE BANKRUPTCY COURT, WOULD PERMANENTLY ENJOIN HOLDERS OF CERTAIN CLAIMS AGAINST THIRD PARTIES FROM ASSERTING SUCH CLAIMS AGAINST SUCH NON-DEBTOR THIRD PARTIES. THE RELEASES BY

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783). The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

RELEASING PARTIES, IF APPROVED, WILL BIND AFFECTED HOLDERS OF CLAIMS AND INTERESTS IN THE MANNER DESCRIBED IN ITEM 2 OF THIS BALLOT.

PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT RELATING TO THE *SECOND AMENDED JOINT CHAPTER 11 PLAN OF H-FOOD HOLDINGS, LLC AND ITS AFFILIATED DEBTORS* (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN")[2] BEFORE COMPLETING THIS BALLOT. THIS BALLOT PERMITS YOU TO VOTE ON THE PLAN, WHICH IS SUBJECT TO BANKRUPTCY COURT APPROVAL AND WHICH CONTEMPLATES A COMPREHENSIVE RESTRUCTURING TRANSACTION (THE "TRANSACTION") UPON THE EMERGENCE OF THE DEBTORS FROM CHAPTER 11.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the Plan as set forth in the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of H-Food Holdings, LLC and Its Affiliated Debtors* and all exhibits related thereto (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on **January 24, 2025** (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.

You are receiving this ballot (the "Ballot") because records indicate that you are the Holder of a Claim in Class 3 (a "Voting Class") as of **January 24, 2025** (the "Voting Record Date"). Accordingly, you may have a right to vote to accept or reject the Plan. Your receipt of this Ballot does not indicate that your Claim(s) has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of, or distribution on account of, Class 3 First Lien Claims.

The Disclosure Statement describes the rights and treatment for each Class. The Disclosure Statement, the Plan, and certain other materials are also included in the packet you are receiving with this Ballot (the "Solicitation Package"). This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect thereto, including with respect to releases by Holders of Claims and Interests. Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein.

YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE SUCH A CLAIM.

*You should carefully and thoroughly review the Disclosure Statement and Plan before you vote to accept or reject the Plan. You may wish to seek legal advice concerning the Plan, classification and treatment of your Claim, and the Releases, Exculpation, and Injunction provisions under the Plan, as your rights might be affected.*

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**THE VOTING DEADLINE IS 4:00 P.M., PREVAILING CENTRAL TIME, ON MARCH 3, 2025.**

### Important Information Regarding Releases under the Plan.[3]

Article VIII.C of the Plan provides for a release by the Debtors (the "Debtor Release"):

**Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Plan Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized**

---

[3]   The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights. If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs. Please read the Plan carefully before completing this Ballot.

Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in **ARTICLE VIII.C** of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.

Article VIII.D of the Plan provides for a release by the Releasing Parties (the "Release by Holders of Claims and Interests"):

Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Plan Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual

arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in <u>ARTICLE VIII.D</u> of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

Article VIII.F of the Plan provides for an exculpation of certain parties (the "<u>Exculpation</u>"):

Without affecting or limiting the releases set forth in <u>ARTICLE VIII.C</u> and <u>ARTICLE VIII.D</u> of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the

solicitation of votes on the Plan, or participation in the New Reorganized Debt and the Equity Rights Offering, the pursuit of consummation of the Plan Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.

Article VIII.G of the Plan establishes an injunction (the "Injunction"):

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE PLAN EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE VIII.F OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING,

PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE INJUNCTIONS IN THIS <u>ARTICLE VIII.G</u> SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

**<u>NOTWTHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF A HOLDER OF A CLAIM OR INTEREST TIMELY OPTS OUT OF OR OBJECTS TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE THE CONFIRMATION DATE, SUCH HOLDER SHALL NOT BE BOUND BY THE RELEASES SET FORTH IN ARTICLE VIII.D OR THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G WITH RESPECT TO THE RELEASED PARTIES (OTHER THAN THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES); PROVIDED THAT, THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G SHALL STILL APPLY TO (I) CLAIMS SUBJECT TO THE EXCULPATION SET FORTH IN ARTICLE VIII.F AND (II) ANY ACTIONS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES; PROVIED FURTHER, THAT THE INJUNCTION PROTOCOL SET FORTH IN ARTICLE VIII.G.1 SHALL STILL APPLY AND ANY SUCH HOLDER SHALL BE BOUND BY THE INJUNCTION PROTOCOL.</u>**

        1.     Injunction Protocol

**NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH,**

**RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASES PRIOR TO THE PLAN EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH DEBTOR, REORGANIZED DEBTOR, OR RELEASED PARTY (THE "<u>INJUNCTION PROTOCOL</u>").  THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.**

Definitions Related to the Debtor Release and the Release by Holders of Claims and Interests:

Under the plan, "***Released Party***" means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the First Lien Agent, (v) the Second Lien Agent, (vi) the Indenture Trustee, (vii) each holder of a First Lien Claim, Second Lien Term Loan Claim or Senior Unsecured Notes Claim that votes for, and does not object to, the Plan, and (b) with respect to each of the foregoing Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law; *provided*, that any Entity or Person that opts out of or timely objects either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation to the releases set forth in **Article VIII.D** of the Plan shall not be deemed a Released Party.

Under the Plan, *"**Releasing Parties**"* means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the Releases provided by the Plan; (v) each Released Party, (vi) each Related Party to each entity in clause (i) through (v) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clause (i) through (v); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release, either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation; *provided further*, *that,* for the avoidance of doubt, in no case, shall a minor (as defined under applicable state law) be a Releasing Party.

Under the Plan, "***Related Party***" means, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other Entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in

clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS HERETO BEFORE COMPLETING THIS BALLOT**

---

**IMPORTANT NOTICE REGARDING TREATMENT FOR CLASS 3**

As described in more detail in the Disclosure Statement, except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment, each Holder of an Allowed First Lien Claim shall receive, in full and final satisfaction of such Allowed First Lien Claim, its Pro Rata share of: (i) 100% of the Exit First Lien Term Loans; (ii) 100% of the Reorganized Equity (subject to dilution by the Equity Rights Offering and the Management Incentive Plan); and (iii) if any of the Second Lien Term Loan Claim Class, the Senior Unsecured Notes Claims Class, or General Unsecured Claims Class do not vote to accept the Plan, the cash distribution that would otherwise been made to any such rejecting Class(es).

---

**Item 1. Principal Amount of Claims and Voting.**

| **ITEM 1**: **AMOUNT OF CLAIMS** | The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder (or authorized signatory for a Holder) of Claim(s) in the following aggregate unpaid principal amount within Class 3 (First Lien Claims) (collectively, your "Claim"). You may vote to accept or reject the Plan. You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan for each Voting Class in order to have your vote in that particular Voting Class counted.

Please note that you are voting all of your Claims in each particular Voting Class either to accept or reject the Plan. You may not split your vote in any particular Voting Class. If you do not indicate that you either accept or reject the Plan in each particular Voting Class by checking the applicable box(es) below, your vote in that particular Voting Class will not be counted. If you indicate that you both accept and reject the Plan for a particular Voting Class by checking both boxes below, your vote in that particular Voting Class will not be counted.

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor. Accordingly, your vote cast below will be applied in the same manner and in the same amount against each applicable Debtor. |
| --- | --- |

| | The Holder of the Claims in the Voting Class set forth below votes to (*please check one and only one box per applicable Voting Claim*): | | |
|---|---|---|---|
| **Voting Class** | **Description** | **Amount** | **Vote to Accept or Reject Plan** |
| Class 3 | First Lien Claims | $_____ | ☐   ACCEPT (VOTE FOR) THE PLAN<br><br>☐   REJECT (VOTE AGAINST) THE PLAN |

**Item 2.  Optional Opt-Out Release Election.**

       AS A HOLDER OF THE CLAIMS IN THE VOTING CLASS IDENTIFIED IN ITEM 1, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE BY HOLDERS OF CLAIMS AND INTERESTS CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN IF THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT-OUT OF THE RELEASES BECAUSE EITHER (I) YOU ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN AND YOU CHECK THE BOX BELOW AND SUBMIT THE OPT-OUT BY THE VOTING DEADLINE, OR (II) YOU VOTE TO ACCEPT OR REJECT THE PLAN IN ITEM 1 ABOVE, AND YOU CHECK THE BOX BELOW AND SUBMIT THE OPT-OUT BY THE VOTING DEADLINE. YOU MAY ALSO VALIDLY OPT-OUT OF THE RELEASES BY FILING AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WITH THE BANKRUPTCY COURT PRIOR TO THE PLAN CONFIRMATION OBJECTION DEADLINE. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE RELEASES BY HOLDERS OF CLAIMS AND INTERESTS IS AT YOUR OPTION, SUBJECT TO ANY OBLIGATION YOU MAY HAVE UNDER THE RESTRUCTURING SUPPORT AGREEMENT.

       ☐    **By checking this box, the Holder of the Claims identified in Item 1 elects to opt-out of the Release by Holders of Claims and Interests.**

**Item 3. Certifications.**

Upon execution of this Ballot, the undersigned certifies that:

1.     as of the Voting Record Date, the undersigned was the Holder (or authorized signatory for a Holder) of the Claims in the aggregate unpaid principal amount within the Voting Class as set forth in Item 1;

2.     the Holder has reviewed a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

3.      the Holder has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

4.      the Holder has cast the same vote with respect to all of the Holder's Claims in each particular Voting Class;

5.      the Holder understands and acknowledges that if multiple Ballots are submitted voting the Claims set forth in Item 1, only the latest, valid Ballot voting the Claims and received by the Claims and Noticing Agent before the Voting Deadline shall be deemed to reflect the voter's intent and thus to supersede and revoke any prior Ballots received by the Claims and Noticing Agent; and

6.      the Holder understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the Holder hereunder, shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, and legal representatives of the Holder and shall not be affected by, and shall survive, the death or incapacity of the Holder.

**Item 4. Holder Information and Signature.**

Name of Holder: _____
                        (*print or type*)

Signature: _____

Name of Signatory: _____
                        (*if other than Holder, include name and title*)

Title: _____

Address: _____

_____

_____

_____

E-mail Address: _____

Date Completed: _____

---

**By electronic, online submission:**

---

To submit your Ballot via the Claims and Noticing Agent's online portal (the "E-Ballot Portal"), visit https://cases.ra.kroll.com/HFS/. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.

Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted. If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the E-Ballot Portal.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:**

_____

The E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

**Holders are strongly encouraged to submit their ballots via the E-Ballot Portal.   Holders who cast a Ballot using the Claims and Noticing Agent's E-Ballot Portal should NOT also submit a paper Ballot.**

If you prefer to return a hard copy of your Ballot, you many return it in the enclosed preaddressed, postage prepaid envelope or:

| If by First Class Mail, Overnight Courier, or Hand Delivery: |
|---|
| H-Food Holdings, LLC Ballot Processing Center<br>c/o Kroll Restructuring Administration LLC<br>850 Third Avenue, Suite 412<br>Brooklyn, NY 11232<br><br>To arrange hand delivery of your Ballot, please email the Claims and Noticing Agent at HFSBallots@ra.kroll.com (with "HFS Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery. |

**IF THE CLAIMS AND NOTICING AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE MARCH 3, 2025 BY 4:00 P.M. (PREVAILING CENTRAL TIME) (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT BY EMAIL AT HFSINFO@RA.KROLL.COM (WITH "HFS SOLICITATION INQUIRY" IN THE SUBJECT LINE), OR CALLING (888) 510-7189 (U.S./CANADA, TOLL-FREE) OR +1 (646) 937-7810 (INTERNATIONAL).

## <u>VOTING INSTRUCTIONS</u>

a.  As described in the Disclosure Statement, the Debtors are soliciting the votes of Holders of Class 3 Claims with respect to the Plan referred to in the Disclosure Statement. The Plan and Disclosure Statement are included in the Solicitation Package you received with the Ballot. Capitalized terms used but not defined herein shall have the meanings assigned to them in the Plan. **PLEASE READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.** You may wish to seek legal advice concerning the Plan and the treatment of your Claim under the Plan.

b.  The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon Holders of Claims and Interests if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims or at least two thirds in amount of Interests in at least one class that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation set forth in section 1129(a) of the Bankruptcy Code.

c.  To ensure that your Ballot is counted, you *must* complete and submit this Ballot as instructed herein. **Ballots will not be accepted by electronic mail or facsimile.**

d.  <u>Use of Hard Copy Ballot</u>. To ensure that your hard copy Ballot is counted, you must: (a) complete your Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 1 of the Ballot; and (c) clearly sign and return your Ballot as instructed herein.

e.  <u>Use of Online E-Ballot Portal</u>. To ensure that your electronic Ballot is counted, please follow the instructions of the Debtors' case administration website at: https://cases.ra.kroll.com/HFS/. You will need to enter your unique E-Ballot identification number indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile or electronic means (other than the online balloting portal).**

f.  Your Ballot (whether submitted by hard copy or through the online balloting portal) *must* be returned to the Claims and Noticing Agent so as to be *actually received* by the Claims and Noticing Agent on or before the Voting Deadline. **<u>The Voting Deadline is March 3, 2025 at 4:00 p.m., prevailing Central Time</u>**.

g.  If a Ballot is received after the Voting Deadline, it will not be counted unless the Debtors determine otherwise or as permitted by applicable law or court order. In all cases, Holders should allow sufficient time to assure timely delivery. No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors. A Ballot will not be counted unless received by the Claims and Noticing Agent.

h.  The Holder understands and acknowledges that if multiple Ballots are submitted voting the Claims set forth in Item 1, only the latest, valid Ballot voting the Claims and received by the Claims and Noticing Agent before the Voting Deadline shall be deemed to reflect the

14

voter's intent and thus to supersede and revoke any prior Ballots received by the Claims and Noticing Agent.

i.      The Ballot does not constitute, and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission with respect to any Claim. The Ballot may not be used for any purpose other than to vote to accept or reject the Plan and to make certain certifications with respect thereto.

j.      Please be sure to sign and date your Ballot. If you are completing the Ballot on behalf of an Entity, indicate your relationship with that Entity and the capacity in which you are signing.

k.      You must vote your entire Claim in each Voting Class either to accept or reject the Plan and may not split your vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan as to a particular Voting Class will not be counted as a vote to accept or reject the Plan as to that Class.

l.      The method of delivery of Ballots to the Claims and Noticing Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Noticing Agent *actually receives* the executed Ballot. In all cases, Holders should allow sufficient time to assure timely delivery.

m.      The following Ballots will not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder; (b) any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote on the Plan; (c) any unsigned Ballot; (d) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan; and/or (e) any Ballot submitted by a party not entitled to cast a vote with respect to the Plan.

n.      If you hold Claims in more than one Class under the Plan, you may receive more than one Ballot. Each Ballot votes only your Claims as indicated on that Ballot. Please complete and return each Ballot you receive.

o.      If your Ballot (a) is not counted for voting purposes for any reason, including because it does not conform to the instructions described in your Ballot but (b) indicates your election to opt-out of the Release by Holders of Claims and Interests, your election to opt-out of the Release by Holders of Claims and Interests shall be deemed valid and you will not be deemed a "Releasing Party" under the Plan, so long as your Ballot is actually received by the Claims and Noticing Agent by the Voting Deadline.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR IF YOU NEED ADDITIONAL COPIES OF THE ENCLOSED MATERIALS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT (I) BY WRITING TO: H-FOOD HOLDINGS, LLC, C/O KROLL RESTRUCTURING ADMINISTRATION LLC, 850 THIRD AVENUE, SUITE 412 BROOKLYN, NY 11232 OR (II) BY EMAIL TO HFSINFO@RA.KROLL.COM (WITH "HFS SOLICITATION INQUIRY" IN THE SUBJECT LINE) OR (III) CALLING (888) 510-7189 (U.S./CANADA, TOLL-FREE) OR +1 (646) 937-7810 (INTERNATIONAL).**

**THE CLAIMS AND NOTICING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

<u>**PLEASE SUBMIT YOUR BALLOT PROMPTLY!**</u>

## EXHIBIT 4B

**Form of Class 4 Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| H-Food Holdings, LLC, *et al.*,[1] | ) | Case No. 24-90586 (ARP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**CLASS 4 – SECOND LIEN TERM LOAN CLAIMS**
**BALLOT FOR ACCEPTING OR REJECTING THE JOINT**
**CHAPTER 11 PLAN OF H-FOOD HOLDINGS, LLC, AND ITS AFFILIATED DEBTORS**

- IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE DEBTORS' CLAIMS AND NOTICING AGENT, KROLL RESTRUCTURING ADMINISTRATION LLC (THE "CLAIMS AND NOTICING AGENT") BY, EMAIL, HFSINFO@RA.KROLL.COM (WITH "HFS SOLICITATION INQUIRY" IN THE SUBJECT LINE), OR CALLING (888) 510-7189 (U.S./CANADA, TOLL-FREE) OR +1 (646) 937-7810 (INTERNATIONAL).

- PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS BALLOT. THIS BALLOT IS BEING SUBMITTED TO YOU TO SOLICIT YOUR VOTE ON THE DEBTORS' PLAN (INCLUDING THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN).

- THIS BALLOT MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT BEFORE **4:00 P.M., PREVAILING CENTRAL TIME, ON MARCH 3, 2025 (THE "VOTING DEADLINE")**.

- IF THE COURT CONFIRMS THE PLAN, IT WILL BIND YOU REGARDLESS OF WHETHER YOU HAVE VOTED.

- NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIALS MAILED WITH THIS BALLOT.

- CONFIRMATION OF THE PLAN IS EXPRESSLY CONDITIONED UPON BANKRUPTCY COURT APPROVAL OF THE RELEASES BY RELEASING PARTIES (AS DESCRIBED BELOW AND LOCATED IN ARTICLE VIII OF THE PLAN), WHICH, IF APPROVED BY THE BANKRUPTCY COURT, WOULD PERMANENTLY ENJOIN HOLDERS OF CERTAIN CLAIMS AGAINST THIRD PARTIES FROM ASSERTING SUCH CLAIMS AGAINST SUCH NON-DEBTOR THIRD PARTIES. THE RELEASES BY RELEASING PARTIES, IF APPROVED, WILL BIND AFFECTED HOLDERS OF CLAIMS AND INTERESTS IN THE MANNER DESCRIBED IN ITEM 2 OF THIS BALLOT.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783).  The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT RELATING TO THE *SECOND AMENDED JOINT CHAPTER 11 PLAN OF H-FOOD HOLDINGS, LLC AND ITS AFFILIATED DEBTORS* (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN")[2] BEFORE COMPLETING THIS BALLOT. THIS BALLOT PERMITS YOU TO VOTE ON THE PLAN, WHICH IS SUBJECT TO BANKRUPTCY COURT APPROVAL AND WHICH CONTEMPLATES A COMPREHENSIVE RESTRUCTURING TRANSACTION (THE "TRANSACTION") UPON THE EMERGENCE OF THE DEBTORS FROM CHAPTER 11.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the Plan as set forth in the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of H-Food Holdings, LLC and Its Affiliated Debtors* and all exhibits related thereto (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on **January 24, 2025** (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.

You are receiving this ballot (the "Ballot") because records indicate that you are the Holder of a Claim in Class 4 (a "Voting Class") as of **January 24, 2025** (the "Voting Record Date"). Accordingly, you may have a right to vote to accept or reject the Plan. Your receipt of this Ballot does not indicate that your Claim(s) has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of, or distribution on account of, Class 4 Claims.

The Disclosure Statement describes the rights and treatment for each Class. The Disclosure Statement, the Plan, and certain other materials are also included in the packet you are receiving with this Ballot (the "Solicitation Package"). This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect thereto, including with respect to releases by Holders of Claims and Interests. Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein.

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE SUCH A CLAIM.**

*You should carefully and thoroughly review the Disclosure Statement and Plan before you vote to accept or reject the Plan. You may wish to seek legal advice concerning the Plan, classification and treatment of your Claim, and the Releases, Exculpation, and Injunction provisions under the Plan as your rights may be affected.*

**THE VOTING DEADLINE IS 4:00 P.M., PREVAILING CENTRAL TIME, ON MARCH 3, 2025.**

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**Important Information Regarding Releases under the Plan**.[3]

Article VIII.C of the Plan provides for a release by the Debtors (the "Debtor Release"):

  **Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Plan Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in ARTICLE VIII.C of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising**

---

[3] The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights. If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs. Please read the Plan carefully before completing this Ballot.

**under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.**

Article VIII.D of the Plan provides for a release by the Releasing Parties (the "<u>Release by Holders of Claims and Interests</u>"):

> **Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Plan Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in**

**connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in ARTICLE VIII.D of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.**

Article VIII.F of the Plan provides for an exculpation of certain parties (the "Exculpation"):

**Without affecting or limiting the releases set forth in ARTICLE VIII.C and ARTICLE VIII.D of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolver Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Reorganized Debt and the Equity Rights Offering, the pursuit of consummation of the Plan Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of**

**consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.**

Article VIII.G of the Plan establishes an injunction (the "<u>Injunction</u>"):

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE PLAN EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO <u>ARTICLE VIII.F</u> OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND

ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE INJUNCTIONS IN THIS <u>ARTICLE VIII.G</u> SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

**<u>NOTWTHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF A HOLDER OF A CLAIM OR INTEREST TIMELY OPTS OUT OF OR OBJECTS TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE THE CONFIRMATION DATE, SUCH HOLDER SHALL NOT BE BOUND BY THE RELEASES SET FORTH IN ARTICLE VIII.D OR THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G WITH RESPECT TO THE RELEASED PARTIES (OTHER THAN THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES); PROVIDED THAT, THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G SHALL STILL APPLY TO (I) CLAIMS SUBJECT TO THE EXCULPATION SET FORTH IN ARTICLE VIII.F AND (II) ANY ACTIONS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES; PROVIED FURTHER, THAT THE INJUNCTION PROTOCOL SET FORTH IN ARTICLE VIII.G.1 SHALL STILL APPLY AND ANY SUCH HOLDER SHALL BE BOUND BY THE INJUNCTION PROTOCOL.</u>**

    1.      Injunction Protocol

**NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASES PRIOR TO THE PLAN EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH DEBTOR, REORGANIZED DEBTOR, OR RELEASED PARTY (THE "<u>INJUNCTION PROTOCOL</u>").   THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.**

Definitions Related to the Debtor Release and the Release by Holders of Claims and Interests:

Under the plan, "***Released Party***" means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the First Lien Agent, (v) the Second Lien Agent, (vi) the Indenture Trustee, (vii) each holder of a First Lien Claim, Second Lien Term Loan Claim or Senior Unsecured Notes Claim that votes for, and does not

object to, the Plan, and (b) with respect to each of the foregoing Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law; *provided*, that any Entity or Person that opts out of or timely objects either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation to the releases set forth in **Article VIII.D** of the Plan shall not be deemed a Released Party.

Under the Plan, *"Releasing Parties"* means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the Releases provided by the Plan; (v) each Released Party, (vi) each Related Party to each entity in clause (i) through (v) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clause (i) through (v); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release, either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation; *provided further*, *that,* for the avoidance of doubt, in no case, shall a minor (as defined under applicable state law) be a Releasing Party.

Under the Plan, "**Related Party**' means, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other Entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS HERETO BEFORE COMPLETING THIS BALLOT**

**IMPORTANT NOTICE REGARDING TREATMENT FOR CLASS 4**

As described in more detail in the Disclosure Statement, except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment of such Claim, each Holder of a Second Lien Term Loan Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

- if Class 4 votes to accept the Plan: (1) its Pro Rata share of 100% of the Second Lien Term Loan Claims Cash Recovery; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the Second Lien Term Loan Claims Cash Recovery shall be reduced on a ratable basis (determined based on the Second Lien Term Loan Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Senior Unsecured Notes Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Second Lien Term Loan Claims Cash Recovery, and (2) the Required Lenders (as defined in the First Lien Credit Agreement) shall waive, and shall cause the applicable First Lien Agent to waive, any turnover or similar rights in favor of holders of First Lien Claims with respect to such distribution on account of the Intercreditor Agreement; or

- if Class 4 votes to reject the Plan: no recovery or distribution on account of such Claim, and all Second Lien Term Loan Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect;

- *provided* that, to the extent the Senior Unsecured Notes Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Second Lien Term Loan Claims Class, then the Second Lien Term Loan Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms.

**Item 1. Principal Amount of Claims and Voting.**

| **ITEM 1**: AMOUNT OF CLAIMS | The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder (or authorized signatory for a Holder) of Claim(s) in the following aggregate unpaid principal amount within the Voting Class as set forth below (your "Claim"). You may vote to accept or reject the Plan. You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan for each Voting Class in order to have your vote in that particular Voting Class counted.

Please note that you are voting all of your Claims in each particular Voting Class either to accept or reject the Plan. You may not split your vote in any particular Voting Class. If you do not indicate that you either accept or reject the Plan in each particular Voting Class by checking the applicable box(es) below, your vote in that particular Voting Class will not be counted. If you indicate that you both accept and reject the Plan for a |

particular Voting Class by checking both boxes below, your vote in that particular Voting Class will not be counted.

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor. Accordingly, your vote cast below will be applied in the same manner and in the same amount against each applicable Debtor.

The Holder of the Claims in the Voting Class set forth below votes to (*please check one and only one box per applicable Voting Claim*):

| Voting Class | Description | Amount | Vote to Accept or Reject Plan |
|---|---|---|---|
| Class 4 | Second Lien Term Loan Claims | $_____ | ☐  ACCEPT (VOTE FOR) THE PLAN<br><br>☐  REJECT (VOTE AGAINST) THE PLAN |

**Item 2.  Optional Opt-Out Release Election.**

AS A HOLDER OF THE CLAIMS IN THE VOTING CLASS IDENTIFIED IN ITEM 1, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE BY HOLDERS OF CLAIMS AND INTERESTS CONTAINED IN <u>ARTICLE VIII.D</u> OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN <u>ARTICLE VIII.D</u> OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN IF THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT-OUT OF THE RELEASES BECAUSE EITHER (I) YOU ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN <u>AND</u> YOU CHECK THE BOX BELOW AND SUBMIT THE OPT-OUT BY THE VOTING DEADLINE, OR (II) YOU VOTE TO ACCEPT OR REJECT THE PLAN IN ITEM 1 ABOVE, <u>AND</u> YOU CHECK THE BOX BELOW AND SUBMIT THE OPT-OUT BY THE VOTING DEADLINE. YOU MAY ALSO VALIDLY OPT-OUT OF THE RELEASES BY FILING AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WITH THE BANKRUPTCY COURT PRIOR TO THE PLAN CONFIRMATION OBJECTION DEADLINE. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE RELEASES BY HOLDERS OF CLAIMS AND INTERESTS IS AT YOUR OPTION, SUBJECT TO ANY OBLIGATION YOU MAY HAVE UNDER THE RESTRUCTURING SUPPORT AGREEMENT.

☐  **By checking this box, the Holder of the Claims identified in Item 1 elects to opt-out of the Release by Holders of Claims and Interests.**

**Item 3. Certifications.**

Upon execution of this Ballot, the undersigned certifies that:

1.  as of the Voting Record Date, the undersigned was the Holder (or authorized signatory for a Holder) of the Claims in the aggregate unpaid principal amount within the Voting Class as set forth in Item 1;

2.      the Holder has reviewed a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

3.      the Holder has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

4.      the Holder has cast the same vote with respect to all of the Holder's Claims in each particular Voting Class;

5.      the Holder understands and acknowledges that if multiple Ballots are submitted voting the Claims set forth in Item 1, only the latest, valid Ballot voting the Claims and received by the Claims and Noticing Agent before the Voting Deadline shall be deemed to reflect the voter's intent and thus to supersede and revoke any prior Ballots received by the Claims and Noticing Agent; and

6.      the Holder understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the Holder hereunder, shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, and legal representatives of the Holder and shall not be affected by, and shall survive, the death or incapacity of the Holder.

**Item 4. Holder Information and Signature.**

Name of Holder:     _____

                    (*print or type*)

Signature:          _____

Name of Signatory:  _____

                    (*if other than Holder, include name and title*)

Title:              _____

Address:            _____

                    _____

                    _____

                    _____

E-mail Address:     _____

Date Completed:     _____

11

**By electronic, online submission:**

To submit your Ballot via the Claims and Noticing Agent's online portal (the "E-Ballot Portal"), visit https://cases.ra.kroll.com/HFS/. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.

Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted. If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the E-Ballot Portal.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:**

The E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

**Holders are strongly encouraged to submit their ballots via the E-Ballot Portal.   Holders who cast a Ballot using the Claims and Noticing Agent's E-Ballot Portal should NOT also submit a paper Ballot.**

If you prefer to return a hard copy of your Ballot, you many return it in the enclosed preaddressed, postage prepaid envelope or:

| If by First Class Mail, Hand Delivery or Overnight Mail: |
|---|
| H-Food Holdings, LLC Ballot Processing Center |
| c/o Kroll Restructuring Administration LLC |
| 850 Third Avenue, Suite 412 |
| Brooklyn, NY 11232 |
| |
| To arrange hand delivery of your Ballot, please email the Claims and Noticing Agent at HFSBallots@ra.kroll.com (with "HFS Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery. |

**IF THE CLAIMS AND NOTICING AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE MARCH 3, 2025 BY 4:00 P.M. (PREVAILING CENTRAL TIME) (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT BY EMAIL AT HFSINFO@RA.KROLL.COM (WITH "HFS SOLICITATION INQUIRY" IN THE SUBJECT LINE), OR CALLING (888) 510-7189 (U.S./CANADA, TOLL-FREE) OR +1 (646) 937-7810 (INTERNATIONAL).

## VOTING INSTRUCTIONS

a.  As described in the Disclosure Statement, the Debtors are soliciting the votes of Holders of Class 4 Claims with respect to the Plan referred to in the Disclosure Statement. The Plan and Disclosure Statement are included in the Solicitation Package you received with the Ballot. Capitalized terms used but not defined herein shall have the meanings assigned to them in the Plan. **PLEASE READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.** You may wish to seek legal advice concerning the Plan and the treatment of your Claim under the Plan.

b.  The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon Holders of Claims and Interests if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims or at least two thirds in amount of Interests in at least one class that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation set forth in section 1129(a) of the Bankruptcy Code.

c.  To ensure that your Ballot is counted, you ***must*** complete and submit this Ballot as instructed herein. **Ballots will not be accepted by electronic mail or facsimile.**

d.  <u>**Use of Hard Copy Ballot**</u>. To ensure that your hard copy Ballot is counted, you must: (a) complete your Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 1 of the Ballot; and (c) clearly sign and return your Ballot as instructed herein.

e.  <u>**Use of Online E-Ballot Portal**</u>. To ensure that your electronic Ballot is counted, please follow the instructions of the Debtors' case administration website at: https://cases.ra.kroll.com/HFS/. You will need to enter your unique E-Ballot identification number indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile or electronic means (other than the online balloting portal).**

f.  Your Ballot (whether submitted by hard copy or through the online balloting portal) ***must*** be returned to the Claims and Noticing Agent so as to be ***actually received*** by the Claims and Noticing Agent on or before the Voting Deadline. **<u>The Voting Deadline is March 3, 2025 at 4:00 p.m., prevailing</u> Central Time**.

g.  If a Ballot is received after the Voting Deadline, it will not be counted unless the Debtors determine otherwise or as permitted by applicable law or court order. In all cases, Holders should allow sufficient time to assure timely delivery. No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors. A Ballot will not be counted unless received by the Claims and Noticing Agent.

h.  The Holder understands and acknowledges that if multiple Ballots are submitted voting the Claims set forth in Item 1, only the last, valid Ballot voting the Claims and received by the Claims and Noticing Agent before the Voting Deadline shall be deemed to reflect the

14

voter's intent and thus to supersede and revoke any prior Ballots received by the Claims and Noticing Agent.

i. The Ballot does not constitute and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission with respect to any Claim. The Ballot may not be used for any purpose other than to vote to accept or reject the Plan and to make certain certifications with respect thereto.

j. Please be sure to sign and date your Ballot. If you are completing the Ballot on behalf of an Entity, indicate your relationship with that Entity and the capacity in which you are signing.

k. You must vote your entire Claim in each Voting Class either to accept or reject the Plan and may not split your vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan as to a particular Voting Class will not be counted as a vote to accept or reject the Plan as to that Class.

l. The method of delivery of Ballots to the Claims and Noticing Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Noticing Agent ***actually receives*** the executed Ballot. In all cases, Holders should allow sufficient time to assure timely delivery.

m. The following Ballots will not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder; (b) any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote on the Plan; (c) any unsigned Ballot; (d) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan; and/or (e) any Ballot submitted by a party not entitled to cast a vote with respect to the Plan.

n. If you hold Claims in more than one Class under the Plan, you may receive more than one Ballot. Each Ballot votes only your Claims as indicated on that Ballot. Please complete and return each Ballot you receive.

o. If your Ballot (a) is not counted for voting purposes for any reason, including because it does not conform to the instructions described in your Ballot but (b) indicates your election to opt-out of the Release by Holders of Claims and Interests, your election to opt-out of the Release by Holders of Claims and Interests shall be deemed valid and you will not be deemed a "Releasing Party" under the Plan, so long as your Ballot is actually received by the Claims and Noticing Agent by the Voting Deadline.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR IF YOU NEED ADDITIONAL COPIES OF THE ENCLOSED MATERIALS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT (I) BY WRITING TO: H-FOOD HOLDINGS, LLC, C/O KROLL RESTRUCTURING ADMINISTRATION LLC, 850 THIRD AVENUE, SUITE 412 BROOKLYN, NY 11232, OR (II) BY EMAIL TO HFSINFO@RA.KROLL.COM (WITH "HFS SOLICITATION INQUIRY" IN THE**

**SUBJECT LINE) OR (III) CALLING (888) 510-7189 (U.S./CANADA, TOLL-FREE) OR +1 (646) 937-7810 (INTERNATIONAL).**

**THE CLAIMS AND NOTICING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

<u>**PLEASE SUBMIT YOUR BALLOT PROMPTLY!**</u>

## EXHIBIT 4C

**Form of Beneficial Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| H-Food Holdings, LLC, *et al.*,[1] | ) | Case No. 24-90586 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT BALLOT FOR (I) VOTING TO ACCEPT OR REJECT THE JOINT**
**CHAPTER 11 PLAN OF REORGANIZATION OF H-FOOD HOLDINGS, LLC,**
**AND ITS AFFILAITED DEBTORS AND (II) OPTING OUT OF RELEASES**

**BALLOT FOR BENEFICIAL HOLDERS OF CLASS 5 SENIOR UNSECURED NOTES**
**CLAIMS**

**PLEASE READ THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY BEFORE COMPLETING THIS BALLOT AND FOLLOW THE RELEVANT INSTRUCTIONS.**

**IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, IN ORDER FOR YOUR VOTE TO BE COUNTED, YOU MUST FOLLOW THE DIRECTIONS OF YOUR NOMINEE AND ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE YOUR VOTE AND TRANSMIT SUCH VOTE ON A MASTER BALLOT, WHICH MASTER BALLOT MUST BE RETURNED TO KROLL RESTRUCTURING ADMINISTRATION, LLC ("KROLL" OR THE "CLAIMS AND NOTICING AGENT") BY MARCH 3, 2025, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

**IF, HOWEVER, YOU RECEIVED A "PRE-VALIDATED" BALLOT FROM YOUR NOMINEE WITH INSTRUCTIONS TO SUBMIT SUCH BALLOT DIRECTLY TO THE CLAIMS AND NOTICING AGENT, IN ORDER FOR YOUR VOTE TO BE COUNTED, YOU MUST COMPLETE, EXECUTE, AND RETURN THE "PRE-VALIDATED"**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783). The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

**BALLOT, SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT BY THE VOTING DEADLINE.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Second Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and Its Affiliated Debtors* (as may be amended, modified, or supplemented from time to time, the "Plan")[2] as set forth in the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of H-Food Holdings, LLC and Its Affiliated Debtors* and all exhibits related thereto (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement"). The United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on **January 24**, **2025** (the "Disclosure Statement Order") [Docket No. ●]. Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.

You are receiving this ballot (the "Ballot") because you are a Beneficial Holder[3] of a Claim arising on account of the Senior Unsecured Notes indicated on **Annex A** hereto as of January 24, 2025 (the "Voting Record Date"). Accordingly, you have a right to vote to (a) accept or reject the Plan and (b) subject to the limitations set forth herein, opt-out of the third-party release set forth in Article VIII.D of the Plan. You can cast your vote through this Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of the Class of Senior Unsecured Notes Claims indicated on **Annex A** hereto.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) at no charge from the Claims and Noticing Agent by: (i) accessing the Debtors' restructuring website at https://cases.ra.kroll.com/HFS; (ii) writing to H-Food Holdings, LLC Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (iii) emailing HFSInfo@ra.kroll.com; or (iv) calling the Claims and Noticing Agent at:

U.S./Canada (toll-free): (888) 510-7189
International (toll): +1 (646) 937-7810

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Ballot in error, or if you believe that you have received the wrong ballot, please contact your Nominee immediately.

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

[3]   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees.

You should review the Disclosure Statement, the Plan, and the instructions contained herein before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in the Class of Senior Unsecured Notes Claims under the Plan.  If you hold Claims in more than one Class entitled to vote on the Plan, you will receive a ballot for each Class in which you are entitled to vote.

In order for your vote to count, your Nominee must receive your vote, whether cast via this Ballot or otherwise according to your Nominee's instructions in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Claims and Noticing Agent on or before the Voting Deadline, which is March 3, 2025, at 4:00 p.m., prevailing Central Time. Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee. If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

### <u>Important Information Regarding Releases under the Plan</u>.[4]

Article VIII.C of the Plan provides for a release by the Debtors (the "<u>Debtor Release</u>"):

**Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Plan Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation,**

---

[4]    The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights. If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs. Please read the Plan carefully before completing this Ballot.

formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in ARTICLE VIII.C of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.

Article VIII.D of the Plan provides for a release by the Releasing Parties (the "Release by Holders of Claims and Interests"):

Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Plan Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their

own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in **ARTICLE VIII.D** of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

Article VIII.F of the Plan provides for an exculpation of certain parties (the "Exculpation"):

**Without affecting or limiting the releases set forth in ARTICLE VIII.C and ARTICLE VIII.D of the Plan, and notwithstanding anything herein to the contrary, no**

5

**Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolver Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Reorganized Debt and the Equity Rights Offering, the pursuit of consummation of the Plan Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.**

Article VIII.G of the Plan establishes an injunction (the "Injunction"):

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE PLAN EFFECTIVE DATE, FROM

6

TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE VIII.F OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE INJUNCTIONS IN THIS ARTICLE VIII.G SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

**NOTWTHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF A HOLDER OF A CLAIM OR INTEREST TIMELY OPTS OUT OF OR OBJECTS TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE THE CONFIRMATION DATE, SUCH HOLDER SHALL NOT BE BOUND BY THE RELEASES SET FORTH IN ARTICLE VIII.D OR THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G WITH RESPECT TO THE RELEASED PARTIES (OTHER THAN THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES); PROVIDED THAT, THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G SHALL STILL APPLY TO (I) CLAIMS SUBJECT TO THE EXCULPATION SET FORTH IN ARTICLE VIII.F AND (II) ANY ACTIONS AGAINST THE DEBTORS, THE**

**REORGANIZED COMPANY, OR THE EXCULPATED PARTIES; PROVIED FURTHER, THAT THE INJUNCTION PROTOCOL SET FORTH IN ARTICLE VIII.G.1 SHALL STILL APPLY AND ANY SUCH HOLDER SHALL BE BOUND BY THE INJUNCTION PROTOCOL.**

    1.      Injunction Protocol

**NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASES PRIOR TO THE PLAN EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH DEBTOR, REORGANIZED DEBTOR, OR RELEASED PARTY (THE "__INJUNCTION PROTOCOL__"). THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.**

Definitions Related to the Debtor Release and the Release by Holders of Claims and Interests:

    Under the plan, "***Released Party***" means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the First Lien Agent, (v) the Second Lien Agent, (vi) the Indenture Trustee, (vii) each holder of a First Lien Claim, Second Lien Term Loan Claim or Senior Unsecured Notes Claim that votes for, and does not object to, the Plan, and (b) with respect to each of the foregoing Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law; *provided*, that any Entity or Person that opts out of or timely objects either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation to the releases set forth in **Article VIII.D** of the Plan shall not be deemed a Released Party.

    Under the Plan, *"**Releasing Parties**"* means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the Releases provided by the Plan; (v) each Released Party, (vi) each Related Party to each entity in clause (i) through (v) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clause (i) through (v); *provided* that, in each case, an Entity shall not be a Releasing Party

if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release, either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation; *provided further*, *that,* for the avoidance of doubt, in no case, shall a minor (as defined under applicable state law) be a Releasing Party.

Under the Plan, "***Related Party***' means, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other Entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS HERETO BEFORE COMPLETING THIS BALLOT**

**IMPORTANT NOTICE REGARDING TREATMENT FOR CLASS 5**

As described in more detail in the Disclosure Statement, except to the extent that a Holder of an Allowed Senior Unsecured Notes Claim agrees to a less favorable treatment of such Claim, each Holder of a Senior Unsecured Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

- if Class 5 votes to accept the Plan: its Pro Rata share of 100% of the Senior Unsecured Notes Cash Recovery; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the Senior Unsecured Notes Cash Recovery shall be reduced on a ratable basis (determined based on the Senior Unsecured Notes Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Senior Unsecured Notes Cash Recovery; or

- if Class 5 votes to reject the Plan: no recovery or distribution on account of such Claim, and all Senior Unsecured Notes Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect;

- *provided* that, to the extent the Second Lien Term Loan Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Senior Unsecured Notes Claims Class, then the Senior Unsecured Notes Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms.

**Item 1. Principal Amount of Claims and Voting.**

| **ITEM 1**: AMOUNT OF CLAIMS | The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Beneficial Holder of Claim(s) in the following aggregate unpaid principal amount within the Voting Class as set forth below (your "Claim"). If the Amount of your Claim for voting purposes is not entered in the box below and you do not know the Amount of your Claim(s) as of the Voting Record Date, please contact your Nominee for this information without delay. You may vote to accept or reject the Plan. You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan for each Voting Class in order to have your vote in that particular Voting Class counted. |
| --- | --- |
| | Please note that you are voting all of your Claims in each particular Voting Class either to accept or reject the Plan. You may not split your vote in any particular Voting Class. If you do not indicate that you either accept or reject the Plan in each particular Voting Class by checking the applicable box(es) below, your vote in that particular Voting Class will not be counted. If you indicate that you both accept and |

|  | reject the Plan for a particular Voting Class by checking both boxes below, your vote in that particular Voting Class will not be counted. The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor. Accordingly, your vote cast below will be applied in the same manner and in the same amount against each applicable Debtor. The Holder of the Claims in the Voting Class set forth below votes to (*please check one and only one box per applicable Voting Claim*): |

| Voting Class | Description | Amount | Vote to Accept or Reject Plan |
|---|---|---|---|
| Class 5 | Senior Unsecured Notes Claims | $_____ <br><br> (principal only) | ☐  ACCEPT (VOTE FOR) THE PLAN <br><br> ☐  REJECT (VOTE AGAINST) THE PLAN |

**Item 2. Optional Opt-Out Release Election.**

AS A HOLDER OF THE CLAIMS IN THE VOTING CLASS IDENTIFIED IN ITEM 1, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE BY HOLDERS OF CLAIMS AND INTERESTS CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN IF THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT-OUT OF THE RELEASES BECAUSE EITHER (I) YOU ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN AND YOU CHECK THE BOX BELOW AND SUBMIT THE OPT-OUT BY THE VOTING DEADLINE, OR (II) YOU VOTE TO ACCEPT OR REJECT THE PLAN IN ITEM 1 ABOVE, AND YOU CHECK THE BOX BELOW AND SUBMIT THE OPT-OUT BY THE VOTING DEADLINE. YOU MAY ALSO VALIDLY OPT-OUT OF THE RELEASES BY FILING AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WITH THE BANKRUPTCY COURT PRIOR TO THE PLAN CONFIRMATION OBJECTION DEADLINE. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE RELEASES BY HOLDERS OF CLAIMS AND INTERESTS IS AT YOUR OPTION, SUBJECT TO ANY OBLIGATION YOU MAY HAVE UNDER THE RESTRUCTURING SUPPORT AGREEMENT.

☐  **By checking this box, the Holder of the Claims identified in Item 1 elects to opt-out of the Release by Holders of Claims and Interests**

**Item 3. Other Ballots Submitted**

By returning this Ballot, the Holder of the Claims identified in Item 1 certifies that (a) this Ballot is the only Ballot submitted for Claims identified in Item 1 owned by such Holder, except as identified in the following table, and (b) all Ballots submitted by the Holder in the same Class

11

indicate the same vote to accept or reject the Plan that the Holder has indicated in Item 1 of this Ballot (please use additional sheets of paper if necessary):

**ONLY COMPLETE THIS TABLE IF YOU HAVE VOTED OTHER CLAIMS IN THE SAME CLASS ON OTHER BALLOTS**

| Beneficial Holder's Account Number at Other Nominee | Name of Registered Holder or Other Nominee | DTC Participant Number of Other Nominee | Principal Amount of Other Claims Voted | Plan Vote of Other Claims (Accept or Reject) | CUSIP of Other Claims Voted |
|---|---|---|---|---|---|
| | | | $ | | |
| | | | $ | | |
| | | | $ | | |
| | | | $ | | |

**Item 4. Certifications.**

Upon execution of this Ballot, the undersigned certifies that:

1. as of the Voting Record Date, the undersigned was the Holder (or authorized signatory for a Holder) of the Claims in the aggregate unpaid principal amount within the Voting Class as set forth in Item 1;

2. the undersigned has reviewed a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

3. the undersigned has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

4. the undersigned has cast the same vote with respect to all of the Holder's Claims in each particular Voting Class;

5. the undersigned understands and acknowledges that if multiple Ballots are submitted voting the Claims set forth in Item 1, only the latest, valid Ballot voting the Claims and received by the Claims and Noticing Agent before the Voting Deadline shall be deemed to reflect the voter's intent and thus to supersede and revoke any prior Ballots received by the Claims and Noticing Agent; and

6. the undersigned understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the Holder hereunder, shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, and legal representatives of the Holder and shall not be affected by, and shall survive, the death or incapacity of the Holder.

149668471_12

**Item 4. Holder Information and Signature.**

Name of Holder: _____

                                (*print or type*)

Signature: _____

Name of Signatory: _____

                                (*if other than Holder, include name and title*)

Title: _____

Address: _____

         _____

         _____

         _____

E-mail Address: _____

Date Completed: _____

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT *PROMPTLY* IN THE ENVELOPE PROVIDED OR OTHERWISE IN
ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE**

---

**IF THE CLAIMS AND NOTICING AGENT DOES NOT *ACTUALLY RECEIVE* THE MASTER BALLOT SUBMITTED ON YOUR BEHALF WHICH REFLECTS YOUR VOTE ON OR BEFORE MARCH 3, 2025, AT 4:00 P.M., PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR GENERAL
QUESTIONS ABOUT THE VOTING PROCEDURES, PLEASE CONTACT THE CLAIMS
AND NOTICING AGENT BY EMAIL AT HFSINFO@RA.KROLL.COM, OR CALLING
(888) 510-7189  (U.S./CANADA), TOLL FREE  OR  +1 (646) 937-7810 (INTERNATIONA),
(TOLL). IF YOU HAVE QUESTIONS ABOUT VOTING INSTRUCTIONS PROVIDED BY
YOUR NOMINEE, PLEASE CONTACT YOUR NOMINEE.

13

## VOTING INSTRUCTIONS

a.    As described in the Disclosure Statement, the Debtors are soliciting the votes of Holders of Class 5 Claims with respect to the Plan referred to in the Disclosure Statement. The Plan and Disclosure Statement are included in the Solicitation Package you received with the Ballot. Capitalized terms used but not defined herein shall have the meanings assigned to them in the Plan. **PLEASE READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.** You may wish to seek legal advice concerning the Plan and the treatment of your Claim under the Plan.

b.    The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon Holders of Claims and Interests if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims or at least two thirds in amount of Interests in at least one class that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation set forth in section 1129(a) of the Bankruptcy Code.

c.    Unless otherwise instructed by your Nominee, to ensure that your vote is counted, you *must* complete and submit your Ballot to your Nominee in sufficient time to allow your Nominee to process your vote and submit a Master Ballot so that the Master Ballot is *actually received* by the Claims and Noticing Agent by the Voting Deadline. You may instruct your Nominee to vote on your behalf in the Master Ballot as follows: (a) complete the Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Ballot; and (c) sign and return the Ballot to your Nominee in accordance with the instructions provided by your Nominee.  The Voting Deadline is **March 3, 2025, at 4:00 p.m., prevailing Central Time**.  Your completed Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Claims and Noticing Agent on or before the Voting Deadline.

d.    **Use of Hard Copy Ballot**. To ensure that your hard copy Ballot is counted, you must: (a) complete your Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 1 of the Ballot; and (c) clearly sign and return your Ballot as instructed herein.

e.    If a Master Ballot or "pre-validated" Beneficial Ballot is received after the Voting Deadline, it will not be counted unless the Debtors determine otherwise or as permitted by applicable law or court order. In all cases, as a Beneficial Holder you should allow sufficient time to assure timely delivery of your Ballot to your Nominee. No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors. A Ballot will not be counted unless received by the Claims and Noticing Agent before the Voting Deadline.

f.    If you deliver multiple Beneficial Ballots to your Nominee with respect to the same Claims prior to the Voting Deadline, the last received valid Beneficial Ballot timely received by your Nominee will supersede and revoke any earlier received Beneficial Ballots.

g.    If a Holder simultaneously casts inconsistent duplicate Beneficial Ballots, with respect to the same Claim(s), such Beneficial Ballots will not be counted.

14

h.      The Ballot does not constitute, and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission with respect to any Claim. The Ballot may not be used for any purpose other than to vote to accept or reject the Plan and to make certain certifications with respect thereto.

i.      Please be sure to sign and date your Beneficial Ballot. If you are signing a Beneficial Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Noticing Agent, the Debtors, or the Bankruptcy Court, submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

j.      You must vote your entire Claim in each Voting Class either to accept or reject the Plan and may not split your vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan as to a particular Voting Class will not be counted as a vote to accept or reject the Plan as to that Class.

k.      The following Ballots will not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder; (b) any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote on the Plan; (c) any unsigned Ballot; (d) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan; and/or (e) any Ballot submitted by a party not entitled to cast a vote with respect to the Plan.

l.      If you hold Claims in more than one Class under the Plan, or you hold Senior Unsecured Notes Claims through multiple Nominees, you may receive more than one Ballot. Each Ballot votes only your Claims as indicated on that Ballot. Please complete and return each Ballot you receive.

m.      If your Beneficial Ballot has been "pre-validated" by your Nominee, including a signature and medallion guarantee certifying your Claim amount for voting purposes as of the Voting Record Date, you may submit such "pre-validated" Ballot directly to the Claims and Noticing Agent by electronic mail at HFSballots@ra.kroll.com (with "H-Food Holdings, LLC Ballot Submission" in the subject line). "Pre-validated" Beneficial Ballots may also be submitted in paper format directly to the Claims and Noticing Agent in the return envelope provided, if any, or otherwise by regular mail, overnight courier, or hand delivery to:

H-Food Holdings, LLC Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

(To arrange hand delivery of your Beneficial Ballot, please email the Claims and Noticing Agent at HFSBallots@ra.kroll.com (with "HFS Ballot Delivery" in the subject line) at least

149668471_12

24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.)

For the avoidance of doubt, only Beneficial Ballots that have been "pre-validated" by a Beneficial Holder's Nominee may be returned directly to the Claims and Noticing Agent as provided above. To be counted, Beneficial Ballots that have not been "pre-validated" by a Nominee must be returned according to the Nominee's instructions.

n.    Your Nominee is authorized to transmit solicitation materials and information to, and solicit and collect votes from, its Beneficial Holder clients using its customary practices, including electronic transmission, links to online resources, a voter information form in lieu of or in addition to a Ballot, and/or online submission of votes.

o.    If your Ballot (a) is not counted for voting purposes for any reason, including because it does not conform to the instructions described in your Ballot but (b) indicates your election to opt-out of the Release by Holders of Claims and Interests, your election to opt-out of the Release by Holders of Claims and Interests shall be deemed valid and you will not be deemed a "Releasing Party" under the Plan, so long as your Ballot is actually received by the Claims and Noticing Agent by the Voting Deadline.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR IF YOU NEED ADDITIONAL COPIES OF THE ENCLOSED MATERIALS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT (I) BY WRITING TO: H-FOOD HOLDINGS, LLC BALLOT PROCESSING CENTER, C/O KROLL RESTRUCTURING ADMINISTRATION LLC, 850 THIRD AVENUE, SUITE 412, BROOKLYN, NY 11232, OR (II) BY EMAIL TO HFSINFO@RA.KROLL.COM (WITH "HFS SOLICITATION INQUIRY" IN THE SUBJECT LINE) OR (III) CALLING (888) 510-7189 (U.S./CANADA, TOLL FREE). OR +1 (646) 937-7810 (INTERNATIONAL, TOLL). HOWEVER, SPECIFIC QUESTIONS ABOUT VOTING INSTRUCTIONS PROVIDED BY YOUR NOMINEE SHOULD BE DIRECTED TO YOUR NOMINEE.**

**THE CLAIMS AND NOTICING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**<u>PLEASE SUBMIT YOUR BALLOT PROMPTLY!</u>**

## Annex A

**Please check one (and only one) box below to indicate the CUSIP/ISIN to which this Beneficial Ballot pertains (or clearly indicate such information directly on the Ballot or on an exhibit thereto).  If you check more than one box, you risk having your vote submitted through this Beneficial Ballot invalidated.**

| Class 5 (Senior Unsecured Notes Claims) | | |
|---|---|---|
| ☐ | 8.500% Senior Notes due 2026 (REG S) | CUSIP U57620AA1<br>ISIN USU57620AA19 |
| ☐ | 8.500% Senior Notes due 2026 (144A) | CUSIP 577088AA5<br>ISIN US577088AA59 |

## EXHIBIT 4D

**Form of Master Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| H-Food Holdings, LLC, *et al.*,[1] | ) | Case No. 24-90586 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**MASTER BALLOT FOR (I) VOTING TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF H-FOOD HOLDINGS, LLC, AND ITS AFFILAITED DEBTORS AND (II) OPTING OUT OF RELEASES**

**MASTER BALLOT FOR HOLDERS OF CLASS 5 SENIOR UNSECURED NOTES CLAIMS**

---

**PLEASE READ THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY BEFORE COMPLETING THIS BALLOT AND FOLLOW THE RELEVANT INSTRUCTIONS.**

**IN ORDER FOR YOUR VOTES ON THIS MASTER BALLOT TO BE COUNTED, THIS MASTER BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY KROLL RESTRUCTURING ADMINISTRATION LLC ("KROLL" OR THE "CLAIMS AND NOTICING AGENT") BY MARCH 3, 2025 AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BELOW.**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Second Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and Its Affiliated Debtors* (as may be amended, modified, or supplemented from time to time, the "Plan")[2] as set forth in the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of H-Food Holdings, LLC and Its Affiliated Debtors* and all exhibits related thereto (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement"). The United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on **January 24, 2025** (the "Disclosure Statement Order") [Docket No. [●]].

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783).  The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.

You are receiving this master ballot (the "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[3] of Senior Unsecured Notes Claim as of January 24, 2025 (the "Voting Record Date").

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy holder of a Nominee for certain Beneficial Holders of Class 5 Senior Unsecured Notes Claims indicated on Annex A hereto, to transmit to the Claims and Noticing Agent the votes of such Beneficial Holders in respect of their Claims to accept or reject the Plan.**

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at http://www.txs.uscourts.gov; or (b) at no charge from the Claims and Noticing Agent by: (i) accessing the Debtors' restructuring website at https://cases.ra.kroll.com/HFS; (ii) writing to H-Food Holdings, LLC Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (iii) emailing HFSInfo@ra.kroll.com (with "HFS Solicitation Inquiry" in the subject line); or (iv) calling the Claims and Noticing Agent at:

U.S./Canada (toll-free): (888) 510-7189
International (toll): +1 (646) 937-7810

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Master Ballot in error, please contact the Claims and Noticing Agent *immediately* at the address, telephone number, or email address set forth above.

You are authorized to transmit solicitation materials and information to, and to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including providing an online link to solicitation materials, the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot (as defined below), and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

You should review the Disclosure Statement, the Plan, and the instructions contained herein before you transmit votes. You or the Beneficial Holders of the Claims for whom you are the Nominee may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of such Claims.

The Bankruptcy Court may confirm the Plan and thereby bind all Holders of Claims or Interests. To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you

---

[3]    A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees.

must complete and return this Master Ballot so that the Claims and Noticing Agent ***actually receives*** it on or before the Voting Deadline.

### Important Information Regarding Releases under the Plan.[4]

Article VIII.C of the Plan provides for a release by the Debtors (the "Debtor Release"):

**Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Plan Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the**

---

[4]    The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights. If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs. Please read the Plan carefully before completing this Ballot.

foregoing, (I) the releases set forth in <u>ARTICLE VIII.C</u> of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.

Article VIII.D of the Plan provides for a release by the Releasing Parties (the "<u>Release by Holders of Claims and Interests</u>"):

Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Plan Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive

4

Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in **ARTICLE VIII.D** of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

Article VIII.F of the Plan provides for an exculpation of certain parties (the "Exculpation"):

Without affecting or limiting the releases set forth in **ARTICLE VIII.C** and **ARTICLE VIII.D** of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolver Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Reorganized Debt and the Equity Rights Offering, the pursuit of consummation of the Plan Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted intentional fraud, willful misconduct, or gross

negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.

Article VIII.G of the Plan establishes an injunction (the "Injunction"):

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE PLAN EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE VIII.F OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR

OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE INJUNCTIONS IN THIS ARTICLE VIII.G SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

**NOTWTHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF A HOLDER OF A CLAIM OR INTEREST TIMELY OPTS OUT OF OR OBJECTS TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE THE CONFIRMATION DATE, SUCH HOLDER SHALL NOT BE BOUND BY THE RELEASES SET FORTH IN ARTICLE VIII.D OR THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G WITH RESPECT TO THE RELEASED PARTIES (OTHER THAN THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES); PROVIDED THAT, THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G SHALL STILL APPLY TO (I) CLAIMS SUBJECT TO THE EXCULPATION SET FORTH IN ARTICLE VIII.F AND (II) ANY ACTIONS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES; PROVIED FURTHER, THAT THE INJUNCTION PROTOCOL SET FORTH IN ARTICLE VIII.G.1 SHALL STILL APPLY AND ANY SUCH HOLDER SHALL BE BOUND BY THE INJUNCTION PROTOCOL.**

1.    Injunction Protocol

**NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASES PRIOR TO THE PLAN EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH DEBTOR, REORGANIZED DEBTOR, OR RELEASED PARTY (THE "INJUNCTION PROTOCOL"). THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.**

Definitions Related to the Debtor Release and the Release by Holders of Claims and Interests:

7

Under the plan, "**_Released Party_**" means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the First Lien Agent, (v) the Second Lien Agent, (vi) the Indenture Trustee, (vii) each holder of a First Lien Claim, Second Lien Term Loan Claim or Senior Unsecured Notes Claim that votes for, and does not object to, the Plan, and (b) with respect to each of the foregoing Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law; _provided_, that any Entity or Person that opts out of or timely objects either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation to the releases set forth in **Article VIII.D** of the Plan shall not be deemed a Released Party.

Under the Plan, _"Releasing Parties"_ means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the Releases provided by the Plan; (v) each Released Party, (vi) each Related Party to each entity in clause (i) through (v) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clause (i) through (v); _provided_ that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release, either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation; _provided further_, _that_, for the avoidance of doubt, in no case, shall a minor (as defined under applicable state law) be a Releasing Party.

Under the Plan, "**_Related Party_**' means, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other Entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS HERETO BEFORE COMPLETING THIS BALLOT**

**Item 1. Certification of Authority to Vote**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐     Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Claims listed in Item 2 below, or

☐     Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of Claims listed in Item 2 below, or

☐     Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner of the aggregate principal amount of Claims listed in Item 2 below,

and accordingly, has full power and authority to vote to accept or reject the Plan, on behalf of the Beneficial Holders of the Claims described in Item 2.

**Item 2.  Claims Vote on Plan**

The undersigned transmits the following votes of Beneficial Holders of Senior Unsecured Notes Claims indicated on **Annex A** hereto and certifies that the following Beneficial Holders of such Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, properly executed ballots (the "Beneficial Holder Ballots") casting such votes as indicated and containing instructions for the casting of those votes on their behalf. For purposes of this Master Ballot, accrued or unmatured interest should not be included.

Indicate in the appropriate column below the aggregate unpaid principal amount voted for each account or attach such information to this Master Ballot in the form of the following table. Please note that each Beneficial Holder must vote all its Claims to accept or reject the Plan and may not split such vote. Any Beneficial Ballot executed by a Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted. **If the Beneficial Holder has checked the box on Item 2 of the Beneficial Ballot pertaining to releases by Holders of Claims, as detailed in Article VIII.D of the Plan, please place an X in the Item 2 column below for each Beneficial Holder that checked the box, unless the Beneficial Holder has voted to accept the Plan.**

| Your Customer Account Number for Each Beneficial Holder of Claims | Principal Amount Held as of Voting Record Date | Item 1 Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | | Item 2 If the box in Item 2 of the Beneficial Holder Ballot was completed, check the box in the column below |
|---|---|---|---|---|---|
| | | Accept the Plan | or | Reject the Plan | OPT-OUT of the Third-Party Release |
| 1 | $ | | | | |
| 2 | $ | | | | |
| 3 | $ | | | | |
| 4 | $ | | | | |

| 5 | $ | | ■ | |
| 6 | $ | | ■ | |
| **TOTALS** | $ | | ■ | |

### Item 3.        Other Ballots Submitted by Beneficial Holders in the Same Class

The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 3 of the Beneficial Holder Ballot:

| Your customer account number and/or Customer Name for each Beneficial Holder who completed Item 4 of the Beneficial Holder Ballot. | Transcribe from Item 3 of the Beneficial Holder Ballot | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Beneficial Holder's Account Number at Other Nominee | Name of Registered Holder or Other Nominee | DTC Participant Number of Other Nominee | Principal Amount of Other Claims Voted | Plan Vote of Other Claims (Accept or Reject) | CUSIP of other Class Claim Votes |
| 1. | | | | $ | | |
| 2. | | | | $ | | |
| 3. | | | | $ | | |
| 4. | | | | $ | | |
| 5. | | | | $ | | |

### Item 4. Certifications.

By signing this Master Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors that:

      a.      it has received a copy of the Disclosure Statement, the Plan, the Master Ballots, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Claims listed in Item 2 above;

      b.      it has received a completed and signed Beneficial Ballot (or other accepted and customary method of communicating a vote) from each Beneficial Holder listed in Item 2 of this Master Ballot;

      c.      it is the registered Holder of all the Claims listed in Item 2 above being voted, or it has been authorized by each Beneficial Holder of the Claims listed in Item 2 above to vote on the Plan;

      d.      no other Master Ballots with respect to the same Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier received Master Ballots are hereby revoked;

      e.      it has properly disclosed: (i) the number of Beneficial Holders of Claims who completed the Beneficial Ballots; (ii) the respective amounts of the Claims owned, as the case may be, by each Beneficial Holder of the Claims who completed a Beneficial Ballot; (iii) each such Beneficial Holder of Claims' respective vote concerning the Plan; (iv) each such Beneficial Holder of Claims' certification as to other Claims voted in the

same Class; and (v) the customer account or other identification number for each such Beneficial Holder of Claims; and

f.  it will maintain Beneficial Ballots and evidence of separate transactions returned by Beneficial Holders of Claims (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

---

Name of Nominee: _____

_(Print or Type)_

DTC Participant Number: _____

Name of Proxy Holder or Agent for Nominee (if applicable):

_____

_(Print or Type)_

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

_____

E-mail Address: _____

---

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) _PROMPTLY_ IN THE ENVELOPE PROVIDED OR VIA FIRST CLASS MAIL, OVERNIGHT COURIER, OR HAND DELIVERY, OR VIA ELECTRONIC MAIL SERVICE TO:**

**H-Food Holdings, LLC Ballot Processing Center**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue, Suite 412**
**Brooklyn, NY 11232**

**To arrange hand delivery of your Master Ballot, please email the Claims and Noticing Agent at HFSBallots@ra.kroll.com (with "HFS Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.**

**IF THE CLAIMS AND NOTICING AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR BEFORE MARCH 3, 2025 AT 4:00 P.M., PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, THE VOTES TRANSMITTED BY THIS MASTER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

## INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as <u>Exhibit A</u> to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. You should immediately distribute Solicitation Packages, including Beneficial Holder Ballots to all Beneficial Holders of Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds. You may distribute the Solicitation Packages and solicitation information to Beneficial Holders, as appropriate, in accordance with your customary practices, including via an online document platform and information resource or email. You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means. Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Notice and Claims Agent, a Master Ballot that reflects the vote of such Beneficial Holders by <u>March 3, 2025, at 4:00 p.m.</u>, prevailing Central Time or otherwise validate the Master Ballot in a manner acceptable to the Notice and Claims Agent.

4. If you are transmitting the votes of any Beneficial Holder of Claims other than yourself, you may either:

   (i)   "Pre-validate" the individual Beneficial Holder Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Claim for voting within five Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Notice and Claims Agent in the return envelope to be provided in the Solicitation Package. A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; applying a medallion guarantee to the Ballot or attaching an authorized signatory list, certifying the Beneficial Holder's voting amount as of the Voting Record Date, indicating the account number of the Beneficial Holder and the principal amount of Claims held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder. The Beneficial Holder then completes the remaining information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Notice and Claims Agent. A list of the Beneficial Holders to whom "pre-validated" Beneficial

13

Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date; or

(ii)   Within five Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee.  In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Notice and Claims Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Notice and Claims Agent.  The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots (or otherwise transmit their vote) to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Notice and Claims Agent so that the Master Ballot is actually received by the Notice and Claims Agent on or before the Voting Deadline.

5.  With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Notice and Claims Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Effective Date of the Plan.  You may be ordered to produce the Beneficial Holder Ballots (or evidence of the vote transmitted to you) to the Debtors or the Bankruptcy Court.

(i)   The Master Ballot **must** be returned to the Notice and Claims Agent so as to be **actually received** by the Notice and Claims Agent on or before the Voting Deadline.  **The Voting Deadline is <u>March 3, 2025, at 4:00 p.m.,</u> prevailing Central Time.**

(ii)   If a Master Ballot is received **after** the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors.  Additionally, **the following votes will <u>not</u> be counted:**

a.   votes contained on any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

b.   votes contained on any Master Ballot cast by a Party that does not hold a Claim in a Class that is entitled to vote on the Plan;

c.   votes contained on any Master Ballot sent by facsimile or any electronic means other than electronic mail;

d.   votes contained on any unsigned Master Ballot;

e.   votes contained on any Master Ballot not marked to accept or reject the Plan or marked both to accept and reject; and/or

14

      f.     votes contained on any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

6. The method of delivery of Master Ballots to the Notice and Claims Agent is at the election and risk of each Nominee.  Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims Agent **actually receives** the executed Master Ballot.  In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

7. If a Beneficial Holder or Nominee holds a Claim in a voting Class against multiple Debtors, a vote on their Beneficial Holder Ballot will apply to all applicable Classes and Debtors against whom such Beneficial Holder or Nominee has such Claim, as applicable, in that voting Class.

8. If multiple Master Ballots are received from the same Nominee with respect to the same Claims voted on a Beneficial Holder Ballot prior to the Voting Deadline, the latest, timely received, properly executed, and otherwise valid Master Ballot will supersede and revoke any earlier received Master Ballots.

9. The Master Ballot does **not** constitute, and shall not be deemed to be, (a) a Proof of Claim or Interest or (b) an assertion or admission of a Claim or Interest.

10. **Please be sure to sign and date the Master Ballot**.  You should indicate that you are signing the Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Notice and Claims Agent, the Debtors, or the Bankruptcy Court, submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

11. If you are both the Nominee and the Beneficial Holder of any of the Claims indicated on **Annex A** of the Master Ballot or Beneficial Holder Ballot, as applicable, and you wish to vote such Claims, you may vote such Claims where indicated on the Master Ballot for such Claims and you must vote your entire Claims in the same Class to either accept or reject the Plan and may not split your vote.

12. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class may be aggregated and treated as if such creditor held one Claim in such Class, in which case all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided*, *however*, that if separate affiliated entities hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity may be counted separately as a vote to accept or reject the Plan.  Any party in interest may contest any such aggregation of multiple Claims at the Confirmation Hearing.

13. The following additional rules shall apply to Master Ballots:

      a.     Votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Claims as of the Voting Record Date, as evidenced by the record and depository listings.

b.   Votes submitted by a Nominee or Beneficial Holder, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, will not be counted in excess of the record amount of the Claims held by such Nominee;

c.   To the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, the Notice and Claims Agent will attempt to reconcile discrepancies with the Nominee;

d.   To the extent that over-votes on a Master Ballot or pre-validated Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Notice and Claims Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Beneficial Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in the Claims; and

e.   For purposes of tabulating votes, each Holder holding through a particular account will be deemed to have voted the principal amount relating to its holdings in that particular account, although the Notice and Claims Agent may be asked to adjust such principal amount to reflect the Claim amount.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR IF YOU NEED ADDITIONAL COPIES OF THE ENCLOSED MATERIALS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT (I) BY WRITING TO: H-FOOD HOLDINGS, LLC, C/O KROLL RESTRUCTURING ADMINISTRATION LLC, 850 THIRD AVENUE, SUITE 412 BROOKLYN, NY 11232, OR (II) BY EMAIL TO HFSBALLOTS@RA.KROLL.COM OR (III) CALLING (888) 510-7189 (U.S./CANADA). OR +1 (646) 937-7810 (INTERNATIONAL).**

**THE CLAIMS AND NOTICING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**<u>PLEASE SUBMIT YOUR BALLOT PROMPTLY!</u>**

16

**Annex A**

**Please check one (and only one) box below to indicate the CUSIP/ISIN to which this Master Ballot pertains (or clearly indicate such information directly on the Master Ballot or on an exhibit thereto). If you check more than one box, you risk having the Beneficial Holder votes submitted through this Master Ballot invalidated.**

| Class 5 (Senior Unsecured Notes Claims) | | |
|---|---|---|
| ☐ | 8.500% Senior Notes due 2026 (REG S) | CUSIP U57620AA1<br>ISIN USU57620AA19 |
| ☐ | 8.500% Senior Notes due 2026 (144A) | CUSIP 577088AA5<br>ISIN US577088AA59 |

**<u>EXHIBIT 4E</u>**

**Form of Class 6 Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| H-Food Holdings, LLC, *et al.*,[1] | ) Case No. 24-90586 (ARP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**CLASS 6 – GENERAL UNSECURED CLAIMS**
**BALLOT FOR ACCEPTING OR REJECTING THE JOINT**
**CHAPTER 11 PLAN OF H-FOOD HOLDINGS, LLC AND ITS AFFILIATED DEBTORS**

- IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE DEBTORS' CLAIMS AND NOTICING AGENT, KROLL RESTRUCTURING ADMINISTRATION LLC (THE "CLAIMS AND NOTICING AGENT") BY, EMAIL, HFSINFO@RA.KROLL.COM (WITH "HFS SOLICITATION INQUIRY" IN THE SUBJECT LINE), OR CALLING (888) 510-7189 (U.S./CANADA, TOLL-FREE) OR +1 (646) 937-7810 (INTERNATIONAL).

- PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS BALLOT. THIS BALLOT IS BEING SUBMITTED TO YOU TO SOLICIT YOUR VOTE ON THE DEBTORS' PLAN (INCLUDING THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN).

- THIS BALLOT MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT BEFORE **4:00 P.M., PREVAILING CENTRAL TIME, ON MARCH 3, 2025 (THE "VOTING DEADLINE")**.

- IF THE COURT CONFIRMS THE PLAN, IT WILL BIND YOU REGARDLESS OF WHETHER YOU HAVE VOTED.

- NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIALS MAILED WITH THIS BALLOT.

- CONFIRMATION OF THE PLAN IS EXPRESSLY CONDITIONED UPON BANKRUPTCY COURT APPROVAL OF THE RELEASES BY RELEASING PARTIES (AS DESCRIBED BELOW AND LOCATED IN ARTICLE VIII OF THE PLAN), WHICH, IF APPROVED BY THE BANKRUPTCY COURT, WOULD PERMANENTLY ENJOIN HOLDERS OF CERTAIN CLAIMS AGAINST THIRD PARTIES FROM ASSERTING SUCH CLAIMS AGAINST SUCH NON-DEBTOR THIRD PARTIES. THE RELEASES BY RELEASING PARTIES, IF APPROVED, WILL BIND AFFECTED HOLDERS OF CLAIMS AND INTERESTS IN THE MANNER DESCRIBED IN ITEM 2 OF THIS BALLOT.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783). The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

149668471_12

PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT RELATING TO THE *SECOND AMENDED JOINT CHAPTER 11 PLAN OF H-FOOD HOLDINGS, LLC AND ITS AFFILIATED DEBTORS* (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN")[2] BEFORE COMPLETING THIS BALLOT. THIS BALLOT PERMITS YOU TO VOTE ON THE PLAN, WHICH IS SUBJECT TO BANKRUPTCY COURT APPROVAL AND WHICH CONTEMPLATES A COMPREHENSIVE RESTRUCTURING TRANSACTION (THE "TRANSACTION") UPON THE EMERGENCE OF THE DEBTORS FROM CHAPTER 11.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the Plan as set forth in the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of H-Food Holdings, LLC and Its Affiliated Debtors* and all exhibits related thereto (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on **January 24, 2025** (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.

You are receiving this ballot (the "Ballot") because records indicate that you are the Holder of a Claim in Class 6 (a "Voting Class") as of **January 24, 2025** (the "Voting Record Date"). Accordingly, you may have a right to vote to accept or reject the Plan. Your receipt of this Ballot does not indicate that your Claim(s) has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of, or distribution on account of, Class 6 Claims.

The Disclosure Statement describes the rights and treatment for each Class. The Disclosure Statement, the Plan, and certain other materials are also included in the packet you are receiving with this Ballot (the "Solicitation Package"). This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect thereto, including with respect to releases by Holders of Claims and Interests. Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein.

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE SUCH A CLAIM.**

*You should carefully and thoroughly review the Disclosure Statement and Plan before you vote to accept or reject the Plan. You may wish to seek legal advice concerning the Plan, classification and treatment of your Claim, and the Releases, Exculpation, and Injunction provisions under the Plan, as your rights might be affected.*

**THE VOTING DEADLINE IS 4:00 P.M., PREVAILING CENTRAL TIME, ON MARCH 3, 2025.**

**PLEASE NOTE THAT IF YOU ARE A COUNTERPARTY TO AN EXECUORY CONTRACT OR UNEXPIRED LEASE YOU ARE RECEIVING THIS BALLOT BECAUSE YOU MAY HAVE A CLASS 6 CLAIM AGAINST ONE OR MORE OF THE DEBTORS. RECEIPT OF THIS BALLOT DOES NOT REFLECT THE INTENDED TREATMENT OF THE**

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**EXECUTORY CONTRACT(S) OR UNEXPIRED LEASES(S) TO WHICH YOU ARE A PARTY AND DOES NOT MEAN THAT SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE WILL OR WILL NOT BE ASSUMED OR ASSUMED AND ASSIGNED.**

### <u>Important Information Regarding Releases under the Plan</u>.[3]

Article VIII.C of the Plan provides for a release by the Debtors (the "<u>Debtor Release</u>"):

**Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Plan Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking**

---

[3]   The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights. If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs. Please read the Plan carefully before completing this Ballot.

**place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in <u>ARTICLE VIII.C</u> of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.**

Article VIII.D of the Plan provides for a release by the Releasing Parties (the "<u>Release by Holders of Claims and Interests</u>"):

**Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Plan Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit**

4

**Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in <u>ARTICLE VIII.D</u> of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.**

Article VIII.E of the Plan provides for releases of Directors and Officers of Wage and Labor Laws (the "<u>Wage and Labor Law Releases</u>"):

**As of the Effective Date, all current and former directors, managers, officers, employees, and managing agents of the Debtors will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by all current and former employees, full-time workers, part-time workers, temporary workers, or workers placed by third-party staffing agencies (each, an "<u>Employee</u>") unless such Employee expressly elects in writing to opt-out of the releases, from any and all Claims and Causes of Action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Employee or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them have, had or would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any Employee or other Person, arising out of or relating to, in whole or in part, the employment of the Employee by the Debtors, including any Claims arising under or related to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., or any related or similar federal or state wage and labor laws.**

Article VIII.F of the Plan provides for an exculpation of certain parties (the "Exculpation"):

**Without affecting or limiting the releases set forth in <u>ARTICLE VIII.C</u> and <u>ARTICLE VIII.D</u> of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolver Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Reorganized Debt and the Equity Rights Offering, the pursuit of consummation of the Plan Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.**

Article VIII.G of the Plan establishes an injunction (the "Injunction"):

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS,

PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE PLAN EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO <u>ARTICLE VIII.F</u> OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE INJUNCTIONS IN THIS <u>ARTICLE VIII.G</u> SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

**NOTWTHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF A HOLDER OF A CLAIM OR INTEREST TIMELY OPTS OUT OF OR OBJECTS TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE THE CONFIRMATION DATE, SUCH HOLDER SHALL NOT BE BOUND BY THE RELEASES SET FORTH IN ARTICLE VIII.D OR THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G WITH RESPECT TO THE RELEASED PARTIES (OTHER THAN THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES); PROVIDED THAT, THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G SHALL STILL APPLY TO (I) CLAIMS SUBJECT TO THE EXCULPATION SET FORTH IN ARTICLE VIII.F AND (II) ANY ACTIONS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES; PROVIED FURTHER, THAT THE INJUNCTION PROTOCOL**

**SET FORTH IN ARTICLE VIII.G.1 SHALL STILL APPLY AND ANY SUCH HOLDER SHALL BE BOUND BY THE INJUNCTION PROTOCOL.**

1.      Injunction Protocol

**NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASES PRIOR TO THE PLAN EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH DEBTOR, REORGANIZED DEBTOR, OR RELEASED PARTY (THE "INJUNCTION PROTOCOL"). THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.**

Definitions Related to the Debtor Release and the Release by Holders of Claims and Interests:

Under the plan, "*Released Party*" means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the First Lien Agent, (v) the Second Lien Agent, (vi) the Indenture Trustee, (vii) each holder of a First Lien Claim, Second Lien Term Loan Claim or Senior Unsecured Notes Claim that votes for, and does not object to, the Plan, and (b) with respect to each of the foregoing Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law; *provided*, that any Entity or Person that opts out of or timely objects either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation to the releases set forth in Article VIII.D of the Plan shall not be deemed a Released Party.

Under the Plan, *"Releasing Parties"* means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the Releases provided by the Plan; (v) each Released Party, (vi) each Related Party to each entity in clause (i) through (v) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clause (i) through (v); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release, either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail,

as applicable, before confirmation; *provided further*, *that,* for the avoidance of doubt, in no case, shall a minor (as defined under applicable state law) be a Releasing Party.

Under the Plan, "***Related Party***" means, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other Entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS HERETO BEFORE COMPLETING THIS BALLOT**

---

**IMPORTANT NOTICE REGARDING TREATMENT FOR CLASS 6**

As described in more detail in the Disclosure Statement, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each Holder of a General Unsecured Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

- if Class 6 votes to accept the Plan: the lower of: (1) its Pro Rata share of 100% of the General Unsecured Claims Cash Recovery; and (2) Cash in an amount equal to 6.0% of such Allowed General Unsecured Claim; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the General Unsecured Claims Cash Recovery shall be reduced on a ratable basis (determined based on the General Unsecured Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and Senior Unsecured Notes Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the General Unsecured Claims Cash Recovery; or

- if Class 6 votes to reject the Plan: no recovery or distribution on account of such Claim, and all General Unsecured Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect.

---

**Item 1. Principal Amount of Claims and Voting.**

| **ITEM 1: AMOUNT OF CLAIMS** | The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder (or authorized signatory for a Holder) of Claim(s) in the following aggregate unpaid principal amount within the Voting Class as set forth below (your "Claim"). You may vote to accept or reject the Plan. You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan for each Voting Class in order to have your vote in that particular Voting Class counted.

Please note that you are voting all of your Claims in each particular Voting Class either to accept or reject the Plan. You may not split your vote in any particular Voting Class. If you do not indicate that you either accept or reject the Plan in each particular Voting Class by checking the applicable box(es) below, your vote in that particular Voting Class will not be counted. If you indicate that you both accept and reject the Plan for a particular Voting Class by checking both boxes below, your vote in that particular Voting Class will not be counted.

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor. Accordingly, your vote cast below will be applied against the Debtor listed beneath the voting amount.

The Holder of the Claims in the Voting Class set forth below votes to (*please check <u>one and</u> <u>only one box per applicable Voting Claim</u>*): |
|---|---|

| **Voting Class** | **Description** | **Amount** | **Vote to Accept or Reject Plan** |
|---|---|---|---|
| Class 6 | General Unsecured Claims | $_____<br><br>Debtor:_____ | ☐   ACCEPT (VOTE FOR) THE PLAN<br><br>☐   REJECT (VOTE AGAINST) THE PLAN |

**Item 2. Optional Opt-Out Release Election.**

AS A HOLDER OF THE CLAIMS IN THE VOTING CLASS IDENTIFIED IN ITEM 1, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE BY HOLDERS OF CLAIMS AND INTERESTS CONTAINED IN <u>ARTICLE VIII.D</u> OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASES CONTAINED IN <u>ARTICLE VIII.D</u> AND, IF APPLICABLE, <u>ARTICLE VIII.E</u> OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN IF THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT-OUT OF THE RELEASES BECAUSE EITHER (I) YOU ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN <u>AND</u> YOU CHECK THE BOX BELOW AND SUBMIT THE OPT-OUT BY THE VOTING DEADLINE, OR (II) YOU VOTE TO ACCEPT OR REJECT THE PLAN IN ITEM 1 ABOVE, <u>AND</u> YOU CHECK THE BOX BELOW AND SUBMIT THE OPT-OUT BY THE VOTING DEADLINE. YOU MAY ALSO VALIDLY OPT-OUT OF THE RELEASES BY FILING AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WITH THE BANKRUPTCY COURT PRIOR TO THE PLAN CONFIRMATION OBJECTION

DEADLINE. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE RELEASES BY HOLDERS OF CLAIMS AND INTERESTS IS AT YOUR OPTION, SUBJECT TO ANY OBLIGATION YOU MAY HAVE UNDER THE RESTRUCTURING SUPPORT AGREEMENT.

☐ **By checking this box, the Holder of the Claims identified in Item 1 elects to opt-out of the Release by Holders of Claims and Interests and the Wage and Labor Law Releases**

**Item 3. Certifications.**

Upon execution of this Ballot, the undersigned certifies that:

a. as of the Voting Record Date, the undersigned was the Holder (or authorized signatory for a Holder) of the Claims in the aggregate unpaid principal amount within the Voting Class as set forth in Item 1;

b. the Holder has reviewed a copy of the Disclosure Statement, the Plan, and the remainder of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c. the Holder has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

d. the Holder has cast the same vote with respect to all of the Holder's Claims in each particular Voting Class;

e. the Holder understands and acknowledges that if multiple Ballots are submitted voting the Claims set forth in Item 1, only the latest, valid Ballot voting the Claims and received by the Claims and Noticing Agent before the Voting Deadline shall be deemed to reflect the voter's intent and thus to supersede and revoke any prior Ballots received by the Claims and Noticing Agent; and

f. the Holder understands and acknowledges that all authority conferred or agreed to be conferred pursuant to this Ballot, and every obligation of the Holder hereunder, shall be binding upon the transferees, successors, assigns, heirs, executors, administrators, and legal representatives of the Holder and shall not be affected by, and shall survive, the death or incapacity of the Holder.

**Item 4. Holder Information and Signature.**

Name of Holder: _____
(*print or type*)

Signature: _____

Name of Signatory: _____
(*if other than Holder, include name and title*)

Title: _____

11

Address: _____

_____

_____

_____

E-mail Address: _____

Date Completed: _____

---

**By electronic, online submission:**

To submit your Ballot via the Claims and Noticing Agent's online portal (the "E-Ballot Portal"), visit https://cases.ra.kroll.com/HFS/. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.

Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted. If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the E-Ballot Portal.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:**

_____

The E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

**Holders are strongly encouraged to submit their ballots via the E-Ballot Portal.   Holders who cast a Ballot using the Claims and Noticing Agent's E-Ballot Portal should NOT also submit a paper Ballot.**

---

| **If by First Class Mail, Hand Delivery, or Overnight Mail:** |
| :---: |
| H-Food Holdings, LLC Ballot Processing Center |
| c/o Kroll Restructuring Administration LLC |
| 850 Third Avenue, Suite 412 |
| Brooklyn, NY 11232 |

To arrange hand delivery of your Ballot, please email the Claims and Noticing Agent at HFSBallots@ra.kroll.com (with "HFS Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

**IF THE CLAIMS AND NOTICING AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE MARCH 3, 2025 BY 4:00 P.M. (PREVAILING CENTRAL TIME) (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT BY EMAIL AT HFSINFO@RA.KROLL.COM (WITH "HFS SOLICITATION INQUIRY" IN THE SUBJECT LINE), OR CALLING (888) 510-7189 (U.S./CANADA, TOLL-FREE) OR +1 (646) 937-7810 (INTERNATIONAL).

## VOTING INSTRUCTIONS

a.  As described in the Disclosure Statement, the Debtors are soliciting the votes of Holders of Class 6 Claims with respect to the Plan referred to in the Disclosure Statement. The Plan and Disclosure Statement are included in the Solicitation Package you received with the Ballot. Capitalized terms used but not defined herein shall have the meanings assigned to them in the Plan. **PLEASE READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.** You may wish to seek legal advice concerning the Plan and the treatment of your Claim under the Plan.

b.  The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon Holders of Claims and Interests if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims or at least two thirds in amount of Interests in at least one class that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation set forth in section 1129(a) of the Bankruptcy Code.

c.  To ensure that your Ballot is counted, you *must* complete and submit this Ballot as instructed herein. **Ballots will not be accepted by electronic mail or facsimile.**

d.  <u>Use of Hard Copy Ballot</u>. To ensure that your hard copy Ballot is counted, you must: (a) complete your Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 1 of the Ballot; and (c) clearly sign and return your Ballot as instructed herein.

e.  <u>Use of Online E-Ballot Portal</u>. To ensure that your electronic Ballot is counted, please follow the instructions of the Debtors' case administration website at: https://cases.ra.kroll.com/HFS/. You will need to enter your unique E-Ballot identification number indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile or electronic means (other than the online balloting portal).**

f.  Your Ballot (whether submitted by hard copy or through the online balloting portal) *must* be returned to the Claims and Noticing Agent so as to be *actually received* by the Claims and Noticing Agent on or before the Voting Deadline. <u>**The Voting Deadline is March 3, 2025 at 4:00 p.m., prevailing Central Time**</u>.

g.  If a Ballot is received after the Voting Deadline, it will not be counted unless the Debtors determine otherwise or as permitted by applicable law or court order. In all cases, Holders should allow sufficient time to assure timely delivery. No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors. A Ballot will not be counted unless received by the Claims and Noticing Agent.

h.  The Holder understands and acknowledges that if multiple Ballots are submitted voting the Claims set forth in Item 1, only the latest, valid Ballot voting the Claims and received by the Claims and Noticing Agent before the Voting Deadline shall be deemed to reflect the voter's intent and thus to supersede and revoke any prior Ballots received by the Claims and Noticing Agent.

14

i.      The Ballot does not constitute, and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission with respect to any Claim. The Ballot may not be used for any purpose other than to vote to accept or reject the Plan and to make certain certifications with respect thereto.

j.      Please be sure to sign and date your Ballot. If you are completing the Ballot on behalf of an Entity, indicate your relationship with that Entity and the capacity in which you are signing.

k.      You must vote your entire Claim in each Voting Class either to accept or reject the Plan and may not split your vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan as to a particular Voting Class will not be counted as a vote to accept or reject the Plan as to that Class.

l.      The method of delivery of Ballots to the Claims and Noticing Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Noticing Agent *actually receives* the executed Ballot. In all cases, Holders should allow sufficient time to assure timely delivery.

m.      The following Ballots will not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder; (b) any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote on the Plan; (c) any unsigned Ballot; (d) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan; and/or (e) any Ballot submitted by a party not entitled to cast a vote with respect to the Plan.

n.      If you hold Claims in more than one Class under the Plan, you may receive more than one Ballot. Each Ballot votes only your Claims as indicated on that Ballot. Please complete and return each Ballot you receive.

o.      If your Ballot (a) is not counted for voting purposes for any reason, including because it does not conform to the instructions described in your Ballot but (b) indicates your election to opt-out of the Release by Holders of Claims and Interests and the Wage and Labor Law Releases, your election to opt-out of the Release by Holders of Claims and Interests shall be deemed valid and you will not be deemed a "Releasing Party" under the Plan, so long as your Ballot is actually received by the Claims and Noticing Agent by the Voting Deadline.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR IF YOU NEED ADDITIONAL COPIES OF THE ENCLOSED MATERIALS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT (I) BY WRITING TO: H-FOOD HOLDINGS, LLC, C/O KROLL RESTRUCTURING ADMINISTRATION LLC, 850 THIRD AVENUE, SUITE 412 BROOKLYN, NY 11232, OR (II) BY EMAIL TO HFSINFO@RA.KROLL.COM (WITH "HFS SOLICITATION INQUIRY" IN THE SUBEJCT LINE) OR (III) CALLING (888) 510-7189 (U.S./CANADA, TOLL-FREE) OR +1 (646) 937-7810 (INTERNATIONAL).**

**THE CLAIMS AND NOTICING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**<u>PLEASE SUBMIT YOUR BALLOT PROMPTLY</u>**

## **EXHIBIT 5**

**Cover Letter**

[●], 2025

TO:   **Holders of Class 3 First Lien Claims**
       **Holders of Class 4 Second Lien Term Loan Claims**
       **Holders of Class 5 Senior Unsecured Notes Claims**
       **Holders of Class 6 General Unsecured Claims**

H-Food Holdings, LLC, and its affiliated debtors (collectively, the "Debtors")[1] are writing to inform you that the Debtors commenced the solicitation of votes to accept or reject the *Second Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC, and its Affiliated Debtors* (as may be amended, modified, or supplemented from time to time, the "Plan")[2] on [●], 2025. The Plan is attached as **Exhibit A** to the Disclosure Statement, and solicitation of the Plan is being conducted in accordance with chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On November 22, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

**You are receiving this notice because you are either a Holder of a (i) First Lien Claim in Class 3, (ii) Second Lien Term Loan Claim in Class 4, (iii) Senior Unsecured Notes Claim in Class 5, or (iv) General Unsecured Claim in Class 6, that is entitled to vote on the Plan in accordance with the applicable Ballot. The Plan and Disclosure Statement have been distributed with this letter (the "Cover Letter") and are accessible for free on the Debtors' restructuring website: https://cases.ra.kroll.com/HFS/. In addition, the Disclosure Statement and proposed Plan are on file with the Bankruptcy Court and may be reviewed, for a fee, by accessing the Bankruptcy Court's website, https://www.txs.uscourts.gov. Note that a PACER password and login are needed to access documents on the Bankruptcy Court's website. A PACER password can be obtained at: www.pacer.uscourts.gov. Copies of the Disclosure Statement and proposed Plan may also be available for review with the Clerk of the Bankruptcy Court, 515 Rusk Street, 4th Floor, Houston, Texas 77002, between the hours of 8:00 a.m. to 5:00 p.m., prevailing Central Time, Monday through Friday.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: H-Food Holdings, LLC (6072); HFS Sub, LLC (8177); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Hearthside Food Solutions, LLC (8653); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Peacock Engineering Company II, LLC (N/A); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services, LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783). The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC, and its Affiliated Debtors* (the "Disclosure Statement"), as applicable. The Statements contained herein are summaries of the provisions contained in the Plan and Disclosure Statement and do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred therein. If there is a discrepancy between the terms herein and the Plan or Disclosure Statement, the Plan or Disclosure Statement, as applicable, shall govern and control.

If you have any questions regarding this Cover Letter, you should contact the Debtors' claims and noticing agent, Kroll Restructuring Administration LLC (the "Claims and Noticing Agent"): (a) via writing to H-Food Holdings, LLC, Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (b) via email at HFSInfo@ra.kroll.com (with "HFS Solicitation Inquiry" in the subject line); and/or (c) via telephone, by calling the Debtors' restructuring hotline at (888) 510-7189 (U.S./Canada, Toll-Free) or +1 (646) 937-7810 (International, Toll) and requesting to have a member of the solicitation team contact you.

On the Petition Date, the Debtors entered into a global Restructuring Support Agreement (the "RSA") with its key stakeholders, the form of which is attached to the Disclosure Statement as Exhibit B.   The primary purpose of the Plan is to comprehensively restructure the Company's capital structure.   **Importantly, all Holders of Allowed Class 1 Other Secured Claims and Class 2 Priority Non-Tax Claims will be paid in full under the Plan.**   The Debtors' restructuring will be accomplished through, among other things, a reduction of more than $1.9 billion of its debt and infusion of $200 million of new equity capital at exit.   The Debtors believe that any valid alternative restructuring proposal would result in significant delays, litigation, and additional costs and would jeopardize recoveries for Holders of Class 3 First Lien Claims, Class 4 Second Lien Term Loan Claims, Class 5 Senior Unsecured Notes Claims, and Class 6 General Unsecured Claims.

## KEY TERMS OF THE PLAN

The proposed Plan contains the following key terms to take effect upon the Debtors' emergence from their chapter 11 cases:

- Except to the extent that Holders agree to less favorable treatment, all Holders of Allowed Other Secured Claims and Priority Non-Tax Claims will receive payment in full in cash in amounts equal to their applicable Claims;

- Except to the extent that a Holder of an Allowed First Lien Claim agrees to a less favorable treatment, on the Effective Date, each such Holder shall receive, pursuant to the Restructuring Transactions, its Pro Rata share of:

  - 100% of the Exit First Lien Term Loans;

  - 100% of Reorganized Equity, subject to dilution by the Equity Rights Offering and the Management Incentive Plan; and

  - If any of the Second Lien Term Loan Claims Class, the Senior Unsecured Notes Claims Class, or the General Unsecured Claims Class do not vote to accept the Plan, the cash distribution that would otherwise have been made to any such rejecting Class(es).

  - Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) that properly exercises its rights under the Equity Rights Offering to purchase Reorganized Equity shall receive such Reorganized Equity on the Plan Effective Date.

2

- Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment of such Claim, each Holder of a Second Lien Term Loan Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

  - <u>if Class 4 votes to accept the Plan</u>: (1) its Pro Rata share of 100% of the Second Lien Term Loan Claims Cash Recovery; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the Second Lien Term Loan Claims Cash Recovery shall be reduced on a ratable basis (determined based on the Second Lien Term Loan Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Senior Unsecured Notes Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Second Lien Term Loan Claims Cash Recovery, and (2) the Required Lenders (as defined in the First Lien Credit Agreement) shall waive, and shall cause the applicable First Lien Agent to waive, any turnover or similar rights in favor of the First Lien Lenders with respect to such distribution on account of the Intercreditor Agreement; or

  - <u>if Class 4 votes to reject the Plan</u>, no recovery or distribution on account of such Claim, and all Second Lien Term Loan Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect;

  - *provided* that, to the extent the Senior Unsecured Notes Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Second Lien Term Loan Claims Class, then the Second Lien Term Loan Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms.

- Except to the extent that a Holder of an Allowed Senior Unsecured Notes Claim agrees to a less favorable treatment of such Claim, each Holder of a Senior Unsecured Notes Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

  - <u>if Class 5 votes to accept the Plan</u>, its Pro Rata share of 100% of the Senior Unsecured Notes Cash Recovery; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the Senior Unsecured Notes Cash Recovery shall be reduced on a ratable basis (determined

based on the Senior Unsecured Notes Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and General Unsecured Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the Senior Unsecured Notes Cash Recovery; or

- <u>if Class 5 votes to reject the Plan</u>, no recovery or distribution on account of such Claim, and all Senior Unsecured Notes Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect;

- *provided* that to the extent the Second Lien Term Loan Claims Class is offered, as a Class, rights, opportunities (including, without limitation, the opportunity to participate in the Equity Rights Offering) or treatment that is more favorable on a ratable basis than that provided to the Senior Unsecured Notes Claims Class, then the Senior Unsecured Notes Claims Class shall be ratably offered such more favorable rights, opportunities or treatment on equivalent terms.

- Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Claim, each Holder of a General Unsecured Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Plan Effective Date:

  - <u>if Class 6 votes to accept the Plan</u>, the lower of: (1) its Pro Rata share of 100% of the General Unsecured Claims Cash Recovery; and (2) Cash in an amount equal to 6.0% of such Allowed General Unsecured Claim; *provided*, that if the aggregate amount of UCC Fees exceeds the UCC Fees Threshold, the General Unsecured Claims Cash Recovery shall be reduced on a ratable basis (determined based on the General Unsecured Claims Cash Recovery divided by the total Unsecured Claims Cash Recovery) with the Cash recovery provided to (or would have been provided had such Class voted to accept the Plan) and on account of Second Lien Term Loan Claims and Senior Unsecured Notes Claims until the aggregate amount of UCC Fees exceeds $25 million, after which no further deduction shall apply; *provided*, *further*, that, for the avoidance of doubt, any UCC Fees in excess of $25 million shall not reduce the General Unsecured Claims Cash Recovery; or

  - <u>if Class 6 votes to reject the Plan</u>, no recovery or distribution on account of such Claim, and all General Unsecured Claims shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect.

4

Please carefully review the enclosed Disclosure Statement and Plan for details about voting, recoveries, the Debtors' proposed financial restructuring, the Debtors' financial performance, and other matters relevant to your decision whether to vote to accept or reject the Plan.

The Debtors are confident that the Plan preserves the going-concern value of the Debtors' businesses and maximizes recoveries for all stakeholders. If the Plan is confirmed, you, as Holders of Claims, as well as other interested parties, will benefit because the Plan provides for a better recovery than would occur if the Debtors were to liquidate in a chapter 7 proceeding.

---

**BINDING NATURE OF THE PLAN:**

IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS OR INTERESTS TO THE <u>MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER</u> WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM OR INTEREST IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

IF YOU FAIL TO OPT OUT OF OR OBJECT BY MARCH 3, 2025 EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE CONFIRMATION TO THE RELEASES SET FORTH IN <u>ARTICLE VIII</u> OF THE PLAN, YOU WILL BE DEEMED TO CONSENT TO AND BE BOUND BY THE RELEASES SET FORTH IN THE PLAN, TO THE EXTENT APPLICABLE.

---

THE DEBTORS STRONGLY URGE YOU TO VOTE IN FAVOR OF THE PLAN.

---

Sincerely,

H-Food Holdings, LLC

on behalf of itself and its affiliates

**<u>EXHIBIT 6</u>**

**Equity Rights Offering Procedures**

# HFS MATTERHORN TOPCO, INC.

## EQUITY RIGHTS OFFERING PROCEDURES

**Holders of Allowed First Lien Claims who are Eligible Offerees[1] are being offered Subscription Rights (as defined herein) to subscribe for Equity Rights Offering Shares (as defined herein) in the Equity Rights Offering, as set forth in these Equity Rights Offering Procedures. Capitalized terms used and not defined herein shall have the meaning assigned to them in the Plan (as defined herein) or the Equity Rights Offering Backstop Commitment Agreement (as defined herein).**

**Holders of Allowed First Lien Claims must complete the Subscription Form (defined below and attached hereto as <u>Exhibit A</u>).**

**Each Equity Rights Offering Share (including any Unsubscribed Share (as defined herein) purchased by the Holders of First Lien Claims[2] that are parties to the Equity Rights Offering Backstop Commitment Agreement (the "<u>Equity Rights Offering Backstop Parties</u>")[3] in accordance with the Equity Rights Offering Backstop Commitment Agreement) is being distributed and issued by HFS Matterhorn Topco, Inc. without registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or any state or local law requiring registration for offer and sale of a security, in reliance upon the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act ("<u>Section 4(a)(2)</u>") and/or Regulation D ("<u>Regulation D</u>") promulgated thereunder, or another available exemption from registration under the Securities Act.**

**No Subscription Rights may be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the Equity Rights Offering Shares, the Allowed First Lien Claims and any related claims), except in connection with a proportional transfer by a Holder of an Allowed First Lien Claim of such underlying Claim, as further described herein, and otherwise in compliance with applicable securities laws.**

---

[1]   "<u>**Eligible Offeree**</u>" means, collectively, each Holder of a First Lien Claim (as defined herein) that is Allowed under the Plan (or, in the case of an Equity Rights Offering Backstop Party, its designated Affiliate, managed fund or account or other designee, in accordance with the terms of the Equity Rights Offering Backstop Commitment Agreement) that is either (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), or (7) under the Securities Act, or an entity in which all of the equity investors are such institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person), and who in each case completes and returns to the Subscription Agent or its nominee, as applicable, by the Expiration Deadline, an eligibility questionnaire to such effect (which questionnaire shall be included in the Subscription Form). For the avoidance of doubt, each Equity Rights Offering Backstop Party is an Eligible Offeree.

[2]   As set forth in the Plan, "<u>**First Lien Claims**</u>" means, collectively, any Claims on account of the First Lien Term Loans and the First Lien Revolving Loans, in the aggregate.

[3]   As set forth in the Plan, the Equity Rights Offering Backstop Parties means the Holders of First Lien Claims that are party to the Equity Rights Offering Backstop Commitment Agreement (or their designated Affiliate(s), managed fund(s) or account(s) or other designee(s) in accordance with the Equity Rights Offering Backstop Commitment Agreement). For the avoidance of doubt, each Equity Rights Offering Backstop Party must be (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), or (7) under the Securities Act, or an entity in which all of the equity investors are such institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person).

None of the Subscription Rights or Equity Rights Offering Shares issuable upon exercise of such rights distributed pursuant to these Equity Rights Offering Procedures have been or will be registered under the Securities Act, or any State or local law requiring registration for offer or sale of a security, and no Equity Rights Offering Share may be sold or transferred except pursuant to an effective registration statement or exemption from registration under the Securities Act. Any Holder of an Allowed First Lien Claim that subscribes for Equity Rights Offering Shares (each, a "**Subscriber**") will be subject to restrictions under the Securities Act on its ability to resell those securities. Such resale restrictions are discussed in more detail in Section VI of the Disclosure Statement (as defined herein), entitled "Transfer Restrictions and Consequences under Federal Securities Law." In addition, holders of Reorganized Equity (as defined herein) are expected to be subject to certain restrictions on transfer under the New Organizational Documents, as further described in the Disclosure Statement.

The Equity Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code (as defined herein). In accordance with section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.

The Subscription Form and all other required documentation to participate in the Equity Rights Offering must be completed and timely submitted, which must be actually and timely received by the Subscription Agent (as defined herein) in no event later than the Subscription Expiration Deadline (as defined herein), and payment of the Aggregate Purchase Price (as defined herein) for such Subscription Rights must be made by the applicable Funding Deadline (as defined herein), in each case, in accordance with all terms and conditions set forth in the Equity Rights Offering Procedures and the Subscription Form, as applicable. All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise of Subscription Rights, shall be determined by the Debtors (as defined herein) in consultation with the Requisite Equity Backstop Parties.[4] Any Equity Rights Offering submissions that do not properly comply with the requirements set forth in the Equity Rights Offering Procedures and the Subscription Form will be deemed not to have been received or accepted until all such defects and irregularities have been timely cured or waived in writing by the Debtors (after consulting with the Requisite Equity Backstop Parties). Unless waived by the Debtors in writing, any defects or irregularities must be cured by the Subscription Expiration Deadline in order to participate in the Equity Rights Offering. The Debtors may, in the exercise of their sole discretion, provide notice to the Subscribers of defects or irregularities in connection with the submission of such Subscription Forms; *provided* that neither the Debtors nor the Requisite Equity Backstop Parties, nor the Reorganized Debtors nor any of their respective employees, Affiliates, or professionals shall incur any liability for giving, or failing to give, such notification and such opportunity to cure. For the avoidance of doubt, the submission of an inaccurate, incomplete, untimely, or otherwise defective Subscription Form or the failure to remit timely and full payment of the Aggregate Purchase Price to the Subscription Agent by the applicable Funding Deadline may result in the irrevocable relinquishment and waiver of a Subscriber's purported right, if any, to participate in the Equity Rights Offering.

---

[4]    The "Requisite Equity Backstop Parties" means the "Required Consenting First Lien Lenders," which is defined in the Restructuring Support Agreement as holders of at least 50.01% of the aggregate outstanding principal amount of First Lien Claims that are held by Consenting First Lien Lenders (as defined in the Restructuring Support Agreement).

**Holders of Allowed First Lien Claims should note the following dates and times relating to the Equity Rights Offering:**

| Date | Calendar Date | Event |
|---|---|---|
| Record Date.................. | 4:00 p.m., prevailing Central Time, on February 4, 2025 | The date fixed by these Equity Rights Offering Procedures for the determination of the Subscription Rights of Holders of an Allowed First Lien Claim. |
| Commencement Date ... | February 5, 2025 | Commencement of the Equity Rights Offering. |
| Subscription Expiration Deadline........................ | 4:00 p.m., prevailing Central Time, on March 3, 2025, or such later time as permitted pursuant to the Equity Rights Offering Backstop Commitment Agreement | The deadline for Eligible Offerees to subscribe for Equity Rights Offering Shares. To exercise Subscription Rights, Eligible Offerees must: (ii) complete and submit the subscription exercise form (the "**Subscription Form**"), along with all exhibits and annexes thereto (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), each and all of which must be received by Kroll Restructuring Administration, LLC in its capacity as subscription agent for the Debtors (the "**Subscription Agent**") by the Subscription Expiration Deadline; and (ii) no later than the applicable Funding Deadline (as defined herein), execute a wire transfer of the Aggregate Purchase Price for the subscribed-for Equity Rights Offering Shares as to which the Subscriber has elected to pay in Cash. Notwithstanding anything to the contrary herein, Eligible Offerees who are Equity Rights Offering Backstop Parties must deliver the Aggregate Purchase Price by the deadline specified in the Backstop Funding Notice (as defined herein) delivered pursuant to the terms of the Equity Rights Offering Backstop Commitment Agreement, by and among Matterhorn Buyer, LLC, HFS Matterhorn Topco, Inc. and the Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties (as defined herein) party thereto, as the same may be amended, modified, or amended and restated from time to time in accordance with its terms (the "**Equity Rights Offering Backstop Commitment Agreement**"). The Backstop Funding Notice shall be delivered at least ten Business Days, but not more than 15 Business Days, before the Plan Effective Date. Eligible Offerees who are not Equity Rights Offering Backstop Parties must deliver the Aggregate Purchase Price by the Subscription Expiration Deadline. |

To Holders of First Lien Claims:

On November 22, 2024, H-Food Holdings, LLC and certain affiliates (the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**"). On December 13, 2024 the Debtors filed the *Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and its Affiliated Debtors* [Docket No. 187] (as amended, supplemented, or otherwise modified from time to time, the "**Plan**") and the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and its Affiliated Debtors* [Docket No. 188] (as amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code. On January 24, 2025, the Bankruptcy Court entered an order approving the Disclosure Statement [Docket No. [●]], and on [●], the Debtors began sending solicitation packages to Holders of Claims and Interests entitled to vote to accept or reject the Plan, including Holders of First Lien Claims.

Pursuant to the Plan (and, with respect to the Holdback Rights Offering Amount to be purchased by the Equity Rights Offering Holdback Parties (each, as defined herein), pursuant to the Equity Rights Offering Backstop Commitment Agreement), (i) each Eligible Offeree will receive non-certificated rights ("**Subscription Rights**") to purchase shares of common stock in the Reorganized Company (the "**Reorganized Equity**") issued in connection with the Equity Rights Offering (the "**Equity Rights Offering Shares**") and may subscribe for its *pro rata* share (calculated based on the aggregate principal amount of Allowed First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all Allowed First Lien Claims) for an aggregate Equity Rights Offering size equal to approximately 65% of the Equity Rights Offering Amount (the "**Non-Holdback Rights Offering Amount**"), and (ii) each Eligible Offeree that is a party to the Equity Rights Offering Backstop Commitment Agreement named in Schedule C thereto (each, a "**Equity Rights Offering Holdback Party**") will receive Subscription Rights to purchase Reorganized Equity, and will purchase such Equity Rights Offering Holdback Party's percentage of the Holdback Rights Offering Amount (as defined below), as set forth on Exhibit B to the Equity Rights Offering Backstop Commitment Agreement, for an aggregate Equity Rights Offering size equal to approximately 35% of the Equity Rights Offering Amount (the "**Holdback Rights Offering Amount**"); *provided* that, in each case under clauses (i) and (ii) above, such Eligible Offeree or Equity Rights Offering Holdback Party, as applicable, (x) timely and properly executes and delivers its Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent in advance of the Subscription Expiration Deadline, and (y) pays the Aggregate Purchase Price as set forth in the paragraph below.

No Eligible Offeree shall be entitled to participate in the Equity Rights Offering unless the Subscription Agent receives from such Eligible Offeree the Aggregate Purchase Price for the Equity Rights Offering Shares such Eligible Offeree subscribes for (i) in the case of an Eligible Offeree that is not an Equity Rights Offering Backstop Party, by the Subscription Expiration Deadline, and (ii) in the case of an Eligible Offeree that is an Equity Rights Offering Backstop Party, by the deadline set in the funding notice to the Equity Rights Offering Backstop Party (the "**Backstop Funding Notice**") delivered to such Eligible Offeree after the Subscription Expiration Deadline pursuant to the terms of the Equity Rights Offering Backstop Commitment Agreement (each such funding deadline, as set forth under clauses (i) and (ii), a "**Funding Deadline**"), subject to, in each case of clauses (i) and (ii), such Eligible Offeree's right to elect to exercise any portion of its Subscription Rights and pay the Aggregate Purchase Price with DIP Claims (as defined in the Plan, including both the funded amount and the amount of any accrued but unpaid interest, premiums and fees, but excluding expenses and professional fees) and thereby offset, on a dollar-for-dollar basis, its Aggregate Purchase Price under the Equity Rights Offering, and its commitments under the Equity Rights Offering Backstop Commitment Agreement, as applicable, in exchange for such DIP Claims (the "**Non-Cash Option**"). No interest is payable on any advanced funding of the Aggregate Purchase Price.

4

To the extent that any Eligible Offeree has validly elected to exercise any portion of its Subscription Rights pursuant to the Non-Cash Option, at the Plan Effective Date an applicable amount of such Eligible Offeree's DIP Claims shall be automatically forgiven, extinguished, terminated and cancelled in full pursuant to the Plan. If the Equity Rights Offering is terminated for any reason, the Aggregate Purchase Price will be returned promptly in accordance with the wire instructions provided. No interest will be paid on any returned Aggregate Purchase Price.

**No Eligible Offeree shall be entitled to participate In the Equity Rights Offering unless the Aggregate Purchase Price for the Equity Rights Offering Shares for which it subscribes is received by the Subscription Agent by the Subscription Expiration Deadline (or, in the case of an Equity Rights Offering Backstop Party, by the Funding Deadline). For all Eligible Offerees (except an Eligible Offeree that is also an Equity Rights Offering Backstop Party), payment of the Aggregate Purchase Price must be made directly to the Subscription Agent on or before the Subscription Expiration Deadline.**

The Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties have already been designated and are known to the Debtors, pursuant to the Equity Rights Offering Backstop Commitment Agreement. The rights and obligations of the Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties in the Equity Rights Offering shall be governed by the Equity Rights Offering Backstop Commitment Agreement to the extent the rights or obligations set forth therein differ from the rights and obligations set forth in these Equity Rights Offering Procedures or any Subscription Form. For the avoidance of doubt, each Equity Rights Offering Backstop Party and each Equity Rights Offering Holdback Party shall be required to exercise its Subscription Rights in accordance with the terms of the Equity Rights Offering Backstop Commitment Agreement.

**In order to participate in the Equity Rights Offering, you must complete all the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline (or, in the case of the Equity Rights Offering Backstop Parties, by the Funding Deadline), you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Equity Rights Offering.**

1. **Equity Rights Offering; Description of Backstop**

Without limitation to the obligations of the Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties pursuant to the Equity Rights Offering Backstop Commitment Agreement, each Eligible Offeree may exercise either all, a portion of, or none of its Subscription Rights in exchange for (i) Cash, (ii) if applicable, its DIP Claims, as offset, on a dollar-for-dollar basis, pursuant to the Non-Cash Option, or (iii) if applicable, any combination thereof.

**Subject to Section 5 below, only a Holder of an Allowed First Lien Claim as of the Record Date that is an Eligible Offeree who timely and properly submits all documentation and required payments to the Subscription Agent in accordance with the procedures set forth herein may be deemed eligible to participate in the Equity Rights Offering.**

Subject to the terms and conditions set forth in the Plan and these Equity Rights Offering Procedures, each Eligible Offeree is entitled to subscribe for Equity Rights Offering Shares up to a maximum aggregate amount not to exceed an amount equal to the result of (i) the quotient of (x) the aggregate principal amount of Allowed First Lien Claims held by such Eligible Offeree divided by (y) the aggregate principal amount of all Allowed First Lien Claims; multiplied by (ii) the Non-Holdback Rights Offering Amount (the "**Maximum Subscription Amount**"). The Subscription Form shall set forth a purchase price per share of Equity Rights Offering Shares (the "**Equity Rights Offering Share Price**").

The product of the Equity Rights Offering Share Price and the number of Equity Rights Offering Shares to be issued to you in the aggregate and payable in Cash is referred to herein as the "**Aggregate Purchase Price**."

Subject to the terms and conditions set forth in the Plan, these Equity Rights Offering Procedures and the Equity Rights Offering Backstop Commitment Agreement, each Equity Rights Offering Backstop Party and each Equity Rights Offering Holdback Party has certain obligations with respect to the Equity Rights Offering.  In the event of any conflict between these Equity Rights Offering Procedures and the Equity Rights Offering Backstop Commitment Agreement with respect to the obligations of the Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties, the Equity Rights Offering Backstop Commitment Agreement shall govern.

There will be no over-subscription privilege in the Equity Rights Offering.  The Equity Rights Offering will be backstopped, severally and not jointly, by the Equity Rights Offering Backstop Parties pursuant to the Equity Rights Offering Backstop Commitment Agreement.  Any Equity Rights Offering Shares that are unsubscribed by the Holders of Allowed First Lien Claims entitled thereto will not be offered to other Holders of Allowed First Lien Claims but will be purchased by the applicable Equity Rights Offering Backstop Party in accordance with the Equity Rights Offering Backstop Commitment Agreement. Subject to the terms and conditions of the Equity Rights Offering Backstop Commitment Agreement, each of the Equity Rights Offering Backstop Party has agreed to (i) purchase (on a several and not joint basis) its *pro rata* share of the Equity Rights Offering Shares that are not purchased by Holders of Allowed First Lien Claims that are not Equity Rights Offering Backstop Parties in the Equity Rights Offering (the "**Unsubscribed Shares**") and (ii) exercise (on a several and not joint basis) all Subscription Rights that are issued to it pursuant to the Equity Rights Offering, and duly purchase all Equity Rights Offering Shares issuable to it pursuant to such exercise in accordance with the Equity Rights Offering, the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Procedures, and the Plan.

Pursuant to the terms of the Equity Rights Offering Procedures, an Eligible Offeree may, at its sole option, elect to use DIP Claims in lieu of cash to purchase Equity Rights Offering Shares and thereby offset, on a dollar-for-dollar basis, its Aggregate Purchase Price under the Equity Rights Offering and its commitments pursuant to the terms of the Equity Rights Offering Backstop Commitment Agreement in exchange for its DIP Claims.

None of the Subscription Rights distributed in connection with these Equity Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security.

**SUBJECT TO THE TERMS AND CONDITIONS OF THE EQUITY RIGHTS OFFERING PROCEDURES (AND, IN THE CASE OF ANY EQUITY RIGHTS OFFERING BACKSTOP PARTY AND ANY EQUITY RIGHTS OFFERING HOLDBACK PARTY, THE EQUITY RIGHTS OFFERING BACKSTOP COMMITMENT AGREEMENT), ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION FORM ARE IRREVOCABLE.**

2.      **Subscription Period**

The Equity Rights Offering will commence on the Commencement Date and will expire at the Subscription Expiration Deadline (the "**Subscription Period**").

Each Eligible Offeree intending to purchase Equity Rights Offering Shares in the Equity Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Subscription Form by the Subscription Expiration Deadline.

Any exercise of Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored, except that the Reorganized Company shall have the discretion, with the consent of the Requisite Equity Backstop Parties, to allow any exercise of Subscription Rights after the Subscription Expiration Deadline.

The Subscription Expiration Deadline may be extended with the consent of the Requisite Equity Backstop Parties and the Debtors, or as required by law.

### 3. Distribution of the Equity Rights Offering Materials

On the Commencement Date, the Subscription Agent shall distribute, or cause to be distributed, the Equity Rights Offering Procedures and the Subscription Form (collectively, the "**Equity Rights Offering Materials**"), to all Holders of Allowed First Lien Claims that are Eligible Offerees, together with appropriate instructions for the proper completion, due execution, and timely delivery of the executed Subscription Form, and, in the case of Eligible Offerees that are not Equity Rights Offering Backstop Parties, the payment of the Aggregate Purchase Price for its Equity Rights Offering Shares. The Subscription Agent shall use such information only for purposes consistent with the Equity Rights Offering Procedures and any order of the Bankruptcy Court.

Copies of the Equity Rights Offering Materials may also be obtained by Eligible Offerees by contacting the Subscription Agent (i) via email to HFSIssuerServices@is.kroll.com (please reference "HFS Equity Rights Offering" in the subject line), or (ii) by calling +1 (888) 510-7189 (U.S./Canada), or +1 (646) 937-7810 (International).

### 4. Exercise of Subscription Rights

(a)     In order to validly exercise its Subscription Rights, each Eligible Offeree that is not an Equity Rights Offering Backstop Party must:

(i)     return a duly completed and executed Subscription Form (inclusive of its eligibility questionnaire) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, together with applicable annexes and exhibits) to the Subscription Agent, indicating whether such Eligible Offeree is exercising any portion of its Subscription Rights in exchange for Cash or its DIP Claims pursuant to the Non-Cash Option, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

(ii)     in no event later than the Subscription Expiration Deadline, subject to such Eligible Offeree's right to elect to use DIP claims as consideration in the Equity Rights Offering, pay the Cash portion of the Aggregate Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds, in accordance with the wire transfer instructions included in the Subscription Form.

(b)     In order to validly exercise its Subscription Rights, each Eligible Offeree that is an Equity Rights Offering Backstop Party must:

(i)     return a duly completed and executed Subscription Form (inclusive of its eligibility questionnaire) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, together with applicable annexes and exhibits) to the Subscription Agent, indicating whether such Eligible Offeree is exercising any portion of its Subscription

Rights in exchange for Cash or its DIP Claims pursuant to the Non-Cash Option, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

(ii)    in no event later than the date set forth in the Backstop Funding Notice, subject to such Equity Rights Offering Backstop Party's right to elect to use DIP claims as consideration in the Equity Rights Offering, pay the Cash portion of the Aggregate Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the wire transfer instructions included in the Backstop Funding Notice.

All Equity Rights Offering Backstop Parties must pay their applicable funding amount directly to the Subscription Agent or as otherwise permitted or directed by the Equity Rights Offering Backstop Commitment Agreement.

**All Eligible Offerees must deliver their completed Subscription Form (inclusive of the eligibility questionnaire) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, together with applicable annexes and exhibits), and payment of the Aggregate Purchase Price payable for the Equity Rights Offering Shares elected to be purchased by such Eligible Offeree (with respect to the Eligible Offerees that are not Equity Rights Offering Backstop Parties) directly to the Subscription Agent on or before the Subscription Expiration Deadline.** In all cases, Eligible Offerees that are Equity Rights Offering Backstop Parties must deliver their payment of the Aggregate Purchase Price, if applicable, payable for the Equity Rights Offering Shares to be received by such Equity Rights Offering Backstop Party directly to the Subscription Agent in accordance with the Backstop Funding Notice.

Any overpayment in connection with such election will be returned, without interest, to such Eligible Offeree as soon as reasonably practicable in accordance with the wire instructions provided.

In the event that the funds received by the Subscription Agent from any Eligible Offeree (with respect to Eligible Offerees that are not Equity Rights Offering Backstop Parties) do not correspond to the Aggregate Purchase Price payable for the Equity Rights Offering Shares elected to be purchased by such Eligible Offeree, the number of Equity Rights Offering Shares deemed to be purchased by such Eligible Offeree will be the lesser of (a) the number of Equity Rights Offering Shares elected to be purchased by such Eligible Offeree, and (b) a number of Equity Rights Offering Shares determined by dividing the amount of the funds received by the Equity Rights Offering Share Price, in each case up to such Eligible Offeree's pro rata share of the Equity Rights Offering Shares in accordance with these Equity Rights Offering Procedures. For the avoidance of doubt, if an Eligible Offeree has elected the Non-Cash Option in excess of the amount of DIP Claims owned by it and which are eligible to be elected as such in accordance with the terms hereof, then such Eligible Offeree shall be deemed to have elected to pay in Cash in lieu thereof.

The Cash paid to the Subscription Agent in accordance with these Equity Rights Offering Procedures will be deposited and held by the Subscription Agent in a segregated subscription account designated by the Subscription Agent, such account being mutually satisfactory to the Requisite Equity Backstop Parties and the Debtors, until administered in connection with the settlement of the Equity Rights Offering on the Plan Effective Date. The Subscription Agent may not use such Cash for any other purpose prior to the Plan Effective Date and may not encumber or permit such Cash to be encumbered with any lien or similar encumbrance. The Cash held by the Subscription Agent hereunder shall not be deemed part of the Debtors' bankruptcy estates and, for the avoidance of doubt, will be non-interest bearing.

5. **Transfer Restriction; Revocation**

The Subscription Rights corresponding to an Allowed First Lien Claim will trade together with, and be evidenced by, such underlying Allowed First Lien Claim, until the Subscription Expiration Deadline, subject to such limitations, if any, that would be applicable to the transferability of the underlying First Lien Claim.  Holders of Allowed First Lien Claims are permitted to designate one or more affiliates to receive the Subscription Rights without the need to transfer the Allowed First Lien Claim to such affiliate(s), subject to compliance with applicable securities laws.

Once an Eligible Offeree has properly exercised its Subscription Rights (subject to the terms and conditions of the Equity Rights Offering Backstop Commitment Agreement in the case of an Equity Rights Offering Backstop Party), such exercise will be irrevocable unless the Equity Rights Offering is terminated.

**Following the proper exercise of Subscription Rights, AN ALLOWED FIRST LIEN CLAIM MAY <u>NOT</u> BE TRANSFERRED.  Any attempted transfer of such Allowed First Lien Claim by a Holder following the exercise of its Subscription Rights will be cancelled and deemed null and void and having no effect and will not be recognized for any purpose.  Furthermore, following the election by an Eligible Offeree of the Non-Cash Option, SUCH PORTION OF DIP CLAIMS AS TO WHICH SUCH ELECTION WAS MADE MAY <u>NOT</u> BE TRANSFERRED by the electing Eligible Offeree.**

6. **Return of Payment**

If the Equity Rights Offering is not consummated or otherwise terminated prior to the Plan Effective Date, any Cash paid to the Subscription Agent will be returned, without interest, to the applicable Holder of an Allowed First Lien Claim as soon as reasonably practicable, in accordance with the wire transfer instructions provided; *provided*, *however*, that the amount under the DIP Claims that offsets, on a dollar-for-dollar basis, the Aggregate Purchase Price under the Equity Rights Offering or the commitments under the Equity Rights Offering Backstop Commitment Agreement, by the election of the Non-Cash Option, shall remain in place if the Equity Rights Offering is not consummated or otherwise terminated prior to the Plan Effective Date.

Unless the Plan Effective Date has occurred, the Equity Rights Offering will be deemed automatically terminated without any action of any party upon the earlier of (i) withdrawal of the Plan, (ii) termination of the Equity Rights Offering Backstop Commitment Agreement in accordance with its terms, (iii) termination of the Restructuring Support Agreement in accordance with its terms, and (iv) the Outside Date (as defined in the Equity Rights Offering Backstop Commitment Agreement) (as such date may be extended pursuant to the terms of the Equity Rights Offering Backstop Commitment Agreement).

7. **Settlement of the Equity Rights Offering and Distribution of the Equity Rights Offering Shares**

The settlement of the Equity Rights Offering is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Debtors with these Equity Rights Offering Procedures, and the simultaneous occurrence of the Plan Effective Date.  The Debtors intend that the Equity Rights Offering Shares will be issued to the Eligible Offerees and/or to any Affiliates (as defined in section 101(2) of the Bankruptcy Code) as such Eligible Offeree may so designate in the Subscription Form in book-entry form on the books and records of the transfer agent through direct registration.

8.      **Fractional Shares**

No fractional rights or Equity Rights Offering Shares will be issued in the Equity Rights Offering. All share allocations will be rounded down to the nearest whole number solely to avoid fractional shares; *provided* that in no event shall any such rounding reduce the aggregate number of Equity Rights Offering Shares to be issued pursuant to the Equity Rights Offering.

9.      **Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights shall be determined by the Debtors in good faith and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtors will not to be deemed to receive nor otherwise accept Subscription Forms that are incomplete, inaccurate, untimely, or otherwise fail to conform to the requirements set forth in these Equity Rights Offering Procedures and the instructions contained in the Subscription Form.

The Debtors may, in the exercise of their sole discretion, provide notification to such Subscriber of such defects or irregularities and permit such defects or irregularities to be waived, *provided* that such waiver is executed in writing, or otherwise timely cured. For the avoidance of doubt, Subscription Forms will be deemed not to have been received or accepted until all defects or irregularities have been waived in writing or timely cured. Neither the Debtors, the Reorganized Debtors, nor any of their respective employees, Affiliates, or professionals shall incur any liability for giving, or failing to give, such notification or opportunity to cure.

**Before exercising any Subscription Rights, each Eligible Offeree should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.**

10.     **Modification of Procedures**

The Debtors reserve the right to modify these Equity Rights Offering Procedures, or adopt additional procedures consistent with these Equity Rights Offering Procedures, to effectuate the Equity Rights Offering and to issue the Equity Rights Offering Shares (subject to consultation with and the consent of the Requisite Equity Backstop Parties); *provided*, *however*, that the Debtors shall provide written notice, including by electronic mail, to each Holder of an Allowed First Lien Claim of any material modification to these Equity Rights Offering Procedures made after the Commencement Date. In so doing, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effectuate and implement the Equity Rights Offering and the issuance of the Equity Rights Offering Shares. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of any executed and delivered Subscription Form without the reasonable consent of the Eligible Offeree party thereto.

The Debtors may request additional information from time to time to confirm that each participant in the Equity Rights Offering is in fact an Eligible Offeree, including, but not limited to, requiring additional certifications by such participant to that effect and other diligence measures as the Debtors deem reasonably necessary.

All calculations, including, to the extent applicable, the calculation of (i) the principal amount of any Eligible Offeree's Allowed First Lien Claim for the purposes of the Equity Rights Offering, (ii) the amount of DIP Claims held by an Eligible Offeree, and (iii) any Eligible Offeree's Equity Rights Offering Shares, shall be made in good faith by the Debtors and in each case in accordance with any Claim amounts

included in the Plan, and any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

### 11. Inquiries and Transmittal of Documents; Subscription Agent

The instructions to the Equity Rights Offering included in the Subscription Form should be read carefully and strictly followed by the Eligible Offerees.

Questions relating to the Equity Rights Offering should be directed to the Subscription Agent by (i) email to HFSIssuerServices@is.kroll.com (please reference "HFS Equity Rights Offering" in the subject line), or (ii) calling +1 (888) 510-7189 (U.S./Canada), or +1 (646) 937-7810 (International).

The risk of non-delivery of all documents and payments to the Subscription Agent is on the Eligible Offeree electing to exercise its Subscription Rights and not the Debtors or the Subscription Agent.

### 12. Failure to Exercise Subscription Rights

Subscription Rights that are not exercised will be forever and irrevocably relinquished on the Subscription Expiration Deadline. If, on or prior to the Subscription Expiration Deadline, the Subscription Agent for any reason does not receive from an Eligible Offeree a duly completed applicable Subscription Form (inclusive of the eligibility questionnaire) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and any other documentation required by these procedures), or, with respect to Eligible Offerees that are not Equity Rights Offering Backstop Parties, the Aggregate Purchase Price, such Eligible Offeree shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Equity Rights Offering.

Subject to the terms and conditions set forth herein and in the Equity Rights Offering Backstop Commitment Agreement, any attempt to exercise Subscription Rights after the Subscription Expiration Deadline in respect of First Lien Claims shall be null and void and none of the Debtors shall be obligated to honor any such purported exercise received by the Subscription Agent after the Subscription Expiration Deadline regardless of when the documents relating thereto were sent. In all cases, you should allow sufficient time to ensure timely delivery of documentation and, if applicable, the Aggregate Purchase Price by the Subscription Expiration Deadline (or, in the case of the Equity Rights Offering Backstop Parties, the deadline in the Backstop Funding Notice).

**Submission of the applicable Subscription Form through the Subscription Agent's electronic portal is the only acceptable form of submission. You should allow sufficient time to ensure timely delivery of the applicable Subscription Form at or prior to 4:00 p.m., prevailing Central Time, on the Subscription Expiration Deadline. The Subscription Agent, Kroll Restructuring Administration, LLC, may be contacted by (i) emailing HFSIssuerServices@is.kroll.com (please reference "HFS Equity Rights Offering" in the subject line), or (ii) calling +1 (888) 510-7189 (U.S./Canada), or +1 (646) 937-7810 (International).**

*PLEASE FOLLOW THE INSTRUCTIONS IN THE SUBSCRIPTION FORM*

**The Subscription Expiration Deadline is 4:00 p.m., prevailing Central Time, on March 3, 2025.**

**Eligible Offerees that are not Equity Rights Offering Backstop Parties should follow the payment instructions provided in the Subscription Form. Eligible Offerees that are Equity Rights Offering Backstop Parties should follow the payment instructions in the Backstop Funding Notice.**

**Eligible Offerees that are not Equity Rights Offering Backstop Parties must deliver the appropriate funding directly to the Subscription Agent no later than the Subscription Expiration Deadline. Eligible Offerees that are Equity Rights Offering Backstop Parties must deliver the appropriate funding directly to the Subscription Agent no later than the date set forth in the Backstop Funding Notice.**

## Exhibit A

**Subscription Form**

**HFS MATTERHORN TOPCO, INC.**

**SUBSCRIPTION FORM
FOR REORGANIZED EQUITY IN THE EQUITY RIGHTS OFFERING**

[1]

**FOR USE BY ELIGIBLE OFFEREES**

**IN CONNECTION WITH THE DEBTORS' PLAN DATED DECEMBER 13, 2024**

**EQUITY RIGHTS OFFERING SUBSCRIPTION EXPIRATION DEADLINE**

**The deadline for Eligible Offerees to subscribe for Equity Rights Offering Shares in the Equity Rights Offering is 4:00 p.m., prevailing Central Time, on March 3, 2025, unless otherwise extended pursuant to the terms of the Equity Rights Offering Procedures (the "Subscription Expiration Deadline").  In order to validly exercise the Subscription Rights:**

    **(i)**    **Eligible Offerees must complete and submit the fully completed version of this subscription exercise form (this "Subscription Form"), along with all exhibits and annexes hereto (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), each and all of which must be received by the Subscription Agent at or prior to the Subscription Expiration Deadline; and**

    **(ii)**    **the Aggregate Purchase Price for the subscribed-for Equity Rights Offering Shares as to which the Eligible Offeree has elected to pay in Cash (if any, following any application of any DIP Rolling Amount (as defined below)) must be received by the Subscription Agent at or prior to the applicable Funding Deadline.**

**Eligible Offerees who are Equity Rights Offering Backstop Parties must deliver the appropriate funding on account of the Equity Rights Offering and their Equity Backstop Commitments (as defined in the Equity Rights Offering Backstop Commitment Agreement) by wire transfer of immediately available funds to the account specified in the Backstop Funding Notice at or prior to the Funding Deadline set in the Backstop Funding Notice (in accordance with the Equity Rights Offering Backstop Commitment Agreement).**

**The Subscription Rights distributed and issued pursuant to the Equity Rights Offering Procedures, and the Equity Rights Offering Shares issued upon the exercise of the Subscription Rights, are being distributed and issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), or any state or local law requiring registration for offer and sale of a security, in reliance upon the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act ("Section 4(a)(2)") and/or Regulation D ("Regulation D") promulgated thereunder, or another available exemption from registration under the Securities Act.**

**Neither the distribution of the Subscription Rights nor the offer and sale of the Equity Rights Offering Shares issuable upon exercise of the Subscription Rights distributed pursuant to these**

---

[1]    Capitalized terms used and not defined herein shall have the meaning ascribed to them in the *Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and its Affiliated Debtors* [Docket No. 187] (as amended, supplemented, or otherwise modified from time to time, the "**Plan**") or the Equity Rights Offering Procedures.

Equity Rights Offering Procedures have been or will be registered under the Securities Act or any state or local law requiring registration for offer and sale of a security.

Please consult the Plan, the Disclosure Statement and the Equity Rights Offering Procedures for additional information with respect to this Subscription Form.

If you have any questions, please contact the Subscription Agent (i) via email to HFSIssuerServices@is.kroll.com (please reference "HFS Equity Rights Offering" in the subject line), or (ii) by calling +1 (888) 510 7189 (U.S./Canada), or +1 (646) 937-7810 (International).  Please note that the Subscription Agent is only able to respond to procedural questions regarding the Equity Rights Offering and cannot provide any information beyond that included in the Equity Rights Offering Procedures and this Subscription Form.

SUBJECT TO THE TERMS AND CONDITIONS OF THE EQUITY RIGHTS OFFERING PROCEDURES (AND THE EQUITY RIGHTS OFFERING BACKSTOP COMMITMENT AGREEMENT IN THE CASE OF ANY EQUITY RIGHTS OFFERING BACKSTOP PARTY), ALL SUBSCRIPTIONS FOR EQUITY RIGHTS OFFERING SHARES SET FORTH IN THIS SUBSCRIPTION FORM ARE IRREVOCABLE.

THE EQUITY RIGHTS OFFERING SHARES FOR WHICH AN ELIGIBLE OFFEREE HAS SUBSCRIBED WILL BE ISSUED AS INDICATED ON THIS SUBSCRIPTION FORM (INCLUDING ITS EXHIBITS), REGARDLESS OF ANY SUBSEQUENT TRANSFER OF ITS UNDERLYING ALLOWED FIRST LIEN CLAIMS, AND NEITHER THE DEBTORS NOR THE SUBSCRIPTION AGENT SHALL HAVE ANY LIABILITY IN RESPECT OF SUCH ISSUANCE TO THE APPLICABLE TRANSFEREE OF SUCH CLAIMS.

PLEASE NOTE: NO EQUITY RIGHTS OFFERING SUBMISSION WILL BE VALID UNLESS YOU PAY THE AGGREGATE PURCHASE PRICE FOLLOWING ANY APPLICATION OF ANY DIP ROLLING AMOUNT (UNLESS YOU ARE AN EQUITY RIGHTS OFFERING BACKSTOP PARTY) AT OR PRIOR TO THE SUBSCRIPTION EXPIRATION DEADLINE.  EQUITY RIGHTS OFFERING BACKSTOP PARTIES MUST COORDINATE THE APPROPRIATE FUNDING IN RESPECT OF THE EQUITY RIGHTS OFFERING AND BACKSTOP COMMITMENTS TO THE ACCOUNT SPECIFIED IN THE BACKSTOP FUNDING NOTICE AT OR PRIOR TO THE FUNDING DEADLINE SET IN THE BACKSTOP FUNDING NOTICE, IN ACCORDANCE WITH THE EQUITY RIGHTS OFFERING BACKSTOP COMMITMENT AGREEMENT.

To fund or subscribe, please read, review and/or complete all items below, as applicable.

**Item 1.      Amount of Allowed First Lien Claims.**

The undersigned hereby certifies that as of the Record Date[1], the undersigned is the Holder, or the Authorized Signatory (as defined herein) of such Holder, of the Allowed First Lien Claims in the principal amount set forth below (insert amount on the line below).  For purposes of this Subscription Form, do not adjust the principal amount for any accrued or unmatured interest (i.e., only include the face amount of such Allowed First Lien Claim).

Aggregate principal amount of Allowed First Lien Claims held as of the Record Date:

$ _____

Name of Eligible Offeree: _____

**Only Eligible Offerees (or their designees) are entitled to participate in the Equity Rights Offering, and only with respect to the Allowed First Lien Claims held on the Record Date.  Subject to Section 9 of the Equity Rights Offering Procedures, the eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors, in consultation with the Requisite Equity Backstop Parties and, if necessary, subject to a final and binding determination by the Bankruptcy Court.**

**Item 2.      Subscription Rights.**

        **2(a)        Eligible Offeree Certification.**

Only Eligible Offerees, have the right, but not the obligation, to participate in the Equity Rights Offering. By checking the box below, the undersigned hereby certifies that it is a Holder of a First Lien Claim (as defined in the Equity Rights Offering Procedures) that is Allowed under the Plan (or, in the case of an Equity Rights Offering Backstop Party, its designated Affiliate, managed fund or account or other designee, in accordance with the terms of the Equity Rights Offering Backstop Commitment Agreement) that is either (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), or (7) under the Securities Act, or an entity in which all of the equity investors are such institutional "accredited investors" (which, in the case of (a) and (b) above, for the avoidance of doubt, may not include any natural person).  Please note that checking the box below if you are not an Eligible Offeree may result in forfeiture of your rights to participate in the Equity Rights Offering.  Each Eligible Offeree must, in addition to checking the box below, complete the certification questionnaire to Eligible Offerees (the "Eligible Offeree Certification Questionnaire") included in Exhibit A hereto.

☐        I am an Eligible Offeree.

---

[1]      If a transfer of Allowed First Lien Claims remains unsettled on the register maintained by the First Lien Agent as of the Record Date, the purchaser of such Allowed First Lien Claims (an "Unsettled Claim Holder") (or an affiliated fund thereof) may be designated as a designee by the Eligible Offeree of such Claims to receive all or part of such Eligible Offeree's Equity Rights Offering Shares by completing Exhibit B of this Subscription Form.

3

**2(b)    Calculation of Aggregate Purchase Price for Eligible Offerees.**

**2(b)-1   Calculation of Maximum Number of Equity Rights Offering Shares on Account of the Non-Holdback Rights Offering Amount.**

The maximum number of Equity Rights Offering Shares for which you may subscribe (your "Maximum Subscription Amount") is calculated as follows:

| | | | | |
|---|---|---|---|---|
| **Insert principal amount of Allowed First Lien Claims held as of the Record Date from Item 1** | **X** | **[ ]**<br>**Equity Subscription Rights Factor** | **=** | **Maximum Subscription Amount** (*Round DOWN to nearest whole number*) |

**2(b)-2   Aggregate Purchase Price (prior to any application of any DIP Rolling Amount).**

The undersigned hereby elects to subscribe for Equity Rights Offering Shares on account of the Non-Holdback Rights Offering Amount for an Aggregate Purchase Price equal to the amount shown below, on the terms and subject to the conditions set forth in the Equity Rights Offering Procedures:

| | | | | |
|---|---|---|---|---|
| **Insert the aggregate number of Equity Rights Offering Shares the undersigned elects to subscribe for** (*Amount should be less than or equal to "Maximum Subscription Amount" from Item 2(b)-1 above*) | **X** | **$[ ]**<br>**Equity Rights Offering Share Price** | **=** | **$**<br>**Aggregate Purchase Price** (*Round UP to nearest whole cent*) |

**2(c)    Equity Rights Offering Holdback Party Certification.**

*This Item 2(c), and Item 2(d) below, are **only** for Equity Rights Offering Holdback Parties, each of whom is aware of its status as an Equity Rights Offering Holdback Party.  Please note that checking the box below if you are not an Equity Rights Offering Holdback Party may result in forfeiture of your rights to participate in the Equity Rights Offering.*  Only Equity Rights Offering Holdback Parties are entitled to, and are obligated pursuant to the terms of the Equity Rights Offering Backstop Commitment Agreement, to participate in and subscribe for their committed portions of the Holdback Rights Offering Amount in the Equity Rights Offering.  By checking the box below, the undersigned hereby certifies that it is an Equity Rights Offering Holdback Party.

☐     I am an Equity Rights Offering Holdback Party identified in the Equity Rights Offering Backstop Commitment Agreement.

4

**2(d)    Calculation of Aggregate Purchase Price for Equity Rights Offering Shares.**

**2(d)-1   Calculation of Equity Rights Offering Shares on Account of the Holdback Rights Offering Amount.**

The Equity Rights Offering Shares for which you, as an Equity Rights Offering Holdback Party, are required to subscribe is calculated as follows:

| | | [  ] | | |
|---|---|---|---|---|
| **Insert applicable Direct Investment Percentage (as defined in the Equity Rights Offering Backstop Commitment Agreement)** | **X** | **Total Direct Investment Shares** | **=** | **Applicable Direct Investment Shares** (*Round to nearest whole number*) |

**2(d)-2   Aggregate Purchase Price (prior to any application of any DIP Rolling Amount).**

The Aggregate Purchase Price for the Equity Rights Offering Shares on account of the Holdback Rights Offering Amount is calculated below:

| | | $[  ] | | $ |
|---|---|---|---|---|
| **Insert the number of applicable Direct Investment Shares** (*from Item 2(d)-1 above*) | **X** | **Equity Rights Offering Share Price** | **=** | **Aggregate Purchase Price** (*Round UP to nearest whole cent*) |

**Item 3.    Equity Rights Offering Backstop Party Representation.**

*This Item 3 is **only** for Equity Rights Offering Backstop Parties, each of whom is aware of its status as an Equity Rights Offering Backstop Party.  Please note that checking the box below if you are not an Equity Rights Offering Backstop Party may result in forfeiture of your rights to participate in the Equity Rights Offering.*

☐    I am an Equity Rights Offering Backstop Party identified in the Equity Rights Offering Backstop Commitment Agreement.

For Eligible Offerees that are Equity Rights Offering Backstop Parties that checked the box in this Item 3, payment of the Aggregate Purchase Price shall **ONLY** be made by wire transfer of immediately available funds to the account specified in the Backstop Funding Notice.

**Item 4.    Payment Instructions.**

**4(a)                   Application of DIP Claims to the Aggregate Purchase Price.**

In accordance with the Plan and the Equity Rights Offering Procedures, a DIP Lender (as defined in the Plan) may elect to apply its DIP Claims (as defined in the Plan, including both the funded amount and the amount of any accrued but unpaid interest, premiums and fees, but excluding expenses and professional fees) as of the Record Date to the Eligible Offeree's Aggregate Purchase Price set forth in Item 2(b)-2 and/or Item 2(d)-2 by completing and executing the certification and direction of the DIP Lenders (the

"DIP Lender Certification"), attached hereto as Exhibit C.  A DIP Lender Certification must be completed for each DIP Lender that will be applying DIP Claims to the Eligible Offeree's Aggregate Purchase Price.

The undersigned hereby certifies that as of the Record Date, the undersigned is the Holder, or the Authorized Signatory of such Holder, of the DIP Claims in the principal amount set forth below:

| | | [ ]<br>**Adjustment Factor** | | **DIP Claims eligible to be applied as DIP Rolling Amount towards the Aggregate Purchase Price**<br>(*Round DOWN to nearest whole number*) |
|---|---|---|---|---|
| **Insert principal amount of DIP Claims held as of the Record Date** | **X** | | **=** | |

The undersigned hereby certifies that attached to this Subscription Form are DIP Lender Certification(s) to apply DIP Claims to the Aggregate Purchase Price (the "DIP Rolling Amount") in the aggregate amount shown below, on the terms and subject to the conditions set forth in the Equity Rights Offering Procedures:

| **DIP Rolling Amount:** | $ |
|---|---|
| | **Insert the aggregate amount of DIP Claims to be applied to the Aggregate Purchase Price as set forth on the DIP Lender Certification(s)**<br>(*Amount should not be greater than the "Aggregate Purchase Price" from Item 2(b)-2 and Item 2(d)-2 above or greater than the aggregate amount of DIP Claims reflected above and on the DIP Lender Certification(s)*)<br>(*Round __UP__ to nearest whole cent*) |

For the avoidance of doubt, if an Eligible Offeree that is also a DIP Lender has elected to apply DIP Claims to its Aggregate Purchase Price in excess of the amount of DIP Claims owned by it and which are eligible to be elected as such in accordance with the terms of the Equity Rights Offering Procedures, then such Eligible Offeree shall be deemed to have elected to pay in cash with respect to such excess.

### 4(b) Cash Payment of the Net Aggregate Purchase Price.

### 4(b)-1 Calculation of the Net Aggregate Purchase Price.

The Aggregate Purchase Price net of the DIP Rolling Amount (the "Net Aggregate Purchase Price") is calculated as follows:

| $ | | $ | | $ |
|---|---|---|---|---|
| **Insert the Aggregate Purchase Price from Item 2(b)-2 and, if applicable, Item 2(d)-2** | **−** | **Insert the DIP Rolling Amount from Item 4(a)** | **=** | **Net Aggregate Purchase Price** (*Round UP to nearest whole cent*) |

6

**4(b)-2   Payment Instructions for the Net Aggregate Purchase Price.**

For Eligible Offerees (other than Equity Rights Offering Backstop Parties) the Net Aggregate Purchase Price set forth in Item 4(b)-1 (if greater than $0) shall be paid to the Subscription Agent **ONLY** in accordance with the following wire instructions:

| Bank Name: | Citibank NA |
|---|---|
| Bank Address: | 153 East 53rd Street, 23rd Floor, New York, NY 10022 |
| ABA/Routing No.: | 021000089 |
| SWIFT (for international wires): | CITIUS33 |
| Account Name: | Kroll Restructuring Administration LLC as Agent for HFS Matterhorn TopCo, Inc. Subscription Account |
| Account No.: | |
| Reference: | [*Insert the Form Number included in the memo field from the confirmation email provided by the Subscription Agent.*]² |

**Item 5.     Wire Refund.**

Please provide the wire information in the event a refund of the Aggregate Purchase Price is required pursuant to the Equity Rights Offering Procedures:

| Bank Name: | |
|---|---|
| Bank Address: | |
| ABA/Routing No.: | |
| SWIFT (for international wires): | |
| Account Name: | |
| Account No.: | |
| Reference: | |

---

²     Upon submission of your Subscription Form, the Subscription Agent will provide you with a unique form number (a "Form Number") that must be included in the wire reference section. Please note that the failure to include the claimant name or Form Number in the reference field of any domestic or international wire payment may result in the rejection of the corresponding rights offering submission. If a designee is wiring all or part of the Net Aggregate Purchase Price, such designee(s) must also include the unique Form Number in the wire reference section.

**Item 6.**     **Equity Rights Offering Shares Delivery Information.**

PLEASE COMPLETE THE ITEMS BELOW IF YOU ARE PARTICIPATING IN THE EQUITY RIGHTS OFFERING AND NOT DESIGNATING ALL OF YOUR EQUITY RIGHTS OFFERING SHARES.

PLEASE COMPLETE THE SPECIAL DELIVERY INSTRUCTIONS (THE "SPECIAL DELIVERY INSTRUCTIONS") SET FORTH IN EXHIBIT B HERETO, IF YOU ARE DESIGNATING ANY OTHER PERSON TO RECEIVE ALL OR A PORTION OF THE EQUITY RIGHTS OFFERING SHARES.

IF YOU ARE DESIGNATING ANOTHER PERSON TO RECEIVE A PORTION (BUT NOT ALL) OF THE EQUITY RIGHTS OFFERING SHARES YOU MUST COMPLETE THE ITEMS BELOW *AND* IN EXHIBIT B HERETO.

Number of Equity Rights Offering Shares to be delivered to you (must be expressed as a whole number with no fractions) (the sum of this number and the number set forth in Exhibit B hereto should equal the aggregate number set forth in Item 2(b)-2 and, if applicable, Item 2(d)-2): _____

Please complete the information below regarding the Eligible Offeree in whose name the Equity Rights Offering Shares in the number indicated above should be registered by the Company's transfer agent. It is strongly recommended that the below information be typed to ensure that it is legible.

**A.**     **Registration Name, Address and Contact Information:**

Registration Name: _____

Address (including street address, city, state and zip code): _____

Telephone: _____

Email: _____

**B.**     **Account Type:**

Please indicate the "account type" that may be used in connection with registration of your Equity Rights Offering Shares. Please check only one box:

☐     **INDIVIDUAL ACCOUNT**; **IRA ACCOUNT**;

☐     **CORPORATIONS (S-CORP)**: (ASSOCIATED, ASSOCIATES, ASSOCIATION, CO, CO. COMPANY, CORP, CORPORATE/PARTNER, ENTERPRISE(S), FUND, GROUP, INCORPORATED, INC, INTERNATIONAL, INTL, LIMITED, LTD, LIFETIME LIMITED COMPANY, LLC, L.L.C., PARTNER, PARTNERS, PLC, PUBLIC LIMITED COMPANY);

☐     **PARTNERSHIP**: (LP, L P, L.P., LLP, LIMITED PARTNERSHIP, LIFETIME LIMITED PARTNERSHIP);

☐     **BANK**;

☐ **NOMINEE ACCOUNTS**; **C-CORP**;

☐ **NON-PROFIT**: (CEMETERY, CHURCH, COLLEGE, COMMISSION FOR CHILDREN WITH, COMMISSION FOR HANDICAPPED, COMMISSION MINISTRIES INC, COMMISSION OF PUBLIC WORKS, COMMISSION OF BANKING & FOUNDATIONS, HOSPITAL, SCHOOL, SYNAGOGUE, UNIVERSITY);

☐ **FIDUCIARY ACCOUNT**: (CUSTODIAN, CO-TRUSTEE, ESTATE, EXECUTOR, EXECUTRIX, FBO, F/B/O, FAO, FIDUCIARY TRUST, ITF, LIFE TEN, PENSION PLAN, INDIVIDUAL NAME PROFIT SHARING PLAN, RETIREMENT PLAN, 401K PLAN, SELL TRANSFER PLEDGE, STATE UNIFORM TRANSFER TO MINOR'S ACT, TTEE, TTEES, UW, UTMA, UGMA, USUFRUCT, UNIFIED, UNIF GIFT MIN ACT, UNIF TRUST MIN ACT, UNIFIED GIFT TO MINORS ACT, UNIFORM GIFT TO MINORS, UNIFORM TRANSFER TO MINORS, GRANT (GRANTOR ANNUITY TRUST));

☐ **TENANTS IN COMMON**;

☐ **TENANTS BY ENTIRETY**: (TEN ENT, TENANTS ENT, TENANTS ENTIRETY, TENANTS BY ENTIRETY, TENANTS BY ENTIRETIES);

☐ **JOINT TENANTS**: (JT TEN, JT TEN WROS, JT WROS, J/T/W/R/S, JOINT TENANCY, JOINT TENANTS WITH RIGHT OF SURVIVORSHIP, JT OWNERSHIP, IF JT ACCOUNT WITH TOD); or

☐ **COMMUNITY PROPERTY**: (COM PROP, COMM PROP, COM PROPERTY, COMM PROPERTY, MARITAL PROPERTY, HWACP, HUSBAND & WIFE AS COMMUNITY PROPERTY).

**C.  DTC participant for the deposit of the Equity Rights Offering Shares indicated above, in the event such Equity Rights Offering Shares are allocated through DTC and are DTC eligible:**

DTC Participant Name: _____

DTC Participant Number: _____

Beneficial Holder Name: _____

Beneficial Holder Account Number: _____

Information regarding your contact at the DTC participant:

DTC Participant Contact Name: _____

DTC Participant Contact Telephone: _____

DTC Participant Contact Email: _____

**Item 7.       Eligible Offeree Certification.**

The undersigned hereby certifies that (a) the undersigned was the Holder of the Allowed First Lien Claims set forth in Item 1 above as of the Record Date, or the authorized signatory (the "Authorized Signatory") of such Holder acting on behalf of such Holder, (b) the Eligible Offeree has reviewed a copy of the Plan, the Disclosure Statement, and the Equity Rights Offering Procedures, and (c) the Eligible Offeree understands that the exercise of the Subscription Rights under the Equity Rights Offering is subject to all the terms and conditions set forth in the Plan, the Equity Rights Offering Procedures, and, if applicable, the Equity Rights Offering Backstop Commitment Agreement.

**The Eligible Offeree (or the Authorized Signatory on behalf of such Eligible Offeree) acknowledges that, by executing this Subscription Form, the Eligible Offeree named below, (i) has elected to exercise the Subscription Rights for the Aggregate Purchase Price designated in Item 2(b)-2 and Item 2(d)-2 above, including, if applicable, the DIP Rolling Amount, and (ii) will be bound to pay such Aggregate Purchase Price and DIP Rolling Amount, as applicable, it has agreed to fund or subscribed for, respectively.**

Date: _____

Name of Eligible Offeree: _____

U.S. Federal Tax EIN/SSN: _____

Signature: _____

Name of Signatory: _____

Title: _____

Telephone: _____

Email: _____

Please deliver each of the following completed documents to the Subscription Agent on or before the Subscription Expiration Deadline:

(i)        this Subscription Form;

(ii)       the Eligible Offeree Certification Questionnaire on Exhibit A hereto for the Eligible Offeree and each designee (if you are seeking to participate in the Equity Rights Offering);

(iii)      if applicable, Special Delivery Instructions on Exhibit B hereto for each designee of Equity Rights Offering Shares;

(iv)      if applicable, DIP Lender Certifications on Exhibit C hereto for each DIP Lender that has elected to apply all or any portion of its DIP Claims to the Aggregate Purchase Price, as applicable; and

(v)       the IRS Form W-8 or IRS Form W-9, as applicable, for the Eligible Offeree and each designee.

The foregoing documents must be submitted to the Subscription Agent via the electronic website portal (the "E-Portal").

To access the E-Portal, visit https://cases.ra.kroll.com/HFS, under the "Quick Link" section of the website, click on the "Submit Equity Rights Offering Subscription Form" and follow the instructions to submit your Subscription Form, along with all exhibits and annexes hereto (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and all other documentation required to participate in the Equity Rights Offering.

**THE E-PORTAL IS THE ONLY VALID METHOD OF SUBMISSION AND NO OTHER METHODS WILL BE ACCEPTED.  Delivery of the Subscription Form or any of the related documents in any way other than as set out above will not constitute a valid exercise of Subscription Rights.  Delivery of this Subscription Form or any of the related documents to any person other than the Subscription Agent does not constitute delivery to the Subscription Agent.**

<u>**EXHIBIT A**</u>

**Eligible Offeree Certification Questionnaire**

**IN ORDER TO PARTICIPATE IN THE EQUITY RIGHTS OFFERING, YOU MUST COMPLETE THIS QUESTIONNAIRE.**

The Equity Rights Offering Shares are being distributed and issued by HFS Matterhorn Topco, Inc. without registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or any state or local law requiring registration for offer and sale of a security, in reliance upon the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act ("<u>Section 4(a)(2)</u>") and/or Regulation D ("<u>Regulation D</u>") promulgated thereunder, or another available exemption from registration under the Securities Act.

Accordingly, each Eligible Offeree that submits this form and elects to subscribe for Equity Rights Offering Shares in the Equity Rights Offering must complete the questionnaire below and certify that it is either:

☐ a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act;

☐ an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), or (7) under the Securities Act; or

☐ an entity in which all of the equity investors are institutional "accredited investors" within the meaning of Rule 501(a)(1), (2), (3), or (7) under the Securities Act.

☐ none of the above.

**If you mark none of the above, you are <u>not</u> permitted to participate in the Equity Rights Offering.**

<u>**EXHIBIT B**</u>

**Equity Rights Offering Shares**

**Special Delivery Instructions**

**IF THERE IS MORE THAN ONE DESIGNEE, COMPLETE A SEPARATE FORM
FOR <u>EACH</u> DESIGNEE.**

**YOU MUST SPECIFY THE NUMBER OF EQUITY RIGHTS OFFERING SHARES
APPLICABLE FOR <u>EACH</u> DESIGNEE**

**Please complete ONLY if the Equity Rights Offering Shares are to be issued in the name of
someone OTHER than the participating Eligible Offeree, including any affiliate or Unsettled Claim
Holder (or an affiliate thereof).**

**Each designee must also complete an IRS Form W-8 or IRS Form W-9, as applicable, and the
Eligible Offeree Certification Questionnaire.**

Number of Equity Rights Offering Shares being designated (must be expressed as a whole number with no fractions): _____

Please complete the information below regarding the designee in whose name the Equity Rights Offering Shares in the number indicated above should be registered by the Company's transfer agent.  It is strongly recommended that the below information be typed to ensure that it is legible.

U.S. Federal Tax EIN/SSN (optional for non-U.S. persons): _____

☐  If <u>**not**</u> a U.S. person, check here and attach appropriate IRS Form W-8

☐  If a U.S. person, check here and attach IRS Form W-9

**A.  Registration Name, Address and Contact Information:**

Registration Name: _____

Address (including street address, city, state and zip code): _____

Telephone: _____

Email: _____

**B.  Account Type:**

Please indicate the "account type" that may be used in connection with registration of the Equity Rights Offering Shares indicated above.  Please check <u>only one</u> box:

☐  **INDIVIDUAL ACCOUNT; IRA ACCOUNT;**

☐  **CORPORATIONS (S-CORP)**: (ASSOCIATED, ASSOCIATES, ASSOCIATION, CO, CO. COMPANY, CORP, CORPORATE/PARTNER, ENTERPRISE(S), FUND, GROUP,

Exhibit B-1

INCORPORATED, INC, INTERNATIONAL, INTL, LIMITED, LTD, LIFETIME LIMITED COMPANY, LLC, L.L.C., PARTNER, PARTNERS, PLC, PUBLIC LIMITED COMPANY);

☐     **PARTNERSHIP**: (LP, L P, L.P., LLP, LIMITED PARTNERSHIP, LIFETIME LIMITED PARTNERSHIP);

☐     **BANK**;

☐     **NOMINEE ACCOUNTS**; **C-CORP**;

☐     **NON-PROFIT**: (CEMETERY, CHURCH, COLLEGE, COMMISSION FOR CHILDREN WITH, COMMISSION FOR HANDICAPPED, COMMISSION MINISTRIES INC, COMMISSION OF PUBLIC WORKS, COMMISSION OF BANKING & FOUNDATIONS, HOSPITAL, SCHOOL, SYNAGOGUE, UNIVERSITY);

☐     **FIDUCIARY ACCOUNT**: (CUSTODIAN, CO-TRUSTEE, ESTATE, EXECUTOR, EXECUTRIX, FBO, F/B/O, FAO, FIDUCIARY TRUST, ITF, LIFE TEN, PENSION PLAN, INDIVIDUAL NAME PROFIT SHARING PLAN, RETIREMENT PLAN, 401K PLAN, SELL TRANSFER PLEDGE, STATE UNIFORM TRANSFER TO MINOR'S ACT, TTEE, TTEES, UW, UTMA, UGMA, USUFRUCT, UNIFIED, UNIF GIFT MIN ACT, UNIF TRUST MIN ACT, UNIFIED GIFT TO MINORS ACT, UNIFORM GIFT TO MINORS, UNIFORM TRANSFER TO MINORS, GRANT (GRANTOR ANNUITY TRUST));

☐     **TENANTS IN COMMON**;

☐     **TENANTS BY ENTIRETY**: (TEN ENT, TENANTS ENT, TENANTS ENTIRETY, TENANTS BY ENTIRETY, TENANTS BY ENTIRETIES);

☐     **JOINT TENANTS**: (JT TEN, JT TEN WROS, JT WROS, J/T/W/R/S, JOINT TENANCY, JOINT TENANTS WITH RIGHT OF SURVIVORSHIP, JT OWNERSHIP, IF JT ACCOUNT WITH TOD); or

☐     **COMMUNITY PROPERTY**: (COM PROP, COMM PROP, COM PROPERTY, COMM PROPERTY, MARITAL PROPERTY, HWACP, HUSBAND & WIFE AS COMMUNITY PROPERTY).

**C.     DTC participant for the deposit of the Equity Rights Offering Shares, in the event the Equity Rights Offering Shares are allocated through DTC and are DTC eligible:**

DTC Participant Name: _____

DTC Participant Number: _____

Beneficial Holder Name: _____

Beneficial Holder Account Number: _____

Information regarding your contact at the DTC participant:

DTC Participant Contact Name: _____

DTC Participant Contact Telephone: _____

DTC Participant Contact Email: _____

**D.     Designee Certification:**

The undersigned designee certifies that the undersigned is an affiliate or an Unsettled Claim Holder (or an affiliate thereof) of an Eligible Offeree with respect to the Equity Rights Offering and hereby agrees to be bound by the terms of the Equity Rights Offering Procedures (including those set forth in the Subscription Form) as though designee were an Eligible Offeree, including, without limitation, the obligations to deliver required documentation (other than the Subscription Form) to the Subscription Agent:

Name of designee: _____

Signature: _____

Name of Authorized Signatory: _____

Title: _____

Telephone: _____

Email: _____

**This Subscription Form, along with all exhibits and annexes hereto (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and all other documentation required to participate in the Equity Rights Offering, must be returned to the Subscription Agent via the E-Portal on or before 4:00 p.m., prevailing Central Time, on March 3, 2025.**

<u>**EXHIBIT C**</u>

**DIP Lender Certification and Direction**

**IF THERE IS MORE THAN ONE DIP LENDER, COMPLETE A SEPARATE CERTIFICATION FOR <u>EACH</u> DIP LENDER.**

The undersigned DIP Lender hereby certifies that the undersigned (a) was the Holder of the DIP Claims in the amounts set forth below as of the Record Date or is the Authorized Signatory of such Holder acting on behalf of such Holder, (b) has reviewed a copy of the Plan, the Disclosure Statement, and the Equity Rights Offering Procedures, (c) understands that it has elected to apply the amount of DIP Claims to the Eligible Offeree's Aggregate Purchase Price, as set forth below, and in accordance with the Equity Rights Offering Procedures and the Plan, and (d) shall not transfer the DIP Claims being elected hereunder from and after the date hereof until the earlier of the termination of the Equity Rights Offering and the Plan Effective Date.

The undersigned DIP Lender hereby directs the DIP Agent to, upon the Plan Effective Date, apply the DIP Claims of such DIP Lender in the amounts set forth below to the Aggregate Purchase Price of the Eligible Offeree set forth herein.

Date: _____

Name of Eligible Offeree: _____

Name of DIP Lender: _____

DIP Claims (amount): $ _____

DIP Claims (amount) to be applied to the Eligible Offeree's Aggregate Purchase Price (insert N/A, if not applicable):

$ _____

DIP Lender Signature: _____

Name of Signatory: _____

Title: _____

Telephone: _____

Email: _____

Please deliver your completed DIP Lender Certification to the Subscription Agent, via the Subscription Agent's E-Portal.  To access the E-Portal, visit https://cases.ra.kroll.com/HFS/, under the "Quick Link" section of the website, click on the "Submit Equity Rights Offering Subscription Form" and follow the instructions to submit your Subscription Form, along with all exhibits and annexes hereto (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and all other documentation required to participate in the Equity Rights Offering.

**THE E-PORTAL IS THE ONLY VALID METHOD OF SUBMISSION AND NO OTHER METHODS WILL BE ACCEPTED.  Delivery of the DIP Lender Certification in any way other than**

Exhibit C-1

as set out above will not be valid.  Delivery of this DIP Lender Certification to any person other than the Subscription Agent does not constitute delivery to the Subscription Agent.

Exhibit C-2

## <u>EXHIBIT 7</u>

**Equity Rights Offering Backstop Commitment Agreement**

**EQUITY RIGHTS OFFERING BACKSTOP COMMITMENT AGREEMENT**

**Dated [●], 2025**

**by and among**

**MATTERHORN BUYER, LLC**

**HFS MATTERHORN TOPCO, INC.**

**and**

**The Commitment Parties identified as such herein**

**Table of Contents**

**Page**

**ARTICLE I THE EQUITY TRANSACTIONS** ................................................................ 2

Section 1.1   The Rights Offering ................................................................ 2
Section 1.2   The Backstop Commitments ................................................... 5
Section 1.3   The Direct Investment Equity Raise ....................................... 6
Section 1.4   Designations and Transfers ..................................................... 7
Section 1.5   Defaults ................................................................................... 9
Section 1.6   Withholding ........................................................................... 10

**ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE DEBTOR AND ISSUER ..... 10**

Section 2.1    Formation ............................................................................. 10
Section 2.2    Power and Authority ............................................................. 10
Section 2.3    Execution and Delivery ........................................................ 10
Section 2.4    Authorized Capital ............................................................... 11
Section 2.5    Issuance and Delivery .......................................................... 11
Section 2.6    Consents and Approvals; No Conflict ................................... 12
Section 2.7    No Broker's Fees .................................................................. 12
Section 2.8    Absence of Certain Changes ................................................. 12
Section 2.9    No Violation; Compliance with Laws .................................... 12
Section 2.10   Legal Proceedings ................................................................ 13
Section 2.11   Labor Relations .................................................................... 13
Section 2.12   Intellectual Property ............................................................ 13
Section 2.13   Title to Real Property ........................................................... 14
Section 2.14   Licenses and Permits ............................................................ 14
Section 2.15   Environmental Matters .......................................................... 14
Section 2.16   Tax Matters .......................................................................... 15
Section 2.17   Employee Benefit Plans ........................................................ 15
Section 2.18   Financial Statements ............................................................. 16
Section 2.19   Material Contracts ................................................................ 16
Section 2.20   Compliance with Anti-Money Laundering Laws .................... 17
Section 2.21   No Unlawful Payments .......................................................... 17
Section 2.22   Insurance .............................................................................. 17
Section 2.23   No General Solicitation ......................................................... 17
Section 2.24   Exclusivity of Representations .............................................. 18

**ARTICLE III   REPRESENTATIONS   AND   WARRANTIES   OF   THE   COMMITMENT PARTIES** ......................................................................................... 19

Section 3.1    Formation ............................................................................. 19
Section 3.2    Power and Authority ............................................................. 19
Section 3.3    Execution and Delivery ........................................................ 19
Section 3.4    Governmental Filings; No Violations; Etc. ............................ 19
Section 3.5    Purchase Intent ..................................................................... 20
Section 3.6    Sophistication ....................................................................... 20
Section 3.7    Reliance on Exemptions ....................................................... 20
Section 3.8    No Broker's Fees .................................................................. 20
Section 3.9    Sufficient Funds ................................................................... 20
Section 3.10   Legal Proceedings ................................................................ 20

**Page**

**ARTICLE IV ADDITIONAL COVENANTS** ................................................................ **21**

Section 4.1     Commercially Reasonable Efforts ................................................ 21
Section 4.2     Conduct of Business .................................................................... 22
Section 4.3     Access to Information, Books and Records .................................. 27
Section 4.4     Blue Sky ...................................................................................... 29
Section 4.5     No Integration; No General Solicitation ...................................... 29
Section 4.6     Use of Proceeds .......................................................................... 29
Section 4.7     DTC Eligibility ............................................................................ 29
Section 4.8     Alternative Restructuring Transactions ....................................... 30
Section 4.9     Further Assurances ...................................................................... 30
Section 4.10    Bankruptcy Court Matters ........................................................... 31
Section 4.11    Tax Matters ................................................................................. 31
Section 4.12    Antitrust Approvals ..................................................................... 31

**ARTICLE V CONDITIONS TO THE OBLIGATIONS OF THE PARTIES** ..................................... **32**

Section 5.1     Conditions to the Obligations of the Commitment Parties ............. 32
Section 5.2     Conditions to the Obligations of the Issuer .................................. 34

**ARTICLE VI TERMINATION** ................................................................................. **35**

Section 6.1     Termination by the Requisite Equity Backstop Parties .................. 35
Section 6.2     Termination by the Issuer ............................................................. 37
Section 6.3     Mutual Termination...................................................................... 39
Section 6.4     Effect of Termination ................................................................... 39

**ARTICLE VII INDEMNIFICATION OBLIGATIONS** ............................................... **40**

Section 7.1     Indemnification Generally ............................................................ 40
Section 7.2     Settlement of Indemnified Claims ................................................ 40
Section 7.3     Contribution ................................................................................ 41
Section 7.4     Indemnification Procedure ........................................................... 41

**ARTICLE VIII MISCELLANEOUS** .......................................................................... **42**

Section 8.1     Survival ....................................................................................... 42
Section 8.2     Notices......................................................................................... 42
Section 8.3     Assignment................................................................................... 43
Section 8.4     No Third Party Beneficiaries......................................................... 44
Section 8.5     Prior Negotiations; Entire Agreement........................................... 44
Section 8.6     Governing Law; Submission to Jurisdiction; Forum Selection; Waiver of Trial by Jury . 44
Section 8.7     Counterparts ................................................................................ 45
Section 8.8     Action by, or Consent or Approval of, the Commitment Parties ..... 45
Section 8.9     Amendments and Waivers ............................................................ 45
Section 8.10    Several Liability ........................................................................... 45
Section 8.11    Specific Performance/Remedies ................................................... 45
Section 8.12    Disclosure.................................................................................... 46
Section 8.13    Other Interpretive Matters ............................................................ 46
Section 8.14    Damages....................................................................................... 47
Section 8.15    No Recourse Against Others ......................................................... 47
Section 8.16    Severability .................................................................................. 47
Section 8.17    Publicity ...................................................................................... 48

**Page**

Section 8.18    Debtor Disclosure Schedules ................................................................. 48

**ARTICLE IX DEFINITIONS** ................................................................................ **48**

**Exhibit A Equity Backstop Percentages** ............................................................. **A-1**

**Exhibit B Direct Investment Percentages** ........................................................... **B-1**

**Exhibit C Equity Rights Offering Procedures** .................................................... **C-1**

**Exhibit D Funding Notice** ................................................................................... **D-1**

## INDEX OF DEFINED TERMS

| Defined Term | Location of Definition |
|---|---|
| Agreement | Preamble |
| Anti-Money Laundering Laws | Section 2.20 |
| Backstop Party Default | Section 1.5(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Backstop Order | Section 5.1(a)(iv) |
| Board | Section 6.2(b) |
| Cash Option | Section 1.1(b) |
| Chapter 11 Cases | Recitals |
| Chosen Courts | Section 8.6(b) |
| Commitment Party(ies) | Preamble |
| Commitment Party Default | Section 1.5(a) |
| Company IT Systems | Section 2.12(b) |
| Company Parties | Preamble |
| Debtor | Preamble |
| Debtors | Recitals |
| Default New Common Stock | Section 1.5(a) |
| Defaulting Commitment Party | Section 1.5(a) |
| Determination Time | Section 1.1(b) |
| Direct Investment Commitments | Recitals |
| Direct Investment Equity Raise | Section 1.3(a) |
| Direct Investment Percentage | Recitals |
| Direct Investment Shares | Recitals |
| Disclosure Statement | Recitals |
| Disclosure Statement Order | Section 5.1(a)(vi) |
| Elected Amount | Section 1.1(b) |
| Environmental Permits | Section 2.15(a) |
| Equity Backstop Commitments | Recitals |
| Equity Backstop Funding Date | Section 1.1(b) |
| Equity Rights Offering Backstop Party(ies) | Preamble |
| Equity Backstop Percentage | Recitals |
| Equity Rights Offering | Recitals |

| Defined Term | Location of Definition |
|---|---:|
| Equity Rights Offering Backstop Premium | Section 1.2(c) |
| Equity Rights Offering Holdback Party(ies) | Recitals |
| Equity Rights Offering Procedures | Section 1.1(a) |
| ERO Shares | Recitals |
| Funding Notice | Section 1.1(b) |
| Holdback Rights Offering Amount | Recitals |
| Indemnified Claim | Section 7.4 |
| Indemnified Person | Section 7.1 |
| Indemnifying Party(ies) | Section 7.1 |
| Intellectual Property Rights | Section 2.12(a) |
| Issuer | Preamble |
| Losses | Section 7.1 |
| Matterhorn Buyer | Preamble |
| Non-Cash Option | Section 1.1(b) |
| Non-Defaulting Commitment Party | Section 1.5(a) |
| Non-Holdback Rights Offering Amount | Recitals |
| Outside Date | Section 6.1(q) |
| Party(ies) | Preamble |
| Per-Share Price | Recitals |
| Petition Date | Recitals |
| Plan | Recitals |
| Premium Shares | Recitals |
| Processed or Processing | Section 2.12(c) |
| Public Disclosure | Section 4.2(a)(O) |
| Related Transferee | Section 1.4(b) |
| Rights Offering Stock | Section 1.1(a) |
| Sanctioned Person | Section 2.21(b) |
| Subscription Expiration Deadline | Section 1.1(b) |
| Subscription Form | Section 1.1(b) |
| Subscription Rights | Recitals |
| Transferee | Section 1.4(b) |

**EQUITY RIGHTS OFFERING BACKSTOP COMMITMENT AGREEMENT**

THIS EQUITY RIGHTS OFFERING BACKSTOP COMMITMENT AGREEMENT, dated as of [●], 2025 (this "Agreement"), by and among HFS Matterhorn Topco, Inc., a Delaware corporation ([which is contemplated to be converted into a Delaware limited liability company on or immediately prior to the Effective Date, in each case,] the "Issuer"), Matterhorn Buyer, LLC, a Delaware limited liability company ("Matterhorn Buyer" or "Debtor"), and each of its affiliates listed on **Schedule A** hereto (together with the Issuer and Matterhorn Buyer, collectively, the "Company Parties") and each holder of First Lien Claims (each, as defined in the Plan) party hereto named in **Schedule B** hereto (collectively, the "Equity Rights Offering Backstop Parties" and, each, an "Equity Rights Offering Backstop Party," which term shall include any of their Affiliated Funds and accounts that becomes a party hereto and subject to the rights and obligations of an Equity Rights Offering Backstop Party in accordance with the terms hereof; provided that any such Affiliated Funds or accounts shall not need to become a party hereto in order to be a designated Related Transferee pursuant to Section 1.4(a) hereof), and each holder of First Lien Claims party hereto named in **Schedule C** hereto (collectively, the "Equity Rights Offering Holdback Parties" and, each, a "Equity Rights Offering Holdback Party," which term shall include any of their Affiliated Funds and accounts that becomes a party hereto and subject to the rights and obligations of a Equity Rights Offering Holdback Party in accordance with the terms hereof; provided that any such Affiliated Funds or accounts shall not need to become a party hereto in order to be a designated Related Transferee pursuant to Section 1.4(a) hereof; and, the Equity Rights Offering Holdback Parties, together with the Equity Rights Offering Backstop Parties, collectively, the "Commitment Parties" and, each, a "Commitment Party").  The Issuer, Matterhorn Buyer, the other Company Parties, the Equity Rights Offering Backstop Parties, and the Equity Rights Offering Holdback Parties are referred to herein, individually, as a "Party" and, collectively, as the "Parties."  Capitalized terms used in this Agreement but not defined herein shall have the meanings set forth in Article IX hereof or, if not defined therein, shall have the meanings given to them in the Plan (as defined below).

WHEREAS, (i) on November 22, 2024, H-Food Holdings, LLC and certain affiliates (collectively, the "Debtors") filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), before the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") (the date of such filings being referred to herein as the Petition Date), (ii) on December 13, 2024, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and its Affiliated Debtors* [Docket No. 187] (as amended, supplemented, or otherwise modified from time to time, the "Plan") and the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and its Affiliated Debtors* [Docket No. 188] (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code, and (iii) on [●], 2025, the Bankruptcy Court entered an Order approving the Disclosure Statement [Docket No. [●]];

WHEREAS, pursuant to the Plan and this Agreement, and in accordance with the Equity Rights Offering Procedures, the Issuer intends to effect a rights offering (the "Equity Rights Offering"), pursuant to which the Issuer shall offer to each Eligible Offeree rights (the "Subscription Rights") to subscribe for and acquire its pro rata share (calculated based on the aggregate principal amount of Allowed First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all Allowed First Lien Claims) of shares of New Common Stock for an aggregate Equity Rights Offering size equal to 65% the Equity Rights Offering Amount (the "Non-Holdback Rights Offering Amount"), at a price per share (being calculated prior to giving effect to the Management Incentive Plan contemplated in the Plan) equal to (a) $305,500,000, divided by (b) the sum of (i) the aggregate number of shares of the Rights Offering Stock (as defined below), (ii) the aggregate number of the Direct Investment Shares issuable pursuant to this Agreement, (iii) the aggregate number of the Premium Shares issuable pursuant to this Agreement, and

(iv) the number of shares of New Common Stock issuable to the holders of Allowed First Lien Claims on account of such First Lien Claims in accordance with the Plan (the "Per-Share Price");

WHEREAS, each Commitment Party desires, on a several and not joint basis, to exercise all Subscription Rights issued to such Commitment Party to subscribe for and acquire shares of New Common Stock issuable in respect of such Subscription Rights in connection with the Equity Rights Offering, at the Per-Share Price, on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, each Equity Rights Offering Backstop Party desires, on a several and not joint basis, to acquire such Equity Rights Offering Backstop Party's percentage of the Unsubscribed Shares, attributable to each such holder of the First Lien Claims as set forth on Exhibit A hereto (collectively, the "Equity Backstop Percentage") at the Per-Share Price (the several, and not joint, obligations of the Equity Rights Offering Backstop Parties to acquire such Unsubscribed Shares, collectively, the "Equity Backstop Commitments"), on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, each Equity Rights Offering Holdback Party desires, on a several and not joint basis, to acquire such Equity Rights Offering Holdback Party's percentage of the Direct Investment Shares (as defined below), attributable to each such holder of the First Lien Claims as set forth on Exhibit B hereto (collectively, the "Direct Investment Percentage") of New Common Stock at the Per-Share Price for an aggregate purchase price equal to 35% of the Equity Rights Offering Amount (the "Holdback Rights Offering Amount"; such aggregate number of shares of New Common Stock to be purchased for the Holdback Rights Offering Amount, the "Direct Investment Shares"; and the several, and not joint, obligations of the Equity Rights Offering Holdback Parties to acquire such Direct Investment Shares in accordance with this Agreement, collectively, the "Direct Investment Commitments"); and

WHEREAS, upon the terms and subject to the conditions set forth herein, in consideration for the Equity Backstop Commitments, the Issuer has agreed to issue the Equity Rights Offering Backstop Premium to the Equity Rights Offering Backstop Parties, to be paid in shares of New Common Stock (such shares the "Premium Shares" and together with the Direct Investment Shares and the Unsubscribed Shares, the "ERO Shares").

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Company Parties and the Commitment Parties agree as follows:

## ARTICLE I
## THE EQUITY TRANSACTIONS

Section 1.1    The Equity Rights Offering.

(a)    (i)    Upon the terms and subject to the conditions of this Agreement, prior to the Effective Date, the Issuer shall conduct the Equity Rights Offering and issue the Subscription Rights pursuant to and in accordance with the Equity Rights Offering Procedures, the form of which is attached hereto as Exhibit C (the "Equity Rights Offering Procedures"), this Agreement and the Plan.

(ii)    Each Eligible Offeree, as reasonably determined by the Subscription Agent, will receive Subscription Rights to purchase, at the Per-Share Price, its pro rata share (calculated based on the aggregate principal amount of Allowed First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all Allowed First Lien Claims) of an aggregate number of shares of New Common Stock, issued

pursuant to and in accordance with the Equity Rights Offering Procedures, equal to the Non-Holdback Rights Offering Amount divided by the Per-Share Price (the "Rights Offering Stock").

(iii)      Subject to Section 1.5 hereof, each Commitment Party shall exercise all Subscription Rights issued to such Commitment Party to subscribe for and acquire shares of Rights Offering Stock issuable in respect of such Subscription Rights in connection with the Equity Rights Offering.

(b)      (i)      The Issuer shall provide, or cause to be provided, to each Eligible Offeree a subscription form (the "Subscription Form"), which shall be in a form reasonably acceptable to the Requisite Equity Backstop Parties, whereby each Eligible Offeree may exercise its Subscription Rights in whole or in part.

(ii)      The Subscription Rights may be exercised during the period specified in the Equity Rights Offering Procedures, which period will commence on the date the Subscription Forms are distributed and will end at the Subscription Expiration Deadline. For purposes of this Agreement and the Equity Rights Offering Procedures, the "Subscription Expiration Deadline" means 4:00 p.m., prevailing Central Time, on [February 28, 2025], or such other subsequent date as the Issuer and the Requisite Equity Backstop Parties may otherwise mutually agree, which such other subsequent date will then be specified in a notice provided by the Issuer to the other Commitment Parties before 8:00 a.m., prevailing Central Time, on the Business Day before the then-effective Subscription Expiration Deadline.

(iii)      Pursuant to the Equity Rights Offering Procedures, in order to exercise a Subscription Right, an Eligible Offeree shall, by the Subscription Expiration Deadline:

(A)      complete and submit a duly completed and executed Subscription Form along with all exhibits and annexes thereto (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, which Subscription Form shall identify the aggregate amount such Eligible Offeree desires to fund pursuant to the Equity Rights Offering (such Eligible Offeree's "Elected Amount"), which amount shall not exceed such Eligible Offeree's Maximum Subscription Amount;

(B)      if such Eligible Offeree is a DIP Lender (as defined in the Plan), such Eligible Offeree shall specify, on such Subscription Form, whether it wishes to exercise its Subscription Rights (x) in exchange for the payment of cash (the "Cash Option"); (y) in exchange for some or all of such Eligible Offeree's DIP Claims (as defined in the Plan, and inclusive of any accrued and unpaid interest, fees and premiums related thereto but excluding any expenses and professional fees that are part thereof) (the "Non-Cash Option"), to the extent set forth in, and in accordance with, the Plan; or (z) in exchange for a combination of the Cash Option and Non-Cash Option (and shall specify the amount of such Cash Option and Non-Cash Option); and

(C)      (x) if such Eligible Offeree is not an Equity Rights Offering Backstop Party, pay the Per-Share Price for each such Equity Rights Offering Share subject to its Cash Option by wire transfer of immediately available funds

to the Subscription Agent, or (y) if such Eligible Offeree is an Equity Rights Offering Backstop Party, make payment as otherwise described herein.

(iv)     The Issuer shall:

(A)     as promptly as reasonably practicable, but no more than five (5) Business Days following the Subscription Expiration Deadline (the "Determination Time"), cause the Subscription Agent to determine, in accordance with the Plan and the Equity Rights Offering Procedures, (x) the final, aggregate number of shares of Rights Offering Stock each Eligible Offeree will receive pursuant to its valid and timely exercise of Subscription Rights, and (y) the aggregate number of Unsubscribed Shares the Equity Rights Offering Backstop Parties have agreed to purchase pursuant to the Equity Backstop Commitments;

(B)     after the Determination Time and at least ten (10) Business Days, but not more than fifteen (15) Business Days, prior to the Effective Date, give, or shall cause the Subscription Agent to give, to the Equity Rights Offering Backstop Parties a written notice, substantially in the form attached hereto as Exhibit D (the "Funding Notice"), by email, including the aggregate number of (and, as applicable, the aggregate Per-Share Price of such shares for which a Cash Option was elected):

(w)     Rights Offering Stock such Equity Rights Offering Backstop Party has subscribed for;

(x)     Unsubscribed Shares such Equity Rights Offering Backstop Party has agreed to purchase;

(y)     Direct Investment Shares such Equity Rights Offering Backstop Party (acting as a Equity Rights Offering Holdback Party) has agreed to purchase; and

(z)     the aggregate number of shares of New Common Stock such Equity Rights Offering Backstop Party shall receive as its portion of the Equity Rights Offering Backstop Premium.

(C)     cause the Subscription Agent to, promptly provide any written backup, information and documentation relating to the information contained in the applicable Funding Notice as any Commitment Party may reasonably request in writing.

(v)     To the extent an Equity Rights Offering Backstop Party is also a DIP Lender and has validly elected to exercise some portion of its Subscription Rights (or its obligation to purchase Unsubscribed Shares or Direct Investment Shares) pursuant to the Cash Option, such Eligible Offeree shall pay the Per-Share Price for each such Equity Rights Offering Share, Unsubscribed Shares and Direct Investment Share of such Commitment Party by wire transfer of immediately available funds to the account specified in the Funding Notice no later than the date that is three (3) Business Days after the receipt of the Funding Notice (the "Equity Backstop Funding Date"). For the avoidance of doubt, the Equity Backstop Funding Date shall be prior to the Effective Date.

(vi)     To the extent that any Eligible Offeree has validly elected to exercise some portion of its Subscription Rights pursuant to the Non-Cash Option, at the Effective Date an amount of such Eligible Offeree's DIP Claims having an aggregate principal amount equal to the aggregate Per-Share Price for each Equity Rights Offering Share such Eligible Offeree has validly elected to be paid pursuant to the Non-Cash Option shall be automatically forgiven, extinguished, terminated and cancelled in full pursuant to the Plan.

(c)     On the Effective Date, the Issuer shall issue to each Eligible Offeree such Equity Rights Offering Shares with respect to which such Eligible Offeree has validly and timely exercised Subscription Rights and paid the aggregate Per-Share Price pursuant to Section 1.1(b) hereof and the Equity Rights Offering Procedures, rounded down to the nearest whole number solely to avoid fractional shares.

(d)     (i)     If the Subscription Agent for any reason does not receive from an Eligible Offeree both (A) a timely and duly completed and executed Subscription Form along with all exhibits and annexes thereto (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), and (B) to the extent such Eligible Offeree has elected to exercise any portion of its Subscription Rights pursuant to the Cash Option, the timely payment in full of the purchase price payable for the Equity Rights Offering Shares such Eligible Offeree elected to purchase pursuant to the Cash Option, such Eligible Offeree shall be deemed to have relinquished and waived its right to participate in the Equity Rights Offering, unless otherwise approved by the Requisite Equity Backstop Parties.

(ii)     For the avoidance of doubt, if an Eligible Offeree has elected the Non-Cash Option in excess of the amount of DIP Claims owned by it and which are eligible to be elected as such in accordance with the terms hereof and the Equity Rights Offering Procedures, then such Eligible Offeree shall be deemed to have elected the Cash Option in lieu thereof.

(e)     Notwithstanding the foregoing or anything else in this Agreement, in the event of any inconsistency between this Agreement, the Plan, the Equity Rights Offering Procedures and the Restructuring Support Agreement regarding the matters set forth herein, this Agreement shall govern.

Section 1.2     The Backstop Commitments.

(a)     (i)     On the terms and subject to the conditions set forth herein (and in any event only upon Issuer's receipt of the amounts described in Section 1.2(b) hereof), the Issuer shall issue to each Equity Rights Offering Backstop Party on the Effective Date, and each Equity Rights Offering Backstop Party shall agree to its Equity Backstop Commitment, and shall, severally and not jointly, purchase (pursuant to the Cash Option, the Non-Cash Option, or a combination thereof) its Equity Backstop Percentage of the Unsubscribed Shares at the aggregate Per-Share Price for such Unsubscribed Shares.

(ii)     Except as otherwise set forth in Section 1.4 hereof, the obligations of the Equity Rights Offering Backstop Parties with respect to the Equity Backstop Commitments are several, and not joint, obligations of the Equity Rights Offering Backstop Parties, such that no Equity Rights Offering Backstop Party shall be liable or otherwise responsible for the Equity Backstop Commitments of any other Equity Rights Offering Backstop Party.

(b)     (i)     On the Equity Backstop Funding Date, each Equity Rights Offering Backstop Party shall pay (pursuant to the Cash Option, the Non-Cash Option, or a combination thereof) to the Issuer such Equity Rights Offering Backstop Party's Equity Backstop Percentage of (x) the aggregate number of Unsubscribed Shares, multiplied by (y) the Per-Share Price, <u>provided</u> that, if such Equity Rights Offering Backstop Party has elected to pay any portion of its commitment pursuant to the Cash Option, such payment shall be made by wire transfer of immediately available funds to the account specified in the Funding Notice.

(ii)     Subject to the receipt of the aforementioned payment, on the Effective Date, the Issuer shall issue to such Equity Rights Offering Backstop Party such Equity Rights Offering Backstop Party's Equity Backstop Percentage of the Unsubscribed Shares.

(iii)     Notwithstanding anything therein to the contrary, the aggregate amount payable hereunder by an Equity Rights Offering Backstop Party in respect of its Non-Cash Option shall not exceed the aggregate principal of its DIP Claims, and to the extent of any such excess, such Equity Rights Offering Backstop Party shall be deemed to have elected the Cash Option.

(c)     (i)     On the terms and subject to the conditions set forth herein, to compensate the Equity Rights Offering Backstop Parties for their agreement to purchase the Unsubscribed Shares pursuant to Section 1.2(a) hereof, the Issuer shall deliver to the Equity Rights Offering Backstop Parties (or their respective designated Related Transferees pursuant to Section 1.4(a) hereof), on the Effective Date, a non-refundable premium equal to an aggregate amount of New Common Stock equal to the result of (x) 10% of the Equity Rights Offering Amount, divided by (y) the Per-Share Price (the "Equity Rights Offering Backstop Premium") free and clear of all Liens (other than under the New Organizational Documents or applicable securities Laws).

(ii)     The Equity Rights Offering Backstop Premium shall be allocated among the Equity Rights Offering Backstop Parties based on their respective Equity Backstop Percentages (rounded among the Equity Rights Offering Backstop Parties solely to avoid fractional shares as the Requisite Equity Backstop Parties may determine in their sole discretion), subject to Section 1.5 hereof.

(d)     (i)     The provisions for the payment of the Equity Rights Offering Backstop Premium are an integral part of the transactions contemplated by this Agreement, the Restructuring Support Agreement and the Plan, and without these provisions, the Equity Rights Offering Backstop Parties would not have entered into this Agreement.

(ii)     The Equity Rights Offering Backstop Premium shall, regardless of the amount of Unsubscribed Shares, if any, actually required to be purchased pursuant to this Agreement, be paid by the Issuer on the Effective Date by delivering the Equity Rights Offering Backstop Premium to the Equity Rights Offering Backstop Parties based on their respective Equity Backstop Percentages, subject to Section 1.5 hereof; provided, however, that if this Agreement is validly terminated prior to the Effective Date in accordance with its terms, no Equity Rights Offering Backstop Premium shall be paid or payable.

Section 1.3     The Direct Investment Equity Raise.

(a)     (i)     On the terms and subject to the conditions set forth herein (and in any event only upon Issuer's receipt of the amounts described in Section 1.3(b) hereof), the Issuer shall issue to each Equity Rights Offering Holdback Party on the Effective Date, and each Equity Rights

Offering Holdback Party shall agree to its Direct Investment Commitment, and shall, severally and not jointly, purchase (pursuant to the Cash Option, the Non-Cash Option, or a combination thereof) its Direct Investment Percentage of the Direct Investment Shares at the Per-Share Price for each Direct Investment Share (such transactions, the "<u>Direct Investment Equity Raise</u>").

        (ii)      The portion of the Direct Investment Shares issued to each Equity Rights Offering Holdback Party pursuant to the preceding sentence shall be rounded up or down to the nearest whole number solely to avoid fractional shares as the Requisite Equity Backstop Parties may determine in their sole discretion; <u>provided</u> that in no event shall any such rounding reduce or increase the aggregate number of Direct Investment Shares to be issued pursuant to the Direct Investment Commitments.

      (b)      (i)      By no later than the Subscription Expiration Deadline, each Equity Rights Offering Holdback Party shall pay (pursuant to the Cash Option, the Non-Cash Option, or a combination thereof) to the Issuer such Equity Rights Offering Holdback Party's Direct Investment Percentage of (x) the aggregate number of Direct Investment Shares, multiplied by (y) the Per-Share Price, <u>provided</u> that, if such Equity Rights Offering Holdback Party has elected to pay any portion of its commitment pursuant to the Cash Option, such payment shall be made by wire transfer of immediately available funds to the account specified in the Funding Notice.

        (ii)      Subject to the receipt of the aforementioned payment, on the Effective Date, the Issuer shall issue to such Equity Rights Offering Holdback Party such Equity Rights Offering Holdback Party's Direct Investment Percentage of the Direct Investment Shares.

        (iii)      Notwithstanding anything therein to the contrary, the aggregate amount payable hereunder by a Equity Rights Offering Holdback Party in respect of its Non-Cash Option shall not exceed the aggregate principal of its DIP Claims, and to the extent of any such excess, such Equity Rights Offering Holdback Party shall be deemed to have elected the Cash Option.

Section 1.4      <u>Designations and Transfers</u>.

      (a)      Each Commitment Party may designate one or more of its Related Transferees (as defined below) to receive any shares of New Common Stock to be issued pursuant to <u>Section 1.2</u> or <u>Section 1.3</u> hereof in lieu of such Commitment Party, by providing written notice of such designation to the Issuer and the Subscription Agent, which notice shall (i) be addressed to the Issuer and the Subscription Agent, and signed by such Commitment Party and each such Related Transferee to be designated, (ii) specify the number of shares of New Common Stock to be issued pursuant to <u>Section 1.2</u> or <u>Section 1.3</u> hereof to such Related Transferee in lieu of such Commitment Party, (iii) contain a confirmation by each such Related Transferee of the accuracy of the representations made by the applicable Commitment Party under this Agreement as applied to such Related Transferee, and (iv) be delivered no later than three (3) Business Days prior to the Effective Date; <u>provided</u> that no such designation pursuant to this <u>Section 1.4(a)</u> shall relieve such Commitment Party from its obligations under this Agreement.

      (b)      Each Commitment Party shall have the right to Transfer all or any portion of its Equity Backstop Commitment or Direct Investment Commitment, as applicable, prior to the Equity Backstop Funding Date or Subscription Expiration Deadline, as applicable, to (i) one or more of the other Commitment Parties with the consent of the Requisite Equity Backstop Parties, (ii) one or more of such Commitment Party's Affiliates or Affiliated Funds (<u>provided</u> that such Transfer

shall not relieve such Commitment Party of its obligations hereunder), (iii) one or more special purpose vehicles that are wholly-owned by such Commitment Party or one or more of its Affiliated Funds (provided that such Transfer shall not relieve such Commitment Party of its obligations hereunder), and, with respect to which such Commitment Party under this clause (iii) either (A) has provided an adequate equity support letter or a guarantee of such special purpose vehicle's Equity Backstop Commitment or Direct Investment Commitment, as applicable, in form and substance reasonably acceptable to the Issuer and the Requisite Equity Backstop Parties, or (B) otherwise remains obligated to fund the Equity Backstop Commitment or the Direct Investment Commitment, as applicable, or (iv) to any other Person approved in advance in writing by the Issuer (acting reasonably) with the consent of the Requisite Equity Backstop Parties (each of the Persons referred to in clauses  (ii), or (iii), a "Related Transferee," and each of the Persons referred to in clauses (i), (ii), (iii) or (iv), a "Transferee"); provided that, in each of the case of clauses (i), (ii), (iii) and (iv): (x) the transferring Commitment Party and the Transferee shall provide written notice to the Issuer and the Subscription Agent of such Transfer at least three (3) Business Days prior to such Transfer, which notice shall indicate the proposed Transferee, and (y) unless such Transferee is a Commitment Party, such Transferee shall deliver to the Issuer, prior to such Transfer, a joinder to this Agreement, in form and substance reasonably satisfactory to the Issuer and the Requisite Equity Backstop Parties, pursuant to which the Transferee agrees to be fully bound by this Agreement and contains a confirmation of the accuracy of the representations made by each Commitment Party under this Agreement as applied to such Transferee; provided, further, that, in each of the case of clauses (i) and (iv), at the same time that such Commitment Party Transfers all or any portion of its Equity Backstop Commitment or Direct Investment Commitment, as applicable, it shall Transfer a corresponding portion of its First Lien Claims to such Transferee and provide evidence of the same reasonably satisfactory to the Issuer and the Requisite Equity Backstop Parties.  In addition to the foregoing, to the extent that a Commitment Party validly elected the Non-Cash Option, at the same time that such Commitment Party Transfers all or any portion of its Equity Backstop Commitment, it shall Transfer a corresponding portion of its DIP Claims to such Transferee and provide evidence of the same reasonably satisfactory to the Issuer and the Requisite Equity Backstop Parties.

(c)     Notwithstanding the foregoing, no such Transfer as contemplated by Section 1.4(b) hereof shall be effective if the same would reasonably be expected to, as reasonably determined by the Requisite Equity Backstop Parties or the Issuer, (i) adversely affect, in any respect, or otherwise delay the ability of the Parties to consummate the transactions contemplated in this Agreement or the other Transaction Documents, (ii) reset or extend any waiting or review period under any Antitrust Laws, or (iii) otherwise prevent, hinder or delay the consummation of the transactions contemplated in this Agreement or the other Transaction Documents, in the case of each of the foregoing clauses (i) through (iii), other than in any immaterial respect;

(d)     Other than as expressly set forth in this Section 1.4, no Commitment Party shall be permitted to Transfer all or any portion of its Equity Backstop Commitment or Direct Investment Commitment, as applicable.  Any Transfer made (or attempted to be made) in violation of this Agreement shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Issuer or any Commitment Party, and shall not create (or be deemed to create) any obligation or Liability of any other Commitment Party or any Issuer to the purported Transferee or limit, alter or impair any agreements, covenants, or obligations of the proposed transferor under this Agreement.  Notwithstanding anything to the contrary herein, no Transfer shall be permitted following the Subscription Expiration Deadline.

(e)     Exhibit A and Exhibit B attached hereto shall be amended, without any consent or approval required by any Party hereto, to reflect each Transfer made in accordance with this Section 1.4.

8

Section 1.5     Defaults.

(a)     In the event that any Commitment Party fails to comply with its obligations to purchase New Common Stock pursuant to Sections 1.1, 1.2 or 1.3 hereof (each, a "Commitment Party Default" and, each such defaulting Commitment Party, a "Defaulting Commitment Party"), all New Common Stock (including, for the avoidance of doubt, the Rights Offering Stock, Unsubscribed Shares and the Direct Investment Shares) the Defaulting Commitment Parties were obligated, but failed, to purchase (the "Default New Common Stock") shall be offered to each of the Commitment Parties that is not a Defaulting Commitment Party (each, a "Non-Defaulting Commitment Party") as follows:

(i)     Each Non-Defaulting Commitment Party shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Issuer to all Non-Defaulting Commitment Parties of such Commitment Party Default, which notice shall be given by the Issuer no later than one (1) Business Day after the Equity Backstop Funding Date, to purchase all or a portion of such Default New Common Stock in such amounts as may be agreed upon by all Non-Defaulting Commitment Parties electing to purchase all or any portion of the Default New Common Stock, or, if no such agreement is reached, up to a number of shares of Default New Common Stock equal to the product of (A)(x) the total number of Default New Common Stock or (y) such lesser number of shares of Default New Common Stock as may be agreed to by the Non-Defaulting Commitment Parties, in either case multiplied by (B) a percentage equal to the quotient of (x) the aggregate of such Non-Defaulting Commitment Party's Equity Backstop Percentage or Direct Investment Percentage, as applicable, divided by (y) the aggregate Equity Backstop Percentages or Direct Investment Percentages, as applicable, of all the Non-Defaulting Commitment Parties (or otherwise in such other proportion as may be agreed to by the Non-Defaulting Commitment Parties).

(ii)     If any Default New Common Stock is not elected to be purchased pursuant to clause (i) by the third Business Day prior to the Effective Date, then, the Parties agree that such Default New Common Stock may be offered by the Issuer to third parties pursuant to this Section 1.5(a), with the consent of the Requisite Equity Backstop Parties, not to be unreasonably withheld, conditioned or delayed, which such Default New Common Stock shall be issued pursuant to a subscription agreement or similar instrument in form and substance reasonably acceptable to the Issuer.

(b)     Notwithstanding anything to the contrary in this Agreement, each Non-Defaulting Commitment Party that is an Equity Rights Offering Backstop Party shall be entitled to receive the Equity Rights Offering Backstop Premium that would have otherwise been payable to such Defaulting Commitment Party pursuant to this Section 1.5(b) ratably in proportion to the Default New Common Stock acquired by such Non-Defaulting Commitment Party.     Further, notwithstanding anything in this Agreement to the contrary, no Defaulting Commitment Party shall be entitled to indemnification provided, or to be provided, under or in connection with this Agreement.

(c)     Notwithstanding anything to the contrary in this Agreement, each Defaulting Commitment Party shall be liable to the Non-Defaulting Commitment Parties and to the Company Parties for the consequences of its breach, and each Party may enforce its rights to money damages or specific performance against such Defaulting Commitment Party.

Section 1.6    <u>Withholding</u>.    Notwithstanding anything to the contrary contained in this Agreement, the Issuer and any other applicable withholding agent shall be entitled to deduct and withhold from any payments made pursuant to this Agreement such amounts as such withholding agent reasonably determines are required to be deducted and withheld with respect to the recipient of such payment under the Code or any applicable provision of state, local or non-United States Tax law.   To the extent that amounts are so withheld and are to be paid to the appropriate governmental authority, such amounts shall be treated for all purposes of this Agreement as having been paid, issued or transferred to the Person in respect of which such deduction and withholding was made.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE DEBTOR AND ISSUER

Except as set forth in the corresponding section of the Debtor Disclosure Schedules, the Issuer, or the Debtor, as applicable, represents and warrants to the Commitment Parties as set forth below, and except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement is made as of the date hereof and as of the Effective Date. For the avoidance of doubt, references to the Debtor shall be also deemed to be references to the Reorganized Debtors (as defined in the Plan).

Section 2.1    <u>Formation</u>.  Each member of the Company Group is a legal entity duly organized, formed or incorporated, as applicable, and is validly existing as a corporation, limited liability company, trust, or other entity, as applicable, and, if applicable, in good standing (or the equivalent thereof) (i) under the applicable Laws of its jurisdiction of incorporation, organization or formation and (ii) except where the failure to have any such authority or qualification would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, in each jurisdiction where the conduct of its business as currently conducted requires such qualifications.

Section 2.2    <u>Power and Authority</u>.  Each member of the Company Group has, subject to the entry of the Backstop Order and the Confirmation Order, the requisite power and authority to (a) enter into, execute and deliver this Agreement to the extent it is a party, and any other Transaction Document to which it is party, and to perform its obligations hereunder and thereunder as applicable, and has taken all necessary action required for the due authorization, execution, delivery and performance by it hereof and thereof as applicable and, subject to the entry of the Disclosure Statement Order, the consummation of the transactions contemplated hereby and thereby as applicable, and (b) own, lease or operate its property and assets and to transact the business in which it is currently engaged, except where the failure to have any such power or authority would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 2.3    <u>Execution and Delivery</u>.  This Agreement has been, and each other Transaction Document to which any member of the Company Group is party has been or will be, duly and validly executed and delivered by the Issuer and any such other relevant member of the Company Group, and, subject to the entry of the Backstop Order, the Confirmation Order and the Disclosure Statement Order, as applicable, and assuming due and valid execution hereof by the Commitment Parties, and of each other Transaction Document by each Commitment Party party thereto and any other Person party thereto, each constitutes the valid and binding obligation of the Issuer and, to the extent applicable, each other member of the Company Group, enforceable against the Issuer and, to the extent applicable, each other member of the Company Group in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditor's rights or by general equity principles.

Section 2.4    Authorized Capital.

(a)    Upon the Effective Date, the authorized, issued and outstanding capital of the Reorganized Debtors will conform to the descriptions set forth in the Plan and the Disclosure Statement, and no shares of capital will be authorized, issued or outstanding except as set forth in the Plan and the Disclosure Statement.  Except for the New Common Stock and any equity interests reserved for issuance in connection with the Management Incentive Plan, no shares of capital stock or other equity interests of the Issuer are reserved for issuance.

(b)    Upon the Effective Date, other than the provisions of the Plan, the Management Incentive Plan and any awards issued thereunder, and except for this Agreement and the New Organizational Documents, the Reorganized Debtors will not be party to or otherwise bound by or subject to any outstanding option, warrant, call, right (including any preemptive right), security, subscription, commitment, contract, arrangement, agreement, obligation, undertaking or convertible or exchangeable security that (i) obligates the Reorganized Debtors to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Reorganized Debtors or any security convertible into, exercisable for, exchangeable into or evidencing the right to subscribe for or acquire any capital stock of, or other equity or voting interest in, the Reorganized Debtors, (ii) obligates the Reorganized Debtors to issue, grant, extend or enter into any such option, warrant, call, right, security, subscription, commitment (contingent or otherwise), contract, arrangement, agreement, obligation, undertaking or convertible or exchangeable security, (iii) restricts the transfer of any shares of capital stock of the Reorganized Debtors (other than transfer restrictions imposed by applicable Law, restrictions subject to the approval of the Commitment Parties, or restrictions included in the New Organizational Documents or any corresponding pledge agreement), or (iv) relates to the voting of any shares of capital stock of the Reorganized Debtors.

Section 2.5    Issuance and Delivery.

(a)    Subject to the entry of the Backstop Order, the Confirmation Order and the Disclosure Statement Order, as applicable, the New Common Stock to be issued and delivered in exchange for the aggregate Per-Share Price hereunder has been, or when issued and delivered in exchange for the aggregate Per-Share Price, will be, duly and validly authorized.  When the New Common Stock to be issued hereunder is issued pursuant to the Equity Rights Offering or this Agreement, as applicable, and delivered, the New Common Stock will have been duly issued and delivered by the Issuer and shall be fully-paid and non-assessable and free and clear of all Liens (other than transfer restrictions imposed hereunder or pursuant to the New Organizational Documents or by applicable Law), and preemptive rights, rights of first refusal, subscription and similar rights (other than pursuant to the New Organizational Documents).

(b)    The distribution of the Subscription Rights and, subject to entry of the Confirmation Order and consummation of the Plan, the issuance and delivery of the ERO Shares will have been duly and validly authorized and, when issued and delivered to the Commitment Parties hereunder, the ERO Shares will be duly and validly issued and delivered, fully-paid and non-assessable and free and clear of all Liens (other than transfer restrictions imposed hereunder or pursuant to the New Organizational Documents or by applicable Law), pre-emptive rights, rights of first refusal, subscription and similar rights (other than pursuant to the New Organizational Documents).

Section 2.6       Consents and Approvals; No Conflict.

(a)       Assuming the accuracy of the Commitment Parties' representations and warranties in Article III, no consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over any member of the Company Group or any of their respective properties is required for the execution and delivery by the Issuer and, to the extent applicable, each other member of the Company Group, of this Agreement and the other Transaction Documents, and consummation of the transactions contemplated hereby and thereby, including the distribution of the Subscription Rights and the issuance of New Common Stock in connection with the Direct Investment Equity Raise, the Equity Rights Offering, the Equity Backstop Commitment and the Equity Rights Offering Backstop Premium, except (i) for any applicable filings notifications, authorizations, approvals, consents, clearances or termination or expiration under Antitrust Laws or foreign investment Laws in connection with the transactions contemplated by this Agreement, (ii) the entry of each of the Backstop Order, the Disclosure Statement Order and the Confirmation Order or (iii) such consents, approvals, notices, clearances, authorizations, registrations or qualifications the absence of which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)       Assuming the consents described in Section 2.6(a) hereof, the execution and delivery by the Issuer and, to the extent applicable, each other member of the Company Group, of this Agreement and the other Transaction Documents, and consummation of the transactions contemplated hereby and thereby, including the distribution of the Subscription Rights and the issuance of New Common Stock pursuant to and in accordance with this Agreement and the Equity Rights Offering Procedures, will not (i) conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract to which any member of the Company Group will be bound as of the Effective Date after giving effect to the Plan, (ii) result in any violation of the provisions of any member of the Company Group's organizational documents (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or the Debtors' undertaking to implement the Restructuring Transactions through the Chapter 11 Cases), or (iii) result in any violation of any Law or Order applicable to any member of the Company Group or any of their properties, except in each of the cases described in clauses (i) or (iii) for any conflict, breach, violation, default, acceleration or Lien which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 2.7       No Broker's Fees.  Except as set forth on Schedule 2.7, no member of the Company Group is a party to any Contract (other than this Agreement) that would give rise to a valid claim against the Company Group for a brokerage commission, finder's fee or like payment in connection with the transactions contemplated hereby or in connection with the Plan for which the Commitment Parties would be liable.

Section 2.8       Absence of Certain Changes.  From December 30, 2023 until the date hereof, except as disclosed in any filing with the Bankruptcy Court, no event, development, occurrence, circumstance, effect, condition, result, state of facts or change has occurred or exists that constitutes, individually or in the aggregate, a Material Adverse Effect.

Section 2.9       No Violation; Compliance with Laws.  No member of the Company Group is in violation of its respective charter or bylaws, certificate of formation or limited liability company operating agreement or similar organizational document in any material respect  (other than, for the avoidance of

12

doubt, a violation that would be triggered as a result of the Chapter 11 Cases or the Debtors' undertaking to implement the Restructuring Transactions through the Chapter 11 Cases).  No member of the Company Group is or has been at any time since December 31, 2023 in violation of any Law or Order, except for any such violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 2.10    Legal Proceedings.  Except as otherwise set forth on Schedule 2.10, other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith or any matters referenced in any proof of claim filed therein, there are no Legal Proceedings pending or, to the Knowledge of the Company Parties, threatened, to which any member of the Company Group is a party that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 2.11    Labor Relations.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there are no labor disputes pending, or to the Knowledge of the Company Parties, threatened in writing against any member of the Company Group.

Section 2.12    Intellectual Property.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (A) each member of the Company Group owns or is licensed or otherwise possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, mask works, domain names, or other intellectual property rights and any and all applications or registrations for any of the foregoing (collectively, "Intellectual Property Rights") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person; (B) to the Knowledge of the Company Parties, none of the members of the Company Group nor any Intellectual Property Right, proprietary right, slogan or other advertising devices, product, process, method, substance, part, or other material now employed, sold or offered by such Person, is infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any Person; and (C) no claim or litigation regarding any of the foregoing is pending or, to the Knowledge of the Company Parties, threatened.

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (A) the information technology assets used in the businesses of the members of the Company Group (the "Company IT Systems") are reasonably adequate and sufficient for the existing needs and operations of the Company Group, (B) have not malfunctioned or failed within the past two (2) years, and (C) the Company Group maintains and uses commercially reasonable back-up, encryption, business continuity, security and disaster recovery technology and procedures consistent with applicable regulatory standards.

(c)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each member of the Company Group collected, maintained, used, disclosed, transferred, protected, stored, deleted, and otherwise processed (collectively "Processed" or "Processing") all Personal Data in compliance with applicable Laws, including any and all Data Laws, and have required all third Persons Processing Personal Data on behalf of the Company Group to do the same through valid and enforceable agreements.  To the Knowledge of the Company Parties, no member of the Company Group is under investigation by any Governmental Entity for a violation of any Laws (including Data Laws).

Section 2.13      Title to Real Property.

(a)      Each member of the Company Group has valid title or leasehold interest, as applicable, to its respective Real Properties, in each case, free of all Liens except for Permitted Liens or except for defects in title or leasehold interest that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their respective currently intended purposes, or except where the failure (or failures) to have such title or leasehold interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Each member of the Company Group has good and valid title in fee simple to all the real property owned by it, free and clear of all Liens except for Permitted Liens.

(b)      Leased Real Property.  Each member of the Company Group is in compliance with all obligations under all leases to which it is a member of the Company Group is a party that have not been rejected in the Chapter 11 Cases, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and no member of the Company Group has received written notice of any good faith claim asserting that any of such leases are not in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Each member of the Company Group enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  No condemnation proceeding is pending or, to the Knowledge of the Company Parties, threatened which would preclude or impair the use of any such leased real property by any member of the Company Group for the purposes for which it is currently used.

Section 2.14      Licenses and Permits.  Each applicable member of the Company Group possesses all licenses, certificates, permits and other authorizations issued by the appropriate Governmental Entities that are necessary for the conduct of the business of the Company Group, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Since January 1, 2022, no member of the Company Group (i) has received written notice of any revocation or modification of any such license, certificate, permit or authorization from the applicable Governmental Entity with authority with respect thereto or (ii) has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except in each case to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 2.15      Environmental Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)      the Company Group, since January 1, 2022, have been in compliance with all (i) applicable Environmental Laws and (ii) material identification numbers and permits required under applicable Environmental Laws for the ownership or lease of their respective properties and the conduct of their respective businesses ("Environmental Permits");

(b)      the Company Group have obtained all Environmental Permits;

(c)      since January 1, 2022, no member of the Company Group has received written notice that any member of the Company Group, or any facility leased by any member of the Company Group, has any material Liability under any Environmental Law or Environmental Permit;

14

(d)      no Legal Proceeding arising under Environmental Laws is pending or, to the Knowledge of the Company Parties, threatened against any member of the Company Group; and

(e)      no Hazardous Substances have been produced, sold, used, stored, transported, handled, released, discharged or disposed of by any member of the Company Group at or from any location, including any leased real property, in a manner that has (i) materially violated any Environmental Law or Environmental Permit or (ii) resulted or would reasonably be expected to result in any material investigation or remediation of Hazardous Substances, or other material Liability under any applicable Environmental Law or Environmental Permit.

Notwithstanding the generality of any other representations and warranties in this Agreement, the representations and warranties in this Section 2.15 constitute the sole and exclusive representations and warranties in this Agreement with respect to any environmental, health or safety matters, including any arising under or relating to Environmental Laws or Hazardous Substances.

Section 2.16      Tax Matters.

(a)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each member of the Company Group has filed or caused to be filed all U.S. federal, state, provincial, local and non-U.S. Tax returns required to have been filed by it, taking into account any filing extensions, on or before the time the extension is due and (ii) each such Tax return is true and correct.

(b)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each member of the Company Group has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in Section 2.16(a) hereof and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the date hereof (except (i) Taxes or assessments that are being contested in good faith by appropriate Legal Proceedings and for which the applicable member of the Company Group (as the case may be) have set aside on its books adequate reserves in accordance with GAAP or (ii) to the extent the non-payment thereof is permitted or required by the Bankruptcy Code).  To the Knowledge of the Company Parties, there is no proposed Tax assessment against any member of the Company Group that would, if made, reasonably be expected to result in a material Tax Liability.

(c)      As of the date hereof, with respect to the Company Group, other than in connection with the Chapter 11 Cases and other than Taxes or assessments that are being contested in good faith and for which the Company Group maintains an adequate reserve in accordance with GAAP or are not expected to result in significant negative adjustments that would be material to the Company Group, (i) no claims have been asserted in writing with respect to any Taxes, and (ii) no Tax returns are being examined by, and no written notification of intention to examine has been received from any Governmental Entity, in each case, to the Knowledge of the Company Parties.

Section 2.17      Employee Benefit Plans.

(a)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (i) each Company Plan is in compliance with the applicable provisions of ERISA and the Code and other federal or state Law; (ii) no member of the Company Group has engaged in a "prohibited transaction" (as defined in Section 406 of ERISA and Section 4975 of the Code) in connection with any Company Plan that would subject any member

of the Company Group to Tax or other Liability; and (iii) no Company Plan maintained or contributed to by any member of the Company Group provides welfare coverage or benefits to retired employees or independent contractors or other former employees or independent contractors (other than as required by Section 601 of ERISA.  During the past six (6) years, no member of the Company Group or any ERISA Affiliate, sponsored, maintained, contributed to or had any obligation to sponsor, maintain or contribute to any Pension Plan or Multiemployer Plan.

(b)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or except as required by applicable Law, no member of the Company Group has established, sponsored or maintained, or has any Liability with respect to, any employee pension benefit plan or other employee compensation or benefit plan, program, policy, agreement or arrangement governed by or subject to the Laws of a jurisdiction other than the United States of America.

(c)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there are no pending, or to the Knowledge of the Company Parties, threatened Legal Proceedings, asserted or instituted against any Company Plan or any Person as fiduciary or sponsor of any Company Plan, in each case other than claims for benefits in the normal course.

(d)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) all compensation and benefit arrangements of the Company Group comply and have complied in both form and operation with their terms and all applicable Laws and legal requirements, and (ii) no member of the Company Group has any obligation to provide any individual with a "gross up" or similar payment in respect of any Taxes, including any that may become payable under Sections 409A or 4999 of the Code.

(e)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all Liabilities (including all employer contributions and payments required to have been made by any member of the Company Group) under or with respect to any compensation or benefit arrangement of any member of the Company Group have been properly accounted for in the Issuer's financial statements in accordance with GAAP.

Section 2.18      Financial Statements.  The audited consolidated balance sheets of the Issuer and its Subsidiaries as of December 30, 2023 and the immediately preceding fiscal year, and the related consolidated statements of operations, shareholders' equity and cash flows of the Issuer and its consolidated Subsidiaries for the fiscal years ended December 30, 2023 and the immediately preceding fiscal year, (i) were prepared in all material respects in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) present fairly in all material respects the financial position of the Issuer and its consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

Section 2.19      Material Contracts.  Except as otherwise disclosed in Schedule 2.19, and other than as a result of a rejection motion filed by any member of the Company Group in the Chapter 11 Cases, all Material Contracts are valid, binding and enforceable by and against the Company Group party thereto and, to the Knowledge of the Company Parties, each other party thereto (except where the failure to be valid, binding or enforceable does not constitute a Material Adverse Effect), and, as of the date hereof, no written notice to terminate, in whole or part, any Material Contract has been delivered to any member of the Company Group (except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect).  Other than as a result of the filing of the Chapter 11 Cases

16

and the underlying facts and circumstances giving rise or contributing thereto, no member of the Company Group nor, to the Knowledge of the Company Parties, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such instances of material default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 2.20    Compliance with Anti-Money Laundering Laws.  The operations of the Company Group are and, since January 1, 2022, have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2011)) and the anti-money laundering statutes of any jurisdictions applicable to the Issuer or its Subsidiaries (and the rules and regulations promulgated thereunder) (collectively, the "Anti-Money Laundering Laws"), and no material Legal Proceeding by or before any Governmental Entity or any arbitrator involving any member of the Company Group with respect to Anti-Money Laundering Laws is pending or, to the Knowledge of the Company Parties, threatened.

Section 2.21    No Unlawful Payments; Sanctions Laws.

(a)    Since January 1, 2022, no member of the Company Group nor, to the Knowledge of the Company Parties, any of their respective directors, officers, employees or agents, has in any material respect:  (i) used funds of any member of the Company Group for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity or for the purpose of corruptly influencing any foreign governmental official, (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds, (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977 or any other Anticorruption Law, or (iv) made any foreign bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

(b)    No member of the Company Group nor, to the Knowledge of the Company Parties, any of their respective directors, officers, employees or other Persons acting on their behalf with express authority to so act is currently subject to any Sanctions administered by OFAC (a "Sanctioned Person").  Each member of the Company Group and their respective officers and employees and, to the Knowledge of the Company Parties, their respective directors and agents, are in compliance with Anticorruption Laws and applicable Sanctions, in all material respects.

Section 2.22    Insurance.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) each member of the Company Group has insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses; and (b) as of the date hereof, no member of the Company Group has received notice from any insurer or agent of such insurer with respect to any insurance policies of the Company Group of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

Section 2.23    No General Solicitation.

(a)    No member of the Company Group, any Person acting on its or any of their behalf or, to the Knowledge of the Company Parties, any Affiliate of the Company Group, has engaged, or intends to engage, in any form of general solicitation or general advertising (within the meaning of Rule 502(c) under the Securities Act) in connection with the offering of the sale of the Direct Investment Shares and the Rights Offering Stock, as applicable, and the receipt of the Equity Rights Offering Backstop Premium, as applicable.

17

(b)      Other than this Agreement, the Restructuring Support Agreement and other Transaction Documents, no member of the Company Group or any Affiliate thereof has entered into any agreement or arrangement with any Person in relation to the sale of the Direct Investment Shares and the Rights Offering Stock, as applicable, and the receipt of the Equity Rights Offering Backstop Premium, as applicable, except, to the extent applicable, pursuant to Section 1.5(a)(ii) hereof.

(c)      No member of the Company Group, any Person acting on its or their behalf or, to the Knowledge of the Company Parties, any Affiliate of the Company Group, directly or indirectly, has made or will make any offers or sales of any security, or has solicited or will solicit offers to buy, or otherwise has negotiated or will negotiate in respect of, any security, under circumstances that would require the registration of any of the securities offered or sold in connection with the Equity Rights Offering or the Direct Investment Equity Raise or under this Agreement under the Securities Act.

Section 2.24    Exclusivity of Representations.  Notwithstanding anything herein to the contrary, it is the explicit intent of the Parties, and the Parties hereby agree, that the representations and warranties made by the Issuer and the Debtor in this Article II (as qualified by the Debtor Disclosure Schedules) and in any certificate delivered at the Effective Date are the exclusive representations and warranties made by the Issuer, the Debtor or any other Person (other than the representations and warranties of the Commitment Parties in accordance with Article III) with respect to the Issuer, the Debtor and the other members of the Company Group, including the businesses and assets of each of them, or the subject matter of this Agreement.  Each of the Issuer and the Debtor hereby disclaims any other express or implied representations or warranties made by any Person with respect to itself or any member of the Company Group, the businesses and assets of the Company Group, the New Common Stock and the transactions contemplated by this Agreement and any certificate, instrument or document delivered pursuant hereto.  Except as expressly set forth herein or in any certificate delivered at the Effective Date, the condition of the assets of the Company Group shall be "as is", "where is" and "with all faults" and neither the Issuer nor the Debtor makes any warranty of merchantability, suitability, adequacy, fitness for a particular purpose or quality with respect to the businesses or any of the assets of the Company Group or as to the condition or workmanship thereof or the absence of any defects therein, whether latent or patent.  Except for the representations and warranties contained in this Article II or in any certificate delivered at the Effective Date, neither the Issuer nor the Debtor is, directly or indirectly, and no other Person on behalf of the Issuer or the Debtor is, making any representations or warranties, including, regarding any *pro-forma* financial information, financial projections or other forward-looking prospects, risks or statements (financial or otherwise) of the Company Group made, communicated or furnished (orally or in writing) to any of the Commitment Parties or any of their respective Affiliates or their respective Representatives (including any opinion, information, projection or advice in any management presentation or the confidential information memorandum provided to any Commitment Party and any of its Affiliates and their respective Representatives), and the Issuer and the Debtor each hereby disclaims all Liability and responsibility for any such information and statements.  It is understood that any of the information set forth in management presentations relating to the Company Group made available to any of the Commitment Parties, their respective Affiliates or their respective Representatives in materials made available in any "data room" (virtual or otherwise), including any cost estimates delivered or made available, financial projections or other projections, in presentations by the management of the Company Group, in "break-out" discussions, in responses to questions submitted by or on behalf of any Commitment Party, their respective Affiliates or their respective Representatives, whether orally or in writing, in materials prepared by or on behalf of the Company Group, or in any other form made available to any Commitment Party or their respective Affiliates or their respective Representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, contain representations or warranties of the Company Group or its Affiliates or its Representatives.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT PARTIES

Each of the Commitment Parties, severally and not jointly, represents and warrants to the Company Parties as set forth below.  Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement is made as of the date hereof and as of the Effective Date.

Section 3.1    Formation.  Such Commitment Party is a legal entity duly incorporated, organized or formed, as applicable, and is validly existing as a corporation or other entity under the applicable Laws of its jurisdiction of organization or formation.

Section 3.2    Power and Authority.  Such Commitment Party has the requisite power and authority to enter into, execute and deliver this Agreement, and any other Transaction Document to which it is a party, and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 3.3    Execution and Delivery.  This Agreement has been, and each other Transaction Document to which such Commitment Party is party has been or will be, duly and validly executed and delivered by such Commitment Party and, subject to entry of the Backstop Order, and assuming due and valid execution hereof by the Company Parties, and of each other Transaction Document by the Company Parties and any other Person party thereto, each constitutes its valid and binding obligation, enforceable against such Commitment Party in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

Section 3.4    Governmental Filings; No Violations; Etc.

(a)    No filings, reports, notices, consents, registrations, approvals, permits or authorizations are required to be made by such Commitment Party with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by such Commitment Party from, any Governmental Entity or other third party in connection with the execution, delivery and performance of this Agreement or the other Transaction Documents by such Commitment Party and the consummation by such Commitment Party of the transactions contemplated hereby.

(b)    The execution, delivery and performance of this Agreement and the other applicable Transaction Documents by such Commitment Party does not, and the consummation by such Commitment Party of the transactions contemplated hereunder will not, constitute or result in (i) a breach, modification, termination or violation of, or a default under, the organizational documents of such Commitment Party, (ii) a breach or violation of any applicable laws, rules and regulations to which such Commitment Party is subject, or (iii) conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract to which such Commitment Party is a party to, except, with respect to clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to prohibit or materially and adversely impact such Commitment Party's performance of its obligations under this Agreement or its ability to consummate the transactions contemplated hereby.

19

Section 3.5      Purchase Intent.   Such applicable Commitment Party is acquiring the New Common Stock (including that related to the Equity Backstop Commitment, the Direct Investment Equity Raise, and the Equity Rights Offering Backstop Premium, as applicable), for its own account or for the accounts for which it is acting as investment advisors or manager, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with the Securities Act, the rules and regulations promulgated thereunder, and any applicable state securities or "blue sky" Laws, and such Commitment Party has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with the Securities Act, the rules and regulations promulgated thereunder, and any applicable state securities or "blue sky" Laws.

Section 3.6      Sophistication.

(a)      Such Commitment Party (i) is an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act or a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, (ii) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the New Common Stock being acquired hereunder, and (iii) understands and is able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding its New Common Stock issued hereunder for an indefinite period of time).

(b)      Such Commitment Party has independently evaluated the merits and risks of its decision (including consulting its own legal, tax, economic and other advisors) to enter into this Agreement and disclaims reliance on any representations or warranties, either express or implied, by or on behalf of any of the Company Parties.

Section 3.7      Reliance on Exemptions.   Such Commitment Party understands that (a) the New Common Stock is being offered and sold to such Commitment Party hereunder in reliance upon specific exemptions from the registration requirements of United States federal securities Laws, will not be registered under the Securities Act, and that the Company Parties are relying upon the accuracy of the Commitment Party's representations and warranties hereunder in determining the availability of such exemptions and (b) the foregoing securities may not be resold or otherwise transferred unless subsequently registered under the Securities Act or an exemption from registration is available.

Section 3.8      No Broker's Fees.   Such Commitment Party is not a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a claim against the Company Group for a brokerage commission, finder's fee or like payment in connection with the transactions contemplated hereby.

Section 3.9      Sufficient Funds.   Such Commitment Party has and shall maintain through the Subscription Expiration Deadline and Equity Backstop Funding Date, in the case of the Equity Rights Offering Holdback Parties and the Equity Rights Offering Backstop Parties, respectively, sufficient assets and the financial capability to perform all of its obligations under this Agreement, including the ability to fully fund its obligations under its Direct Investment Equity Raise and its Equity Backstop Commitment, respectively.   Such Commitment Party acknowledges that its obligations under this Agreement and the other Transaction Documents are not conditioned in any manner upon its obtaining financing.

Section 3.10     Legal Proceedings.   Other than as may exist or arise in the Chapter 11 Cases, there are no Legal Proceedings pending or, to the knowledge of such Commitment Party, threatened in writing, to which such Commitment Party or any of its Subsidiaries is a party or to which any property of such Commitment Party or any of its Subsidiaries is the subject, in each case that will (or would be reasonably

likely to) prohibit, delay, or adversely impact such Commitment Party's performance of its obligations under this Agreement or the other agreements contemplated hereunder.

## ARTICLE IV
## ADDITIONAL COVENANTS

Section 4.1    Commercially Reasonable Efforts.

(a)    Without in any way limiting any other respective obligation of any Party in this Agreement, during the period commencing on the date of this Agreement and ending on the earlier of the Effective Date and the date on which this Agreement is validly terminated in accordance with its terms, each Party shall use (and the Issuer shall cause each member of the Company Group to use) commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Plan, including using commercially reasonable efforts to:

(i)    timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Person and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Entity;

(ii)    cooperating with the defense of any Legal Proceedings in any way challenging (A) this Agreement, the Plan, or any other document expressly contemplated hereby and thereby, (B) the Backstop Order, (C) the Confirmation Order or (D) the consummation of the transactions contemplated hereby and thereby, including, seeking to have any stay or temporary restraining Order entered by any Governmental Entity vacated or reversed; provided that nothing in this Section 4.1(a)(ii) shall limit the obligations of any of the parties to the Restructuring Support Agreement; and

(iii)    working together in good faith to finalize the New Organizational Documents and any other documents or agreements in connection with the Equity Rights Offering and the Direct Investment Equity Raise and all other documents relating thereto for timely inclusion in the Plan and filing with the Bankruptcy Court in accordance with the Restructuring Support Agreement and the Plan.

(b)    Except as contemplated by Section 4.8 hereof, no Party shall, directly or indirectly, object to, delay, impede, or take any other action to interfere with, or that is inconsistent in any material respect with, or is intended to frustrate or impede, the acceptance, implementation or consummation of the transactions contemplated hereunder or the other Restructuring Transactions.

(c)    Subject to applicable Laws relating to the exchange of information, and in accordance with the Restructuring Support Agreement, the Parties shall have the right to review in advance, and, to the extent practicable the Commitment Parties and the Issuer, respectively, will consult with the other on all of the information relating to the Commitment Parties, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the transactions contemplated by this Agreement; provided, however, that the Parties are not required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court.  In exercising the foregoing rights and obligations, the Parties shall act reasonably and as promptly as practicable.

Section 4.2    Conduct of Business.

(a)    Except (i) as contemplated by this Agreement, the Restructuring Support Agreement or the other Transaction Documents, (ii) as required by applicable Law or Order or as required by any Governmental Entity, including as required by any Order of the Bankruptcy Court, or (iii) with the prior written consent (not to be unreasonably withheld, conditioned or delayed) of the Requisite Equity Backstop Parties (it being understood and agreed that email confirmation from such Requisite Equity Backstop Parties or any of their legal advisors shall be sufficient for such consent to be deemed given), during the period beginning on the date of this Agreement and ending on the earlier of the Effective Date and the date on which this Agreement is validly terminated in accordance with its terms, the Issuer shall, and shall cause each member of the Company Group to, use commercially reasonable efforts to:

(A)    support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with the Restructuring Support Agreement;

(B)    the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in the Restructuring Support Agreement, take steps necessary and desirable to address any such impediment in reasonable consultation with the Consenting Stakeholders (as defined in the Restructuring Support Agreement);

(C)    obtain any and all required regulatory and third-party approvals for the Restructuring Transactions in reasonable consultation with the Requisite Equity Backstop Parties;

(D)    negotiate in good faith and to execute and deliver the Definitive Documents (as defined in the Restructuring Support Agreement) and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by the Restructuring Support Agreement and by this Agreement;

(E)    seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent and to the extent the Company Parties receive any Transfer Agreements (as defined in the Restructuring Support Agreement), as soon as reasonably practicable notify counsel to the Commitment Parties of such Transfer Agreements via email as set forth in accordance with Section 8.2 hereof;

(F)    consult with the Requisite Equity Backstop Parties as to which material executory contracts are to be assumed;

(G)    (x) provide counsel for the Requisite Equity Backstop Parties an opportunity to review draft copies of all material motions or pleadings and first day pleadings, and (y) to the extent reasonably practicable, provide a reasonable opportunity to counsel to any Requisite Equity Backstop Parties materially affected by such filing to review draft copies of other documents that the Company Parties intend to file with the Bankruptcy Court, as applicable; provided that the foregoing shall not apply to any retention or fee applications of any of the advisors to the Company Parties or procedures with respect to the Debtors' retention and compensation of ordinary course professionals;

(H)      continue ordinary course practices to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases;

(I)      except as otherwise expressly set forth in this Agreement, operate their businesses and operations in the ordinary course in a manner that is consistent with this Agreement and the Restructuring Support Agreement and consistent with the Company Group past practice, and use commercially reasonable efforts to preserve intact the Company Parties' business organization and relationships with third parties (including, without limitation, suppliers, customers, and governmental and regulatory authorities and employees);

(J)      inform, as soon as reasonably practicable, the advisors to the Commitment Parties in writing (email being sufficient) as soon as reasonably practicable after becoming aware (and in any event within two (2) Business Days after becoming so aware) of: (v) any event or circumstance that has occurred, or that is reasonably likely to occur, that would permit any Party to terminate, or that would result in the termination of, this Agreement; (w) any matter or circumstance that is, or is reasonably likely to be, a material impediment to the implementation or consummation of the Restructuring Transactions; (x) the threat or commencement of any involuntary chapter 11 proceeding under the Bankruptcy Code with respect to any of the Company Parties, material lawsuit, investigation, hearing, or enforcement action from or by any person or entity in respect of any Company Party; (y) a breach of this Agreement by any Party; or (z) any material representation or statement made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made;

(K)      promptly execute any outstanding engagement letters of the First Lien Ad Hoc Group Advisors (as defined in the Restructuring Support Agreement), pay in full and in cash all First Lien Ad Hoc Group Restructuring Expenses (as defined in the Restructuring Support Agreement) when properly incurred and invoiced in accordance with the relevant engagement letters and/or fee arrangements (and not terminate such engagement letters and/or fee arrangements or seek to reject them in the Chapter 11 Cases); provided that (x) all accrued and unpaid First Lien Ad Hoc Group Restructuring Expenses (including First Lien Ad Hoc Group Restructuring Expenses incurred following the Petition Date) as of the Effective Date of the Plan, including any reasonable estimate of such First Lien Ad Hoc Group Restructuring Expenses, shall be paid by the Company Parties on the Effective Date of the Plan, and (y) in the event a Termination Date (as defined in the Restructuring Support Agreement) occurs with respect to the Company Parties, the Company Parties shall remain obligated to pay all First Lien Ad Hoc Group Restructuring Expenses accrued and unpaid as of and up to such Termination Date in accordance with the applicable engagement letters and/or fee arrangements of the advisors to the Consenting Stakeholders (as defined in the Restructuring Support Agreement);

(L)      subject to Section 8 of the Restructuring Support Agreement, actively and timely oppose and object to the efforts of any person seeking in any manner to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions

23

(including, if applicable, the Debtors' timely filing of objections or written responses in the Chapter 11 Cases) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions in consultation with the Requisite Equity Backstop Parties;

(M)     provide timely responses to all reasonable diligence requests sent to the Issuer by and through the Requisite Equity Backstop Parties on a continuing and rolling basis, including but not limited to, (x) updates regarding the material business and financial (including liquidity) performance of the Company Parties, (y) the status of obtaining any necessary or desirable authorizations (including consents) from each Requisite Equity Backstop Party, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or exchange, and (z) the general status and progress of the Restructuring Transactions, including progress in relation to the documentation and negotiations of the Definitive Documents set forth on Section 3.01 of the Restructuring Support Agreement;

(N)     promptly provide information to the Commitment Parties, as soon as reasonably practicable after becoming aware (and in any event within two (2) Business Days after becoming so aware) of such information, regarding any discussions or any actions or inaction relating to material claims or causes of action brought against any Company Party (or any Affiliate) relating to or arising out of the Company's labor practices (including, without limitation, any claims asserted by a Governmental Entity), including copies of any materials provided to or provided by the Company Parties with respect to such claims and causes of action, as necessary to keep the Commitment Parties reasonably contemporaneously informed as to the status and substance of the foregoing;

(O)     (x) deliver drafts to the counsel of the Commitment Parties, via email as set forth in accordance with <u>Section 8.2</u> hereof, all Company Party press releases, public filings, public announcements, or other communications with any news media, or material mass communications that constitute disclosure of the existence or terms of this Agreement or the Restructuring Support Agreement or any amendment thereto, the Chapter 11 Cases, the Restructuring Transactions, or any settlement or proposed settlement of any material claims or causes of action held by or brought against any Company Party (including, without limitation, any claims asserted by a Governmental Entity) to the general public (each, a "<u>Public Disclosure</u>") as soon as reasonably practicable but no later than two (2) Business Days in advance of making any such Public Disclosure (it being understood that such period may be shortened by agreement of the Parties to the extent there are exigent circumstances), and (y) use commercially reasonable, good faith efforts to consult the First Lien Ad Hoc Group Advisors on public relations strategy and consider and incorporate any reasonable input or comments from the First Lien Ad Hoc Group Advisors on each Public Disclosure, who shall be authorized to share such Public Disclosure with the steering committee of the First Lien Ad Hoc Group, and which Public Disclosure shall be reasonably acceptable to the Required Consenting First Lien Lenders;

(P)     (x) provide to the counsel of the Commitment Parties, via email as set forth in accordance with <u>Section 8.2</u> hereof, on a professional eyes only basis, a copy of any written Alternative Restructuring Transaction as soon as

24

practicable but in any event within three (3) Business Days of the Company Parties' or their advisors' receipt of such Alternative Restructuring Transaction and (y) promptly provide such information to the counsel of the Commitment Parties, via email as set forth in accordance with Section 8.2 hereof, regarding such discussions or any actions or inaction pursuant to Section 4.8 hereof (including copies of any materials provided to or provided by the Company Parties with respect to the applicable Alternative Restructuring Transaction) as necessary to keep the counsel of the Commitment Parties reasonably contemporaneously informed as to the status and substance of the foregoing; in each case, to the extent that the board of directors, board of managers, or such similar governing body of a Company Party determines, after consultation with outside counsel, the foregoing is not inconsistent with applicable Law or its fiduciary obligations under applicable Law; and

(Q)     give prompt notice (email being sufficient) to the counsel of the Commitment Parties, as set forth in accordance with Section 8.2 hereof, within one (1) day if any Company Party or the board of directors, board of managers, or such similar governing body of a Company Party, acting in good faith and after consulting with counsel, determines (x) to pursue, assist in, consent to, vote for, or enter into any agreement regarding any unsolicited Alternative Restructuring Transaction in accordance with Section 4.8 hereof, or (y) that proceeding with the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law.

(b)     Except (i) as contemplated by this Agreement, the Restructuring Support Agreement or the other Transaction Documents, (ii) as required by applicable Law or Order or as required by any Governmental Entity, including as required by any Order of the Bankruptcy Court, or (iii) with the prior written consent (not to be unreasonably withheld, conditioned or delayed) of the Requisite Equity Backstop Parties (it being understood and agreed that email confirmation from such Requisite Equity Backstop Parties or any of their legal advisors shall be sufficient for such consent to be deemed given), during the period beginning on the date of this Agreement and ending on the earlier of the Effective Date and the date on which this Agreement is validly terminated in accordance with its terms, the Issuer shall not, and shall cause each member of the Company Group not to:

(A)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(B)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in, this Agreement, the Restructuring Support Agreement, the Definitive Documents, or the Plan;

(C)     (x) seek to waive, amend, or modify any of the Definitive Documents, in a manner that is materially inconsistent with this Agreement or the Restructuring Support Agreement, or (y) file any pleading with the Bankruptcy Court that is materially inconsistent with this Agreement or the Restructuring Support Agreement or seeking authorization to accomplish or effect any of the foregoing, in each case if such action is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3 of the Restructuring Support Agreement;

25

(D)      except as permitted by Section 4.8 hereof, without the prior written consent of the Requisite Equity Backstop Parties, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(E)      take any action with respect to the disposition, treatment, or dissolution of any material Company Party (including any foreign or domestic Subsidiaries or Affiliates, whether or not such entities are Filing Entities (as defined in the Restructuring Support Agreement) or signatory to this Agreement), except as permitted by Section 3 of the Restructuring Support Agreement without the prior consultation with the Requisite Equity Backstop Parties;

(F)      modify or execute the Definitive Documents in a manner that is inconsistent with this Agreement, the Restructuring Support Agreement and the Restructuring Term Sheet (as defined in the Restructuring Support Agreement) in any material respect; provided that the foregoing may be cured by the Company Parties within three (3) Business Day following the delivery of a written notice in accordance with Section 8.2 hereof;

(G)      file any Definitive Document, motion, or pleading with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that is materially inconsistent with this Agreement, the Restructuring Support Agreement or the Restructuring Term Sheet or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3 of the Restructuring Support Agreement;

(H)      (x) commence any proceeding or other action that challenges (1) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests (as defined in the Restructuring Support Agreement) of any of the Commitment Parties, or (2) the validity, enforceability, or perfection of any lien or other encumbrance securing (or purporting to secure) of any Company Claims/Interests of any of the Commitment Parties, or (y) support any person in connection with any of the acts described the foregoing clauses;

(I)      materially amend or change any of their respective existing organizational documents without the prior written consent of the Requisite Equity Backstop Parties;

(J)      (x) authorize, create, issue, sell, or grant any additional equity interests of HFS Matterhorn Topco, Inc., or (y) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any equity interests, in each case without the prior written consent of the Requisite Equity Backstop Parties;

(K)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement or the Restructuring Support Agreement in all material respects;

(L)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments

26

thereof) that, in whole or in part, is not materially consistent with this Agreement, the Restructuring Support Agreement or the Plan;

(M) in a transaction outside of the ordinary course, sell any assets (including, without limitation, any intellectual property) in a transaction or a series of transaction having a fair market value of $5,000,000.00 or greater without the prior written consent of the Requisite Equity Backstop Parties;

(N) except in accordance with the Restructuring Transactions or in the ordinary course of business and consistent with past practice, incur any indebtedness or guarantee any indebtedness of another entity involving amounts greater than $5,000,000.00 in principal amount in the aggregate across all such transactions without the prior written consent of the Requisite Equity Backstop Parties;

(O) except in the ordinary course of business and consistent with past practice, terminate or release (x) any obligors or guarantors of their obligations under the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Senior Unsecured Notes Indenture or (y) any of the liens on, security interests in, or guarantees of any of the assets of the Company Parties that secure the obligations under the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Senior Unsecured Notes Indenture, in each case without the prior written consent of the Requisite Equity Backstop Parties; or

(P) settle any (x) material claims or causes of action brought against any Company Party (or any Affiliate) (including, without limitation, any claims asserted by a Governmental Entity) other than in the ordinary course of business and consistent with past practice or (y) claims or causes of action brought against any Company Party (or any Affiliate) involving principal amounts greater than $5,000,000, in each case without the prior written consent of the Requisite Equity Backstop Parties.

(c) Except as otherwise expressly provided in this Agreement, nothing in this Agreement shall give the Commitment Parties, directly or indirectly, any right to control or direct the operations of the Company Group. Prior to the Effective Date, the Issuer and the Debtor, as applicable, shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of the business of the Company Group.

Section 4.3    Access to Information, Books and Records.

(a) Subject to applicable Law, upon reasonable notice during the period from the date hereof until the earlier to occur of the termination of this Agreement in accordance with its terms and the Effective Date, the Issuer shall, and shall cause the other members of the Company Group to, afford the Commitment Parties and their respective Representatives, upon their reasonable request, reasonable access, during normal business hours and without unreasonable disruption or interference with the Company Group's conduct of business, to the Company Group's employees, advisors and representatives, properties, books, Contracts and records and, during the period from the date hereof until the earlier to occur of the termination of this Agreement in accordance with its terms and the Effective Date, the Issuer shall (and shall cause the other members of the Company Group to) furnish as promptly as reasonably practicable to such Commitment Parties all reasonable information concerning the Company Group's business, properties and personnel as may

reasonably be requested by any such party; provided that the foregoing shall not require the Issuer or any other member of the Company Group to permit any inspection, or to disclose any information, that in the reasonable judgment of the Issuer would reasonably be expected to cause any member of the Company Group to (i) violate the terms of any applicable Contracts (including any of their respective obligations with respect to confidentiality to a third party if the Issuer shall have used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure), (ii) jeopardize any attorney-client privilege or other similar privilege of any member of the Company Group, or (iii) violate any applicable Laws or Orders.

(b)      The Commitment Parties shall utilize commercially reasonable security measures in collecting, using and storing the Company Group's information and accessing the Company Group's systems.

(c)      All requests for information and access made in accordance with this Section 4.3 shall be directed to an executive officer of the Issuer or such Person as may be designated by the Issuer's executive officers.

(d)      (i) Each Commitment Party hereby agrees that any information acquired by such Commitment Party or its respective Representatives pursuant to a request made under Section 4.2 hereof or this Section 4.3 are strictly confidential, and that from and after the date hereof until the date that is one (1) year after the later of the termination of this Agreement or the Effective Date, each Commitment Party shall, and shall cause its Representatives to, (A) keep confidential and not provide or disclose to any Person any documents or information received or otherwise obtained by such Commitment Party or its Representatives pursuant to this Agreement, or in connection with a requests made under Section 4.2 hereof or this Section 4.3 (except that provision or disclosure may be made to any Affiliate or Representative of such Commitment Party who needs to know such information for purposes of this Agreement or the other Transaction Documents and who agrees to observe the terms of this Section 4.3(d) (and such Commitment Party will remain liable for any breach of such terms by any such Affiliate or Representative)), and (B) not use such documents or information for any purpose other than in connection with this Agreement or the other Transaction Documents or the transactions contemplated hereby and thereby.

(ii)      Notwithstanding the foregoing, the immediately preceding sentence shall not apply in respect of documents or information that (A) is now or subsequently becomes generally available to the public through no violation of this Section 4.3(d), (B) becomes available to a Commitment Party or its Representatives on a non-confidential basis from a source other than any of the Debtors or any of their respective Representatives, (C) becomes available to a Commitment Party or its Representatives through document production or discovery in connection with the Chapter 11 Cases or other judicial or administrative process, or (D) such Commitment Party or any Representative thereof is required to disclose pursuant to judicial or administrative process or pursuant to applicable Law or applicable securities exchange rules; provided, that, such Commitment Party or such Representative shall provide the Issuer with prompt written notice of such legal compulsion and cooperate with the Issuer to obtain a protective order or similar remedy to cause such information or documents not to be disclosed, including interposing all available objections thereto, at the Issuer's sole cost and expense; provided, further, that, in the even that such protective Order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of such information or documents that is legally required to be disclosed and shall exercise its commercially reasonable efforts (at the

Issuer's sole cost and expense) to obtain assurance that confidential treatment will be accorded such disclosed information or requests.

(e)    No Company Party makes any representations or warranties with respect to any of the information provided or made available pursuant to Section 4.2 hereof or this <u>Section 4.3</u>.

Section 4.4    <u>Blue Sky</u>.  Subject to the accuracy of <u>Section 3.6</u> hereof, (a) the Issuer shall, on or before the Effective Date, take such action as the Issuer and the Requisite Equity Backstop Parties shall reasonably determine is necessary in order to qualify, or to obtain an exemption from such qualification, for any securities issued pursuant to this Agreement and the Plan for sale to the Commitment Parties at the Effective Date under applicable securities and "blue sky" Laws of the states of the United States, and shall provide reasonable evidence of any such action so taken to the Commitment Parties; (b) the Issuer shall timely make all filings and reports relating to the offer and sale of the securities issued pursuant to this Agreement and the Plan required under applicable securities and "blue sky" Laws of the states of the United States; and (c) the Company Parties shall pay all filing fees and expenses with respect to the filings to be made pursuant to this <u>Section 4.4</u>.

Section 4.5    <u>No Integration; No General Solicitation</u>.

(a)    Neither the Issuer nor any of its Affiliates (as defined in Rule 501(b) of Regulation D promulgated under the Securities Act) will, directly or through any agent, sell, offer for sale, solicit offers to buy or otherwise negotiate in respect of, any security (as defined in the Securities Act), that is or will be integrated with the sale of any of the New Common Stock to be issued under the Plan and this Agreement in a manner that would require registration of any securities to be issued by the Issuer on the Effective Date under the Securities Act.

(b)    None of the Issuer or any of its Affiliates or any other Person acting on its or their behalf will solicit offers for, or offer or sell, any such securities by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D promulgated under the Securities Act or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act.

Section 4.6    <u>Use of Proceeds</u>.  The Issuer will apply the proceeds from the Equity Rights Offering and the Direct Investment Equity Raise for the purposes identified in the Plan and the Restructuring Support Agreement.

Section 4.7    <u>DTC Eligibility</u>.

(a)    Upon the written request of the Requisite Equity Backstop Parties, the Issuer shall engage a transfer agent to facilitate transfers of the New Common Stock to be issued pursuant to the Equity Rights Offering and the Plan.

(b)    Upon the written request of the Requisite Equity Backstop Parties, the Issuer shall use commercially reasonable efforts to have the New Common Stock (i) to be issued pursuant to this Agreement and the Plan be cleared through the facilities of The Depository Trust Company (if The Depository Trust Company determines such securities are eligible to be so cleared), or (ii) if DTC eligibility is not available under (i), to be issued through direct registration on the books and records of the Issuer's transfer agent.

Section 4.8    Alternative Restructuring Transactions.

(a)    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or such similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to this Agreement or the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 4.8 shall not be deemed to constitute a breach of this Agreement.

(b)    Notwithstanding anything to the contrary in this Agreement (but subject to Section 4.8(a) hereof), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (i) consider, solicit, or develop proposals with respect to Alternative Restructuring Transactions; (ii) provide access to non-public information concerning any Company Party to any Person that (A) the Company Parties may reasonably determine may submit a proposal with respect to an Alternative Restructuring Transaction, and (B) has entered into a reasonable and customary confidentiality agreement or a reasonable and customary nondisclosure agreement with the Company Parties; provided, however, that no Company Party shall enter into any confidentiality agreement or nondisclosure agreement with any such Person to the extent such confidentiality agreement or nondisclosure agreement would restrict any Company Party's ability to share any documents or terms concerning such Alternative Restructuring Transaction with the Commitment Parties in accordance with the terms of this Agreement; (iii) maintain or continue discussions or negotiations with respect to any Alternative Restructuring Transactions if such Person, acting in good faith and after consulting with counsel, determines that the failure to take such action would be inconsistent with its fiduciary duties or applicable Law; and (iv) enter into or continue discussions or negotiations with holders of Claims against or equity interests in a Company Party, any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Person regarding the Restructuring Transactions.

(c)    Nothing in this Agreement shall: (i) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (ii) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or (iii) require any Company Party to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal or professional privilege.

Section 4.9    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement, each of the Issuer and the Commitment Parties hereby covenants and agrees to cooperate with one another in good faith with respect to the pursuit, approval, implementation and consummation of the transactions contemplated in this Agreement and the Plan, as well as the negotiation, drafting, execution, and delivery of documents (including any related orders, agreements, instruments, schedules, or exhibits) described in this Agreement, the Plan or the Restructuring Support Agreement or as may otherwise be reasonably necessary or as the Commitment Parties may reasonably request to facilitate the transactions contemplated in this Agreement in accordance with this Agreement, the Plan or the Restructuring Support Agreement.

(b)    Furthermore, subject to the terms and conditions hereof, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, such action as may be

reasonably necessary or reasonably requested by the other Party to carry out the purpose and intent of this Agreement, the Plan and the Restructuring Support Agreement.

Section 4.10    Bankruptcy Court Matters.

(a)    The Company Parties shall use their commercially reasonable efforts to (i) obtain the entry of (A) the Backstop Order (which may be part of the Disclosure Statement Order (as defined herein)) and the Disclosure Statement Order no later than sixty-five (65) calendar days after the Petition Date, subject to the Bankruptcy Court's availability; and (B) the Confirmation Order no later than one hundred and ten (110) calendar days after the Petition Date, subject to the Bankruptcy Court's availability, and (ii) cause the Backstop Order, the Disclosure Statement Order and the Confirmation Order to become Final Orders; provided that the failure of any of this Section 4.10(a) to occur on or within the timeframes contemplated in this Section 4.10(a) may be cured by the Company Parties at any time prior to delivery of a notice purporting to terminate this Agreement on account thereof.

(b)    The Company Parties shall provide to each of the Commitment Parties and their counsel, a reasonable opportunity to review and comment on any proposed amendment, modification, supplement or change to the Plan or the Disclosure Statement, and such documents must be in form and substance reasonably acceptable to each of the Requisite Equity Backstop Parties and the Issuer.

Section 4.11    Tax Matters.

(a)    For U.S. federal and applicable state and local income tax purposes, the Parties agree that the (i) Equity Rights Offering Backstop Premium shall be treated as put option premium, and (ii) the Parties shall prepare and file all tax returns consistent with that tax treatment except as otherwise required pursuant to a final determination within the meaning of Section 1313(a) of the Code.

Section 4.12    Antitrust Approvals.

(a)    Except as set forth in this Agreement or with the prior written consent of the Company Parties, during the period from the date of this Agreement to the earlier of the Effective Date and the date on which this Agreement is terminated in accordance with its terms, the Commitment Parties shall use commercially reasonable efforts to reasonably promptly take all actions and prepare and file all necessary documentation (including by reasonably cooperating with the Company Parties as to the appropriate time of filing such documentation and its content) and to effect all applications that are necessary in connection with seeking any governmental approval, exemption or authorization from any Governmental Entity under any Antitrust Laws, that are necessary to consummate and make effective the transactions contemplated by this Agreement.

(b)    Without limiting the foregoing, the Commitment Parties will reasonably cooperate with the Company Parties in preparing and filing all necessary documentation and to effect all applications that are necessary in connection with seeking any governmental approval, exemption or authorization from any Governmental Entity.

(c)    The Commitment Parties shall reasonably promptly notify the Company Parties (and furnish to them copies of, if requested) of any communications from Governmental Entities and shall not participate in any meeting with any such authority unless they consult with the

Company Parties in advance and, to the extent permitted by applicable Law, including any Antitrust Authority, and give the Company Parties a reasonable opportunity to attend and participate thereat.

(d)       The Commitment Parties shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the Parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.

## ARTICLE V
## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 5.1       <u>Conditions to the Obligations of the Commitment Parties</u>.

(a)       The obligations of each Commitment Party to purchase Unsubscribed Shares pursuant to its respective Equity Backstop Commitments, in the case of Equity Rights Offering Backstop Parties, or the Direct Investment Shares pursuant to its Direct Investment Commitments, in the case of Equity Rights Offering Holdback Parties, on the Effective Date are subject to the satisfaction of the following conditions (unless, to the extent permitted by applicable Law, waived by the Requisite Equity Backstop Parties) prior to or at the Effective Date:

(i)       Representations and Warranties.  The representations and warranties of the Issuer (A) contained in <u>Sections 2.2</u>, <u>2.3</u>, <u>2.4</u>, <u>2.5</u>, <u>2.6(b)(ii)</u>, <u>2.7</u> and <u>2.8</u> shall be true and correct in all respects as of the Effective Date with the same effect as if made as of such time (except for such representations and warranties made as a specified date, which shall be true and correct as of such specified date) (other than *de minimis* inaccuracies in the case of <u>Section 2.4</u>), and (B) otherwise contained in <u>Article II</u> shall be true and correct (disregarding all materiality, Material Adverse Effect or similar qualifiers) as of the Effective Date with the same effect as if made as of such time (except for such representations and warranties made as of a specified date, which shall be true and correct as of such specified date), except where the failure to be so true and correct would not reasonably be expected to constitute, individually or in the aggregate, a Material Adverse Effect.

(ii)       <u>Covenants</u>.  Each of the Company Parties shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by such Party on or prior to the Effective Date.

(iii)       <u>Equity Rights Offering Backstop Premium</u>.  The Issuer will have delivered the Equity Rights Offering Backstop Premium to the Equity Rights Offering Backstop Parties on the Effective Date, subject to Section 1.5 hereof.

(iv)       <u>Equity Rights Offering Backstop Commitment Agreement Approval Order</u>.  The Bankruptcy Court shall have entered an Order approving this Agreement (the "<u>Backstop Order</u>"), such Order shall be in form and substance reasonably satisfactory to the Requisite Equity Backstop Parties and such Order shall be a Final Order.

(v)       <u>Restructuring Support Agreement</u>.  The Restructuring Support Agreement shall not have been terminated with respect to the Company Parties and shall be in full force and effect in accordance with its terms.

(vi)　Disclosure Statement Order.  The Bankruptcy Court shall have entered an Order approving the Disclosure Statement (the "Disclosure Statement Order"), such Order shall be in form and substance reasonably satisfactory to the Requisite Equity Backstop Parties and such Order shall be a Final Order.

(vii)　Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order, such Order shall be in form and substance reasonably satisfactory to the Requisite Equity Backstop Parties and such Order shall be a Final Order.

(viii)　Approved Plan.  The conditions to the occurrence of the Effective Date (other than any conditions relating to occurrence of the closing of the transactions contemplated by this Agreement and conditions the satisfaction of which requires the taking of action by the Commitment Parties) set forth in the Plan shall have been satisfied or waived  (other than such conditions that, by their terms, are to be satisfied as of the occurrence of the Effective Date) in accordance with the terms thereof.

(ix)　Effective Date.  The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the consummation of the transactions contemplated hereby, in accordance with the terms and conditions in the Restructuring Support Agreement, the Plan and the Confirmation Order.

(x)　Antitrust Approvals.  All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement and the Plan shall have terminated or expired and all applicable authorizations, approvals, consents or clearances under any Antitrust Laws in connection with the transactions contemplated by this Agreement and the Plan shall have been obtained.

(xi)　No Legal Impediment.  No Law or Order enacted, adopted or issued by any Governmental Entity with competent jurisdiction that prohibits the implementation and consummation of the Plan, the Equity Rights Offering, the Direct Investment Equity Raise or the transactions contemplated by this Agreement shall be in effect.

(xii)　No Material Adverse Effect.  Since the date of this Agreement, no Material Adverse Effect shall have occurred that is continuing as of the Effective Date.

(xiii)　Officer's Certificate.  The Commitment Parties shall have received a certificate from an authorized signatory of the Issuer confirming that the conditions set forth in Sections 5.1(a)(i) and 5.1(a)(ii) hereof have been satisfied.

(xiv)　New Organizational Documents.  Each Commitment Party shall have received duly executed counterparts of each of the New Organizational Documents to be entered into at the Effective Date by the Issuer or any of its Subsidiaries.

(b)　All or any of the conditions set forth in this Section 5.1 may only be waived in whole or in part with respect to all Commitment Parties by a written instrument delivered by the Requisite Equity Backstop Parties and if so waived, the Commitment Parties shall be bound by such waiver.

Section 5.2      Conditions to the Obligations of the Issuer.

(a)      The obligations of the Company Parties to consummate the transactions contemplated by this Agreement on the Effective Date are subject to satisfaction of the following conditions (unless waived by the Issuer) prior to or at the Effective Date:

(i)      Representations and Warranties.  The representations and warranties of the Commitment Parties set forth in this Agreement shall be true and correct in all material respects (or if already qualified by "materiality," "material adverse effect" or similar, shall be true in all respects) on and as of the date hereof and as of the Effective Date with the same effect as if made as of such time (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects (or if already qualified by "materiality," "material adverse effect" or similar, shall be true in all respects) as of such specified date).

(ii)      Covenants.  The Commitment Parties shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Commitment Parties on or prior to the Effective Date.

(iii)      Equity Rights Offering Backstop Commitment Agreement Approval Order.  The Bankruptcy Court shall have entered the Backstop Order, such Backstop Order shall be in form and substance reasonably satisfactory to the Issuer and such Order shall be a Final Order.

(iv)      Disclosure Statement Order.  The Bankruptcy Court shall have entered the Disclosure Statement Order, such Order shall be in form and substance reasonably satisfactory to the Issuer and such Order shall be a Final Order.

(v)      Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order, such Order shall be in form and substance reasonably satisfactory to the Issuer and such Order shall be a Final Order.

(vi)      Effective Date.  The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the consummation of the transactions contemplated hereby, in accordance with the terms and conditions in the Restructuring Support Agreement, the Plan and the Confirmation Order.

(vii)      Antitrust Approvals.  All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement and the Plan shall have terminated or expired and all applicable authorizations, approvals, consents or clearances under any Antitrust Laws in connection with the transactions contemplated by this Agreement and the Plan shall have been obtained.

(viii)      No Legal Impediment.  No Law or Order enacted, adopted or issued by any Governmental Entity with competent jurisdiction that prohibits the implementation of the Plan, the Equity Rights Offering or the transactions contemplated by this Agreement shall be in effect.

(ix)      Approved Plan.  The conditions to the occurrence of the Effective Date (other than any conditions relating to occurrence of the closing of the transactions

contemplated by this Agreement and conditions the satisfaction of which requires the taking of action by the Debtor or any of its Subsidiaries) set forth in the Plan shall have been satisfied or waived  (other than such conditions that, by their terms, are to be satisfied as of the occurrence of the Effective Date) in accordance with the terms thereof.

(x)      Restructuring Support Agreement.  The Restructuring Support Agreement shall not have been terminated with respect to the Commitment Parties and remains in full force and effect in accordance with its terms.

(xi)      New Organizational Documents.  On or before the Effective Date, the Debtor shall have received duly executed counterparts of each of the New Organizational Documents to be entered into at the Effective Date by the Commitment Parties or any of their Affiliates.

(xii)      Exit First Lien Term Loan Facility. The Exit First Lien Term Loan Facility (as defined in the Restructuring Support Agreement) shall be in effect with the terms set forth in the Plan.

(b)      All or any of the conditions set forth in this Section 5.2 may only be waived in whole or in part with respect to the Company Parties by a written instrument delivered by the Issuer and if so waived, the Company Parties shall be bound by such waiver.

## ARTICLE VI
## TERMINATION

Section 6.1      Termination by the Requisite Equity Backstop Parties.  The Requisite Equity Backstop Parties may terminate this Agreement as to all Parties by the delivery of a written notice in accordance with Section 8.2 hereof to all of the Parties, at any time upon the occurrence of any the following events:

(a)      (i) a Company Party has breached any representation, warranty, covenant or other agreement made by the Company Parties in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in Section 5.1(a)(i), Section 5.1(a)(ii), and Section 5.1(a)(xii) hereof not to be satisfied, (ii) the Requisite Equity Backstop Parties shall have delivered written notice of such breach or inaccuracy to the Company Parties in accordance with Section 8.2 hereof, (iii) such breach or inaccuracy is not cured by the Company Parties by the tenth (10th) Business Day after receipt of such notice, and (iv) as a result of such failure to cure, any condition set forth in Section 5.1(a)(i), Section 5.1(a)(ii), or Section 5.1(a)(xii) hereof is not capable of being satisfied; provided that this Agreement may not be terminated pursuant to this Section 6.1(a) if the Requisite Equity Backstop Parties are then in willful or intentional breach of this Agreement;

(b)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions, and (ii) remains in effect for thirty (30) days after the Requisite Equity Backstop Parties transmit a written notice in accordance with Section 8.2 hereof detailing any such issuance; provided that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c) any Company Party (i) publicly announces, or states in writing to any of the Requisite Equity Backstop Parties or other holders of Company Claims/Interests (including but not limited to Section 4.8 hereof), its intention not to support or pursue the Restructuring Transactions; or (ii) exercises any right pursuant to <u>Section 4.8</u> hereof that constitutes a material breach pursuant to this Agreement;

(d) the board of directors, board of managers, or such similar governing body of any Company Party, acting in good faith and after consulting with counsel, determines (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law, or (ii) in the exercise of its fiduciary duties, to enter into an Alternative Restructuring Transaction;

(e) the Bankruptcy Court enters an order denying confirmation of the Plan and such Order shall not have been reversed or vacated within fourteen (14) days of entry;

(f) (i) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order that is not stayed, vacated, or withdrawn fourteen (14) days from entry, or (ii) the filing of a motion or application in the Bankruptcy Court by any Company Party that is not been withdrawn five (5) days after filing, in each case without the prior written consent of the Requisite Equity Backstop Parties, (A) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (C) rejecting this Agreement, (D) dismissing one or more of the Chapter 11 Cases of a material Company Party, or (E) invalidating, disallowing, subordinating, or limiting the enforceability, priority, or validity of any of the Claims against, or the interests in, any member of the Company Group held by any of the Commitment Parties;

(g) upon the commencement of an involuntary case against any of the Company Parties or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief in respect of the Company Parties or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar law now or hereafter in effect; provided that such involuntary proceeding is not dismissed within a period of forty-five (45) days after the filing thereof;

(h) any Company Party files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement and such motion has not been withdrawn or amended within two (2) Business Days of receipt by the Company Parties of written notice from the Party that such motion or pleading is inconsistent with this Agreement;

(i) a Company Party files or directly supports another party in filing any motion, application, adversary proceeding, or other pleading challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any Claims of the Commitment Parties arising under any of the Prepetition Facilities (as defined in the Restructuring Support Agreement) and such Company filing is not withdrawn after five (5) Business Days of a written request from the Requisite Equity Backstop Parties;

(j) any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(k)        the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset (other than with respect to insurance proceeds) of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions and such order is not reversed after fourteen (14) days from the Bankruptcy Court's entry;

(l)        unless previously approved in writing by the Requisite Equity Backstop Parties, this Agreement or any Definitive Document is amended, waived, or modified in any manner that is inconsistent with the terms of this Agreement and any such amendment, waiver, or modification is not annulled, deemed invalid, or otherwise modified such that it is consistent with the terms of this Agreement within five (5) Business Days after written notice from the Requisite Equity Backstop Parties;

(m)        the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Company Claims/Interests of any of the Commitment Parties and such order is not reversed after fourteen (14) days from the Bankruptcy Court's entry;

(n)        any Company Party revokes the Restructuring Transaction without the prior consent of the Requisite Equity Backstop Parties, including the withdrawal of the Plan, as applicable, or support therefor, or publicly announces its intention to take any such act;

(o)        any Company Party settles any (i) material claims or causes of action brought against any Company Party (or any Affiliate) (including, without limitation, any claims asserted by a Governmental Entity) other than in the ordinary course of business and consistent with past practice or (ii) claims or causes of action brought against any Company Party (or any Affiliate) involving principal amounts greater than $5,000,000, in each case without the prior written consent of the Requisite Equity Backstop Parties;

(p)        the Bankruptcy Court determines that any material claims or causes of action brought against any Company Party (including, without limitation, any claims asserted by a Governmental Entity) in excess of $5,000,000 are nondischargeable;

(q)        the Effective Date shall not have occurred by 125 days after the Petition Date (the "Outside Date"); provided that the Commitment Parties shall not have the right to terminate this Agreement pursuant to this Section 6.1(q) if they are then in material breach of this Agreement; or

(r)        the occurrence of any of the events set forth in Section 13.01 of the Restructuring Support Agreement.

Section 6.2        Termination by the Issuer.  Upon written notice from the Issuer delivered in accordance with Section 8.2 hereof to the Commitment Parties, at any time upon the occurrence of any the following events, the Issuer may terminate this Agreement:

(a)        with respect to the applicable Commitment Party only, (i) either (A) any breach of any representation, warranty, covenant or other agreement made by such Commitment Party in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would or would reasonably be expected to, individually or in the aggregate, cause a condition set forth in Section 5.2(a)(i) or Section 5.2(a)(ii) hereof not to be satisfied, or (B) any material breach by such Commitment Party of, or such Commitment Party ceasing to be a party to,

37

the Restructuring Support Agreement, (ii) the Issuer or a Company Party shall have delivered written notice of such breach or inaccuracy or event to such Commitment Party in accordance with Section 8.2 hereof, and (iii) such breach or inaccuracy is not cured by such Commitment Party by the fifteenth (15th) Business Day after receipt of such notice; provided that, (x) the Company Parties shall not have the right to terminate this Agreement pursuant to this Section 6.2(a), if they are then in willful or intentional breach of this Agreement, and (y) this Agreement shall continue in full force and effect with respect to the Company Parties and the non-breaching Commitment Parties;

(b)        the Issuer's board of directors (the "Board"), or the board of directors, board of managers, or such similar governing body of any Company Party, and after consulting with counsel, determines (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Transaction;

(c)        the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions, and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 8.2 hereof detailing any such issuance;

(d)        if any Commitment Party (i) publicly announces their intention not to support the Restructuring Transaction, or (ii) validly terminates this Agreement as to themselves pursuant to Section 6.1 hereof, in which case the Company Parties can terminate only with respect to such Commitment Party and this Agreement shall otherwise remain in full force and effect with respect to each non-terminating or non-breaching Commitment Party;

(e)        the Bankruptcy Court enters an order denying confirmation of the Plan and such Order shall not have been reversed or vacated within fourteen (14) days of entry;

(f)        the entry of an order by the Bankruptcy Court or the filing of a motion or application by any Commitment Party (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) dismissing one or more of the Chapter 11 Cases of a material Company Party;

(g)        upon the commencement of an involuntary case against any of the Company Parties or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief in respect of the Company Parties or their debts, or of a substantial part of their assets, under any federal, state, or foreign bankruptcy, insolvency, administrative, receivership, or similar law now or hereafter in effect; provided that such involuntary proceeding is not dismissed within a period of forty-five (45) days after the filing thereof;

(h)        any Commitment Party files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement and such motion has not been withdrawn or amended within two (2) Business Days of receipt by any Company Party of written notice from the Company Party that such motion or pleading is inconsistent with this Agreement;

(i)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset (other than with respect to insurance proceeds) of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions;

(j)     the Effective Date shall not have occurred by the Outside Date; provided that the Company Parties shall not have the right to terminate this Agreement pursuant to this Section 6.2(j) if a Company Party is then in material breach of this Agreement;

(k)     The Issuer does not receive proceeds, including deemed proceeds through the election of the Non-Cash Option, equal to the Equity Rights Offering Amount pursuant to the Equity Rights Offering, the Direct Investment Equity Raise, and this Agreement; provided that any termination pursuant to this Section 6.2(k) shall not relieve or otherwise limit the Liability of any defaulting Commitment Party for any breach or violation of its obligations under this Agreement or any documents or instruments delivered in connection herewith; or

(l)     The termination of the Restructuring Support Agreement.

Section 6.3     Mutual Termination.  This Agreement may be terminated by mutual written agreement of the Issuer and the Requisite Equity Backstop Parties.

Section 6.4     Effect of Termination.

(a)     Upon the termination of this Agreement in accordance with this Article VI, and except as expressly provided in Article VI, this Agreement shall forthwith become null and void, any payments received by the Issuer pursuant to Funding Notices shall be returned, without interest, to the bank account identified by the applicable Commitment Party in such Commitment Party's Subscription Form as soon as reasonably practicable, and of no further force or effect as to all Parties and each Party shall, except as expressly provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement; provided, however, that (i) in no event shall any such termination relieve a party from Liability for its actual and intentional fraud or any willful or intentional breach of this Agreement and (ii) any confidentiality agreements between any of the Commitment Parties and any member of the Company Group, and the provisions set forth in this Section 6.4, Article VII, and Article VIII hereof, shall survive the termination of this Agreement in accordance with their terms.

(b)     For purposes of this Agreement, "willful or intentional breach" shall mean a breach of this Agreement that is a consequence of an act undertaken by the breaching party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

(c)     Any termination of this Agreement shall in no way impact the rights, remedies and obligations of any parties pursuant to the terms of the Restructuring Support Agreement, which shall remain in full force and effect to the extent the Restructuring Support Agreement remains in full force and effect.

## ARTICLE VII
## INDEMNIFICATION OBLIGATIONS

Section 7.1      Indemnification Generally.  Following the entry of the Backstop Order, the Debtor and the Issuer (each an "Indemnifying Party" and collectively, the "Indemnifying Parties") shall, jointly and severally, indemnify and hold harmless each Commitment Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives and controlling Persons (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than income Taxes of the Commitment Parties incurred as a result of participating in the transactions contemplated by this Agreement or the Plan) (collectively, "Losses") that any such Indemnified Person has actually incurred or to which any such Indemnified Person has actually become subject, arising out of or in connection with this Agreement, the Plan and the transactions contemplated hereby and thereby, or any claim, challenge, litigation, investigation or Legal Proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such Legal Proceedings are brought by the Debtor, the Issuer, the other members of the Company Group, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable and documented out-of-pocket fees and expenses of counsel (which shall be limited to one law firm and one local counsel (to the extent necessary), each serving as counsel for the Indemnified Persons) and other reasonable and documented out-of-pocket third-party expenses actually incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other Legal Proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (i) as to any Indemnified Person to the extent arising from a material breach or failure by any Commitment Party of this Agreement (including in connection with any Commitment Party having defaulted on its obligation to exercise its Subscription Rights or pay the purchase price for such Commitment Party's exercise of its Subscription Rights or Equity Backstop Commitment of any Unsubscribed Shares or such Commitment Party's failure to fund its obligations under the Direct Investment Equity Raise), or (ii) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct, gross negligence or fraud of such Indemnified Person.

Section 7.2      Settlement of Indemnified Claims.  The Indemnifying Parties shall not be liable for any settlement of any Indemnified Claims (as defined below) effected by such Indemnified Person without the written consent of the Indemnifying Parties (which consent shall not be unreasonably withheld, conditioned or delayed).  If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Parties or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Parties agree to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Parties hereunder in accordance with, and subject to the limitations of, this Article VII.  The Indemnifying Parties shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all Liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 7.3    Contribution.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 7.1 hereof, then the Indemnifying Parties shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Parties, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Parties, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Parties, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (a) the total value received or proposed to be received by the Issuer pursuant to the sale of the Unsubscribed Shares in the Equity Rights Offering and the New Common Stock in the Direct Investment Equity Raise contemplated by this Agreement and the Plan bears to (b) the Equity Rights Offering Backstop Premium to be paid to the Equity Rights Offering Backstop Parties.  The Indemnifying Parties also agree that no Indemnified Person shall have any Liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

Section 7.4    Indemnification Procedure.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding that is the subject of indemnification set forth in Section 7.1 hereof (an "Indemnified Claim"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Parties in respect thereof, promptly notify the Indemnifying Parties in writing of the commencement thereof; provided that (a) the omission to so notify the Indemnifying Parties will not relieve the Indemnifying Parties from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Parties will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Article VII.  In case any such Indemnified Claims are brought against any Indemnified Person and the Indemnified Person notifies the Indemnifying Parties of the commencement thereof, the Indemnifying Parties will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Parties will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided that, if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Parties and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Parties, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Parties to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person (it being understood that Ropes & Gray LLP shall be counsel acceptable to such Indemnified Persons), the Indemnifying Parties shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Parties shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Parties shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Parties have received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Parties assume the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Parties have failed or is failing to defend such claim and

41

provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Parties shall have authorized in writing the employment of counsel for such Indemnified Person.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1     <u>Survival</u>.  The representations and warranties made in this Agreement will not survive the Effective Date.  Covenants and agreements that by their terms are to be satisfied after the Effective Date shall survive until satisfied in accordance with their terms.

Section 8.2     <u>Notices</u>.

(a)     Any notices, request, consents, claims, demands, waivers and other communications to a Party hereunder shall be in writing and shall be deemed to have been duly given and received (i) when delivered personally, as of the date received; (ii) when received by the addressee if sent by an internationally recognized overnight delivery service (receipt requested) or (iii) on the date sent via email (so long as the sender has not received an automatic email from the applicable email server indicating delivery failure), if sent on a Business Day at the recipient's place of business (or if sent on a day that is not a Business Day, then receipt shall be deemed to occur on the immediately following Business Day).

(b)     Such communications must be sent to such party at its address or number set forth below (or at such other address or number as it may from time to time designate in writing to the other Parties):

(i)     If to any of the Commitment Parties, to the address set forth on such Commitment Party's signature page hereto,

with a copy (which shall not constitute notice) to:

**Gibson, Dunn & Crutcher LLP**
Attention:      Scott J. Greenberg
Joshua Brody
Matthew J. Williams
E-mail address: SGreenberg@gibsondunn.com
JBrody@gibsondunn.com
MJWilliams@gibsondunn.com

(ii)     If to the Debtor, to:

**Matterhorn Buyer, LLC**
Address:      3333 Finley Rd, Suite 800
Downers Grove, IL 60515
Attention:      Robert M. Caruso
E-mail address: rcaruso@alvarezandmarsal.com

(iii)     If to the Issuer, to:

**HFS Matterhorn Topco, Inc.**
Address:     3333 Finley Rd, Suite 800
                Downers Grove, IL 60515
Attention:    Robert M. Caruso
E-mail address: rcaruso@alvarezandmarsal.com

with a copy (which shall not constitute notice) to:

**Ropes & Gray LLP**
Address:     1211 Avenue of the Americas
                New York, NY 10036
Attention:    Ryan Preston Dahl
                Matthew M. Roose
                Natasha S. Hwangpo
                Sam Badawi
E-mail address: Ryan.Dahl@ropesgray.com
                Matthew.Roose@ropesgray.com
                Natasha.Hwangpo@ropesgray.com
                Sam.Badawi@ropesgray.com

**Ropes & Gray LLP**
Address:     191 North Wacker Drive
                32nd Floor
                Chicago, IL 60606
Attention:    Stephen L. Iacovo
E-mail address: Stephen.Iacovo@ropesgray.com

**Porter Hedges LLP**
Address:     1000 Main St.
                36th Floor
                Houston, TX 77002
Attention:    John F. Higgins
                M. Shane Johnson
                Jack M. Eiband
E-mail address: jhiggins@porterhedges.com
                sjohnson@porterhedges.com
                jeiband@porterhedges.com

(c)     For the avoidance of doubt, when written notice or approval from Requisite Equity Backstop Parties is required by this Agreement, an email from such Requisite Equity Backstop Parties' counsel to Issuer's counsel shall be sufficient.

Section 8.3     <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned by any of the Parties (whether by operation of Law or otherwise) without the prior written consent of the other Parties; <u>provided</u> that the Commitment Parties' obligations hereunder may be assigned, delegated or transferred, in whole or in part, by any Commitment Party pursuant to <u>Section 1.4</u> hereof.  Except as expressly provided in <u>Article VII</u> hereof with respect to the Indemnified Persons, none of this Agreement and the other Transaction Documents is intended to and or confers upon

any Person other than the Parties any rights or remedies under this Agreement.  Any attempted or purported assignment in violation of this <u>Section 8.3</u> shall be null and void.

Section 8.4    <u>No Third Party Beneficiaries</u>.  Except as otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

Section 8.5    <u>Prior Negotiations; Entire Agreement</u>.  This Agreement (including the Exhibits and the other documents and instruments referred to herein) constitutes the entire agreement of the Parties hereto and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the Parties hereto with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties hereto will continue in full force and effect.

Section 8.6    <u>Governing Law; Submission to Jurisdiction; Forum Selection; Waiver of Trial by Jury</u>.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the Laws of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)    Each Party agrees that it shall bring any action or proceeding in respect of any claim based upon, arising out of, or related to this Agreement or any provision hereof, in the United States District Court for the Southern District of New York, any New York State court sitting in the Borough of Manhattan of New York City, or, during the pendency of the Chapter 11 Cases, the Bankruptcy Court (the "<u>Chosen Courts</u>") and, solely in connection with such claims, (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts generally and unconditionally, and irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any such claim (i) any claim that it is not personally subject to the jurisdiction of such Chosen Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of such Chosen Court or from any legal process commenced in such Chosen Court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Each Party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.6</u>.

Section 8.7    Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile, electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

Section 8.8    Action by, or Consent or Approval of, the Commitment Parties.  Whenever this Agreement refers to any action to be taken by, or any consent or approval to be given by, the Commitment Parties, unless otherwise expressly provided in any particular instance, such reference shall be deemed to require the action, consent or approval of the Requisite Equity Backstop Parties.

Section 8.9    Amendments and Waivers.

(a)    This Agreement may be amended, modified or supplemented and the terms and conditions of this Agreement may be waived only by a written instrument signed by the Issuer and the Requisite Equity Backstop Parties; provided that (i) any modification of, or amendment or supplement to, this Agreement that would have the effect of changing a Commitment Party's Equity Backstop Percentage (as set forth on Exhibit A hereto) or Direct Investment Percentage (as set forth on Exhibit B hereto), or increasing the Per-Share Price to be paid in respect of such Equity Rights Offering Backstop Party's Equity Backstop Commitment or such Equity Rights Offering Holdback Party's Direct Investment Commitment, or changing a Equity Rights Offering Holdback Party's investment in the Direct Investment Equity Raise, in each case subject to Section 1.5 hereof, shall require the prior written consent of such Commitment Party, (ii) any modification of, or amendment or supplement to, this Agreement that would have the effect of modifying this sentence shall require the prior written consent of all of the Commitment Parties, (iii) any modification to the threshold percentage set forth in the definition of "Requisite Equity Backstop Parties" may be made only by a written instrument executed by all Commitment Parties and the Issuer, and (iv) if the proposed modification, amendment, waiver, or supplement has a disproportionate or adverse effect on any Commitment Party as compared to the other Commitment Parties, then the prior written consent of each such affected Party shall also be required to effectuate such modification, amendment, waiver, or supplement.  Notwithstanding the foregoing, Exhibit A and Exhibit B attached hereto may be amended, without any consent or approval required by any Party hereto, to reflect each Transfer made in accordance with Section 1.4 hereof.

(b)    The terms and conditions of this Agreement may be waived (i) by the Issuer (on behalf of itself and the other Company Parties) only by a written instrument executed by the Issuer, and (ii) by the Requisite Equity Backstop Parties (on behalf of themselves or all of the Commitment Parties, as applicable) only by a written instrument executed by the Requisite Equity Backstop Parties.

(c)    No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.

Section 8.10    Several Liability.  For the avoidance of doubt, all obligations of the Commitment Parties hereunder are several, and not joint, in nature.

Section 8.11    Specific Performance/Remedies.  It is understood and agreed by the Parties that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, that money damages would

not be a sufficient remedy for any breach of this Agreement by any Party and that, in addition to any other remedy to which a party is entitled at law, in equity, in contract, in tort or otherwise, each non-breaching party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an Order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by the Parties and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of the Parties under this Agreement.  No Party shall be required to provide any bond or other security in connection with seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, all in accordance with the terms of this <u>Section 8.11</u>.

Section 8.12    <u>Disclosure</u>.  Except as required by law, no Party or its advisors (including counsel to any Party) shall disclose to any Person (including, for the avoidance of doubt, any other Commitment Party), other than advisors to the Company Parties and the Commitment Parties, <u>Exhibit A</u> or <u>Exhibit B</u> hereto or, with respect to any Equity Rights Offering Backstop Party (without such Party's prior written consent), its Equity Backstop Percentage, or, with respect to any Equity Rights Offering Holdback Party (without such Party's prior written consent), its Direct Investment Percentage; <u>provided</u>, <u>however</u>, that, if such disclosure is required by Law, subpoena, or other legal process or regulation, the disclosing party shall afford the relevant party a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant disclosing party).

Section 8.13    <u>Other Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day;

(ii)    any reference in this Agreement to "$" shall mean U.S. dollars;

(iii)    all Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein and any capitalized terms used in any such Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement;

(iv)    words imparting the singular number only shall include the plural and vice versa;

(v)    the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires;

(vi)    the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it;

(vii)    the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement;

(viii)    all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified;

(ix)    the word "or" shall be non-exclusive; and

(x)    any reference herein to this Agreement, and to any Contract or Law means to this Agreement, and to such Contract or Law, respectively, in each case as from time to time amended, modified or supplemented, including, in the case of this Agreement, Contracts, by waiver or consent and, in the case of Laws, by succession of comparable successor Laws.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

Section 8.14    Damages.  Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.

Section 8.15    No Recourse Against Others.

(a)    This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as Parties and their respective successors and assigns, as applicable.

(b)    No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney, assignee or other representative of any Party or of any Affiliate of any Party, shall have any Liability for any obligations or Liabilities of any Party under this Agreement or for any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement based on, in respect of or by reason of this Agreement and the transactions contemplated hereby and thereby; provided, however, that nothing in this Section 8.15 shall relieve or otherwise limit the Liability of any Party or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement.

Section 8.16    Severability.

(a)    If any provision of this Agreement is held to be invalid, illegal or unenforceable in any jurisdiction under any applicable Law, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other term or provision of this Agreement in such jurisdiction or invalidate or render illegal or unenforceable such term or provision in any other

jurisdiction, and the invalid, illegal or unenforceable provision shall be interpreted and applied so as to produce as near as may be the economic result intended by the Parties.

(b)    Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of such parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 8.17    Publicity.  At all times prior to the Effective Date or the earlier termination of this Agreement in accordance with its terms, the Issuer and the Commitment Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements, in each case, with respect to the transactions contemplated by this Agreement, except as required by or reasonably necessary to comply with applicable Law (including (x) the Bankruptcy Code, bankruptcy rules, and applicable local rules of the Bankruptcy Court to the extent reasonably necessary to obtain entry of the Backstop Order, Disclosure Statement Order or Confirmation Order and (y) in any filing made by the Debtors with the Bankruptcy Court and as may be necessary or appropriate in the good faith determination of the Debtors or its Representatives to obtain Bankruptcy Court approval of the transactions contemplated hereby), Orders of the Bankruptcy Court or the rules or regulations of any applicable securities exchange, and except for disclosure of matters that become a matter of public record as a result of the Chapter 11 Cases and any filings or notices related thereto; provided that nothing in this Agreement shall restrict or prohibit the Debtor, the Commitment Parties or their respective Affiliates from making any announcement to their respective employees, customers and other business relations to the extent that such announcement consists solely of, or is otherwise consistent in all material respects with previous press releases, public disclosures or public statements made by any Party in accordance with this Agreement, including in investor conference calls, Q&As or other publicly disclosed statements or documents, in each case, to the extent such disclosure is still accurate in all material respects (and not misleading).

Section 8.18    Debtor Disclosure Schedules.  It is expressly understood and agreed that (a) the disclosure of any fact or item in any section of the Debtor Disclosure Schedules shall be deemed disclosure with respect to any other Section or subsection of this Agreement or the Debtor Disclosure Schedules to which its relevance is reasonably apparent on its face, (b) the disclosure of any matter or item in the Debtor Disclosure Schedules shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement, and (c) the mere inclusion of an item in the Debtor Disclosure Schedules as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has resulted in and would reasonably be expected to result in a Material Adverse Effect.

## ARTICLE IX
## DEFINITIONS

Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made; provided that, for purposes of this Agreement, no Commitment Party shall be deemed an Affiliate of any member of the Company Group.

For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by Contract or otherwise; provided that, for purposes of this Agreement, (a) no Commitment Party shall be deemed an Affiliate of the Issuer or any of its Subsidiaries, and (b) no portfolio company of any Commitment Party shall be deemed to be an Affiliate of such Commitment Party.

"Affiliated Fund" means, with respect to a Commitment Party any investment fund the primary investment advisor to which is such Commitment Party, the investment advisor of such Commitment Party or an Affiliate thereof.

"Alternative Restructuring Transaction" means any written proposal, term sheet, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, chapter 11 plan, share exchange, business combination, or similar transaction involving all, substantially all or a material portion of the Company Parties and/or their assets that is an alternative to one or more of the Restructuring Transactions.

"Anticorruption Laws" means all Laws of any jurisdiction applicable to the Company Group from time to time concerning or relating to bribery or corruption.

"Antitrust Authorities" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws, and "Antitrust Authority" means any of them.

"Antitrust Laws" mean the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other federal, state or foreign Law governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any foreign investment Laws.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the Laws of the State of New York.

"Claim" means any "claim" against any member of the Company Group as defined in sections 101(5) and 102(2) of the Bankruptcy Code, including, without limitation, any Claim arising after the Petition Date.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Company Group" means the Issuer and the Debtors.

"Company Plan" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) which is subject to ERISA, other than a Multiemployer Plan, which any member of the Company Group sponsors, maintains, or to which it makes, is making, or is obligated to make contributions.

"Contract" means any binding written agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, but excluding the Plan.

"<u>Data Laws</u>" means all applicable Laws concerning the privacy and/or security of Personal Data, and all regulations promulgated thereunder, including (in each case to the extent applicable) the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009, Pub. Law No. 111-5 the Gramm-Leach-Bliley Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, the Federal Trade Commission Act, the Privacy Act of 1974 state Social Security number protection Laws, and state data breach notification Laws (the foregoing specific Laws, the "<u>Specific Data Laws</u>").

"<u>Debtor Disclosure Schedules</u>" means the disclosure schedules delivered by the Debtor and the Issuer to the Commitment Parties on the date of this Agreement.

"<u>Effective Date</u>" has the meaning given to such term in the Plan.

"<u>Eligible Offeree</u>" has the meaning given to such term in the Plan.

"<u>Environmental Laws</u>" means any applicable Law regulating or relating to (a) the protection of natural resources or the environment, (b) the release or disposal of Hazardous Substances, (c) pollution or (d) the protection of health and safety from exposure to Hazardous Substances.

"<u>Equity Rights Offering Amount</u>" means $200,000,000, which may be increased with the consent of the Issuer and the Requisite Equity Backstop Parties.

"<u>Equity Rights Offering Shares</u>" means with respect to any Eligible Offeree that validly exercised its subscription rights, the final, aggregate number of shares of Rights Offering Stock that such Eligible Offeree is entitled to receive pursuant to the Equity Rights Offering equal to the result of (a) such Eligible Offeree's Maximum Subscription Amount (or, if lower, the Elected Amount of such Eligible Offeree), divided by (b) the Per-Share Price.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) that, together with any member of the Company Group, is, or at any relevant time during the past six (6) years was, treated as a single employer under any provision of Section 414 of the Code.

"<u>Final Order</u>" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"<u>First Lien Claims</u>" has the meaning given to such term in the Plan.

"<u>Governmental Entity</u>" means any U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof).

"<u>Hazardous Substance</u>" means any substance or material (a) listed, classified or regulated as a "pollutant," "contaminant," "toxic substance," "hazardous substance," "hazardous waste" pursuant to Environmental Laws or (b) subject to regulation under any applicable Environmental Law due to its dangerous or deleterious properties or characteristics, including petroleum, petroleum byproducts, asbestos, urea formaldehyde, radioactive materials, medical waste and polychlorinated biphenyls.

"<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"<u>Knowledge</u>", with respect to the Company Parties, means the actual knowledge of the individuals set forth on <u>Schedule 9</u> following reasonable inquiry.

"<u>Law</u>" means any law (statutory or common), statute, regulation, rule, code, or ordinance or determination enacted, adopted, issued or promulgated by any Governmental Entity.

"<u>Legal Proceedings</u>" means legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suit, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings.

"<u>Liability</u>" means, with respect to any Person, any indebtedness, obligation, or liability (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability) of such Person, regardless of whether such debt, obligation or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such debt, obligation or liability is immediately due and payable.

"<u>Liens</u>" means any lien, adverse claim, charge, option, right of first refusal, right of first offer, servitude, security interest, mortgage, license, pledge, deed of trust, easement, encumbrance, right-of-way, restriction on transfer, conditional sale or other title retention agreement, defect in title, lien or judicial lien as defined in Sections 101(36) and (37) of the Bankruptcy Code or other restrictions of a similar kind.

"<u>Management Incentive Plan</u>" has the meaning given to such term in the Plan.

"<u>Material Adverse Effect</u>" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change or series of events, developments, occurrences, circumstances, effects, conditions, results, states of facts or changes ("<u>Changes</u>") occurring after the date of this Agreement that, individually or in the aggregate, has, or would reasonably be expected to have, a material and adverse effect on the business, assets, properties, results of operations, liabilities or condition (financial or otherwise) of the Company Group, taken as a whole; <u>provided</u> that, none of the following will constitute a Material Adverse Effect: (i) the filing and pendency of the Chapter 11 Cases; (ii) any Change in global, national or regional political conditions (including any statements or proclamations of public officials, any potential or actual government shutdown or any breakup of a political or economic union), in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Company Group operates, including any Change in the United States or applicable foreign economies or securities, commodities or financial markets; (iii) volcanoes, tsunamis, effects of climate change or other weather or meteorological events, earthquakes, floods, droughts, storms, hurricanes, tornadoes, fires, acts of god, natural disasters, man-made disasters or other force majeure events, epidemics, pandemics, disease outbreaks, or public health crises including outbreaks or additional waves of outbreaks of any contagious diseases (including influenza, COVID-19 or any variation thereof), hostilities, acts of war (whether or not declared), sabotage, civil unrest, cyberattacks, terrorism, cyberterrorism, military actions, national emergencies or force majeure events, or any escalation or material worsening of any of the foregoing; (iv) Changes that affect the industries in which any member of the Company Group operates; (v) any Changes in applicable Law or generally accepted accounting principles in the United States ("<u>GAAP</u>"), or

in the interpretation or enforcement thereof, first arising after the date hereof; (vi) any matters expressly disclosed in the Debtor Disclosure Schedules or publicly disclosed in any first day pleadings or declarations or in any filings of the Chapter 11 Cases; (vii) the execution, announcement or performance of this Agreement or the other Transaction Documents or the transactions contemplated hereby or thereby (including any act or omission of the Issuer and its Subsidiaries to operate as expressly required or prohibited, as applicable, by the Restructuring Support Agreement or this Agreement or consented to or required by the Requisite Equity Backstop Parties in writing) and including, without limitation, the Restructuring Transactions; (viii) Changes in the market price or trading volume of the claims or equity or debt securities of the Issuer and its Subsidiaries (but not the underlying facts giving rise to such Changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (ix) failure of the Issuer or any of its Subsidiaries to meet any internal or published projections, forecasts, estimates or predictions (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (x) actions or omissions taken or not taken by or on behalf of a member of the Company Group or any of their respective Affiliates at the written request of, or with the prior written consent of, the Requisite Equity Backstop Parties after the date hereof; (xi) actions taken by any of the Commitment Parties or their Affiliates, including any breach of this Agreement or the Restructuring Support Agreement by the Commitment Parties; or (xii) any objections in the Bankruptcy Court to (A) this Agreement, the other Definitive Documents or the transactions contemplated hereby or thereby; (B) the reorganization of the Debtors, the Plan, or the Disclosure Statement; provided that the exceptions set forth in clauses (ii), (iii), (iv), or (v) of this definition shall not apply to the extent that such described Change has a material and disproportionately adverse impact on the Company Group, taken as a whole, as compared to other companies comparable in size and scale to the Debtors in the industries in which the Company Group operates, but in each case, solely to the extent of such disproportionate impact.

"Material Contracts" means any contract necessary for the operation of the business of the Debtors as presently conducted by the Debtors that is a "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K or required to be disclosed on a current report on Form 8-K).

"Maximum Subscription Amount" means, with respect to any Eligible Offeree, an amount equal to the result of (i) the quotient of (x) the aggregate principal amount of Allowed First Lien Claims held by such Eligible Offeree divided by (y) the aggregate principal amount of all Allowed First Lien Claims; multiplied by (ii) the Non-Holdback Rights Offering Amount.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any member of the Company Group or any ERISA Affiliate is making or accruing an obligation to make contributions, or each such plan with respect to which any such entity has any Liability or obligation (including on account of an ERISA Affiliate).

"New Common Stock" means shares of common stock[, limited liability company interests, or other equivalent common equity interests,] in the Issuer to be issued pursuant to the Plan and this Agreement on the Effective Date.

"New Organizational Documents" means any shareholders agreement and charter of the Reorganized Debtors which shall collectively be in form and substance reasonably acceptable to the Requisite Equity Backstop Parties and the Issuer.

"Offered Shares" means a number of shares of New Common Stock, rounded down to the nearest whole number, equal to the Non-Holdback Rights Offering Amount divided by the Per-Share Price.

"<u>Order</u>" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of competent jurisdiction.

"<u>Owned IP</u>" means all Intellectual Property Rights owned by the members of the Company Group that are necessary for the operation of their respective businesses.

"<u>Pension Plan</u>" means any employee pension benefit plan, as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan), subject to the provisions of Title IV of ERISA or Section 412 or 430 of the Code or Section 302 of ERISA, and sponsored or maintained (at the time of determination or at any time within the six years prior thereto) by any member of the Company Group or any ERISA Affiliate, or with respect to which any such entity has any actual or contingent Liability or obligation.

"<u>Permitted Liens</u>" means (a) Liens for Taxes that (i) are not yet delinquent or (ii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made in accordance with GAAP; (b) landlord's, operator's, vendors', carriers', warehousemen's, mechanics', materialmen's, repairmen's and other similar Liens for labor, materials or supplies or other like Liens arising by operation of law in the ordinary course of business provided with respect to any Real Property or personal property incurred in the ordinary course of business consistent with past practice and as otherwise not prohibited under this Agreement that have been filed on a schedule with the Bankruptcy Court in connection with the Chapter 11 Cases or, if not so filed, for amounts that are not more than 120 days delinquent and that do not materially detract from the value of, or materially impair the use of, any material Real Property or personal property of any member of the Company Group for the operation of the Company Group's business, or, if for amounts that do materially detract from the value of, or materially impair the use of, any material Real Property or personal property of any member of the Company Group, if such Lien is being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (c) zoning, building codes and other land use Laws regulating the use or occupancy of any Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such Real Property; <u>provided</u> that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Real Property for the operation of the Company Group's business; (d) easements, covenants, conditions, minor encroachments, restrictions on transfer and other similar matters affecting title to any Real Property (including any title retention agreement) and other non-monetary title defects and encumbrances that do not or would not materially impair the ownership, use or occupancy of such Real Property or the operation of the Company Group's business; (e) any interest or title of a lessor under any lease or sublease entered into by any of the Debtors and any financing statement filed in connection therewith; (f) non-exclusive licenses of Owned IP granted to customers, vendors, or contractors in the ordinary course of business; (g) Liens and Claims that, pursuant to the Plan and the Confirmation Order, will be discharged and released on the Effective Date; (h) Liens granted under or permitted by the DIP Facility; (i) from and after the Effective Date, liens granted in connection with or permitted under the Exit First Lien Term Loan Facility and the Exit Revolving Facility (as defined in the Restructuring Support Agreement); and (j) Liens listed on <u>Schedule 9.1</u> of the Debtor Disclosure Schedules.

"<u>Person</u>" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, associate, trust, Governmental Entity or other entity or organization.

"<u>Personal Data</u>" means (i) any information which can be used to identify an individual, and (ii) any information that is regulated or protected by one or more Specific Data Laws.

"<u>Petition Date</u>" means November 22, 2024.

"Plan Supplement" means the documents filed with the Bankruptcy Court as exhibits or supplements to the Plan, including any documents identified by the Plan or Disclosure Statement as such in form and substance reasonably satisfactory to the Debtor and the Requisite Equity Backstop Parties.

"Real Property" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any member of the Company Group, together with, in each case, all easements, hereditaments and appurtenances relating thereto, and all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"Representatives" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, consultants, investment bankers, attorneys, accountants, advisors and other representatives.

"Requisite Equity Backstop Parties" shall mean the Required Consenting First Lien Lenders, as defined in the Restructuring Support Agreement.

"Restructuring Support Agreement" has the meaning given to such term in the Plan.

"Restructuring Transactions" shall mean transactions as described in the Restructuring Support Agreement and the Restructuring Term Sheet attached as Exhibit B thereto, and related transactions or steps to be taken in connection therewith.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC, the U.S. Department of Commerce or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state or His Majesty's Treasury of the United Kingdom.

"Securities Act" means the Securities Act of 1933, as amended.

"Subscription Agent" means subscription agent for the Equity Rights Offering selected by the Issuer.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary), (a) owns, directly or indirectly, more than 50% of the stock or other equity interests, or (b) has the power to elect a majority of the board of directors or similar governing body.

"Taxes" means (a) all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Entity in the nature of taxes, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon; (b) any Liability for any amounts of the type described in clauses (a), (c), and (d) of a predecessor entity, as a transferee or arising by operation of Law or Contract; (c) any Liability for the payment of any amounts of the type described in clauses (a), (b), or (d) as a result of being a member of an affiliated, consolidated, combined, or unitary group for any period (including any arrangement for group or consortium Tax relief or similar arrangement); and (d) any Liability for the payment of any amounts of the type described in clauses (a), (b), or (c) as a result of any express obligation to indemnify any other person or as a result of any obligation under any agreement or arrangement to make any payment determined by reference to the Liability of a third party.

54

"<u>Transaction Documents</u>" means, collectively, this Agreement, the Plan, the Restructuring Support Agreement, the Equity Rights Offering Procedures, the Plan Supplement, the New Organizational Documents, and any other documents and agreements expressly contemplated hereby or thereby, or by the Plan.

"<u>Transfer</u>" means to sell, pledge, assign, transfer, permit the participation in, or otherwise dispose of.

"<u>Unsubscribed Shares</u>" means a number of shares of New Common Stock equal to (x) the total number of Offered Shares <u>minus</u> (y) such number of Offered Shares for which both (i) a Subscription Right has been validly exercised and (ii) the purchase price (A) has been duly paid (pursuant to the Cash Option) on or before the Subscription Expiration Deadline or (B) will be satisfied through the exchange of DIP Claims (pursuant to the Non-Cash Option), as applicable.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**MATTERHORN BUYER, LLC**


By: _____
    Name:
    Title:


**HFS MATTERHORN TOPCO, INC.**


By: _____
    Name:
    Title:

**COMMITMENT PARTY:**

[●]


By: _____
      Name:
      Title:

      Address:


      Attention:
      Email:

## <u>SCHEDULE A</u>
## COMPANY PARTIES

MATTERHORN BUYER, LLC
HFS SUB, LLC
HFS MATTERHORN TOPCO, INC.
MATTERHORN PARENT, LLC
MATTERHORN INTERMEDIATE, LLC
H-FOOD HOLDINGS, LLC
HEARTHSIDE USA - CORPORATE, INC.
HEARTHSIDE HOLDCO, LLC
HEARTHSIDE FINANCE COMPANY, INC.
HEARTHSIDE FOOD SOLUTIONS, LLC
INTERBAKE FOODS, LLC
RYT-WAY MIDCO, LLC
PEACOCK ENGINEERING COMPANY II, LLC
HEARTHSIDE USA, LLC
HEARTHSIDE USA- CPG PARTNERS, LLC
OAK STATE PRODUCTS, LLC
STANDARD FUNCTIONAL FOODS GROUP, LLC
QUALITY BAKERY PRODUCTS, LLC
TOLL PACKAGING SERVICES LLC
RYT-WAY INDUSTRIES, LLC
MATTERHORN SUB, LLC
PEACOCK FOODS LLC
HEARTHSIDE USA- PRODUCE & FOODSERVICE, LLC

## SCHEDULE B
## EQUITY RIGHTS OFFERING BACKSTOP PARTIES

[*Intentionally Omitted*]

**<u>SCHEDULE C</u>**
**EQUITY RIGHTS OFFERING HOLDBACK PARTIES**

[*Intentionally Omitted*]

**EXHIBIT A**
**EQUITY BACKSTOP PERCENTAGES**

[*Intentionally Omitted*]

**<u>EXHIBIT B</u>**
**DIRECT INVESTMENT PERCENTAGES**

[*Intentionally Omitted*]

**EXHIBIT C**
**EQUITY RIGHTS OFFERING PROCEDURES**

[*Intentionally Omitted*]

Exhibit C-1

**<u>EXHIBIT D</u>**
**FUNDING NOTICE**

[*Intentionally Omitted*]

**<u>EXHIBIT 8</u>**

**Notice of Non-Voting Status**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| H-Food Holdings, LLC, *et al.*,[1] | Case No. 24-90586 (ARP) |
| Debtors. | (Jointly Administered) |

**NOTICE OF NON-VOTING STATUS**

      **PLEASE TAKE NOTICE THAT** on November 22, 2024 (the "Petition Date"),[2] the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

      **PLEASE TAKE FURTHER NOTICE THAT** on January 24, 2025, the Debtors filed with the Bankruptcy Court the *Second Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC, and its Affiliated Debtors* [Docket No. [●]] (as may be further amended, supplemented, or otherwise modified from time to time, the "Plan") and related disclosure statement [Docket No. [●]], (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement").  Copies of the Plan and the Disclosure Statement may be obtained free of charge by (i) visiting the website maintained by the Debtors' claims and noticing agent, Kroll Restructuring Administration LLC (the "Claims and Noticing Agent"), https://cases.ra.kroll.com/HFS/, (ii) calling the Claims and Noticing Agent at (888) 510-7189

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783).  The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

[2] Capitalized terms used but not defined herein have the meanings given to them in the Plan or the Disclosure Statement, as applicable. The statements contained herein are summaries of the provisions contained in the Plan and the Disclosure Statement and do not purport to be precise or complete statements of all the terms and provisions of the Plan or the documents referred therein. To the extent there is a discrepancy between the terms herein and the Plan or the Disclosure Statement, the Plan or the Disclosure Statement, as applicable, shall govern and control.

(US/Canada Toll-Free) or +1 (646) 937-7810 (International Toll), or (iii) sending an electronic mail message to: hfsballots@ra.kroll.com.

**PLEASE TAKE FURTHER NOTICE THAT** on January 24, 2025, the Court entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing the Debtors to solicit acceptances for the Plan; (b) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the Solicitation Package; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) approving the Equity Rights Offering Procedures.

**PLEASE TAKE FURTHER NOTICE THAT** you are either (1) a Holder or potential Holder of a Claim against or Interest in the Debtors that, due to the nature and treatment of such Claim or Interest under the Plan, **is not entitled to vote on the Plan**, or (2) an employee or former employee of one or more of the Debtors who does not hold a Claim against or Interest in the Debtors and, because you do not hold a Claim against or Interest in the Debtors, **is not entitled to vote on the Plan**. Specifically, under the terms of the Plan, Holders of Claims or Interests in Classes 1, 2, 7, 8, 9, and 10, are **not** entitled to vote on the Plan:

(i) a Holder of a Claim in Classes 1, 2, and 9 is Unimpaired under the Plan and, therefore, is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code;

(ii) a Holder of a Claim or an Interest in Classes 8 and 10 is Impaired under the Plan and is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code; and

(iii) a Holder of a Claim or Interest in Class 7 is either: (a) Unimpaired under the Plan and, therefore, is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or (b) Impaired under the Plan and conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE THAT** any objections (each, an "Objection") to the Plan must (1) be in writing, (2) comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas, (3) state the name and address of the objecting party and the amount and nature of the objecting party's Claim or Interest, (4) state with particularity the legal and factual basis for such Objections, and, if practicable, a proposed modification to the Plan that would resolve such an Objection, and (5) be filed with the Court and served so that the Notice Parties below actually receive the Objection no later than **March 3, 2025, at 4:00 p.m., prevailing Central Time** (the "Plan Confirmation Objection Deadline").

Objections must be mailed or emailed to parties who have filed a notice of appearance in the Debtors' Chapter 11 Cases as well as the following parties:

| Counsel to the Debtors | ROPES & GRAY LLP |
|---|---|
| | Ryan Preston Dahl |

2

| | Matthew M. Roose<br>Natasha S. Hwangpo<br>1211 Avenue of the Americas<br>New York, New York 10036<br>Telephone: (212) 596-9000<br>Facsimile: (212) 596-9090<br>ryan.dahl@ropesgray.com<br>matthew.roose@ropesgray.com<br>natasha.hwangpo@ropesgray.com<br><br>-and-<br><br>ROPES & GRAY LLP<br>Stephen L. Iacovo<br>191 North Wacker Drive, 32nd Floor<br>Chicago, Illinois 60606<br>Telephone: (312) 845-1200<br>Facsimile: (312) 845-5500<br>stephen.iacovo@ropesgray.com |
|---|---|
| **Counsel to the Debtors** | PORTER HEDGES LLP<br>John F. Higgins<br>M. Shane Johnson<br>Jack M. Eiband<br>1000 Main St. 36th Floor<br>Houston, TX 77002<br>Telephone: (713) 226-6000<br>Facsimile: (713) (228-1331<br>jhiggins@porterhedges.com<br>sjohnson@porterhedges.com<br>jeiband@porterhedges.com |
| **United States Trustee** | **Office of the United States Trustee for the Southern District of Texas**<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002<br>Susan B. Hersh<br>Telephone: (214) 767-1073<br>Email: susan.hersh@usdoj.gov |

**PLEASE TAKE FURTHER NOTICE THAT** if you have questions regarding this notice or would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost,** you should contact Kroll by: (a) visiting the Debtors' restructuring website at https://cases.ra.kroll.com/HFS/; (b) writing to H-Food Holdings, LLC, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) contacting Kroll at HFSInfo@ra.kroll.com (with "HFS Solicitation Inquiry" in the subject line); and/or (d) calling the Debtors' restructuring hotline at (888) 510-7189 (U.S./Canada, Toll-Free) or +1 (646) 937-7810 (International) and requesting to have a member of the Solicitation Team contact you.

All pleadings filed in the Chapter 11 Cases (i) may be inspected at the office of the Clerk of the Bankruptcy Court for the Southern District of Texas, P.O. Box 61010, Houston, Texas 77208 (the "Clerk's Office") and (ii) will be available on the website maintained by the Claims and Noticing Agent at https://cases.ra.kroll.com/HFS/.

**PLEASE TAKE FURTHER NOTICE THAT** the following provisions are included in the Plan:

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS.**

**ALTHOUGH YOU ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, THE OPT-OUT FORM ATTACHED HERETO PROVIDES YOU WITH THE OPTION TO NOT GRANT THE VOLUNTARY RELEASE BY RELEASING PARTIES CONTAINED IN ARTICLE VIII.D OF THE PLAN (THE "RELEASE BY HOLDERS OF CLAIMS AND INTERESTS"). IF YOU WERE GIVEN THE NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE PLAN BUT DID NOT OPT OUT, YOU SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASES.**

---

**Important Information Regarding Releases under the Plan.**[3]

Article VIII.C of the Plan provides for a release by the Debtors (the "Debtor Release"):

**Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Plan Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the**

---

[3]  The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights. If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs. Please read the Plan carefully before completing this Ballot.

**Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in ARTICLE VIII.C of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.**

Article VIII.D of the Plan provides for a release by the Releasing Parties (the "Release by Holders of Claims and Interests"):

**Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Plan Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties,**

5

in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in **ARTICLE VIII.D** of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be

null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

Article VIII.E of the Plan provides for releases of Directors and Officers of Wage and Labor Laws (the "Wage and Labor Law Releases"):

**As of the Effective Date, all current and former directors, managers, officers, employees, and managing agents of the Debtors will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by all current and former employees, full-time workers, part-time workers, temporary workers, or workers placed by third-party staffing agencies (each, an "Employee") unless such Employee expressly elects in writing to opt-out of the releases, from any and all Claims and Causes of Action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Employee or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them have, had or would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any Employee or other Person, arising out of or relating to, in whole or in part, the employment of the Employee by the Debtors, including any Claims arising under or related to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., or any related or similar federal or state wage and labor laws.**

Article VIII.F of the Plan provides for an exculpation of certain parties (the "Exculpation"):

**Without affecting or limiting the releases set forth in ARTICLE VIII.C and ARTICLE VIII.D of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolver Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Reorganized Debt and the Equity Rights Offering, the pursuit of consummation of the Plan Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing, except for**

**Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.**

Article VIII.G of the Plan establishes an injunction (the "Injunction"):

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE PLAN EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE VIII.F OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH

ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE INJUNCTIONS IN THIS ARTICLE VIII.G SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

**NOTWTHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF A HOLDER OF A CLAIM OR INTEREST TIMELY OPTS OUT OF OR OBJECTS TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE THE CONFIRMATION DATE, SUCH HOLDER SHALL NOT BE BOUND BY THE RELEASES SET FORTH IN ARTICLE VIII.D OR THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G WITH RESPECT TO THE RELEASED PARTIES (OTHER THAN THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES); PROVIDED THAT, THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G SHALL STILL APPLY TO (I) CLAIMS SUBJECT TO THE EXCULPATION SET FORTH IN ARTICLE VIII.F AND (II) ANY ACTIONS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES; PROVIDED FURTHER, THAT THE INJUNCTION PROTOCOL SET FORTH IN ARTICLE VIII.G.1 SHALL STILL APPLY AND ANY SUCH HOLDER SHALL BE BOUND BY THE INJUNCTION PROTOCOL.**

1. Injunction Protocol

**NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASES PRIOR TO THE PLAN EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH**

**PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH DEBTOR, REORGANIZED DEBTOR, OR RELEASED PARTY (THE "INJUNCTION PROTOCOL"). THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.**

Definitions Related to the Debtor Release and the Release by Holders of Claims and Interests:

Under the plan, "*Released Party*" means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the First Lien Agent, (v) the Second Lien Agent, (vi) the Indenture Trustee, (vii) each holder of a First Lien Claim, Second Lien Term Loan Claim or Senior Unsecured Notes Claim that votes for, and does not object to, the Plan, and (b) with respect to each of the foregoing Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law; *provided*, that any Entity or Person that opts out of or timely objects either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation to the releases set forth in **Article VIII.D** of the Plan shall not be deemed a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the Releases provided by the Plan; (v) each Released Party, (vi) each Related Party to each entity in clause (i) through (v) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clause (i) through (v); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release, either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation; *provided further*, *that,* for the avoidance of doubt, in no case, shall a minor (as defined under applicable state law) be a Releasing Party.

Under the Plan, "*Related Party*' means, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other Entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies,

fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

---

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES AND TO PROVIDE YOU WITH THE ATTACHED RELEASE OPT-OUT FORM WITH RESPECT TO THE RELEASE BY HOLDERS OF CLAIMS AND INTERESTS PROVIDED IN THE PLAN. IF YOU HAVE ANY QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AND NOTICING AGENT AT H-FOOD HOLDINGS, LLC, C/O KROLL RESTRUCTURING ADMINISTRATION LLC, 850 THIRD AVENUE, SUITE 412, BROOKLYN, NY 11232, VIA E-MAIL AT HFSINFO@RA.KROLL.COM (WITH "HFS SOLICITATION INQUIRY" IN THE SUBJECT LINE), OR BY CALLING THE DEBTORS' RESTRUCTURING HOTLINE AT (888) 510-7189 (U.S./CANADA, TOLL-FREE) OR +1 (646) 937-7810 (INTERNATIONAL) AND REQUESTING TO HAVE A MEMBER OF THE SOLICITATION TEAM CONTACT YOU.

---

Dated:  [●], 2025
      Houston, Texas

**PORTER HEDGES LLP**

*/s/ Draft*
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Jack M. Eiband (TX Bar No. 24135185)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331
Email: jhiggins@porterhedges.com
      sjohnson@porterhedges.com
      jeiband@porterhedges.com

-and-

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
Matthew M. Roose (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: ryan.dahl@ropesgray.com
      matthew.roose@ropesgray.com
      natasha.hwangpo@ropesgray.com

-and-

**ROPES & GRAY LLP**
Stephen L. Iacovo (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail: stephen.iacovo@ropesgray.com

*Counsel to the Debtors and Debtors in Possession*

**<u>EXHIBIT 9</u>**

**Opt-Out Form**

**RELEASE OPT-OUT FORM**

You are receiving this opt-out form (the "Opt-Out Form") because you are or may be a Holder of a Claim or Interest that is not entitled to vote on the *Second Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and Its Affiliated Debtors* (as amended, supplemented, or otherwise modified from time to time, the "Plan") or within the last two years you were an employee of H-Food Holdings, LLC or one or more of its affiliated debtors or debtors in possession (collectively, the "Debtors").  **Except as otherwise set forth in the Plan (1) Holders of Claims and Interests are deemed to grant the release set forth in Article VIII.D (the "Release by Holders of Claims and Interests"), unless a Holder affirmatively opts out or timely objects to the Release by Holders of Claims and Interests as described below, and (2) former employees of the Debtors are deemed to grant the release set forth in Article VIII.E (the "Wage and Labor Law Releases"), unless such former employee affirmatively opts out or timely objects to the Wage and Labor Law Releases as described below.**

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS OPT- OUT FORM CAREFULLY **BEFORE** COMPLETING THIS OPT-OUT FORM.

**UNLESS YOU CHECK THE BOX ON THIS OPT-OUT FORM BELOW AND FOLLOW ALL INSTRUCTIONS, YOU WILL BE HELD TO FOREVER RELEASE THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.**

**THIS OPT-OUT FORM MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY KROLL RESTRUCTURING ADMINISTRATION LLC (THE "CLAIMS AND NOTICING AGENT") ON OR BEFORE 4:00 P.M. PREVAILING CENTRAL TIME ON MARCH 3, 2025 (THE "OPT-OUT DEADLINE").**

If you believe you have received this Opt-Out Form in error, please contact the Claims and Noticing Agent immediately by calling (888) 510-7189 (U.S./Canada, toll-free) or +1 (646) 937-7810 (International) and requesting to have a member of the Solicitation Team contact you, or sending an email to HFSInfo@ra.kroll.com (with "HFS Solicitation Inquiry" in the subject line).

Before completing this Opt-Out Form, please read and follow the enclosed "Instructions for Completing this Opt-Out Form" carefully to ensure that you complete, execute, and return this Opt-Out Form properly.

**Item 1.       Releases.**

AS A HOLDER OF A CLAIM OR INTEREST OR A CURRENT OR FORMER EMPLOYEE OF ONE OR MORE OF THE DEBTORS, YOU WILL BE A "RELEASING PARTY" UNDER THE PLAN AND DEEMED TO PROVIDE THE RELEASE BY HOLDERS OF CLAIMS AND INTERESTS CONTAINED IN **ARTICLE VIII.D**, AND, IF APPLICABLE, **ARTICLE VIII.E** OF THE PLAN, AS SET FORTH BELOW.  YOU MAY, HOWEVER, CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN **ARTICLE VIII.D**, AND, IF APPLICABLE, **ARTICLE VIII.E** OF THE PLAN.  YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN **ONLY** IF YOU (A) CHECK THE BOX BELOW AND SUBMIT THE OPT-OUT FORM BY THE OPT-OUT

DEADLINE OR (B) TIMELY OBJECT TO THE RELEASES CONTAINED IN **ARTICLE VIII.D**, AND, IF APPLICABLE, **ARTICLE VIII.E** OF THE PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION OF THE PLAN. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE PARTY RELEASE BY HOLDERS OF CLAIMS AND INTERESTS IS AT YOUR OPTION.

### Important Information Regarding Releases under the Plan.[1]

Article VIII.C of the Plan provides for a release by the Debtors (the "Debtor Release"):

**Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Plan Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute, violations of federal or state securities laws or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transactions, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of or Claim against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with**

---

[1]   The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights. If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs. Please read the Plan carefully before completing this Ballot.

the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, (I) the releases set forth in <ins>ARTICLE VIII.C</ins> of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including those that are proposed to be released herein by the Debtors, any such releases given by the Debtors will be null and void against such party and its Related Parties.

Article VIII.D of the Plan provides for a release by the Releasing Parties (the "<ins>Release by Holders of Claims and Interests</ins>"):

Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, except for the rights and remedies that remain in effect to enforce the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Plan Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, the Estates, and the Released Parties, in each case on behalf of themselves and their respective successors and assigns, representatives and any other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, any Restructuring Transaction, the governance, management, transactions, ownership, or

3

operation of the Debtors, the purchase, sale or rescission of any security of or Claim Against the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolving Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, or related contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the foregoing, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the Reorganized Equity), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the (I) releases set forth in ARTICLE VIII.D of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission judicially determined by a Final Order to have constituted intentional fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), gross negligence, recklessness or willful misconduct, or (ii) releasing any contractual, post- Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, and (II) to the extent that the special committee of officers of Matterhorn Buyer, LLC determines to recommend that any Debtor should not grant releases in favor of any party with respect to any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, any such releases given by the Consenting Stakeholders will be null and void and the Consenting Stakeholders will have no obligations to offer or consent to such releases of such party or any of its Related Parties.

Article VIII.E of the Plan provides for releases of Directors and Officers of Wage and Labor Laws (the "Wage and Labor Law Releases"):

As of the Effective Date, all current and former directors, managers, officers, employees, and managing agents of the Debtors will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by all current and former employees, full-time workers, part-time workers, temporary workers, or workers placed by third-party staffing agencies (each, an "Employee") unless such Employee expressly elects in writing to opt-out of the releases, from any and all Claims and Causes of Action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law

or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Employee or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them have, had or would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any Employee or other Person, arising out of or relating to, in whole or in part, the employment of the Employee by the Debtors, including any Claims arising under or related to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., or any related or similar federal or state wage and labor laws.

Article VIII.F of the Plan provides for an exculpation of certain parties (the "Exculpation"):

Without affecting or limiting the releases set forth in **ARTICLE VIII.C** and **ARTICLE VIII.D** of the Plan, and notwithstanding anything herein to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, DIP Credit Agreement, Exit Revolver Facility, Exit First Lien Term Loan Facility, the Equity Rights Offering, the Definitive Documents, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, or participation in the New Reorganized Debt and the Equity Rights Offering, the pursuit of consummation of the Plan Effective Date, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.

Article VIII.G of the Plan establishes an injunction (the "Injunction"):

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE PLAN EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE VIII.F OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE INJUNCTIONS IN THIS ARTICLE VIII.G SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED COMPANY, THE RELEASED

PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

**NOTWTHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF A HOLDER OF A CLAIM OR INTEREST TIMELY OPTS OUT OF OR OBJECTS TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN EITHER THROUGH (1) A FORMAL OBJECTION FILED ON THE DOCKET OF THE CHAPTER 11 CASES OR (2) AN INFORMAL OBJECTION PROVIDED TO THE DEBTORS BY ELECTRONIC MAIL, AND SUCH OBJECTION IS NOT WITHDRAWN ON THE DOCKET OF THE CHAPTER 11 CASES OR VIA ELECTRONIC MAIL, AS APPLICABLE, BEFORE THE CONFIRMATION DATE, SUCH HOLDER SHALL NOT BE BOUND BY THE RELEASES SET FORTH IN ARTICLE VIII.D OR THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G WITH RESPECT TO THE RELEASED PARTIES (OTHER THAN THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES); PROVIDED THAT, THE INJUNCTION SET FORTH IN THIS ARTICLE VIII.G SHALL STILL APPLY TO (I) CLAIMS SUBJECT TO THE EXCULPATION SET FORTH IN ARTICLE VIII.F AND (II) ANY ACTIONS AGAINST THE DEBTORS, THE REORGANIZED COMPANY, OR THE EXCULPATED PARTIES; PROVIDED FURTHER, THAT THE INJUNCTION PROTOCOL SET FORTH IN ARTICLE VIII.G.1 SHALL STILL APPLY AND ANY SUCH HOLDER SHALL BE BOUND BY THE INJUNCTION PROTOCOL.**

1.    Injunction Protocol

**NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASES PRIOR TO THE PLAN EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH DEBTOR, REORGANIZED DEBTOR, OR RELEASED PARTY (THE "INJUNCTION PROTOCOL"). THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.**

Definitions Related to the Debtor Release and the Release by Holders of Claims and Interests:

Under the plan, "*Released Party*" means, collectively, each of the following in their capacity as such: (a)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the First Lien Agent, (v) the Second Lien Agent, (vi) the Indenture Trustee, (vii) each holder of a First Lien Claim, Second Lien Term Loan Claim or Senior Unsecured Notes Claim that votes for, and does not object to, the Plan, and (b) with respect to each of the foregoing

Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law; *provided*, that any Entity or Person that opts out of or timely objects either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation to the releases set forth in **Article VIII.D** of the Plan shall not be deemed a Released Party.

Under the Plan, *"**Releasing Parties**"* means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the Releases provided by the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the Releases provided by the Plan; (v) each Released Party, (vi) each Related Party to each entity in clause (i) through (v) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clause (i) through (v); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release, either through (1) a formal objection filed on the docket of the chapter 11 cases or (2) an informal objection provided to the debtors by electronic mail, and such objection is not withdrawn on the docket of the chapter 11 cases or via electronic mail, as applicable, before confirmation; *provided further*, *that,* for the avoidance of doubt, in no case, shall a minor (as defined under applicable state law) be a Releasing Party.

Under the Plan, "***Related Party***' means, with respect to (x) any Entity or Person, such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other Entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

**Item 2.  Optional Release by Holders of Claims and Interests.**

| ☐ | **BY CHECKING THIS BOX, YOU ELECT TO <u>OPT-OUT</u> OF THE RELEASE BY HOLDERS OF CLAIMS AND INTERESTS AND THE WAGE AND LABOR LAW RELEASES IN <u>ARTICLE VIII</u> OF THE PLAN.** |

**Item 3.  Certifications.**

By signing this Opt-Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors:

a.  that, as of **January 24, 2025**, either: (i) the undersigned is the Holder of a Claim or an Interest; (ii) the undersigned is an authorized signatory for an Entity or Person that is the Holder of a Claim or an Interest;

b.  that the Holder has received a copy of the *Notice of (A) Non-Voting Status to Holders or Potential Holders of (I) Unimpaired Claims or Equity Interests Conclusively Presumed to Accept the Plan and (II) Impaired Claims or Equity Interests Conclusively Deemed to Reject the Plan and (B) Opportunity for Holders of Claims and Equity Interests to Opt-Out of the Third-Party Release* and that this Opt-Out Form is made pursuant to the terms and conditions set forth therein;

c.  that the undersigned has made the same election with respect to all Claims or Interests held by the undersigned; and

d.  that no other Opt-Out Form has been cast with respect to the Holder's Claims or Interests, or, if any other Opt-Out Forms have been cast with respect to such Claims or Interests, such Opt-Out Forms are hereby revoked.

YOUR RECEIPT OF THIS OPT-OUT FORM DOES NOT SIGNIFY THAT YOUR CLAIM OR INTEREST HAS BEEN OR WILL BE ALLOWED.

| | |
|---|---|
| Name of Holder: | |
| Signature: | |
| Signatory Name (if other than the Holder): | |
| Title: | |
| Address: | |
| Email Address: | |
| Date Completed: | |

**IF YOU WISH TO OPT OUT, PLEASE COMPELTE, SIGN, AND DATE THIS OPT OUT FORM AND RETURN PROMPTLY VIA ONE OF THE METHODS BELOW:**

**By First Class Mail, Hand Delivery, or Overnight Mail:**

H-Food Holdings, LLC Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

To arrange hand delivery of your Opt-Out Form, please email the Claims and Noticing Agent at HFSBallots@ra.kroll.com (with "HFS Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

**By Electronic, Online Submission:**

Please visit https://cases.ra.kroll.com/HFS.  Click on the "Submit E-Ballot" section of the Debtors' website and follow the directions to submit the electronic version of your Opt-Out Form.  If you choose to submit your Opt-Out Form via Kroll Restructuring Administration LLC's E-Ballot Portal, you should not also return a hard copy of your Opt-Out Form.

IMPORTANT NOTE:  You will need the following information to retrieve and submit the electronic version of your Opt-Out Form:

Unique E-Opt-Out ID#: _____

The E-Ballot Portal is the sole manner in which this Opt-Out Form will be accepted via electronic or online transmission.  Opt-Out Forms submitted by facsimile or email will not be counted.

## INSTRUCTIONS FOR COMPLETING THIS FORM

1.      Capitalized terms used in the Opt-Out Form or in these instructions (the "**Instructions**") but not otherwise defined therein or herein shall have the meaning set forth in the Plan.

2.      To ensure that your election to opt-out is counted, you must complete the Opt-Out Form and take the following steps: (a) clearly indicate your decision to "opt-out" of the Third-Party Release set forth in the Plan in <u>Item 1</u> above; (b) make sure that the information required by <u>Item 2</u> above has been correctly inserted; and (c) sign, date and return an original of your Opt-Out Form in accordance with paragraph 3 directly below.

3.      **Return of Opt-Out Form:** Your Opt-Out Form MUST be returned to the Claims and Noticing Agent so as to be **actually received** by the Claims and Noticing Agent on or before the Opt-Out Deadline, which is **4:00 p.m., (prevailing Central Time), on March 3, 2025**.

4.      If an Opt-Out Form is received by the Claims and Noticing Agent after the Opt-Out Deadline, it will not be effective.  Additionally, the following Opt-Out Forms will **NOT** be counted:

      a.      any Opt-Out Form that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest;

      b.      any Opt-Out Form cast by or on behalf of an Entity that is not entitled to opt-out of the Release by Holders of Claims and Interests;

      c.      any Opt-Out Form sent to the any party (other than the Claims and Noticing Agent);

      d.      any Opt-Out Form transmitted by facsimile or email;

e.        any unsigned Opt-Out Form; or

f.        any Opt-Out Form not completed in accordance with the procedures approved in the Solicitation Order and described herein.

5.        The method of delivery of Opt-Out Forms to the Claims and Noticing Agent is at the election and risk of each Holder of a Claim or Interest.  Except as otherwise provided herein, such delivery will be deemed made to the Claims and Noticing Agent only when the Claims and Noticing Agent **actually receives** the executed Opt-Out Form.  Holders should allow sufficient time to assure timely delivery.

6.        If multiple Opt-Out Forms are received from the same Holder with respect to the same Claim or Interest prior to the Opt-Out Deadline, the last Opt-Out Form timely received will supersede and revoke any earlier received Opt-Out Forms.

7.        The Opt-Out Form is not a letter of transmittal and may not be used for any purpose other than to opt-out of the Release by Holders of Claims and Interests.  Accordingly, at this time, Holders of Claims or Interests should not surrender certificates or instruments representing or evidencing their Claims or Interests, and neither the Debtors nor the Claims and Noticing Agent will accept delivery of any such certificates or instruments surrendered together with an Opt-Out Form.

8.        The Opt-Out Form does **not** constitute, and shall not be deemed to be, (a) a proof of Claim, (b) proof of Interest, or (c) an assertion or admission of a Claim or Interest.

9.        **Please be sure to sign and date your Opt-Out Form**.  If you are signing an Opt-Out Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Noticing Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Opt-Out Form.

<u>**PLEASE RETURN YOUR OPT-OUT FORM PROMPTLY**</u>

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, REGARDING THE DEBTORS OR THE PLAN, OTHER THAN WHAT IS CONTAINED IN THE DOCUMENTS MAILED HEREWITH.

## Exhibit 10

## Committee Statement

The Official Committee of Unsecured Creditors of
H-Food Holdings, LLC, *et al*.
c/o

| Lowenstein Sandler LLP | McDermott Will & Emery LLP |
|---|---|
| 1251 Avenue of the Americas | 2501 North Harwood Street, Suite 1900 |
| New York, New York 10020 | Dallas, Texas 75201 |

January 24, 2025

To: All Unsecured Creditors of H-Food Holdings, LLC, *et al*.

Re: In re H-Food Holdings, LLC, *et al*., No. 24-90586 (ARP) (Bankr. S.D. Tex.)

Dear Unsecured Creditors:

The Official Committee of Unsecured Creditors (the "Committee") of H-Food Holdings, LLC, *et al*. (the "Debtors") submits this letter to all unsecured creditors concerning their decision as to whether to vote in favor of the *Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and its Affiliated Debtors* [ECF No. 323] (as may be subsequently amended, the "Plan"). The deadline to vote on whether to accept or reject the Plan is March 3, 2025, at 4:00 p.m., prevailing Central Time (the "Voting Deadline").

We strongly encourage you to read the entirety of this letter to fully understand the Committee's current position with respect to the Plan.

## I. What Is the Committee?

A committee of unsecured creditors is a fiduciary body appointed by the United States Trustee. The Committee is designed to represent a cross-section of the applicable, unsecured creditor body. The Committee, as a fiduciary, has a duty to maximize unsecured creditor recovery. The Committee is essentially representing the interests of all general unsecured creditors here.

## II. The Committee's Current Position on the Plan

Based on the currently known facts and circumstances and the information the Debtors and their professionals have provided to date, the Committee is still in the process of determining whether to recommend voting to accept the Plan or voting to reject (*i.e.*, vote against) the Plan. The Committee is investigating potential estate claims and causes of action against third parties that the Debtors propose to release, as well as whether unencumbered assets exist that could be used to improve the recovery of unsecured creditors. Subject to the outcome of such investigation, the Committee anticipates publicly filing its summary recommendation on or before February 24, 2025. As explained in more detail below, the Committee currently takes issue with the broad releases in the Plan (pending the conclusion of its ongoing investigation) and the Plan's failure to properly allocate potentially unencumbered assets to unsecured creditors. The Plan provides releases of claims held by the Debtors and third parties against, among others, the Debtors' secured lenders, current and former directors and officers, equity sponsors, and other individuals who operated the Debtors prepetition. **The Committee's investigation remains ongoing, and the Committee urges unsecured creditors to**

**refrain from voting on the Plan until the Committee provides an update on the results of its investigation.**

### III. Background

On November 22, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases are pending before the Honorable Alfredo R. Peréz in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

On December 4, 2024, the Office of the United States Trustee for Region 7 appointed a statutory committee of unsecured creditors pursuant to Bankruptcy Code section 1102(a)(1). The Committee is represented by the following professionals: (i) the law firms of McDermott Will & Emery LLP and Lowenstein Sandler LLP as proposed counsel and (ii) Berkeley Research Group, LLC as proposed financial advisor. The members of the Committee have devoted a considerable amount of their own time working on these cases to protect the rights of all unsecured creditors.

### IV. The Plan and Disclosure Statement

On January 10, 2025, the Debtors filed the Plan and the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and its Affiliated Debtors* [ECF No. 324] (the "Disclosure Statement"). Prior to the Petition Date, the Debtors entered into a *Restructuring Support Agreement* (the "RSA") with certain of the Debtors' First Lien Lenders, Second Lien Term Lenders, Senior Unsecured Noteholders, and equity sponsors, the terms of which are embodied in the Plan. Under the Plan, the Debtors' First Lien Lenders will receive (i) 100% of the Debtors' reorganized equity (subject to dilution by a rights offering and a management incentive plan), (ii) $825 million in exit financing, and (iii) any distributions earmarked for holders of Class 4 Second Lien Term Loan Claims, Class 5 Senior Unsecured Notes Claims, and Class 6 General Unsecured Claims if such classes vote to reject the Plan. Unsecured creditors are slated to receive (i) $21 million among Holders of Senior Unsecured Notes if the class votes in favor of the Plan; and (ii) the lesser of $2.4 million or 6.0% among Holders of General Unsecured Claims if the class votes in favor of the Plan. Plan at Art. III.B.5–6. Such recoveries may be further reduced if the collective fees of the Committee's professionals exceed $13 million. If Class 5 Holders of Senior Unsecured Notes or Class 6 Holders of General Unsecured Claims vote to reject the Plan, such class of creditors will not receive any distribution. Based upon the Debtors' financial projections, the general unsecured creditors are only anticipated to receive a recovery of 0.0% - 6.0%.

The Bankruptcy Court held a hearing on January 24, 2025 to consider approval of the Disclosure Statement. On January 24, 2025, the Court entered an order approving the Disclosure Statement, establishing procedures for the solicitation and tabulation of votes to accept or reject the Plan, and establishing deadlines and procedures for filing objections to confirmation of the Plan.

### V. The Committee Believes the Release Provisions in the Plan Are Inappropriate

The Plan proposes to release third parties, including (i) the parties to the RSA, (ii) First Lien Lenders, Second Lien Term Lenders, and Senior Unsecured Noteholders that vote in favor of the Plan and do not object to the Plan, (iii) the Debtors' current and former directors and officers, and (iv) various related parties from claims belonging to the Debtors' estates and claims belonging to third parties without the Committee first completing an investigation into whether there are causes of action

against these parties. As drafted, it is unclear whether the Plan (i) improperly releases valuable claims of the Debtors' estates; and/or (ii) provides for inadequate or no consideration to the Debtors' estates in return for releases in favor of certain parties. Importantly, the Plan also provides for releases by third parties, ***including unsecured creditors who fail to check the box on their respective ballots indicating their intent to opt out of the releases***, of any and all claims that could otherwise have been asserted against such released parties in connection with the Debtors' estates, their bankruptcy cases, the transactions or events giving rise to any claim that is treated in the Plan, and a host of other conduct. ***If you fail to check the box on your ballot opting out of such releases, you will be forever barred from asserting any claim or cause of action that you otherwise could have asserted based on the released conduct***.

Subject to its investigation, the Committee has concerns over the breadth of the releases proposed under the Plan, particularly those being provided to the Debtors' prepetition lenders and current and former directors and officers. The Committee is investigating various events and circumstances arising prior to the Petition Date, including (i) the sale of the Debtors' European nutritional functional bars business and the July 2024 repatriation (the "Repatriation")of approximately $187.9 million of related cash proceeds (the "Unencumbered Cash"), (ii) alleged labor law violations that were the subject of a February 2023 New York Times article, (iii) certain sale-leaseback transactions executed between 2022 and 2024, resulting in more than $304 million in capital lease obligations, (iv) the divestment of alleged non-core assets in the first quarter of 2024, and (v) the Debtors' negotiation of and entry into the RSA.

The Committee is separately conducting an analysis of the Debtors' prepetition secured lenders' liens on the Debtors' assets to determine whether any unencumbered assets exist that may inure to the benefit of unsecured creditors, including investigating and analyzing the Repatriation and the Unencumbered Cash. Without information about the specific claims against the released parties, the specific form and value of the purported consideration each of the released parties provided in exchange for a release, and the legal and factual bases supporting the determination that the releases are in the best interests of the Debtors' estates, the Committee cannot support the releases until its own investigation is completed.

Although the Committee's investigation into these and other matters is ongoing, the Committee hopes to commence negotiations regarding the Plan structure and releases with the Debtors. The Committee will update unsecured creditors regarding its views on Plan voting and the results of its investigation before the Voting Deadline and urges unsecured creditors not to vote on the Plan until the Committee provides an update on the results of its investigation. The most updated version of the Committee's recommendation can be found on the Debtors' website at https://cases.ra.kroll.com/HFS/.

**The Committee recommends that you NOT vote on the Plan until the summary recommendation report, described below, is filed with the Court on or before February 24, 2025 (subject to extension).**

BEFORE YOU CAST YOUR BALLOT YOU SHOULD REVIEW THE ENCLOSED PLAN, THE DISCLOSURE STATEMENT, AND THE EXHIBITS TO THE DISLCOSURE STATEMENT IN THEIR ENTIRETY, AND YOU MAY WANT TO CONSULT YOUR OWN LEGAL AND FINANCIAL PROFESSIONALS.

This letter does not purport to reflect the views of the Bankruptcy Court and does not constitute findings of fact or conclusions of law endorsed by the Bankruptcy Court, nor does it necessarily reflect

the views of any individual Committee member, each of which reserves any and all of its rights. The Committee reserves all rights with respect to any potential claims and causes of action identified in the Committee's investigation.  This letter is not intended or offered as legal advice as to any specific claim or the treatment of any claim under the Plan. It has been prepared for informational purposes only.

If you have any questions regarding voting procedures or otherwise, please contact counsel to the Committee:

Lowenstein Sandler LLP
Jeffrey Cohen and David M. Posner:
(212) 262-6700
jcohen@lowenstein.com
dposner@lowenstein.com

-and-

McDermott Will & Emery LLP
Charles R. Gibbs: (713) 653-1700
crgibbs@mwe.com

Very truly yours,
**The Official Committee of Unsecured Creditors of H-Food Holdings, LLC, *et al.***