**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| H-Food Holdings, LLC, *et al.*,[1] | Case No. 24-90586 (ARP) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR ENTRY OF ORDER (I) AUTHORIZING AND APPROVING THE DEBTORS' (A) KEY EMPLOYEE RETENTION PLAN AND (B) KEY EMPLOYEE INCENTIVE PLAN, AND (II) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Motion for Entry of Order (I) Authorizing and Approving the Debtors' (A) Key Employee Retention Plan and (B) Key Employee Incentive Plan, and (II) Granting Related Relief* [ECF No. 338] (the "Motion") and the *Declaration of Christopher J. Kearns in Support of Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of Order (I) Authorizing and Approving the Debtors' (A) Key Employee Retention Plan and (B) Key*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: H-Food Holdings, LLC (6072); HFS Sub, LLC (8177); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA – Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Hearthside Food Solutions, LLC (8653); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Peacock Engineering Company II, LLC (N/A); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783). The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

*Employee Incentive Plan, and (II) Granting Related Relief* (the "Kearns Declaration"), attached hereto as **Exhibit A**.[2]  In support of this Objection, the Committee respectfully states as follows:[3]

## PRELIMINARY STATEMENT

1.      In these Chapter 11 Cases, the Debtors have affirmatively decided to allocate substantial dollars to several purposes *other than to pay their general unsecured creditors*.  The Debtors have chosen to allot over $138 million to pay for, among other things, professional fees (over $88 million), the settlement with the Illinois Department of Labor and Illinois Attorney General ($4.5 million), and fees payable to the lenders in connection with the debtor-in-possession financing ($21 million[4]) that has not been drawn at all in these Chapter 11 Cases.  The Debtors presently have a cash balance of approximately $261 million and project that they will have approximately $50 million in cash at emergence.[5]  Yet, the Debtors only propose to distribute up to $2.4 million to general unsecured creditors (Class 6) and up to $21 million to holders of Senior Unsecured Notes Claims (Class 5) under the Plan (which amount was negotiated by the Consenting Senior Unsecured Noteholders,[6] a RSA (defined below) party).

2.      Now, to add insult to injury, the Debtors seek approval of a key employee incentive plan (the "KEIP") that is approximately ten times the amount set aside for Class 6 general

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3]    The Committee has no objection to the approval of the key employee retention plan set forth in the Motion and, in fact, supports additional compensation to the rank-and-file who have continued to stick with the Debtors during an otherwise unsettling moment in their corporate history.

[4]    Such amount *excludes* the $15 million in adequate protection fees that the DIP Lenders waived at the Committee's request.

[5]    The Committee believes the actual cash at emergence will be substantially larger, as the projected nearly $50 million in cash assumes that the Debtors will spend the full $139 million approved by this Court for critical vendor payments and the Debtors' supplier programs will cease, which has not happened to date. The Debtors have been consistently substantially ahead of forecast, which the Committee believes will continue to be the case through the effective date.

[6]    As defined in the *Second Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings, LLC and its Affiliated Debtors* [ECF No. 388] (the "Plan").

unsecured creditors.  Even worse, such KEIP payments would be designated for insiders that (i)
have already received approximately ████████ in "retention payments" in the 12 months prior
to the Petition Date,[7] (ii) are entitled to contractual bonuses pursuant to their employment
contracts, and (iii) are slated to participate in a management incentive plan (the "MIP") post-
effective date, which would provide certain members of the management team with 10% of the
Debtors' reorganized equity outstanding immediately after the effective date of the Plan.  At a time
when unsecured creditors are projected to receive minimal recoveries, diverting such a substantial
sum to executive bonuses is both unwarranted and grossly disproportionate.

3.       Against this backdrop, the Debtors' proposal to pay up to $24.1 million to their
insider executives under the KEIP is unwarranted under the Bankruptcy Code and the facts and
circumstances of these Chapter 11 Cases.  The Committee respectfully submits that the KEIP must
not be approved.

## BACKGROUND

### A.  The Chapter 11 Proceedings

4.       On November 22, 2024 (the "Petition Date"), each of the Debtors filed a voluntary
petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court
for the Southern District of Texas, Houston Division (the "Court").

5.       The Debtors remain in possession of their property and continue to operate and
manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the

---

[7]      Fifty percent ████████████ of these awards ostensibly were earned on December 31, 2024, with the
remaining 50% ████████) to be earned on December 31, 2025.

Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner in these Chapter 11 Cases.

6.      On December 4, 2024, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [ECF No. 134, 140] appointing the Committee.

7.      A detailed description of the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases, are set forth in the *Declaration of Robert M. Caruso, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [ECF No. 30].

8.      Prior to the Petition Date, the Debtors entered into the Restructuring Support Agreement (the "RSA") with the Consenting First Lien Lenders, the Consenting Second Lien Term Lenders, the Consenting Senior Unsecured Noteholders, and the Consenting Sponsor (each as defined in the Plan), which generally sets forth the terms of the Plan.  Assuming that the two classes of unsecured creditors vote in favor of the Plan (and therefore avoid a deathtrap that would strip them of any recovery), unsecured creditors are slated to receive: (i) $21 million among Holders of Senior Unsecured Notes in Class 5 (which amount was negotiated by the Consenting Senior Unsecured Noteholders, a RSA party); and (ii) the lesser of $2.4 million or 6.0% among Holders of General Unsecured Claims in Class 6, each subject to certain dilutions.  Plan § III.B.5–6.  The Plan also provides for a MIP, which would deliver 10% of the reorganized equity to its participants.  *Id.* § I.A.105.

