## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>H-Food Holdings, LLC, *et al.*,[1]<br><br>                                    Debtors. | Chapter 11<br><br>Case No. 24-90586 (ARP)<br><br>(Jointly Administered) |
| Hearthside Food Solutions, LLC and MP Midco Holdings, LLC,<br><br>                                    Plaintiffs,<br><br>v.<br><br>LOF 3333, LLC,<br><br>                                    Defendant. | Adv. Pro. No. 25-[     ] (ARP) |

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiff and Debtor Hearthside Food Solutions, LLC ("Hearthside") and Plaintiff MP Midco Holdings, LLC ("Maker's Pride") bring this action to enforce an agreement by the landlord for Plaintiffs' corporate headquarters, LOF 3333, LLC ("LOF"), and to redress LOF's attempts to defraud Hearthside—and manipulate the Bankruptcy Code—in connection with the parties' negotiation of an amended lease.  In support of their claims, Plaintiffs allege as follows:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  HFS Sub, LLC (8177); H-Food Holdings, LLC (6072); Hearthside Food Solutions, LLC (8653); Peacock Engineering Company II, LLC (N/A); HFS Matterhorn Topco, Inc. (0765); Matterhorn Parent, LLC (4445); Matterhorn Intermediate, LLC (1574); Matterhorn Buyer, LLC (0335); Hearthside USA - Corporate, Inc. (3174); Hearthside Holdco, LLC (6206); Hearthside Finance Company, Inc. (8294); Interbake Foods, LLC (7640); Ryt-way Midco, LLC (4388); Hearthside USA, LLC (7655); Hearthside USA – CPG Partners, LLC (2282); Oak State Products, LLC (1822); Standard Functional Foods Group, LLC (4160); Quality Bakery Products, LLC (0528); Toll Packaging Services LLC (5955); Ryt-way Industries, LLC (0783); Matterhorn Sub, LLC (N/A); Peacock Foods LLC (N/A); and Hearthside USA – Produce & Foodservice, LLC (0783).   The Debtors' service address is 3333 Finley Road, Suite 800, Downers Grove, IL 60515.

## INTRODUCTION

1.      Hearthside has leased office space from LOF since 2017.  During the pendency of the chapter 11 cases (the "Chapter 11 Cases") of Hearthside and its above-captioned debtor affiliates (collectively, the "Debtors"), Hearthside determined that it would be in the best interest of Hearthside and its creditors to reject the lease agreement with LOF and move the Debtors' corporate headquarters to a smaller and more economical location, unless LOF would be willing to agree to significant concessions on certain key terms of the parties' lease agreement.

2.      Hearthside and LOF initially attempted to negotiate an amendment to the lease to avoid Hearthside's rejection of the lease, but as of March 6, 2025, they were unable to reach agreement on the terms.  Accordingly, Hearthside informed LOF that it intended to reject the lease pursuant to 11 U.S.C. § 365 and move the Debtors' headquarters to a different location in Illinois pursuant to a new lease agreement, with square footage and rental payments commensurate with the needs of the reorganized Debtors.

3.      On March 6, 2025, the Friday before the scheduled hearing to confirm the Debtors' plan of reorganization on March 10, 2025, LOF approached Hearthside and asked for one last chance to reach agreement on new terms.  The parties exchanged terms quickly—particularly given the time pressure created by the requirement of 11 U.S.C. § 365(d)(4)(A) that a debtor assume or reject an unexpired lease of real property by the date of the entry of an order confirming a plan—and entered into a Letter of Intent on March 7, 2025.  Hearthside thereafter assumed the lease in the Third Amended Joint Chapter 11 Plan of Reorganization of H-Food Holdings and its Affiliated Debtors [Docket No. 611] (the "Plan") confirmed on March 11, 2025 in reliance on LOF's representations and agreement that it was prepared to amend the existing lease on the terms reflected in the Letter of Intent.  Unbeknownst to Hearthside, LOF had no intention of honoring those representations.

4.      The parties negotiated a formal amendment memorializing the terms of the Letter of Intent.  LOF sent an execution version to Hearthside (now operating under the trade name of Maker's Pride) on Tuesday, April 1, indicating that "the terms are good through 5:00PM on Friday, April 4th."  Hearthside accepted LOF's offer and executed and returned the final amendment that LOF had expressly approved in advance of LOF's deadline.

5.      Despite the repeated representations and promises it had made to Hearthside prior to the effective date of the Plan, LOF radically changed course once this Court's approval of the Plan was in its rearview mirror.  With no explanation or justification, LOF purported to reject the executed amendment and insisted on moving forward under the terms of the original lease, contrary to its express representations and Plaintiffs' reliance on those representations.

6.      Plaintiffs have initiated this adversary proceeding to curtail LOF's manipulation of the bankruptcy process to induce Hearthside to enter into an agreement LOF had no intention of honoring, thereby burdening a freshly reorganized entity with an unviable contract and impacting the distribution scheme contemplated by the Plan.

## JURISDICTION AND VENUE

7.      This adversary proceeding arises in and relates to the Chapter 11 Cases, jointly administered at Case No. 24-90586 (ARP), which was filed in this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

8.      This Court has jurisdiction to consider this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157, 11 U.S.C. §§ 105 and 365, and Federal Rule of Bankruptcy Procedure 7001.  Furthermore, under Article XI.3 of the Plan, this Court explicitly retained jurisdiction to "resolve any matters related to . . . the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is a party . . . and to hear [and] determine . . . any Claims arising therefrom . . . including Claims related to the rejection of an Executory Contract or

Unexpired Lease . . . or any other matter related to such Executory Contract or Unexpired Lease" and "any dispute regarding whether a contract or lease is or was executory or unexpired."

9.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, Plaintiffs consent to the entry of a final order by the Court in connection with this adversary proceeding to the extent that it is later determined that the court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

10.      Venue is proper in this Court under 28 U.S.C. § 1409.

## PARTIES

11.      Plaintiff Hearthside Food Solutions, LLC is a Debtor in jointly administered Case No. 24-90586 (ARP).  Hearthside is a limited liability company incorporated in Delaware and headquartered in Downers Grove, Illinois.  Hearthside is a successor-in-interest to Peacock Engineering Company, LLC ("Peacock"), the original tenant who was party to the office lease agreement (including all amendments, modifications, and supplements thereto) assumed pursuant to the Plan.

12.      Plaintiff MP Midco Holdings, LLC is a limited liability company incorporated in Delaware and headquartered in Downers Grove, Illinois.  Maker's Pride is a successor-in-interest to Hearthside and Peacock.

13.      Defendant LOF 3333, LLC is a limited liability company incorporated in Illinois and headquartered in Chicago, Illinois.  LOF is the successor-in-interest to LSREF4 Turtle, LLC, the original landlord who was party to the office lease agreement (including all amendments, modifications, and supplements thereto) assumed pursuant to the Plan.

## STATEMENT OF FACTS

14.     Peacock, a predecessor-in-interest to Plaintiffs Hearthside and Maker's Pride, entered into an office lease agreement with LSREF4 Turtle, LLC, the predecessor-in-interest to LOF, on May 31, 2017 (the "Office Lease Agreement").  Hearthside acquired Peacock in 2018 and succeeded Peacock as the tenant under the Office Lease Agreement.

15.     On November 22, 2024, each of the Debtors, including Hearthside, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.

16.     In January 2025, Hearthside determined, in its business judgment, that the existing terms of the Office Lease Agreement were no longer practical for the Debtors' reorganizing business.  The Debtors no longer required as much space as provided for in the original lease given the smaller size of their reorganized business, and their financial position rendered the existing lease payments untenable.  The Chapter 11 Cases provided the Debtors various options to address these issues, including by rejecting the Office Lease Agreement pursuant to section 365 of the Bankruptcy Code, negotiating for new office space with other landlords, or through a consensual negotiation of revised lease terms with LOF, which Hearthside began pursuing.  Throughout these negotiations, LOF was aware that Hearthside was a Debtor in the Chapter 11 Cases and had the option to reject the Office Lease Agreement.

17.     Hearthside and LOF were initially unable to reach an agreement on the terms of an amendment to the Office Lease Agreement.  Consequently, in January and February 2025, Hearthside began looking for alternative office space and intended to reject the Office Lease Agreement if a suitable replacement lease could be found.  Hearthside made it clear to LOF that Hearthside had the option to reject the lease if the parties were unable to reach agreement on the terms of an amendment to the Office Lease Agreement.

18.     LOF was aware that a hearing to consider confirmation of the Debtors' Plan was scheduled for March 10, 2025, and that therefore, practically speaking, the Debtors would need to decide whether to assume or reject the Office Lease Agreement by March 7, 2025.  On March 6, 2025, LOF approached Hearthside to reopen negotiations.  That same day, Hearthside sent proposed terms of an amended lease to LOF.  LOF responded with a counteroffer on March 7, 2025, the last day on which Hearthside could practically reject the Office Lease Agreement.

19.     Hearthside accepted LOF's counteroffer, and the parties signed a Letter of Intent on the same day, March 7, 2025 (the "Letter of Intent").  *See* Exhibit A.  Consistent with Hearthside's business priorities, the Letter of Intent provided for a significant reduction in both the aggregate square footage and the rental rate per square foot.  Specifically, the Letter of Intent provided that the rented premises would be 12,704 square feet—as compared to 24,031 square feet in the original Office Lease Agreement, with the option for Hearthside to make further adjustments to the square footage within the first 6 months of the revised lease.  The Letter of Intent also provided for a reduction in the rental rate from $24.50 per square foot to $18.00 per square foot, with the application of certain credits by LOF that would result in a net rental rate of $16.00 per square foot.  While the Letter of Intent stated that it was non-binding, and that a binding and effective lease required a "lease document" "executed by both parties," LOF represented through the Letter of Intent that it was willing to execute a revised lease on the terms set forth therein.

20.     In reliance on LOF's representations that it was willing to execute an amendment to the lease on the terms set forth in the Letter of Intent, Hearthside made the decision to assume the Office Lease Agreement, and formally did so in the Plan that was confirmed on March 11, 2025.  Hearthside would not have assumed the Office Lease Agreement—and instead would have

rejected it, consistent with its rights to do so—in the absence of LOF's express assurances memorialized in the Letter of Intent.

21.     In reality, and unbeknownst to Hearthside, LOF never intended to enter a revised lease on the terms it represented to Hearthside in the Letter of Intent.  Instead, it executed the Letter of Intent in order to mislead and induce Hearthside into assuming the Office Lease Agreement, thereby manipulating the bankruptcy process for its own gain, and had no intention of honoring the terms of the Letter of Intent.

22.     Hearthside relied to its detriment on LOF's misrepresentations by assuming the Office Lease Agreement and the Letter of Intent pursuant to the Plan and forgoing the ability to reject the Office Lease Agreement and to pursue other opportunities to secure reduced office space on more favorable financial terms.

23.     The Debtors' Plan was confirmed on March 11, 2025.  The Plan provides that "each . . . Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such . . . Unexpired Lease . . . ."  The plain terms of the Plan make clear that Hearthside only assumed the existing Office Lease Agreement subject to the "modifications, amendments" and "other agreements" reflected in the Letter of Intent.

24.     Following execution of the Letter of Intent, in the period leading up to the effective date of the Plan, Hearthside and LOF continued to negotiate an amendment to the Office Lease Agreement memorializing the material terms set forth in the Letter of Intent.  On March 14, 2025, LOF provided Hearthside with a draft of the amendment for review.

25.     On March 31, 2025, Hearthside provided LOF with immaterial edits and comments to the proposed amendment, including by listing Maker's Pride as the entity to which the lease

would be assigned.  Both the March 14 and March 31 draft amendments were consistent with the terms of the Letter of Intent.

26.     Later on March 31, 2025, the Plan became effective.

27.     On April 1, 2025, LOF provided Hearthside with a clean version of the amendment (through the parties' brokers).  LOF accepted all of Hearthside's edits and sent an executable PDF of the amendment.  LOF stated that "[t]he terms are good through 5:00pm on Friday, April 4th" and directed Hearthside to accept the amendment by responding with an executed amendment by that time.  *See* Exhibit B.  LOF also asked Hearthside to provide a Letter of Credit or cash security deposit.

28.     On the morning of April 4, 2025, Hearthside accepted LOF's firm offer of the amended lease as reflected in the execution version of the amendment that LOF had sent by returning a signed copy of the amendment (the "Executed Amendment").  *See* Exhibit C. Hearthside also requested an invoice to facilitate providing the security deposit.  *See* Exhibit D. Maker's Pride's payments of the security deposit and April 2025 rent were processed on April 7, 2025, after a delay in invoicing by LOF.

29.     But LOF in fact had no intention of executing the amendment it offered to Hearthside.  Despite having repeatedly indicated that it agreed to the key terms of the amendment over the previous several weeks, LOF notified Maker's Pride for the first time on April 11, 2025— not coincidentally, just days after the Plan's effective date and the Debtors' emergence from Chapter 11—that it did not agree to and rejected the Executed Amendment (and that as a result the April 7, 2025 payment was incorrect).  LOF indicated that rent instead would be governed by the terms of the original Office Lease Agreement, which it knew full well Hearthside had assumed

only because LOF had represented that it would be willing to amend that agreement on the terms set forth in the Letter of Intent.

30.     On April 18, 2025, Maker's Pride informed LOF that Maker's Pride was troubled by LOF's bad faith conduct and would pursue enforcement of the Letter of Intent, which had been assumed under the Plan as part of the Office Lease Agreement, unless LOF countersigned the Executed Amendment by April 23, 2025.  LOF responded on April 23, 2025, declining to countersign the Executed Amendment.

<u>**COUNT I**</u>
**(Declaratory Judgment Under 28 U.S.C. § 2201(a))**

31.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

32.     An actual legal and substantial controversy exists between the parties regarding whether the Letter of Intent was assumed as a "modification[], amendment[], supplement[], restatement[], or other agreement[] that in any manner affect[s]" the unexpired Office Lease Agreement assumed pursuant to the Plan and in accordance with section 365(a) of the Bankruptcy Code.

33.     The Letter of Intent outlines the agreed upon modifications to the existing, unexpired Office Lease Agreement pursuant to which Hearthside (later succeeded by Maker's Pride) will remain a tenant of LOF.

34.     Accordingly, Plaintiffs are entitled to a declaratory judgment that the Letter of Intent was assumed under the Plan as part of the unexpired Office Lease Agreement and is therefore enforceable against LOF.

<u>**COUNT II**</u>
**(Fraudulent Inducement)**

35.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

36.     LOF entered into the Letter of Intent and promised to execute an amendment to the Office Lease Agreement incorporating the material terms of the Letter of Intent, despite knowing that it did not intend to honor the Letter of Intent.

37.     LOF knowingly misrepresented its intentions in order to induce Hearthside to assume the Office Lease Agreement pursuant to the Plan.

38.     Hearthside acted in reliance on LOF's execution of the Letter of Intent and LOF's statements in assuming the Office Lease Agreement under the Plan.

39.     As a result of Hearthside's reliance on LOF's execution of the Letter of Intent and LOF's misrepresentations, Hearthside (later succeeded by Maker's Pride) has been financially harmed by the continued application of the original terms of the Office Lease Agreement and by forgoing the opportunity to negotiate a more favorable lease for an alternative office space.