**B.  The Proposed KEIP**

9.     On January 15, 2025, the Debtors filed the Motion, along with declarations by Robert M. Caruso [ECF No. 342] (the "<u>Caruso Declaration</u>") and Vance Yudell [ECF No. 341] (the "<u>Yudell Declaration</u>") in support of the Motion.

10.    Through the proposed KEIP, the Debtors seek to pay eight (8) insider employees (the "<u>KEIP Participants</u>") an incentive bonus pool of up to $24.1 million for meeting certain performance targets (the "<u>Performance Targets</u>") through specified reporting periods (the "<u>Performance Periods</u>").  Motion ¶ 21, 24.  The KEIP Participants are comprised of eight (8) members of the Debtors' senior management team: the Chief Executive Officer, Chief Financial Officer, two Chief Operating Officers, Chief Customer & Commercial Officer, Chief Legal Officer, Chief Human Resources Officer, and Chief Strategy Officer.  *Id*. ¶ 26.

11.    The Motion only seeks approval of the KEIP for the initial four-month performance period (*i.e*., December 1, 2024 through March 31, 2025) (the "<u>Initial Performance Period</u>"), as the remaining time periods are projected to occur after the effective date of the Plan.  *Id.* ¶ 25.  To the extent that a chapter 11 plan is not consummated prior to March 31, 2025, there shall be Supplemental Performance Periods in three-month increments, ending on the following dates: June 30, 2025, September 30, 2025, and December 31, 2025.  *Id.*  The Debtors will file a notice with the performance metrics for supplemental performance periods if the plan is not consummated by March 31, 2025.  *Id.*

12.     For the Initial Performance Period, the KEIP offers the following payouts:

**4-Month Individual KEIP Values (December 1, 2024 – March 31, 2025)**

| Participant's Title | Threshold Award Opportunity | Target Award Opportunity | Maximum Award Opportunity |
|---|---|---|---|
| Chief Executive Officer | $735,000 | $1,470,000 | $2,940,000 |
| Chief Financial Officer | $216,667 | $433,333 | $866,667 |
| Chief Operating Officer – 1 | $166,667 | $333,333 | $666,667 |
| Chief Operating Officer – 2 | $166,667 | $333,333 | $666,667 |
| Chief Customer & Commercial Officer | $166,667 | $333,333 | $666,667 |
| Chief Legal Officer | $166,667 | $333,333 | $666,667 |
| Chief Human Resources Officer | $133,333 | $266,667 | $533,333 |
| Chief Strategy Officer | $100,000 | $200,000 | $400,000 |
| **Total** | **$1,851,668** | **$3,703,332** | **$7,406,668** |

*Id.* ¶ 26.

13.     While the Debtors attempt to emphasize that they are only seeking approval for the Initial Performance Period, the Motion also seeks authorization to grant additional KEIP Awards during subsequent three-month performance periods (the "Supplemental Performance Periods") if a chapter 11 plan is not confirmed by March 31, 2025. *Id.* ¶ 25. These supplemental KEIP Awards would not necessarily be governed by the Performance Targets established for the Initial Period. *Id.* If the Chapter 11 Cases extend beyond the Initial Performance Period, the total cost of the KEIP could reach up to $24.1 million, representing a significant depletion of estate resources to benefit insiders. *See id.* ¶ 25.

14.     In the absence of confirmation by March 31, 2025, the KEIP offers the following

total payouts based on Performance Targets through December 31, 2025:

**13-Month Individual KEIP Values (December 1, 2024 – December 31, 2025)**

| Participant's Title | Threshold Award Opportunity | Target Award Opportunity | Maximum Award Opportunity |
|---|---|---|---|
| Chief Executive Officer | $2,388,750 | $4,777,500 | $9,555,000 |
| Chief Financial Officer | $704,167 | $1,408,333 | $2,816,667 |
| Chief Operating Officer – 1 | $541,667 | $1,083,333 | $2,166,667 |
| Chief Operating Officer – 2 | $541,667 | $1,083,333 | $2,166,667 |
| Chief Customer & Commercial Officer | $541,667 | $1,083,333 | $2,166,667 |
| Chief Legal Officer | $541,667 | $1,083,333 | $2,166,667 |
| Chief Human Resources Officer | $433,333 | $866,667 | $1,733,333 |
| Chief Strategy Officer | $325,000 | $650,000 | $1,300,000 |
| **Total** | **$6,017,918** | **$12,035,832** | **$24,071,668** |

*Id.* ¶ 26.

15.     The KEIP's payouts are tied equally to two performance metrics: a sales-based

metric (the "Sales-Based Metric") and a profit-based metric (the "Profit-Based Metric"). *Id.* ¶ 24.

The Sales-Based Metric is measured by the Debtors' sales volume in pounds, with payouts

adjusting by 10% for every 1% increase or decrease in sales. *Id.* The Profit-Based Metric is

measured by adjusted EBITDA, with payouts adjusting by 10% for every 4.0% increase or

decrease in adjusted EBITDA, respectively. *Id.* The Profit-Based Metric will measure the

Debtors' adjusted EBITDA, calculated in a manner consistent with the calculation and presentation

of Adjusted EBITDA for purposes of the financial projections (the "Financial Projections") filed

as Exhibit D to the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization*

*of H-Food Holdings, LLC and Its Affiliated Debtors* [ECF No. 324] (which, for the avoidance of

doubt, will not include any forward-looking or "run-rate" pro forma adjustments, such as for

potential cost savings). *Id.* The Performance-Based Metric was developed based on the Financial

Projections, which were prepared based on assumptions made by the Debtors' management team,

in consultation with their advisors, as to the future performance of the Debtors and reflect the Debtors' judgment and expectations regarding their future operations and performance. *Id.*

16.     The performance targets for the Sales-Based Metric and Profit-Based Metric are set forth below:

| KEIP Performance Volume Targets (in pounds) Per Initial Performance Period | | | |
|---|---|---|---|
| Performance Period | Threshold Award Opportunity | Target Award Opportunity | Maximum Award Opportunity |
| Period ending 3/31/25 | ███████ | | ███████ |

| KEIP Performance EBITDA Targets (in dollars) Per Initial Performance Period | | | |
|---|---|---|---|
| Performance Period | Threshold Award Opportunity | Target Award Opportunity | Maximum Award Opportunity |
| Period ending 3/31/25 | ███████ | ███████ | ███████ |

*Id.* ¶ 28.