## <u>COUNT III</u>
### (Breach of the Covenant of Good Faith and Fair Dealing)

40.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

41.     The Office Lease Agreement vested LOF with discretion in negotiating any modifications to the agreement.

42.     By inducing Hearthside to execute the Letter of Intent and assume the Office Lease Agreement under false pretenses and later rejecting the Executed Amendment memorializing the material terms of the Letter of Intent, LOF exercised its contractual discretion in bad faith.

43.     As a result of LOF's bad faith conduct, Maker's Pride has been financially harmed by the continued application of the original terms of the Office Lease Agreement and by forgoing the opportunity to negotiate a more favorable lease for an alternative office space.

## COUNT IV
### (Breach of Contract – Amendment to the Office Lease Agreement)

44.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

45.     LOF made a valid offer to Hearthside by sending an executable version of the amendment to Hearthside and directing Hearthside to execute the amendment by 5:00 pm on April 4, 2025.

46.     Hearthside (later succeeded by Maker's Pride) accepted LOF's offer by returning the Executed Amendment on the morning of April 4, 2025 and promptly paying the requested security deposit to LOF, forming a binding contract between the parties.

47.     LOF breached the contract by purporting to reject the Executed Amendment and refusing to accept Maker's Pride's payments made according to the terms of the Executed Amendment.

48.     As a result of LOF's breach, Maker's Pride has been financially harmed by the continued application of the original terms of the Office Lease Agreement and by forgoing the opportunity to negotiate a more favorable lease for an alternative office space.

## COUNT V
### (Specific Performance – Letter of Intent)

49.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

50.     The Letter of Intent was assumed as part of the unexpired Office Lease Agreement pursuant to the Plan and in accordance with 11 U.S.C. § 365(a).

51.     Hearthside (later succeeded by Maker's Pride) complied with the Letter of Intent by negotiating and executing an amendment memorializing the terms of the Letter of Intent and making payments to LOF consistent with the terms of the Letter of Intent.

52.     LOF breached the Letter of Intent by rejecting the Executed Amendment memorializing the terms of the Letter of Intent and rejecting payments consistent with the terms of the Letter of Intent.

53.     Plaintiffs have no adequate remedy at law.

<u>**COUNT VI**</u>
**(Specific Performance – Amendment to the Office Lease Agreement)**

54.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

55.     LOF made a valid offer to Hearthside by sending an executable version of the amendment to Hearthside and directing Hearthside to execute the amendment by 5:00 pm on April 4, 2025.

56.     Hearthside (later succeeded by Maker's Pride) accepted LOF's offer by returning the Executed Amendment on the morning of April 4, 2025 and promptly paying the requested security deposit to LOF, forming a binding contract between the parties and complying with the terms of the Executed Amendment.

57.     LOF failed to perform its obligations under the contract by rejecting the Executed Amendment and refusing to accept Maker's Pride's payments made according to the terms of the Executed Amendment.

58.     Plaintiffs have no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment and relief in their favor and against Defendant as follows:

59.     Declaring that the Letter of Intent was assumed as part of the unexpired Office Lease Agreement and is therefore enforceable against LOF;

60.     Ordering LOF to perform its obligations under the Letter of Intent;

61.     Ordering LOF to perform its obligations under the Executed Amendment to the Office Lease Agreement;

62.     Ordering LOF to pay damages in an amount to be determined at trial;

63.     Awarding Plaintiffs reasonable and necessary attorneys' fees and costs; and

64.     Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: April 29, 2025

     _/s/  John F. Higgins_____
PORTER HEDGES LLP
John F. Higgins (09597500)
M. Shane Johnson (24083263)
Jack M. Eiband (24135185)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713)226-6000
Facsimile: (713) 228-1331
Emails: jhiggins@porterhedges.com
       sjohnson@porterhedges.com
       jeiband@porterhedges.com

-and-

ROPES & GRAY LLP
Daniel V. McCaughey (*pro hac vice* forthcoming)
Elena Weissman Davis (*pro hac vice* forthcoming)
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Emails: daniel.mccaughey@ropesgray.com
       elena.davis@ropesgray.com

-and-

ROPES & GRAY LLP
Stephen L. Iacovo (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
Email: stephen.iacovo@ropesgray.com

*Counsel for Plaintiffs*

**EXHIBIT A**



# 3333 Finley Point Proposal

**Prepared For:**



FOOD SOLUTIONS

Pete Adamo
CBRE
700 Commerce Dr
Oak Brook, IL 60523

**Represented By:**

Norman D Murdoch
Bradford Allen Realty Services
1900 Spring Road, Suite 502
Oak Brook, Illinois 60523
P 630.239.4082

| Hearthside Food Solutions | 3333 Finley Road | February 28, 2025 |
|---|---|---|

*Dear Pete, please find the attached Letter of Intent outlining the agreed upon terms for Hearthside Food Solutions to remain a tenant at 3333 Finley.*

**1. LANDLORD:**

LOF 3333, LLC, an Illinois limited liability company

**2. TENANT:**

Hearthside Food Solutions, LLC. Final entity to be determined upon emergence from Bankruptcy courts.

**3. MANAGEMENT:**

Bradford Allen Management Services is located on site at the property.

**4. USE:**

Per existing lease.

**5. PREMISES:**

The 8th floor will be converted to a multi-tenant floor. Commencing 3/1/25 the adjusted Hearthside premises will be 12,704 RSF (includes the existing IT room). Hearthside will have up to 6 months to determine the exact RSF needed (minimum 10,000 RSF) calculated upon a mutually agreed upon space plan. If the Tenant figures out the area needed before the end of the 6 month time frame, then the RSF would change upon the substantial completion of the new premises.

Hearthside would require use of the existing IT room as part of premises. LL shall extend corridor slightly to provide access from common area corridor at all times.

**6. TERM:**

Three (3) years and three (3) months extension from the existing lease expiration of 10/31/2028.

**7. NET BASE RENTAL:**

Starting 3/1/25 the rental rate will be reduced to $18.00 Per RSF Net. Landlord will provide a $13.83 per RSF TI credit that will be applied to the monthly rent that will equate to a net rental rate of $16.00.

**8. ESCALATIONS:**

$0.50 escalation Per Square Foot annually.

**9. RENT ABATEMENT:**

Tenant will be provided twenty three (23) months of gross free rent applied in the form of a $34.96/rsf rent credit and $33.46/rsf T&O credit applied evenly over the term of the lease ($5,350.87 rent credit each month, $5,121.28 T&O credit each month).

**10. TENANT IMPROVEMENTS:**

Landlord will at its cost demise the premises and create the needed new corridors to make the floor multi-tenant. Landlord will also provide turnkey construction for a new break area, consisting of new sink, countertop, area for a refrigerator with water hookup, lower and upper cabinets using building standard finishes in the location designated on plan.



| Hearthside Food Solutions | 3333 Finley Road | February 28, 2025 |
|---|---|---|

**11. RESTORATION:** Tenant will not be responsible for any restoration required under the existing lease agreement.

**12. COMMON AREA CONF ROOM:** Tenant shall have rent free use of the common area conf room 24 times per year.

**13. SECURITY DEPOSIT:** A letter of credit will need to be provided with the amount determined by landlord review of Tenants financials. Landlord will be open to having a direct conversation with the appropriate person with the Tenant.

**14. OTHER LEASE TERMS:** All other lease terms will be per the existing lease document.

**15. COMMISSIONS:** If a lease is entered into by Tenant, Landlord and Tenant acknowledge, represent, and warrant each to the other that, except for Bradford Allen Realty Services Landlord Group, and CBRE no other brokerage fee or commission is due to any other party as a result of the execution of this Lease.

**16. NON-BINDING:** The submission of this proposal does not constitute an offer to lease. A lease shall not be binding and in effect until a lease document has been executed by both parties. Tenant or Landlord shall have no liabilities for any expenses incurred in anticipation of a lease or in replying to this request unless they have been specifically authorized in writing by us. Tenant and Landlord reserves the right to reject any proposal it receives

Thank you for presenting this to your client, please let me know any questions.

Sincerely,

*Norman D Murdoch*

Norman D Murdoch

Agreed and Accepted By:
Hearthside Food Solutions, LLC

Name: _____

LOF 3333, LLC

Name: **Nick Hewitt**   Its: **CFO**

Its: _____

Page **3** of **4**



L of 3333, LLC

LAURENCE R ELBAUM , Manager

Date: 3/7/25                                    Date: _____

BA BRADFORD ALLEN

**EXHIBIT B**



**From:** Norm Murdoch <nmurdoch@bradfordallen.com>
**Sent:** Tuesday, April 1, 2025 11:54 AM
**To:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>; Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>; Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Subject:** RE: Hearthside

**External**

JD, Matt and Pete,
Attached is a clean version of the amendment and an executable PDF, we accepted all the changes.
The terms are good through 5:00pm on Friday, April 4th. If not received by that time, the rent schedule will be adjusted to be retroactive to April 1st instead of March 1st.
We will need both a tenant executed amendment as well as the Letter of Credit.
We have not seen a draft LoC to review yet. In the event they cannot get the LoC by Friday, we would be ok accepting cash in lieu of the LOC and would reimburse the tenant once the LoC is received.

Also attached is the commission agreement we can agree to. We are paying $1.50 on 39 months including abatement ($61,932.00).

Please let me know any questions.

Norm

**Norman D. Murdoch**
Managing Director
**(O)** 630 239 4082  **(C)** 847 445 9744

www.bradfordallen.com



---

**From:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>
**Sent:** Monday, March 31, 2025 12:24 PM
**To:** Norm Murdoch <nmurdoch@bradfordallen.com>; Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>; Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Subject:** RE: Hearthside

Thanks Norm

## JD Saporta
Transaction Manager
CBRE | Advisory & Transaction Services | Occupier
321 N Clark St., Floor 34, Chicago, IL 60610
T +1 312 935 1405 | C +1 312 504 3654
jd.saporta@cbre.com | www.cbre.com

---

**From:** Norm Murdoch <nmurdoch@bradfordallen.com>
**Sent:** Monday, March 31, 2025 10:42 AM
**To:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>; Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>; Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Subject:** RE: Hearthside



Great, thanks. I will get these reviewed and get back to you.

Norm

**Norman D. Murdoch**
Managing Director
**(O)** 630 239 4082  **(C)** 847 445 9744

www.bradfordallen.com



**From:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>
**Sent:** Monday, March 31, 2025 10:16 AM
**To:** Norm Murdoch <nmurdoch@bradfordallen.com>; Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>; Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Subject:** RE: Hearthside

Hi Norm – hope all is well! Attached are Hearthside's comments. They are emerging from bankruptcy today assuming everything goes smoothly. We are ready to sign this ASAP if the Landlord is OK with our changes.

Thanks,

**JD Saporta**
Transaction Manager
CBRE | Advisory & Transaction Services | Occupier
321 N Clark St., Floor 34, Chicago, IL 60610
T +1 312 935 1405 | C +1 312 504 3654
jd.saporta@cbre.com | www.cbre.com

---

**From:** Norm Murdoch <nmurdoch@bradfordallen.com>
**Sent:** Friday, March 28, 2025 10:51 AM
**To:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>; Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>; Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Subject:** Re: Hearthside

**External**

JD, thanks for getting back to me. Hopefully we see them Monday.
Have a great weekend.
Norm

Norm Murdoch
Bradford Allen Realty Services
O 630-239-4082
M 847-445-9744

---

**From:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>
**Sent:** Friday, March 28, 2025 10:45:21 AM
**To:** Norm Murdoch <nmurdoch@bradfordallen.com>; Mulvihill, Matt @ Chicago Suburban

<Matt.Mulvihill@cbre.com>; Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Subject:** RE: Hearthside

Hi Norm – sorry HFS legal was occupied with bankruptcy filings. We are pushing and have a call to finalize our comments and send to you Monday morning.

We are committed to getting this wrapped up ASAP.

Thanks,
**JD Saporta**
Transaction Manager
CBRE | Advisory & Transaction Services | Occupier
321 N Clark St., Floor 34, Chicago, IL 60610
T +1 312 935 1405 | C +1 312 504 3654
jd.saporta@cbre.com | www.cbre.com

---

**From:** Norm Murdoch <nmurdoch@bradfordallen.com>
**Sent:** Friday, March 28, 2025 10:42 AM
**To:** Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>; Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Cc:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>
**Subject:** Re: Hearthside

External

Matt, I got an out of office from Pete. Please check on the lease comments. Pete was hoping they would be done yesterday but I haven't seen them. We need to wrap this up it shouldn't take this long to address an amendment. We are now a month past the new start date, and I am getting pressure from ownership to adjust that date if it slips further. Please let me know what you get back. Thanks
Norm

Norm Murdoch
Bradford Allen Realty Services
O 630-239-4082
M 847-445-9744

---

**From:** Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>
**Sent:** Thursday, March 20, 2025 12:02:57 PM
**To:** Norm Murdoch <nmurdoch@bradfordallen.com>; Adamo, Peter @ Chicago Suburban

<Peter.Adamo@cbre.com>
**Cc:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>
**Subject:** Re: Hearthside

Totally get it.  That walk through will be a good milestone for you guys to start creating a good schedule.

Thanks for ongoing cooperation!!

Matt

Matt Mulvihill | Vice Chairman
CBRE | Advisory & Transaction Services | Occupier Industrial & Logistics
T +1 847 706 4964 | C +1 312 493 5522
matt.mulvihill@cbre.com
www.linkedin.com/in/mattmulvihill

---

**From:** Norm Murdoch <nmurdoch@bradfordallen.com>
**Date:** Thursday, March 20, 2025 at 12:01 PM
**To:** Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>, Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Cc:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>
**Subject:** RE: Hearthside

**External**

Matt,
Thanks for the update. I know we don't have a construction schedule yet but will ask if something can be put together. I did talk with Pete, and he set up a tour for me, Logan the asset manager and the property manager for next Wednesday the 26th to walk the giveback area. I know Pete has asked about the specs of the kitchen area, if you could follow up on that I would appreciate it.

Looking forward to seeing the comments.

Norm

**Norman D. Murdoch**
Managing Director
**(O)** 630 239 4082  **(C)** 847 445 9744

www.bradfordallen.com



**From:** Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>
**Sent:** Thursday, March 20, 2025 11:52 AM
**To:** Norm Murdoch <nmurdoch@bradfordallen.com>; Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Cc:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>
**Subject:** Re: Hearthside

Norm,

Had a call with HFS this morning.  Roger, internal counsel, was reviewing and did not have many questions.  He did ask about schedule for work, but we will respond with that with our comments.

Our guess is that it should be back to you early next week.

Thanks,

Matt

Matt Mulvihill | Vice Chairman
CBRE | Advisory & Transaction Services | Occupier Industrial & Logistics
T +1 847 706 4964 | C +1 312 493 5522
matt.mulvihill@cbre.com
www.linkedin.com/in/mattmulvihill

**From:** Norm Murdoch <nmurdoch@bradfordallen.com>
**Date:** Wednesday, March 19, 2025 at 4:39 PM
**To:** Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Cc:** Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>
**Subject:** RE: Hearthside

**External**

Pete/Matt,
I am meeting with ownership tomorrow morning. Any update on the lease comments? What is

the timing for BK approval, does it have to be approved by the courts prior to signature? We do need final Landlord lender approval, but they have been in the loop the entire time and no issues are anticipated. Based upon the other recent deals we have done, it has taken about 1-2 weeks for us to get that approval.