17.     If a KEIP Participant is terminated without cause, resigns for "good reason," dies, or becomes disabled, they are entitled to a prorated portion of the next quarterly payment. *Id.* ¶ 24.  While the KEIP includes a clawback provision for KEIP Participants who resign voluntarily within 30 days of a payment, this safeguard is narrow and may allow participants to benefit from KEIP payouts regardless.

## C.     Contractual Bonus Structure

18.     The KEIP Participants are contractually eligible for annual performance-based awards at target that range from ███████ of their base salary, with the exception being the Chief Executive Officer, who is eligible for a performance-based bonus at ███ of base salary at target.  Kearns Decl. ¶ 12.  Certain of the KEIP Participants were granted equity at the time of their hiring, which is subject to vesting, repurchase, and other obligations and restrictions. *Id.*  Neither of these benefits are waived in exchange for participation in the KEIP.

### D.      2024 Executive Retention Agreement

19.      In 2024, each of the KEIP Participants signed a retention agreement that provided for approximately ▬▬▬▬▬▬ in awards contingent on their retention through December 31, 2025 (the "Retention Bonus"). *Id.* ¶ 13.  The Retention Bonus was paid in full to the KEIP Participants on January 26, 2024.[8]  *Id.*  Fifty percent ▬▬▬▬▬▬▬ of these awards ostensibly were earned on December 31, 2024, with the remaining 50% ▬▬▬▬▬▬▬ to be earned on December 31, 2025.  *Id.*  Therefore, approximately ▬▬▬▬ in retention awards accrue on a monthly basis.  *Id.* These Retention Bonuses are approximately ▬▬▬ of the KEIP Participants' contractual targeted annual bonus.  *Id.*  The Retention Bonus is not being waived in exchange for participation in the KEIP.

### E.      2024 Bonus Payments

20.      On the day prior to the Petition Date, the KEIP Participants were paid approximately ▬▬▬▬▬ in the aggregate in bonuses related to 2024 performance ("2024 Bonus").  *Id.* ¶ 14.  These payments (excluding retention payments) were approximately ▬▬▬ of the KEIP Participants' contractual targeted annual performance bonus.  *Id.*  The inclusion of December 2024 in the Initial Performance Period of the KEIP is a "double-dip" for the month of December as the KEIP Participants were paid related to the Debtors' 2024 performance based on actual performance through October and forecasted performance in November and December.  *Id.* The 2024 Bonuses are not being waived in exchange for participation in the KEIP.

---

[8] 

### F.    A&M's Analyses

21.    To assess the reasonableness of the KEIP, Alvarez & Marsal North America, LLC ("A&M"), the Debtors' financial advisors, (i) compared target total direct compensation to a peer group of 15 companies[9] that the Debtors use for executive compensation benchmarking purposes (the "Market Comparables Analysis")[10], and (ii) compared the proposed KEIP to key employee incentive plans approved in 13 Chapter 11 cases since 2019 of companies with prepetition assets between $965 million and $8.7 billion (the "Bankruptcy Comparables Analysis")[11].  Motion ¶ 10. The Market Comparables Analysis considered the 2025 portion of the Retention Bonus ████ ████), while the Bankruptcy Comparables Analysis did not consider such awards.  Kearns Decl. ¶ 16.

22.    Compared to court-approved incentive plans of the Debtors' chapter 11 peers, A&M concluded that the annualized target cost of the KEIP (which did not consider the additional compensation related to the 2025 portion of the Retention Bonus) would be at the 86th percentile of the KEIP Peer Group, with the target cost per participant in the 86th percentile on an annualized basis.

---

[9]    The executive compensation peer group consists of The J.M. Smucker Company, Ingredion Incorporated, Post Holdings, Inc., McCormick & Company, Incorporated, Coca-Cola Consolidated, Inc., Lamb Weston Holdings, Inc., Flowers Foods, Inc., Brown-Forman Corporation, TreeHouse Foods, Inc., WK Kellogg Co., B&G Foods, Inc., Lancaster Colony Corporation, BellRing Brands, Inc., The Hain Celestial Group, Inc., and Utz Brands, Inc. (collectively, the "Executive Compensation Peer Group").

[10]    Per A&M's Market Comparables Analysis, taking into account base salary, other bonus payments attributable to 2025 and the KEIP Awards (at target), annualized total direct compensation for each of the insiders is at or near ████████ of market.

[11]    The KEIP peer group includes 24 Hour Fitness Worldwide, Brazos Electric Power Cooperative, Inc., Bristow Group, Inc., California Resources Corporation, Diamond Offshore Drilling, Inc., LSC Communications, Inc., Neiman Marcus Group, Inc., NPC International, Inc., PHI, Inc., Purdue Pharma, L.P., Silicon Valley Bank, Stage Stores, Inc., and Wesco Aircraft Holdings Inc. (collectively, the "KEIP Peer Group").