Thanks
Norm

**Norman D. Murdoch**
Managing Director
**(O)** 630 239 4082  **(C)** 847 445 9744

[www.bradfordallen.com](http://www.bradfordallen.com)



---

**From:** Norm Murdoch
**Sent:** Friday, March 14, 2025 12:33 PM
**To:** Adamo, Peter @ Chicago Suburban <[Peter.Adamo@cbre.com](mailto:Peter.Adamo@cbre.com)>
**Cc:** Mulvihill, Matt @ Chicago Suburban <[Matt.Mulvihill@cbre.com](mailto:Matt.Mulvihill@cbre.com)>
**Subject:** RE: Hearthside

Pete and Matt,
Attached is the draft of the amendment for review. We have not included a burndown of the LOC as we need to get that approved by ownership but in the essence of time we wanted to you the draft. Please have any comments redlined and returned to me.

Norm

**Norman D. Murdoch**
Managing Director
**(O)** 630 239 4082  **(C)** 847 445 9744

[www.bradfordallen.com](http://www.bradfordallen.com)



---

**From:** Adamo, Peter @ Chicago Suburban <[Peter.Adamo@cbre.com](mailto:Peter.Adamo@cbre.com)>
**Sent:** Thursday, March 13, 2025 3:12 PM
**To:** Norm Murdoch <[nmurdoch@bradfordallen.com](mailto:nmurdoch@bradfordallen.com)>
**Cc:** Mulvihill, Matt @ Chicago Suburban <[Matt.Mulvihill@cbre.com](mailto:Matt.Mulvihill@cbre.com)>
**Subject:** FW: Hearthside

Norm – We spoke with Hearthside today and they are ok with the $125k initial LC.  Due to regulations, this cannot be posted until they emerge from C11, which will be in April.  They

would request that the LC be reduced by 50%  18 months after commencement if they have an S&P DCP credit rating of B+ or better.

A couple other items.

Hoping to have an amendment to review tomorrow.  I know you are looking into it - Just let me know if that is possible
Do you have a timeline on construction timeline?  Will Hearthside need to meet with your architect / project manager to discuss break area? Let us know if we can get this coordinated.
HFS would like 90 days to remove FFE from give back space. I would think that should work based upon the  preconstruction steps that still need to be completed.
HFS would like to perform some minor cosmetic refreshments to the suite.  Paint, planters etc.... Does the building architect perform these services?

Appreciate the help. Thanks

Pete

**Peter Adamo**
Senior Vice President
CBRE | Advisory & Transaction Services
700 Commerce Dr. | Oak Brook, IL 60523
T +1 630 573 7053 | C +1 630 732 1229
peter.adamo@cbre.com

---

**From:** Logan Sangdahl <lsangdahl@bradfordallen.com>
**Sent:** Tuesday, March 11, 2025 1:12 PM
**To:** nhewitt@hearthsidefoods.com
**Cc:** Norm Murdoch <nmurdoch@bradfordallen.com>; Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Subject:** Fw: Hearthside

`External`

Good Afternoon, Nick.

Thank you for your time yesterday.

After reviewing the attached and discussing our conversation yesterday with ownership, we are requesting a $125K letter of credit to serve as security for the amendment. This equates to

roughly five months of gross rent taking all rent credits into account which we believe is a reasonable amount given the entity will be newly emerged from bankruptcy.

Let me know if you have any questions

Thank you,


**Logan Sangdahl**

Managing Director

**(C)** 630 405 8918

**(O)** 312 278 2513

**(F)** 312 994 5701

---

**From:** Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Sent:** Monday, March 10, 2025 3:33 PM
**To:** Logan Sangdahl <lsangdahl@bradfordallen.com>
**Cc:** Norm Murdoch <nmurdoch@bradfordallen.com>
**Subject:** Hearthside

Logan – attached is the information Nick referenced.  Thank you for the time today.

**Peter Adamo**
Senior Vice President
CBRE | Advisory & Transaction Services
700 Commerce Dr. | Oak Brook, IL 60523
T +1 630 573 7053 | C +1 630 732 1229
peter.adamo@cbre.com


Details about the personal data CBRE collects and why, as well as your data privacy rights under applicable law, are available at **CBRE – Privacy Policy.**

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "First Amendment") is made and entered into as of the ___ day of _____, 2025, by and between LOF 3333, LLC, an Illinois limited liability company ("Landlord"),  and MP Midco Holdings, LLC, a Delaware Limited Liability Company  ("Tenant") (sometimes collectively referred to herein as the "Parties").

### RECITALS

A.      Landlord, as successor-in-interest to LSREF4 Turtle LLC ("Original Landlord"), and Tenant, as successor to both (i) Peacock Engineering Company, LLC ("Original Tenant") and (ii) Hearthside Food Solutions, LLC ("Assigning Tenant"), are parties to that certain Office Lease Agreement dated May 31, 2017, as amended by that certain Letter Agreement dated September 24, 2020 between Original Landlord and Assigning Tenant (as amended, the "Lease"), pursuant to which Tenant leases from Landlord certain premises containing approximately 24,031 rentable square feet of space in the Building (as defined herein) commonly known as Suite 800 (the "Existing Premises"), on the eighth (8th) floor of the building located at 3333 Finley Road, Downers Grove, Illinois (the "Building").

B.      Landlord has succeeded to all of the right, title and interest of Original Landlord as the "Landlord" under the Lease.

C.      Assigning Tenant is the successor in interest to Original Tenant as set forth in that certain Letter Agreement dated September 24, 2020 between Original Landlord and Assigning Tenant.

D.      On November 22, 2024, Assigning Tenant and several of its affiliates the ("Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), the proceedings of which were jointly administered in In re H-Food Holdings, LLC, Case No. 24-90586 (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

E.      On March 11, 2025, the Bankruptcy Court entered an order (Bankruptcy Case Dkt. 615, the "Confirmation Order") confirming the Debtors' Third Amended Joint Chapter 11 Plan Of Reorganization Of H-Foods Holdings, LLC And Its Affiliated Debtors (Bankruptcy Case Dkt. 611, the "Bankruptcy Plan"), which Confirmation Order authorized the Debtors to assume and assign certain of the Debtors' executory contracts and unexpired leases to certain Reorganized Debtors as defined in the Bankruptcy Plan, and the confirmed Bankruptcy Plan became effective on  March 31, 2025.

F.      On March 31, 2025, Assigning Tenant did assume and assign to Tenant the Lease, pursuant to sections 365(f) and 1123(b)(2) of the Bankruptcy Code, the terms of the Bankruptcy Plan, and the terms of the Confirmation Order (the "Assumption and Assignment").

G.      Landlord and Tenant desire to amend the Lease to reduce the size of the Current Premises, extend the term of the Lease and further modify the Lease as set forth below.

# AGREEMENTS

NOW, THEREFORE, in consideration of the recitals, rent paid and to be paid to Landlord and the covenants to be performed in accordance with the terms and conditions of the Lease, as hereby amended, Landlord and Tenant do hereby agree as follows:

1.  *Recitals/Definitions.*  The recitals set forth above are hereby incorporated into and made a part of this First Amendment.  Capitalized terms used but not defined in this First Amendment shall have the same meanings ascribed to them in the Lease.

2.  *Assumption of Lease.*  Tenant represents and warrants to Landlord that as of March 1, 2025 (the "Effective Date"): (a) the Assumption and Assignment of the Lease was a valid assignment to Tenant of all of Assigning Tenant's rights, interests, and obligations under the Lease; (b) Tenant has accepted such assignment and delegation set forth above, has assumed the Lease, and agrees to pay all rent and other charges accruing under the Lease accruing from and after the Effective Date; (c) Tenant agrees to observe and perform directly to Landlord, all of the other covenants, agreements and obligations to be observed and/or performed by the "Tenant" under the Lease from and after the Effective Date; (d) the Lease remains in full force and effect with Tenant as the "Tenant" under the Lease; and (e) Tenant has inspected the Premises and knows the present condition thereof and confirms that neither Landlord nor any officer, member, employee, agent or beneficiary of Landlord has made any representation or warranty to Tenant concerning the Premises, or otherwise, expressed or implied.

3.  *Extension of Term*.  The Term of the Lease, previously scheduled to end on October 31, 2028, is hereby extended for the thirty-nine (39) month period (the "Amendment Term") beginning November 1, 2028 (the "Amendment Commencement Date") and ending January 31, 2032 (the "Amendment Termination Date").   The Amendment Term shall be deemed part of the Term of the Lease and the Amendment Termination Date shall be the last day of the Term, unless the Lease is sooner terminated in accordance with its terms.

4.  *Reduction of Premises*. Effective as of the Effective Date, the Current Premises shall be reduced to and deemed to consist only of approximately 12,704 rentable square feet of space which shall continue to be known as Suite 800, as shown on Exhibit A attached hereto (the "Reduced Premises"), and the Premises, as defined in the Lease, shall mean only the Reduced Premises.  Tenant acknowledges that the Reduced Premises may not be separately demised from the Current Premises as of the Effective Date.  No later than the ninetieth (90th) day after the execution of this First Amendment (the "Reduction Date"), Tenant shall vacate and surrender possession of the portion of the Current Premises other than the Reduced Premises consisting of approximately 11,327 rentable square feet (the "Relinquished Premises") in its then existing condition, subject to the following:

> (i)  On or before the Reduction Date, Tenant will vacate and surrender the Relinquished Premises in a "broom clean" condition and otherwise in its then existing condition, with all of the personal property of Tenant, including, without limitation, Tenant's furniture, removed therefrom. Tenant hereby releases, on and as of the Reduction Date, all of its right, title and interest in, and in respect of, the Relinquished Premises. Tenant

2

covenants, agrees and represents that Tenant shall have no further right to use, occupy or have possession of the Relinquished Premises or any portion thereof from and after Reduction Date. Notwithstanding anything herein or in the Lease to the contrary, Tenant hereby acknowledges and agrees to be fully responsible and liable to Landlord and immediately reimburse Landlord for any and all damages incurred by Landlord due to any holding over by Tenant in the Relinquished Premises from and after the Reduction Date in accordance with the terms of the Lease applicable any holdover of the Premises.

(ii)     Subject to Paragraphs 4(i) above and 4(iv) below, Landlord agrees (a) to forever release and discharge Tenant from all obligations, covenants and agreements of Tenant arising under or in connection with the Relinquished Premises from and after the Effective Date including, for the avoidance of all doubt, restoration of the kitchen area, (b) not to make any demand to or sue Tenant for obligations, covenants and agreements of Tenant arising under or in connection with the Relinquished Premises from and after the Effective Date, and (c) to release Tenant from all obligations, covenants and agreements of Tenant under the Lease in connection with the full Premises accruing prior to the Effective Date.

(iii)    Subject to Paragraph 4(iv) below, with respect to the Relinquished Premises only, Tenant agrees (i) to forever release and discharge Landlord from all obligations, covenants and agreements of Landlord arising under or in connection with the Relinquished Premises from and after the Effective Date, and (ii) not to make any demand to or sue Landlord for obligations, covenants and agreements of Landlord arising under or in connection with the Relinquished Premises from and after the Effective Date.

(iv)    Notwithstanding anything to the contrary herein contained, with respect to the Relinquished Premises only, Landlord and Tenant acknowledge and agree that (a) Tenant shall continue to be fully liable to Landlord to the extent set forth in the Lease for any claim for personal injury or property damage arising from events occurring on or prior to the later of the Reduction Date or the date Tenant (and any one claiming by, through or under Tenant) actually vacates and surrenders the Relinquished Premises to Landlord in the condition required by this Section 4, (b) each of Landlord and Tenant shall continue to be fully liable to the other to the extent set forth in the Lease for any payments or refunds or credits relating to any reconciliation of any Additional Rent payable under the Lease with respect to the Relinquished Premises and any additional amounts due to Landlord in accordance with the terms of the Lease attributable to periods up to the Reduction Date, (c) each continue to be fully liable to the other for any breach of any obligation under this Paragraph 4(iv), and (d) each continue to be fully liable to the other for such other matters that are expressly provided in the Lease to survive any such termination and surrender.

3

5.    *Rent*.

a.    Notwithstanding anything set forth in Section 3, at all times prior to the Reduction Date, Tenant shall continue to pay Basic Rental, Tenant's Proportionate Share of Direct Costs and other amounts as set forth in the Lease as heretofore amended, with respect to the entire Current Premises.

b.    From and after the Reduction Date and continuing through the Expiration Date, Tenant shall pay Landlord monthly installments of Basic Rental for the Reduced Premises only as follows (subject to the Rent Credit, the BR Abatement Credit and the T&O Abatement Credit (as such terms are defined below), to the extent applicable):

| Month From | Month To | Rate | Monthly Base Rent | Rent Credit | BR Abatement Credit | T&O Abatement Credit | Monthly Amount After Credits | Annual Amount after Credits |
|---|---|---|---|---|---|---|---|---|
| March 2025 | February 2026 | $18.00 | $19,056.00 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $6,466.52 | $77,598.24 |
| March 2026 | February 2027 | $18.50 | $19,585.33 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $6,995.85 | $83,950.20 |
| March 2027 | February 2028 | $19.00 | $20,114.67 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $7,525.19 | $90,302.28 |
| March 2028 | February 2029 | $19.50 | $20,644.00 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $8,054.52 | $96,654.24 |
| March 2029 | February 2030 | $20.00 | $21,173.33 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $8,583.85 | $103,006.20 |
| March 2030 | February 2031 | $20.50 | $21,702.67 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $9,113.19 | $109,358.28 |
| March 2031 | January 2032 | $21.00 | $22,232.00 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $9,642.52 | $115,710.24 |

c.    To the extent applicable, the Monthly Base Rent, as set forth above, shall be subject to the following credits (collectively, the "Credits"), to the extent applicable:

(i)    Provided no Default, beyond any applicable notice and cure period, is then occurring, Tenant shall be entitled to an abatement credit (the "Rent Credit") in the amount of $175,738.39.   Tenant has elected to apply the entire Rent Credit as a credit in the amount of $2,117.33 against each monthly installment of Base Rent through the period from March 1, 2025 through January 31, 2032.

(ii)    Provided no Default, beyond any applicable notice and cure period, is then occurring, Tenant shall be entitled to an abatement credit (the "BR Abatement Credit") in the amount of $444,122.21.   Tenant has elected to apply the entire BR Abatement Credit as a credit in the amount of $5,350.87 against each monthly installment of Base Rent through the period from March 1, 2025 through January 31, 2032.

(iii)    Provided no Default, beyond any applicable notice and cure period, is then occurring, Tenant shall be entitled to an abatement credit (the "T&O Abatement Credit") in the amount of $425,066.24.   Tenant has elected to apply the

4

entire T&O Abatement Credit as a credit in the amount of $5,121.28 against each monthly installment of Base Rent through the period from March 1, 2025 through January 31, 2032.