**ARGUMENT**

A.    **The Proposed KEIP Is Neither Justified By The Facts And Circumstances Of These Chapter 11 Cases Nor A Sound Exercise Of The Debtors' Business Judgment.**

23.    The KEIP should not be approved because it fails to satisfy the relevant requirements under sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.  The Debtors have not demonstrated that the KEIP is the product of the Debtors' exercise of sound business judgment under section 363(b)(1) of the Bankruptcy Code nor that the KEIP is justified by the facts and circumstances of these cases as required by section 503(c)(3) of the Bankruptcy Code.  Under section 503(c)(3), the Debtors must demonstrate that the proposed KEIP is "justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3); *see also In re Country Fresh Holding Company, Inc.*, 2021 WL 2932680, at *12 (Bankr. S.D. Tex. July 12, 2021) ("The most faithful reading of § 503(c)(3) is one requiring more 'than simple deference to the debtor's business judgment.'") (quoting 4 COLLIER ON BANKRUPTCY ¶ 503.17 (16th ed. 2021)); *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236–37 (Bankr. N.D. Tex. 2009); *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).

24.    In assessing whether a particular program is justified by the facts and circumstances of a particular case, courts generally consider whether "the KEIP's implementation will serve the interests of creditors and the debtor's estate." *Country Fresh*, 2021 WL 2932680, at *13. Courts also consider several other factors, including: (i) whether there is a reasonable relationship between the plan proposed and the results to be obtained; (ii) whether the cost of the plan is reasonable; (iii) whether the scope of the plan is fair and reasonable; (iv) whether the plan is consistent with industry standards; (v) whether the debtor exercised due diligence efforts in investigating the need for a plan analyzing which key employees need to be incentivized; and (vi) whether the debtor received independent counsel in performing the due diligence and in creating and authorizing the

incentive compensation.  *Dana*, 358 B.R. at 576–77.  No one factor is dispositive—the Court has discretion to weigh each of these factors based on the specific facts and circumstances before it. *Id*. at 576.  When considering these factors, the proposed KEIP is plainly inappropriate.

25.    Courts since *In re Dana Corp.* have increasingly distanced section 503(c)(3) from the deferential business judgment rule of section 363(b)(1), with judges playing a more critical role in reviewing bonus programs.  *See, e.g.*, *Pilgrim's Pride*, 401 B.R. at 236–37 ("[T]he test of section 503(c)(3) should not be equated to the business judgment rule as applied under section 363(b)(1)" because this would make section 503(c)(3) redundant.).   In place of the business judgment rule, transfers of estate assets or creation of administrative obligations outside the ordinary course of business must be "justified by the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  The *Pilgrim's Pride* court further noted that "the conditioning of approval of covered transfers and obligations upon their being 'justified by the facts and circumstances of the case'" suggests that "Congress intended the court to play a more critical role in assessing transactions" falling within the ambit of section 503(c)(3).  *Id.* at 237 (internal citations omitted). Unlike the business judgment test, under which courts defer to debtors' business judgment, in a section 503(c)(3) analysis, "even if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it." *Id.*

### i.    The KEIP Does Not Establish a Relationship Between Effort and Outcome

26.    The Debtors have not established a nexus, much less a strong one, between the KEIP and the results sought to be achieved.  The record is devoid of any evidence that the KEIP is necessary for the Debtors to achieve the Performance Targets of certain sales volumes and adjusted EBITDA, and the Motion fails to demonstrate how the KEIP Participants will contribute

or how they will add value or increase recoveries for unsecured creditors beyond performing their ordinary job functions.

                ii.        **There is Insufficient Evidence to Conclude that the KEIP's Costs are Reasonable.**

27.     The Debtors have not presented sufficient evidence that the costs of the KEIP are reasonable. The KEIP Participants have the opportunity to be awarded bonuses in 2025, which are multiples higher than what would have been awarded in the ordinary course (*i.e.*, pursuant to their individual employment contracts). Kearns Decl. ¶ 19. The Debtors appear to be targeting total direct compensation for the KEIP Participants to be in the ▮▮▮▮▮▮ of the Market Comparables Analysis (annualized); this would indicate targeted total bonuses (2025 portion of the Retention Bonus and KEIP, at target) aggregating ▮▮▮▮▮. *Id.* This would result in the KEIP Participants receiving awards in 2025 that would be substantially higher than their contractual annual performance-based awards. *Id.* As compared to contractual target performance bonuses ▮▮▮▮▮▮▮ the KEIP awards, at target, on an annualized basis are ▮▮▮ of the aggregate base salary of the KEIP Participants, or approximately ▮▮ higher than contractually awarded at target. Including the 2025 portion of the Retention Bonus, the awards at target on an annualized basis are ▮▮ of the aggregate base salary of the KEIP Participants, or ▮▮ higher than contractually awarded at target:

28.     Further, the Bankruptcy Comparables Analysis for the Initial Performance Period and the related conclusion that the proposed KEIP is reasonable is misleading.  The Bankruptcy Comparables Analysis, as illustrated below, compares a 4-month program in these Chapter 11 Cases to programs that were primarily 6 months or longer:

| Non-Annualized Bankruptcy Comparables | |
|---|---|
| Comparables | Duration |
| 24 Hour Fitness Worldwide Inc. | 6 Months |
| Brazos Electric Power Cooperative, Inc. | 6 Months |
| Bristow Group Inc. | 9 Months |
| California Resources Corporation | 6 Months |
| Diamond Offshore Drilling Inc. | 12 Months |
| LSC Communications, Inc. | 9 Months |
| Neiman Marcus Group Ltd LLC | 6 Months |
| NPC International, Inc. | 6 Months |
| PHI, Inc | 12 Months |
| Purdue Pharma, L.P. | 12 Months |
| Silicon Valley Bank | 6 Months |
| Stage Stores | 5 Months |
| Wesco Aircrafts Holdings,  Inc. | 9 Months |
| Hearthside | 4 Months |

*See id.* ¶ 20.