If a Default by Tenant beyond any applicable notice and cure period, shall occur under the Lease Tenant's right to each of the Credits shall immediately terminate, and, if as a result of such Default, Landlord either terminates this Lease or terminates Tenant's right to possess the Premises, then in addition to any other rights and remedies of Landlord under the Lease, as hereby amended, or otherwise available at law or in equity, Tenant shall pay to Landlord the unamortized portion of the aggregate sum of the Credits previously applied to rent due under the Lease (as such amounts are amortized on a straight-line basis over the Extension Term at an eight percent (8%) annual rate).

d.     Landlord has provided Tenant with all reconciliation statements for Expenses and Taxes due under the Lease for all calendar years prior to 2025 ("Prior CAM Charges") and Landlord agrees that Tenant has paid all its share of such Prior CAM Charges and Tenant shall have no further liability for Prior CAM Charges or any Expenses or Taxes for periods prior to the Effective Date.

e.     Tenant shall remain responsible through the extended Term for Tenant's Pro Rata Share of the total amount of Expenses and Taxes accruing from and after the Effective Date, all in accordance with the terms of the Lease; provided, however, from and after the Effective Date, Tenant's Pro Rata Share shall be deemed to be 5.68%.

6.     *Landlord's Work.*

(a)     No promise of Landlord to alter, remodel, repair or improve the Reduced Premises or the Building and no representations respecting the condition of the Reduced Premises or the Building have been made by Landlord to Tenant, except for Landlord's ongoing maintenance, repair and replacement obligations as expressly set forth in the Lease; provided, however, subject to force majeure or delays caused by Tenant, within one hundred twenty (120) days after the Reduction Date, Landlord shall, at Landlord's sole expense and in accordance with all applicable laws, perform the following work (collectively, the "Landlord's Work"):

(i)     Install a demising wall to demise the Reduced Premises consistent with a space plan reasonably approved by Landlord and Tenant, and make all required ceiling, carpeting, painting and lighting alterations/repairs associated therewith;

(ii)     Separate the building systems in the Relinquished Premises  from those in the Reduced Premises, including but not limited to, the sprinkler, HVAC and electrical systems, as needed;

(iii)     Modify the electrical meter for the Reduced Premises to exclude the Relinquished Premises;

5

(iv)    Create new corridors on the eighth (8th) floor of the Building to make such floor reasonably function as a multi-tenant floor consistent with Building standards;

(v)    Extend the existing hallway on the eighth (8th) floor of the Building to provide access from the Premises (and the IT room included in the Premises) to such hallway; and

(vi)    Provide turn-key construction for a new break area within the Reduced Premises in a location consistent with Exhibit B attached here, solely consisting of a sink, countertop, area for a refrigerator with water hookup, lower and upper cabinets, all consistent with Building-standard finishes (the "Break Room Work") on the following terms:

        (a)    Landlord shall cause to be prepared architectural, mechanical and engineering plans, including all dimensions and specifications for the Break Room Work ("Plans").

        (b)    Tenant shall cooperate as necessary in connection with the preparation of the Plans, in a complete and timely manner, and without limiting the foregoing, shall provide to Landlord all information as shall be required by Landlord's engineers to prepare the Plans.

        (c)    The Plans shall be delivered to Tenant for its review and consideration.  Tenant shall inform Landlord of any required changes as soon as possible, but in no event later than five (5) business days following Tenant's receipt of the Plans.  Any change or modification of such Plans shall not be valid or binding unless consented to by Landlord in writing.

Except for the Landlord's Work, Tenant acknowledges that it accepts and retains possession of the Reduced Premises in "as-is" condition, and that Landlord has no obligations with respect to the condition thereof other than Landlord's obligation to maintain the Building in accordance with the Lease.

(b)    Tenant agrees and acknowledges that Landlord shall have access to the Premises, including, without limitation, the Reduced Premises and the Relinquished Premises, as necessary for the purpose of completing the Landlord's Work. Tenant shall not be entitled to any compensation for any inconvenience or interference with Tenant's business, nor to any abatement or reduction in Base Rent or other amounts due under the Lease, nor shall Tenant's obligations under the Lease, as hereby amended, be otherwise affected as a result of Landlord's completion of the Landlord's Work. Tenant agrees to reasonably cooperate with Landlord and accommodate Landlord in its efforts to complete the Landlord's Work, including, without limitation, moving workstations, cubicles, shelving and other items as necessary, and Tenant acknowledges that from time to time there may be disruptions to Tenant's business operations in the Reduced Premises as

6

a result of final completion of Landlord's Work. Landlord agrees to use reasonable efforts to minimize such disruptions at no material additional cost to Landlord.

(c)     Tenant agrees and acknowledges that upon reasonable advance notice Landlord shall have access to the Relinquished Premises, as necessary for the purpose of showing the Relinquished Premises to other prospective tenants or users, provided, however, that such activities shall be done, so far as practicable, so as to not unreasonably interfere with the operation of Tenant's business.

7.     *Option to Renew*.  Landlord acknowledges that Tenant has one (1) additional option to renew for a period of five (5) years according to Exhibit K to the Lease.

8.     *Termination of Termination Options*.    The Termination Option, as set forth in Section 2 of Exhibit K to the Lease, is hereby terminated and deemed null and void.

9.     *Termination of Right of First Refusal.*    The Right of First Refusal, as set forth in Section 3 of Exhibit K to the Lease, is hereby terminated and deemed null and void

10.     *Security Deposit*.    Notwithstanding the provisions of the Lease that provide otherwise, as additional security for the full and prompt performance by Tenant of all Tenant's obligations under the Lease, Tenant shall upon execution of this First Amendment deliver to Landlord, and maintain with Landlord for a period through the sixtieth (60th) day after the last day of the Term (as extended), as the a security deposit (the "Security Deposit") an unconditional, irrevocable, transferable and automatically renewable standby letter of credit (the "Letter of Credit"), in the amount of One Hundred Twenty Five Thousand and 00/100ths Dollars ($125,000.00), with an expiry date at least one (1) year from the date of issuance, with provisions for an "evergreen" or automatic renewal for subsequent one (1) year periods (unless the issuer thereof notifies Landlord of its refusal to renew no less than sixty (60) days prior to any annual expiration date), issued by an issuer and upon terms and conditions and in form satisfactory to Landlord in its sole discretion, including, without limitation, a provision requiring payment by the issuer on the date of any draw request made by 11:00 a.m. local time, providing for draws to be made in the City of Chicago or by facsimile or overnight courier service and providing that no fee shall be payable by the transferor or transferee of said Letter of Credit in connection with any transfer thereof. If Tenant breaches any provision hereof, Landlord may, at its option, without limiting its remedies and without notice to Tenant, apply all or part of the Security Deposit to cure such breach and compensate Landlord for any loss or damage caused by such breach.  If, upon any transfer of the Letter of Credit, any fees or charges shall be imposed, then Tenant agrees to pay promptly such fees or charges.  Landlord shall not be required to keep the Security Deposit or any funds drawn therefrom separate from its other accounts or pay interest on the Security Deposit.  If Landlord applies any portion of the Security Deposit, Tenant, within 3 days after demand therefor, shall deposit an amendment to the Letter of Credit with Landlord in an amount sufficient to restore the Security Deposit to its original amount, and Tenant's failure to do so shall be a breach of this Lease.  In the event Landlord is furnished notice of non-renewal of the Letter of Credit furnished hereunder, Landlord shall have the right to draw down the Letter of Credit in full and retain the proceeds thereof as the Security Deposit hereunder.  In the event that the bank issuing the Letter of Credit becomes insolvent, or a receiver is appointed for the issuing bank or the issuing bank is closed for any reason, or any other action is taken by or with respect to the issuing bank which, in

Landlord's reasonable discretion, renders the issuing bank unsatisfactory, Tenant shall, within five (5) days after receipt of notice from Landlord, provide a substitute Letter of Credit to Landlord in the same amount issued by an issuer acceptable to Landlord and otherwise satisfying all requirements of this Article 33. The use, application or retention of the Security Deposit, or any part thereof, by Landlord shall not prevent Landlord from exercising any other right or remedy provided by this Lease or by law and shall not operate as a limitation on any recovery to which Landlord may be entitled.  The Security Deposit is not an advance payment of Rent or measure of damages. Any unapplied portion of the Security Deposit shall be returned to Tenant within 60 days after the latest to occur of (a) the expiration of the Term, (b) Tenant's surrender of the Premises as required hereunder, or (c) determination of the final Rent due from Tenant.  Landlord or any owner of the Building may transfer or assign the Security Deposit to any new owner of the Building or to any assignee or transferee of this Lease or may credit the Security Deposit against the purchase price of the Building and upon such transfer or credit all liability of the transferor or assignor of such security shall cease and come to an end, so long as the transferee assumes the obligation.

11.     *Guaranty*.    Landlord and Tenant acknowledge and agree that the Guaranty executed by Greencore US Holdings, LLC pursuant to Section 25.01 of the Lease is null and void.

12.     *Conference Room Use*.    For so long as Landlord elects to offer the Building's conference room as a general amenity to tenants of the Building, Tenant shall have a right to use the Building's conference room at no charge (other than out-of-pocket costs for food and beverage service, AV equipment and the like) for up to four (4) hours on up to twenty-four (24) occasions in any calendar year, all subject to Landlord's scheduling procedures and rules and subject to the availability of the conference room.

13.     *Restoration*.    Notwithstanding anything contained in the Lease, Tenant shall not be responsible for the restoration of any alteration or improvements existing in the Premises as of the Effective Date.

14.     *Notice Address*.    Section 1.12 of the Lease is hereby restated in its entirety to provide the following notice addresses:

|  |  |
|---|---|
| If to Landlord: | LOF 3333, LLC<br>c/o Bradford Allen Investment Advisors<br>300 South Wacker Drive, Suite 3500<br>Chicago, Illinois 60606<br>Attention:  Laurence B. Elbaum and Logan Sangdahl |
| With a copy to: | Fox, Swibel, Levin and Carroll, LLP<br>200 West Madison Street, Suite 3000<br>Chicago, Illinois 60606<br>Attention:  Tom Buranosky |
| If to Tenant: | MP Midco Holdings, LLC<br>ATTN:  Nick Hewitt, CFO<br>3333 Finley Rd., Suite 800<br>Downers Grove, IL 60515 |

With a copy to: CBRE

15. *Estoppel Statement*. Tenant hereby certifies and agrees that the Lease is in full force and effect, and, as of the date hereof, to the best of Tenant's knowledge, Landlord is not in default under the Lease.  Landlord hereby certifies and agrees that the Lease is in full force and effect, and, to the best of Landlord's knowledge, Tenant is not in default under the Lease, and no event has occurred which, with notice or the passage of time, or both, would ripen into Tenant's default under the Lease.

16. *Successors and Assigns*. This First Amendment shall bind and inure to the benefit of Landlord and Tenant and their respective successors and assigns.

17. *Effectiveness of Amendment*. Except as expressly provided otherwise herein, the terms and provisions of this First Amendment shall become effective as of the date set forth in the preamble of this First Amendment.  Except as herein expressly modified, all other terms and conditions of the Lease shall remain in full force and effect.  To the extent that the terms and provisions of this First Amendment conflict with the terms and provisions of the Lease, the terms and provisions of this First Amendment shall govern and control.

18. *Relationship with Brokers*.  Landlord and Tenant represent, warrant, acknowledge and agree that there are no brokers, agents or finders in connection with this First Amendment other than Bradford Allen Realty Services, acting on behalf of Landlord, and CBRE, acting on behalf of Tenant (collectively, the "Brokers").  Landlord and Tenant shall  indemnify, protect, defend and hold harmless the other party against all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including reasonable attorneys' fees) arising from any claims or demands of any broker or brokers or finders, other than the Brokers, for any commission, finder's fee, or similar compensation alleged to be owing because of the indemnifying party's dealings with any real estate broker or brokers or finders in connection with this First Amendment. Landlord shall pay all fees due to the Brokers per separate agreement.

19. *Counterparts*. This First Amendment may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. In addition, a signed counterpart of this First Amendment transmitted electronically by e-mail transmission of a ".pdf" format data file or via DocuSign (or another mutually acceptable electronic signature method) shall have the same force and effect as an original counterpart thereof signed by, or on behalf of, such party.

20. *Entire Agreement*.  This First Amendment contains the entire agreement between the parties with respect to the subject matter of this First Amendment, and supersedes all prior understandings, agreements and representations, if any, with respect to such subject matter.

21. *Authority*.  Each party executing this First Amendment hereby represents and warrants to the other that it has full authority and right to execute this First Amendment.

5199505 v3 -

IN WITNESS WHEREOF, the parties have caused this First Amendment to Lease to be executed as of the date first written above.

**LANDLORD:**

LOF 3333, LLC, an Illinois limited liability company

By:
Name: _____
Its: _____


**TENANT**:

MP Midco Holdings, LLC,
a(n) Delaware Limited Liability Company


By:_____

Name: Nick Hewitt

Its: CFO

Exhibit A
Reduced Premises



12,704 RSF

Exhibit B

Exhibit B



**12,704 RSF**

Eighth Floor Plan







Exhibit B

5199505 v3 -

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "First Amendment") is made and entered into as of the ___ day of _____, 2025, by and between LOF 3333, LLC, an Illinois limited liability company ("Landlord"),  and MP Midco Holdings, LLC, a Delaware Limited Liability Company  ("Tenant") (sometimes collectively referred to herein as the "Parties").

## RECITALS

A.      Landlord, as successor-in-interest to LSREF4 Turtle LLC ("Original Landlord"), and Tenant, as successor to both (i) Peacock Engineering Company, LLC ("Original Tenant") and (ii) Hearthside Food Solutions, LLC ("Assigning Tenant"), are parties to that certain Office Lease Agreement dated May 31, 2017, as amended by that certain Letter Agreement dated September 24, 2020 between Original Landlord and Assigning Tenant (as amended, the "Lease"), pursuant to which Tenant leases from Landlord certain premises containing approximately 24,031 rentable square feet of space in the Building (as defined herein) commonly known as Suite 800 (the "Existing Premises"), on the eighth (8th) floor of the building located at 3333 Finley Road, Downers Grove, Illinois (the "Building").

B.      Landlord has succeeded to all of the right, title and interest of Original Landlord as the "Landlord" under the Lease.

C.      Assigning Tenant is the successor in interest to Original Tenant as set forth in that certain Letter Agreement dated September 24, 2020 between Original Landlord and Assigning Tenant.

D.      On November 22, 2024, Assigning Tenant and several of its affiliates the ("Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), the proceedings which were jointly administered in In re H-Food Holdings, LLC, Case No. 24-90586 (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

E.      On March 11, 2025, the Bankruptcy Court entered an order (Bankruptcy Case Dkt. 615, the "Confirmation Order") confirming the Debtors' Third Amended Joint Chapter 11 Plan Of Reorganization Of H-Foods Holdings, LLC And Its Affiliated Debtors (Bankruptcy Case Dkt. 611, the "Bankruptcy Plan"), which Confirmation Order authorized the Debtors to assume and assign certain of the Debtors' executory contracts and unexpired leases to certain Reorganized Debtors as defined in the Bankruptcy Plan, and the confirmed Bankruptcy Plan became effective on  March 31, 2025.