29.     Consequently, in these cases there should be an adjustment to provide an "apples to apples" analysis of bankruptcy comparables.  *Id.*  The Bankruptcy Comparables Analysis adjusted to present on an annualized basis illustrates that the proposed KEIP is expensive, as evidenced by the annualized cost of the KEIP per KEIP Participant being in the 86th percentile before considering the 2025 portion of the Retention Bonus, which is a part of the Market Comparables Analysis.  *Id.*  Adjusting the Bankruptcy Comparables Analysis to include the 2025 portion of the Retention Bonus shows that, at target, the total cost per KEIP Participant would be in the ████████ and the target cost of the program would be in the ████████:

$ in 000s

| Summary Statistics | No. of Participants | Target Cost | Target Cost per Participant | Target Cost as a % of Prepetition Assets | Target Cost as a % of Prepetition Revenue | Max Cost as a % of Target Cost |
|---|---|---|---|---|---|---|
| | | | Annualized Market Incentive Data | | | |
| 25th Percentile | 7 | $ 5,500 | $ 659 | 0.14% | 0.24% | 129% |
| 50th Percentile | 7 | 8,000 | 914 | 0.29% | 0.40% | 150% |
| 75th Percentile | 9 | 9,675 | 1,244 | 0.39% | 0.63% | 200% |
| **Hearthside** | **8** | **$ 11,110** | **$ 1,389** | **0.38%** | **0.33%** | **200%** |
| *Percentile Rank* | *58%* | | *86%* | *86%* | *74%* | *43%* | *70%* |
| **Hearthside w/ 2025 Retention** | ████████████████████████████████ | | | | | |
| *Percentile Rank* | | | | | | |

*See id.*

30.    As evidenced above and as set forth in the Kearns Declaration, the KEIP is an expensive program that provides for target awards that are simply not reasonable when compared to similarly situated companies that have sought relief under chapter 11 and would seek to reward the KEIP Participants that are already entitled to (i) the Retention Bonus, (ii) contractual bonuses, and (iii) potential participation in the MIP.

### iii.    The KEIP is Not Consistent with Industry Standards.

31.    As set forth above, the Debtors have failed to establish that the proposed KEIP is consistent with industry standards.  The Debtors reviewed other KEIP plans in other chapter 11 cases in formulating the KEIP.  The Bankruptcy Comparables Analysis, adjusted to include the 2025 portion of the Retention Bonus, reflects that the cost per KEIP Participant, at target, would be in the ████████.  *See id.* ¶ 20.  Such a result cannot be said to be consistent with industry standards and makes the KEIP expensive.

### iv.    There is No Satisfactory Evidence that the Debtors Investigated the Need for the KEIP.

32.    Although the Debtors contend that they worked closely with their advisors to develop the KEIP, the Motion simply makes conclusory statements regarding the necessity of the KEIP.  There is no evidence that the Debtors would not be successful in meeting the sales volumes and adjusted EBITDA figures set forth in the KEIP without payment of the proposed bonuses to

the KEIP Participants.  The Debtors fail to make a sufficient showing that they performed a reasonable investigation of the need for the KEIP or that the KEIP is justified by the facts and circumstances of these Chapter 11 Cases or that it is an exercise of sound business judgment.  The proposed KEIP merely provides the Debtors' executives with an opportunity to deplete the Debtors' assets at the expense of the Debtors' estates and creditors.

33.     Based on the foregoing, the Debtors have failed to adequately establish that the KEIP is justified by the facts and circumstances of these Chapter 11 Cases or that it is an exercise of the Debtors' sound business judgment.  Accordingly, the KEIP should not be approved.

**B.      Necessary Modifications To The Terms Of The Employee Compensation Plans.**

34.     To the extent this Court is inclined to approve the KEIP in these Chapter 11 Cases, the Committee respectfully submits that the following requirements be satisfied prior to the Debtors' payments of any bonus amounts:

**i. Waiver of Severance and Claims**.  Before the KEIP Participants receive any of the substantial financial bonuses the Debtors seek to award them under the KEIP, the KEIP Participants must be required to waive any rights to severance, bonuses, and other payments under any employment agreements they have with the Debtors. KEIP Participants should also be required to release all claims against the Debtors in these Chapter 11 Cases, whether prepetition claims, alleged priority claims, or alleged post-petition administrative expense claims.

**ii. Insider Avoidance Actions**.  Any order approving the Motion should contain a reservation of the Committee's right to pursue any chapter 5 causes of action and any state law claims, including claims for preferential transfers and fraudulent conveyances, against any KEIP Participant.

## **RESERVATION OF RIGHTS**

35.     This Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights to supplement and amend this Objection, including by filing declarations in support thereof, to introduce evidence at any hearing relating to this Objection, to seek discovery, and to further object to the Motion on any grounds that may be appropriate.

## **CONCLUSION**

WHEREFORE, the Committee requests that the Court deny the approval of the KEIP in its entirety.