F.      On March 31, 2025, Assigning Tenant did assume and assign to Tenant the Lease, pursuant to sections 365(f) and 1123(b)(2) of the Bankruptcy Code, the terms of the Bankruptcy Plan, and the terms of the Confirmation Order (the "Assumption and Assignment").

G.      Landlord and Tenant desire to amend the Lease to reduce the size of the Current Premises, extend the term of the Lease and further modify the Lease as set forth below.

## AGREEMENTS

NOW, THEREFORE, in consideration of the recitals, rent paid and to be paid to Landlord and the covenants to be performed in accordance with the terms and conditions of the Lease, as hereby amended, Landlord and Tenant do hereby agree as follows:

1.     *Recitals/Definitions.*  The recitals set forth above are hereby incorporated into and made a part of this First Amendment.  Capitalized terms used but not defined in this First Amendment shall have the same meanings ascribed to them in the Lease.

2.     *Assumption of Lease.*  Tenant represents and warrants to Landlord that as of March 1, 2025 (the "Effective Date"): (a) the Assumption and Assignment of the Lease was a valid assignment to Tenant of all of Assigning Tenant's rights, interests, and obligations under the Lease; (b) Tenant has accepted such assignment and delegation set forth above, has assumed the Lease, and agrees to pay all rent and other charges accruing under the Lease accruing from and after the Effective Date; (c) Tenant agrees to observe and perform directly to Landlord, all of the other covenants, agreements and obligations to be observed and/or performed by the "Tenant" under the Lease from and after the Effective Date; (d) the Lease remains in full force and effect with Tenant as the "Tenant" under the Lease; and (e) Tenant has inspected the Premises and knows the present condition thereof and confirms that neither Landlord nor any officer, member, employee, agent or beneficiary of Landlord has made any representation or warranty to Tenant concerning the Premises, or otherwise, expressed or implied.

3.     *Extension of Term*.  The Term of the Lease, previously scheduled to end on October 31, 2028, is hereby extended for the thirty-nine (39) month period (the "Amendment Term") beginning November 1, 2028 (the "Amendment Commencement Date") and ending January 31, 2032 (the "Amendment Termination Date").   The Amendment Term shall be deemed part of the Term of the Lease and the Amendment Termination Date shall be the last day of the Term, unless the Lease is sooner terminated in accordance with its terms.

4.     *Reduction of Premises*.  Effective as of the Effective Date, the Current Premises shall be reduced to and deemed to consist only of approximately 12,704 rentable square feet of space which shall continue to be known as Suite 800, as shown on Exhibit A attached hereto (the "Reduced Premises"), and the Premises, as defined in the Lease, shall mean only the Reduced Premises.  Tenant acknowledges that the Reduced Premises may not be separately demised from the Current Premises as of the Effective Date.  No later than the ninetieth (90th) day after the execution of this First Amendment (the "Reduction Date"), Tenant shall vacate and surrender possession of the portion of the Current Premises other than the Reduced Premises consisting of approximately 11,327 rentable square feet (the "Relinquished Premises") in its then existing condition, subject to the following:

> (i)     On or before the Reduction Date, Tenant will vacate and surrender the Relinquished Premises in a "broom clean" condition and otherwise in its then existing condition, with all of the personal property of Tenant, including, without limitation, Tenant's furniture, removed therefrom. Tenant hereby releases, on and as of the Reduction Date, all of its right, title and interest in, and in respect of, the Relinquished Premises. Tenant

covenants, agrees and represents that Tenant shall have no further right to use, occupy or have possession of the Relinquished Premises or any portion thereof from and after Reduction Date. Notwithstanding anything herein or in the Lease to the contrary, Tenant hereby acknowledges and agrees to be fully responsible and liable to Landlord and immediately reimburse Landlord for any and all damages incurred by Landlord due to any holding over by Tenant in the Relinquished Premises from and after the Reduction Date in accordance with the terms of the Lease applicable any holdover of the Premises.

(ii)     Subject to Paragraphs 4(i) above and 4(iv) below, Landlord agrees (a) to forever release and discharge Tenant from all obligations, covenants and agreements of Tenant arising under or in connection with the Relinquished Premises from and after the Effective Date including, for the avoidance of all doubt, restoration of the kitchen area, (b) not to make any demand to or sue Tenant for obligations, covenants and agreements of Tenant arising under or in connection with the Relinquished Premises from and after the Effective Date, and (c) to release Tenant from all obligations, covenants and agreements of Tenant under the Lease in connection with the full Premises accruing prior to the Effective Date.

(iii)    Subject to Paragraph 4(iv) below, with respect to the Relinquished Premises only, Tenant agrees (i) to forever release and discharge Landlord from all obligations, covenants and agreements of Landlord arising under or in connection with the Relinquished Premises from and after the Effective Date, and (ii) not to make any demand to or sue Landlord for obligations, covenants and agreements of Landlord arising under or in connection with the Relinquished Premises from and after the Effective Date.

(iv)     Notwithstanding anything to the contrary herein contained, with respect to the Relinquished Premises only, Landlord and Tenant acknowledge and agree that (a) Tenant shall continue to be fully liable to Landlord to the extent set forth in the Lease for any claim for personal injury or property damage arising from events occurring on or prior to the later of the Reduction Date or the date Tenant (and any one claiming by, through or under Tenant) actually vacates and surrenders the Relinquished Premises to Landlord in the condition required by this Section 4, (b) each of Landlord and Tenant shall continue to be fully liable to the other to the extent set forth in the Lease for any payments or refunds or credits relating to any reconciliation of any Additional Rent payable under the Lease with respect to the Relinquished Premises and any additional amounts due to Landlord in accordance with the terms of the Lease attributable to periods up to the Reduction Date, (c) each continue to be fully liable to the other for any breach of any obligation under this Paragraph 4(iv), and (d) each continue to be fully liable to the other for such other matters that are expressly provided in the Lease to survive any such termination and surrender.

3

5.    *Rent*.

a.    Notwithstanding anything set forth in Section 3, at all times prior to the Reduction Date, Tenant shall continue to pay Basic Rental, Tenant's Proportionate Share of Direct Costs and other amounts as set forth in the Lease as heretofore amended, with respect to the entire Current Premises.

b.    From and after the Reduction Date and continuing through the Expiration Date, Tenant shall pay Landlord monthly installments of Basic Rental for the Reduced Premises only as follows (subject to the Rent Credit, the BR Abatement Credit and the T&O Abatement Credit (as such terms are defined below), to the extent applicable):

| Month From | Month To | Rate | Monthly Base Rent | Rent Credit | BR Abatement Credit | T&O Abatement Credit | Monthly Amount After Credits | Annual Amount after Credits |
|---|---|---|---|---|---|---|---|---|
| March 2025 | February 2026 | $18.00 | $19,056.00 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $6,466.52 | $77,598.24 |
| March 2026 | February 2027 | $18.50 | $19,585.33 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $6,995.85 | $83,950.20 |
| March 2027 | February 2028 | $19.00 | $20,114.67 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $7,525.19 | $90,302.28 |
| March 2028 | February 2029 | $19.50 | $20,644.00 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $8,054.52 | $96,654.24 |
| March 2029 | February 2030 | $20.00 | $21,173.33 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $8,583.85 | $103,006.20 |
| March 2030 | February 2031 | $20.50 | $21,702.67 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $9,113.19 | $109,358.28 |
| March 2031 | January 2032 | $21.00 | $22,232.00 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $9,642.52 | $115,710.24 |

c.    To the extent applicable, the Monthly Base Rent, as set forth above, shall be subject to the following credits (collectively, the "Credits"), to the extent applicable:

(i)    Provided no Default, beyond any applicable notice and cure period, is then occurring, Tenant shall be entitled to an abatement credit (the "Rent Credit") in the amount of $175,738.39.  Tenant has elected to apply the entire Rent Credit as a credit in the amount of $2,117.33 against each monthly installment of Base Rent through the period from March 1, 2025 through January 31, 2032.

(ii)    Provided no Default, beyond any applicable notice and cure period, is then occurring, Tenant shall be entitled to an abatement credit (the "BR Abatement Credit") in the amount of $444,122.21.  Tenant has elected to apply the entire BR Abatement Credit as a credit in the amount of $5,350.87 against each monthly installment of Base Rent through the period from March 1, 2025 through January 31, 2032.

(iii)    Provided no Default, beyond any applicable notice and cure period, is then occurring, Tenant shall be entitled to an abatement credit (the "T&O Abatement Credit") in the amount of $425,066.24.  Tenant has elected to apply the

4

entire T&O Abatement Credit as a credit in the amount of $5,121.28 against each monthly installment of Base Rent through the period from March 1, 2025 through January 31, 2032.

If a Default by Tenant beyond any applicable notice and cure period, shall occur under the Lease Tenant's right to each of the Credits shall immediately terminate, and, if as a result of such Default, Landlord either terminates this Lease or terminates Tenant's right to possess the Premises, then in addition to any other rights and remedies of Landlord under the Lease, as hereby amended, or otherwise available at law or in equity, Tenant shall pay to Landlord the unamortized portion of the aggregate sum of the Credits previously applied to rent due under the Lease (as such amounts are amortized on a straight-line basis over the Extension Term at an eight percent (8%) annual rate).

d.      Landlord has provided Tenant with all reconciliation statements for Expenses and Taxes due under the Lease for all calendar years prior to 2025 ("Prior CAM Charges") and Landlord agrees that Tenant has paid all its share of such Prior CAM Charges and Tenant shall have no further liability for Prior CAM Charges or any Expenses or Taxes for periods prior to the Effective Date.

e.      Tenant shall remain responsible through the extended Term for Tenant's Pro Rata Share of the total amount of Expenses and Taxes accruing from and after the Effective Date, all in accordance with the terms of the Lease; provided, however, from and after the Effective Date, Tenant's Pro Rata Share shall be deemed to be 5.68%.

6.      *Landlord's Work*.

(a)      No promise of Landlord to alter, remodel, repair or improve the Reduced Premises or the Building and no representations respecting the condition of the Reduced Premises or the Building have been made by Landlord to Tenant, except for Landlord's ongoing maintenance, repair and replacement obligations as expressly set forth in the Lease; provided, however, subject to force majeure or delays caused by Tenant, within one hundred twenty (120) days after the Reduction Date, Landlord shall, at Landlord's sole expense and in accordance with all applicable laws, perform the following work (collectively, the "Landlord's Work"):

(i)      Install a demising wall to demise the Reduced Premises consistent with a space plan reasonably approved by Landlord and Tenant, and make all required ceiling, carpeting, painting and lighting alterations/repairs associated therewith;

(ii)      Separate the building systems in the Relinquished Premises  from those in the Reduced Premises, including but not limited to, the sprinkler, HVAC and electrical systems, as needed;

(iii)      Modify the electrical meter for the Reduced Premises to exclude the Relinquished Premises;

5

(iv)    Create new corridors on the eighth (8th) floor of the Building to make such floor reasonably function as a multi-tenant floor consistent with Building standards;

(v)    Extend the existing hallway on the eighth (8th) floor of the Building to provide access from the Premises (and the IT room included in the Premises) to such hallway; and

(vi)    Provide turn-key construction for a new break area within the Reduced Premises in a location consistent with Exhibit B attached here, solely consisting of a sink, countertop, area for a refrigerator with water hookup, lower and upper cabinets, all consistent with Building-standard finishes (the "Break Room Work") on the following terms:

(a)    Landlord shall cause to be prepared architectural, mechanical and engineering plans, including all dimensions and specifications for the Break Room Work ("Plans").

(b)    Tenant shall cooperate as necessary in connection with the preparation of the Plans, in a complete and timely manner, and without limiting the foregoing, shall provide to Landlord all information as shall be required by Landlord's engineers to prepare the Plans.

(c)    The Plans shall be delivered to Tenant for its review and consideration.  Tenant shall inform Landlord of any required changes as soon as possible, but in no event later than five (5) business days following Tenant's receipt of the Plans.  Any change or modification of such Plans shall not be valid or binding unless consented to by Landlord in writing.

Except for the Landlord's Work, Tenant acknowledges that it accepts and retains possession of the Reduced Premises in "as-is" condition, and that Landlord has no obligations with respect to the condition thereof other than Landlord's obligation to maintain the Building in accordance with the Lease.

(b)    Tenant agrees and acknowledges that Landlord shall have access to the Premises, including, without limitation, the Reduced Premises and the Relinquished Premises, as necessary for the purpose of completing the Landlord's Work. Tenant shall not be entitled to any compensation for any inconvenience or interference with Tenant's business, nor to any abatement or reduction in Base Rent or other amounts due under the Lease, nor shall Tenant's obligations under the Lease, as hereby amended, be otherwise affected as a result of Landlord's completion of the Landlord's Work. Tenant agrees to reasonably cooperate with Landlord and accommodate Landlord in its efforts to complete the Landlord's Work, including, without limitation, moving workstations, cubicles, shelving and other items as necessary, and Tenant acknowledges that from time to time there may be disruptions to Tenant's business operations in the Reduced Premises as

6

a result of final completion of Landlord's Work. Landlord agrees to use reasonable efforts to minimize such disruptions at no material additional cost to Landlord.

(c)    Tenant agrees and acknowledges that upon reasonable advance notice Landlord shall have access to the Relinquished Premises, as necessary for the purpose of showing the Relinquished Premises to other prospective tenants or users, provided, however, that such activities shall be done, so far as practicable, so as to not unreasonably interfere with the operation of Tenant's business.

7.    *Option to Renew*.  Landlord acknowledges that Tenant has one (1) additional option to renew for a period of five (5) years according to Exhibit K to the Lease.

8.    *Termination of Termination Options*.    The Termination Option, as set forth in Section 2 of Exhibit K to the Lease, is hereby terminated and deemed null and void.