*[Remainder of Page Intentionally Left Blank]*

Dated: February 5, 2025                              Respectfully submitted,

                                                     **MCDERMOTT WILL & EMERY LLP**
                                                     */s/ Charles R. Gibbs*
                                                     Charles R. Gibbs
                                                     Texas State Bar No. 7846300
                                                     Grayson Williams (admitted *pro hac vice*)
                                                     Texas State Bar No. 24124561
                                                     845 Texas Avenue, Suite 4000
                                                     Houston, TX 77002-1656
                                                     Telephone: (713) 653-1700
                                                     Facsimile: (713) 739-7592
                                                     Email: crgibbs@mwe.com
                                                             gwilliams@mwe.com

                                                     -and-

                                                     **LOWENSTEIN SANDLER LLP**
                                                     Jeffrey L. Cohen (admitted *pro hac vice*)
                                                     David M. Posner (admitted *pro hac vice*)
                                                     Bruce S. Nathan
                                                     1251 Avenue of the Americas
                                                     New York, NY 10020
                                                     Telephone: (212) 262-6700
                                                     Facsimile: (212) 262-7402
                                                     Email:  jcohen@lowenstein.com
                                                             dposner@lowenstein.com
                                                             bnathan@lowenstein.com

                                                     -and-

                                                     Michael A. Kaplan (admitted *pro hac vice*)
                                                     Colleen M. Restel
                                                     One Lowenstein Drive
                                                     Roseland, NJ 07068
                                                     Telephone: (973) 597-2500
                                                     Facsimile:  (973) 597-2400
                                                     Email: mkaplan@lowenstein.com
                                                             crestel@lowenstein.com


                                                     *Counsel to the Official Committee of Unsecured*
                                                     *Creditors*

**<u>EXHIBIT A</u>**

Kearns Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| H-FOOD HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 24-90586 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**DECLARATION OF CHRISTOPHER J. KEARNS IN SUPPORT OF OBJECTION OF
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS'
MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE
DEBTORS' (A) KEY EMPLOYEE RETENTION PLAN AND (B) KEY EMPLOYEE
INCENTIVE PLAN, AND (II) GRANTING RELATED RELIEF**

I, Christopher J. Kearns, hereby declare as follows:

1.      I submit this declaration in support of the Committee's objection (the "Objection")

to the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Key*

*Employee Retention Plan and (B) Key Employee Incentive Plan, and (II) Granting Related Relief*

(the "Motion").[2]  Lowenstein Sandler LLP, designated counsel ("Counsel"), requested that

Berkeley Research Group, LLC ("BRG") consider whether the Debtors' proposed KEIP is

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783). The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

[2]     Capitalized terms used but not defined herein have the meaning ascribed in the Objection.

reasonable and generally consistent with market practice, including similarly situated companies that have sought relief under chapter 11.

## INTRODUCTION AND QUALIFICATIONS

2.     I am a Managing Director, Senior Advisor and former co-head of the Corporate Finance practice of BRG, a professional services firm with offices located at 810 Seventh Avenue, Suite 4100, New York, New York 10019. I am a Certified Public Accountant, a Certified Insolvency and Restructuring Advisor, a Certified Turnaround Professional, and a Certified Fraud Examiner. I have over 45 years of financial experience as an auditor, corporate officer and, for over 30 years, as an advisor or responsible officer in bankruptcy and turnaround matters.

3.     I have served as the principal advisor to various parties-in-interest in numerous complex bankruptcy and restructuring matters, including, but not limited to, Silicon Valley Bank, Brazos Electric, Genesis Global, Endo Pharmaceuticals, Starter Corporation, Proterra Inc., WeWork, Chemtura Corporation, MPM Silicones (Momentive), Schwinn GPT, Southern Foods Group (Dean Foods), Caesars Entertainment Operating Company, SunGard Availability Services, SemGroup, Tidewater Inc., Calpine Corporation, Energy Future Holdings, Dynegy Holdings LLC, Instant Brands, Verity Health System, Nortel Networks, Peabody Energy, Diamond Offshore, Gleacher & Company, Eastman Kodak, Speedcast International and Lyondell Chemical Company.

4.     I have served as a testifying expert witness in matters concerning solvency, valuation, capital adequacy, credit analysis and various financial issues in bankruptcy and restructuring including, but not limited to, the design and general reasonableness of employee incentive plans and programs.

5.     Prior to joining BRG in June 2015, I was one of the founding members of Capstone Advisory Group, LLC ("Capstone"), a financial services consulting firm, founded in January 2004,

2

which provided a vast array of services to businesses. The services provided by Capstone included consultation in business turnaround and restructuring situations, workouts and reorganization, bankruptcy matters, transaction advisory and due diligence services, forensic accounting, valuation, and dispute resolution services. Prior to co-founding Capstone, from 1991 to 2004, I was a Senior Managing Director of FTI Consulting, Inc. ("FTI") (and predecessor firms) and the co-leader of FTI's New York office. My experience and client assignments during that period were substantially similar to the assignments I performed at Capstone and BRG.

6.      Prior to 1991, I was employed by Bristol-Myers Squibb Company for approximately three years (including serving as Assistant Corporate Controller), and a major international public accounting firm for ten years in the mergers and acquisitions group, and in the audit practice.

7.      BRG's Corporate Finance practice focuses on the areas of business turnaround and restructuring situations, out-of-court workouts, bankruptcy matters, valuation, transaction advisory services, interim management, performance improvement and financial excellence services. On December 9, 2024, the Committee selected BRG as its financial advisor. Since then, BRG has (i) been conducting its diligence by reviewing financial information provided by the Debtors' advisors in a data room; (ii) had a number of discussions with the Debtors' Chief Restructuring Officer, advisors, and management team; (iii) reviewed various court filings including first day motions, the Restructuring Support Agreement, and the various iterations of the Disclosure Statement and Plan of Reorganization; and (iv) prepared various analyses for the Committee. I have been directly involved with our team in all aspects of BRG's ongoing work.