9.    *Termination of Right of First Refusal.*    The Right of First Refusal, as set forth in Section 3 of Exhibit K to the Lease, is hereby terminated and deemed null and void

10.    *Security Deposit*.    Notwithstanding the provisions of the Lease that provide otherwise, as additional security for the full and prompt performance by Tenant of all Tenant's obligations under the Lease, Tenant shall upon execution of this First Amendment deliver to Landlord, and maintain with Landlord for a period through the sixtieth (60th) day after the last day of the Term (as extended), as the a security deposit (the "Security Deposit") an unconditional, irrevocable, transferable and automatically renewable standby letter of credit (the "Letter of Credit"), in the amount of One Hundred Twenty Five Thousand and 00/100ths Dollars ($125,000.00), with an expiry date at least one (1) year from the date of issuance, with provisions for an "evergreen" or automatic renewal for subsequent one (1) year periods (unless the issuer thereof notifies Landlord of its refusal to renew no less than sixty (60) days prior to any annual expiration date), issued by an issuer and upon terms and conditions and in form satisfactory to Landlord in its sole discretion, including, without limitation, a provision requiring payment by the issuer on the date of any draw request made by 11:00 a.m. local time, providing for draws to be made in the City of Chicago or by facsimile or overnight courier service and providing that no fee shall be payable by the transferor or transferee of said Letter of Credit in connection with any transfer thereof. If Tenant breaches any provision hereof, Landlord may, at its option, without limiting its remedies and without notice to Tenant, apply all or part of the Security Deposit to cure such breach and compensate Landlord for any loss or damage caused by such breach.  If, upon any transfer of the Letter of Credit, any fees or charges shall be imposed, then Tenant agrees to pay promptly such fees or charges.  Landlord shall not be required to keep the Security Deposit or any funds drawn therefrom separate from its other accounts or pay interest on the Security Deposit.  If Landlord applies any portion of the Security Deposit, Tenant, within 3 days after demand therefor, shall deposit an amendment to the Letter of Credit with Landlord in an amount sufficient to restore the Security Deposit to its original amount, and Tenant's failure to do so shall be a breach of this Lease.  In the event Landlord is furnished notice of non-renewal of the Letter of Credit furnished hereunder, Landlord shall have the right to draw down the Letter of Credit in full and retain the proceeds thereof as the Security Deposit hereunder.  In the event that the bank issuing the Letter of Credit becomes insolvent, or a receiver is appointed for the issuing bank or the issuing bank is closed for any reason, or any other action is taken by or with respect to the issuing bank which, in

7

Landlord's reasonable discretion, renders the issuing bank unsatisfactory, Tenant shall, within five (5) days after receipt of notice from Landlord, provide a substitute Letter of Credit to Landlord in the same amount issued by an issuer acceptable to Landlord and otherwise satisfying all requirements of this Article 33. The use, application or retention of the Security Deposit, or any part thereof, by Landlord shall not prevent Landlord from exercising any other right or remedy provided by this Lease or by law and shall not operate as a limitation on any recovery to which Landlord may be entitled. The Security Deposit is not an advance payment of Rent or measure of damages. Any unapplied portion of the Security Deposit shall be returned to Tenant within 60 days after the latest to occur of (a) the expiration of the Term, (b) Tenant's surrender of the Premises as required hereunder, or (c) determination of the final Rent due from Tenant. Landlord or any owner of the Building may transfer or assign the Security Deposit to any new owner of the Building or to any assignee or transferee of this Lease or may credit the Security Deposit against the purchase price of the Building and upon such transfer or credit all liability of the transferor or assignor of such security shall cease and come to an end, so long as the transferee assumes the obligation.

11.   *Guaranty*.   Landlord and Tenant acknowledge and agree that the Guaranty executed by Greencore US Holdings, LLC pursuant to Section 25.01 of the Lease is null and void.

12.   *Conference Room Use*.   For so long as Landlord elects to offer the Building's conference room as a general amenity to tenants of the Building, Tenant shall have a right to use the Building's conference room at no charge (other than out-of-pocket costs for food and beverage service, AV equipment and the like) for up to four (4) hours on up to twenty-four (24) occasions in any calendar year, all subject to Landlord's scheduling procedures and rules and subject to the availability of the conference room.

13.   *Restoration*.   Notwithstanding anything contained in the Lease, Tenant shall not be responsible for the restoration of any alteration or improvements existing in the Premises as of the Effective Date.

14.   *Notice Address*.   Section 1.12 of the Lease is hereby restated in its entirety to provide the following notice addresses:

| | |
|---|---|
| If to Landlord: | LOF 3333, LLC<br>c/o Bradford Allen Investment Advisors<br>300 South Wacker Drive, Suite 3500<br>Chicago, Illinois 60606<br>Attention:  Laurence B. Elbaum and Logan Sangdahl |
| With a copy to: | Fox, Swibel, Levin and Carroll, LLP<br>200 West Madison Street, Suite 3000<br>Chicago, Illinois 60606<br>Attention:  Tom Buranosky |
| If to Tenant: | MP Midco Holdings, LLC<br>ATTN:  Nick Hewitt, CFO<br>3333 Finley Rd., Suite 800<br>Downers Grove, IL 60515 |

5199505 v3 -

With a copy to:         CBRE

15.     *Estoppel Statement*. Tenant hereby certifies and agrees that the Lease is in full force and effect, and, as of the date hereof, to the best of Tenant's knowledge, Landlord is not in default under the Lease.  Landlord hereby certifies and agrees that the Lease is in full force and effect, and, to the best of Landlord's knowledge, Tenant is not in default under the Lease, and no event has occurred which, with notice or the passage of time, or both, would ripen into Tenant's default under the Lease.

16.     *Successors and Assigns*. This First Amendment shall bind and inure to the benefit of Landlord and Tenant and their respective successors and assigns.

17.     *Effectiveness of Amendment*. Except as expressly provided otherwise herein, the terms and provisions of this First Amendment shall become effective as of the date set forth in the preamble of this First Amendment.  Except as herein expressly modified, all other terms and conditions of the Lease shall remain in full force and effect.  To the extent that the terms and provisions of this First Amendment conflict with the terms and provisions of the Lease, the terms and provisions of this First Amendment shall govern and control.

18.     *Relationship with Brokers*.  Landlord and Tenant represent, warrant, acknowledge and agree that there are no brokers, agents or finders in connection with this First Amendment other than Bradford Allen Realty Services, acting on behalf of Landlord, and CBRE, acting on behalf of Tenant (collectively, the "Brokers").  Landlord and Tenant shall  indemnify, protect, defend and hold harmless the other party against all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including reasonable attorneys' fees) arising from any claims or demands of any broker or brokers or finders, other than the Brokers, for any commission, finder's fee, or similar compensation alleged to be owing because of the indemnifying party's dealings with any real estate broker or brokers or finders in connection with this First Amendment. Landlord shall pay all fees due to the Brokers per separate agreement.

19.     *Counterparts*. This First Amendment may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. In addition, a signed counterpart of this First Amendment transmitted electronically by e-mail transmission of a ".pdf" format data file or via DocuSign (or another mutually acceptable electronic signature method) shall have the same force and effect as an original counterpart thereof signed by, or on behalf of, such party.

20.     *Entire Agreement*.  This First Amendment contains the entire agreement between the parties with respect to the subject matter of this First Amendment, and supersedes all prior understandings, agreements and representations, if any, with respect to such subject matter.

21.     *Authority*.  Each party executing this First Amendment hereby represents and warrants to the other that it has full authority and right to execute this First Amendment.

5199505 v3 -

IN WITNESS WHEREOF, the parties have caused this First Amendment to Lease to be executed as of the date first written above.

**LANDLORD:**

LOF 3333, LLC, an Illinois limited liability company

By:
Name: _____
Its: _____

**TENANT**:

MP Midco Holdings, LLC,
a(n) Delaware Limited Liability Company

By:_____

Name: Nick Hewitt

Its: CFO

Exhibit A
Reduced Premises



12,704 RSF

Exhibit B

Exhibit B



Eighth Floor Plan




Exhibit B

**Bernelm, LLC d/b/a**
**Bradford Allen Realty Services**

300 South Wacker Drive, Suite 3500
Chicago, Illinois 60606
T   312.994.5700   |   F 312.994.5701
www.bradfordallen.com

April 1, 2025

Peter Adamo
CBRE, Inc.
700 Commerce Drive
Oak Brook, IL 60523

*Commission Agreement between Bradford Allen Realty Services ("Agent"), LOF 3333, LLC, an Illinois Limited Liability Company ("Landlord"), and CBRE, Inc. ("Broker") for the leasing of premises at 3333 Finley Road, Downers Grove, Illinois 60515*

Dear Peter:

This letter (this "Agreement") confirms our agreement that if each of the following conditions (the "Conditions") occur, Broker will have earned as its sole compensation a commission calculated in accordance with the terms of Schedule A attached hereto (the "Commission") to be due and payable by Landlord in accordance with the terms of this Agreement. The Conditions are:

A.  A lease amendment (the "Lease") between Landlord and Hearthside Foods, Inc. ("Tenant") for the space on the 8th floor, suite 800,(the "Premises") in the building commonly known as 3333 Finley Road (the "Building") is fully executed and unconditionally delivered by all parties (including delivery of any  guarantees or consents by, or agreements with, the holders of superior leases or superior mortgagees as may be required by the Lease); and

B.  Tenant deposits with Landlord all security required under the Lease and any rent payable upon signing the Lease; and

C.  Broker has submitted an invoice for the Commission and, following or simultaneously upon receipt of payment in full of the commission owed to Broker, hereunder, a commercially reasonable lien waiver reasonably requested  by Landlord; and

D.  Broker represents and warrants that, to the best of its knowledge, it is the sole representative of Tenant with regard to the Lease.

E.  One hundred percent (100%) of the Commission shall be due and payable within thirty (30) days after Conditions (a), (b), and (c) above are satisfied.  If each of Conditions (a), (b), and (c) above are not satisfied within one (1) year after the date of this Agreement, this Agreement  shall  automatically  terminate.

F.  No commission shall be due or payable hereunder except to the extent earned as provided  in this Agreement

G.  Broker shall not be entitled to any commission or other compensation arising out of any renewals or extensions of the Lease or any leasing of additional  space in the Building by Tenant, whether provided for in the Lease or negotiated separately therefrom  at any time, unless approved by Landlord in writing at the time of the occurrence.  Said approval shall be a newly executed brokerage commission agreement for the specific purpose of negotiating an extension of

the term of the Lease, additional space, or both.

H.  If Tenant has a right to cancel the Lease for either a portion or all of the Premises, any Commission payable hereunder shall be deemed earned and calculated only with respect to the non-cancelable portion of the term of the Lease until Tenant's right to cancel shall expire or be waived, and the balance of the Commission shall be payable to Broker following the last day on which Tenant may exercise, but has not exercised, such right to cancel. This paragraph shall not apply if the Tenant is required to pay a cancellation fee upon cancellation of the Lease which includes the unamortized portion of the Commission paid to Broker.

I.  Landlord shall have the unqualified right, in its sole discretion, to refuse to enter into the Lease for any reason whatsoever without incurring any obligation to Broker for the payment of the Commission or otherwise. Landlord shall have no obligation to resort to any legal remedy or take any other action to cause any of the Conditions to be satisfied.

J.  Broker represents that (i) it is a duly licensed real estate broker in the State of Illinois and is entitled under law to receive the Commission, (ii) it has dealt with no broker or entity other than Landlord, Tenant and Agent in connection with the Lease, (iii) to the best of its knowledge, after reasonable inquiry, it is the sole broker (other than Agent) with whom Tenant has dealt in connection with the Lease, and (iv) that Tenant has appointed and authorized Broker to be Tenant's exclusive agent with respect to the Premises or the Building. Broker agrees to indemnify, defend and hold Agent and Landlord, and their respective direct and indirect partners, principals, officers, directors, shareholders and employees (collectively, the "Indemnified Parties"), harmless from and against all liability, loss, damage and expense (including reasonable attorneys' fees and disbursements) to the extent attributable to any breach of the above representation and/or any claim for a brokerage commission, finder's fee, damages or other compensation made by any other person, firm or entity alleging to have, as a result of its action, dealt with or through Broker in connection with the Lease, provided that Broker's total liability under this indemnity shall not exceed the amount of the Commission paid or thereafter payable to Broker hereunder, plus reasonable legal fees and disbursements incurred by Landlord and the Indemnified Parties. Broker shall not settle any claim, action, or proceeding for any amounts in excess of the Commission without the Indemnified Party's prior approval.

K.  In the enforcement of its rights hereunder, except for Landlord, Broker agrees not to seek or obtain a money judgment or exercise any other right or remedy against any of the Indemnified Parties or their successors or assigns. No direct or indirect partner, shareholder or member in or of Landlord (and no officer, director, member, employee or agent of such partner, member or shareholder of Landlord) will be personally liable for the performance of Landlord's obligations under this Agreement. The rights and remedies of Broker shall be enforceable solely against Landlord. In the event of the sale of the Building prior to the due date of any portion of the Commission payable hereunder, Landlord shall be released from any further obligation to Broker for such portions of the Commission, provided the transferee of the Building assumes in writing the obligation to pay such amounts when due to Broker.

L.  Broker acknowledges that it is an independent contractor and not an agent of Landlord, and Broker has no right or authority to make any representation, enter into any agreement or create any obligation or liability upon Landlord.

M.  Any notices, consents or approvals required or permitted to be given by either party under this Agreement shall be in writing and sent by personal delivery or certified or registered mail, postage prepaid, return receipt requested, addressed as follows:

    a.  To Broker at:     CBRE, Inc., 321 N. Clark St. Chicago, IL 60654. Attn: Peter Adamo; with a copy to: CBRE, Inc. 321 N. Clark St. Chicago, IL 60654, Attn: Managing Director

    b.  To Landlord at:     300 S Wacker Dr., Suite 3500, Chicago, IL 60606

    c.  To Agent at:     300 S Wacker Dr., Suite 3500. Chicago, IL 60606

Notices shall be deemed given upon personal delivery, as indicated by affidavit, or, if mailed, on the date set forth on the return receipt. Either party may change its address for notice by giving notice thereof to the other party pursuant to this Paragraph.

N. This Agreement (i) expresses the parties' entire agreement on the matters covered herein, (ii) supersedes all prior understandings between such parties on such matters, (iii) shall be governed by Illinois law, (iv) shall be binding on such parties' lawful successors, designees and assigns, and (v) sets forth obligations and/or payments hereunder which shall not be assigned, altered, or supplemented except in a writing signed by both Landlord, Agent and Broker.

0. In the event of any controversy, claim or dispute relating to the Agreement or the breach thereof, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorneys· fees and costs of suit.

P. Broker acknowledges and agrees that the terms of any letter of intent entered into or presented by or to Landlord in connection with Tenant's leasing of space in the Property, the terms of any lease negotiated between Landlord and Tenant for space in the Property and any information regarding the Premises, the Building or the Lease (collectively the "Confidential Information") are confidential and proprietary information. Broker agrees that no Confidential Information shall be reproduced or disseminated, distributed, circulated or disclosed to, or discussed with any person (other than Tenant) by Broker, its officers, directors, employees, agents or attorneys without Landlord' s prior written consent.

Bradford Allen Realty Services represents and warrants it is the duly authorized agent for the Landlord at the Property and is empowered to bind Landlord to the terms of this Agreement. Anything to the contrary herein notwithstanding, in no event shall Bradford Allen Realty Services or any affiliate. officer, director or shareholder thereof, be liable for the payment or reimbursement therefore to Bradford Allen Realty Service by the owner of the Property or its successor in interest. Bradford Allen Realty Services represents that it has full authority to enter into this Agreement without violating anyone else's rights, or any other agreements or contractual obligations.

If you are in agreement with the above terms, please forward a signed copy of this letter to my attention.

Sincerely,

***LOF 3333, LLC, an Illinois Limited Liability Company***
**By: Bernelm, LLC d/b/a Bradford Allen Realty Services**
as its duly authorized agent

Laurance B. Elbaum
Managing Broker

**Agreed and Accepted By:**
CBRE, Inc.

By:_____ __              D a t e:_____

Its:_____ __

SCHEDULE "A"
Commission Schedule

Commission Calculations: Any Commission due and payable to Broker under this Agreement shall be calculated based on the following:

The Commission payable under this Agreement will be calculated based on $1.50 per rentable square foot of the leased Premises for each year of the Lease term beyond October 31, 2028, inclusive of any rent abatement periods, and pro-rated for partial years. No Commission will be payable for any term of the Lease beyond 15 years.