8.      Except as otherwise indicated, all facts set forth in the Declaration are either based on my personal knowledge, information obtained from the Debtors' advisors, or my opinions based

on my experience and personal knowledge. I have relied upon (a) my experience in complex chapter 11 cases; (b) my knowledge of the operations and financial condition of the Debtors based on BRG's ongoing work; (c) my review of various analyses prepared by Alvarez & Marsal North America, LLC ("A&M") pertaining to the KEIP; and (d) my review of the Debtors' Motion and the related declarations of Robert Caruso and Vance Yudell.

9.      In preparing this Declaration and forming my opinions herein, I was assisted by others at BRG who worked at my direction and under my supervision.  My and BRG's compensation is not contingent upon the outcome of this matter.

10.     I am duly authorized to submit this Declaration and if called up to testify, I could and would testify competently to the facts set forth herein.

11.     Based on my analysis, it is my opinion that the proposed KEIP, adjusted to consider additional compensation (*i.e.*, retention payments applicable to the post-petition period), is not reasonable and generally is not consistent with similarly situated companies that have sought relief under chapter 11.

## FACTUAL BACKGROUND[3]

### A.    Contractual Bonus Structure

12.     The KEIP Participants are contractually eligible for annual performance-based awards at target that range from ▇▇▇▇▇▇ of their base salary, with the exception being the

---

[3]    The information in this Factual Background is derived from my review of the Motion; the declaration of Vance Yudell (the "Yudell Declaration") and Robert Caruso (the "Caruso Declaration") in support of the Motion; and the documents and information provided by the Debtors' advisors during the Committee's diligence process, including, but not limited to: certain employment contracts and two analyses, dated November 20, 2024, and January 14, 2025, prepared by A&M's Compensation and Benefits Group.  The key terms of the KEIP are set forth in the Objection and the Motion.  As of the date of this Declaration, I understand that financial results for January 2025 are not available.  I have received preliminary December 2024 results, which reflect (i) volume of ▇▇▇▇▇▇, which is ▇▇▇▇▇ target, and (ii) adjusted EBITDA of ▇▇▇▇▇▇, which is ▇▇▇▇ target.

4

Chief Executive Officer who is eligible for a performance-based bonus at ███ of base salary at target. Certain of the KEIP Participants were granted equity at the time of their hiring, which is subject to vesting, repurchase, and other obligations and restrictions.

### B.    The 2024 Executive Retention Agreement

13.    In 2024, each of the KEIP Participants signed a retention agreement that provided for ███████ in awards contingent on their retention through December 31, 2025 (the "Retention Bonus"). The award was paid in full to the KEIP participants on January 26, 2024.[4] Fifty percent (50%) ████████ of these awards were earned on December 31, 2024, with the remaining fifty percent (50%) ███████ to be earned on December 31, 2025. Therefore, approximately ██████ in retention awards accrue on a monthly basis. These awards are approximately ███ of the KEIP Participants' contractual targeted annual bonus.

### C.    2024 Bonus Payments

14.    On the day prior to the Petition Date, the KEIP participants were paid approximately ███████ in bonuses related to 2024 performance ("2024 Bonus"). These payments (excluding the Retention Bonus) were approximately ███ of the KEIP Participants' contractual targeted annual performance bonus.  The inclusion of December 2024 in the Initial Performance Period of the KEIP is a "double-dip" for the month of December as the KEIP Participants were paid based on actual performance through October and forecasted performance in November and December.

---

[4] 

### D.      A&M's Analyses

15.      To assess the reasonableness of the KEIP, A&M (i) compared target total direct compensation to a peer group of 15 companies[5] that the Debtors use for executive compensation benchmarking purposes ("Market Comparables Analysis")[6], and (ii) compared the proposed KEIP to key employee incentive plans approved in 13 Chapter 11 cases since 2019 of companies with prepetition assets between $965 million and $8.7 billion ("Bankruptcy Comparables Analysis").[7][8]

16.      A&M's Market Comparables Analysis considered the 2025 portion of the Retention Bonus ███████████ while A&M's Bankruptcy Comparables Analysis did not consider such awards.

17.      Compared to court-approved incentive plans of the Debtors' chapter 11 peers, A&M concluded that the annualized target cost of the KEIP (which did not consider the additional compensation related to the 2025 portion of the Retention Bonus) would be at the 86th percentile of the KEIP Peer Group, with the target cost per participant in the 86th percentile on an annualized basis.

---

[5]     The executive compensation peer group consists of The J.M. Smucker Company, Ingredion Incorporated, Post Holdings, Inc., McCormick & Company, Incorporated, Coca-Cola Consolidated, Inc., Lamb Weston Holdings, Inc., Flowers Foods, Inc., Brown-Forman Corporation, TreeHouse Foods, Inc., WK Kellogg Co., B&G Foods, Inc., Lancaster Colony Corporation, BellRing Brands, Inc., The Hain Celestial Group, Inc., and Utz Brands, Inc. (collectively, the "Executive Compensation Peer Group").

[6]     Per A&M's Market Comparables Analysis, taking into account base salary, other bonus payments attributable to 2025 and the KEIP Awards (at target), annualized total direct compensation for each of the insiders is at or near ███████████ of market.

[7]     The KEIP peer group includes 24 Hour Fitness Worldwide, Brazos Electric Power Cooperative, Inc., Bristow Group, Inc., California Resources Corporation, Diamond Offshore Drilling, Inc., LSC Communications, Inc., Neiman Marcus Group, Inc., NPC International, Inc., PHI, Inc., Purdue Pharma, L.P., Silicon Valley Bank, Stage Stores, Inc., and Wesco Aircraft Holdings Inc. (collectively, the "KEIP Peer Group").