**EXHIBIT C**

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "First Amendment") is made and entered into as of the ___ day of _____, 2025, by and between LOF 3333, LLC, an Illinois limited liability company ("Landlord"),  and MP Midco Holdings, LLC, a Delaware Limited Liability Company  ("Tenant") (sometimes collectively referred to herein as the "Parties").

## RECITALS

A.      Landlord, as successor-in-interest to LSREF4 Turtle LLC ("Original Landlord"), and Tenant, as successor to both (i) Peacock Engineering Company, LLC ("Original Tenant") and (ii) Hearthside Food Solutions, LLC ("Assigning Tenant"), are parties to that certain Office Lease Agreement dated May 31, 2017, as amended by that certain Letter Agreement dated September 24, 2020 between Original Landlord and Assigning Tenant (as amended, the "Lease"), pursuant to which Tenant leases from Landlord certain premises containing approximately 24,031 rentable square feet of space in the Building (as defined herein) commonly known as Suite 800 (the "Existing Premises"), on the eighth (8th) floor of the building located at 3333 Finley Road, Downers Grove, Illinois (the "Building").

B.      Landlord has succeeded to all of the right, title and interest of Original Landlord as the "Landlord" under the Lease.

C.      Assigning Tenant is the successor in interest to Original Tenant as set forth in that certain Letter Agreement dated September 24, 2020 between Original Landlord and Assigning Tenant.

D.      On November 22, 2024, Assigning Tenant and several of its affiliates the ("Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), the proceedings which were jointly administered in In re H-Food Holdings, LLC, Case No. 24-90586 (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

E.      On March 11, 2025, the Bankruptcy Court entered an order (Bankruptcy Case Dkt. 615, the "Confirmation Order") confirming the Debtors' Third Amended Joint Chapter 11 Plan Of Reorganization Of H-Foods Holdings, LLC And Its Affiliated Debtors (Bankruptcy Case Dkt. 611, the "Bankruptcy Plan"), which Confirmation Order authorized the Debtors to assume and assign certain of the Debtors' executory contracts and unexpired leases to certain Reorganized Debtors as defined in the Bankruptcy Plan, and the confirmed Bankruptcy Plan became effective on  March 31, 2025.

F.      On March 31, 2025, Assigning Tenant did assume and assign to Tenant the Lease, pursuant to sections 365(f) and 1123(b)(2) of the Bankruptcy Code, the terms of the Bankruptcy Plan, and the terms of the Confirmation Order (the "Assumption and Assignment").

G.      Landlord and Tenant desire to amend the Lease to reduce the size of the Current Premises, extend the term of the Lease and further modify the Lease as set forth below.

### AGREEMENTS

NOW, THEREFORE, in consideration of the recitals, rent paid and to be paid to Landlord and the covenants to be performed in accordance with the terms and conditions of the Lease, as hereby amended, Landlord and Tenant do hereby agree as follows:

1. *Recitals/Definitions.* The recitals set forth above are hereby incorporated into and made a part of this First Amendment. Capitalized terms used but not defined in this First Amendment shall have the same meanings ascribed to them in the Lease.

2. *Assumption of Lease.* Tenant represents and warrants to Landlord that as of March 1, 2025 (the "Effective Date"): (a) the Assumption and Assignment of the Lease was a valid assignment to Tenant of all of Assigning Tenant's rights, interests, and obligations under the Lease; (b) Tenant has accepted such assignment and delegation set forth above, has assumed the Lease, and agrees to pay all rent and other charges accruing under the Lease accruing from and after the Effective Date; (c) Tenant agrees to observe and perform directly to Landlord, all of the other covenants, agreements and obligations to be observed and/or performed by the "Tenant" under the Lease from and after the Effective Date; (d) the Lease remains in full force and effect with Tenant as the "Tenant" under the Lease; and (e) Tenant has inspected the Premises and knows the present condition thereof and confirms that neither Landlord nor any officer, member, employee, agent or beneficiary of Landlord has made any representation or warranty to Tenant concerning the Premises, or otherwise, expressed or implied.

3. *Extension of Term.* The Term of the Lease, previously scheduled to end on October 31, 2028, is hereby extended for the thirty-nine (39) month period (the "Amendment Term") beginning November 1, 2028 (the "Amendment Commencement Date") and ending January 31, 2032 (the "Amendment Termination Date"). The Amendment Term shall be deemed part of the Term of the Lease and the Amendment Termination Date shall be the last day of the Term, unless the Lease is sooner terminated in accordance with its terms.

4. *Reduction of Premises.* Effective as of the Effective Date, the Current Premises shall be reduced to and deemed to consist only of approximately 12,704 rentable square feet of space which shall continue to be known as Suite 800, as shown on Exhibit A attached hereto (the "Reduced Premises"), and the Premises, as defined in the Lease, shall mean only the Reduced Premises. Tenant acknowledges that the Reduced Premises may not be separately demised from the Current Premises as of the Effective Date. No later than the ninetieth (90th) day after the execution of this First Amendment (the "Reduction Date"), Tenant shall vacate and surrender possession of the portion of the Current Premises other than the Reduced Premises consisting of approximately 11,327 rentable square feet (the "Relinquished Premises") in its then existing condition, subject to the following:

> (i)     On or before the Reduction Date, Tenant will vacate and surrender the Relinquished Premises in a "broom clean" condition and otherwise in its then existing condition, with all of the personal property of Tenant, including, without limitation, Tenant's furniture, removed therefrom. Tenant hereby releases, on and as of the Reduction Date, all of its right, title and interest in, and in respect of, the Relinquished Premises. Tenant

covenants, agrees and represents that Tenant shall have no further right to use, occupy or have possession of the Relinquished Premises or any portion thereof from and after Reduction Date.  Notwithstanding anything herein or in the Lease to the contrary, Tenant hereby acknowledges and agrees to be fully responsible and liable to Landlord and immediately reimburse Landlord for any and all damages incurred by Landlord due to any holding over by Tenant in the Relinquished Premises from and after the Reduction Date in accordance with the terms of the Lease applicable any holdover of the Premises.

(ii) Subject to Paragraphs 4(i) above and 4(iv) below, Landlord agrees (a) to forever release and discharge Tenant from all obligations, covenants and agreements of Tenant arising under or in connection with the Relinquished Premises from and after the Effective Date including, for the avoidance of all doubt, restoration of the kitchen area, (b) not to make any demand to or sue Tenant for obligations, covenants and agreements of Tenant arising under or in connection with the Relinquished Premises from and after the Effective Date, and (c) to release Tenant from all obligations, covenants and agreements of Tenant under the Lease in connection with the full Premises accruing prior to the Effective Date.

(iii) Subject to Paragraph 4(iv) below, with respect to the Relinquished Premises only, Tenant agrees (i) to forever release and discharge Landlord from all obligations, covenants and agreements of Landlord arising under or in connection with the Relinquished Premises from and after the Effective Date, and (ii) not to make any demand to or sue Landlord for obligations, covenants and agreements of Landlord arising under or in connection with the Relinquished Premises from and after the Effective Date.

(iv) Notwithstanding anything to the contrary herein contained, with respect to the Relinquished Premises only, Landlord and Tenant acknowledge and agree that (a) Tenant shall continue to be fully liable to Landlord to the extent set forth in the Lease for any claim for personal injury or property damage arising from events occurring on or prior to the later of the Reduction Date or the date Tenant (and any one claiming by, through or under Tenant) actually vacates and surrenders the Relinquished Premises to Landlord in the condition required by this Section 4, (b) each of Landlord and Tenant shall continue to be fully liable to the other to the extent set forth in the Lease for any payments or refunds or credits relating to any reconciliation of any Additional Rent payable under the Lease with respect to the Relinquished Premises and any additional amounts due to Landlord in accordance with the terms of the Lease attributable to periods up to the Reduction Date, (c) each continue to be fully liable to the other for any breach of any obligation under this Paragraph 4(iv), and (d) each continue to be fully liable to the other for such other matters that are expressly provided in the Lease to survive any such termination and surrender.

5.    *Rent*.

a.    Notwithstanding anything set forth in Section 3, at all times prior to the Reduction Date, Tenant shall continue to pay Basic Rental, Tenant's Proportionate Share of Direct Costs and other amounts as set forth in the Lease as heretofore amended, with respect to the entire Current Premises.

b.    From and after the Reduction Date and continuing through the Expiration Date, Tenant shall pay Landlord monthly installments of Basic Rental for the Reduced Premises only as follows (subject to the Rent Credit, the BR Abatement Credit and the T&O Abatement Credit (as such terms are defined below), to the extent applicable):

| Month From | Month To | Rate | Monthly Base Rent | Rent Credit | BR Abatement Credit | T&O Abatement Credit | Monthly Amount After Credits | Annual Amount after Credits |
|---|---|---|---|---|---|---|---|---|
| March 2025 | February 2026 | $18.00 | $19,056.00 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $6,466.52 | $77,598.24 |
| March 2026 | February 2027 | $18.50 | $19,585.33 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $6,995.85 | $83,950.20 |
| March 2027 | February 2028 | $19.00 | $20,114.67 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $7,525.19 | $90,302.28 |
| March 2028 | February 2029 | $19.50 | $20,644.00 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $8,054.52 | $96,654.24 |
| March 2029 | February 2030 | $20.00 | $21,173.33 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $8,583.85 | $103,006.20 |
| March 2030 | February 2031 | $20.50 | $21,702.67 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $9,113.19 | $109,358.28 |
| March 2031 | January 2032 | $21.00 | $22,232.00 | $(2,117.33) | $(5,350.87) | $(5,121.28) | $9,642.52 | $115,710.24 |

c.    To the extent applicable, the Monthly Base Rent, as set forth above, shall be subject to the following credits (collectively, the "Credits"), to the extent applicable:

(i)    Provided no Default, beyond any applicable notice and cure period, is then occurring, Tenant shall be entitled to an abatement credit (the "Rent Credit") in the amount of $175,738.39.  Tenant has elected to apply the entire Rent Credit as a credit in the amount of $2,117.33 against each monthly installment of Base Rent through the period from March 1, 2025 through January 31, 2032.

(ii)    Provided no Default, beyond any applicable notice and cure period, is then occurring, Tenant shall be entitled to an abatement credit (the "BR Abatement Credit") in the amount of $444,122.21.  Tenant has elected to apply the entire BR Abatement Credit as a credit in the amount of $5,350.87 against each monthly installment of Base Rent through the period from March 1, 2025 through January 31, 2032.

(iii)    Provided no Default, beyond any applicable notice and cure period, is then occurring, Tenant shall be entitled to an abatement credit (the "T&O Abatement Credit") in the amount of $425,066.24.  Tenant has elected to apply the

4

entire T&O Abatement Credit as a credit in the amount of $5,121.28 against each monthly installment of Base Rent through the period from March 1, 2025 through January 31, 2032.

If a Default by Tenant beyond any applicable notice and cure period, shall occur under the Lease Tenant's right to each of the Credits shall immediately terminate, and, if as a result of such Default, Landlord either terminates this Lease or terminates Tenant's right to possess the Premises, then in addition to any other rights and remedies of Landlord under the Lease, as hereby amended, or otherwise available at law or in equity, Tenant shall pay to Landlord the unamortized portion of the aggregate sum of the Credits previously applied to rent due under the Lease (as such amounts are amortized on a straight-line basis over the Extension Term at an eight percent (8%) annual rate).

d.      Landlord has provided Tenant with all reconciliation statements for Expenses and Taxes due under the Lease for all calendar years prior to 2025 ("Prior CAM Charges") and Landlord agrees that Tenant has paid all its share of such Prior CAM Charges and Tenant shall have no further liability for Prior CAM Charges or any Expenses or Taxes for periods prior to the Effective Date.

e.      Tenant shall remain responsible through the extended Term for Tenant's Pro Rata Share of the total amount of Expenses and Taxes accruing from and after the Effective Date, all in accordance with the terms of the Lease; provided, however, from and after the Effective Date, Tenant's Pro Rata Share shall be deemed to be 5.68%.

6.      *Landlord's Work*.

(a)      No promise of Landlord to alter, remodel, repair or improve the Reduced Premises or the Building and no representations respecting the condition of the Reduced Premises or the Building have been made by Landlord to Tenant, except for Landlord's ongoing maintenance, repair and replacement obligations as expressly set forth in the Lease; provided, however, subject to force majeure or delays caused by Tenant, within one hundred twenty (120) days after the Reduction Date, Landlord shall, at Landlord's sole expense and in accordance with all applicable laws, perform the following work (collectively, the "Landlord's Work"):

(i)      Install a demising wall to demise the Reduced Premises consistent with a space plan reasonably approved by Landlord and Tenant, and make all required ceiling, carpeting, painting and lighting alterations/repairs associated therewith;

(ii)      Separate the building systems in the Relinquished Premises  from those in the Reduced Premises, including but not limited to, the sprinkler, HVAC and electrical systems, as needed;

(iii)      Modify the electrical meter for the Reduced Premises to exclude the Relinquished Premises;

5

(iv)     Create new corridors on the eighth (8th) floor of the Building to make such floor reasonably function as a multi-tenant floor consistent with Building standards;

(v)     Extend the existing hallway on the eighth (8th) floor of the Building to provide access from the Premises (and the IT room included in the Premises) to such hallway; and

(vi)     Provide turn-key construction for a new break area within the Reduced Premises in a location consistent with Exhibit B attached here, solely consisting of a sink, countertop, area for a refrigerator with water hookup, lower and upper cabinets, all consistent with Building-standard finishes (the "Break Room Work") on the following terms:

        (a)     Landlord shall cause to be prepared architectural, mechanical and engineering plans, including all dimensions and specifications for the Break Room Work ("Plans").

        (b)     Tenant shall cooperate as necessary in connection with the preparation of the Plans, in a complete and timely manner, and without limiting the foregoing, shall provide to Landlord all information as shall be required by Landlord's engineers to prepare the Plans.

        (c)     The Plans shall be delivered to Tenant for its review and consideration.  Tenant shall inform Landlord of any required changes as soon as possible, but in no event later than five (5) business days following Tenant's receipt of the Plans.  Any change or modification of such Plans shall not be valid or binding unless consented to by Landlord in writing.

Except for the Landlord's Work, Tenant acknowledges that it accepts and retains possession of the Reduced Premises in "as-is" condition, and that Landlord has no obligations with respect to the condition thereof other than Landlord's obligation to maintain the Building in accordance with the Lease.

(b)     Tenant agrees and acknowledges that Landlord shall have access to the Premises, including, without limitation, the Reduced Premises and the Relinquished Premises, as necessary for the purpose of completing the Landlord's Work. Tenant shall not be entitled to any compensation for any inconvenience or interference with Tenant's business, nor to any abatement or reduction in Base Rent or other amounts due under the Lease, nor shall Tenant's obligations under the Lease, as hereby amended, be otherwise affected as a result of Landlord's completion of the Landlord's Work. Tenant agrees to reasonably cooperate with Landlord and accommodate Landlord in its efforts to complete the Landlord's Work, including, without limitation, moving workstations, cubicles, shelving and other items as necessary, and Tenant acknowledges that from time to time there may be disruptions to Tenant's business operations in the Reduced Premises as

6

a result of final completion of Landlord's Work. Landlord agrees to use reasonable efforts to minimize such disruptions at no material additional cost to Landlord.