[8]     For purposes of BRG's analysis, I have adopted A&M's Market Comparables Analysis and Bankruptcy Comparables Analysis.

*$ in 000s*

| Annualized Market Incentive Data | | | | | | |
|---|---|---|---|---|---|---|
| Summary Statistics | No. of Participants | Target Cost | Target Cost per Participant | Target Cost as a % of Prepetition Assets | Target Cost as a % of Prepetition Revenue | Max Cost as a % of Target Cost |
| 25th Percentile | 7 | $ 5,500 | $ 659 | 0.14% | 0.24% | 129% |
| 50th Percentile | 7 | 8,000 | 914 | 0.29% | 0.40% | 150% |
| 75th Percentile | 9 | 9,675 | 1,244 | 0.39% | 0.63% | 200% |
| **Hearthside** | **8** | **$ 11,110** | **$ 1,389** | **0.38%** | **0.33%** | **200%** |
| *Percentile Rank* | *58%* | *86%* | *86%* | *74%* | *43%* | *70%* |

## BRG'S ANALYSIS

18.     I reviewed A&M's Market Comparables Analysis and Bankruptcy Comparables Analysis.

19.     With respect to the Market Comparables Analysis:

- The KEIP Participants have the opportunity to be awarded bonuses in 2025, which are multiples higher than what would have been awarded in the ordinary course (*i.e.*, pursuant to their individual employment contracts). The Debtors appear to be targeting total direct compensation for the KEIP Participants to be in the ███ ████████ of the Market Comparables Analysis (annualized); this would indicate targeted total bonuses (2025 portion of the Retention Bonus and KEIP, at target) aggregating ████████. This would result in the KEIP Participants receiving awards in 2025 that would be substantially higher than their contractual annual performance-based awards.

- As compared to contractual target performance bonuses ████████████████, the KEIP awards, at target, on an annualized basis are ██████ of the aggregate base salary of the KEIP Participants, or approximately ████ higher than contractually awarded at target. Including the 2025 portion of the Retention Bonus, the awards

at target on an annualized basis are ▮▮▮▮ of the aggregate base salary of the KEIP

Participants, or ▮▮▮ higher than contractually awarded at target.



20.      With respect to the Bankruptcy Comparables Analysis:

- A&M's Bankruptcy Comparables Analysis for the Initial Performance Period and
  their related conclusion that the proposed KEIP is reasonable is misleading. This
  analysis, as illustrated below, compares a 4-month program in these cases to
  programs that were primarily 6 months or longer.

| Non-Annualized Bankruptcy Comparables | |
|---|---|
| Comparables | Duration |
| 24 Hour Fitness Worldwide Inc. | 6 Months |
| Brazos Electric Power Cooperative, Inc. | 6 Months |
| Bristow Group Inc. | 9 Months |
| California Resources Corporation | 6 Months |
| Diamond Offshore Drilling Inc. | 12 Months |
| LSC Communications, Inc. | 9 Months |
| Neiman Marcus Group Ltd LLC | 6 Months |
| NPC International, Inc. | 6 Months |
| PHI, Inc | 12 Months |
| Purdue Pharma, L.P. | 12 Months |
| Silicon Valley Bank | 6 Months |
| Stage Stores | 5 Months |
| Wesco Aircrafts Holdings, Inc. | 9 Months |
| | |
| Hearthside | 4 Months |

- Consequently, in these cases there should be an adjustment to provide an "apples to apples" analysis of Bankruptcy Comparables. A&M has done that by rendering an analysis of Bankruptcy Comparables on an annualized basis which I will adopt for my analysis.

- A&M's Bankruptcy Comparables Analysis adjusted to present on an annualized basis illustrates that the proposed KEIP is expensive, as evidenced by the annualized cost of the KEIP per KEIP Participant being in the 86th percentile before considering the 2025 portion of the Retention Bonus which is a part of A&M's Market Comparables Analysis. Adjusting the Bankruptcy Comparables Analysis to include the 2025 portion of the Retention Bonus shows that, at target, the total cost per KEIP Participant would be in the ███████████ and the target cost of the program would be in the ███████████.

*$ in 000s*

| Annualized Market Incentive Data | | | | | | |
|---|---|---|---|---|---|---|
| Summary Statistics | No. of Participants | Target Cost | Target Cost per Participant | Target Cost as a % of Prepetition Assets | Target Cost as a % of Prepetition Revenue | Max Cost as a % of Target Cost |
| 25th Percentile | 7 | $ 5,500 | $ 659 | 0.14% | 0.24% | 129% |
| 50th Percentile | 7 | 8,000 | 914 | 0.29% | 0.40% | 150% |
| 75th Percentile | 9 | 9,675 | 1,244 | 0.39% | 0.63% | 200% |
| **Hearthside** | **8** | **$ 11,110** | **$ 1,389** | **0.38%** | **0.33%** | **200%** |
| *Percentile Rank* | *58%* | | *86%* | *86%* | *74%* | *43%* | *70%* |
| **Hearthside w/ 2025 Retention** | ███████████ | | | | | |
| *Percentile Rank* | ███████████ | | | | | |

21.     Consequently, in my opinion, the proposed KEIP is an expensive program that provides for target awards that are not reasonable when compared to similarly situated companies that have sought relief under chapter 11.

*[Signature Page Follows]*

9

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: February 5, 2025
      New York, New York

                                   /s/    *Christopher J. Kearns*
                                      Christopher J. Kearns

10

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on February 5, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Charles R. Gibbs*
Charles R. Gibbs