(c)     Tenant agrees and acknowledges that upon reasonable advance notice Landlord shall have access to the Relinquished Premises, as necessary for the purpose of showing the Relinquished Premises to other prospective tenants or users, provided, however, that such activities shall be done, so far as practicable, so as to not unreasonably interfere with the operation of Tenant's business.

7.     *Option to Renew*.  Landlord acknowledges that Tenant has one (1) additional option to renew for a period of five (5) years according to Exhibit K to the Lease.

8.     *Termination of Termination Options*.   The Termination Option, as set forth in Section 2 of Exhibit K to the Lease, is hereby terminated and deemed null and void.

9.     *Termination of Right of First Refusal.*   The Right of First Refusal, as set forth in Section 3 of Exhibit K to the Lease, is hereby terminated and deemed null and void

10.     *Security Deposit*.   Notwithstanding the provisions of the Lease that provide otherwise, as additional security for the full and prompt performance by Tenant of all Tenant's obligations under the Lease, Tenant shall upon execution of this First Amendment deliver to Landlord, and maintain with Landlord for a period through the sixtieth (60th) day after the last day of the Term (as extended), as the a security deposit (the "Security Deposit") an unconditional, irrevocable, transferable and automatically renewable standby letter of credit (the "Letter of Credit"), in the amount of One Hundred Twenty Five Thousand and 00/100ths Dollars ($125,000.00), with an expiry date at least one (1) year from the date of issuance, with provisions for an "evergreen" or automatic renewal for subsequent one (1) year periods (unless the issuer thereof notifies Landlord of its refusal to renew no less than sixty (60) days prior to any annual expiration date), issued by an issuer and upon terms and conditions and in form satisfactory to Landlord in its sole discretion, including, without limitation, a provision requiring payment by the issuer on the date of any draw request made by 11:00 a.m. local time, providing for draws to be made in the City of Chicago or by facsimile or overnight courier service and providing that no fee shall be payable by the transferor or transferee of said Letter of Credit in connection with any transfer thereof. If Tenant breaches any provision hereof, Landlord may, at its option, without limiting its remedies and without notice to Tenant, apply all or part of the Security Deposit to cure such breach and compensate Landlord for any loss or damage caused by such breach.  If, upon any transfer of the Letter of Credit, any fees or charges shall be imposed, then Tenant agrees to pay promptly such fees or charges.  Landlord shall not be required to keep the Security Deposit or any funds drawn therefrom separate from its other accounts or pay interest on the Security Deposit.  If Landlord applies any portion of the Security Deposit, Tenant, within 3 days after demand therefor, shall deposit an amendment to the Letter of Credit with Landlord in an amount sufficient to restore the Security Deposit to its original amount, and Tenant's failure to do so shall be a breach of this Lease.  In the event Landlord is furnished notice of non-renewal of the Letter of Credit furnished hereunder, Landlord shall have the right to draw down the Letter of Credit in full and retain the proceeds thereof as the Security Deposit hereunder.  In the event that the bank issuing the Letter of Credit becomes insolvent, or a receiver is appointed for the issuing bank or the issuing bank is closed for any reason, or any other action is taken by or with respect to the issuing bank which, in

7

Landlord's reasonable discretion, renders the issuing bank unsatisfactory, Tenant shall, within five (5) days after receipt of notice from Landlord, provide a substitute Letter of Credit to Landlord in the same amount issued by an issuer acceptable to Landlord and otherwise satisfying all requirements of this Article 33. The use, application or retention of the Security Deposit, or any part thereof, by Landlord shall not prevent Landlord from exercising any other right or remedy provided by this Lease or by law and shall not operate as a limitation on any recovery to which Landlord may be entitled.  The Security Deposit is not an advance payment of Rent or measure of damages. Any unapplied portion of the Security Deposit shall be returned to Tenant within 60 days after the latest to occur of (a) the expiration of the Term, (b) Tenant's surrender of the Premises as required hereunder, or (c) determination of the final Rent due from Tenant.  Landlord or any owner of the Building may transfer or assign the Security Deposit to any new owner of the Building or to any assignee or transferee of this Lease or may credit the Security Deposit against the purchase price of the Building and upon such transfer or credit all liability of the transferor or assignor of such security shall cease and come to an end, so long as the transferee assumes the obligation.

11.   *Guaranty*.   Landlord and Tenant acknowledge and agree that the Guaranty executed by Greencore US Holdings, LLC pursuant to Section 25.01 of the Lease is null and void.

12.   *Conference Room Use*.   For so long as Landlord elects to offer the Building's conference room as a general amenity to tenants of the Building, Tenant shall have a right to use the Building's conference room at no charge (other than out-of-pocket costs for food and beverage service, AV equipment and the like) for up to four (4) hours on up to twenty-four (24) occasions in any calendar year, all subject to Landlord's scheduling procedures and rules and subject to the availability of the conference room.

13.   *Restoration*.   Notwithstanding anything contained in the Lease, Tenant shall not be responsible for the restoration of any alteration or improvements existing in the Premises as of the Effective Date.

14.   *Notice Address*.   Section 1.12 of the Lease is hereby restated in its entirety to provide the following notice addresses:

|  |  |
|---|---|
| If to Landlord: | LOF 3333, LLC<br>c/o Bradford Allen Investment Advisors<br>300 South Wacker Drive, Suite 3500<br>Chicago, Illinois 60606<br>Attention:  Laurence B. Elbaum and Logan Sangdahl |
| With a copy to: | Fox, Swibel, Levin and Carroll, LLP<br>200 West Madison Street, Suite 3000<br>Chicago, Illinois 60606<br>Attention:  Tom Buranosky |
| If to Tenant: | MP Midco Holdings, LLC<br>ATTN:  Nick Hewitt, CFO<br>3333 Finley Rd., Suite 800<br>Downers Grove, IL 60515 |

With a copy to:        CBRE

15.     *Estoppel Statement*. Tenant hereby certifies and agrees that the Lease is in full force and effect, and, as of the date hereof, to the best of Tenant's knowledge, Landlord is not in default under the Lease.  Landlord hereby certifies and agrees that the Lease is in full force and effect, and, to the best of Landlord's knowledge, Tenant is not in default under the Lease, and no event has occurred which, with notice or the passage of time, or both, would ripen into Tenant's default under the Lease.

16.     *Successors and Assigns*. This First Amendment shall bind and inure to the benefit of Landlord and Tenant and their respective successors and assigns.

17.     *Effectiveness of Amendment*. Except as expressly provided otherwise herein, the terms and provisions of this First Amendment shall become effective as of the date set forth in the preamble of this First Amendment.  Except as herein expressly modified, all other terms and conditions of the Lease shall remain in full force and effect.  To the extent that the terms and provisions of this First Amendment conflict with the terms and provisions of the Lease, the terms and provisions of this First Amendment shall govern and control.

18.     *Relationship with Brokers*.  Landlord and Tenant represent, warrant, acknowledge and agree that there are no brokers, agents or finders in connection with this First Amendment other than Bradford Allen Realty Services, acting on behalf of Landlord, and CBRE, acting on behalf of Tenant (collectively, the "Brokers").  Landlord and Tenant shall  indemnify, protect, defend and hold harmless the other party against all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including reasonable attorneys' fees) arising from any claims or demands of any broker or brokers or finders, other than the Brokers, for any commission, finder's fee, or similar compensation alleged to be owing because of the indemnifying party's dealings with any real estate broker or brokers or finders in connection with this First Amendment. Landlord shall pay all fees due to the Brokers per separate agreement.

19.     *Counterparts*. This First Amendment may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. In addition, a signed counterpart of this First Amendment transmitted electronically by e-mail transmission of a ".pdf" format data file or via DocuSign (or another mutually acceptable electronic signature method) shall have the same force and effect as an original counterpart thereof signed by, or on behalf of, such party.

20.     *Entire Agreement*.  This First Amendment contains the entire agreement between the parties with respect to the subject matter of this First Amendment, and supersedes all prior understandings, agreements and representations, if any, with respect to such subject matter.

21.     *Authority*.  Each party executing this First Amendment hereby represents and warrants to the other that it has full authority and right to execute this First Amendment.

9

IN WITNESS WHEREOF, the parties have caused this First Amendment to Lease to be executed as of the date first written above.

**LANDLORD:**

LOF 3333, LLC, an Illinois limited liability company

By:
Name: _____
Its: _____

**TENANT**:

MP Midco Holdings, LLC,
a(n) Delaware Limited Liability Company

By:_____

Name: Nick Hewitt

Its: CFO

Exhibit A
Reduced Premises



12,704 RSF

Exhibit B

Exhibit B



12,704 RSF

Eighth Floor Plan







Exhibit B

**EXHIBIT D**

| | |
|---|---|
| **From:** | Norm Murdoch |
| **To:** | Saporta, Jd @ Chicago |
| **Cc:** | Mulvihill, Matt @ Chicago Suburban; Adamo, Peter @ Chicago Suburban |
| **Subject:** | RE: Hearthside |
| **Date:** | Friday, April 04, 2025 10:51:52 AM |
| **Attachments:** | image002.png |
| | image003.png |

**External**

Received and have passed along to the asset manager.

**Norman D. Murdoch**
Managing Director
**(O)** 630 239 4082  **(C)** 847 445 9744

www.bradfordallen.com



**From:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>
**Sent:** Friday, April 4, 2025 9:23 AM
**To:** Norm Murdoch <nmurdoch@bradfordallen.com>
**Cc:** Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>; Adamo, Peter @ Chicago Suburban <Peter.Adamo@cbre.com>
**Subject:** RE: Hearthside

Hi Norm,

See the attached signed lease. We are ready to send over April Rent and the SD, but we need invoices for both. Hearthside overpaid March rent so can you please send me two invoices i) new April Rent ii) Security Deposit less March Over Payment?  Below is what we believe are the amounts for each, but please confirm with the Landlord?

- New April Rent per the attached Amendment: $21,605.45
  - We used a T&O figure of $14.30 PSF so our monthly came out to $15,138.93. Let us know if that is correct?
- Security Deposit Amount: $73,098.24
  - $125,000 minus the overpayment of March ($73,507.21 - $21,605.45 = $51,901.76), so the invoice amount for the SD should be $73,098.24
  - This $ amount depends on the new April Rent Statement

Thanks,

**JD Saporta**
Transaction Manager
CBRE | Advisory & Transaction Services | Occupier
321 N Clark St., Floor 34, Chicago, IL 60610
T +1 312 935 1405 | C +1 312 504 3654
jd.saporta@cbre.com | www.cbre.com

---

**From:** Saporta, Jd @ Chicago
**Sent:** Thursday, April 3, 2025 5:37 PM
**To:** Norm Murdoch <nmurdoch@bradfordallen.com>
**Cc:** Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>; Adamo, Peter @ Chicago
Suburban <Peter.Adamo@cbre.com>
**Subject:** FW: Hearthside

Hi Norm,

Thank you for note. We appreciate everything the Landlord is doing to accommodate Makers
Price (formally Hearthside). They are working extremely hard in setting up this company after
emerging from bankruptcy on Monday. They are not dragging their feet, but they will not be
able to post the LOC by tomorrow. They paid their full old amount of March rent, which is
about a ~$51K overage.

Makers Pride is looking forward to staying in building and having a fresh start in their new
space. They look forward to the partnership with the Landlord.

We are committed to getting the executed Amendment to you tomorrow with a minor change
giving Makers Pride 10 business days to post the LOC. The Landlord can hold onto the $51K
over payment in rent until the LOC is posted. Confirming the Landlord is OK with this, and we
can finalize this tomorrow?

Thanks,
**JD Saporta**
Transaction Manager
CBRE | Advisory & Transaction Services | Occupier
321 N Clark St., Floor 34, Chicago, IL 60610
T +1 312 935 1405 | C +1 312 504 3654
jd.saporta@cbre.com | www.cbre.com

---

**From:** Nick Hewitt <nhewitt@makerspride.com>
**Sent:** Thursday, April 3, 2025 11:17 AM
**To:** Saporta, Jd @ Chicago <Jd.Saporta@cbre.com>; Roger Harris <rharris@makerspride.com>
**Cc:** Mulvihill, Matt @ Chicago Suburban <Matt.Mulvihill@cbre.com>; Daniel Coats
<dcoats@makerspride.com>; Ryan Dorsey <rdorsey@makerspride.com>; Segerson, Kevin @ Chicago

Suburban <[Kevin.Segerson@cbre.com](mailto:Kevin.Segerson@cbre.com)>; Adamo, Peter @ Chicago Suburban
<[Peter.Adamo@cbre.com](mailto:Peter.Adamo@cbre.com)>
**Subject:** RE: Hearthside

 **External**

JD,

Given we emerged from C11 on Monday we are not in a position to set up any form of collateral
this week. We have a massive amount of administration to attend to right now. Further, we
already paid March based upon the old lease terms so the LL is already sitting on this cash.
That should be more than sufficient until we set up the LC withing a reasonable period of time.
I am happy to sign the lease with a 10 business day lead time to get things set up.

 **Nick Hewitt**
Chief Financial Officer
Phone: +1 331-758-7359
3333 Finley Rd.| Ste.800| Downers Grove, IL |60515
[www.makerspride.com](http://www.makerspride.com)

---

**From:** Saporta, Jd @ Chicago <[Jd.Saporta@cbre.com](mailto:Jd.Saporta@cbre.com)>
**Sent:** Wednesday, April 2, 2025 8:51 AM
**To:** Nick Hewitt <[nhewitt@makerspride.com](mailto:nhewitt@makerspride.com)>; Roger Harris <[rharris@makerspride.com](mailto:rharris@makerspride.com)>
**Cc:** Mulvihill, Matt @ Chicago Suburban <[Matt.Mulvihill@cbre.com](mailto:Matt.Mulvihill@cbre.com)>; Daniel Coats
<[dcoats@makerspride.com](mailto:dcoats@makerspride.com)>; Ryan Dorsey <[rdorsey@makerspride.com](mailto:rdorsey@makerspride.com)>; Segerson, Kevin @ Chicago
Suburban <[Kevin.Segerson@cbre.com](mailto:Kevin.Segerson@cbre.com)>; Adamo, Peter @ Chicago Suburban
<[Peter.Adamo@cbre.com](mailto:Peter.Adamo@cbre.com)>
**Subject:** RE: Hearthside

WARNING: The sender of this email could not be validated and may not match the person in the "From" field.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you
recognize the sender and know the content is safe.

---

Hi Nick,

Is there a draft letter we can send to them to review? The Landlord has requested that if we
cannot get a signed LOC by Friday, they would be willing to accept cash in lieu of the LOC in
the interim. We are sensing that the Landlord wants this closed out ASAP (signed amendment
and LOC/Cash), and they have mentioned moving the effective date to 4/1/2025 if we cannot

close this out by Friday.

Thanks,
**JD Saporta**
Transaction Manager
CBRE | Advisory & Transaction Services | Occupier
321 N Clark St., Floor 34, Chicago, IL 60610
T +1 312 935 1405 | C +1 312 504 3654
jd.saporta@cbre.com | www.cbre.com

and dispose of this e-mail.

Details about the personal data CBRE collects and why, as well as your data privacy rights under applicable law, are available at **CBRE – Privacy Policy.**